UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GO GLOBAL RETAIL LLC,

                            Plaintiff,

v.

DREAM ON ME INDUSTRIES, INC.,
and DREAM ON ME, INC.,

                            Defendants.

**Case No.: 1:23-cv-07987-AS**

**AMENDED COMPLAINT**

**JURY TRIAL REQUESTED**

## NATURE OF THE CASE

1.      Go Global Retail LLC ("Go Global") provides a cutting edge, industry leading brand investment platform built upon decades of industry experience, transactional expertise, and operational knowledge.

2.      Using its proprietary systems and models, Go Global has a proven track record demonstrating its ability to identify opportunities to build brand equity in the consumer products and retail sectors, frequently but not exclusively with distressed retail assets.

3.      In recent years, Go Global has successfully acquired brands which are frequently (but not exclusively) distressed retail brands, including through bankruptcy and other carve-out transactions. Examples include Modcloth, Janie and Jack, and Brums Milano.

4.      In each instance, Go Global used its proprietary financial models, expertise, and industry know-how to improve operational efficiencies, develop brand recognition in key marketplaces, improve infrastructure/systems and enhance profitability.

5.      Most recently, Go Global identified and targeted the financially distressed "buybuy BABY" ("BBBY") retail assets for possible purchase out of bankruptcy and

investigated raising debt or equity financing to acquire the assets subject to extensive due diligence.

6.      In connection with its efforts to prepare a bid for the assets of BBBY in the bankruptcy process, Go Global retained Ankura Capital Advisors LLC ("Ankura") to assist and advise with, among other things, identifying potential equity investors and sources of debt financing.

7.      On or about June 10, 2023, Go Global and Ankura engaged in discussions with the principals of the "DOM Family," of companies, which include Dream On Me Industries, Inc. and its corporate affiliate Dream On Me, Inc., (Dream On Me Industries, Inc., and Dream On Me, Inc., are hereafter referred to as "DOM") about developing a joint bid for the assets of BBBY using Go Global's proprietary technology and DOM's baby products and children's furniture manufacturing experience for a joint bid for the assets of BBBY.

8.      In connection with the potential transaction, DOM entered into a non-disclosure agreement (the "NDA") which included, among other material terms, confidentiality, and non-circumvention language.

9.      The NDA expressly forbade DOM from bidding on the assets of BBBY without the participation of Go Global (unless agreed in writing by Go Global).

10.      After DOM signed the NDA, DOM was provided access to a data room containing Go Global's proprietary forecasts, financial models, data, and other Go Global analysis concerning the details of a contemplated bid for certain assets of BBBY, which represented proprietary plans created by Go Global for the post-acquisition strategy of maximizing the value of the purchased assets by: standing up the business, reopening stores, and rebuilding the technology stack.

11.     In furtherance of the parties' contemplated joint bid, and subject to the terms of the NDA, Go Global disclosed additional information to DOM about strategic considerations for the joint operation of BBBY, should a joint bid prove successful.

12.     However, just days after receiving this valuable confidential information from Go Global, DOM breached the NDA, and committed other independent torts, by utilizing Go Global's proprietary forecasts, financial models, data, and strategic operating plans to make a separate bid for the intellectual property of BBBY without notice to, or knowledge or permission from, Go Global.

13.     On June 28, 2023, DOM was deemed the successful bidder for BBBY's intellectual property based on a bid of $15.5 million.

14.     Upon information and belief, DOM continues to utilize Go Global's proprietary forecasts, financial models, data, and strategic operating plans to maximize the value of the assets it purchased.

## THE PARTIES

15.     Go Global Retail LLC is a Delaware limited liability company.

16.     The sole member of Go Global Retail LLC is Jeffrey Streader, a resident of the State of California.

17.     Upon information and belief, Dream on Me Industries, Inc. is a New Jersey corporation with its principal place of business at 45 Veronica Avenue, Somerset, NJ 08873.

18.     Dream on Me Industries, Inc. is a designer, manufacturer, and supplier of baby products such as cribs.

19.     Upon information and belief, Dream on Me, Inc. is an affiliate of Dream on Me Industries, Inc., which is a New Jersey corporation with its principal place of business located at 45 Veronica Avenue, Somerset, NJ 08873.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

21.     This Court has supplemental jurisdiction over all other claims asserted in this action, in that the other claims relate to the original jurisdiction claim, and form part of the same case or controversy, 28 U.S.C. § 1367.

22.     Alternatively, this Court additionally has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between Plaintiff's members who are citizens of California and Defendant which is a New Jersey corporation with its principal place of business located in New Jersey, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23.     Venue is proper pursuant to the forum selection clause set forth in the Non-Disclosure Agreement underlying this dispute. "This Agreement shall be governed and construed and interpreted in accordance with the laws of the State of New York" and "the sole and exclusive jurisdiction and venue for any litigation arising out of this Agreement shall be appropriate federal or state court located in New York County, State of New York."

24.     Moreover, venue is proper because the actions giving rise to the instant dispute occurred substantially in the State of New York, County of New York.

**THE FACTS**

*Background*

25.    BBBY was a subsidiary of Bed Bath & Beyond, Inc. ("Bed Bath & Beyond") that operated retail stores and an online retail channel for selling baby products and furniture.

26.    In or around March 2023, Go Global learned that Bed Bath & Beyond planned to file for bankruptcy protection.

27.    Go Global expressed interest in investigating the acquisition of BBBY's assets and was given access to BBBY's data to conduct due diligence.

28.    From March 2023 through June 2023, Go Global used its proprietary modeling techniques to forecast the success of the BBBY brand in the event of Go Global's acquisition of the going concern and/or intellectual property assets of BBBY.

29.    In furtherance of its interest in examining the assets of BBBY, on or about May 15, 2023, Go Global retained Ankura.

30.    Ankura offers investment banking services related to mergers, acquisitions, and divestitures, as well as private placement capital raises, and has experience assisting potential bidders with structuring financing models for the acquisition of distressed assets from bankruptcy.

31.    Go Global's agreement with Ankura contemplated, among other things, the services Ankura was to provide and the compensation Go Global was to pay for the provision of those services.

32.    The agreement with Ankura also included a confidentiality provision, protecting confidential information shared by and among Go Global and Ankura during the term of the engagement.

33.     On April 23, 2023, Bed Bath & Beyond, filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United State Bankruptcy Court for the District of New Jersey (Case No. 23-133590).

34.     On April 25, 2023 (DE # 92), the Bankruptcy Court approved bidding procedures for the sale of Bed Bath & Beyond, as well as BBBY's assets.

35.     The Bankruptcy Court ordered an auction of BBBY's intellectual property assets on June 28, 2023 ("BABY IP Auction"), which would be followed by another auction with respect to all or substantially all of the assets of the BBBY brand on June 29, 2023 ("BABY Going-Concern Auction").

***Go Global is Introduced to DOM***

36.     On June 9, 2023, Christian Tempke, a managing director at global investment bank, Lazard Frères & Co. LLC ("Lazard"), emailed Go Global's managing director Christian Feuer ("Feuer") to introduce him to Milan Gandhi ("Gandhi").

37.     Gandhi is the CFO/COO of Welspun USA, Inc. ("Welspun").

38.     Welspun is a wholly-owned subsidiary of WBGL, a public corporation in India.

39.     Gandhi is responsible for Welspun's commercial operations, including finance and accounting, budgeting, warehousing and distribution, legal, commercial insurance, and credit risk review.

40.     Relevant here, Gandhi was advising DOM in connection with its interest in pursuing BBBY.

41.     In response to the introduction, Feuer proposed a Microsoft Teams meeting with Gandhi for June 10, 2023.

42.     Gandhi responded that he would be glad to connect with Feuer and added DOM owner, Mark Srour ("Srour"), and CMO/CTO, Avish Dahiya ("Dahiya"), to the email chain to coordinate their availability for a meeting.

43.     Dahiya emailed Feuer advising that Srour was not available for a call, but that he and Gandhi were available that afternoon.

44.     Dahiya further advised that the proposed NDA would be signed and returned to Go Global in advance of the meeting.

45.     At 1:48pm on June 10, 2023, Dahiya transmitted the signed NDA to Go Global and Ankura.

46.     Dahiya signed the NDA in his capacity as "CMO/CTO" of "Dream on Me, Inc. / DOM Family (DOM)," indicating clear knowledge and assent that the DOM family of companies were to be bound by the NDA.

47.     At 3:32pm on June 10, 2023, Abishek Pathania, a senior associate at Ankura, transmitted the countersigned NDA to DOM.

48.     Upon circulating the countersigned NDA to DOM, Dahiya, Gandhi and Srour were granted access to a secure, confidential data room which included: (1) all financial data related to BBBY, (2) Go Global's annotated versions of the BBBY data, (3) Go Global's proprietary forecasts, financial models, and strategic operating plans that Go Global had prepared in anticipation of making a bid for BBBY assets, and (4) important and valuable customer data which Go Global had secured at their own cost and negotiation.

49.     Upon information and belief, DOM downloaded all the documents in the data room.

50.     Upon information and belief, DOM maintains copies of all documents downloaded from the data room.

***The Non-Disclosure Agreement***

51.     The NDA contemplated that Go Global would "disclose Proprietary Information" to DOM and its affiliates (i.e., the "DOM Family").

52.     Under the terms of the NDA, Proprietary Information is defined as " information concerning [] [BBBY]…information concerning [Go Global]…and all information derived therefrom, including without limitation, trade secrets (under state law and the Defend Trade Secrets Act), know-how, summaries, notes, processes, ideas, contracts, other technical, business, financial, customer and product development plans, forecasts, strategies, customer lists and data, financial information, employee information, pricing data, sales data, intellectual property of any nature, marketing plans, website designs, internet marketing or sales practices or strategies, and records containing or otherwise reflecting such information."

53.     In exchange for access to Go Global's Proprietary Information, DOM agreed "not to initiate or maintain contact (except for those contacts made in the ordinary course of business and other than in connection with the Purpose) with any officer, director or employee or agent of [BBBY] regarding [BBBY]'s business, operations, prospects, or finances, except with the express permission of Global and then only subject to the terms of this Agreement."

54.     The NDA also included a non-circumvention obligation:

[DOM] covenants and agrees that [DOM] and its affiliates, and that [DOM] will cause its equity holders, directors, officers, managers, employees, agents, advisors or representatives **not to**, directly or indirectly, solicit, encourage, negotiate, or discuss with [BBBY], or enter into any agreement, understanding or commitment regarding, a possible transaction, sale, merger, combination, consolidation, joint venture, partnership, recapitalization, restructuring, refinancing or other disposition of all or any material part of [BBBY]  or its subsidiaries or any [] [BBBY]'s  or its subsidiaries' assets or issued or unissued capital stock other than

involving the potential transaction with [Go] Global, and only then with
knowledge and express consent of [Go] Global ("Non-Circumvention
Obligation").

 (emphasis added).

55.     The NDA further provides that the "Agreement shall be governed and construed

and interpreted in accordance with the laws of the State of New York."

56.     The parties to the NDA also agreed that "the sole and exclusive jurisdiction and

venue for any litigation arising out of this Agreement shall be appropriate federal or state court

located in New York County, State of New York."

57.     The NDA also contains a clause providing for an award of reasonable attorneys'

fees to the prevailing party in any dispute or litigation.

### *The June 10, 2023 Meeting Between Go Global and DOM*

58.     During the June 10, 2023, video conference meeting, DOM representatives

communicated to Go Global and Ankura that DOM had no intention of "going alone" into the

Section 363 bid process.

59.     DOM admitted that it lacked the necessary retail experience and dropped out of

the bidding process.

60.     DOM is a baby furniture company that sells its products to retailers like Amazon,

Burlington, Kohl's, Overstock, Home Depot, Walmart, and Wayfair.

61.     Upon information and belief, DOM did not sell its products directly to consumers.

62.     Upon information and belief, DOM did not operate any retail locations.

63.     Representatives of DOM expressed an interest in producing furniture and

managing the supply chain in connection with the operation of BBBY assets.

64.    While DOM has no experience owning or operating brick-and-mortar retail stores, Go Global is experienced in the development of brick-and-mortar retail stores post-acquisition, as well as with direct-to-consumer e-commerce.

65.    DOM also disclosed that it was too far behind in its diligence with Lazard and needed to "piggy-back" off Go Global's efforts to participate in a bid.

66.    Indeed, whether DOM was still considering a separate bid was in the forefront of the June 10 conversation.

67.    On multiple occasions, both in writing and orally, both before and after Go Global provided DOM with any of its confidential information, DOM confirmed that it was **not** pursuing an independent bid for BBBY. Go Global relied on these representations in providing DOM access to Go Global's proprietary forecasts, financial models, and strategic operating plans both (1) contained in its secured confidential data room, and (2) as expressed between the executives of each of the companies in live discussions.

68.    This was precisely why DOM was presented with the NDA prior to the initial meeting and prior to granting DOM access to Go Global's data room – if Go Global knew that DOM would ultimately pursue a separate bid for the assets of BBBY, logically, Go Global would not have shared its proprietary financial models and valuable retail industry know-how with DOM.

69.    With DOM's verbal confirmation that it was not pursuing a separate bid for BBBY and the protections of the NDA in place, Go Global engaged in discussions with DOM about a joint bid to buy the assets of BBBY.

70.     Following the June 10 video call, Gandhi emailed the Go Global and Ankura participants, stating, in part, "We look forward to further exploring ways to partner in this transaction."

71.     Representatives of DOM and Go Global also met in person to further discussions of a joint bid for BBBY, including discussions where Go Global representatives shared information concerning Go Global's proprietary forecasts, financial models, and strategic operating plans for the auction of BBBY assets.

72.     On Monday, June 12, 2023, Go Global and DOM representatives met for dinner at Mike's Bistro in Manhattan.

73.     During the meal, the parties continued their discussions in support of a joint bid and DOM's use of Go Global's proprietary forecasts, financial models, and strategic operating plans for the auction of BBBY assets shared by Go Global.

***DOM Accesses Go Global's Proprietary Financial Models, Trade Secrets and Other Confidential Information***

74.     Data logs maintained by Ankura show that Dahiya and Srour accessed Go Global's proprietary forecasts, financial models, and strategic operating plans contained in the secure data room on June 10, 2023, and June 14, 2023.

75.     Go Global began compiling the information contained in the secure data room in March 2023, before the announcement of Bed Bath and Beyond's chapter 11 filing.

76.     Go Global used reasonable protections under the circumstances to safeguard its confidential and proprietary information. These reasonable safeguards included the use of a data room, and access to the data room was provided only to those parties who had a business reason to access the data, and who were subject to a non-disclosure agreement. The data room is a

password protected platform which enables Go Global to maintain the secrecy of the documents and information contained therein.

77.     The documents and information within the secure data room contained proprietary information and confidential trade secrets generated by Go Global in connection with its efforts to consummate a transaction for the purchase of the assets of BBBY.

78.     For example, among the documents in the data room was a series of Microsoft Excel spreadsheets consisting of proprietary financial models projecting expected revenues and returns on investment over a period of five (5) years based upon Go Global's proposed valuation and investment structure.

79.     Go Global's proprietary financial models also projected sales, expenses, costs, and growth assumptions across BBBY's brick and mortar and digital channels.

80.     Unlike the raw, prior years' data provided to all potential bidders by Lazard and Alix Partners, Go Global's proprietary financial models resized the store fleet and outlined a growth strategy by channel.

81.     Moreover, Go Global's proprietary analysis contained recommendations concerning which BBBY brick and mortar retail locations should remain operational and which should be closed, based upon a time-consuming and detailed review of store-by-store performance.

82.     Go Global's projections considered deploying its modern technological ecosystem that use cloud-based services for customer acquisition, customer segmentation and customer personalization, which would allow the purchaser of the BBBY assets to compete in a dynamic retail environment.

83.    The proprietary information contained in Go Global's data room, and which Go Global provided to DOM, is not publicly known information.

84.    Go Global receives commercial advantage by maintaining the secrecy of its proprietary forecasts, financial models, data, and strategic operating plans because no other company employs the same proprietary methods, analysis, or combination of formulas.

85.    DOM did not have any of this proprietary information prior to accessing Go Global's data room or discussing a joint bid with Go Global.

86.    Go Global did not share any of the information contained in the data room until DOM had signed the NDA so that Go Global could ensure the protection of its proprietary forecasts, financial models, and strategic operating plans.

87.    The documents in the data room included other Go Global proprietary information pertaining to the contemplated transaction, including:

(a)    Gross sales projections;

(b)    Proposed distribution structures for investors;

(c)    Sales forecasts;

(d)    Status of discussions with vendors to ensure continuity during transition periods;

(e)    Target net revenues;

(f)    Go Global's view of the strengths and weaknesses of BBBY's business channels and verticals;

(g)    BBBY customer data which was extremely valuable, and which Go Global had shared with DOM related plans to protect, migrate, and further commercialize;

(g)    Transaction strategy and financing ratios; and

(h)    Identification of key BBBY personnel and plans for business development.

88.     The proprietary information shared with DOM was not raw data but, rather, a set of forward-looking projections prepared by Go Global based on:

      (a)     Historical financials;

      (b)     Analysis of beneficial retail locations;

      (c)     Projections of what merchandise to stock and whether to venture into new sectors of apparel and soft goods, such as a "store" branded line of products;

      (d)     How to best extricate BBBY from Bed Bath and Beyond infrastructure and IT systems, and projected costs of same; and

      (e)     A proprietary understanding of how to build brand equity and recognition, based upon Go Global's experience with Janie and Jack, Brums, and other similar transactions.

89.     In connection with the foregoing, Go Global obtained access to debtor Bed Bath & Beyond's data systems through BBBY to analyze and determine how to extract BBBY's infrastructure and data management systems from Bed Bath & Beyond. This included emails and conversations between Go Global's Head of Data, Thoryn Stephens, and DOM's IT team, which unveiled Go Global's valuable and confidential implementation strategies, developed over many years.

90.     Go Global also compiled information about replacing systems that would not be extracted, including recommendations of successor vendors and the like.

91.     Go Global has expended significant resources in terms of capital investment and labor to develop the proprietary forecasts, financial models, and strategic operating plans it provided to DOM.

92.     Go Global's proprietary forecasts, financial models, and strategic operating plans for the auction of BBBY assets is commercially valuable to Go Global, Go Global's competitors, and intended collaborator DOM.

93.     Following DOM's review of the financial models and other documents in the data room, Go Global and DOM exchanged emails concerning how Go Global prepared its analysis and arrived at its conclusions.

94.     Indeed, Go Global personnel had spent hundreds of hours reviewing data and refining their analysis dating back to March 2023.

95.     Thus, DOM received and accessed the product of months of work performed by Go Global personnel, which provided a roadmap for structuring a purchase of certain assets of BBBY, and its strategy for optimizing financial performance of those BBBY assets thereafter.

96.     Go Global and DOM personnel also met in-person, with the Ankura representatives working with Go Global, in furtherance of pursuing a joint bid for the BBBY assets.

97.     With the protections of the NDA in place, Go Global verbally shared additional insights with DOM regarding structuring a successful bid and turning around BBBY.

98.     Members of Go-Global's deal team, with expertise in e-commerce, technology and business strategy shared their insight with DOM.

99.     In a June 14, 2023, email exchange between Dahiya and Feuer, Feuer answered questions Dahiya posed concerning budget reconciliations, necessary technology support for BBBY's retail business and cost-cutting measures.

100.     Feuer replied, in relevant part, that Go Global reached its analysis using a proprietary technology playbook consisting of strategies Go Global deployed in connection with its other transactions.

101.    Feuer also provided Dahiya insight about how to trim certain costs – a necessary step to ensuring BBBY would operate within budget and smoothly transition the business to an eventual purchaser.

102.    On June 15, 2023, for approximately two hours, the principals of Go Global met in-person with the principals of DOM at DOM's offices, where Go Global discussed its due diligence findings, financial models, and post-acquisition strategies in detail. DOM asked many questions and Go Global addressed those questions and further detailed their strategy and outlook.

103.    Unbeknownst to Go Global, and despite DOM's obligations under the NDA, all the proprietary information disclosed by Go Global was evaluated by DOM personnel for the purposes of structuring an independent bid for the assets of BBBY, all without the participation of or compensation of Go Global.

***DOM Violates the NDA by Submitting a Bid for the Assets of BBBY***

104.    On June 28, 2023, the BABY IP Auction was held, and DOM was deemed the Successful Bidder with its bid of $15.5 million.[1]

105.    DOM submitted its independent bid in the BABY IP auction without the participation of Go Global, and also without Go Global's knowledge or consent, in violation of the Non-Circumvention Clause in the NDA.

106.    During a July 11, 2023, court hearing, the United States Bankruptcy Court for the District of New Jersey approved the sale of BBBY's intellectual property to DOM.

107.    Go Global was not a party to the bankruptcy proceedings. In the end, Go Global did not have a seat at the bidder's table nor did it submit a direct bid at the bankruptcy auction.

---

[1] By comparison, Bed Bath & Beyond's intellectual property assets (a much larger portfolio) were sold for $21 million.

108.     By bidding on BBBY's intellectual property, DOM violated the NDA through its misappropriation of Go Global's proprietary, confidential and trade secret information and its use of that information to bid for BBBY's intellectual property.

109.     The very act of bidding on BBBY's intellectual property, without the participation or express written consent of Go Global, constituted a violation of the NDA.

110.     Moreover, DOM used Go Global's proprietary confidential and trade secret information in order to prepare and ensure the success of its bid.

111.     In fact, DOM purchased eleven leases for BBBY retail locations throughout the Northeast, based on Go Global's analysis and projections for growth, for only $1,700,000.00.

112.     Without the knowledge DOM obtained from Global, DOM would have been unable to successfully bid for any of BBBY's assets. On information and belief, DOM **continues to use** Go Global's proprietary forecasts, financial models, and strategic operating plans in relation to its efforts to maximize the value of the purchased BBBY assets and data, and to operate the resulting business.

113.     Go Global's proprietary forecasts, financial models, data, and strategic operating plans related to the auction for BBBY assets are valuable trade secrets that Go Global spent months developing.

114.     DOM did not pay or otherwise compensate Go Global for DOM's use of Go Global's proprietary forecasts, financial models, data, and strategic operating plans.

115.     Go Global expends significant amounts of resources in finding, engaging, developing a target investment and thesis, and preparing related financial models and strategic operating plans, with the aim that it will earn significant fees and future financial upside upon the

closing of a transaction based on its efforts. A non-exhaustive list of those various factors include:

(a) A professional fee calculated as the amount of hours expended multiplied by an hourly rate;

(b) A compensatory success fee;

(c) Ongoing advisory fees to the surviving business;

(d) Equity in the surviving business; and

(e) Appreciation in value of the equity held in the surviving business.

116.   Indeed, Go Global even prepared a financial model that included at least some of its anticipated fees upon the successful closing of a BBBY transaction, which Go Global shared with DOM. DOM knew that Go Global expected to be compensated for its efforts, and that significant compensation for Go Global would be customary under the circumstances.

117.   DOM closed on the BBBY assets utilizing Go Global's proprietary trade secrets and valuable business know-how, all without compensating Go Global for any of its contributions.

118.   Upon information and belief, DOM continues to operate an ongoing business utilizing Go Global's proprietary trade secrets and valuable business know-how, all without compensating Go Global for any of its contributions.

## AS AND FOR A FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

119.   Go Global repeats and realleges the allegations in Paragraphs 1 to 118 as if fully set forth herein.

120.   On or about June 10, 2023, DOM executed an NDA with Go Global.

121.    In accordance with the terms of the NDA, Go Global provided DOM with access to its secure data room related to its bid for the assets of BBBY that included but was not limited to, financial models, projections, sales forecasts, information about BBBY's vendors, Go Global's analysis of BBBY's business channels and vertical, transaction strategy, BBBY personnel contacts, and business development plans.

122.    Go Global also shared its proposed bid for the purchase of BBBY's assets which analyzed relevant factors such as employee retention, stores assumed and intellectual property assets to be acquired.

123.    The NDA provides that DOM shall not "directly or indirectly, solicit, encourage, negotiate, or discuss with [BBBY], or enter into any agreement, understanding or commitment regarding, a possible transaction, sale, merger, combination, consolidation, joint venture, partnership, recapitalization, restructuring, refinancing or other disposition of all or any material part of [BBBY]" without Go Global, otherwise known as the "Non-Circumvention Obligation."

124.    DOM breached the Non-Circumvention Obligation by exclusively bidding on BBBY's intellectual property on June 28, 2023, which bid was later approved by the United States Bankruptcy Court of the District of New Jersey on July 11, 2023.

125.    DOM continues to breach the Non-Circumvention Obligation by using Go Global's proprietary forecasts, financial models, and strategic operating plans to maximize the value of the purchased BBBY assets and operate the resulting business.

126.    At no time did DOM provide Go Global with written notice of its action as was required by the NDA.

127.    DOM breached the NDA and has damaged and continues to damage Go Global.

128.    By reason of the foregoing, Go Global is entitled to damages in an amount to be determined.

## AS AND FOR A SECOND CAUSE OF ACTION
## (AWARD OF ATTORNEYS' FEES AND COSTS)

129.    Go Global repeats and realleges the allegations in Paragraphs 1 to 128 as if fully set forth herein.

130.    The June 10, 2023, NDA executed by DOM provides, "If any court of competent jurisdiction holds the non-prevailing party to be in violation, breach, or nonperformance of any of the terms of this letter agreement, then the non-prevailing party shall pay all reasonable costs of such action or suit, including reasonable attorneys' fees."

131.    DOM has breached the NDA by bidding (and ultimately purchasing) BBBY's intellectual property in violation of the Non-Circumvention Obligation set forth in the NDA.

132.    As DOM has breached the NDA, it is contractually obligated to pay Go Global's "reasonable costs… including reasonable attorneys' fees."

133.    Based on the foregoing, Go Global is entitled to damages in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
## (UNJUST ENRICHMENT)

134.    Go Global repeats and realleges the allegations in Paragraphs 1 to 133 as if fully set forth herein.

135.    Go Global provided DOM with access to its secure data room which contained proprietary, confidential information that was integral to the acquisition of some or all of BBBY's assets including, but not limited to gross sales projections; proposed distribution structures for investors; sales forecasts; status of discussions with vendors to ensure continuity

during transition periods; target net revenues; Go Global's view of the strengths and weaknesses of BBBY's business channels and verticals; transaction strategy and financing ratios; and identification of key BBBY personnel and plans for business development, as well as Go Global's proprietary systems and models for brand acquisition.

136.    DOM misled Go Global, stating it would partner with Go Global in the joint bid to acquire of BBBY's assets and that it would not go alone to acquire the assets of BBBY.

137.    Instead, DOM used the information provided by Go Global, including information found it Go Global's secure data room and in Go Global's Bid, that was provided in furtherance of the parties' proposed partnership, to develop and submit its own competing bid for BBBY's assets.

138.    DOM has been unjustly enriched at Go Global's expense because DOM acquired BBBY's assets using the proprietary information and know-how compiled and analyzed by Go Global.

139.    DOM continues to unjustly enrich itself by using Go Global's proprietary forecasts, financial models, and strategic operating plans to maximize the value of the purchased BBBY assets and operate the resulting business.

140.    DOM has not compensated Go Global and has been unjustly enriched at Go Global's expense.

141.    Based on the foregoing, Go Global is entitled to damages in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
## (CONSTRUCTIVE TRUST)

142.    Go Global repeats and realleges the allegations in Paragraphs 1 to 141 as if fully set forth herein.

143.     Go Global and DOM entered a confidential relationship, based on the sharing of proprietary information to enter a joint bid to purchase BBBY's assets.

144.     On June 10, 2023, DOM through its representatives, promised to Go Global that it would not make a bid for BBBY's assets alone and that it would partner with Go Global in Go Global's Bid to purchase BBBY's assets and intellectual property.

145.     In reliance on DOM's promise, Go Global shared proprietary information with DOM regarding a turnaround of BBBY including, but not limited to gross sales projections; proposed distribution structures for investors; sales forecasts; status of discussions with vendors to ensure continuity during transition periods; target net revenues; Go Global's view of the strengths and weaknesses of BBBY's business channels and verticals; transaction strategy and financing ratios; and identification of key BBBY personnel and plans for business development, as well as Go Global's proprietary systems and models for brand acquisition.

146.     As a result of the information obtained from Go Global, DOM crafted its own bid for BBBY's intellectual property; directly contradicting the promise it made to Go Global that it would not bid for BBBY's assets.

147.     If Go Global knew that DOM was going to bid for BBBY's assets without Go Global's participation, Go Global would not have shared its proprietary information with DOM.

148.     Thus, DOM has been unjustly enriched at Go Global's expense.

149.     DOM continues to unjustly enrich itself by using Go Global's proprietary forecasts, financial models, and strategic operating plans to maximize the value of the purchased BBBY assets and operate the resulting business.

150.     Based on the foregoing, Go Global is entitled to damages in an amount to be determined at trial.

151.    Based on the foregoing, Go Global is entitled to the imposition of a constructive trust over the assets of BBBY acquired by DOM and the revenues and profits earned in connection therewith.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 *ET SEQ.*)

152.    Go Global repeats and realleges the allegations in Paragraphs 1 to 151 as if fully set forth herein.

153.    Go Global's trade secrets include, as further described above, its proprietary forecasts, financial models, data, and strategic operating plans. All of those trade secrets relate to products or services used, sold, purchased, or transported, or intended for use, sale purchase or transport in interstate commerce across the country and throughout the world.

154.    Go Global's trade secrets, as described above, constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

155.    Go Global's trade secrets derive both actual and potential economic value from not being generally known to Go Global's competitors, and from not being readily ascertainable through proper means by Go Global competitors.

156.    DOM used Go Global's trade secrets in violation of the NDA DOM signed with Go Global, and without Go Global's express or implied consent.

157.    DOM knew or had reason to know that use of Go Global's trade secrets in violation of the NDA constituted the improper use of Go Global's trade secrets because of the circumstances outlined in the NDA giving rise to a duty to maintain secrecy or limit use.

158.    At all relevant times, Go Global has taken reasonable measures to protect the secrecy of its trade secrets that DOM misappropriated, including those referred to above.

159.   DOM's actions, as set forth above, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5) because DOM acquired Go Global's trade secrets through breach of the NDA or other improper means.

160.   DOM acquired Go Global's trade secrets through "improper means" within the meaning of 18 U.S.C. § 1839(6), and DOM had reason to know, and did know, that they acquired the trade secrets through improper means.

161.   DOM used Go Global's trade secrets without Go Global's express or implied consent, and DOM knew that they did not have Go Global's consent.

162.   DOM knew that they had contractual obligations prohibiting them from disclosing or using Go Global's trade secrets.

163.   DOM acquired and used Go Global's trade secrets with the intention and effect of causing Go Global both economic, intangible, and irreparable harm.

164.   DOM's misappropriation has proximately caused damages to Go Global, including but not limited to lost profits, goodwill, competitive advantage, and business opportunities.

165.   DOM was unjustly enriched as a further proximate cause of their misappropriation of Go Global's trade secrets by receiving the benefit of Go Global's proprietary information through their misappropriation of trade secret information, at no cost, which Go Global would charge DOM for use and access to that proprietary information.

166.   DOM continues to unjustly enrich itself by using Go Global's proprietary forecasts, financial models, and strategic operating plans to maximize the value of the purchased BBBY assets and operate the resulting business.

167.    As a direct and proximate cause of DOM's misappropriation, Go Global was damaged and irreparably harmed, and Go Global continues to be damaged and irreparably harmed.

168.    DOM's conduct in misappropriating Go Global's trade secrets was intentional, willful, wanton, reckless and malicious and warrants exemplary damages against DOM pursuant to 18 U.S.C. § 1836(b)(3)(C), and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Common Law Misappropriation)

169.    Go Global repeats and realleges the allegations in Paragraphs 1 to 168 as if fully set forth herein.

170.    Go Global's trade secrets as described above constitute trade secrets within the meaning of common law.

171.    Go Global's trade secrets that DOM misappropriated derive economic value, both actual and potential, form not being generally known to and not being readily ascertainable through proper means by Go Global's competitors, or to other persons or entities who might obtain economic value from their disclosure or use.

172.    At all relevant times, Go Global has taken the above-described reasonable measures to protect the secrecy of its trade secrets that DOM misappropriated.

173.    DOM's actions, as set forth above, constitute "misappropriation" within the meaning of the common law.

174.    DOM's misappropriation has proximately caused damages to Go Global, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities.

25

175.    DOM has been unjustly enriched as a further proximate cause of DOM's misappropriation of Go Global's trade secrets.

176.    Go Global's trade secrets are in continuous use in the operation of DOM's business.

177.    DOM misappropriated Go Global's trade secrets in breach of the NDA and through improper means.

178.    DOM's conduct in misappropriating Go Global's trade secrets was willful, fraudulent, malicious, and was done with the intent to injure and oppress Go Global and improve DOM's own economic opportunities, thereby justifying an award of punitive damages against Defendant.

179.    Go Global is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential and trade secret information by returning Go Global's confidential and trade secret files, as well as destroying all copies of Go Global's trade secret information that DOM may have created.

**WHEREFORE**, Plaintiff, Go Global respectfully requests the Court judgment as follows:

(a)    as to the First Cause of Action, damages against Defendants in an amount to be determined;

(b)    as to the Second Cause of Action, damages against Defendants in an amount to be determined;

(c)    as to the Third Cause of Action, damages against Defendants in an amount to be determined;

(d)    as to the Fourth Cause of Action,

   (i) damages against Defendants in an amount to be determined, together with,

   (ii) the establishment of a constructive trust governing the proceeds, profits and other property and intellectual property wrongfully obtained by Defendant in violation of the Non-Disclosure Agreement;

(f)      as to the Fifth Cause of Action,

(i) pursuant to 18 U.S.C. § 1836(b)(3)(A), an injunction against Defendants to prevent any actual or threatened misappropriation, including an order directing Defendants to return to Go Global (or destroy), to not disclose, and to refrain from further misappropriating, any of Go Global's proprietary, confidential or trade secret information, and an order prohibiting Defendants from further using, disclosing or misappropriating Go Global's proprietary, confidential or trade secret information;

(ii) pursuant to 18 U.S.C. § 1836(b)(3)(B), an award of damages against Defendants in an amount to be determined, including but not limited to: Go Global's damages for actual loss caused by Defendants' misappropriation, Go Global's damages for unjust enrichment (not addressed in computing damages for actual loss) caused by Defendants' misappropriation, or in lieu of damages measure by other methods, a reasonable royalty for Defendants' disclosure or use;

(iii) pursuant to 18 U.S.C. § 1836(b)(3)(C), exemplary damages multiplying or otherwise enhancing any award because of Defendants' willful, malicious, or deliberate wrongdoing described herein; and,

(iv) pursuant to 18 U.S.C. § 1836(b)(3)(D), an award of Plaintiff's reasonable attorneys' fees because of Defendants' willful, malicious, or deliberate wrongdoing described herein.

(g)      as to the Sixth Cause of Action, damages against Defendants in an amount to be determined, together with an order directing Defendants to return to Go Global (or destroy), to not disclose, and to refrain from further disclosing or misappropriating any of Go Global's proprietary, confidential or trade secret information, and an order prohibiting Defendants from further disclosing or misappropriating Go Global's proprietary, confidential or trade secret information; and

(h)      such other and further relief under law or equity as the Court may deem just and proper, including pre-judgment interests and an award of attorney fees and costs.

## DEMAND FOR JURY TRIAL

Plaintiff Go Global hereby demands a trial by jury on all issues so triable of right.

Dated:  December 22, 2023          Respectfully submitted,

**FALCON RAPPAPORT & BERKMAN LLP**
By: */s/ Moish E. Peltz, Esq.*
Moish E. Peltz, Esq.
Steven C. Berlowitz, Esq.
265 Sunrise Highway, Suite 50
Rockville Centre, NY 11570
Telephone: (516) 599-0888
mpeltz@frblaw.com; sberlowitz@frblaw.com

*Attorneys for Plaintiff Go Global Retail LLC*