**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GO GLOBAL RETAIL LLC,

                                 Plaintiff,

                -against-

DREAM ON ME INDUSTRIES, INC.,
and DREAM ON ME, INC.

                           Defendants.

1:23-cv-07987 (AS)

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION……………………………………………………………………………..1

SUMMARY OF FACTS ........................................................................................................ 1

   I.   GO GLOBAL BACKGROUND. ................................................................... 1

   II.   GO GLOBAL IS INTRODUCED TO DOM. ................................................ 3

   III.   DOM VIOLATE THE NDA ........................................................................ 5

   IV.   DOM WINS BABY BANKRUPTCY AUCTION WITHOUT GO GLOBAL. ............ 6

ARGUMENT ........................................................................................................................ 7

   I.   STANDARD OF REVIEW. .......................................................................... 7

   II.   DOM MISAPPROPRIATED GO GLOBAL'S PROPRIETARY TRADE SECRET INFORMATION...................................................................................................... 8

      A.   DOM Violated the Defend Trade Secrets Act. ............................................... 8

        i.   Go Global Created Protectable Trade Secrets. ......................................... 9

        ii.   DOM Misappropriated Plaintiff's Proprietary Information..................................... 14

          1.   DOM Improperly Acquired Go Global's Proprietary Information...................... 14

          2.   DOM Improperly Disclosed Go Global's Proprietary Information to Unauthorized Third Parties to Raise Investment Capital. ................................................................. 15

          3.   DOM Misappropriated Plaintiff's Trade Secret Information to Avoid Research and Development Costs.................................................................................. 16

4.    DOM Used Go Global's Proprietary Information to Obtain a Material Advantage Against Go Global in the Bankruptcy Auction..............................................................19

5.    Go Global is Entitled to Exemplary Damages and Attorneys' Fees Pursuant to 18 U.S.C. § 1836(b)(3)(C) & (D). ......................................................................................20

B.    DOM Misappropriated Go Global's Trade Secret Information Under New York Common Law...............................................................................................................21

III.    DOM IS LIABLE FOR BREACH OF CONTRACT....................................................21

A.    DOM Breached the NDA............................................................................................21

i.    DOM Disclosed Go Global's Proprietary Information to Raise Capital for DOM's Solo Bid. ......................................................................................................................22

ii.    DOM Used Go Global's Proprietary Information in DOM's Solo bid. ..................22

iii.    DOM Submitted and Won its Solo bid for Baby's Intellectual Property Assets and Store Leases Without Notifying Go Global or Receiving Go Global's Consent. ............23

B.    DOM's Breach of the NDA Damaged Go Global. ......................................................23

C.    Go Global is Entitled to Attorneys' Fees Pursuant to the NDA. .................................25

IV.    DOM IS LIABLE FOR UNJUST ENRICHMENT.......................................................25

CONCLUSION................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alpha Capital Aktiengesellschaft v. Advanced Viral Research Corp.*, 2003 WL 328302, at *5

    (S.D.N.Y. Feb. 11, 2003) ................................................................................. 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 7

*Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp.3d 328 (S.D.N.Y. 2023) ...................... 8,9

*Epic Systems Corp. v. Tata Consultancy Services, Ltd.*, 980 F.3d 1117 (7th Cir. 2020) ............ 24

*Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158 (S.D.N.Y. 2006) .......................... 13

*Flatiron Health, Inc. v. Carson*, 602 F. Supp. 3d 482 (S.D.N.Y. 2020) ...................................... 13

*Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219 (2d Cir. 1994) ................................... 7

*General Elec. Co. v. Macejka*, 252 A.D.2d 700 (3d. Dept. 1998) ......................................... 13, 14

*IME Watchdog, Inc. v. Gelardi*, 2024 WL 4314714, at *7 (E.D.N.Y. March 13, 2024).............. 21

*Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171 (2d Cir.

    1990) ......................................................................................................... 8

*KCG Holdings, Inc. v. Khandekar*, 2020 WL 1189302, at *5 (S.D.N.Y. March 12, 2020)........... 7

*Linkco, Inc. v. Fujitsu Ltd.*, 2002 WL 237838, at *2 (S.D.N.Y. Feb. 19, 2002) .......... 8, 10, 12, 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..................................... 7

*Next Communications, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *4 (S.D.N.Y. March 30,

    2016) ...................................................................................................... 18, 19

*North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999)........................................ 24

*North Avenue Grp. Holdings, LLC v. Lasalle Cap. Grp. II-A, L.P.*, 2020 WL 9813474, at *11

    (N.D. Ga. May 29, 2020) .............................................................................. 22

*Pretesting Company v. Arbitron Company*, 1996 WL 480899, at *3 (S.D.N.Y. Aug. 23, 1996) ..8

*Quantlab Tech., Limited (BVI) v. Kuharsky*, 696 Fed.Appx. 682 (5th Cir. 2017)............. 16, 22, 24

*Schanfield v. Sojitz Corp. of America*, 663 F. Supp.2d 305 (S.D.N.Y. 2009) .............................. 20

*Shamrock Power sales, LLC v. Scherer*, 2015 WL 5730339, at *19 (S.D.N.Y. Sept. 30, 2015)

.................................................................................................................... 7, 8, 14, 19, 20, 25

*Smithfield Ham and Products Co., Inc. v. Portion Pac, Inc.*, 905 F. Supp. 346 (E.D. Va. Nov.

1995) ................................................................................................................................. 24

*Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955 (2d Cir. 1997)

......................................................................................................................................... 9

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*, 2024 WL 1116090, at *4

(S.D.N.Y. March 13, 2024).................................................................................................. 21

*TAG 380, LLC v. ComMet 380, Inc.*, 10 N.Y.3d 507 (N.Y. 2008)................................................ 25

*TNS Media Research, LLC v. Tivo Research and Analytics, Inc.*, 629 Fed.Appx. 916 (Fed. Cir.

2015) ................................................................................................................................. 13

*Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269 (E.D.N.Y. 2002)............................ 14

*United Pool Distribution, Inc. v. Custom Courier Solutions, Inc.*, 2024 WL 3163432, at *8

(W.D.N.Y. June 25, 2024) ................................................................................................... 23

**Statutes**

18 U.S.C. § 1836(b)(3)(C)-(D) ................................................................................................ 20

18 U.S.C. § 1839(3) ................................................................................................................. 9

18 U.S.C. § 1839(5)-(6) .................................................................................................... 8, 9, 15

Fed. R. Civ. P. 56(a) ................................................................................................................ 7

Fed. R. Civ. P. 56(c) ................................................................................................................ 7

Restatement (Third), of Unfair Competition § 40 cmt. C (Am. Law. Inst. 1995) ...................... 18

Restatement of Torts § 757 .................................................................................................. 9, 24

Pursuant to Fed. R. Civ. P. 56, Local Civil Rule 56.1, and Your Honor's Individual Practices in Civil Cases, Plaintiff Go Global Retail, LLC ("Go Global" or "Plaintiff") hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment asserted against Defendants Dream On Me Industries, Inc. and Dream on Me, Inc. (together "DOM" or "Defendants"). The facts underlying this motion are fully set forth in Go Global's Rule 56.1 Statement of Facts ("SOF").

## INTRODUCTION

This case concerns DOM's egregious breach of contract and misappropriation of Go Global's trade secrets. DOM's actions reveal a calculated and deceitful strategy to exploit Go Global's proprietary information for their own gain, going so far as to secretly record private conversations, and disclose Go Global's trade secrets to unauthorized third parties to raise investment capital. There can be no dispute that DOM improperly acquired, disclosed and used Go Global's trade secret information in breach of a non-disclosure agreement. Accordingly, the Court should grant partial Summary Judgment to Go Global on the Amended Complaint.

## SUMMARY OF FACTS

### I.     GO GLOBAL BACKGROUND.

Go Global is a brand investment platform that identifies opportunities to build brand equity in consumer products and retail stores, frequently but not exclusively from distressed retail assets. SOF at ¶ 1. In or around March 2023, Go Global learned that Bed Bath & Beyond ("BedBath") planned to file for bankruptcy protection, expressed interest in the potential purchase of BedBath's bankruptcy assets, and began reviewing data in relation to the same. SOF at ¶¶ 22-23. In particular, Go Global was interested in purchasing the assets belonging to one of BedBath's subsidiaries, Buy

Buy Baby ("Baby" or "Baby Bankruptcy Assets"). SOF at ¶ 22. Baby is a retail chain that sells clothing, strollers, and other baby-related items. SOF at ¶ 18.

From March through July 2023, Go Global used its proprietary modeling techniques and experience to forecast the success of a potential purchase of the Baby Bankruptcy Assets, which included Baby's intellectual property ("Baby IP") as well as Baby's business as a going-concern. SOF at ¶¶ 23-49. In furtherance of its potential acquisition, Go Global retained Ankura Capital Advisors, LLC ("Ankura") to assist it in raising capital and structuring a bid. SOF at ¶ 57.

Go Global's team dedicated over three months and 1,700 hours to structuring a bid. SOF at ¶¶ 22-23, 51, 156. As part of its due diligence, Go Global obtained access to Baby's historical data through Lazard Freres & Co. LLC ("Lazard"), which was the banker in charge of the auction for Baby's Bankruptcy Assets ("Baby Bankruptcy Auction"), and was storing and providing access to this information to potential bidders through a secure data room ("Lazard Data Room"). SOF at ¶¶ 17, 25-26. Go Global's Christian Feuer ("Feuer") reviewed and curated this raw data to assist him in developing investment calculations, estimates related to working capital needed for inventory purchases, and other financial projections. SOF at ¶ 33-35. Feuer also used this information to project sales, expenses, costs, and growth assumptions across Baby's retail brick and mortar and digital channels. SOF at ¶ 34. Feuer's background in business resuscitation enabled him to expertly manipulate the Baby data to generate a comprehensive forward-looking projection and blueprint of how to both (i) purchase the assets Go Global was interested in, and (ii) then "stand up" the resulting retail and e-commerce business. SOF at ¶¶ 4-6, 24, 39.

Go Global's Deborah Gargiulo ("Gargiulo"), who has many years of experience as a chief financial officer for brands such as Trish McEvoy and Ralph Lauren, worked alongside Feuer to assist in developing the information and projections Go Global required to structure a bid. SOF at

¶¶ 7-8, 42-44. Specifically, Gargiulo was responsible for evaluating the Baby retail stores Go Global should purchase and operate following a successful bid. SOF at ¶¶ 7-8, 42-44.

Gargiulo and Feuer's analysis was ultimately compiled into a single Excel document, which outlined an operation and growth strategy based upon Feuer's projections, and resized the retail store fleet based upon Gargiulo's recommendations (Plaintiff's "Financial Model"). SOF at ¶ 44. Go Global's Financial Model likewise contained information on Go Global's structure for a bid in the Bankruptcy Auction as well as an analysis of the amount of capital Go Global thought necessary to operate the resulting business ("Bidding Strategy"). SOF at ¶¶ 47-48. In addition, Go Global also developed confidential and proprietary information concerning Baby's technology stack transition and migration plan, which included implementing its proprietary technology playbook and cost-cutting measures ("Technology Plan"). SOF at ¶ 49. The Technology Plan, together with Go Global's Financial Model and Bidding Strategy, constitutes Go Global's proprietary trade secret information ("Proprietary Information"). SOF at ¶ 50.

Go Global expended significant resources in terms of capital investment and labor to develop its Proprietary Information, estimated at a total value of $1,545,813. SOF at ¶¶ 51-52. To ensure that the Proprietary Information remained secret, Go Global stored it in a secure data room. SOF at ¶ 58. Moreover, because Go Global was preparing for an auction against industry competitors, Go Global made sure that the Proprietary Information was only shared with people inside of Go Global on a need-to-know basis, and when it was shared outside of Go Global it was done so under the protection of a non-disclosure agreement. SOF at ¶¶ 59-60.

## II.    GO GLOBAL IS INTRODUCED TO DOM.

On June 9, 2023, Lazard introduced Go Global to Dream on Me, Inc. and Dream on Me Industries, Inc. ("DOM" or "Defendants"). SOF at ¶ 61. DOM is a baby furniture manufacturer

that makes products such as cribs, bedrails, strollers, and walkers, and many other baby-related products. SOF at ¶ 11. DOM has no experience operating retail stores. SOF at ¶¶ 84, 88-89.

Following the introduction, Go Global and DOM agreed to meet to discuss a potential joint bid for Baby's Bankruptcy Assets in which DOM would join Go Global's capital structure as an investor, with Go Global occupying the role of General Partner. SOF at ¶¶ 62-63, 65-67. At the time, Lazard and DOM communicated to Go Global that, unlike Go Global, DOM was too far behind on its due diligence to compete in the Baby Bankruptcy Auction and had no experience purchasing or operating brick-and-mortar retail stores. SOF at ¶¶ 83-92. Indeed, when Go Global and DOM first began exploring their partnership, DOM had conducted minimal to no due diligence, developed no work-product, and had not retained the appropriate number of staff with the right expertise to assist with the project. SOF at ¶¶ 83-92. Thus, Go Global agreed to discussions with DOM, in part, because it believed DOM had no intention of bidding for Baby's business alone, and was instead searching for a passive investment opportunity. SOF at ¶ 94.

On June 10, 2023, Go Global sent DOM a non-disclosure agreement ("NDA"), which DOM signed and returned to Go Global. SOF at ¶¶ 67-69, 78. Among other things, the NDA prohibited DOM from disclosing Go Global's Proprietary Information, limited DOM's use of Go Global's Proprietary Information to the structuring of a joint partnership for Baby's Bankruptcy Assets with Go Global, and precluded DOM from placing a bid for the Baby Bankruptcy Assets without Go Global's participation, or barring that, Go Global's consent. SOF at ¶¶ 74-76.

Following receipt of the signed NDA, Ankura's Kathleen Lauster ("Lauster") then held a Zoom meeting with DOM to confirm that DOM was serious about the potential partnership and would not circumvent the NDA to submit a bid without Go Global. SOF at ¶¶ 81-82. DOM responded to Lauster that it did not have retail experience, had no intention of submitting a bid

without Go Global, and reiterated that they were too far behind on their due diligence to do so. SOF at ¶¶ 83-92. DOM would later internally concede that it was woefully unprepared and had never reviewed data and information in the Lazard Data Room concerning "HR, Legal, leases, stores, finance and budgets, [and] planning," that "[e]very other bidder [had] done more extensive work," and that DOM "[l]ack[ed] proper internal teams/professionals" and were "shooting in the dark with no internal capabilities to help." SOF at ¶¶ 145-46.

On June 10, 2023, Go Global granted DOM access to Go Global's Data Room, which contained Go Global's Proprietary Information, including its Financial Model, Bidding Strategy, and valuable third-party data not in the Lazard Data Room that Go Global had secured at its own cost. SOF at ¶¶ 93, 100. DOM accessed Go Global's Data Room and downloaded its entire contents. SOF at ¶ 98. Go Global also provided responses to DOM's questions regarding Go Global's proprietary technology transition and migration playbook. SOF at ¶¶ 134-43.

Go Global and DOM met twice in person to discuss a potential partnership on June 12, 2023, and June 15, 2023 ("June 15 Meeting"). SOF at ¶¶ 101-103. Unbeknownst to Go Global, DOM secretly recorded the June 15 Meeting. SOF at ¶¶ 105-114. This surreptitious recording included private conversations amongst the Go Global representatives. SOF at ¶ 108. While alone, Go Global discussed the new business' potential equity requirements, and the amount Go Global anticipated bidding. SOF at ¶ 111. DOM watched and listened to Go Global's discussion in real-time. SOF at ¶ 107. DOM never disclosed to Go Global that it had recorded the meeting, nor that DOM had watched a live feed of Go Global's private discussion. SOF at ¶ 106.

## III.    DOM VIOLATED THE NDA.

On June 14, 2023, DOM owner Mark Srour, disclosed Go Global's Financial Model and Bidding Strategy to Michael Tennyson ("Tennyson"), Gary Mason ("Mason"), Scott Englander

("Englander") and Joseph "Yussy" Friedland ("Friedland") to convince them to invest with DOM. SOF at ¶¶ 119-28. Englander then disclosed Go Global's Financial Model to Jacob Sod ("Sod"). SOF at ¶ 127-28. None of the aforementioned are DOM employees or agents. SOF at ¶ 121, 126, 128. Englander, Friedland and Sod all invested with DOM, contributing $2 million, $8 million, and $20 million, respectively. SOF at ¶ 129.

DOM also used Go Global's Proprietary Information to identify key data and assessed Go Global's plans to understand how Go Global was approaching both the Baby Bankruptcy Auction and "stand-up" of the resulting business. SOF at ¶¶ 130-33. Because DOM did not initially know how much Go Global anticipated bidding for the Baby Bankruptcy Assets, information concerning Go Global's bid, as well as the capital necessary to operate the stores, was useful to DOM in structuring its own winning proposal, as well as ensuring that Go Global did not win the auction. SOF at ¶¶ 95-96, 140, 144-51. DOM repeatedly referenced Go Global's Proprietary Information in internal e-mails and text messages as they developed their solo bid. SOF at ¶¶ 112, 130-33; *see also* Peltz Decl., Exhibits 22, 26, 28, 31.

## IV. DOM WINS BABY BANKRUPTCY AUCTION WITHOUT GO GLOBAL.

Despite communicating the opposite to Go Global, DOM always intended to submit a bid for Baby's Bankruptcy Assets, with or without Go Global. SOF at ¶ 157. DOM had no limit for the amount it would bid. SOF at ¶ 179. On June 28, 2023, DOM submitted a successful bid of $15.5 million for the Baby IP. SOF at ¶ 161. On July 17, 2023, DOM additionally paid $1.7 million for eleven leases of Baby's retail locations. SOF at ¶ 201. Go Global was unable to compete in the Baby Bankruptcy Auction due to DOM's use of Go Global's Proprietary Information. SOF at ¶ 198. DOM overpaid and inflated the price of Baby Bankruptcy Assets. SOF at ¶ 194. The

Bankruptcy Court approved the sale of Baby Bankruptcy Assets to DOM on July 11, 2023. SOF at ¶ 199.

Go Global filed its Complaint on November 21, 2023, and then its Amended Complaint on December 22, 2023. SOF at ¶¶ 203-204. DOM moved to dismiss the Amended Complaint on January 31, 2024; Go Global opposed on February 29, 2024; and DOM replied on March 15, 2024. SOF at ¶¶ 205-207. The Court denied DOM's Motion to Dismiss on April 26, 2024. SOF at ¶ 208.

## <u>ARGUMENT</u>

### I.    STANDARD OF REVIEW.

Summary Judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also KCG Holdings, Inc. v. Khandekar*, 2020 WL 1189302, at *5 (S.D.N.Y. Mar. 12, 2020); *Shamrock Power sales, LLC v. Scherer*, 2015 WL 5730339, at *19 (S.D.N.Y. Sept. 30, 2015). The moving party bears the burden of proving that no genuine issue of material fact exists, or that because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994); *KCG Holdings*, 2020 WL 1189302, at *5; *Shamrock*, 2015 WL 5730339, at *19.

A party opposing summary judgment cannot do so based upon mere allegations or denials but instead bears the burden of setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986); *see also Pretesting Co. v. Arbitron Co.*, 1996 WL 480899, at *3 (S.D.N.Y. Aug. 23, 1996).

## II.    DOM MISAPPROPRIATED GO GLOBAL'S PROPRIETARY TRADE SECRET INFORMATION.

### A. <u>DOM Violated the Defend Trade Secrets Act.</u>

To prevail on a claim under the Defend Trade Secrets Act ("DTSA"), "a plaintiff must prove that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp.3d 328, 384 (S.D.N.Y. 2023); *see also Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990); *Shamrock*, 2015 WL 5730339, at *25.

Under New York law, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret." *Integrated Cash*, 920 F.2d at 174; *see also Linkco, Inc. v. Fujitsu Ltd.*, 2002 WL 237838, at *2 (S.D.N.Y. Feb. 19, 2002); *Shamrock*, 2015 WL 5730339, at *25.

The DTSA defines "misappropriation" to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who," *inter alia*, "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5); *see also Better Holdco*, 666 F.Supp.3d at 389; *KCG Holdings*, 2020 WL 1189302, at *10. "Improper means" under the DTSA "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other

means." 18 U.S.C. § 1839(6); *see also KCG Holdings*, 2020 WL 1189302, at *10. The DTSA "therefore contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *Better Holdco*, 666 F. Supp. 3d at 389; *see also KCG Holdings*, 2020 WL 1189302, at *10.

i.    <u>Go Global Created Protectable Trade Secrets.</u>

Go Global's Proprietary Information, including its annotated version of Baby's financial data, proprietary forecasts, financial models, capital structure, and strategic operating plans is a trade secret under both the DTSA, as well as New York's six-factor common law test. Under the DTSA, the definition of "trade secret" includes "all forms and types of financial, business, scientific, technological, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" so long as (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value form the disclosure or use of the information." 18 U.S.C. § 1839(3); *see also* Restatement (First) of Torts § 757 cmt. b (Am. L. Inst. 1939); *Linkco*, 2002 WL 237838, at *2; *Softel, Inc. v. Dragon Med. and Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997).

"In determining whether information constitutes a trade secret, New York courts consider: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the

information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Linkco,* 2002 WL 237838 at *3; *Integrated Cash*, 920 F.2d at 173.

An analysis of the six-factor test readily establishes that Go Global's Proprietary Information warrants trade secret protection. *First,* it is undisputed that Go Global's Proprietary Information, including Go Global's Financial Model, Bidding Strategy, and Technology Plan, was not known outside of Go Global, and had not even begun to be developed until beginning in or around March 2023 for use in an auction that ultimately occurred in early July 2023. *See* SOF at ¶¶ 50, 53-54. While Lazard provided all potential bidders access to the Lazard Data Room, only Go Global had access to, among other things, the years of experience of Go Global's executive team and resulting work product, and the set of Baby data that Go Global had reviewed and curated for use in developing Go Global's Proprietary Information. *See* SOF at ¶¶ 29, 35-36, 55.

*Second*, within Go Global, access to the Proprietary Information was restricted to people who required it, including Jeff Streader, Christian Feuer, Deborah Gargiulo, Yuen Chau, and Thoryn Stephens, all of whom worked directly for Go Global on developing or utilizing the Proprietary Information so Go Global could compete in the Baby Bankruptcy Auction. *See* SOF at ¶¶ 3-10, Exhibit 41 at ¶ 22.

*Third,* Go Global took reasonable measures to guard the secrecy of its Proprietary Information to prevent it from disclosure. Go Global stored its Proprietary Information in a password protected data room administered by Ankura to ensure the information's secrecy. *See* Exhibit 1 at 26:5-27:5, 39:13-20, 52:2-12; Exhibit 2 at 56:7-10; Exhibit 9 at 23:3-7, 55:12-22. Access to the Go Global Data Room and Go Global's Proprietary Information was highly restricted. *See* SOF at ¶ 53-60. When Go Global did share its Proprietary Information outside of Go Global, as it did with potential investors or partners, it only did so under the protection of an

NDA. *See* Exhibit 1 at 32:7-12, 39:13-20, 52:2-12; Exhibit 2 at 55:17-19; Exhibit 3 at 15:24-16:4; Exhibit 4 at 31:17-22; Exhibit 9 at 30:9-31:11.

*Fourth*, the Proprietary Information was valuable to Go Global and its competitors in the Baby Bankruptcy Auction, including DOM. Go Global specifically developed its Proprietary Information to assist it in structuring a bid for Baby's Bankruptcy Assets. *See* SOF at ¶¶ 23-24, 30, 34, 56. Because Go Global's Proprietary Information contained financial projections, financial models, operational blueprints, and information concerning Go Global's bidding strategy for use in a bankruptcy auction against industry competitors, the Proprietary Information derived value from not being generally known. *See* Peltz Decl., Exhibit 41 at ¶¶ 24-25. Moreover, in the NDA, DOM was aware of and agreed that DOM derived value from Go Global's trade secrets. *See* Exhibit 18 at ¶¶ 1, 8; Exhibit 6 at 57:15-58:21, 62:19-22.

The Proprietary Information was particularly valuable to DOM because it had neither conducted due diligence nor developed its own work product or any financial projections. *See* Exhibit 31 at 1-2; *see also* Exhibit 6 at 89:11-12 (A. Dahiya: "No, we didn't have a professional model like that"). In fact, DOM openly admitted that Go Global's Proprietary Information was valuable to DOM, offered to pay for the "legwork" performed by Go Global, and furthermore conceded that DOM needed Go Global's Proprietary Information to remain competitive in the Bankruptcy Auction. *See* Exhibit 21 (June 15, 2023 Tr.) at 133:13-16 (M. Srour: "If it cost you a million dollars to do the legwork that you did right now, I'd be happy to pay for half of that, of course I'll pay it."); Exhibit 22 at 5 (A. Dahiya: "Without go global our chances reduce as we are 4 weeks behind."); *see also* Exhibit 1 at 35:12-22 (Go Global had DOM sign an NDA so that DOM "would not then learn from [Go Global] and bid around [Go Global]").

*Fifth*, Go Global devoted significant resources to developing the Proprietary Information, including its own labor and money. Go Global's experienced team ultimately expended over 1,700 hours between March and July 2023 working to develop the Proprietary Information. *See* SOF at ¶ 51. The value of Go Global's Proprietary Information, based upon capital investment and labor has been valued at approximately $1,545,813. *See* SOF at ¶ 52.

*Finally*, Go Global's Proprietary Information could not be easily duplicated or otherwise acquired by others. Go Global's Data room contained an organized set of curated data, which Go Global had painstakingly reviewed and pulled from the Lazard Data Room, and valuable third-party data Go Global had secured at its own cost. *See* SOF at ¶¶ 35, 100. DOM did not have access to Go Global's curated data, nor other of Go Global's Proprietary Information, until Go Global granted DOM access to the Go Global Data Room, and only after DOM executed an NDA. *See* Exhibit 5 at 51:3-23; Exhibit 6 at 97:12-18, 107:21-24, 108:5-8. Go Global's Proprietary Information was the result of months of work reviewing a significant amount of complicated data by sophisticated and experienced industry experts. *See* SOF at ¶¶ 4-7, 22-50; *see also* Peltz Decl., Exhibit 6 at 52:25-53:18, 82:22-83:9; Exhibit 7 at 89:22-90:10. Moreover, because Go Global's Proprietary Information includes Go Global's own analysis and projections of Baby, based upon Go Global's unique modeling and formulas (Exhibit 1 at 84:13-16), the only way to reproduce the Proprietary Information would be through improper acquisition, disclosure, copying, or use. *See Integrated Cash*, 920 F.2d at 173-74. Thus, while any of the bidders could have downloaded documents from the Lazard Data Room, Go Global's selection, curation, and analysis of that data into the resulting comprehensive and actionable financial model could not have been easily duplicated. *See* SOF at ¶¶ 35-36.

Courts in this Circuit routinely find financial forecasts, financial models, capital structures, and strategic operating plans constitute trade secret information. *See, e.g.*, *KCG Holdings*, 2020 WL 1189302, at *1 ("predictive models that are designed to forecast price movements in securities markets" and which contain "combinations of information and the mathematical formulas that forecast future prices" constitute trade secrets); *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 163-64 (S.D.N.Y. 2006) (brand strategy document that established "forward-looking plans concerning business development" and "investment" held a trade secret); *Flatiron Health, Inc. v. Carson*, 602 F. Supp. 3d 482, 485 (S.D.N.Y. 2020) (information concerning plaintiff's "business, potential business, operations or finances" constituted protectable trade secrets); *General Elec. Co. v. Macejka*, 252 A.D.2d 700, 701 (3d Dep't 1998) (pricing and profit margin information held a trade secret); *see also TNS Media Rsch., LLC v. Tivo Rsch. and Analytics, Inc.*, 629 Fed.App'x. 916, 933 (Fed. Cir. 2015) (finding plaintiff's "capital structure, income statements, financial projections, and strategic plans" could "be protectable trade secrets . . . where it is not publicly known, not readily identifiable without inside information or otherwise complex.").

In *KCG Holdings*, 2020 WL 1189302, at *1, plaintiff KCG Holdings, Inc. ("KCG"), a financial services firm, developed and relied upon predictive models to forecast price movements as part of its service offerings. On summary judgment, the Court found protectable trade secrets where KCG implemented "access restrictions" and other security measures, instructed KCG employees on how to protect sensitive information, and obtained enforceable confidentiality agreements. *See id.* at *2-3. Go Global executed similar protocols. Like KCG, Go Global restricted access to its Proprietary Information, securely stored it in a data room, and only shared the Proprietary Information under the protection of non-disclosure agreements. *See* SOF at ¶¶ 51-60.

13

Accordingly, given the undisputed circumstances, the Court can readily find that Go Global's Proprietary Information is a trade secret. *See KCG Holdings*, 2020 WL 1189302, at *1 ("predictive models that are designed to forecast price movements in securities markets" deemed trade secret); *Shamrock*, 2015 WL 5730339, at *26 (finding protectable trade secret where plaintiff devoted significant time, effort and money to creating trade secret, kept the "information in a locked building and on a password-protected computer system," and shared it with employees "only on a need-to-know basis"); *Integrated Cash*, 920 F.2d at 173-74 (finding plaintiff had protectable trade secret where information was not generally known to the public, plaintiff employed security measures, such as nondisclosure agreements, and product "could not be readily duplicated without the secret information acquired by [plaintiff] through years of research"); *see also Linkco,* 2002 WL 237838 at *2-3; *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 278-79 (E.D.N.Y. 2002); *General Elec.*, 252 A.D.2d at 701.

ii.  DOM Misappropriated Go Global's Proprietary Information.

DOM misappropriated Go Global's Proprietary Information through improper acquisition, disclosure, and use. DOM made material misrepresentations to convince Go Global to disclose its Proprietary Information to DOM. Once in hand, DOM then disclosed Go Global's Proprietary Information to unauthorized third-parties; utilized it to raise investment capital, accelerate DOM's due diligence, and develop a "Go Forward Plan"; and finally weaponized the information to ensure that DOM, not Go Global, was the winner of the Baby Bankruptcy Assets.

1.  DOM Improperly Acquired Go Global's Proprietary Information.

DOM repeatedly expressed to Go Global, orally and in writing, that it would not submit a solo bid in the lead up to Go Global granting DOM access to Go Global's Proprietary Information. SOF at ¶ 92; Exhibit 18 at ¶ 12. DOM has since unequivocally admitted that it always intended to

make a bid in the auction, with or without Go Global. SOF at ¶ 157. Go Global relied upon DOM's misrepresentations in agreeing to share Go Global's Proprietary Information. SOF at ¶ 94. Moreover, DOM's misrepresentations are material because Go Global was expressly concerned about DOM learning from and then leapfrogging Go Global in the Baby Bankruptcy Auction, which is what DOM did. SOF at ¶ 71. Thus, DOM's acquisition of Go Global's Proprietary Information, based on material misrepresentations of fact, constitutes misappropriation. *See* 18 U.S.C. § 1839(5)-(6); *KCG Holdings*, 2020 WL 1189302, at *10.

2. <u>DOM Improperly Disclosed Go Global's Proprietary Information to Unauthorized Third Parties to Raise Investment Capital.</u>

It is undisputed that on June 14, 2023, despite the direct prohibition against disclosure (NDA at ¶ 3), DOM emailed Go Global's Financial Model to Michael Tennyson ("Tennyson") and Gary Mason ("Mason") to convince them to join DOM in a potential deal related to the purchase of Baby's Bankruptcy Assets. *See* Exhibit 23; *see also* Exhibit 5 at 53:5-55:19 ("Q: And you, in this email, are forwarding the Go Global Baby, LRP model to [Michael Tennyson], is that right? A: correct"). DOM then held conversations with Tennyson and Mason concerning Go Global's Financial Model to persuade them to team-up with DOM. *See* Exhibit 5 at 56:1-6 ("Q: Did you discuss the Go Global model that you sent with him? A: I believe I did.").

DOM likewise disclosed Go Global's Financial Model and bidding strategy to Joseph "Yussy" Friedland ("Friedland") and Scott Englander ("Englander"). *See* Exhibit 25; *see also* Exhibit 5 at 65:11-17 ("Q: Do you know if you sent Scott Englander or Yussy the Go Global model? A: I believe I did. Q: You did. Did you discuss the Go Global model with them during that conversation. A: Yes."), 71:14-25 ("Q: You told Scott that you thought it was a good deal, is that right? A: Yes. Q: And to substantiate that statement, did you show Scott the Go Global model? A: Yes. Q: And what did he say when you did that? A: He liked the model. Q: He liked the Go Global

model, is that right? A: Yes."). After receiving the Go Global Model, Englander then further distributed it to others, including to Jacob Sod ("Sod"). *See* Exhibit 5 at 72:23-73:3.

Lastly, because DOM was behind in its work to structure a bid, and did not have any financial modeling or investment term sheets of its own to share, Go Global's Financial Model served as a critical stand-in. *See* Exhibit 31; Exhibit 6 at 87:7-12. After receiving and discussing Go Global's Financial Model, Englander, Friedland, and Sod all invested with DOM, contributing $2 million, $8 million, and $20 million, respectively. *See* Exhibit 5 at 66:9-16, 205:22-206:5, 206:6-9. DOM's disclosure of Go Global's Proprietary Information for this purpose contravenes the NDA, which limited DOM's use of the information to a potential joint bid with Go Global, not Englander, Friedland, or Sod. SOF at ¶ 76. DOM's misuse of the Proprietary Information to attract investment partners is thus sufficient to establish misappropriation under the DTSA. *See Quantlab Tech., Limited (BVI) v. Kuharsky*, 696 Fed.Appx. 682, 690 (5th Cir. 2017) (upholding liability where defendant used "stolen trade secrets" to help "find investors").

      3.   <u>DOM Misappropriated Go Global's Trade Secret Information to Avoid Research and Development Costs.</u>

DOM also used Go Global's Proprietary Information to learn and develop their personal knowledge to accelerate their due diligence, data review, and development of work product in relation to structuring a bid for Baby's Bankruptcy Assets. DOM freely concedes that it used Go Global's Proprietary Information as a lodestar as DOM attempted to assemble the collection of key data and information Go Global relied upon to develop Go Global's business thesis, Financial Model, and Bidding Strategy. On June 19, 2023, DOM's Dahiya internally circulated an e-mail with the subject line "<u>BBB Go Forward Plan we can use</u>" to Srour and Gandhi, which attached sales forecasts, store recommendations, and growth strategies, while noting that "these documents are about <u>90% of the plan Go Global</u> was going forward with." Exhibit 26 (emphasis added).

This conduct alone is sufficient for the Court to find that DOM used, and therefore misappropriated, Go Global's Proprietary Information. Indeed, "[r]eviewing another's trade secrets to develop one's personal knowledge constitutes use, and therefore misappropriation." *KCG Holdings,* 2020 WL 1189302, at *11 (granting summary where defendant used "template[s] or sample[s]" to "learn" and "develop [defendant's] personal knowledge").

There is more. DOM used Go Global's Proprietary Information to develop its Technology Roadmap. *See* Exhibit 28 at 8. In a slide entitled "How did we get here?" DOM plainly acknowledges that it "review[ed] goglobal's tech and product plan," which included "reviewing [Go Global's] tech stack, patterns and risk on DOM" in order to "understand how [Go Global] think[s]." Exhibit 28 at 8.

DOM regularly checked its work against or otherwise referenced Go Global's Proprietary Information. On June 17, 2023, DOM internally discussed what Go Global was considering bidding (Exhibit 22 at 5 ("we know [Go Global is considering] somewhere between ████████ ██████ . . . for going concern")), and sought to derive Go Global's next moves based on the information Go Global had shared with DOM. *See* Exhibit 22 at 5 ("What is [Go Global] thinking next?"); *see also* WhatsApp ("Go Global does not have enough capital for go forward plan.")

Two days later, on June 19, 2023, DOM expressly indicated they would "assess where go global was," and furthermore sought information and validation from the Baby Team regarding Go Global's work. *See* Exhibit 22 at 5 ("Yea we must [speak to Patty] so you can validate quickly and get info from team on [Go Global], they will share it.").

DOM needed Go Global because DOM was late to the bankruptcy auction process; behind on its data review, development of financial modeling, and other critical documents; and understaffed with insufficient resources to catch up. *See* Exhibit 22 at 5 (A. Dahiya: "Without go

17

global our chances reduce as <u>we are 4 weeks behind</u>.") (emphasis added); Exhibit 6 at 40:21-41:2

("Q: Do you know when Dream on Me started developing or working on a bid for BBBY's assets?

A: I would say – if you say a proper bid, <u>it was quite late</u> I think. I think it was somewhere around

May or June") (emphasis added); Exhibit 31 at 1 ("[DOM has a] [l]ack of proper internal

teams/professionals to work on this project, we are all shooting in the dark with no internal

capabilities to help"); *see also* Exhibit 6 at 142:14-16, 154:17-21; Exhibit 7 at 28:8-15.

Accordingly, DOM did not have the time, resources, or expertise to conduct due diligence

on the data in the Lazard Data Room, "build the terms and investment models/deal sheet" in order

to develop their own financial model or business plan, much less prepare for transition of the

operating business. *See* Exhibit 31 at 2. DOM unequivocally admits that it had no idea how to

operate the business it was attempting to purchase. *See* Exhibit 6 at 159:23-160:4 ("Q: Did Dream

on Me know or have an understanding of how to run this business; yes or no? A: We had – Q: yes

or no? A: No."); *see also* Exhibit 31. That is why DOM wanted to speak with Go Global in the

first instance, and why DOM strip-mined Go Global's Proprietary Information to enable it to

sufficiently fund and win its bid without Go Global. *See* SOF at ¶¶ 130-38, 143, 111-12.

Courts in this Circuit agree that "[t]here are no technical limitations on the nature of the

conduct that constitutes 'use' of a trade secret" and that "any exploitation of the trade secret that

is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'"

Restatement (Third) of Unfair Competition § 40 cmt. c (Am. L. Inst. 1995); *see also Next

Commc'ns, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *4 (S.D.N.Y. Mar. 30, 2016) (adopting

Restatement definition of "use"); *KCG Holdings*, 2020 WL 1189302, at *12 (same).

Thus, DOM's use of Go Global's Proprietary Information to increase its knowledge,

accelerate its work, and avoid the time and costs associated with the same constitutes

misappropriation under the DTSA. *See KCG Holdings*, 2020 WL 1189302, at *11 (defendant's review and study of plaintiff's trade secrets "to develop [defendant's] personal knowledge constitutes use, and therefore misappropriation"); *Shamrock*, 2015 WL 5730339, at *28 (granting summary judgment where defendant used plaintiff's pricing information to outbid plaintiff's manufacturer for contracts); *see also Next Commc'ns*, 2016 WL 1275659, at *4 ("use" of a trade secret includes "relying on the trade secret to assist or accelerate research or development").

4.   DOM Used Go Global's Proprietary Information to Obtain a Material Advantage Against Go Global in the Bankruptcy Auction.

Even if DOM did not have access to Go Global's cultivated cache of annotated data, financial projections, and blueprints – which it did – DOM still benefited from understanding Go Global's Bidding Strategy, including Go Global's view on which assets it valued, how much Go Global would bid, and how much capital it believed was required to run the resulting business. *See* Exhibit 22 at 5 ("we know [Go Global is considering] somewhere between ▇ and ▇▇▇▇▇ . . . for going concern"). In particular, because the Baby Bankruptcy Auction was a competitive process among a limited number of business rivals (SOF at ¶ 56), and because DOM desperately wanted to win the auction (Exhibit 5 at 39:6-40:8, 202:5-21, 203:19-4), DOM's knowledge of Go Global's potential bid, which they did not have until Go Global disclosed it to them, was valuable to DOM to enable them to structure their own winning proposal, and to ensure that Go Global was not the winner. *See* Exhibit 5 at 51:3-21; *see also* Exhibit 6 at 107:21-24 ("Q: did you know before you got access to Go Global's data room that they were going to be bidding ▇▇▇▇▇▇? A: No."), 108:5-8 ("Q: did you know that [Go Global] would expect another ▇▇▇▇▇ as working capital before you got access to the go global data room? A: No."). This is critical because DOM (and more generally, the pool of potential bidders) viewed Go Global as the clear front-runner to win the assets. *See* Exhibit 21 at 204:13-17.

Go Global's Proprietary Information was therefore vital to DOM as a benchmark, launching pad, and weapon to clear bidding opponents to assure its own victory. Having conducted no due diligence on the data in the Lazard Data Room (*see, e.g.*, Exhibit 31), DOM used Go Global's Proprietary Information to assure and luminate its decision-making on whether and how much to bid, the critical documents to focus on, and how much money it would cost to operate the resulting business. *See Shamrock*, 2015 WL 5730339, at *28 (granting summary judgment where defendant utilized plaintiff's trade secret information to outbid plaintiff's manufacturers for contracts); *Schanfield v. Sojitz Corp. of America*, 663 F. Supp.2d 305, 350 (S.D.N.Y. 2009) (trade secret comprised of "strategic weaknesses . . . could provide a competitor with useful information that would give him an advantage").

5.  <u>Go Global is Entitled to Exemplary Damages and Attorneys' Fees Pursuant to 18 U.S.C. § 1836(b)(3)(C) & (D).</u>

Go Global's Proprietary Information was misappropriated willfully, maliciously, and in bad faith, rendering an award of both attorneys' fees and exemplary damages appropriate. *See* 18 U.S.C. § 1836(b)(3)(C)-(D). DOM acted with conscious indifference to Go Global's rights when it intentionally contravened the plain duties DOM voluntarily accepted as part of the NDA. *See supra* at II(A)(ii)(2)-(4). In pursuit of Baby's Bankruptcy Assets, DOM intentionally (1) misappropriated Go Global's Proprietary Information to advance and accelerate DOM's due diligence (*supra*, at II(A)(ii)(3)); (2) developed a "Go Forward Plan" based upon a review of Go Global's Proprietary Information (Exhibit 26); (3) disclosed Go Global's Proprietary Information to raise investment capital (*supra*, at II(A)(ii)(2)); and (4) secretly recorded Go Global's private, internal discussions regarding Go Global's potential bid and the state of Go Global's capital stack (SOF at ¶¶ 108-14; Exhibit 5 at 94:13-96:5, 97:22-98:7).

20

In light of the demonstrable deficiency of DOM's due diligence and work related to structuring a bid, there can be no other conclusion except that DOM sought Go Global's Proprietary Information for the purpose of gaining a material advantage at the auction. Indeed, DOM has now admitted that it always intended on bidding for Baby's assets with or without Go Global. SOF at ¶ 157. DOM's actions are precisely the willful, malicious, and bad faith conduct envisioned by 18 U.S.C. 1836(b)(3)(C) & (D). Accordingly, Go Global is entitled to exemplary damages and reasonable attorneys' fees. *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2024 WL 1116090, at *4-5 (S.D.N.Y. Mar. 13, 2024).

### B. <u>DOM Misappropriated Go Global's Trade Secret Information Under New York Common Law.</u>

"The elements for a misappropriation claim under New York law are fundamentally the same [as under Section 1836] . . . [and] [d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *IME Watchdog, Inc. v. Gelardi*, 2024 WL 4314714, at *7 (E.D.N.Y. Mar. 13, 2024). Thus, the Court should grant Go Global summary judgment for common law misappropriation for the same reasons as stated above. *See supra* at Section II(A).

### III.    DOM IS LIABLE FOR BREACH OF CONTRACT.

There is no dispute that DOM signed a valid and enforceable NDA, Go Global fully performed under the contract, which DOM then breached, thereby causing damages to Go Global. *See* SOF at ¶¶ 78, 119-52, 167-61. Accordingly, DOM is liable to Go Global for breach of contract.

### A. <u>DOM Breached the NDA.</u>

DOM breached the NDA in three ways, including improperly disclosing Go Global's Proprietary Information, using the information to accelerate DOM's due diligence, and submitting a bid without Go Global's participation or consent.

       i.  <u>DOM Disclosed Go Global's Proprietary Information to Raise Capital for DOM's Solo Bid</u>.

It is undisputed that DOM executed an enforceable non-disclosure agreement that prohibited DOM from disclosing Go Global's Proprietary Information. The NDA states:

> [DOM] <u>shall hold in confidence and not disclose</u>, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose, the Proprietary Information or any portion thereof.

NDA at ¶ 3 (emphasis added).

There is also no doubt that DOM disclosed Go Global's Proprietary Information. SOF at ¶¶ 119-29. The disclosure diminished or destroyed the value of the Proprietary Information. DOM is thus liable for breach of contract. *See North Avenue Grp. Holdings, LLC v. Lasalle Cap. Grp. II-A, L.P.*, 2020 WL 9813474, at *11 (N.D. Ga. May 29, 2020); *Quantlab*, 696 Fed.Appx. at 690.

       ii.  <u>DOM Used Go Global's Proprietary Information in DOM's Solo bid</u>.

Section 2 of the NDA states:

> [DOM], and [DOM's] affiliated companies, shall use the Proprietary Information solely for the Purpose and for no other purpose whatsoever as used herein, the "Purpose" means the evaluation of [Baby's Bankruptcy Assets], any Transaction, the terms of any Transaction and any investment vehicle or fund established by [Go] Global, in connection with a potential investment, or any other business with [Baby] (a "Transaction"). The disclosure of the Proprietary Information of [Baby] to [DOM] does not confer upon [DOM] any license, interest or rights of any kind in or to the Proprietary Information.

DOM admits in e-mails, text messages, and testimony that it employed Go Global's Proprietary Information to assist DOM in conducting due diligence, developing a "Go Forward Plan," and structuring a bid for Baby's Bankruptcy Assets without Go Global. *See supra* at II(A)(ii)(2)-(4). DOM's unauthorized use of the Proprietary Information against Go Global, a direct competitor in the bankruptcy auction, diminished or destroyed the commercial value of the Proprietary Information to Go Global. Accordingly, DOM breached the NDA.

22

iii.    <u>DOM Submitted and Won its Solo Bid for Baby's Intellectual Property Assets and Store Leases Without Notifying Go Global or Receiving Go Global's Consent</u>.

Section 12 of the NDA states:

[Go] Global contemplates the expenditure of substantial resources, time and money for legal and accounting work to be performed in connection with the proposed Transaction. Accordingly, [DOM] covenants and agrees that [DOM] and its affiliates, and that [DOM] will cause its equity holders, directors, officers, managers, employees, agents, advisors or representatives not to, directly or indirectly, solicit, encourage, negotiate, or discuss with [Baby], or enter into any agreement, understanding or commitment regarding a possible transaction, sale, merger, combination, consolidation, joint venture, partnership, recapitalization, restructuring, refinancing or other disposition of all or any material part of [Baby] or its subsidiaries or any of [Baby] or its subsidiaries' assets or issued or unissued capital stock <u>other than involving the potential Transaction with [Go] Global, and only then with knowledge and express consent of [Go] Global ("Non-Circumvention Obligation").</u> The Non-Circumvention Obligation set forth herein shall terminate only upon written notice by [Go] Global of termination of discussions with [Baby] regarding the Transaction or [DOM] believes in good faith that such potential Transaction has terminated.

There is no dispute that DOM submitted a solo bid for and won Baby's IP as well as leases for eleven stores. *See* SOF at ¶¶ 158, 161. Moreover, DOM admits that it never sought Go Global's consent to submit a bid without Go Global, and never received written or oral permission to do so. *See* SOF at ¶ 159. DOM's conduct damaged Go Global because DOM had agreed to bid jointly with Go Global, but DOM's solo bid won the assets. *See* SOF at ¶ 161. Accordingly, DOM's submission of a bid without Go Global, and without Go Global's consent, breached the NDA.

**B.    <u>DOM's Breach of the NDA Damaged Go Global.</u>**

DOM's conduct damaged Go Global in at least three ways. *First*, under the NDA, DOM acknowledged "that any breach of the covenants contained in this Agreement will cause the Target and [Go] Global immediate and irreparable harm . . . ." *See* Exhibit 18 at ¶ 8. This is sufficient to establish the fact of damages. *See United Pool Distribution, Inc. v. Custom Courier Solutions, Inc.*, 2024 WL 3163432, at *8 (W.D.N.Y. June 25, 2024) (contract language that "any breach or

attempted breach would cause irreparable injury" held "sufficient to prove the fact of damages"); *see also Alpha Capital Aktiengesellschaft v. Advanced Viral Research Corp.*, 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003) (giving great weight to "contractual stipulation to the effect that irreparable harm exists".)

*Second*, DOM's disclosure to unauthorized third-parties destroyed the trade secret status of the Proprietary Information, diminishing or destroying the value of an asset that Go Global had developed through thousands of hours of work and analysis. *See, e.g.*, *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) ("a trade secret once lost is, of course, lost forever"); *Smithfield Ham and Products Co., Inc. v. Portion Pac, Inc.*, 905 F. Supp. 346, 350 (E.D. Va. Nov. 1995) ("[T]he value of the trade secret as an asset of the company is diminished by its disclosure whether or not the person acquiring it uses it competitively").

Moreover, by using Go Global's Proprietary Information to accelerate its due diligence, develop a "Go Forward Plan," raise investment capital, and target and neutralize Go Global in the Baby Bankruptcy Auction, DOM damaged the commercial advantage and value of the Proprietary Information Go Global had specifically developed to assist Go Global, not DOM, in the auction. Restatement (First) of Torts § 757, cmt. c ("One who has a trade secret may be harmed . . . by the use of his secret in competition with him."); *see also Epic Systems Corp. v. Tata Consultancy Services, Ltd.*, 980 F.3d 1117, 1131-32 (7th Cir. 2020) (upholding award of damages for avoided development costs where defendant "used [plaintiff's] confidential information to thoroughly evaluate what it would take to compete in a new market); *Quantlab*, 696 Fed.Appx. at 690 (upholding award of damages where evidence established defendant used "stolen trade secrets to avoid his own development costs . . . as well as to find investors for those ventures").

*Third*, DOM damaged Go Global by muscling Go Global out of the Baby Bankruptcy Auction. DOM had agreed to bid jointly with Go Global, but DOM won the assets with a solo bid. *See* SOF at ¶ 161. DOM used Go Global's Proprietary Information to inflate the price of the Baby IP, thereby making Go Global's participation in the auction uneconomical. *See* SOF at ¶¶ 194-95. DOM's misconduct thus damaged Go Global. *See Shamrock*, 2015 WL 5730339, at *29.

### C. <u>Go Global is Entitled to Attorneys' Fees Pursuant to the NDA.</u>

Section 15 of the NDA states:

> If any court of competent jurisdiction holds the non-prevailing party to be in violation, breach, or nonperformance of any of the terms of this letter agreement, then the non-prevailing party will pay all reasonable costs of such action or suit, including reasonable attorneys' fees.

There is no material dispute of the fact of DOM's breach of the NDA. *See supra* at Section III(A). Thus, DOM is liable for all reasonable costs and attorneys' fees. *See, e.g.*, *TAG 380, LLC v. ComMet 380, Inc.*, 10 N.Y.3d 507, 515-16 (2008).

## IV.    DOM IS LIABLE FOR UNJUST ENRICHMENT.

In the alternative to breach of contract, DOM received a benefit in the form of Go Global's Proprietary Information, which it used to accelerate its due diligence, raise investment capital, and structure a bid that would prevent Go Global from winning the Baby Bankruptcy Auction. *See supra* at II(A)(ii)(2)-(4). DOM obtained these benefits without compensating Go Global and at Go Global's expense. It is against equity and good conscious to permit DOM to so enrich itself. Accordingly, DOM is liable for unjust enrichment.

### <u>CONCLUSION</u>

For the reasons set forth above, this Court should grant Go Global's Motion for Summary Judgment on Counts I, II, III, V and VI.

Dated: Rockville Centre, New York
December 20, 2024

**FALCON RAPPAPORT & BERKMAN LLP**

By: */s/ Moish E. Peltz*
Moish E. Peltz, Esq.
Steven C. Berlowitz, Esq.
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
Tel: (516) 599-0888

*Attorneys for Plaintiff Go Global Retail LLC*