## Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2
 3   _____
 4   GO GLOBAL RETAIL, LLC,       CASE NO. 1:23-CV-07987-AS
 5         Plaintiff,             Briarcliff, New York
         vs.
 6
     DREAM ON ME INDUSTRIES, INC.  October 18, 2024
 7   AND DREAM ON ME, INC.,        9:58 a.m.
 8         Defendants.
     _____
 9
10
11          VIDEOCONFERENCE DEPOSITION OF
                  DEBORAH GARGIULO
12
13
14         Taken by Counsel for the Defendant
15
16
17         Nicholas Catucci, CER-50207229
              Esquire Deposition Solutions
18
19
20
21
22
23
24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

## Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3   On behalf of the Plaintiff, Go Global Retail, LLC:
 4       STEVEN C. BERLOWITZ, ESQ.
         FALCON RAPPAPORT & BERKMAN, LLP
 5       1185 Avenue of the Americas
         Third Floor
 6       New York, New York 10036
         212-203-3255
 7       sberlowitz@frblaw.com
 8
 9   On behalf of the Defendants, Dream on Me Industries, Inc.
     and Dream on Me, Inc.:
10
11       THOMAS K. MURPHY, ESQ.
         GREENBAUM ROWE SMITH & DAVIS, LLP
12       75 Livingston Avenue
         Suite 301
13       Roseland, New Jersey 07068
         973-577-1908
14       tmurphy@greenbaumlaw.com
```

## Page 3

```
 1                 INDEX TO EXAMINATION
 2
 3   EXAMINATION                                     PAGE
 4   Examination by Mr. Murphy                          5
 5
 6
 7                  INDEX OF EXHIBITS
 8   NUMBER       DESCRIPTION                        PAGE
 9   Exhibit 1    Excel Spreadsheet                    26
10   Exhibit 2    Three-Page Email Chain              32
11                Bates GG-0008771-8773
12   Exhibit 3    Two-Page Email Chain                34
13                Bates GG-0000420-421
14   Exhibit 4    Eight-Page Document Go Global Logo  36
15                Bates GG-0030208-30215
16   Exhibit 5    One-Page Email Chain                38
17                Bates GG-0042597
18   Exhibit 6    One-Page Email Chain                41
19                Bates GG-0048891
20   Exhibit 7    Go Global Case Studies/Investment   53
21                Process
22
23
24       (Exhibits 1 through 7 were attached to the original
25   transcript.)
```

## Page 4

```
 1       THE REPORTER: We are now on record at 9:58 a.m.
 2   Eastern Time, on October 18th, 2024, to take the deposition
 3   of Deborah Gargiulo in the matter of Go Global Retail, LLC,
 4   versus Dream On Me Industries and Dream On Me, Inc.
 5       My name is Nicholas Catucci, notary public and
 6   digital reporter for Esquire Deposition Solutions in the
 7   state of New York. I'll be capturing the verbatim record
 8   of today's proceeding using electronic audio equipment, a
 9   computer, and specialized recording software, which is not
10   a form of stenography.
11       The witness is located in Briarcliff Manor, New
12   York, and has confirmed their identity with driver's
13   license issued by the state of New York.
14       Will everyone in attendance please identify
15   yourselves for the record and state who you represent.
16       MR. MURPHY: Sure. Thomas Murphy, Greenbaum Rowe
17   Smith & Davis, here for Dream On Me Industries, Inc., and
18   Dream On Me, Inc.
19       MR. BERLOWITZ: Steve Berlowitz with Falcon
20   Rappaport & Berkman, LLP. I represent Go Global Retail.
21       THE REPORTER: Absent any objection at this time,
22   Counsel and the witness agree to my administration of the
23   oath to this witness, and that the final transcript may be
24   used for all purposes allowed by the local Rules of Civil
25   Procedure.
```



Page 5

1   MR. MURPHY: I -- I agree.
2   MR. BERLOWITZ: I agree.
3   THE WITNESS: Am I supposed to agree?
4   MR. BERLOWITZ: No.
5   MR. MURPHY: No. You're okay.
6   THE REPORTER: Hearing no objection, this shall
7   constitute agreement and stipulation of such. I will now
8   swear in the witness.
9       Deborah Gargiulo, please raise your right hand to
10  be sworn.
11      DEBORAH GARGIULO,
12  having first been duly sworn, testified as follows:
13      THE REPORTER: Thank you.
14      Counsel, you may now begin.
15      EXAMINATION
16  BY MR. MURPHY:
17  Q.  Good morning, Deborah. My name is Tom Murphy.
18  As I mentioned before we went on the record, I'm the lawyer
19  for Dream On Me Industries, Inc., who will be taking your
20  deposition this morning in connection with a case brought
21  against it by Go Global Retail, LLC.
22      Have you ever had your deposition taken before?
23  A.  No.
24  Q.  Okay. I'll go through some brief instructions
25  before we begin. You're under oath here this morning, the

Page 6

1   same way you would be if you were testifying in court. The
2   court reporter, Nicholas, who you should be able to see on
3   your screen, is going to take down everything that is said
4   while we're on the record here today.
5       Therefore, it's important that you don't, you
6   know, answer with nods or other gestures. Need a verbal
7   response. It also makes his job a lot easier if we don't
8   talk over one another.
9       So even if you know where I'm going with my
10  question, just let me finish, and I'll do the same with
11  your answer.
12      If you don't understand a question, let me know,
13  and I will rephrase it. If you answer, I'll assume you
14  understood the question. If you don't know an answer, that
15  is a fine response. I do not want you to guess. You may
16  approximate, but just let us know that you are
17  approximating.
18      And if you need a break for any reason, just let
19  us know. We just can't take a break while a question is
20  pending.
21      Do you understand these instructions?
22  A.  Yes.
23  Q.  Did you do anything to prepare for today's
24  deposition?
25  A.  Yes.

Page 7

1   Q.  What did you do?
2   A.  I read my emails and reviewed the work that I put
3   together when I was working on the -- when we -- when we
4   were working to acquire Buy Buy Baby.
5   Q.  Besides your lawyers, did you speak to anyone in
6   the -- while preparing for the deposition?
7   A.  No.
8   Q.  Are you aware that other individuals from Go
9   Global have been deposed in this case already?
10  A.  Yes.
11  Q.  Have you spoken to any of them about their
12  depositions?
13  A.  No.
14  Q.  Did you bring any documents with you this
15  morning?
16  A.  No.
17  Q.  Do you have any notes with you this morning?
18  A.  No.
19  Q.  Are you currently affiliated with Go Global?
20  A.  Yes.
21  Q.  And what is your title at Go Global?
22  A.  Partner.
23  Q.  And how long have you been with Go Global?
24  A.  Three-plus years. Three and a half, maybe.
25  Q.  Have you been a partner that entire time?

Page 8

1   A.  I started as an operating partner and then became
2   partner fairly quickly.
3   Q.  I think I understand the difference between those
4   two things, but could you just explain that to me.
5   A.  An operating partner -- it's been awhile. So an
6   operating partner, I guess, is more specifically working --
7   I'm not -- from a profit share perspective, an operating
8   partner just gets paid -- paid less.
9       So if I -- if I'm not -- if I'm not working on a
10  deal and we close a deal, I -- I -- as a partner, I can
11  still participate. That's the main aspect.
12  Q.  Law firms have a similar structure.
13      What is your -- or where did you work before Go
14  Global?
15  A.  Prior to Go Global, I was a CFO of many different
16  retail organizations. But prior to Go Global, I was a CFO
17  of Trish McEvoy, which was a cosmetic brand.
18      Do you need to know prior or that's enough?
19  Q.  How long were you there at Trish McEvoy?
20  A.  Maybe two or three years.
21  Q.  And -- and just briefly, where you -- where were
22  you before that?
23  A.  I was -- I -- I was CFO at Ralph Lauren for the
24  Club Monaco brand. So I ran all of the Club Monaco retail
25  locations as CFO. And all the other companies -- CFO of



Page 9

1  different companies.
2  Q.  Besides your work currently at Go Global, do you
3  receive compensation from anybody else?
4  A.  I'm a 1099 employee, so yes, at times I do.
5  Q.  So in the last year, besides Go Global, who else
6  would you have received compensation from?
7  A.  So I -- I want to make a statement back for one
8  second.
9  Q.  Sure.
10  A.  During -- during the whole three and a half
11  years, I've only been with Go Global.  Only recently now
12  have I been -- been receiving some compensation elsewhere.
13  Q.  Okay.
14  A.  Yeah.
15  Q.  And the compensation you're receiving elsewhere,
16  is that, like, a consulting sort of arrangement or -- or
17  what is that?
18  A.  Correct.  Yes.
19  Q.  What's your highest level of education?
20  A.  I have an MBA in finance and international
21  business.
22  Q.  Where'd you get that?
23  A.  From Pace University.
24  Q.  And where'd you go to college?
25  A.  Saint -- St. John's University with a -- a BS in

Page 10

1  accounting.
2  Q.  Did there -- during your time at Go Global, did
3  there come a time where you became aware of the Buy Buy
4  Baby bankruptcy?
5  A.  Yes.
6  Q.  Do you remember when that was?
7  A.  April, May time frame.
8  Q.  Of '23?
9  A.  Yes.
10  Q.  Do you remember how you first learned of that
11  bankruptcy?
12  A.  We typically have internal meetings on a Friday
13  to discuss deals, prospective deals.  And it came -- and it
14  came up at that point as potential synergy, you know, for
15  another asset that we own.
16  Q.  And initially, in that kind of April time frame,
17  did you begin working on that project?
18  A.  Yes.
19  Q.  Okay.  And what was your role?
20  A.  When the data room opened, my role was more
21  specifically to look at all of the store analysis and make
22  some evaluations on -- since we're a retailer and I have a
23  lot of retail experience, to make some evaluations on those
24  particular stores and what we could potentially select or
25  why we would select them.

Page 11

1  And also, you know, compare them to what -- Buy
2  Buy Baby's opinion.  A lot -- a lot of back and forth with
3  stores.
4  Q.  And I know that -- and we're going to talk about
5  that, that there were a -- a few different data rooms.
6  The data room you were referencing is the one
7  that was housed by Lazard at that point, right.
8  A.  Correct.
9  Q.  And we're going to look at some documents about
10  the stores, but do you remember when the process first
11  started, how many stores were open?
12  A.  Approximately 115 to 117 stores.
13  Q.  And do you remember initially how many stores Go
14  Global was considering attempting to keep open?
15  A.  Initially, about 95 stores.
16  Q.  And we will go through it in a little bit more
17  detail, but am I correct that that number decreased over
18  time, the number that Go Global intended to keep open?
19  A.  Yes.
20  Q.  Besides the store analysis, did you have any
21  other significant responsibilities in the process?
22  A.  Yes.
23  Q.  What else?
24  A.  I went out to debt providers as we were looking
25  for term sheets because we would typically look at a deal

Page 12

1  for debt inequity.
2  Q.  Were you also involved in trying to solicit
3  equity or only the debt providers?
4  A.  Only the debt providers.
5  Q.  Do you know approximately how many debt providers
6  you met with?
7  A.  Yes.
8  Q.  How many?
9  A.  I met with three.
10  Q.  And who were they?
11  A.  They were Second Avenue, Bank of America, and
12  MidCap.
13  Q.  Did any of those three commit to being involved
14  in the deal?
15  A.  Yes.
16  Q.  Which one?  Or, well, which of them?
17  A.  All three, but I had term sheets from two.
18  Q.  Which two did you have term sheets from?
19  A.  MidCap and Second Avenue.  Bank of America was
20  still working on theirs, but those are the ones I had
21  physical term sheets from.
22  Q.  For each of those, do you -- do you remember how
23  much debt was provided for in the term sheets?
24  A.  I'm a little fuzzy, but -- because the deal
25  changed multiple times.  So in the initial term sheet, the



Page 13
1  initial debt would have been a lot higher. One of them was
2  in the range of about ▮▮▮▮▮▮ I don't recall the other
3  one, off the top of my head. That would adjust as the deal
4  would adjust, as well.
5      Q.  And if the deal had commenced, would that debt
6  have been used for operating or as part of -- of funding
7  the purchase?
8      A.  Both.
9      Q.  Did there come a time during the process you
10 became aware of an entity known as Dream On Me?
11     A.  Yes.
12     Q.  How did you first learn of Dream On Me?
13     A.  I met them at a dinner. But I think the day
14 before or the day of I was told of Dream On Me being
15 interested as a party to participate in the deal with Go
16 Global.
17     Q.  Do you remember who told you that?
18     A.  I think you're on mute.
19         MR. BERLOWITZ:  No.  I -- did you not hear
20 his question?
21         THE WITNESS:  No.
22         MR. MURPHY:  Oh.
23         MR. BERLOWITZ:  Can you repeat?
24         THE WITNESS:  Oh, it's okay.
25         MR. MURPHY:  Can you hear me now?

Page 14
1          THE WITNESS:  Yes.
2  BY MR. MURPHY:
3      Q.  I -- I said, do -- do you remember who told you
4  that, meaning told you about Dream On Me?
5      A.  Jeff Streader.
6      Q.  Before Jeff Streader had told you about Dream On
7  Me, had you ever heard of them?
8      A.  No.  But I -- I believe that Lazard told Jeff
9  about Dream On Me.
10     Q.  Okay.
11     A.  And that's how it came about. Jeff would
12 communicate internally with us as -- as partners.
13     Q.  You mentioned a dinner meeting. Prior to the
14 dinner meeting, did you personally have any interaction
15 with Dream On Me?
16     A.  No.
17     Q.  Prior to the dinner meeting, did you do any
18 research about Dream On Me?
19     A.  I looked up who they were.
20     Q.  And do you remember what you found?
21     A.  They were a manufacturer of cribs or baby
22 furniture.
23     Q.  Did you learn anything else?
24     A.  I went into the stores to look at their product
25 before the dinner, into the Buy Buy Baby stores.

Page 15
1      Q.  That was my next question. Into a -- into a Buy
2  Buy Baby store?
3      A.  Uh-huh.
4      Q.  Okay. And I -- I think you -- you just have to
5  say yes or no for the court reporter.
6      A.  Yes. Sorry.
7      Q.  No. Not a problem. Based on your review of the
8  product and the -- like, whatever research you had done,
9  did you have any initial impressions of Dream On Me?  I'm
10 talking about before you met them.
11     A.  No.
12     Q.  Were you -- do you know if Dream On Me signed an
13 NDA, non-disclosure agreement?
14     A.  Can you -- no. Can you repeat? Who signed --
15     Q.  Do -- do you -- do you know if Dream On Me signed
16 a non-disclosure agreement?
17     A.  Yes.
18     Q.  Were you involved in the process of Dream On Me
19 signing a non-disclosure agreement?
20     A.  No.
21     Q.  Have you ever seen --
22     A.  I didn't -- I didn't send it. Somebody else sent
23 it to them to sign.
24     Q.  And so I -- and I expect since you didn't, do you
25 know if the non-disclosure agreement was signed before the

Page 16
1  dinner you went to?
2      A.  I don't know, but I believe so. It -- it would
3  have been signed before we shared any financial
4  information.
5      Q.  Understood. But you never -- you -- you
6  personally were not involved in that process --
7      A.  No.
8      Q.  -- meaning for -- for Dream On Me, I mean?
9      A.  No.
10     Q.  And I think I may have asked the question kind
11 of backwards.
12         Were you involved in the process of Dream On Me
13 executing an NDA for this -- related to this transaction?
14     A.  No.
15     Q.  The dinner meeting you're speaking of, do you
16 remember when it took place?
17     A.  Yes.
18     Q.  When was that?
19     A.  June 12th, '23.
20     Q.  And I believe that was a Monday, right?
21     A.  Correct. Yes.
22     Q.  And at that point, I believe there was a looming
23 deadline to submit a bid; is that right?
24     A.  Yes.
25     Q.  Do you know at that point what the deadline was?



Page 17
1  A.  It -- I'm fuzzy.  It was -- may have been the
2  16th.  I'm not sure the exact date, but it was in -- it was
3  in June.
4      Q.  Okay.
5      A.  It was --
6      Q.  Was it -- was it within that week?
7      A.  It would have been after the -- the meeting we
8  had with them in New Jersey.  So I don't know if it was
9  that week or the week after.  I'm not -- I'm not -- not
10 positive.
11     Q.  So if the dinner meeting was on the 12th, do you
12 remember when the meeting was in New Jersey?
13     A.  Yes.
14     Q.  When was that?
15     A.  The 15th of June.
16     Q.  The dinner meeting, my understanding, that was at
17 a restaurant in New York City?
18     A.  Yes.
19     Q.  Do you remember who was there?
20     A.  Yes.
21     Q.  Who -- who was there?
22     A.  Mark, the father; Jack, his son; Avish -- Avish,
23 if I'm saying it right; and Milan from Dream On Me.  From
24 Go Global, myself and Christian Feuer.  And then Kathleen
25 from Ankura.

Page 18
1      Q.  And what do you remember about that dinner
2  meeting?
3      A.  Started as -- as cordial.  Everyone was very
4  nice.  It was the first time we were meeting.  I was seated
5  next to Mark, and we were initially making small talk.
6  Then he may have asked some questions related to Buy Buy
7  Baby.  It was clear to me that they didn't know a lot about
8  the deal.  They were not familiar with the bankruptcy
9  process.
10         They came across as unsophisticated investors,
11 and they came across as not understanding any -- or doing
12 any research from the data room, which is why they asked
13 for our help.
14     Q.  Did you leave that meeting thinking that they
15 were a potential partner?
16     A.  I left unsure because with conversations with
17 Mark, he started saying at that point that he would just go
18 in and tell the stores what to do, and he would do things
19 his way, and he had his own style and his own way.
20         And we are a, you know, corporate group.  Like
21 to, you know, put in some controls into -- into a business.
22 And he suggested that that didn't really matter to him, so
23 I left unsure at that point.
24     Q.  At that point, were the discussions involving
25 Dream On Me's potential participation in the deal, did they

Page 19
1  involve them having any involvement in the day-to-day
2  operation?
3      A.  That became more clear in the second meeting, but
4  it was clear at the dinner that they were supposed to just
5  -- we were running the day-to-day operations, and they were
6  investing.  He stated that he knew the manufacturing piece
7  of the business, but he specifically stated he did not know
8  how to run retail.
9          And they also stated that they had not done
10 research and were looking for our help because we were in
11 the data room and had done a lot of research on the
12 business to develop opinions on the bid.
13     Q.  That data room you just referred to is -- that's
14 the Lazard data room?
15     A.  Yes.  Lazard had two data rooms.
16     Q.  Do you know what the difference was in the two
17 Lazard data rooms?
18     A.  Yes.
19     Q.  What was the difference?
20     A.  There was a data room called the clean data room.
21 And it was a restricted access, and the items that would be
22 in there were in there from a confidentiality standpoint;
23 for instance, payroll records, if they needed to show
24 someone's name or salary.  So from that perspective, they
25 couldn't put that in the initial data room.

Page 20
1          So if we were looking to keep certain people or
2  not and needed to see specifics, then -- then I would be
3  able to gain access to that.  But that -- that was not --
4  that was on a restricted basis.
5      Q.  And if one was called the clean data room, how
6  would the other one be referenced?
7      A.  It's just the -- the Lazard data room.  I mean --
8      Q.  Okay.
9      A.  I don't -- I don't know specifically if there was
10 anything in there, other than payroll.  Payroll is what I
11 was interested in.
12     Q.  And when you say "in there," you're referring to
13 the clean data room?
14     A.  Correct.  Yes.
15     Q.  And am I correct that you would have been
16 interested in the payroll in connection with your store
17 analysis?
18     A.  And -- and corporate.  And corporate analysis, as
19 well.  So if we were -- just as an example, if we were
20 keeping all the corporate employees, because at one point
21 we suggested to, we'd want to know what that is.  But if we
22 were -- if we were not taking all the stores and had to
23 terminate people and there was going to be restructure
24 involved, we needed to know salary -- at least salary
25 information.



Page 21

1    I believe in the regular data room they just
2 summarized it, and in the clean data room, it was more
3 broken out.
4    Q.  Do you know if both Lazard data rooms required
5 non-disclosure agreements?
6    A.  I don't know.  I -- I would have to say yes, but
7 I -- uh-huh.
8    Q.  You -- you'd -- you'd expect yes, but you're not
9 positive.  Is that a fair statement?
10    A.  I -- I believe it's all combined in one NDA.
11 It's still Lazard who's controlling the data room, but you
12 would have to ask them.
13    Q.  You mentioned some impressions from -- of Mark
14 from the dinner.
15        Did you have any impressions of Avish?
16    A.  Not really.
17    Q.  Okay.  Between the dinner meeting on the 12th and
18 the subsequent in-person meeting you had on the 15th in New
19 Jersey, did you personally have any interactions with Dream
20 On Me?
21    A.  No.
22    Q.  Were you involved in scheduling the meeting in
23 New Jersey?
24    A.  No.
25    Q.  Who told you about the meeting in New Jersey?

Page 22

1    A.  There were emails from either Jeff or Kathleen
2 that I probably was CC'd on and I was asked to participate.
3    Q.  What do you remember about the meeting you went
4 to in New Jersey?
5    A.  It started out as cordial.  We took a tour of
6 their warehouse.  They indicated that they could also
7 provide a synergy from a 3PL perspective, not just
8 manufacturing.
9    Q.  I'm trying to catch that.  A synergy from what?
10    A.  From a 3PL.  From a warehousing perspective, if
11 we wanted.
12    Q.  Thank you.
13    A.  And then we -- then we sat down for the meeting
14 after the tour of the warehouse.
15    Q.  Do you know about how long the meeting was?
16    A.  Yes.
17    Q.  How long?
18    A.  About -- about four hours, roughly.  Very -- very
19 long.
20    Q.  Okay.
21    A.  It probably would have went longer if we didn't
22 have to leave.
23    Q.  Based on your reaction, was the meeting longer
24 than it needed to be?
25    A.  Yes, absolutely.

Page 23

1    Q.  Why -- why do you say the meeting was longer than
2 it needed to be?
3    A.  Because they -- because they did not have a clear
4 understanding of finance or how deals work or structure of
5 private equity.  And they kept getting upset and leaving
6 the room, kind of storming out of the room and then coming
7 back in, and it became quite heated at times.
8    Q.  Was everybody who was at the dinner also at the
9 meeting in New Jersey?
10    A.  There -- Matthew was not at the dinner, and he
11 was at the meeting.  He was from Ankura.
12    Q.  Is that Matthew Lapish?
13    A.  Yes.  I'm trying to -- and -- and on -- on
14 camera, there was Jeff Streader and Yuen Chau, who
15 participated in the -- the meeting, but they were not at
16 the dinner.
17    Q.  But then all of the dinner participants were also
18 there, correct?
19    A.  Yes.
20    Q.  You mentioned that you didn't think that the
21 Dream On Me team had a clear understanding of how a private
22 equity deal would work or the structure.
23        What makes you say that?
24    A.  They became very -- very accusatory towards us
25 during the meeting, you know, almost as if we were trying

Page 24

1 to get one over on them, so to speak.  They didn't review
2 the -- the documents or the -- the model would have shown
3 how -- how it worked.  They didn't ask questions
4 beforehand.
5        I think that they were simple businessmen who
6 have probably not come into a deal like this or would want
7 to work with other partners.  They did not even believe
8 there should be a board of directors.  They did not see any
9 significance in having a strategic or financial --
10 financial partners with them, you know, for the deal.  So I
11 don't know if that answers -- uh-huh.
12    Q.  At that time, was it anticipated that Go Global
13 would be contributing any of its own equity into the
14 transaction?
15    A.  Can you repeat that?
16    Q.  Yeah.  So at that time, as of, like -- as of June
17 15th, was it anticipated that Go Global would be
18 contributing any of its own equity into the purchase of the
19 transaction?
20    A.  So we contribute what we call sweat equity.  I
21 don't know how they would have viewed that.
22    Q.  I think I -- I understand what you mean, but
23 could you just explain to me what sweat equity is?
24    A.  We would put all the work into -- into the deal,
25 and we would manage the asset brand, and we would have a



Page 25

1  percentage participation in the deal in -- in terms of, you
2  know, equity, so.
3     Q.  Would you refer to that as a 2 and 20 model?
4     A.  Yes.
5     Q.  And again, I think I know what that is, but could
6  you explain to me your understanding of what that is?
7     A.  The -- the investors -- investors would put in 80
8  percent of the equity or debt.  Go Global would get 20
9  percent of the equity for the business, and this is on a
10 non-diluted basis we're speaking right now.
11        And then we would take a 2 percent management fee
12 of the -- usually, it's of the purchase price on a yearly
13 basis to run the company, which could be partly negotiated
14 or waived depending on, you know, where we are in the deal
15 or, you know, we would never do anything to hurt the asset.
16    Q.  I'm going to be marking a few documents as
17 exhibits as we go forward.  So what I'm going to do is I'm
18 going to share my screen, and we'll go over the documents.
19 I'll identify them and then ask you a few questions about
20 them.
21    A.  Okay.
22        MR. MURPHY:  Can everybody see my screen now?
23        THE REPORTER:  Yeah.
24        MR. BERLOWITZ:  Yes.
25        THE WITNESS:  Yes.

Page 26

1         MR. MURPHY:  I'm -- I'm going to mark this as
2  Exhibit 1.  It's an Excel spreadsheet that is Bates number
3  DOM-00075.  It has several tabs.
4         (Exhibit 1 was marked for identification.)
5  BY MR. MURPHY:
6     Q.  Deborah, looking at the first page of the
7  spreadsheet, do you recognize this document?
8     A.  Yes.
9     Q.  What is this document?
10    A.  This would have been one of the many models that
11 we would create when -- when we're looking to acquire a
12 company.  This one is specifically for Dream On --
13 specifically for the Buy Buy Baby acquisition.
14    Q.  Understood.  So -- and just to kind of simplify,
15 I -- or to clarify, I understand there are several versions
16 of this document.  We've been referring to it as the Go
17 Global model.
18        Does that work for you?
19    A.  Yes.
20    Q.  Okay.  I will represent to you that this document
21 is Version 9.  I know there were several versions after
22 that.  I'll also represent to you that it -- my
23 understanding from prior testimony is that this version
24 would have been the current version as of June 10th of
25 2023.

Page 27

1     A.  If -- if --
2     Q.  I'm just trying and I -- and the reason I'm --
3     A.  -- this is what they had.
4     Q.  -- and the reason -- and the reason I'm -- I'm
5  making those representations is to try to streamline the --
6  the process here.
7         THE REPORTER:  And just for the cleanliness of
8  the record, please do try not to speak over one another.
9  Thank you so much.
10        MR. MURPHY:  No problem.
11 BY MR. MURPHY:
12    Q.  So I'm going to ask you a few questions about it.
13 If you see or have any reason to believe that I'm incorrect
14 about my representation of the document, please, please let
15 me know.
16        Does that make sense to you?
17    A.  Yes.
18    Q.  Okay.  My understanding is that Christian Feuer
19 was, ultimately, the owner of at least most of the tabs on
20 this document; is that correct?
21    A.  Yes.
22    Q.  When you met with Dream On Me at their office in
23 New Jersey, did you feel like they had reviewed this
24 document?
25    A.  I don't know, but based on some of their

Page 28

1  questions, they may not have understood it.
2     Q.  Do you remember any of those questions
3  specifically that you're referencing?
4     A.  They didn't have this open in front of them, but
5  their questions were more about them taking more equity
6  share either from us or from Perot Family Offices because
7  they didn't want them involved, and then they tried to
8  start negotiating on the 20 percent piece.  They just --
9  that's what I recall.
10    Q.  When you met with Dream On Me, do you remember
11 ever looking at this document together?
12    A.  I don't recall.  They had it, but I don't recall.
13    Q.  I'd like to take a look at the cap table, which
14 is in column -- starts in Column J and Line 42.
15    A.  Okay.
16    Q.  So as a -- in that time, I see there's -- there's
17 two different family office lines.
18        Do you know who those family offices would have
19 been at that time?
20    A.  I know, yes.
21    Q.  Who would they have been?
22    A.  Perot Family Office.  I don't know if it was for
23 these exact amounts.  And then there was Andrew Axelrod,
24 who is the -- owns the hedge fund and is our main investor
25 in Janie and Jack.



Page 29

1    And there may have been some others, but you have
2    to keep in mind that, you know, these are probably
3    approximations at that time, and -- and since I -- and to
4    be clear, since I wasn't responsible on the equity side, I
5    don't know how many other people that they were speaking
6    with.
7    Q.  Understood.  It then lists Go Global equity is
8    ▮▮▮▮▮▮▮▮▮     Do you know anything about that?
9    A.  I am not clear, but at some point in the process
10   we were pledging our own equity from -- from Janie and
11   Jack, but I don't know at what point, so myself, as
12   partner, would have agreed to pledge some of my own equity
13   to get this deal done.
14       But, again, I -- I'm not sure if it was from this
15   date or a later date, to be honest.
16   Q.  And then the next two lines would be management
17   and Go Global 20 percent carry, and that's the 2 and 20,
18   the part of the deal that we spoke about earlier; is that
19   correct?
20   A.  You would have to double-check with Christian
21   exactly how he listed it, but -- so I -- I would have to
22   say yes, but I would double-check with Christian.
23       There should be something that shows an 80/20 --
24   oh, there's the 80, there's the 20.  Okay.  So it -- it's
25   in Column L.  If you look at L43, 44, 60 and 20 percent is

Page 30

1    the 80 percent.  And then the 20 percent for Go Global is
2    the 20.  That's the 80/20 part of the model.
3        The 2 percent, you wouldn't -- you wouldn't see
4    in a table.  You would see it as an expense for future.
5    That's not until after you start running the -- running the
6    company and their -- you know.
7    Q.  There are several tabs across the bottom.
8        Were there -- are there any tabs that you were
9    responsible for?
10   A.  I may have been asked to update certain tabs if
11   someone wasn't available on the team or if Christian was
12   traveling.  As a for instance, if they needed to change a
13   number, like inventory, they may have asked me to go in and
14   adjust it, but I was mainly responsible for the store
15   recommendation tab.
16   Q.  Understood.  So that was kind of more my
17   question.
18       Were you responsible for the store recommendation
19   tab?
20   A.  Yes.
21   Q.  Okay.  I see in lines, like, 104 to 112 where it
22   says "no selection."  Does that mean that that -- those
23   were at this point undecided upon?
24   A.  I think it was.  Can you scroll up for a moment?
25   I just want to see the column headings at the top.

Page 31

1    Q.  I'm sorry.
2    A.  Okay.  Column D.  And can you scroll down?
3    Q.  Yeah.
4    A.  Okay.  So when -- when I was looking at the data,
5    there were -- clearly, I looked at more than 95 stores.  I
6    don't know how many are -- stores are in total.  And Column
7    D represented what Buy Buy Baby's opinion was, and they had
8    not selected those.  Column B was my selections.
9        So I would have selected certain stores that they
10   had not selected for different -- for different various
11   reasons, and you can see, like, on 107, 108, 109, et
12   cetera.  This is an old version.
13   Q.  Yeah.
14   A.  Uh-huh.
15   Q.  Did Go Global ever submit a bid for Buy Buy Baby?
16   A.  Yes.
17   Q.  How many bids did Go Global -- Go Global submit?
18   A.  How many did they submit?
19   Q.  Yes.
20   A.  I don't know.  I -- I know of one -- absolutely
21   of one, but I think that if there's more, you'll have to
22   speak to Jeff Streader.
23   Q.  That's fine.  Do you know if that bid was a
24   binding bid?
25   A.  It was a stalking horse bid.

Page 32

1    Q.  Do you know if it was a qualifying bid?
2    A.  I do not know.
3    Q.  During that week that you met with Dream On Me,
4    did you meet with any other potential equity investors?
5    A.  I didn't handle equity.
6    Q.  Then what got you involved in the negotiations or
7    discussions with Dream On Me?
8    A.  I don't understand the question.
9    Q.  Well -- well, they were going to be an equity
10   investor, right?
11   A.  Correct.
12   Q.  So I guess what -- what made you get involved
13   with -- with them, with Dream On -- the Dream On Me aspect
14   of this case or this matter?
15   A.  So in my role in the company, I -- depending on
16   the deal, I could handle both sides.  I -- I have done in
17   the past, and they wanted me to participate.  Because I
18   have the knowledge, retail knowledge, and knowledge of
19   deals.  Everything is moving very quickly.  We divide it
20   and conquer.
21       MR. MURPHY:  I'm going to mark as Exhibit 2, it's
22   a three-page email chain.  The first page is Bates number
23   GG-0008771.  The top email is an email from Deborah to
24   Kathleen Lauster on Wednesday, June 14th of 2023.
25       (Exhibit 2 was marked for identification.)



Page 33
1    THE WITNESS:  Yes.
2  BY MR. MURPHY:
3    Q.  Deborah, do you recognize this email?
4    A.  Yes.
5    Q.  Your email is in response to Kathleen's email
6  where she says "To be admitted as a qualified bidder, a
7  deposit must be made on Friday."
8        Is that consistent with your recollection of --
9  of the deadline for bidding at that time?
10   A.  Yes.  In the -- in the meeting and prior to the
11 meeting, Kathleen was in communication and -- with them,
12 with DOM, and during the meeting, she redistributed the
13 process and the deadlines, so they -- they were aware.
14   Q.  You said, "Hope DOM can move that fast."
15       At that point, did you have any knowledge or
16 belief as to whether they could move that fast?
17   A.  That email was before we met in person, right?
18 Because it's dated June 14th.
19   Q.  Correct.  Yes.
20   A.  So I would have been coming off of the impression
21 from only the -- the dinner at that point.  And she's
22 asking -- they don't -- they're getting to know us, right?
23 So she's -- she's telling them to make a bid, and I'm
24 saying, "I hope they can move that fast."  So it's -- it
25 was neither here nor there.

Page 34
1        MR. MURPHY:  I'm going to mark Exhibit 3.  It is
2  a two-page email chain.  The first document is GG-0000420.
3        (Exhibit 3 was marked for identification.)
4  BY MR. MURPHY:
5    Q.  The top email is from Matthew Lapish, Abhishek
6  Pathania on Friday, July 14th.  But I actually want to look
7  at the email below that that's from Jeff Streader to
8  Christian Feuer, Yuen Chau, and Deborah, and CCs several
9  other people.
10       So this email, Deborah, would have been on June
11 14th, which I think we've established was the day before
12 the meeting in New Jersey with Dream On Me; is that right?
13   A.  Yes.
14   Q.  In this email Jeff says, "We need to align on
15 Plan B - if Mark is non-committal at the meeting and needs
16 more time to work" -- "to think through this.  We need to
17 align on our communication to let him know we will go
18 alone."
19       As of June 14th, did Go Global have sufficient
20 funding to move forward with the deal without -- without
21 Dream On Me?
22   A.  Yes.
23   Q.  Am I -- would you have considered Mark to be
24 non-committal at the meeting the following day?
25   A.  After the dinner they -- we got the impression

Page 35
1  that he was quite headstrong and might do his own thing.
2  So that's likely what he, Jeff, meant by Plan B.  You would
3  have to double-check with Jeff, but if the deadline was
4  approaching that quickly, then we needed to come up with a
5  deposit and put it down, which we did, because he didn't.
6        I think the previous email you showed, it said,
7  to be qualified bidder we needed to have the deposit by
8  that Friday, and we put a deposit down.
9    Q.  Do you know if Dream On Me put a deposit down by
10 that Friday?
11   A.  I do not know.  Not with us, but I do not know if
12 they did something on their own.  I also don't know the
13 exact date of the deposit.
14   Q.  Have you ever seen a copy of the bid that was
15 submitted?
16   A.  The initial?
17   Q.  Or, I guess, like, what -- whatever -- what --
18 whatever was submitted with the deposit you're speaking of.
19   A.  I -- I don't know if there was an email that I'm
20 just not recollecting, but I'm going to -- I would have to
21 review, to be honest.  And you just might need to go to
22 Jeff's -- Jeff -- there you go.
23       MR. MURPHY:  So I'm going to mark as Exhibit
24 4 -- it's an eight-page document.  Got Go Global's logo
25 across the top.

Page 36
1        (Exhibit 4 was marked for identification.)
2  BY MR. MURPHY:
3    Q.  It's entitled, Draft Bid for Assets Buy Buy Baby,
4  and it's dated June 16th of 2023.  First Bates number is
5  GG-0030208.
6        I can scroll through all the pages, but do you --
7  do you recognize this document?
8    A.  Everything was moving quite fast.  Christian sent
9  it.  I don't know if I was CC'd on an email from -- from
10 this, but I didn't put this together, other than the 20
11 stores.
12   Q.  So I'm correct that your role in this document
13 would have been the decision to, at this point, intend to
14 operate 20 stores?
15   A.  Correct.  But we would have discussed also as a
16 group that the asset, and not just the stores, but the
17 company, was -- was deteriorating at that time because the
18 deadline -- the deadlines changed a couple of times in --
19 in this process.
20       So our bid was significantly less than it was in
21 that first document that you presented.
22   Q.  In your opinion, was the Buy Buy Baby brand being
23 damaged during this time period?
24   A.  Yes.
25   Q.  Would you say it was being damaged significantly?



Page 37

1  A.  Yes.  The inventory was being liquidated I
2  believe by -- by Hilco, in significant sales.  We were
3  looking to buy the -- the inventory, which is an asset, and
4  the IP, and the -- the sizes were broken.  The remaining
5  inventory would have had less value from where we initially
6  started.
7     And the IP also would have significantly
8  decreased because of the market.  Because all of this
9  impacts the market, would impact the brand -- brand in
10 total.
11  Q.  As of this time, on June 16th of last year, did
12 you have any opinion regarding the proposed ▮▮▮▮▮▮▮
13 price put on the intellectual property?
14  A.  I didn't produce this document.  I can tell you
15 that -- from looking at stores and looking at inventory,
16 that the business was in decline, but I don't have an
17 opinion specifically on that 18.7.
18     By the -- by the time we got towards the end of
19 the process, I -- I can tell you, it was worth a lot less
20 than that, from an IP perspective.
21  Q.  If Go Global were to -- if Go Global were going
22 to have -- let me start over.
23     If Go Global had acquired Buy Buy Baby, was the
24 plan to open additional stores?
25  A.  At some point, yes.  It would have been in

Page 38

1  our projection.  We were also looking to -- to grow their
2  e-commerce business, which is what we specialize in, as
3  well.
4  Q.  So this -- this bid that we're looking at, is
5  this the -- the one bid that you were aware of?
6  A.  No.  There -- there was another one in the
7  beginning of the process, which would have been the
8  stalking horse bid, which was a lot -- a lot more money.
9  There -- there may have been several bids.  I'm just not
10 aware of all the different ones.
11    Again, I -- I would prefer that you go to Jeff
12 for that, because I -- I don't want to state something
13 that's incorrect.
14  Q.  But you believe there was a -- a higher bid that
15 was submitted prior to this?
16  A.  In the beginning of the process, before we met
17 Dream On Me.  And, also, before they started liquidating
18 everything, in fairness.
19    MR. MURPHY:  I'm going to mark Exhibit 5.
20    (Exhibit 5 was marked for identification.)
21 BY MR. MURPHY:
22  Q.  It's a one-page email chain.  It's page
23 number GG-0042597.  The top email is from a -- a Rick
24 Maicki at Ankura to Deborah and Jeff, and CCs some other
25 individuals.  And then there's an email below that from

Page 39

1  Deborah, that I believe she was responding to.
2  A.  Uh-huh.  Yeah.  Yes.
3  Q.  Your email references some time spent with Patty.
4  Is that -- is that Patty Wu?
5  A.  Yes.
6  Q.  And what was Patty Wu's position at that time?
7  A.  I believe she's a CEO of Buy Buy Baby.
8     THE WITNESS:  Sorry.  Give me one second.  I'm
9  sorry.
10    MR. MURPHY:  No -- no problem.
11    MR. BERLOWITZ:  I guess the mailman came by
12 or something, you know.
13    THE WITNESS:  I tried -- I -- I should have done
14 a surgeon general's warning earlier.
15    MR. MURPHY:  I've -- I've been there.  That's --
16 that's no problem at all.
17    THE WITNESS:  Yeah.  She was so good up until
18 now, but -- so I might go back and forth on mute for -- as
19 -- as you asked.
20    MR. MURPHY:  No, that's fine.  And -- and we can
21 actually -- I -- this isn't going to be terribly long from
22 now.  I'm -- I'm thinking that we're going to be done
23 without needing to take a lunch break or anything like
24 that.  Probably -- probably about another hour or so.
25    THE WITNESS:  Okay.  It's fine.

Page 40

1     MR. MURPHY:  If you -- if you want to take a
2  break for a few minutes, we can take a break now, or we can
3  keep going.  It's up to you.  I'm fine either way.
4     THE WITNESS:  We -- we keep -- I'm fine.  We can
5  keep going.
6     MR. MURPHY:  Okay.
7  BY MR. MURPHY:
8  Q.  The -- your email mentions the impact of store --
9  store closures on e-com?
10  A.  Yes.
11  Q.  Can you just expand on that?  Explain to me the
12 --
13  A.  Uh-huh.
14  Q.  -- how the store closures impact e-com?
15  A.  Yes.  At the time of this email, I was doing a
16 lot of research on the -- the stores, and what I was trying
17 to -- to establish with this email is two -- two things.
18    One is Bed Bath & Beyond also had stores that may
19 have had co-tenancy with Buy Buy Baby.  So I was trying to
20 establish where there were co-tenancies, and if I should --
21 to select a store or how that would impact.
22    And then also from an -- a heat map perspective,
23 so to speak, I was looking at, if we were to have a store
24 closure, how that would impact e-com or how much from
25 digital sales were happening in the area of certain



Page 41

1  particular stores. So it's more of, like, a geographical
2  type of analysis.
3    Q. And so, if I'm understanding correctly, you would
4  look at where a store was located, and look at the amount
5  of internet traffic and sales that you would get online,
6  and whether having a store there impacted that?
7    A. To the best of my ability, with the information
8  that they were able to provide.
9    Q. In general, was there a significant impact on
10 e-com when a store closed?
11   A. I don't recall, off of the top of my head,
12 because their e-commerce business was quite small. They
13 were more of a retailer.
14     So again, I don't want to guess. I'd have to go
15 back to notes, but I -- I don't want to -- I don't want to
16 guess. I don't think it was too significant.
17     MR. MURPHY: I'm going to mark as Exhibit 6, it's
18 a one-page email chain.
19     (Exhibit 6 was marked for identification.)
20 BY MR. MURPHY:
21   Q. The top email is from Deborah to Jeffrey Streader
22 and CCs several individuals. It's Bates number GG-0048891.
23 So Deborah, this looks like an email you sent to Jeff on
24 June 18th of last year.
25     Does that look correct?

Page 42

1    A. Yes.
2    Q. And so this would have been three days after the
3  meeting you had with Dream On Me; is that right?
4    A. Yes.
5    Q. It says, "We'll discuss with Patty on her view
6  for 20 versus 95 as soon as possible."
7       You're referring to store locations, right?
8    A. Correct.
9    Q. Did you ever have a discussion with Patty about
10 the -- the 20 versus 95?
11   A. Yes.
12   Q. What do you remember about that discussion?
13   A. First, all discussions with Patty are with
14 Lazard, so I just want to make that clear. So after the
15 June 15th meeting, when it became clear that it may not
16 work out with Dream On Me at that point, we started looking
17 at alternative scenarios, lowering our bid, and therefore,
18 lowering the amount of stores that we were -- we were
19 looking at.
20      So when I had to go from 95 to 20, the discussion
21 was, you know, these were the -- these were the 20 that --
22 best 20 that I -- I felt were important. And I wanted to
23 -- I wanted to review with her again, like, the
24 co-locations or if there's any specifics that I may not --
25 that I may have overlooked that weren't just financial.

Page 43

1    Like, for example, if no more traffic was coming
2  to the area, if they were so significantly impacted by, you
3  know, by COVID and no one came back as a for instance. So
4  it was more about getting the data about the store that I
5  may not have just seen in the financials.
6    Q. Was 20 a number that you -- you believe was the
7  ideal number or was 20 based on the proposed bid -- bid
8  amount?
9    A. Because of -- we had to go down to 20, because we
10 spent a lot of time with Dream On Me. And they -- they, to
11 some respect, either weren't going to be a partner or
12 wasted our time.
13     And during that process, the stores kept losing
14 value, because there was liquidation and the market kept
15 changing. So we had to go down to 20 stores at a certain
16 point, you know, to align with the bid.
17   Q. Were -- were there discussions --
18   A. 22 stores --
19   Q. Oh, sorry.
20   A. -- or -- sorry. Or 22 stores. Whatever it was.
21   Q. Were there discussions about a number of stores
22 between 95 and 20 to 22, or did it drop right down from 95
23 to that range?
24   A. There were -- there may have been, at certain --
25 at a certain point, before DOM, a 70 store model.

Page 44

1  And then I saw in the data room, which was not us, a 40
2  store model.
3       So I don't know who requested that. I had
4  believed that maybe DOM had requested that. I'm not sure.
5  And then we went down to a 20 store model, or 22 store, to
6  be honest.
7    Q. And you said you saw a 40 store model? That
8  would have been in the Lazard data room?
9    A. Correct. Not requested by me.
10   Q. And would that be a model that someone else
11 requested that Lazard put together?
12   A. Possibly.
13   Q. Did you ever consider a 40 store model?
14   A. I did not. And -- and to be clear, I thought
15 that it was DOM, because it happened right after one of the
16 meetings, which indicated to me that they were possibly
17 trying to look at this on their own.
18     I -- I believe it was between the dinner and the
19 meeting on the 15th or right after the 15th.
20   Q. But you -- you don't know who that was, right --
21   A. Correct.
22   Q. -- who requested it?
23   A. I -- I do not know. I would not be privy to
24 that. That's confidential.
25   Q. Was your 95 store model in the Lazard data room?



Page 45

1  A.  A 95 store model was in the data room.  I don't
2  know if it was my 95 store model.  It could have been Buy
3  Buy Baby's, because that's where I started, from their --
4  their 95.
5      Q.  Is the answer the same to the 22 store model?
6      A.  I am not positive.
7      Q.  You -- you're not sure if it was in there or not;
8  is that the answer?
9      A.  I believe there was a 20 store model.  I don't
10 have access to the data room any longer.  I believe there
11 was a 20 store model.  I do not know if it was my -- I
12 started with 22, and then took it down, so I am not
13 positive if it was mine or not.
14     Q.  Related to the Go Global data room, did you have
15 any responsibilities for putting documents or information
16 in there?
17     A.  No.
18     Q.  You wrote that FY-22 data is data hard to use.  I
19 -- I believe you mean fiscal year.
20         Can you just explain to me why that is.
21     A.  Yes.  The -- the information in the data room --
22 let me -- let me take a step back.  They provided full year
23 information for 2019 and 2021.  For 2022, they only
24 provided ten months' worth of information, because that was
25 what was available at the time.

Page 46

1          And I had to extrapolate all of the information
2  from P&Ls and different sources to put it together, so I
3  can do a compare of the three years.  So that -- so it just
4  became difficult to pull down, and it took a lot of time
5  to, you know, all pull together.
6      Q.  As of that June 18th date of last year, from your
7  perspective, what would have been the ideal number of
8  stores to take?
9      A.  I'm trying to think of how to answer that.  One
10 second.  I'm -- I -- at that point, the -- the ideal number
11 of stores would have been what we selected, the lesser
12 amount, because we wouldn't want to overbid on a company to
13 -- you know, we want to make sure that we're successful
14 walking in.
15         And, at that point, if we were only taking 20,
16 and then adding stores later, that would have been my
17 recommendation.
18     Q.  So after your -- the Go Global bid deposit was
19 submitted, what's your recollection of what happened in the
20 auction process?
21     A.  Do -- do you have the date of the -- of the
22 deposit?
23     Q.  Yeah.  I can -- I can show.  It was -- it was
24 June 16th.  It was that Friday.  I can -- I can show that
25 to you --

Page 47

1      A.  Okay.
2      Q.  -- if you want to -- me to put it back up.
3      A.  No.  No.  That -- that -- that's okay.
4      Q.  The -- I -- I'll -- and I can -- I'll -- I can
5  just put it back up.  The -- the last page of that bid I
6  showed you has a wire confirmation.
7      A.  From Janie and Jack?  Okay.
8      Q.  Yeah.  I'll -- yep.  I'm going to put that back
9  up.  One second.
10     A.  Uh-huh.
11     Q.  This is the bid that we looked at earlier.  And,
12 actually, before I get to the -- the wire on the last page,
13 would you have been responsible for -- for identifying
14 these -- these stores listed here on -- on Exhibit --
15 Exhibit A?
16     A.  I would have provided a list to Christian Feuer,
17 and -- and possibly -- possibly attorneys.  I'm not sure.
18 Uh-huh.
19     Q.  So this is the wire transfer I was speaking of,
20 which does appear to come from Janie and Jack, LLC?
21     A.  Yes.
22     Q.  And then so it looks like it was inputted on the
23 -- on the 16th at night, which I understand to be a Friday,
24 and then it would have been the weekend.  And I believe
25 June 19th was a holiday, so I think that -- I don't think

Page 48

1  it actually went through until the 20th.
2          That is my understanding of how the dates played
3  out.
4      A.  I'm not sure.  Janie and Jack is in San
5  Francisco.  So it looks like it was initiated on West Coast
6  time, right?  That's 7:23 West Coast time, so I don't --
7      Q.  Right.  Which would be, like, 10:30 here?
8      A.  I -- I couldn't say when -- yeah.  I couldn't say
9  when it cleared.  Yeah.
10     Q.  Okay.  No.  That -- that's fine.  And I -- I'm
11 actually not really concerned about when it -- when it
12 cleared.  I was just trying to give you a -- a background.
13     A.  Right.  That -- that's fine.
14     Q.  Did -- so after -- once this was submitted,
15 what's your recollection of -- of the -- of the auction
16 process?
17     A.  My recollection is that there were two next
18 steps.  One -- or a few next steps.  One is, they were
19 going to have an auction for the IP for Bed Bath & Beyond.
20 They -- by "they," the bankruptcy process -- in the
21 bankruptcy process.
22         There would be a separate date for an auction for
23 the IP for Buy Buy Baby.  Then they were going to auction
24 stores, and they -- they basically separated Buy Buy Baby
25 from the Bed Bath & Beyond bankruptcy and treated it



Page 49

1  separately.
2      There -- there was a bid for the Bed Bath IP,
3  which everyone was very surprised about.  So Overstock.com
4  -- don't quote me on dates because I don't -- I just know
5  this all happened after that period that you gave me.
6      Overstock.com purchased the IP for Bed Bath for
7  20-something million, maybe 25 million, in that ballpark.
8  We were all very surprised about that because it was such a
9  -- such a low bid and the -- myself, Patty, Jeff, our
10  internal global team were concerned that the IP would go
11  for even less on the Buy Buy Baby side.  So it took the
12  value out of it.
13      And then what else?  Then when the IP was being
14  auctioned -- and like I said, there was a later date for
15  the stores.  My understanding -- or at least we were told
16  that although the IP was being auctioned, since they were
17  looking at Buy Buy Baby, to sell that as a whole company,
18  as an ongoing operation, that there was a later date in
19  which we could participate, and we can still bid on the
20  company, on the IP, and the stores.
21      And if our bid was more than whatever the bid
22  would be for the IP, they were still looking to sell the
23  company for the value of the entire company to run it as an
24  operation.
25   Q.  So if I'm understanding it correctly, there was

Page 50

1  an opportunity still to purchase the going concern with the
2  IP even after the IP auction?
3   A.  Correct.  And -- and they -- they actually moved
4  the date of -- of that to roughly July 7th, maybe.
5   Q.  You mentioned you were surprised about the amount
6  that the Bed Bath & Beyond IP sold for.
7      Did you expect it to be higher or lower?
8   A.  I think everyone, meaning of the market, not just
9  Go Global, expected it to -- to be higher, but then that
10  put a lot of -- put a lot of strain on Buy Buy Baby,
11  because that was the jewel, and they were -- they were more
12  profitable than Bed Bath from financial data.  Not -- not
13  from what was happening in the market as we speak.  But
14  Overstock set -- set a low precedent.
15   Q.  And I'm correct that Go Global was never involved
16  in the Bed Bath & Beyond side of that?
17   A.  Correct.
18   Q.  Is that right?  Yeah.
19   A.  Correct.
20   Q.  Did Go Global participate in the IP-only auction?
21   A.  I do not believe so, but please ask Jeff.
22   Q.  Do you know who won the IP-only auction?
23   A.  Yes.  That would be Dream On Me.
24   Q.  And do you know how much Dream On Me paid for the
25  IP?

Page 51

1   A.  Yes.
2   Q.  How much was that?
3   A.  15 and a half million.  They also set a
4  precedent, a very bad one.
5   Q.  Do you know what the next highest bid was after
6  Dream On Me?
7   A.  I do not know.  I -- I believe it was close, but
8  I -- I do not know.
9   Q.  So following the IP auction, did Go Global
10  continue in its attempt to acquire Buy Buy Baby?
11   A.  Yes.
12   Q.  Can you tell me what you remember happening at
13  that time?
14   A.  We -- yeah.  The answer to that is yes.  We
15  revised -- we revised our models several times to -- again,
16  to take a look at market conditions where the IP was,
17  number of stores, number of people we would keep, et
18  cetera.  We proceeded to, in our modeling, lower the value
19  of the IP and inventory.
20      At one point we had it as low as seven, and we
21  continued -- we continued in the process and -- and in our
22  work to see if we could acquire the company.
23   Q.  Do you know if Go Global submitted a bid after
24  the IP auction?
25   A.  I do not know.  In fairness, it was moving very,

Page 52

1  very fast.
2   Q.  I -- I can -- I can see this and I -- I've heard
3  that from, frankly, everybody involved.
4   A.  Right.  So my -- my answer is not no.  I just --
5  I may not have been privy to that email or if it -- if
6  there was one.
7   Q.  When you were considering -- when Go Global was
8  considering a bid after the IP auction, was Go Global still
9  using a 20 store model?
10   A.  I -- I am not -- so let's go back to the previous
11  question.
12   Q.  Sure.
13   A.  Right.  So your previous question was asking me
14  if there was a bid, and I -- you would have to go to Jeff
15  because I don't know, so I don't know how to answer that
16  question.
17   Q.  Okay.
18   A.  I didn't even work on a lesser one from there, if
19  you're asking me that.
20   Q.  That's a fair question.  Did you ever -- did you
21  ever work in a model that was less than 20 stores or fewer
22  than 20 stores?
23   A.  No.  But I did point out I worked on a model that
24  had 22 stores, and I pointed out that during one of the
25  real estate auctions, that some stores may have been taken.



Page 53

1  So that's how we got down to roughly a 20 store model. I
2  don't believe it was less than 20.
3        There may have been an email from me stating that
4  I thought it went down to 18, but they corrected me and
5  said that some of those stores were still available. So we
6  were still at 20.
7        MR. MURPHY: I am going to mark as Exhibit 7 the
8  three-page document. It's got a Go Global logo across the
9  top of it.
10       (Exhibit 7 was marked for identification.)
11 BY MR. MURPHY:
12    Q. The first section is entitled Case
13 Study/Investment Process.
14       Deborah, do you recognize this document?
15    A. I believe Yuen Chau wrote the document in
16 preparation for -- we're looking -- we're looking to get a
17 fund. So we were marketing from a marketing perspective to
18 try to get into a fund.
19    Q. And -- and I think -- I think I understand, but
20 when you say trying to get into a fund, what -- what do you
21 mean?
22    A. Some private equities have -- you know, create
23 funds. And if you have -- if you have a fund or people
24 that are supporting you as a private equity and
25 contributing money, then you can take those funds and buy

Page 54

1  assets with them.
2        Of course, there's a lot of -- a lot of rules
3  involved, clearly. So we are -- we're in the process of
4  starting our -- or getting someone to contribute for -- to
5  us for our first fund.
6     Q. Do you know if you've ever read this document
7  before?
8     A. I do not recall it. I don't know if there's
9  store information.
10    Q. In the first paragraph it says that this document
11 is being shared to explain why Go Global passed on this
12 opportunity relative to what may have been reported on CNBC
13 and other news agencies.
14       Would you agree with the characterization that Go
15 Global passed on the Buy Buy Baby opportunity?
16    A. No. This document was for marketing purposes.
17    Q. So that's inaccurate, that you passed?
18    A. Can you repeat that, please?
19    Q. So is it inaccurate to say that -- that Go Global
20 passed on the opportunity?
21    A. We were still involved in the -- in the process.
22 So if I -- if you want me to clarify, at -- at one point we
23 passed, but then it -- the process reopened. So towards
24 the end of June, we communicated that we were out of the
25 process because the market deteriorated so much, and we

Page 55

1  were concerned, but then Lazard approached us and said,
2  "You are the best partner for us. You know retail. You're
3  going to keep this as a whole."
4        And the process is still open, and we continued
5  with the process. So -- so this is a little out of context
6  because of that.
7        You have to remember that this document was after
8  the fact, after DOM already had taken the company --
9  already had won the bid for the company, and we were -- we
10 were still marketing for a fund.
11    Q. Okay. Do you know what was reported on CNBC and
12 other news agencies?
13    A. I -- at the time I did. I don't recall the
14 article right now, unless you have it to show it to me, but
15 I believe it stated that Dream On Me won -- won the bid,
16 and Go Global did not win the bid, or something to that
17 effect.
18    Q. So -- so you said you didn't agree with the
19 statement that Go Global passed on the opportunity. I'm --
20 I'm still not clear on why that is.
21    A. I did not put together this document, so.
22    Q. Yeah. I'm not asking you -- well, I understand
23 that, but I -- I'm -- I -- you said you disagree with that
24 statement, so I just want to know what you disagree --
25 like, why you disagree with that statement.

Page 56

1     A. Because the -- so are you asking me in relation
2  to emails or in relation to this -- in this document?
3  Because for this document, I really can't answer too many
4  questions, to be honest. I'm not --
5     Q. Again, I -- I guess I'm just asking whether you
6  agree with the statement in the document.
7     A. I don't -- I don't understand the purpose of the
8  question.
9     Q. Oh, you don't have to understand the purpose. I
10 just need -- I --
11    A. We -- at some point in time we sent an email to
12 Lazard to say that we were out of the process, but then the
13 process reopened, and we were back in the process. So the
14 word passed.
15       As it's related here, I'm having a hard time
16 trying to understand because there was a point in time when
17 we said that we were out of the process, so you could
18 allude to say that that was passed. But then we were back
19 in the process.
20       So it was back open for us, and we continued to,
21 you know, pursue the asset. As it's written in this
22 document, I don't know how -- you need it -- or how he
23 wrote it, and how it was supposed to go to from a marketing
24 perspective, I'm not sure. So I would probably have you
25 refer back to him on that.



Page 57
1  Q.  There's a bold paragraph that says, "The opaque
2  status of inventory levels, leases, human resources, and
3  vendor contracts lead us to increase the risk profile based
4  on the cost to restock inventory, uncertainty of retaining
5  key customer data, and assurance of the" -- excuse me --
6  "assurance of leases.  Without a high" -- "higher level of
7  certainty we felt the seller needed to provide in the
8  criteria mentioned below, we decided to pass on acquiring
9  Baby."
10      I guess the same question: Do you agree with that
11 sentence?
12  A.  So taking the word out, "pass," because again, we
13 were in and out of the process, I agree with the statement
14 that there was uncertainty around inventory levels, leases,
15 human resources, vendor contracts.  All of those, I do
16 agree with.
17      Again, the -- the company had decreased levels of
18 sales and profits.  The inventory was continuing to
19 deplete.  People were leaving the company because of the
20 bankruptcy process.  So key employees were starting to
21 leave because there was too much uncertainty.
22      Vendors were -- could -- or I don't know if, at
23 that point, can start applying pressure and ask for
24 prepayments on future goods.  So all of that led to risk in
25 the business.  We believed that we can still, you know, run

Page 58
1  the business, had we acquired it because this is what we
2  do.  But also, at that time, what was happening with the
3  bid is that we had to also put in a significant amount of
4  working capital to -- in addition to what we were bidding
5  for the company in order to run it day one, to restock
6  inventory, and et cetera.
7      So the long answer is, I do agree with the
8  beginning of that.  I'm taking the word out, "pass,"
9  because I don't know how it's related to this document.
10 Q.  Okay.  I mean, would you agree that you use --
11 used that word on purpose?  I mean, you put it in capital
12 letters.
13      MR. BERLOWITZ:  Objection.
14      THE WITNESS:  You would have to check with Yuen,
15 but I would have to guess that if the news is spinning it
16 that -- if the news is stating that we didn't acquire Buy
17 Buy Baby, we would want to explain to someone what the
18 risks were involved.
19 BY MR. MURPHY:
20 Q.  So if you disagree that Go Global passed on
21 acquiring Baby, how would you characterize it?
22 A.  I would say that we were -- we still had the
23 opportunity to purchase the company, and we were still
24 pursuing down that path.
25 Q.  What would happen when that path came to an end?

Page 59
1  A.  I don't understand.
2  Q.  Okay.  So I guess you -- I mean, at some point,
3  didn't that pursuit stop?
4  A.  At some point, yes, it would have stopped because
5  --
6  Q.  And why did it stop?
7  A.  So Buy Buy Baby -- so DOM bid 15 and a half of
8  the IP, which was overvalued, and there was now pressure,
9  you know, on us because now we would -- we would have to
10 justify a higher bid to investors.
11      So I don't know exactly how it stopped or if it
12 just stopped because of a time -- date or time frame.  But
13 I guess it -- it came to an end.  I don't know if that was
14 July 7th or whatever date it was.
15      MR. MURPHY:  Steve, I think I'm just about done.
16 I just want to look at my notes for a couple of minutes.
17      Do you want to just take a five-minute break?
18      MR. BERLOWITZ:  Sure.  Five-minute break.
19      THE REPORTER:  Okay.  Without hearing objection,
20 the time is 12:02 p.m. Eastern.  We're officially off
21 record.
22      (A recess was taken.)
23      THE REPORTER:  Okay.  Oh, sorry about that.  The
24 time is 12:08 p.m. Eastern.  We're officially back on
25 record.

Page 60
1  BY MR. MURPHY:
2  Q.  So the -- the bidding process that occurred after
3  the IP auction, were you directly involved in that?
4  A.  No.  Just from a -- from a modeling standpoint I
5  was, but from the actual -- what was getting submitted, I
6  was not.
7  Q.  From the Go Global side, would that have been
8  Jeff, Christian, and Yuen?
9  A.  Yes.
10 Q.  Do you know anything about Ziff Davis, Inc?
11 A.  I know the name, but I -- I don't know him.
12 Q.  Do you know anything about Ziff Davis'
13 involvement in the potential transaction?
14 A.  I do not.  Was he on the -- was he on the equity
15 side?  If he was on the equity side, I would not.
16 Q.  After the June 15th meeting, did you have any
17 further communications with Dream On Me?
18 A.  No.
19 Q.  Do you know if anyone from Go Global had any
20 further communications with Dream On Me?
21 A.  That might be a question for Christian or
22 Kathleen.  I -- so there may have been, but not -- I did
23 not.
24 Q.  So if -- if I'm understanding correctly, you
25 attended both meetings, but you otherwise didn't have any



Page 61

1  communications on your own with Dream On Me?
2      A.  No.
3      Q.  That -- that's correct?
4      A.  That's correct.  Sorry.  That is correct.
5          MR. MURPHY:  I don't have any further questions.
6  Thank you.
7          MR. BERLOWITZ:  No questions.
8          THE WITNESS:  Thank you.
9          THE REPORTER:  Okay, everyone.  Please stick
10  around.  I will have some spelling questions in a moment
11  that I will need everyone's help with.
12          But in the meantime, Counsel --
13          MR. MURPHY:  Oh, Nicholas, can you -- if you send
14  me your email address, I'll email you the exhibits.
15          THE REPORTER:  Absolutely.
16          And Counsel Murphy, would you like a copy of the
17  transcript?
18          MR. MURPHY:  Yes, please.
19          THE REPORTER:  Okay.  Standard delivery time is
20  ten business days.  Is that okay for you?
21          MR. MURPHY:  That's fine.
22          THE REPORTER:  Okay.  And Counsel Berlowitz,
23  would you like a copy of the transcript?
24          MR. BERLOWITZ:  Tom, I can just get a copy from
25  you, I assume?

Page 62

1          MR. MURPHY:  Yeah.  You --
2          MR. BERLOWITZ:  -- okay.  Yeah.  No.  No, thank
3  you.
4          THE REPORTER:  Okay.  Thank you so much.  All
5  right.  The time is 12:11.  I'm sorry.  12:12 p.m. Eastern.
6  We're officially off record.
7          (Deposition concluded at 12:12 p.m.)

Page 63

1                CERTIFICATE OF REPORTER
2
3          I, NICHOLAS CATUCCI, a Digital Reporter and
4  Notary Public in and for the State of New Jersey, do hereby
5  certify:
6
7          That the foregoing witness was duly sworn; that
8  the proceeding took place before me at the time and place
9  herein set forth; that the testimony and proceedings were
10  accurately captured with annotations by me during the
11  proceeding.
12
13          I further certify that I am not related to any of
14  the parties to this action by blood or marriage and that I
15  am not interested in the outcome of this matter, financial
16  or otherwise.
17
18          IN WITNESS THEREOF, I have hereunto set my hand
19  this 22nd day of October, 2024.
20
21
22
23          _____
             NICHOLAS CATUCCI
24          Notary Commission New Jersey/50207229
             Commission Expires:  February 22, 2028
25

Page 64

1                CERTIFICATE OF TRANSCRIPTIONIST
2
3          I, Jacqueline Poolton, Certified Shorthand
4  Reporter/Registered Professional Reporter/Certified
5  Realtime Reporter, do hereby certify:
6          That the foregoing is a complete and true
7  transcription of the original digital audio recording
8  of the testimony and proceedings captured in the
9  above-entitled matter.  As the transcriptionist, I
10  have reviewed and transcribed the entirety of the
11  original digital audio recording of the proceeding to
12  ensure a verbatim record to the best of my ability.
13          I further certify that I am neither attorney for
14  nor a relative or employee of any of the parties to the
15  action; further, that I am not a relative or employee of
16  any attorney employed by the parties hereto, nor
17  financially or otherwise interested in the outcome of this
18  matter.
19          IN WITNESS THEREOF, I have hereunto set my
20  hand this 29th day of October, 2024.
21
22
23          _____
24          Jacqueline Poolton, CSR/RPR/CRR
25



Page 65

```
 1              DEPOSITION ERRATA SHEET
 2
 3   Esquire Job No. J11905319
 4   Case Caption:  GO GLOBAL RETAIL, LLC v. DREAM ON ME
     INDUSTRIES, INC. AND DREAM ON ME, INC.
 5
 6         DECLARATION UNDER PENALTY OF PERJURY
 7
 8        I declare under penalty of perjury that I have read
 9   the entire transcript of my deposition taken in the
10   above-captioned matter or the same has been read to me, and
11   the same is true and accurate, save and except for changes
12   and/or corrections, if any, as indicated by me on the
13   DEPOSITION ERRATA SHEET hereof, with the understanding that
14   I offer these changes as if still under oath.
15
16        Signed on the _____ day of _____, 2024.
17
18
19
20
21             _____
                   DEBORAH GARGIULO
22
23
24
25
```

Page 66

```
 1              DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25             DEBORAH GARGIULO
```

Page 67

```
 1              DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25             DEBORAH GARGIULO
```

