**Page 1**

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------------------
3    GO GLOBAL RETAIL LLC,
4               Plaintiff,
5          -v-      Index No. 1:23-cv-07987-AS
6    DREAM ON ME INDUSTRIES, INC., and DREAM ON ME,
     INC.,
7
               Defendants.
8
     --------------------------------------------
9
10
11        REMOTE VIDEOCONFERENCE DEPOSITION OF YUEN
12   CHAU, a Witness herein, taken by the Defendant,
13   on Wednesday, October 16, 2024, at 2:30 p.m.,
14   before Jeffrey Shapiro, a Stenographic Reporter
15   and Notary Public, within and for the State of
16   New York.
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2
3
4
5
6         IT IS HEREBY STIPULATED AND AGREED by
7    and between the attorneys for the respective
8    parties hereto, that the filing, sealing and
9    certification be, and the same are hereby
10   waived;
11
12        IT IS FURTHER STIPULATED AND AGREED
13   that all objections, except as to the form of
14   the questions, shall be reserved to the time of
15   the trial;
16
17        IT IS FURTHER STIPULATED AND AGREED
18   that the within examination may be subscribed
19   and sworn to before any notary public with the
20   same force and effect as though subscribed and
21   sworn to before this Court.
22
23
24
25
```

**Page 2**

```
1    A P P E A R A N C E S :
2    GREENBAUM ROWE SMITH & DAVIS LLP
3      Attorneys for the Defendants
4        99 Wood Avenue South
5        Iselin, New Jersey 08830
6    BY:  THOMAS MURPHY, ESQ.
7
8
     FALCON RAPPAPORT & BERKMAN LLP
9
       Attorneys for the Plaintiff
10
       265 Sunrise Highway, Suite 50
11
       Rockville Centre, New York 11570
12
     BY:  STEVEN BERLOWITZ, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1    Whereupon,
2              YEUN CHAU,
3    after having been first duly sworn, was examined
4    and testified as follows:
5              DIRECT EXAMINATION
6    BY MR. MURPHY:
7         Q.   State your name for the record.
8         A.   Yuen Chau.
9         Q.   What is your address?
10        A.   12372 Chase Street, Garden Grove,
11   California 92845.
12        Q.   Good afternoon, Mr. Chau.  My name
13   is Tom Murphy, I'm a lawyer with Greenbaum Rowe
14   Smith & Davis.  We represent Dream On Me, Inc.,
15   and Dream On Me Industries, Inc. in a lawsuit
16   brought against it by Go Global Retail LLC.
17        Do you understand that you're here
18   virtually today to have your deposition taken
19   in connection with that case?
20        A.   Yes, I understand.  And you can
21   call me Yuen.
22        Q.   Okay.  Sounds good.  Thanks.  And
23   you can call me Tom.
24        Can you hear me okay?
25        A.   Yes.
```



Page 5

Chau

Q. Great. Have you ever had your deposition taken before?

A. No.

Q. I'm going to go through some brief instructions before we begin. You're under oath here today the same way you would be if you're testifying in court.

The court reporter, Jeff, who you could see on your screen is going to be taking down and making a record of everything that is said this afternoon during the deposition. Therefore, it's important for you to provide verbal responses, he can't transcribe nods or other gestures. It also makes his job a lot easier if we don't talk over one another. So, you may know where I'm going with my question, just let me finish and I'll do the same with your answer?

If you don't understand a question, let me know and I'll rephrase it. If you answer, I will assume you understood the question. If you do not know the answer, let me know -- let us know that, that's perfectly fine. We just want to know what you know. We

Page 6

Chau

don't want you to guess. You may approximate, just let us know that you're approximating. And if you need a break for any reason, just let us know, you just can't take one while a question is pending.

Do you understand these instructions?

A. Yes.

Q. Did you do anything to prepare for today's deposition?

A. I read e-mails, I spoke to our attorney.

Q. I don't want to know anything you spoke to your attorney about. But is there anything else you did besides review e-mails?

A. That's about it. The contents of the e-mails.

Q. And do you know approximately how many e-mails you've reviewed?

A. Twenty, give or take. And there's attachments and there's like old e-mails on e-mails.

Q. Understood. Did you speak to anyone else about Go Global about your deposition today?

Page 7

Chau

A. Did I speak to anybody else in Go Global, you said?

Q. Yes.

A. Well, my colleague and I have the deposition today.

Q. Did you speak to Jeff Streader about his deposition?

A. I spoke to -- he told me that he had his deposition. He told me -- yes, I spoke to him.

Q. Did you have any substantive conversation about his deposition?

A. Not in detail. He's been traveling.

Q. How about -- same question for Christian Feuer?

A. No, I have not spoken to Christian Feuer in quite a few days. He knows I have a deposition, he told me he had -- he had his. So, minimal contact.

Q. Are you currently affiliated with Go Global?

A. Yes.

Q. What's your title?

Page 8

Chau

A. I'm senior partner.

Q. And my understanding is that you are not a W-2 employee; is that correct?

A. Correct.

Q. And how long have you been affiliated with Go Global?

A. Approximately, close to seven years.

Q. Is your work for Go Global full-time?

A. No.

Q. Currently, approximately what percentage of your work is for Go Global?

A. Can you define "percentage"? I'm not trying to be a jerk about it, but what do you mean by that? Because I have -- I do a lot -- I work long hours, but I'm not a W-2, so I'm not sure of your question.

Q. Okay. Well, right now, besides Go Global, where else do you receive compensation from?

A. I'm a professor at a Community College.

Q. What do you teach?



Page 9

Chau

1   A.   Business.
2   Q.   And in your role as a senior
3   partner at Go Global, what are your
4   responsibilities?
5   A.   I evaluate potential deals coming
6   in. I speak to investors. I speak to my
7   colleagues in terms of evaluating the deals. I
8   do due diligence. I -- yeah, I manage
9   documentation.
10  Q.   Are you involved with any of the
11  companies that Go Global currently owns?
12  A.   I'm not directly involved, no. I
13  have been involved in the past. And there's a
14  certain period of involvement, and then I
15  disengage.
16  Q.   I see. So, the majority of your
17  involvement is generally on the front-end
18  before a transaction occurs; is that a fair
19  statement?
20  A.   During the transaction, and then
21  also during transition, and I won't be in the
22  company long-term, I'm not employed by the
23  company, but I do assist the company for a
24  period of time -- the companies.

Page 10

Chau

1   Q.   Did you work on the Janie and Jack
2   transaction?
3   A.   Yes.
4   Q.   And I am correct that you worked on
5   the attempted purchase of BuyBuy Baby; is that
6   correct?
7   A.   Yes.
8   Q.   Do you know when you --
9   approximately when you first started working on
10  the potential BuyBuy Baby deal?
11  A.   Probably March of 2023.
12  Q.   And how did that come to be in
13  March of '23?
14  A.   We were connected with Lazard, who
15  was the advisor of Bed Bath & Beyond, we were
16  interested in BuyBuy Baby.
17  Q.   And do you know who first connected
18  you with Lazard?
19  A.   I don't recall. Yeah, I don't
20  recall. I'm trying to remember. It could have
21  been us reaching out to Lazard because some of
22  our associates did have relationships with
23  them, so it could have been our connected
24  outreach.

Page 11

Chau

1   Q.   In March of 2023, do you know if
2   there was already a Lazard data room?
3   A.   No, I did not know. I did not --
4   let me rephrase. Lazard provided information,
5   but there was no -- we had a data room, but it
6   was not the same data room as -- it was a data
7   room that was created early on before their
8   foreclosure. So, there was a data room, but,
9   you know -- there's many different data rooms,
10  so I just want to make sure I'm clear, there
11  was a data room for us.
12  Q.   When you say "for us," you mean for
13  Go Global only?
14  A.   That we could access, there's data
15  that we could access.
16  Q.   But there were other -- well, your
17  understanding at that time is there were other
18  entities and people who are able to access that
19  data room other than Go Global?
20  A.   I do not know.
21  Q.   Related to BuyBuy Baby, do you know
22  how many different data rooms you accessed
23  through Lazard?
24  A.   Probably two, the one that we got

Page 12

Chau

1   in March, the data that we got in March, and
2   then the one for the Bed Bath & Beyond.
3   Q.   And am I correct that the
4   information and documents available in those
5   data rooms changed over time?
6   A.   When you say "changed," do you mean
7   additional information was provided --
8   Q.   Yeah, things were added.
9   A.   I'm sorry?
10  Q.   Were things added over time to the
11  data room?
12  A.   Sure. Yes, yes.
13  Q.   Would you make specific requests to
14  Lazard for additional information?
15  A.   Yes.
16  Q.   And then would the responses to
17  those requests end up in the Lazard data room?
18  A.   Yes.
19  Q.   Do you remember who your main
20  contacts at Lazard was?
21  A.   I believe there was a Mr. Tempke --
22      (Talking over each other.)
23      I believe so. There was also Brendan
24  or Brandon. And a couple of analysts, as well,



Page 13

1            Chau
2  but I don't recall the names.
3      Q.   I believe the name Brendan Shea, is
4  that who you're referring to?
5      A.   I believe so, that sounds correct.
6      Q.   So, when you first started this
7  process in March, what did you do?
8      A.   We expressed our interest in BuyBuy
9  Baby.  We asked for information.  We had
10  conversations with Lazard, they provided a
11  certain amount of information to us to start
12  our assessment and analysis.
13      Q.   And the e-mails that you mentioned
14  that you reviewed, did you bring them with you
15  today?
16      A.   No.
17      Q.   What is your highest level of
18  education?
19      A.   I have an MBA.
20      Q.   From where?
21      A.   Columbia.
22      Q.   Can you briefly walk me through
23  your career history since college?
24      A.   Sure.  Investment banking, capital
25  markets, trading desk, IT development on the

Page 14

1            Chau
2  trading desk, Morgan Stanley, Citi Group, CBS.
3  Venture Capital for a while.  And then a couple
4  of start-ups that I founded, and then before Go
5  Global, a multi-strategy hedge fund.
6      Q.   Am I correct that Go Global
7  retained Ankura in connection with this
8  potential transaction?
9      A.   Yes.
10      Q.   Were you involved in their
11  retention?
12      A.   I did not select them.  I was
13  involved in their discussions with them and
14  interaction with them.
15      Q.   Am I correct that Go Global had
16  potential investors sign non-disclosure
17  agreements?
18      A.   I'm sorry, repeat that again,
19  please.
20      Q.   Yes.  Am I correct that Go Global
21  had potential investors sign non-disclosure
22  agreements?
23      A.   Yes.
24      Q.   Were you involved in the process of
25  having those non-disclosure agreements

Page 15

1            Chau
2  executed?
3      A.   Some of them, yes.
4      Q.   Were you involved in the process of
5  -- well, do you know if Dream on Me signed a
6  non-disclosure agreement?
7      A.   I know that they did.
8      Q.   Were you involved in the process of
9  Dream on me executing a non-disclosure
10  agreement?
11      A.   Not in the execution.
12      Q.   Were you involved in any
13  discussions with Dream On Me over the terms of
14  the non-disclosure agreement?
15      A.   No.
16      Q.   Have you ever seen a non-disclosure
17  agreement that Dream On Me signed?
18      A.   Yes.
19      Q.   When did you first see that?
20      A.   I believe I provided some of that
21  to Christian Feuer, my colleague.
22      Q.   And do you know when that would
23  have been?
24      A.   In June, early June, maybe, around
25  there.

Page 16

1            Chau
2      Q.   Early June of '23 or '24?
3      A.   '23.  Before Dream On Me signed it,
4  I would have probably provided Christian a
5  template or a type of NDA.
6      Q.   I see.  So, you would have -- am I
7  correct that Go Global had a form or a template
8  non-disclosure agreement?
9      A.   There is a lot of non-disclosure
10  agreements out there, but yeah, we do have a
11  non-disclosure agreement, yes, we do.
12      Q.   And do you have multiple different
13  types of templates for that?
14      A.   We do have different non-disclosure
15  agreements depending on who we are in
16  discussions with.
17      Q.   And based on your testimony, it
18  seems like you did not discuss the
19  non-disclosure agreement with Dream On Me
20  before they executed it, but that you did
21  provide Christian Feuer with a form of
22  non-disclosure agreement --
23      A.   That's possible for him.  I don't
24  recall exactly.  He may have had it from the
25  past, I'm not sure.



Page 17

Chau

1
2    Q.    But outside of that form or
3    template, do you know if you ever saw the
4    agreement that Dream On Me actually signed?
5    A.    Yes, I did.
6    Q.    And when would you have received
7    that?
8    A.    Possibly before they signed it and
9    definitely after they signed it.  I don't
10   recall.  I definitely saw it after they signed
11   it.
12   Q.    Do you remember in what context you
13   saw it after they signed it?
14   A.    Just to verify that they signed it
15   so that we could share the project information
16   with them.
17   Q.    Did you have a role in Go Global's
18   attempt to raise capital for this transaction?
19   A.    Yes.
20   Q.    And what was your role related to
21   that?
22   A.    I conversed with potential
23   investors, provided information and had phone
24   calls.
25   Q.    To the best of your recollection,

Page 18

Chau

1
2    did Go Global ever receive firm commitments
3    from investors to contribute funds?
4    A.    We had varying degrees of
5    commitment, some very strong and some more
6    preliminary.  It varies because a deal is
7    fluid.
8    Q.    Understood.  Can you tell me either
9    what individuals or entities you would have
10   considered to be in the very strong category?
11   A.    There was a number of investors
12   that would have -- that were interested.
13   Q.    Any that you could specifically
14   remember?
15   A.    There was Axar Capital that was
16   interested, we were speaking to them.  We had
17   multiple conversations with Perot.
18   Q.    Did Axar Capital commit to invest?
19   A.    They had conditions for a
20   commitment, if I remember correctly.
21   Q.    Do you know if those conditions
22   were met?
23   A.    Sorry?
24   Q.    Do you know if those conditions
25   were met?

Page 19

Chau

1
2    A.    I think some of them were and some
3    of them probably were not.  I don't recall.
4    Q.    How about Perot?  Did you have
5    input from Perot?
6    A.    We had a strong interest from them.
7    Q.    Do you know if Go Global ever
8    submitted a qualified bid for BuyBuy Baby?
9    A.    We submitted bids or indications of
10   an interest.  I'm not sure if that's what
11   you're talking about.
12   Q.    I'll get to that.
13   Did you submit more than one bid?
14   A.    No, I don't think we saw
15   indication.  We indicated our interest
16   throughout.
17   Q.    Throughout this deposition, I'm
18   going to, at certain times, share my screen and
19   mark certain documents as exhibits.  I'm going
20   to do that now (indicating).
21   MR. MURPHY:  I'm going to mark
22   Exhibit 1, it's a five-page e-mail chain.
23   (Exhibit 1 was so marked for
24   identification.)
25   The first one is Bates numbered

Page 20

Chau

1
2    ANK-0039806.  And the top e-mail is an
3    e-mail from Yuen Chau on May 29th, 2023
4    to Christian Feuer, and then it CCs a
5    couple of people from Ankura and Jeff
6    Streader.
7    BY MR. MURPHY:
8    Q.    Take a look at this e-mail.
9    Does this appear to be an e-mail you
10   wrote?
11   A.    Sorry, say that again, sir.
12   Q.    Does it appear to be an e-mail that
13   you wrote?
14   A.    From the screen, it appears it is.
15   Q.    It mentions Sixth Street.  What can
16   you tell me about that?
17   A.    Sixth Street is a lender -- was a
18   lender to Bed Bath & Beyond.  I believe they
19   were a key lender and a focal point in terms of
20   a decisionmaker type of lender, like as far as
21   having certain rights as a lender.
22   Q.    Did you ever have any discussions
23   with Sixth Street about them being involved in
24   the transaction on your side?
25   A.    I did, yes.



Page 21

Chau
2    Q.   And how would they have been
3  potentially verified?
4    A.   They could have rolled their debt
5  or did some type of structure with their debt.
6  And they -- there's multiple things they could
7  have done as a debt holder.
8    Q.   Am I correct that Go Global was
9  ultimately unable to reach an agreement with
10 Sixth Street?
11   A.   We did not reach an agreement with
12 Sixth Street in this instance of getting
13 them -- and I'm trying to read the e-mail here.
14 I think we were trying to engage them, but we
15 did not.
16   Q.   And I understand that this e-mail
17 is from May 29th, and things changed over time
18 during June of last year; is that correct?
19   A.   So, yes.  So, May 29th, and then
20 June of the same year, Sixth Street could have
21 changed their perspective on the business.  I
22 can't speak to that.
23   Q.   Was the -- during that time period
24 of May and June of last year, was the value of
25 BuyBuy Baby decreasing?

Page 22

Chau
2    A.   I'm sorry, what --
3    Q.   Was the value of BuyBuy Baby
4  decreasing during that time period?
5    A.   Decreasing?  I think it depends on
6  who you speak to.  I mean, obviously, the --
7  there was a deterioration in Bed Bath & Beyond,
8  so I think as far as BuyBuy Baby goes, there
9  probably, you know -- it's a mother company, so
10 if the mother company is having issues, I would
11 think that the -- the, you know -- BuyBuy Baby
12 would, as well.  But as far as the value of the
13 company, that's a different question.  I mean,
14 I'm not sure.  Are you saying -- I'm not sure
15 what do you mean by the value of the company?
16   Q.   Well, I guess -- what -- during the
17 month of June of last year, did what Go Global
18 was willing to pay for the BuyBuy Baby going
19 concern change over time?
20   A.   Yes.
21   Q.   And am I correct that that number
22 was decreasing over time?
23   A.   I think that that's the valuation
24 of that, the value was decreasing in the
25 business, yeah.  If that's what you're asking.

Page 23

Chau
2  It's based on what one would pay.
3    Q.   And what were the reasons for that?
4    A.   There were a few reasons.  First of
5  all, the Bed Bath & Beyond parent was going
6  through a bankruptcy process, it did not go
7  through that process earlier in the year, it's
8  going through that process.  So, in that
9  process, they would be selling things to raise
10 money and pay back debt and do -- and that
11 certain amount of inventory would have been
12 sold, and that could have happened to BuyBuy
13 Baby, as well.
14     And during that transition, obviously
15 there is probably less customer engagement,
16 even though the brand -- the BuyBuy Baby
17 brand -- the BuyBuy Baby company, excuse me,
18 was still operating, so with Bed Bath & Beyond,
19 they were going through that foreclosure
20 process.
21   Q.   Would you say during that time
22 period that BuyBuy Baby suffered from brand
23 damage?
24   A.   I do think that they probably did
25 as any brand would in that situation.

Page 24

Chau
2      MR. MURPHY:  I shared my screen and
3  I'm going to mark as Exhibit 2, it's a
4  two-page e-mail chain.  It's not Bates
5  numbered, which I will clean up later for
6  the record.
7      (Exhibit 2 was so marked for
8  identification.)
9      MR. MURPHY:  It's an e-mail from
10 Kathleen Lauster to Jeff Streader, and it
11 CCs several people, including Yuen.
12 BY MR. MURPHY:
13   Q.   First off, do you know who Kathleen
14 Lauster is?
15   A.   Yes.
16   Q.   Who is she?
17   A.   She worked for Ankura.
18   Q.   And do you know what her role is at
19 Ankura?
20   A.   Yes, I'm reading it's senior
21 managing director.
22   Q.   And I recognized you said you were
23 reading that, you got that from her e-mail
24 signature block; is that right?
25   A.   Yeah, it's on there --



Page 25

Chau

1

2      Q.    Is that something you knew without
3  reading it just now?
4      A.    I didn't know her exact title.  I
5  mean, I think she was a managing director in
6  the advisory business.
7      Q.    Do you know if she's currently the
8  CEO of Ankura?
9      A.    I do not know that.
10     Q.    This e-mail indicates that you were
11  CC'd on it.  Do you remember receiving this
12  e-mail?
13     A.    I believe I did.  I don't remember
14  it -- this exact e-mail, but I remember e-mails
15  from her, yes.
16     Q.    Do you have any reason to believe
17  you didn't receive this e-mail?
18     A.    No.
19     Q.    In her e-mail above her signature,
20  it references "sources."  Am I correct that
21  that would be sources of capital for the
22  purchase?
23     A.    Potential, yes.
24     Q.    And it lists "███████" next to
25  Go Global.  Was Go Global going to be

Page 26

Chau

1

2  contributing ████████ in equity at that
3  time?
4      A.    I think there was a possibility
5  through our investors that that could be the
6  case.  I don't remember this amount
7  specifically, but that's within reason.
8      Q.    When you say through Go Global's
9  investors, what do you mean by that?
10     A.    Well, we work with investors that
11  invest in deals that -- where they provide us
12  money, like -- they give us LPs in the private
13  equity term.
14     Q.    At that time, do you know who the
15  potential investors would have been that would
16  have allocated the Go Global amount?
17     A.    Well, Kathleen was also helping us
18  raise money, that was part of her role.  So, I
19  believe some of it within her contacts or a
20  family office, interested family offices.
21     Q.    And I see that below the ████
22  ████ Go Global, there's family office 1 and
23  family office 2.  But that would be different
24  than the investors through Go Global?  I'm just
25  trying to understand the distinction.

Page 27

Chau

1

2      A.    Yeah, yeah.  So, some investors
3  would invest directly into the transaction, so
4  those would probably be a family office that
5  does that.  Others would put a -- fund the
6  transaction through Go Global as an LP.
7  They're both LPs in that sense that they're
8  investors coming in different ways.
9      Q.    Would I be correct that under this
10  scenario, that the potential family offices
11  would own a direct stake in BuyBuy Baby and an
12  investor that comes through Go Global would
13  not?
14     A.    Not necessarily.  They could still
15  go through Go Global, it's up to them.  But in
16  this case, I think we were also delineating, I
17  guess, different investors, maybe the ones that
18  Kathleen was bringing in.  So, I'm not sure
19  exactly why -- I'm not sure exactly who is who
20  in here, based on her naming convention or
21  whatnot.
22     Q.    You mentioned Axar and Perot
23  earlier.  Would they have been considered to be
24  family offices or they would have been under
25  the Go Global umbrella?

Page 28

Chau

1

2      A.    Perot could have been.  I don't
3  think -- I'm not sure if Axar would have been.
4      Q.    And just so -- I'm making sure I
5  understand your answer.  When you say "could
6  have been," you're saying it could have been
7  one of the family offices?
8      A.    That Kathleen was referring to.
9      Q.    So, you believe it could have been
10  Perot, but it would likely not have been Axar,
11  if I'm understanding you correctly?
12     A.    That's my speculation.  I didn't
13  write the e-mail, so I'm not sure --
14     Q.    Yeah, I don't want you to
15  speculate.  I just want -- just based on what
16  you either know or what your understanding was
17  of what was going on at the time on June 7th.
18     A.    Yeah, there was a lot going on.  We
19  were talking to a lot of investors.  She was
20  talking to different investors, as well, in her
21  network, or at least helping us.  So, it could
22  have been, it could have been.  Again, like I
23  said, I'm not sure because it's not specific
24  there.  It could have been.
25     Q.    Would Go Global be putting up any



Page 29

1          Chau
2   of its own money in a potential deal?
3        A.   In a potential deal, we could, yes.
4        Q.   You know -- and I know the model
5   exchanged over time.  We're going to take a
6   look at the model in a little bit.  But were
7   there ever times during the potential purchase
8   of BuyBuy Baby that Go Global was going to be
9   contributing any of its own funds to the
10  transaction?
11       A.   Not that I recall, no.  We were not
12  planning to put our own money.  There was some
13  thought about how we could raise -- put some of
14  our money in, there was talk about that.  But
15  that's not in what we presented to LPs.  They
16  knew that we were using -- we were the manager,
17  we would manage and operate and help with
18  developing the business and transitioning, but
19  not with -- they weren't expecting us to put
20  money in.
21       Q.   It's kind of I guess the second
22  paragraph, it's broken sort of into two, it
23  starts with, "Go Global's prior offer," and the
24  next sentence says, "The new structure."
25            Could you review that for me and let

Page 30

1          Chau
2   me know if you understand what she's describing
3   there.
4        A.   I believe she is saying that there
5   is two different ways to structure an offer.
6   One would be an amount in the first sentence,
7   where it says, "Go Global's prior offer valued
8   the business at ▮▮▮▮▮▮▮▮ but included ▮▮▮▮
9   ▮▮▮▮ in deferred payout by equity ownership
10  and junior debt."  That's one type of
11  structure.
12            The new structure, which maybe that's
13  what she is proposing or -- if I can remember
14  correctly, or offering up, calls for Go Global
15  owning 100 percent of the business at a lower
16  valuation with more cash needed at closing.
17  So, it's a different type of structure, lower
18  dollar amount, but more cash needed versus
19  using debt.  That's what I believe she's trying
20  to say there, if I was just to read it in that
21  way.
22            MR. MURPHY:  I'm going to mark as
23  Exhibit 3, it's a non-disclosure
24  agreement, it's got Go Global's logo on
25  the top.  It's Bates numbered DOM0000031.

Page 31

1          Chau
2            (Exhibit 3 was so marked for
3   identification.)
4            And it's executed on the last page
5   by Go Global Retail, and then Dream On
6   Me, Inc./non-family.
7   BY MR. MURPHY:
8        Q.   Is this the non-disclosure
9   agreement for Dream On Me that you were
10  referring to earlier?
11       A.   Yes.
12       Q.   I believe you said you would have
13  seen the agreement in connection with -- before
14  you would have provided Dream On Me with any
15  confidential proprietary information; is that
16  right?
17       A.   I would have seen this or at least
18  had my colleague confirm that it's signed.  So,
19  yes, there's no way we would provide, we would
20  not normally provide proprietary information on
21  work we've done unless we know that there's an
22  NDA signed.
23       Q.   And were you involved in providing
24  information to Dream On Me?
25       A.   No.

Page 32

1          Chau
2        Q.   So, if you were involved in
3   providing information to Dream On Me, what
4   would have been the reason you were checking on
5   the NDA?
6        A.   As a standard deal procedure, I
7   manage, you know, like I said earlier,
8   documents, checklist.
9        Q.   When did you personally first
10  become aware of Dream On Me?
11       A.   Probably early June, Kathleen had
12  mentioned them, as well as, I believe, Lazard
13  had mentioned them, as well.  So, I'm not sure
14  who I heard it from first, but I know it was
15  through these entities.
16       Q.   And when you first heard about
17  them, do you remember what you were told?
18       A.   That they are interested in the
19  BuyBuy Baby business.  They were not in the
20  process anymore.  They are looking for a
21  partner.  What else?  They were -- they are a
22  furnisher, manufacturer for baby cribs, and
23  they supplied those baby cribs to BuyBuy Baby.
24  That's --
25       Q.   Had you ever heard of them before



Page 33

Chau

1
2  that?
3      A.    No.
4      Q.    You said that you thought you were
5  told that they had been involved or were no
6  longer involved in the process; is that right?
7      A.    I remember seeing something -- or
8  somebody telling me that, I don't remember
9  seeing that.  I don't recall exactly, but I --
10  my understanding is they were interested, but
11  they were not really in the process anymore, I
12  remember, yeah, something to that degree.  But
13  that was just pure hearsay.  I mean, that's my
14  impression from what I remember.
15      Q.    And am I correct that you don't
16  remember where you heard that from, but that's
17  your recollection of what you --
18      A.    Right.  It was probably in an
19  e-mail, and that's probably the reason why
20  Lazard introduced us because they thought we
21  could be good partners together.  They were
22  interested in the -- they're very interested in
23  the business, they had capital.  Obviously, we
24  wouldn't be talking to them if they didn't
25  represent that they had money and capital to

Page 34

Chau

1
2  invest in it because we were talking to
3  investors.
4      Q.    Were there ever any discussions
5  about Dream On Me being a general partner with
6  Go Global?
7      A.    When you use the term "general
8  partner," what do you mean in terms of this
9  context?  This is different --
10      Q.    Yeah.  I guess involved in the
11  operation of the business going forward, as
12  opposed to a limited partner who's just
13  investing capital?
14      A.    So, no, not prior to a meeting that
15  happened on videoconferencing, I believe on
16  June 15th or something like that.  In the
17  middle of the month or something.  That was the
18  one interaction that I had with them.  We
19  talked about our roles, but never as a GP.
20  Because a GP, under our definition, is a
21  private equity term, and not something that we
22  would --
23      Q.    What is your definition of a GP?
24      A.    It's basically a private equity
25  type of investor that manages a transaction,

Page 35

Chau

1
2  and manages the company, the asset.  And that's
3  usually our -- that's our role, we're raising
4  money to make the acquisition.  So, we weren't
5  looking -- we did not look to them for that.
6      Q.    You said you were involved with one
7  meeting with them; is that correct?
8      A.    Correct.
9      Q.    And you mentioned it was by
10  videoconference; is that right?
11      A.    Yes.
12      Q.    Were there -- in that meeting, were
13  there several people who were in one location?
14      A.    Yes.
15      Q.    So, I guess were there several
16  people who were in-person in New Jersey, and
17  then there were some other people on
18  videoconference; is that right?
19      A.    I was on the videoconference.  I
20  believe my colleague, Jeff Streader, would have
21  been, too, because he is in California.  And
22  there were people that I had ascertained from
23  the videoconference that were in-person
24  together.
25      Q.    Was Christian Feuer there

Page 36

Chau

1
2  in-person, do you know?
3      A.    Yes, I believe so.
4      Q.    Besides Christian, was there anyone
5  else from Go Global who was there in-person?
6      A.    I believe Deb Gargiulo was there.
7      Q.    And was there anyone from Ankura
8  who was there in-person?
9      A.    I believe Kathleen was there.  I'm
10  not certain, but I believe she was there.
11      Q.    Besides those people, do you
12  remember who else may have been there
13  in-person?
14      A.    Dream On Me representatives and
15  leadership.
16      Q.    Do you remember their names?
17      A.    Mark, I think Milan was there,
18  Abish, I believe Mark's son was there, I don't
19  remember his name.  So, there were people
20  there, yeah, that I could see.  I mean, I don't
21  remember if there was a video.  But I think
22  there's sometimes that we could see them and
23  times where there was screen share, but that's
24  what I can recall.  There might have been more
25  people, I'm not sure.



Page 37

1                    Chau
2       Q.   During that meeting, were you and
3   Jeff in the same place?
4       A.   No.
5       Q.   And then did you attend that entire
6   meeting?
7       A.   Pretty much, yes.  I may have --
8   yeah, I would say yes, because I think we
9   logged out at different times.  But the -- I
10  guess what I'm trying to make clear is that I
11  log off of the Zoom or the videoconferencing,
12  but they may have been still talking, walking
13  out the door or whatever --
14      Q.   Understood.  You don't know what
15  happened after you logged off?
16      A.   Correct.  I just want to be
17  accurate.
18      Q.   Understood.  Do you remember
19  approximately how long you were logged in for?
20      A.   At least an hour and a bit.  I
21  mean, I felt it was a long meeting.
22      Q.   What do you remember about the
23  meeting?
24      A.   We had introductions, we -- they
25  introduced who they are, we introduced who we

Page 38

1                    Chau
2   are.  A little bit further, Jeff talked about
3   Go Global, and then we got right into it.  We
4   presented them our model, what we thought about
5   the business.  We went through our strategy
6   that we developed, in different aspects of how
7   we would stand up the business, the different
8   issues in the business.  So, it was really a
9   very frank open conversation about what we were
10  doing, and we shared a lot.
11      Q.   Am I correct that -- do you know if
12  Christian and Deborah had met a couple of days
13  prior with the Dream On Me people in-person?
14      A.   Yes, they had a dinner meeting to
15  get to know each other, which then transpired
16  into this conference call meeting, or larger
17  meeting.  Dream On Me had interest in working
18  with Go Global, hence this meeting, and, you
19  know, there was like time constraints of
20  bidding and all that stuff.  So, I think this
21  was -- yes, so I do remember that they met them
22  before.
23      Q.   When did you first have your own
24  direct contact with Dream On Me?
25      A.   Can you explain --

Page 39

1                    Chau
2       Q.   You personally, did you speak to
3   them prior to the June 15th meeting?
4       A.   No, no.
5       Q.   Do you know if you personally
6   exchange any e-mails with Dream On Me prior to
7   that meeting?
8       A.   I might have been copied on some or
9   I might have sent some where I was CC'd, but I
10  was never the direct contact for Dream On Me.
11  So, I would not have like independently sent
12  something.
13      Q.   Who is the direct contact?
14      A.   Christian would have been.  Deb,
15  probably, because she was sharing the model,
16  the financial model.  Thoryn Stevenson would
17  have been, who was on the IT side.  I believe
18  he spoke with their IT head and technology
19  people about his work and his discoveries.
20  Jeff Streader would have spoken to them
21  directly.  I'm a little bit further away from
22  that engagement.
23      Q.   Is Thoryn Stevens still affiliated
24  with Go Global?
25      A.   No, I don't think he is.  I

Page 40

1                    Chau
2   don't -- yeah, I'm not in charge of that, so.
3       Q.   Do you know the last time you spoke
4   to him?
5       A.   Four months ago, five months ago, I
6   mean, maybe -- I don't know.
7       Q.   And what was Thoryn's role?
8       A.   He was -- he is an operating
9   partner in the area of technology, data
10  science, software.
11      Q.   And I think I know the difference,
12  but can you just explain to me the difference
13  between an operating partner and yourself as a
14  senior partner?
15      A.   Yeah.  So, in certain cases,
16  it's -- I guess it's participation in the
17  deals; right?  He's also involved in deals kind
18  of like how I am.  But his role would be
19  specific to technology-related issues,
20  discovery assessment analysis and planning.
21         MR. MURPHY:  I'm going to mark as
22  Exhibit 4 a three-page e-mail chain.  The
23  first e-mail is an e-mail from Jeff
24  Streader that was sent on June 13th of
25  2023 to Thoryn Stevens, with a copy to



Page 41

Chau

1
2  Christian Feuer and to you.
3        (Exhibit 4 was so marked for
4  identification.)
5  BY MR. MURPHY:
6        Q.   Am I correct that June 13th would
7  have been between the initial meeting that some
8  people from Go Global had with Dream On Me and
9  the second meeting that you attended?
10       A.   I believe so.  So, they met early
11 in the week over dinner, so it would have been
12 either on the Monday or Tuesday.  If you can
13 tell me that, then I can confirm.
14       Q.   I'll represent to you that other
15 people in the case have testified that the
16 dinner was on Monday, the 12th?
17       A.   Okay.  Then this would have been
18 between the two, yes, you're correct.
19       Q.   Do you remember receiving this
20 e-mail?
21       A.   I don't remember it off the top of
22 my head, but I can see that I was CC'd and it's
23 very likely that I read it.
24       Q.   In -- the subject is "Dream On Me,"
25 and then on the third line down, Jeff says,

Page 42

Chau

1
2  "Remember they do not have the secret sauce and
3  we will not give it to them."
4        Do you know what he's referring to?
5        A.   I didn't write the e-mail, so I'm
6  not sure what he means by "secret sauce."  And
7  this was before we met them on the second
8  meeting.  And I believe -- yeah, I'm not sure
9  exactly because we did share a lot with them in
10 terms of things.  I'm just reading this e-mail
11 as I'm speak to you --
12       Q.   Take your time.
13       A.   Yeah.  They showed our blueprint.
14 I read the e-mail.  Thank you.
15       Q.   Since the e-mail was sent to
16 Thoryn, would that imply that it was about
17 technology-related issues?
18       A.   Yes, I would think so.
19       Q.   Do you know there were information
20 or documents that were specifically withheld
21 from Dream On Me?
22       A.   No, I don't know if they -- it's
23 how much documents -- I can't speak for what
24 documents were held and not held.  I do know
25 that we -- from my perspective, we provided the

Page 43

Chau

1
2  most what we knew in terms of our plans, we
3  were very open and sharing.  So, what we
4  withheld, I can't speak to that because I
5  didn't -- I wasn't part of that.  I can't
6  answer that in terms of -- because I shared
7  what we shared, I know a lot of us shared -- we
8  shared a lot, let's put it this way, in terms
9  of plans, documentation, things that we worked
10 on since March.  So, we shared a lot.
11       So, I can't say -- I wouldn't say we
12 withheld stuff.  In fact, I think we shared a
13 lot.
14       Q.   When he says, "We are not giving
15 the plans away," do you know what he is
16 referring to?
17       A.   Well, it could be related to
18 something in IT, but I know that Thoryn had
19 spoken to them about IT and the work that he
20 has done in it.  Whether these plans were given
21 and shared in that meeting, that could have
22 been possible, as well, because at this point,
23 we didn't have our second meeting.
24       So, this was more preliminary
25 information and as we got to know them better

Page 44

Chau

1
2  and we felt that we could work together in a
3  second meeting, I would be -- I wouldn't be
4  surprised of some of the stuff that was not
5  spoken about.  An initial call was spoken
6  about, you know, in our videoconference meeting
7  because we -- like I said, we shared a lot at
8  that point.  So, I don't think things were
9  withheld, no.
10       Q.   The meeting that you attended, how
11 do you think it went?
12       A.   I thought initially it went well.
13 We were talking about what we would do with the
14 business.  It sounded like they were interested
15 in working with us.  We provided insights based
16 on how they reacted, the things that we're
17 telling them.  I don't want to say they looked
18 surprised, but I think it was helpful to them.
19 They were interested and they asked about what
20 we were doing and so forth.
21       So, I think that worked out -- that
22 part of it worked out well, I think they were
23 trying to impress upon us the things that they
24 had done.  So, I think it was a good exchange.
25 I do think there was points where they may have



Page 45

Chau

1  been -- they may have wanted certain terms or
2  conditions that we may or may not agree with,
3  but I think that's in any discussion, right,
4  it's back and forth.
5      Q.   After that meeting, did you
6  personally have any contact with Dream On Me?
7      A.   No.
8      Q.   Do you know if anyone else in Go
9  Global had any contact with Dream On Me after
10  that meeting?
11      A.   I believe Christian did.
12          MR. MURPHY:  I'm going to mark
13      Exhibit 5, it's a one-page e-mail chain.
14      It's Bates numbered GG-0008746.
15          (Exhibit 5 was so marked for
16      identification.)
17          MR. MURPHY:  The top e-mail is an
18      e-mail from Jeff Streader, Thursday, June
19      15th, 6:12 p.m., Eastern.  It is sent to
20      Kathleen Lauster and copies several
21      people from Go Global, including Yuen.
22  BY MR. MURPHY:
23      Q.   Yuen, do you remember receiving
24  this e-mail?

Page 46

Chau

1      A.   Yes, I do.
2      Q.   So, this would have been the same
3  day as the meeting that we were just talking
4  about; correct?
5      A.   Yes.
6      Q.   Do you remember Jeff saying "no
7  more calls, no more meetings"?
8      A.   From the e-mail here, I can see
9  that, yeah.
10      Q.   Well, I guess does this e-mail
11  refresh your recollection of Go Global's
12  position at the meeting?
13      A.   It does reflect it because we want
14  them to come back to us and get their thoughts,
15  rather than giving up more.  We gave up a lot
16  of what we've done.  They have our Excel
17  sheets, they have our models, they have our
18  plans and information, so we don't want to give
19  out more unless they give us some indication of
20  where they stand as a potential partner.
21      I believe that your earlier question
22  of whether there was communications after that
23  meeting, I still think -- I believe, if I
24  remember correctly, they -- someone from Dream

Page 47

Chau

1  on Me did text or converse with Christian Feuer
2  after this meeting.  So, even though this --
3  Jeff had said this, it does not indicate that
4  no communications happened after that.  So,
5  this doesn't prove that what I said was wrong
6  because they still reached out to us, or to
7  Christian, at least from what I remember.
8      Q.   This e-mail says, "We spent way too
9  much time on how to reduce our carry, anyway
10  DOM should get more since they deliver 80 to 85
11  percent of the value of Future Co."
12      Do you agree with that statement?
13      A.   Do I -- yeah, I agree with that
14  statement in the sense that DOM I don't think
15  they had a realistic view of their value in the
16  business.  They were -- and again, this is --
17  this is -- this is how negotiations go, people
18  pop up who they are and they try to get a
19  better deal and whatnot, and we're not going
20  to -- we shouldn't acquiesce any further to the
21  deal because we were reducing our return on it.
22  Because we don't believe they were at 80 to 85
23  percent of future value, that was the
24  indication here.

Page 48

Chau

1      They thought they would, but it's
2  clear to me that they wouldn't from that
3  meeting.  And they obviously didn't in that
4  meeting either because they didn't offer
5  anything valuable to us in the sense of
6  insights, strategy or how to run the business.
7  The only thing they could offer, I believe, was
8  capital.
9      Q.   So, following the June 15th
10  meeting, do you remember what happened next
11  chronologically with regard to this
12  transaction?
13      A.   In terms of the transaction itself,
14  Lazard and I believe the law firm that was
15  conducting the process had delays, they sent
16  multiple different timelines.  Yeah.  And we
17  did not -- I don't think we -- we didn't have
18  another formal meeting with Dream On Me or
19  anything like that.  We were working on the
20  deal, we remained very interested in BuyBuy
21  Baby the whole time.  So, yeah, we were still
22  following the deal, for sure.
23      Q.   Do you know when Go Global
24  submitted their offer letter related to the



Page 49

1          Chau
2   transaction?
3      A.   We submitted indications of
4   interest at different times.  Yeah, we even
5   indicated early before the bankruptcy happened
6   that we were interested in, you know -- there
7   was -- I'm not trying to avoid the question.
8   The deal -- there's a lot of changes, there's a
9   lot of flow in the deal.
10        So, at a lot of different points, we
11  were indicating to Lazard we'll be interested,
12  we were giving indications of interest.  So, it
13  was throughout the process that we were
14  communicating that to Lazard.
15     Q.   Did Go Global ever submit anything
16  that you would consider to be a bid?
17     A.   I believe we submitted indications
18  and we submitted statements that we would be
19  interested in buying it, and that we were
20  putting something together.  Personally, I
21  remember doing that, is that what you're
22  saying?
23        MR. MURPHY:  I'm going to mark
24     Exhibit 6, a two-page e-mail chain.  The
25     top e-mail is from Matthew Lapish on

Page 50

1          Chau
2     Saturday, June 17th of 2023.
3        (Exhibit 6 was so marked for
4     identification.)
5   BY MR. MURPHY:
6      Q.   And I'm just going to scroll down
7   to the bottom, and then have you review it, and
8   then ask you a few questions about it.
9      A.   Okay.
10     Q.   The first e-mail is June 16th,
11  2023, at 11:27 p.m. from Christian Feuer.  I'm
12  going to let you review the whole thing, and
13  then I'm going to ask some questions.
14     A.   Okay.  You can stop there.
15     Q.   So, I guess a couple of questions.
16  Do you know who Matthew Lapish is?
17     A.   Yes, he works with Kathleen.
18     Q.   At Ankura?
19     A.   Yes.
20     Q.   Do you remember receiving this
21  e-mail?
22     A.   I remember, yes, receiving this
23  e-mail, or reading these e-mails.
24     Q.   So, would you agree with Matthew's
25  characterization that what was submitted was a

Page 51

1          Chau
2   bid?
3      A.   What -- sorry, would I agree with
4   Matthew --
5      Q.   "Lazard's request for a meeting
6   ASAP in order to determine the seriousness of
7   this bid."
8      A.   Okay.
9      Q.   So, would you agree that Go Global
10  submitted a bid?
11     A.   Yes, in this process, yes.  Into
12  Lazard's hands, yes, we did in the sense of
13  this is what we were looking to do.  Is it a
14  binding bid?  I'm not sure, if that's what
15  you're asking for, but yeah --
16     Q.   Did Go Global ever submit a binding
17  bid?
18     A.   As far as this bid goes, yes.  I
19  mean, we submit a bid like this, let me put it
20  that way.  I mean, I'm not sure what you're
21  asking here.
22     Q.   Or why -- what -- why did Lazard
23  have -- did Lazard question the seriousness of
24  the bid?
25     A.   I don't know.  That's --

Page 52

1          Chau
2        (Talking over each other.)
3        Well, they probably want to get to
4   know who the investors are, the ultimate
5   investors are, and to see whether they're able
6   to work with the timeline or work with us.  I
7   don't agree with Matthew, per se.  I think
8   that -- I don't know if Lazard said that.
9        I mean, they probably wanted a meeting
10  because the timing was really moving quickly
11  and also they had delays, so they probably
12  wanted to close the deal quickly, so that's why
13  it's ASAP.  I'm assuming that.  As far as the
14  seriousness, I think that's Matthew's
15  interpretation as an investment banker wanting
16  to close a deal or, you know, move things
17  along.  Yeah.
18        And it says the auction is Wednesday,
19  that's a Saturday, so there was maybe a few
20  days, so he was probably -- he was encouraging
21  us to have a discussion or a meeting or
22  something to that effect.  So, I can't say that
23  that was Lazard's opinion, this is Matthew's
24  interpretation of their opinion.
25     Q.   Do you disagree with that



Page 53

1            Chau
2  statement?
3      A.   No, I don't disagree with that.  I
4  think it's interpreted differently from him.  I
5  didn't speak to Lazard, so I can't say that
6  that's true or not true.  But, you know, we
7  were serious and -- yeah.  I mean, I don't
8  necessarily think he's wrong, but I don't agree
9  with it.  That could be his interpretation.  I
10 wasn't there, I didn't speak to Lazard, he
11 spoke to Lazard, and I don't know who he spoke
12 to in Lazard either.
13     Q.   As of June 17th, did Go Global have
14 the capital necessary to complete the
15 transaction?
16     A.   We had capital commitments and
17 capital -- indications of capital from
18 different investors, and we were trying to put
19 that all together.
20     Q.   Do you know what he meant when he
21 said there's no time to be trying to round up
22 capital on Tuesday?
23     A.   So, there, he's probably saying
24 that depending on the amount that Mike -- that
25 the transaction might take place.  Because if I

Page 54

1            Chau
2  remember it correctly, it was an auction
3  process, so the numbers might move; right?  So,
4  how much capital you have?  You might be able
5  to -- I'm thinking there's a bidding process,
6  so I think he's trying to say you have to know
7  how much you have so that you can bid in a
8  certain way or manner.
9      But we were, you know, the whole time
10 and he should know, too, because he's the one
11 helping us "round up capital," that's his job.
12 So, he is -- I think he was trying to say let's
13 get everything together, let's get all our
14 commitments together.
15     Q.   How much did Go Global have in
16 commitments as of this date?
17     A.   I don't recall.  I know that we
18 had -- based on the earlier part of your e-mail
19 chain here, that there was a discussion about
20 Janie and Jack, so -- and -- yeah.  So, there
21 may have been a couple of different plans here,
22 one was to buy it through -- acquire it -- if
23 you can go up a little, sir (indicating)?
24 Thanks.  It sounds like Janie and Jack would
25 acquire it.

Page 55

1            Chau
2      And so, there was some -- we had
3  thoughts about going that route and there was
4  other -- depending on which advisors would
5  ultimately commit, and there was also the route
6  of depending on how much some of these
7  investors would commit, we have Axar or Perot
8  that would support a different type of
9  structure.  So -- but these deals, it's pretty
10 fluid.
11     Q.   Do you agree with his statement
12 that "the chaotic scattershot approach to this
13 bid will not have engendered any goodwill with
14 either Sixth Street or Lazard"?
15     A.   No, I don't know what he meant by
16 that, to be honest.  He was part of -- he was
17 our advisor.  Yeah, I don't know why -- I can't
18 speak for him here.  I don't agree with it, per
19 se, but I don't -- I can't speak for him here.
20     MR. MURPHY:  I'm going to mark as
21 Exhibit 7, it's an eight-page document
22 with a Go Global logo on the top.  It's
23 numbered -- Bates number GG-0030208.
24     (Exhibit 7 was so marked for
25 identification.)

Page 56

1            Chau
2  BY MR. MURPHY:
3      Q.   Do you recognize this document?
4      A.   No, I don't think I wrote this one.
5      Q.   I didn't ask you who wrote it.  Do
6  you recognize it?
7      A.   Can you keep on going?
8      Q.   Sure (indicating).  And I can go as
9  fast or slow as you want, just --
10     A.   Yeah.  I just want to scan it to
11 make sure.  I don't want to say yes or no
12 without knowing something.
13     Stop there.
14     I don't recall this, per se.  Is that
15 the bottom?  If you can scroll back to the --
16     (Talking over each other.)
17     Q.   This is the last page.  I'll
18 represent to you the last page appears to be a
19 wire confirmation.  Do you know anything about
20 that?
21     A.   I don't remember this one.  I don't
22 do wires at Go Global.
23     Q.   Do you know if Go Global submitted
24 any kind of bid deposit at any time --
25     A.   Yeah, I don't think we wired -- I



Page 57

Chau

1  didn't wire -- I don't remember.  I didn't wire
2  anything.  I don't know if we wired anything,
3  per se.  Who is this to?  Restructuring,
4  administration -- I would have to go back and
5  look at this.  Are these URLs?
6      Q.   Excuse me?
7      A.   Are these URLs, web addresses?  If
8  you can go up, sir (indicating)?
9      Q.   Sure.
10     A.   Okay.  Yeah, it looks like --
11     Q.   I believe this is an exhibit with
12 various domain names --
13     A.   Yeah.  Okay.  So, this will be the
14 assets that BuyBuy Baby holds, and we actually
15 researched it and looked into this.  Okay.  Got
16 it.
17     Q.   I believe what we're scrolling
18 through now are all exhibits (indicating) --
19         (Talking over each other.)
20     A.   These would have been the store
21 locations that we would have flagged after
22 having done some research in them.  Our
23 group -- yeah, our group does that --
24     Q.   And am I correct that preliminary

Page 58

Chau

1  stores to be assumed would be the ones that
2  would remain open; is that right?
3      A.   These would be -- to the best of my
4  recollection, these would be the ones that we
5  think could work well.  And after acquisition,
6  we keep these open.  And that is something that
7  we worked on, that we did research on it.  This
8  is not a random list.  This is something that
9  we would have shared in our model.
10         So, that's a work to build together,
11 that's not an exhibit from Lazard.  I just want
12 to make sure you understand that --
13         (Talking over each other.)
14     Q.   I believe it to be an exhibit --
15 well, let's back up a second.  Do you recognize
16 this whole document now?
17     A.   I recognize pieces of it and that's
18 why I'm trying to like -- I'm running through
19 it.  It looks like Christian, Christian Tempke.
20 I don't -- okay.  I don't remember reading this
21 -- I recognize portions, let me put it that
22 bay.  I recognize portions of this document.
23 Christian may have assembled it, as it says
24 here "drafted for BuyBuy Baby," and he sent it

Page 59

Chau

1  to Christian Tempke who I remember is from
2  Lazard.
3      Q.   Do you know -- we were just looking
4  at an e-mail chain that referenced a bid that
5  was submitted.  Do you know if this is the bid
6  that was submitted?
7      A.   Probably.  This is probably -- I
8  mean, I would think -- because your e-mail
9  earlier was June 17th and this is June 16th, so
10 I'm assuming Christian sent this on June 16th.
11 That's my assumption.  I don't know that.
12     Q.   Okay.  I don't want you to guess.
13 So, you personally did not have any involvement
14 with the submission of the bid; is that
15 correct?
16     A.   Right.  Okay.  So, I would probably
17 have talked to Christian about -- what should
18 be in a bid, what my thoughts are about the
19 company.  But as far as writing this bid, it
20 would have been him.
21     Q.   Would you have reviewed the bid
22 before it was submitted?
23     A.   I may have.  But as I mentioned, I
24 didn't submit this one, so it could be -- there

Page 60

Chau

1  could be different versions that went through.
2  That's why I'm saying I recognize parts of the
3  document, so I might have seen this at an
4  earlier iteration, and then this final
5  iteration, I can't say I reviewed it and okayed
6  it, I don't think I did that.
7      Q.   Seeing the wire confirmation, does
8  that refresh your recollection at all of
9  whether Go Global ever submitted any kind of
10 bid deposit?
11     A.   I don't remember, to be honest.  I
12 don't remember.  I mean, because the wire says
13 to Cro, and I'm not sure -- like I said, I
14 don't do the wires, so I'm not sure why it says
15 "Cro."  Can you -- if you can enlighten me?  If
16 you know something that I don't know?
17     Q.   I can represent to you that it was
18 attached as an exhibit to this document the way
19 it was produced to us.
20     A.   Okay.
21     Q.   And it says here under the third
22 bullet point, it says, "Janie and Jack will
23 initiate a wire tonight, please find the screen
24 shot of Exhibit 8."



Page 61

Chau

1

2      A.    Okay.  So, I'm assuming Janie and
3   Jack, this is probably the structure that we're
4   looking at where we would bring Janie and Jack
5   in as a potential partner into the transaction.
6   So, that's probably why it came from Janie and
7   Jack.
8      Q.    The first bullet point says the
9   total offer -- well, the total offer is ███
███████ comprised of the following, and then
11   ████████ of that is for all of the
12   intellectual property as outlined below.
13          Were you involved in valuing the
14   intellectual property of BuyBuy Baby?
15      A.    I was -- I contributed to the --
16   how do I say it -- the overall assessment of
17   the business, but I did not come up with the
18   intellectual property number.
19      Q.    Do you have an opinion about the
20   intellectual property number?
21      A.    In what way?  In this particular
22   document or eventually in the deal or --
23      Q.    At this point, did you have an
24   opinion about --
25      A.    Can you slow down?

Page 62

Chau

1

2      Q.    -- the ██████████ value placed
3   on it?
4      A.    I believe that Christian would have
5   gone through his process and made a fair
6   determination based on what he knew at the
7   time.  It may have been -- if you scroll down a
8   little bit (indicating)?  Yeah.  I mean, I'm
9   not sure.  I mean, I guess -- it's been a
10   little while, but I would think that Christian
11   would have gone through his process properly
12   and kind of thought through what that should
13   be.
14          As far as the number or the opinion, I
15   mean, 21.5 for Bed Bath & Beyond, which is a
16   huge business, and -- at 21.5 and this is 18.7,
17   it seems like that, you know -- that there's a
18   high value on Baby at this point, yeah.  I
19   mean --
20      Q.    Does that mean you would agree with
21   the sentence above the chart that says, "We
22   believe the Baby IP valuation is very
23   aggressive when compared to the stalking horse
24   bid for the Bed Bath & Beyond IP"?
25      A.    Yes, I think so.  I would agree

Page 63

Chau

1

2   with that at that moment, yeah.  I'm just also
3   basing on Christian's assessment here, I trust
4   his judgment in that sense.  I can't speak for
5   him, per se, but I -- yeah.
6      Q.    So, am I correct that if you were
7   not directly involved in determining the amount
8   of --
9          (Talking over each other.)
10          -- submission to Lazard?
11      A.    I'm sure I provided my opinion at
12   time and probably in different areas where, you
13   know -- particularly with HR that I looked at
14   for this particular transaction.  I think,
15   hopefully, he would have taken some of my
16   thoughts and put it into his equation; right?
17   But no, I did not draft it or say, "Hey, this
18   is the number you got to go with, Christian."
19   I don't believe I did that.
20      Q.    We've been going about 90 minutes,
21   do you want to take a short break or are you
22   okay?
23      A.    I can do either.
24          (Recess taken.)
25          MR. MURPHY:  I'm going to mark as

Page 64

Chau

1

2      Exhibit 8, it's a two-page e-mail chain.
3      The first one is Bates number
4      ANK-0041290.  Top e-mail is from Jeff
5      Streader to Kathleen and it CCs some
6      people, including Yuen.
7          (Exhibit 8 was so marked for
8      identification.)
9   BY MR. MURPHY:
10      Q.    The e-mail I'd like to look at is
11   an e-mail from Kathleen Lauster on June 18th,
12   addressed to Christian.  Do you know if you
13   received this e-mail directly from Kathleen or
14   if you just received it on the copy from Jeff?
15      A.    I don't recall.  I'm sure that
16   could be found out, yeah.  But I did get the CC
17   or I got the one above this particular screen.
18      Q.    In the second paragraph, she says,
19   "We know the entire Go Global team has worked
20   hard to put together this alternative plan and
21   we recognize the effort it took to pivot in
22   such a short timeline, we applaud you on your
23   efforts."
24          Do you know what the "pivot" is that
25   she's referring to?



Page 65

1          Chau
2      A.    Probably in terms of trying to find
3   different ways to construct an offer.  As I
4   mentioned to you earlier, there is different
5   ways to come to an offer, kind of a package.
6   And I think maybe she -- I believe this is what
7   she's trying to say, or she could be talking
8   about, I guess, coming up with some type of,
9   you know, potential investor group or something
10  to that effect.
11      But it would be -- I would think that
12  there's, you know -- we're looking at different
13  structures and she's probably looking at --
14  she's probably talking about pivoting
15  structures or looking at different structures.
16      Q.    A little further down next to my
17  cursor, she says, "We would be remiss if we
18  didn't advise you that based on recent
19  conversations with Lazard, the debtors and
20  their advisors are frustrated and disappointed
21  with where we are three days before the
22  auction."
23      Do you know why they would have been
24  frustrated and disappointed?
25      A.    Yeah, I think this whole process

Page 66

1   was very frustrating for everybody.  If you
2   look at the deal history, they had multiple
3   delays, they didn't, you know -- they were
4   providing information that things were going
5   along.  So, things are changing.  And I think
6   what they were trying to do is basically put a
7   final kind of conclusion to the whole sale
8   process of BuyBuy Baby, and they probably
9   wanted people to put their -- put certain
10  offers together maybe in a format that they
11  wanted to within a few days, and I think
12  everybody was frustrated at the time.  So, I
13  think they were frustrated not just -- I don't
14  think it's directly only at us.
15      Q.    Above that, it says, "We want to
16  make sure Go Global is best positioned to
17  qualify and ultimately win the bid."
18      Do you know what it took to qualify?
19      A.    I think what she was referring to
20  maybe it's just to give them assurance that we
21  had investors, that we would have a good plan
22  to buy, and then keep running the company and
23  so forth.  So, I think it's just -- if I had to
24  think about where Lazard's position would be,

Page 67

1   it's that they want to make sure that people
2   are -- they have a good amount of buyers to
3   have a good auction; right?  I mean, yeah, I
4   think that's what they're saying.  So, she
5   wants us to be seen in a good light; right, so
6   that we could ultimately compete and win.
7      Q.    Are the terms "qualifying bid" and
8   "binding bid" the same in your mind?
9      A.    "Qualifying bid" and "binding bid,"
10  I -- no, I think in this sense, "qualifying
11  bid" means a bid that they would determine is a
12  viable bid.  "Binding," to me, would mean in
13  general, I don't know about here, would be
14  something you can't get out of; right?  I mean,
15  that's what I would understand is "binding."
16  But at this point, that process hasn't
17  happened.
18      Q.    So, am I correct that Go Global
19  never submitted a binding bid for BuyBuy Baby?
20      A.    I do not believe we had a binding
21  bid in that sense.  No, I don't think so, in
22  that definition.
23      Q.    Did Go Global ever submit a
24  qualifying bid for BuyBuy Baby?

Page 68

1      A.    I think our bids were qualified to
2   a degree.  I think they're, I want to say, like
3   reasonable or quality, of quality.  We had good
4   investors, we had investors who expressed
5   interest and they were quality investors.  So,
6   I think that qualification, in my point of
7   view, was met.  So, I would think we had
8   quality bids, I mean -- or a quality group
9   together.  Whether that was --
10      Q.    Did they qualify?
11      A.    Well, they would have to -- I think
12  you're saying did they qualify us, is that what
13  you're saying?
14      Q.    Yes.
15      A.    I don't recall because -- okay.
16  So, they could say -- because they were working
17  with us and kept on moving along with us, so
18  obviously they qualified us throughout the
19  process.  Otherwise, they would say step out of
20  the process; right?
21      So, I think if you're asking that,
22  yeah, I think we provided qualified bids along
23  the way -- qualified indications along the way.
24  But no, we didn't have a binding -- we



Page 69

Chau

1
2 weren't -- didn't have a binding bid, if that's
3 what you're saying. So, I think that's two
4 different --
5    Q.    Your e-mail, to me, says, "We want
6 to make sure Go Global is best positioned to
7 qualify and ultimately win the bid." That
8 would imply to me that as of June 18th, Go
9 Global had not qualified; am I wrong?
10    A.    That is not -- I don't think that's
11 completely accurate because if I remember
12 correctly, there were different stages of this
13 process that got moved along. So, I think we
14 were qualified at a certain stage, and then
15 they had moved, they delayed the auction or
16 delayed the process, and then I believe no one
17 actually showed up for the -- the auction got
18 pushed or something, and I think there's like
19 other bids.
20        And again, this is all from memory;
21 okay? So, I believe we were a qualified
22 investor in the process; okay? I mean, in the
23 sense that we should -- they saw us a viable
24 buyer; okay? Based on the work we've done,
25 based on how we represented ourselves.

Page 70

Chau

1
2        What they could -- I don't know what
3 they're referring to, but it could be part of
4 the process they're talking about because at
5 different stages, they were -- who was going to
6 be accepted as a bidder or -- that could have
7 been what they're implying here, but I can't
8 say exactly what Kathleen meant here.
9        But I do -- if you're asking me do I
10 think we were qualified? Yes, I do think we
11 were qualified to make a bid, and they
12 qualified over us -- us over time. But, you
13 know, I think if you're talking about the
14 actual bidding process, we didn't offer a
15 binding bid.
16    Q.    Did the going concern auction ever
17 occur?
18    A.    The going concern auction? So, I
19 believe that the IP auction -- well, the IP
20 auction happened. I think after that, there
21 would have been an opportunity to -- there was
22 an open -- I think there was an open
23 opportunity to go after the IP and the assets,
24 I would say, as a whole. But at that time,
25 too, I think the IP -- yeah, I think there was

Page 71

Chau

1
2 -- I don't remember if it was a separate
3 process. I think you could bid for both at the
4 same time --
5        (Talking over each other.)
6    Q.    That was after the IP auction,
7 you're talking about?
8    A.    I believe -- I think you could have
9 done both at the same time, if I'm not
10 mistaken.
11    Q.    Was there ever an IP only auction?
12    A.    I think -- no, there was an IP only
13 auction in the auction; okay? From what I
14 understand. Okay. So, you can walk in and say
15 I only want the IP or I want the whole thing.
16    Q.    Did Go Global bid on the IP only?
17    A.    No. We would have -- any of our
18 indications would have been for both, our
19 indications. I mean, again, we didn't have a
20 binding bid.
21    Q.    And why ultimately did Go Global
22 not have a binding bid?
23    A.    We tried to get investors to come
24 in with us, and I think the valuation of the
25 business changed over time, the state of the

Page 72

Chau

1
2 business changed, as well. And it's really
3 about what we believe is a fair value and what
4 the investors believe, as well. They were
5 committed to us, they believed in what we were
6 doing, they saw the work, as well. But
7 ultimately, it's a matter of whether your
8 investors see things eye to eye or see the same
9 type of value in order to allow you to execute
10 a bid.
11    Q.    So, ultimately, there was no bid
12 because there was not -- there were not
13 sufficient capital contributed --
14    A.    Right.
15    Q.    And do you believe Go Global would
16 have bid if it had raised sufficient capital?
17    A.    Say that again, sir.
18    Q.    Do you believe Go Global would have
19 bid if it had raised sufficient capital?
20    A.    I believe we would have bid at a
21 certain price. And I think, you know, to say
22 that we didn't have sufficient capital to the
23 point that where the value was. We had
24 commitments and we had investors interested,
25 but it's all about the valuation; right, how



Page 73

1              Chau
2    much you're willing to pay for it.  So, granted
3    where it was at in terms of the IP, ultimately
4    whether the IP auction ended up, I think that
5    value was outside of what we had indicated
6    before we think that -- because remember, the
7    deal starts to evolve over time; right?
8         So, what you saw, maybe what Christian
9    sent on the 17th, the next day, the day after,
10   things change, and we got, you know --
11   constantly getting more information and the
12   deal, you know -- certain things start to
13   diminish, values start kicking wrong values and
14   valuation ideas.
15        So, for instance, the IP would have
16   been probably lower than that particular
17   estimate.  So, are people, you know -- would
18   you be willing to pay that much; right?  And I
19   think that's where -- it's not so much that we
20   didn't have the capital, per se, but the
21   capital at certain valuations just, you know,
22   didn't make sense to the investor or didn't
23   make sense acquiring at a certain value -- at a
24   certain price, I should say.  Not value; at a
25   certain price.

Page 74

1              Chau
2         And that price was a little bit beyond
3    what we disclosed, we would kind of think of in
4    terms of ratios and how much we would pay for
5    the business, both IP, as well as the ongoing.
6    Does that make sense?
7         Q.   Yeah.  What was submitted on the
8    16th, did you have the capital for that?
9         A.   Sorry, what was submitted on the
10   16th?
11        Q.   The bid we were looking at, do you
12   know if you had the capital to support that
13   bid?
14        A.   Sorry, can you --
15        Q.   Yeah.
16        A.   I just want to make sure that I'm
17   speaking to the right document (indicating.)
18   The ██████████ I believe we had some of that,
19   yeah.
20        Q.   Some, but not all.
21        A.   Maybe not all or not confirmed at
22   the time, which is probably why Kathleen had
23   mentioned, you know, get everything together or
24   whatnot.  So, I'm only -- I'm kind of -- yeah,
25   I would I believe that's -- I believe that's

Page 75

1              Chau
2    probably the case, and I'm putting this
3    together.  It's been a while, but I mean, if
4    I'm putting what you're showing me together,
5    that sounds right.  So, at -- but at this time,
6    this was on the 17th, so things have changed --
7    or 16th, so by the 17th, 18th or so, the
8    perception and the ratios may have changed in
9    terms of intellectual property versus what's in
10   the inventory, what we can rely on, and then
11   also how much we would want to pay for the
12   intellectual property at this point.
13        And so -- yeah.  So, that would
14   determine our thoughts behind it.
15        Q.   Do you know how much the winning
16   bid was for the intellectual property?
17        A.   I believe it was 15.5.
18        Q.   Do you know when that auction
19   occurred?
20        A.   I don't remember exactly.  It
21   must -- I would think it was after this date,
22   if that's correct.  I'm not sure, actually.
23   Again, because the timelines had moved a lot,
24   it's been a year, so I know that the
25   intellectual property bid happened, and then

Page 76

1              Chau
2    there was time after that to submit another bid
3    to kind of take the whole -- take that as well
4    as an ongoing concern.
5         My view is that -- what was seen in
6    that e-mail, that proposal, that indication was
7    higher than what I think was reasonable in the
8    sense of by the time it happened, at the time
9    that the bid was won and by the time one would
10   look to do a counter, that would have been a
11   high number because the value would have
12   changed or diminished by then.  Yeah.
13        Q.   You're saying that the value of the
14   IP would have diminished by then?
15        A.   May have, yeah, may have.  So, I'm
16   not saying that that's -- the number that
17   Christian had there in his proposal was the
18   right one.  It was the one that he felt was
19   aggressive at the time.  But at the same time,
20   you know, between then and the close of the
21   whole transaction; right, I mean, the whole
22   process, there was probably about another week
23   or so --
24        Q.   I'll represent to you that the IP
25   auction was on June 28th.



Page 77

Chau

1
2     A.   Okay.  There you go.  Thank you.
3     Q.   Does that sound right to you?
4     A.   Yeah.  I know that everything was
5  in June.  That's what I can say, yeah.  That
6  period of time.
7          MR. MURPHY:  What I've shared on my
8      screen now I'm going to mark as Exhibit
9      9, it is an Excel spreadsheet with
10     multiple tabs across the bottom.  The
11     whole document is Bates number DOM00075.
12         (Exhibit 9 was so marked for
13     identification.)
14 BY MR. MURPHY:
15     Q.   Yuen, just looking at this
16  spreadsheet, do you recognize it?
17     A.   I do.  Can you scroll up, sir?
18     Q.   Sure (indicating).
19     A.   I recognize it, although there were
20  many iterations, this evolved over time as we
21  put more work into it.  So, I'm not sure which
22  --
23     Q.   My understanding is this is version
24  9 --
25     A.   Okay.

Page 78

Chau

1
2     Q.   -- and was -- the current version
3  as of around June 10th of last year is what
4  I've been told, and I'll represent that to you.
5          Were you involved in the creation of
6  this document?
7     A.   No.
8     Q.   Did you use this document in any
9  way, or other versions of it --
10    A.   I've read this before.  I forwarded
11  versions of this, too.  But I didn't use it.  I
12  mean, I'm not sure what you meant by "use."
13  But I mean, I guess, yes, I forwarded it, you
14  know.  But I didn't create the document and --
15  yeah, but I referred to it, yes.
16    Q.   Is it your understanding that this
17  document was created by Christian Feuer?
18    A.   And I think Deb Gargiulo worked on
19  it, too.  So, I think there's -- and then we
20  all provided kind of our opinions and thoughts
21  and information based on our areas of due
22  diligence and specialty.  So, no, it wasn't
23  just one person, the team worked on it, but
24  Christian assembled it, put it together and
25  modeled it along with Deb, I believe.

Page 79

Chau

1
2     Q.   Am I correct that Deb's main focus
3  was the source?
4     A.   That was one of our focuses.  Deb
5  is a CFO level person, she's a CFO of different
6  companies, so she has a lot of understanding of
7  finance.  So, yeah, I think -- I believe that
8  was one of them, and there may have been
9  others, too.  And it's collaborative, so it
10  could be in different areas.
11    Q.   So, am I correct -- I'm just trying
12  to understand your involvement with this
13  particular document.  Am I correct that you
14  would have provided input, but you would not
15  have revised or changed the document yourself?
16    A.   No, I do not revise or change
17  documents.  That would have been Christian, Deb
18  and others, maybe.  I would have given my
19  opinion on certain things, and that might have
20  been the input, as we all do as a team, so.
21         MR. MURPHY:  I'm going to mark as
22     Exhibit 10, it's a 23-page document that
23     starts with DOM000052.  It's got a BuyBuy
24     Baby logo on the first page, and it's
25     entitled, "Acquisition and Turnaround

Page 80

Chau

1
2     Strategy," it has a June 2023 date across
3     the front.
4          (Exhibit 10 was so marked for
5     identification.)
6  BY MR. MURPHY:
7     Q.   Is this a document that you
8  recognize?
9     A.   I do.
10    Q.   What is this document?
11    A.   I believe this document is an
12  information document of how we see the
13  opportunity, what we think is -- what's
14  available there, why we think it's attractive,
15  and it gives indication on what we would do, I
16  believe.  If you can scroll back up?
17    Q.   Sure.
18    A.   There's also Go Global, as well,
19  our background.
20    Q.   And who would this document be
21  provided to?
22    A.   It would be provided to probably
23  potential partners in this, be it investors,
24  passive investors or maybe the investment
25  partners here, in that sense.



Page 81

1                        Chau
2        Q.   Here on page 8, there is a
3   reference to Go Global equity, and it says "█████
4   ████████"
5        Do you see that?
6        A.   Mm-hmm.
7        Q.   You have to say "yes" or "no."
8        A.   Yes, I'm sorry.
9        Q.   So, would this indicate the
10  potential investors that Go Global is going to
11  contribute ██████████?
12       A.   That would indicate our investors
13  that would go through Go Global equity to
14  invest in the potential transaction.
15       Q.   I'm sorry, say that one more time.
16       A.   Yeah.  That would be -- yes.  That
17  would be Go Global equity contribution with the
18  investors that would put money through Go
19  Global to make the investment.
20       Can you scroll to the front two pages?
21  I just want to make sure I'm understanding
22  which document this -- because -- strategy.
23  Okay.  Can you go down one more, sir
24  (indicating).
25       Q.   Sure.

Page 82

1                        Chau
2        A.   Okay.  Got it.  Understood.
3        Q.   Would you have been involved in the
4   creation of this document?
5        A.   I was involved in certain slides in
6   this, but not the creation of the complete
7   document.  Say, for instance, go down --
8        Q.   If I scroll down, can you tell me
9   what slides you were --
10       A.   Yeah, sure (indicating).  This one.
11       Q.   And what was your involvement?
12       A.   This is kind of a standard template
13  Go Global introduction.  So, I would introduce
14  Go Global to potential partners, investors, you
15  know, people that we work with.
16       Q.   Got it.  And I'm correct that this
17  slide is really about Go Global generally, and
18  less about BuyBuy Baby specifically?
19       A.   Correct.  And that's -- those would
20  have been my contributions.  This one here
21  (indicating).  This one here (indicating).
22       Q.   And just for the record, you've
23  indicated page 5, page 6.  And again, these
24  appear to be about Go Global in general; is
25  that right?

Page 83

1                        Chau
2        A.   These are about Go Global.  This
3   would have been more Christian (indicating).
4   Yeah.  Whenever there's a spreadsheet involved
5   -- it would be him.  So, I just -- yeah.  So,
6   this would be his document --
7        (Talking over each other.)
8        Q.   Am I correct that this spreadsheet
9   and these chart -- the graphics came from some
10  version of the model that we looked at
11  previously?
12       A.   I'm assuming so just because the
13  page that you showed me and this page looks
14  similar.  As far as some of these other
15  statistics, yeah, I mean, some of it could be
16  our estimates, others could be derived from
17  information that we gathered in due diligence.
18  Sorry.  Yeah, like for instance, the software
19  one would have been things we ascertained, and
20  probably a plan that we would have in terms of
21  going about implementing certain software
22  (indicating), so.
23       Q.   And the software, for the record,
24  he's referring to page 9.
25       A.   No, I'm not.

Page 84

1                        Chau
2        Q.   Okay.  Then tell me what you're
3   refer to, I'm sorry.
4        A.   Okay.  I didn't read the page, but
5   if you can scroll, that would be great
6   (indicating).  Continue, continue, continue,
7   continue.  Right there, I saw that when you
8   were scrolling down.
9        Q.   Okay.  So, just to clarify, you
10  were referring to page 14?
11       A.   Yes, yes.  So, these are things
12  that may or may not have been in the data that
13  we developed and thought through this and had
14  plans.  So, yeah, the technology carve-out
15  strategy, that would be our plan.
16       Q.   Were you involved in developing the
17  technology carve-out strategy?
18       A.   No.
19       Q.   Would that have been Thoryn?
20       A.   Probably, and Jeff.
21       Q.   And did you create any documents
22  that were in the Go Global data room?
23       A.   No, not that I can recall.  If --
24  yeah.  If you want to go through a list, I can
25  look at a list.  But I don't -- I don't think I



Page 85

Chau

1  put anything into the Go Global data room.
2      MR. MURPHY:  I'm going to mark
3      Exhibit 11, it's a 61-page document that
4      starts DOM0001082.  It's got a BuyBuy
5      Baby logo and a Go Global logo on the
6      front, it says "May 2023."
7          (Exhibit 11 was so marked for
8          identification.)
9  BY MR. MURPHY:
10     Q.   Yuen, is this a document you
11 recognize?
12     A.   I do.
13     Q.   What is this?
14     A.   This is earlier on in the
15 discussion.  This is back in May.  Yeah, this
16 is back in May.  I believe this is also a
17 discussion document we had with the management
18 at BuyBuy Baby at the time, where we were
19 really looking at how to work together.
20         When we approach things, we approach
21 it pretty holistically, thinking about how
22 management, we could work with management, who
23 in management we would work well with.  We were
24 gathering some of their information and I think

Page 86

Chau

1  we were trying to ascertain ways to go forward.
2  In this conversation, though, I think this was
3  also BuyBuy Baby showing us what they were
4  doing, the management was doing.  And then we
5  had ideas for them and we went back and forth
6  and so forth.
7          But I believe this is a meeting that
8  happened with -- this was shown to us at a
9  meeting that happened with the management of
10 the company.  The "company," meaning BuyBuy
11 Baby.
12     Q.   This is a BuyBuy Baby document?
13     A.   I believe so.  I believe so.  I
14 remember seeing this document in our
15 discussions with them because we had multiple
16 discussions.  And things are not in here on
17 paper, but I'm sure -- I remember us discussing
18 ideas, suggestions, things like that.  So,
19 there's a lot shared here, too, and interacted.
20     Q.   Do you know who Steve Hannan is?
21     A.   Steve Hannan?
22     Q.   Hannan, yeah.
23     A.   Can you spell that, sir?
24     Q.   H-A-N-N-A-N.

Page 87

Chau

1      A.   Yes, I do.
2      Q.   And who is he?
3      A.   He is a board member of Janie and
4  Jack.
5          MR. MURPHY:  I'm going to mark as
6          Exhibit 12, it's a four-page e-mail
7          chain.  The top e-mail is from Christian
8          Feuer to Jeff Streader, copies Yuen and
9          Deborah Gargiulo.  The first Bates number
10         is GG-0021594.
11             (Exhibit 12 was so marked for
12             identification.)
13 BY MR. MURPHY:
14     Q.   Yuen, this e-mail you were copied
15 on is a forward from Christian Feuer, which
16 forwards an e-mail from Steve Hannan that was
17 sent on June 20th of 2023.  In that e-mail, he
18 says, "As a board member, I'm very concerned."
19         Do you know what he was concerned
20 about?
21     A.   If you scroll down, I could
22 probably tell you, ascertain (indicating).
23 Okay.  "I'm very concerned" -- can you also
24 make it bigger?

Page 88

Chau

1      Q.   Sure (indicating).  Is that better?
2      A.   Yeah, thank you.  (Reading.)
3          Okay.  All right.
4      Q.   Based on your review of this
5  e-mail, do you know what Steve Hannan was
6  concerned about?
7      A.   Not particularly.  I didn't -- no.
8          MR. MURPHY:  I'm going to mark as
9          Exhibit 13, it's a two-page e-mail chain
10         that starts with Bates number
11         ANK-0035975.  The top e-mail is from Jeff
12         Streader to Kathleen Lauster and Matthew
13         Lapish at Ankura.
14             (Exhibit 13 was so marked for
15             identification.)
16         THE WITNESS:  Tom, can I ask you to
17         make it bigger again?
18 BY MR. MURPHY:
19     Q.   I'm looking, actually, at the
20 second e-mail in the chain from June 26th of
21 2023 from Jeff Streader to Christian Tempke and
22 Brendan Shea, copying several people, including
23 Yuen (indicating).
24         Do you remember receiving this e-mail?



Page 89

Chau

2    A.    I remember receiving something like
3  this.
4    Q.    Where did things stand on June
5  26th?
6    A.    So, I don't remember exactly
7  because I know that there was this point, where
8  there was the actual auction, and they
9  needed -- I believe that they needed to know
10  whether we were going to be in the auction or
11  not. That doesn't mean that we couldn't bid
12  again. So, I'm not sure of the timeline
13  because we were also still looking at making an
14  offer countering what was the winning bid. So,
15  I'm not sure here.
16       So, let me just qualify myself. I
17  mean, it's been a while. But I remember that
18  there was the -- there was one formal process
19  stream that ended, and I think we had to define
20  our position there. But there was another
21  stream that we could try to go after things
22  afterwards or whatnot. So, I'm not sure where
23  this lies in there, if that makes sense.
24    Q.    Understood. Did there come a time
25  where you thought it was over from a Go Global

Page 90

Chau

2  perspective, and then it was revived again
3  before it was over?
4    A.    Yes, multiple times in the whole
5  because they would stop the process, and then
6  they would start it again and we didn't -- we
7  weren't sure what was going on. That's -- I
8  don't want to say the fault of Lazard, but I
9  mean, it was Lazard and Kirkland Ellis that was
10  running the process, and sometimes we just --
11  things were pushed up, so we didn't -- but no,
12  we always wanted to -- we always wanted and
13  we're interested in the business, I mean,
14  that's something that I have to say that, you
15  know, we kept on pursuing.
16    Q.    Do you agree with Jeff's statement
17  that the prospect of brand and business revival
18  is not without significant risk?
19    A.    I agree with that, yes, that there
20  was significant risk to the business as
21  there -- that risk would then qualify how much
22  one would value the business and how much one
23  would pay for it. But obviously, there would
24  have been risks all throughout the process.
25    Q.    Sir, am I correct that this e-mail

Page 91

Chau

2  was advising Lazard that Go Global was
3  withdrawing from the process?
4    A.    From that -- at that stage, that's
5  what it sounds like --
6    Q.    And do you know what happened after
7  that?
8    A.    I thought there was -- and I could
9  be wrong. I thought there was an opportunity
10  allowed for maybe another process or something.
11  I mean, I'm not sure.
12    Q.    It's your understanding that
13  subsequent to the IP auction, there was still
14  an opportunity to purchase the whole thing?
15    A.    I believe so, yes.
16    Q.    Who is Patty Wu?
17    A.    She is the CEO of BuyBuy Baby.
18    Q.    And how about Sue Grove?
19    A.    I think she was very senior in Bed
20  Bath & Beyond, not BuyBuy Baby. I'm not --
21  yeah, I think she was more senior, if I'm not
22  mistaken, probably on the Bed Bath & Beyond
23  side.
24    Q.    And that's for both of them or just
25  for Sue Grove?

Page 92

Chau

2    A.    No, I think Patty was -- Patty was
3  CEO of BuyBuy Baby. Sue was very senior at Bed
4  Bath & Beyond, the parent, I believe.
5    Q.    And what was Alix Partner's role?
6    A.    I think Alix, they're a consulting
7  firm. And they probably contributed thoughts
8  in terms of marketing or customer relationships
9  or customer profiling because that's their
10  background, I believe. They are a consulting
11  group.
12    Q.    And they would have been retained
13  by BuyBuy Baby?
14    A.    We didn't pay them. I don't think
15  we paid them. So, I would assume so. I
16  don't --
17    Q.    You're not sure? Am I correct that
18  you're not sure?
19    A.    I don't know if they were retained
20  by them or they did a study or -- I mean, I
21  would think that they're on the other side of
22  the table. They were providing information,
23  I'm assuming. I mean, I don't know if they
24  were retained, I can't speak to that.
25    Q.    Go Global retained Ankura; correct?



Page 93

Chau

1
2    A.    Yes.
3    Q.    Besides Ankura, did Go Global
4  retain any other outside consultants related to
5  this --
6    A.    Let me think about that.  We may --
7  because we worked with different partners, we
8  may have -- we may have.  I didn't retain
9  anybody.  I didn't --
10    Q.    Besides Ankura, do you remember
11  working with anybody else outside of --
12    A.    There was another division in
13  Ankura that we worked with, the consulting
14  side.  The consulting side.  Because Kathleen
15  was the finance side and there was a consulting
16  side, I believe.  So, that's who I would think
17  we also worked with, retained.  But I didn't
18  create the retention.  I mean, I didn't write
19  up the contract or anything like that.
20    Q.    And am I correct that what you're
21  referring to is a consulting arm of Ankura?
22    A.    Yes.
23    Q.    And you think you guys may or may
24  not have worked with them, you're not sure?
25    A.    No, we worked with them.  I'm not

Page 94

Chau

1  sure about the retention -- how the retention
2  worked or how the contract worked.  So, I'm
3  not -- if that's what you're implying, if we
4  retained anybody else, that's what I'm trying
5  to answer.
6    Q.    Is Project Butterfly a name that Go
7  Global used or is that a name that Lazard used?
8    A.    I think that's a name that Lazard
9  used.
10    MR. MURPHY:  I'm going to mark as
11  Exhibit 14, it's a two-page e-mail chain,
12  it starts with GG-0013673.  It's an
13  e-mail.  The top e-mail is from Jeffrey
14  Streader on June 27th, 2023.  Sent to
15  Christian Tempke and Brendan Shea at
16  Lazard, it copies several people,
17  including Yuen, and it blind copies
18  several other people.
19    (Exhibit 14 was so marked for
20  identification.)
21    THE WITNESS:  Sorry, I'm blind
22  copied on this, you said?
23    MR. MURPHY:  You're regular copied.
24    THE WITNESS:  Okay.

Page 95

Chau

1    MR. MURPHY:  There are several other
2  people who are listed as blind copied.
3  BY MR. MURPHY:
4    Q.    Do you remember receiving this
5  e-mail from Jeff?
6    A.    I remember seeing this, yes, I do.
7    Q.    So, as of this date, the 27th, he
8  said, "The auction is tomorrow or this week,
9  you're not going to participate."
10    Was that your understanding at that
11  time?
12    A.    Was my understanding that the
13  auction was in the next couple of days?  Yes.
14    Q.    Or that you weren't going to
15  participate if it was?
16    A.    That's my understanding from Jeff's
17  e-mail here.
18    Q.    I guess is this e-mail consistent
19  with your recollection that you did start
20  attempting to participate again?
21    A.    Not at this stage.  At this stage,
22  this is just, I believe, Jeff, from what I can
23  read here, summarizing some of his discussions
24  with different members or different parties

Page 96

Chau

1  that he's mentioned here.  I was not part of
2  those conversations.  That's all I can
3  ascertain.
4    MR. MURPHY:  I'm going to mark
5  Exhibit 15, it's a two-page e-mail chain.
6  It doesn't have a Bates number, which I
7  will fix later.  But the first e-mail is
8  from Rick Maicki from Ankura to Kathleen
9  Lauster and Matthew Lapish.  But it's
10  forwarding an e-mail from Jeff Streader
11  on which you were CC'd.  The e-mail is to
12  a George Mrkonic.
13    (Exhibit 15 was so marked for
14  identification.)
15  BY MR. MURPHY:
16    Q.    Do you know top name Rick Maicki?
17    A.    Yeah, I know Rick.  Rick is part of
18  Ankura.
19    Q.    Do you know what his role at Ankura
20  is?
21    A.    Consulting.
22    Q.    Do you know who George Mrkonic is?
23    A.    Not really.  I have to jog my
24  memory.  I don't remember who George is.

Page 97

1                        Chau
2        Q.    And I guess this e-mail said there
3   appears to be a problem with the IP auction
4   winner --
5        A.    Sorry, can I stop you for a little
6   bit.  I'm just trying to remember all this,
7   Tom.
8        Q.    Sure.
9        A.    George, I believe, is a high net
10  worth individual that Rick introduced us to
11  into this deal.  So, yeah, I've heard the name,
12  but there's a couple of Georges flying around.
13  So, yeah.  Okay.
14        Q.    So, I guess it says here the
15  lawyers have reached out, it appears there's a
16  problem with the IP auction winner.
17        Do you know what that problem was?
18        A.    I do not.
19        Q.    Do you know, from your perspective,
20  what was going on at this time?  We're now in
21  the first week of July.
22        A.    I believe at this time, we're
23  trying to do a counter bid or offer; right, at
24  this point.  I'm not sure what he means by
25  "problem."

Page 98

1                        Chau
2        Q.    I guess you said you're trying to
3   do a counter bid, that's consistent with Jeff's
4   e-mail here that says, "We are sharpening our
5   pencils for a new lower bid"?
6        A.    Right, right, I would think so,
7   yeah.
8        Q.    And when he says "new lower bid,"
9   is he referring to lower than what Go Global
10  was planning on bidding earlier?
11        A.    I'm not sure on this one.  I can't
12  remember.  I mean, in the context of this, it
13  could be -- it could be what we would have bid
14  before, maybe.  But I'm not sure.  I mean,
15  there's not enough in this e-mail that I can
16  remember.
17        Q.    Do you remember what your
18  involvement was at this time?
19        A.    I was not part of the discussions
20  with Rick.
21        Q.    Let's just back up from that
22  specific discussion.  I guess at this point in
23  early July, do you remember what you were doing
24  related to this transaction?
25        A.    Yeah, I -- I'm trying to think of

Page 99

1                        Chau
2   how we could still get into the deal, maybe.  I
3   mean, different options there.  We were just
4   evaluating what was happening.
5        Q.    Am I correct that at this point,
6   if -- the opportunity was there to obtain
7   BuyBuy Baby, still?
8        A.    It looks like it, yes.  I guess
9   what Lazard was saying or Kirkland Ellis was
10  that they indicated that there's an
11  opportunity.  They didn't talk to me directly.
12        MR. MURPHY:  I'm going to mark as
13       Exhibit 16, it's a three-page document
14       with a Go Global logo across the top.
15       The top section says, "Case
16       Study/Investment Process."  I'm just
17       going to go down slowly so you can see
18       the whole document I'm talking about.
19        (Exhibit 16 was so marked for
20       identification.)
21  BY MR. MURPHY:
22        Q.    Is this a document you're familiar
23  with?
24        A.    Yes.
25        Q.    What is this document?

Page 100

1                        Chau
2        A.    This is a marketing document, I
3   believe, in a format that basically talks about
4   how we go about making investments, it offers
5   some insight to potential LPs of how we go
6   about doing due diligence, our processes and so
7   forth.  And it was a case study of BuyBuy
8   Baby's process for us post everything.  I think
9   this was probably later on in July or August or
10  something, after everything was over.
11        Q.    The top section says, "Go Global is
12  sharing this case study with our investment
13  partners to provide some insights into our
14  consideration to acquire BuyBuy Baby from the
15  bankruptcy auction process of its parent Bed
16  Bath & Beyond, and context as to why we passed
17  on the opportunity relative to what may have
18  been reported on CNBC and other news agencies."
19        Did Go Global pass on the opportunity
20  to purchase BuyBuy Baby?
21        A.    We -- so, based on -- so, on this
22  document, which is a marketing document, it's
23  not a deal document, when we say we passed on
24  it, we want to let the investors know that the
25  value that was being placed on the asset at the



Page 101

Chau

1
2  time, the money was not available for us to
3  make -- or it didn't make sense to make a
4  higher bid -- it was difficult to make a higher
5  bid, I should say.  And that we eventually did
6  not do the deal.  I mean, that's what we mean
7  by "passed," we did not do the deal.  Because
8  this is a marketing document, this is not an
9  investment document, so when I say "passed"
10  here, we didn't do the deal.
11     Q.   Were you involved in creating this
12  document?
13     A.   Yes.
14     Q.   So, when you say "I said passed,"
15  did you write this document?
16     A.   I wrote this document.
17     Q.   Why is "passed" in capital letters?
18     A.   Because there were some reports on
19  some news agency that we actually bought it, so
20  I didn't want any -- and that was -- I don't
21  know why that was the case, but there was
22  misinformation in the marketplace.
23     Q.   And that misinformation was that
24  you actually bought it?
25     A.   That we had obtained it or

Page 102

Chau

1
2  something to that effect, I can't remember
3  exact words.  But I wanted to clarify that.
4     Q.   So, does "passed" imply that Go
5  Global voluntarily chose not to participate?
6     A.   Not necessarily.  It could be for a
7  number of reasons.  I didn't want to get into
8  details there because, again, there would have
9  been some privacy issues or -- I just didn't
10  want to get into that -- the weeds of that, so
11  I just wanted to let them know that we
12  ultimately didn't do this deal and what was our
13  process in looking at it.  It's really a
14  document to show investors and potential
15  partners of the work that we do, kind of the
16  thought process.  And we just used this as a
17  case study.
18     Q.   So, I'm looking at the bold
19  section, where it says, "The opaque status of
20  inventory levels leads to human resources and
21  vendor contracts led us to increase the risk in
22  profile based on the cost to restock inventory,
23  uncertainty of retaining key customer data and
24  assurance of leases.  Without a higher level of
25  certainty we felt the seller needs to provide

Page 103

Chau

1
2  in the criteria mentioned below, we decided to
3  pass on acquiring Baby."
4     Is that accurate?
5     A.   That is accurate.
6     Q.   So, Go Global chose not to attempt
7  to acquire BuyBuy Baby; correct?
8     A.   Based on the amount of money that
9  was -- based on the winning bid, it -- and in
10  taking these risks and the assessment that I
11  put down there, it didn't -- we were not able
12  to go forward in terms of buying the asset.
13  The bid was higher than what our investors
14  probably would have paid for it and what we
15  thought was a good value for it, and it's
16  something that we didn't ultimately have a
17  binding bid for.
18     Q.   Obviously, you felt like it was
19  worth ███ on June 16th, but it wasn't worth
20  ███ on June 28th?
21     A.   Christian felt that it was worth ███
22  at the time, and it was aggressive already.
23  And that document, I believe, would have said,
24  look, we're being aggressive here, if we were
25  being aggressive, we would bid this much; okay?

Page 104

Chau

1
2  By the time we got here, the inventory was
3  further diminished, certain stores are closing
4  down, people weren't sure about which stores
5  are open, could they use their gift cards and
6  things like that.  So, the brand of IP had some
7  more uncertainty; right?
8     And as I mentioned here in what I'm
9  writing, there was certainly uncertainty around
10  it.  So, certainly it would not have been worth
11  as much by this time.  Because we're talking
12  July now, and the way that things were moving
13  so quickly, that even from the 17th or 16th,
14  whatever Christian wrote that, to the 23rd,
15  things have already started changing.  And
16  definitely you'll, you know -- you probably
17  seen things where we're asking Lazard for more
18  information and to give us updates, because it
19  was that fluid.
20     So, if somebody knew our strategy in
21  terms of how much we think we value from a
22  ratio point of view, ███ is higher than what
23  our investors may have wanted to put in and
24  what we could have a binding offer for.  So,
25  that, you know -- passing both from a valuation



Page 105

Chau

1
2  point of view, but also from a, you know --
3  the -- not having the capital to buy it.
4      Q.   Do you know what the second highest
5  bid was?
6      A.   I think it's around ███
7      Q.   So, if the winning bid was ███
8  ███ instead of $15 and a half million,
9  would that have changed anything, to your
10 knowledge?
11      MR. BERLOWITZ:  Objection.
12      THE WITNESS:  I still think it would
13 have been high.
14      MR. BERLOWITZ:  I just want to make
15 sure my objection was noted.
16 BY MR. MURPHY:
17      Q.   If the winning bid was ███
18 instead of $15 and a half million, is there
19 anything you would have written differently
20 here?
21      MR. BERLOWITZ:  Objection.
22      THE WITNESS:  I'm sorry, say that
23 again.
24 BY MR. MURPHY:
25      Q.   If the winning bid was ███

Page 106

Chau

1
2  for the IP instead of $15 and a half million,
3  would that have changed anything you wrote in
4  this document?
5      MR. BERLOWITZ:  Objection.
6      You can answer.
7      THE WITNESS:  If it was ███ instead
8  of 15 and a half, would it have changed
9  anything I would have written in this?  I
10 still think there was deterioration in
11 the value of the business.  I'm not sure
12 what you're trying to say.  I mean, I --
13 the -- you're trying to say that the half
14 a million difference --
15 BY MR. MURPHY:
16      Q.   I'm just asking if a half a million
17 difference would have made any difference?
18      A.   I would still have an opinion of
19 the opaque nature of the inventory, sure.
20      Q.   My question is, if it was ███
21 instead of 15 and a half, would your conclusion
22 have been any different?
23      A.   Probably not.  I mean, I think what
24 you're saying is that -- what I'm trying to say
25 to you here is that the nature of the business

Page 107

Chau

1
2  had changed, so we didn't think that that was a
3  fair value of it; right?  And that's what had
4  transpired.  I can't speculate that if things
5  had not changed differently with inventory and
6  human resources, would ███ be more worth it or
7  not worth it?  I can't speculate on that --
8      Q.   I'm not asking you to speculate --
9      A.   But I'm trying to say that -- that
10 if -- the -- my -- our assessment was that this
11 was deteriorating.  And so, therefore, you
12 know, that still stands; right?  I mean, I
13 still say yes, the risk profile was there.
14      Q.   Understood.  So, I am correct that
15 if the winning bid had been ███ instead
16 of $15 and a half million, that would not have
17 changed your conclusion?
18      MR. BERLOWITZ:  Objection.
19      You can answer.
20      THE WITNESS:  If you want to
21 arbitrarily pick numbers, yeah, sure.  I
22 mean, I guess ███ is not that much
23 different from 15.5 or if it was 16 or
24 17.  I mean, what I'm trying to say is
25 that my assessment was the same.

Page 108

Chau

1
2  BY MR. MURPHY:
3      Q.   I'm correct it would not have
4  changed?
5      MR. BERLOWITZ:  Objection.  I think
6  he's answered the question.
7  BY MR. MURPHY:
8      Q.   You can answer.  Am I correct that
9  it would not have changed if it was ███
10 ███?
11      MR. BERLOWITZ:  Objection.
12 BY MR. MURPHY:
13      Q.   You can answer.
14      A.   Okay.  So, just I just want to
15 make -- Tom, I'm not trying to be difficult
16 here.  I just want to understand.  So, I'm
17 looking at this from a perspective of this is
18 not a deal document, I'm not speculating on
19 pricing here.  What I'm doing here for
20 investors is to tell them we went through this
21 process and because of certain risk profiles,
22 based on what did actually happen, not
23 speculating whether it would have been lower or
24 higher, this is our assessment.
25      Q.   Looking at this, it says "The bid



Page 109

Chau

1  of 15 and a half million, just the IP set the
2  valuation in the higher end of our estimate for
3  the inventory levels and product stock could
4  not be accurately provided by the seller."
5  Okay?
6
7      All I want to know is, if that
8  sentence says a bid of ███████ instead of 15
9  and a half, would that have changed anything?
10     MR. BERLOWITZ: Objection.
11     (Talking over each other.)
12 BY MR. MURPHY:
13     Q.   Is that ████████████
14  difference material?
15     A.   It could have been.  Based on -- I
16  mean -- so, I want to answer your question.  I
17  don't want to be -- I want to be
18  straightforward to you.  I'm looking at this as
19  a marketing document, this is not a deal
20  document.  So, when I reflect this, I reflect
21  what happened; right?  And why we came to
22  certain conclusions we did.  If you're asking
23  me to like speculate if it was oh, it was 5
24  million difference half a million difference,
25  then that's not what I'm trying to do here.

Page 110

Chau

1
2      If you're saying that this is an offer
3  document, then I could say oh, the range was
4  high, the range was low.  What I'm saying here
5  is that this was on the higher end of our
6  range, and that based on this risk here, we
7  would have -- we passed; right?  And for
8  different reasons.  One, because investors
9  didn't align with that thought, that was a high
10  bid.  And also secondly, there was this issue
11  that I mentioned here.
12     So, that's the perspective I'm coming
13  into, if I start saying oh, yeah, ████
14  ████ is more better or a quarter is easier,
15  then it becomes a deal situation, I can't
16  speculate that post deal.  I'm just working --
17  in this document, I'm only working with what I
18  have, does that make sense?
19     Q.   Yes.
20     Does the word "pass" mean something
21  different in a marketing document than it is in
22  a deal document?
23     A.   In a marketing document, as I
24  mentioned in the beginning, we did not do the
25  deal ultimately, and I didn't want to get

Page 111

Chau

1  into -- the marketing document to a potential
2  LP, why?  We couldn't raise the money or we
3  raised enough money, but the money -- I didn't
4  want to get into that; right?  It's suffice to
5  say in this document, we didn't do the deal.
6     Q.   Okay.  But the real reason was you
7  couldn't raise the money; correct?
8     A.   The real reason for what?
9     Q.   That you didn't do the deal was
10  that you couldn't raise enough money; correct?
11     A.   We didn't raise enough -- we didn't
12  raise the money based on the winning bid to
13  outbid, let's put it that way, yeah.  Because
14  investors were interested, different valuation,
15  different levels.
16     Q.   Am I correct, though, that if you
17  had submitted a binding bid for the going
18  concern before the IP auction, there never
19  would have been an IP only auction?
20     MR. BERLOWITZ: Objection.
21     THE WITNESS: That's speculation.  I
22  don't know.  Because you don't know if
23  the fulcrum lender would do it or not.  I
24  mean, I don't know.

Page 112

Chau

1
2      Why would you ask that, Tom?
3  BY MR. MURPHY:
4     Q.   Back to the case study for a
5  second.  At the end of the day, it's accurate
6  to say that Go Global passed on bidding on
7  BuyBuy Baby?
8     MR. BERLOWITZ: Objection.
9     You can answer.
10     THE WITNESS: We didn't -- I mean, I
11  think the -- it's in the records, we
12  didn't -- we didn't have -- at the end of
13  the day, we didn't have a bid there;
14  right?  I think that's a fact.  But not
15  material to this document, per se.
16 BY MR. MURPHY:
17     Q.   Why do you say it wasn't
18  material --
19     A.   Because like I said, this document
20  is a marketing document, I didn't want to go
21  into all the different rationales for passing;
22  right?  I mean, we sufficed that investors or
23  people we talked to know that we didn't do the
24  deal, that was the main point.  The main point
25  of the -- the main point of the document is to

Page 113

                    Chau
1
2   show our processes.  Okay.  Yeah.
3       Q.   Do you know when you wrote this
4   document, the case study?
5       A.   I think in August, if I'm not
6   wrong.
7       Q.   August of '23, just to clarify?
8       A.   Yes, that's right.  And I don't
9   think I finished it, then.  It was probably --
10  there's different iterations, probably, because
11  the grammar was kind of bad on some of them
12  that you read.
13      Q.   And do you know if this document
14  was ultimately shared with potential limited
15  partners?
16      A.   Not at the time of the transaction.
17  It has no relevance to the -- I mean, this is
18  way after.
19      Q.   No, no.  I meant subsequent, yeah.
20  I didn't mean  the BuyBuy Baby transaction, I
21  just meant in general.
22      A.   I've shared with a few people,
23  yeah.
24      MR. MURPHY:  I have no further
25  questions.  Thank you.

Page 114

                    Chau
1
2       MR. BERLOWITZ:  No questions from
3   me.
4       (Whereupon, at 5:27 p.m. the matter
5   was concluded.)
6
7
8
                _____
9               YUEN CHAU
10
11  Subscribed and sworn to before me
    this _____ day of _____, 20____.
12  _____
        NOTARY PUBLIC
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 115

1               I N D E X
2
3   WITNESS       EXAMINATION BY        PAGE
4   MR. CHAU      MURPHY / DIRECT        3
5
                    EXHIBITS
6
    DEFENDANT'S    DESCRIPTION          PAGE
7
    Exhibit 1     Bates ANK-0039806     19
8
    Exhibit 2     Lauster e-mail        24
9
    Exhibit 3     Bates DOM0000031      31
10
    Exhibit 4     Streader e-mail       41
11
    Exhibit 5     Bates GG-0008746      45
12
    Exhibit 6     Lapish e-mail         50
13
    Exhibit 7     Bates GG-0030208      55
14
    Exhibit 8     Bates ANK-0041290     64
15
    Exhibit 9     Bates DOM00075        77
16
    Exhibit 10    Bates DOM000052       80
17
    Exhibit 11    Bates DOM0001082      85
18
    Exhibit 12    Bates GG-0021594      87
19
    Exhibit 13    Bates ANK-0035975     88
20
    Exhibit 14    Bates GG-0013673      94
21
    Exhibit 15    Maicki e-mail         96
22
    Exhibit 16    Case Study/Inv. Process  99
23
    (Electronic copies of the exhibits were retained
24  by the reporter.)
25

Page 116

1
2           C E R T I F I C A T I O N
3
4       I, Jeffrey Shapiro, a Stenographic
5   Reporter and Notary Public, within and for the
6   State of New York, do hereby certify:
7       That YUEN CHAU, the witness whose
8   examination is hereinbefore set forth, was first
9   duly sworn by me, and that transcript of said
10  testimony is a true record of the testimony
11  given by said witness.
12      I further certify that I am not
13  related to any of the parties to this action by
14  blood or marriage, and that I am in no way
15  interested in the outcome of this matter.
16
17      IN WITNESS WHEREOF, I have hereunto
18  set my hand this 31st day of October, 2024.
19
20
21
22
23              JEFFREY SHAPIRO
24
25



Page 117

```
1           DEPOSITION ERRATA SHEET
2
3    Our Assignment No. J11891487
4    Case Caption:  GO GLOBAL vs. DREAM ON ME
5
6    DECLARATION UNDER PENALTY OF PERJURY
7           I declare under penalty of perjury
8        that I have read the entire transcript of
9        my Deposition taken in the captioned
10       matter or the same has been read to me,
11       and the same is true and accurate, save
12       and except for changes and/or
13       corrections, if any, as indicated by me
14       on the DEPOSITION ERRATA SHEET hereof,
15       with the understanding that I offer these
16       changes as if still under oath.
17
18
19       _____
20       Yuen Chau
21
22   Subscribed and sworn to on the _____ day of
     _____, 20_____ before me,
23       _____
24   Notary Public,
     In and for the State of _____
25
```

Page 118

```
1           DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____Change to: _____
4    _____
5    Reason for change: _____
6    Page No._____Line No._____Change to: _____
7    _____
8    Reason for change: _____
9    Page No._____Line No._____Change to: _____
10   _____
11   Reason for change: _____
12   Page No._____Line No._____Change to: _____
13   _____
14   Reason for change: _____
15   Page No._____Line No._____Change to: _____
16   _____
17   Reason for change: _____
18   Page No._____Line No._____Change to: _____
19   _____
20   Reason for change: _____
21   Page No._____Line No._____Change to: _____
22   _____
23   Reason for change: _____
24   SIGNATURE:_____DATE:_____
25          Yuen Chau
```

Page 119

```
1           DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____Change to: _____
4    _____
5    Reason for change: _____
6    Page No._____Line No._____Change to: _____
7    _____
8    Reason for change: _____
9    Page No._____Line No._____Change to: _____
10   _____
11   Reason for change: _____
12   Page No._____Line No._____Change to: _____
13   _____
14   Reason for change: _____
15   Page No._____Line No._____Change to: _____
16   _____
17   Reason for change: _____
18   Page No._____Line No._____Change to: _____
19   _____
20   Reason for change: _____
21   Page No._____Line No._____Change to: _____
22   _____
23   Reason for change: _____
24   SIGNATURE:_____DATE:_____
25          Yuen Chau
```

