UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - X
GO GLOBAL RETAIL, LLC,

Plaintiff,

-against- Index No.1:23-cv-07987

DREAM ON ME, INC. and DREAM ON ME INDUSTRIES,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - X

October 2, 2024
10:00 a.m.

DEPOSITION of AVISH DAHIYA, a witness for the Defendant herein, taken by the attorney for the Plaintiff, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, held via web conference, on the above date and time, before Jennie Kilgallen, a Stenotype Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

FALCON, RAPPAPORT & BERKMAN, PLLC
Attorneys for the Plaintiff
265 Sunrise Highway - Suite 50
Rockville Centre, New York 11570

BY: STEVEN BERLOWITZ, ESQ.
sberlowitz@frblaw.com

GREENBAUM, ROWE, SMITH & DAVIS, LLP
Attorneys for the Defendant
75 Livingston Avenue
Roseland, New Jersey 07068

BY: THOMAS MURPHY, ESQ.
tmurphy@greenbaumlaw.com

ALSO PRESENT:

JESSICA MOORE, ESQ.
Falcon, Rappaport & Berkman, PLLC

CHRISTIAN FEUER

MOISHE PELTZ

MARK SROUR

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto, through their respective Counsel, that the certification, sealing and filing of the within examination will be and the same hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn before the Court.

THE COURT REPORTER: It is hereby stipulated and agreed to by and between counsel for all parties present that this deposition is being conducted remotely by video conference, and that the court reporter, witness and all counsel are in separate remote locations and participating via Zoom or any web conference meeting platform under the control of the court reporting agency.

It is further stipulated that this video conference will not be recorded in any manner and that any recording without the express written consent of all parties shall be considered unauthorized, in violation of law and shall not be used for any purpose in this litigation or otherwise.

Before I swear in the witness, I will ask each counsel to stipulate on the record that I, the court reporter, may swear in the witness even though I am not physically in the presence of the witness and that there is no objection

to that at this time nor will there be any objection at a future date.

All attorneys state they have no objection or so stipulated?

MR. BERLOWITZ: I consent.

MR. MURPHY: I consent as well for defendants.

THE COURT REPORTER: Counsel, can you represent to the best of your knowledge and belief, that the witness appearing today via web conference is, in fact, Avish Dahiya?

MR. MURPHY: Yes.

(Whereupon, the Witness presented a NJ State driver's license.)

A V I S H D A H I Y A,

The witness herein, having been first duly sworn remotely by a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER: May we have your name for the record?

THE COURT: Dahiya Avish.

THE COURT REPORTER: And your address, sir.

THE WITNESS: 5 Watchung Drive. Basking Ridge, New Jersey.

EXAMINATION BY
STEVEN BERLOWITZ, ESQ.:

Q. Thank you. Good morning Mr. Dahiya. My name is Steven Berlowitz with the law firm of Falcon, Rappaport & Berkman. I represent the plaintiff, Go Global Retail, LLC in the matter of Go Global versus Dream On Me Industries and Dream On Me, Inc.

Have you ever been deposed before?

A. No.

Q. I'm going to go over a few ground rules to help streamline the process.

This deposition is being stenographically recorded. I would like you to please answer all my questions verbally and not with physical movements like a shrug or a nod of the head because the court reporter can't take down those movements. She can only take down your verbal responses. Do you understand that?

A. Yes.

Q. Please wait until I've completed my

question before you respond. The court reporter can't take both of our responses at the same time. It's crosstalk. So I ask that you please wait for me to finish my question. Do you understand that?

A. Yes.

Q. If you need to have a question repeated, please let me know and the court reporter can read it back to you or if you don't understand the question, I am happy to rephrase. Do you understand that?

A. Yes.

Q. Please let me know if at anytime you need a break for the bathroom, water, any reason I'm happy to give it to you.

Please note though you cannot take a break if there's a question pending. I will ask that you respond to the question before we break. Do you understand that?

A. Yes.

Q. Do you understand that you are testifying under oath under penalty of perjury in this proceeding?

A. Yes.

A. Dahiya

Q. Have you ever been a plaintiff or a defendant in a lawsuit?
A. Are you asking me personally?
Q. Yes.
A. Yes.
Q. Were you a plaintiff?
A. Yes.
Q. And what lawsuit was that?
A. That was with my previous company that I worked with.
Q. And what was the nature of that lawsuit?
A. It was regarding certain payments that they were supposed to give back to me.
Q. I see. So you brought a lawsuit against your former company, your former employer?
A. Yes.
Q. You weren't deposed in that matter?
A. No.
Q. Was there a trial in that matter?
A. No.
Q. Were you ever a defendant in a lawsuit?

A. No.

Q. Any other lawsuits other than the one you just mentioned?

A. No.

Q. Have you ever been a witness in a lawsuit?

A. No.

Q. Have you ever been arrested or convicted of a crime?

A. No.

Q. Are you taking any medication or have any other medical conditions that may affect your memory?

A. No.

Q. Same question, but for your ability to testify truthfully today.

A. Yes.

Q. Sorry, you are taking medication?

MR. MURPHY: He misunderstood the question.

MR. BERLOWITZ: That's why I'm clarifying.

Q. I want to clarify, are you taking medication that would impact your ability to

testify truthfully today?

A. No.

Q. I'm going to be showing you documents on a screen throughout this deposition. I hope your screen is big enough. I want to make sure that you're capable of reading the documents I show you.

A. Yes, I've got a second screen so yes.

Q. And you don't have any eyesight issues, is that right?

A. Yes, age-related, small letters, but yeah, I'm sure I can read these.

Q. Perfect. I just want to note initially we had called for your deposition in your individual capacity. We are, I've been referred to you as of yesterday through Mr. Srour, I'm hope I'm pronouncing this correctly, that you would know a number of answers to questions that I had asked him.

I'm going to go over this with you. I want to be clear, are you aware that you are, in addition to testifying in your individual capacity, that you are also testifying on

behalf of Dream On Me Industries and Dream On Me, Inc.?

A. Yes.

Q. And are you prepared to answer questions on behalf of those companies?

A. Yes, to the best of my ability, yeah.

Q. Of course. Can you please describe your education?

A. Yeah, I studied engineering and then I also did a decision-making course at Stanford which is an advanced certification program.

Q. Let's back up. You went to college at Stanford?

A. Yes.

Q. And you got an engineering degree?

A. Yes, it was advanced certification and strategic decision-making.

Q. You received a degree in advanced strategic --

A. Yes, a certification, correct.

Q. Did you also receive a degree in engineering?

A. Yes.

Q. Have you received any other degrees?

A. No.

Q. Is the degree in strategic decision-making, is that a certificate?

A. It's a certificate.

Q. Did you attend graduate school?

A. Yes.

Q. Which school?

A. It's in India, BMS Engineering College.

Q. And what was your area of focus in graduate school?

A. Information science and tech.

Q. Did you graduate?

A. Yes.

Q. And what degree did you earn?

A. Information science and tech.

Q. What did you do after graduation from your graduate program?

A. I just became an entrepreneur.

Q. Do you have any professional certificates or licenses or credentials? I

believe you mentioned one. I'm asking if you have any others.

A. No, I may have done certifications in advertising, I think Amazon advertising, something else as needed kind of.

I don't remember, but I may have done Google. I may have done Facebook. Very hard to say, but yeah some of those, yes.

Q. Have you ever been subjected to any disciplinary action or censure by a licensing body?

A. No.

Q. Can you please describe your work experience?

A. With the baby, I have been 16, 17 years in the baby industry. Before that, I did management consulting. So I worked with many startups in the baby area. I did work with some of the large corporations through that management consulting and before that was a stint on the media side, media and entertainment side. I would say 30 years or something.

Q. Can you please walk me through each

of the companies that you worked for and tell me what you did there, generally?

A. Yeah. Yeah. So baby was all about -- I did many things, multiple hats, but I would say more about strategic work. That means partnerships, growth-related, some E-commerce-related, some tech-related, mixed bag in that.

In the management consulting it was more to do with strategy partnership, off-shoring partnerships, partnership with India trying to disrupt some of the models that were there for startups to get the products live sooner than later at a more optimum cost so those were some of the works that I've done.

What I've done with media, which was animation and visual effects, general management, you know, yeah.

Q. You really had a broad career to date, yeah?

A. Yes, you can say I invented myself many times.

Q. Can you walk me through the names of the companies that you worked for briefly

in chronological order?

A. So if I remember, so now is Dream On Me Industries, right. Before that was Heritage, Baby, before that was Munire, M-U-N-I-R-E or A Furniture, B and A Global, and then Cedar Blue Global, digital media.

Q. Any others?

A. No.

Q. You currently work for Dream On Me Industries and/or Dream On Me, Inc., is that correct?

A. Yes.

Q. Who do you work for?

A. Dream On Me Industries, yes.

Q. Are you also employed by Dream On Me, Inc.?

A. No.

Q. Just Dream On Me Industries?

A. Yes.

Q. What position do you hold with Dream On Me Industries?

A. My title doesn't say anything in the Dream On Me universe. So we -- meaning I have helped operating like an adviser. I

have done strategy, insights into our customers, strategy partnership with our customers, a lot of E-commerce, a lot of marketing site-work. Pretty much wherever the company needed me to jump in or where I felt I could contribute, I did that. And whatever Mark needed me to focus on, that's what I did.

Q. When did you start working -- when I say Dream On Me or DOM I'm referring to Dream On Me Industries.

A. Yes.

Q. When did you start working for Dream On Me?

A. Approximately ten years back.

Q. When you started there, what were your responsibilities?

A. When I started, some E-commerce, marketing, helping the company grow, you know, find out venues for new customers, yeah, store business, you know.

We had stated sites of our customers business. For example, Walmart, if you were in the E-commerce, how do we get into the

Walmart store, for example.

MR. MURPHY: You can keep your voice up.

THE WITNESS: Yes.

Q. Have your responsibilities changed since you started working at Dream On Me?

A. I wouldn't say changed. I would say it's added right, nothing got dropped, but things kept on adding. Suddenly, okay, you have to do a joint venture or you have to do some looking into -- some company comes in, look into it.

It's a very entrepreneurial type of work. And in our DOM universe, titles don't tell the story, no.

Q. Is it safe to say you wear a lot of hats at Dream On Me?

A. Yes, a lot of hats, yes.

Q. Who do you report to at Dream On Me?

A. I report to Mark.

Q. Anybody else?

A. I also report to his brother Joey. I would say 90 percent, depending on the

project, some projects could be that I'm reporting to Joey more or updating him versus Mark but, yeah mostly Mark.

Q. Is Joey's name Joey Srour?

A. Yes.

Q. Do you know whether he has an ownership interest in Dream On Me?

A. I believe so, he has an ownership on both partners in Dream On Me, Industries.

Q. And Joey works for Dream On Me, is that right?

A. Yes, he owns Dream On Me, yeah.

Q. He also works at Dream On Me?

A. Got it.

Q. Does he?

A. Yes.

Q. Do you know what he does?

A. Yeah, he does day-to-day ops, warehousing, supply chain, manufacturing. Those are some of the areas that are dedicated to him.

Q. I will get to this much later, but I will skip ahead real quick, do you know whether Joey was involved in Dream On Me's

bid for BBBY's assets?

A. No, he is not involved.

Q. I believe you said you've been at Dream On Me for ten years?

A. Yes.

Q. And during that time I believe you testified that your responsibilities only grew over time, is that right?

A. Yes.

Q. Have you ever been disciplined, counseled or suspended with regard to your job at Dream On Me?

A. No.

Q. I'm going to share a document with you now.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

Q. Can you see that I'm sharing a document with you?

A. Correct.

MR. BERLOWITZ: I will represent this is the 30(b)(6) notice that we sent out to counsel for Dream On Me.

(Whereupon, at this time, a

document was marked as Plaintiff's Exhibit 1, as of this date.)

Q. Do you recognize this document?

A. Yes, I took a printout of this.

Q. So you've reviewed it before?

A. Yes.

Q. I just want to go over a few of the topics and make sure you're prepared to testify about them?

A. Yeah.

Q. So I will scroll down to the topics. Topic number four, please read topic number four.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Okay.

Q. Are you able to testify about documents in the data room including, but not limited to, reviewing documents, downloading documents, analyzing documents, manipulating documents and sharing documents?

A. Yes.

Q. Topic number five, are you able to testify about the location or storage of data

room documents Dream On Me, Inc. downloaded from the data room?

A. Yes.

Q. Topic number six, are you able to testify about Dream On Me, Inc.'s security protocols for storing confidential or trade secret information, data retention policies, email retention policies and messaging retention policies?

A. To some extent, to the best of my knowledge, yes.

Q. Topic number seven, are you able to testify about any research analysis, fact-finding studies, investigation, performed by Dream On Me, Inc. concerning the BBBY or Bed, Bath & Beyond Inc.?

A. Okay, yes.

Q. Yes?

A. Yes.

Q. Topic number 12, are you able to testify about the development of any bid by Dream On Me, Inc. for Baby IP assets, including but not limited to, documents used to support the bid or identity of individuals

who assisted in developing a bid?

A. Yeah to some extent, yes.

Q. Topic number 13, are you able to testify about the development of any bid by Dream On Me, Inc. for BBBY retail store leases included but not limited to documents used to support the bid or the identity of individuals who assisted in developing the bid?

A. Yes.

Q. And topic number 14, are you able to testify about the post-acquisition technology support for BBBY's retail and E-commerce business?

A. To some extent, but I feel this is something that Amit would be able to -- I don't know if you have a deposition with him, but he would be the right guy to talk to about it. Whatever extent I know, a little bit, no problem, I can share that.

Q. I might ask you some questions and you can answer to the best of your ability. I understand that. I can ask Amit and that's fine, but thank you for sharing that.

A. Dahiya

Did you do anything to prepare for this deposition today?

A. I spoke to the lawyer and he updated me what --

MR. MURPHY: Avish, don't say what we spoke about.

A. Yes, I'm just -- he gave us the document that we are reviewing and said what the questions and the areas of discussion would be.

MR. MURPHY: You're going down -- tell him that we spoke and you can tell him what else you did, but just don't say the things that you and I said to each other.

THE WITNESS: Yes.

Q. To reiterate, I'm not trying to learn about the statements that were made between you and your attorneys. I just want to know if you worked with them to prepare for this deposition; yes or no?

A. Yes.

Q. Did you meet with anyone else to prepare for this deposition?

A. No.

Q. You didn't meet with Mark?

A. No, we couldn't -- he was busy yesterday, we couldn't talk.

Q. Did you review any documents to prepare for this deposition?

A. I would say as we were trying to share the data with you guys, that's when I may have looked at some of the data, but I'm not specifically looking at any data regarding this, yeah.

Q. When you say share the data with you guys, are you referring to reviewing documents that were then produced in this action by Dream On Me?

A. Yes, some of the data, yeah, making sure you have what you needed.

Q. So were you involved in the document collection in relation to this action?

A. Partly, yes.

Q. Do you know who else was involved in that?

A. Steve.

A. Dahiya

Q. Who is Steve?

A. Steve is our IT guy. He's the IT director in Dream On Me.

Q. What is his last name?

A. Good question. Steven --

Q. If you don't remember or if you need --

A. Let me just check.

(Whereupon, at this time, there was a pause in the proceeding.)

MR. MURPHY: What are you --

MR. BERLOWITZ: It's okay if he looks it up. I'm fine.

A. Steven Kachtan. K-A-C-H-T-A-N.

Q. Was there anyone else at Dream On Me that you worked with in terms of collecting documents in relation to this action?

A. It was whoever was working on it, I communicated to them that if they have anything to share and Steve would put all the data in for sharing.

Q. You said whoever else was working on it, so who would those people be?

A. Mark, myself, Amit, Milan.

Q. And anyone else?

A. No.

Q. I believe you testified that you did not review documents in preparation for this deposition, is that right?

A. Yes.

Q. Did you take any notes in preparation for this deposition?

A. Yeah, I did. I was looking at some of the timelines and I did make some notes.

Q. Do you have those notes in front of you?

A. Yeah, I do.

MR. BERLOWITZ: I will call for the production of those notes.

Q. Did you bring any other notes or documents with you today?

A. No, except for the printout.

Q. The printout, are you referring to the 30(b)(6) notice?

A. Yes.

Q. Are there any documents related to this litigation in your possession that you

have not produced other than the notes that we just discussed?

A. I don't know. I shared everything with our legal so I don't know what you guys have. I have no visibility on that, but they have what we have shared.

Q. Have you taken any other steps to prepare for this deposition that we have not discussed yet?

A. No.

Q. I will switch topics now. You're familiar with Dream On Me, is that right?

A. Yes.

Q. You're familiar with both Dream On Me Industries and Dream On Me, Inc., is that right?

A. I'm not familiar with Dream On Me, Inc.

Q. Just Dream On Me Industries?

A. Yes.

Q. I realize you just said you are not familiar with Dream On Me, Inc., but I will still ask the question. Do you know what the difference is between these two companies?

A. Dahiya

A. To be frank, I don't know the difference.

Q. That's okay.

A. Dream On Me, Inc., and they have industries, but I don't know. If there's another company existing, I don't know that.

Q. The company that was developing the bid for BBBY's assets, was that Dream On Me, Inc. or Dream On Me Industries?

A. Dream On Me Industries.

Q. What does Dream On Me Industries do?

A. They're in multiple businesses from manufacturing to sourcing to designing products to -- and I know Mark is heavy into the real estate side of the investments so yeah, so I would -- that's what I would say.

Q. And does Dream On Me specialize in baby products?

A. Yes.

Q. Can you --

A. Yes.

Q. Sorry, I'm not trying to interrupt you. Please finish.

A. Go ahead. Sorry.

Q. I would ask if you could please expand on that?

A. So baby as a category has many subcategories. So you have mattresses, furniture, wood furniture. You may have plastic or metal furniture. You may have gear which is bassinets, which is strollers.

Then you have soft goods, you know, that would be, what do you call it, bed sheets and, you know, all that. Pretty much there's a huge list of subcategories that we carry.

Q. Dream On Me Industries engages in all of those categories, is that your testimony?

A. Correct.

Q. Does Dream On Me Industries have retail stores?

A. As of now, no, we don't have retail stores.

Q. Did Dream On Me ever have retail stores?

A. That would be Mark's question. I know that they had been in retail in the

past. I know Mark had been in retail in the past, yeah.

Q. Do you personally have retail experience?

A. Of a store, no. If you ask me whether I run stores or not, no.

Q. Well, I am asking if you run stores so I guess the answer to that is no?

A. No.

Q. It seems like maybe you have other experience in retail and I would like to know, is that true?

A. Yeah, in retail because we are in the retail business, right. We understand D to C, direct to consumer market. Sorry for the acronym.

So we do understand that business, E-commerce business. That's the foundation for Dream On Me, that they were dominating the market in the E-commerce space very early on when people really didn't believe in E-commerce that much.

Q. So what is your basis for the statement that Dream On Me has retail

experience?

A. My understanding with that statement is that we do understand the customer in that retail space, so the retail space is more like B to B to C these days, business to business to customer.

We do understand customer behavior. We do understand what they're liking, what is their preferences. All that data today is what we are looking at.

It's that retail has changed quite a bit where the days where you would give a product and you're done. The B to B notion, I buy a product, I give it to you, I'm done, I got paid and I'm gone.

But that's not the case, you know. You have to take ownership until the end of the customer -- the customer buying, why they're buying, what is the price elasticities in the market. What happens if the product is 20 percent discount. What if it's 20 percent over. Who is the competition? Who is taking the market share, the discounting. All those have changed significantly in the E-commerce

world.

Q. I believe you testified that Dream On Me has experience knowing customers or knows the customer, is that accurate?

A. Yes.

Q. Does Dream On Me run any retail stores?

A. No.

Q. Does it know how to run retail stores?

A. They ran it in the past, they would know what that is. I don't know. I can't answer for that.

Q. I believe you mentioned that Dream On Me is in manufacturing, is that right?

A. Yes.

Q. What items does Dream On Me manufacture?

A. They manufacture mattresses and mattresses are manufactured in the New Jersey facility. And then we also manufacture furniture.

Q. What kind of furniture?

A. Toddler beds, cribs, dressers.

A. Dahiya

Q. Baby furniture?

A. Yes, baby furniture, yes.

Q. Any other items that Dream On Me manufactures?

A. Anything to do with wood, yes, and anything to do with mattresses, yes.

Q. Are you familiar with the bankruptcy auction for BBBY's assets?

A. Yes.

Q. How are you familiar with that?

A. Because we were in that process during the bankruptcy and even prior to the bankruptcy.

Q. Do you know -- continue.

A. Sorry, go ahead. Go ahead.

Q. Do you know when Dream On Me first became interested in purchasing the assets of BBBY?

A. In 2021, '22.

Q. And --

A. I can't be sure, but we did approach the leadership at that point in time that we would be very interested and we didn't want them to land in the same

situation as Toys "R" Us and the Babies "R" Us situation.

Q. And why were you interested in them in 2021 or 2022?

A. We, of course, we were their vendors. And second, we know the business of Baby. We also knew what happened in the Babies "R" Us and Toys "R" Us situation which was that the mothership brought down Babies "R" Us.

It was very similar that Babies "R" Us was doing well. Toys "R" Us was suffering. In this case, it was Bed, Bath & Beyond was suffering and buybuy BABY was a far better enterprise and we were worried that it's going to be same and they should be extracted. We are here to partner with them and we believed that's the route they should be taking now versus later.

Q. In 2021 or 2022, when you were approached -- did you approach BBBY or Bed, Bath & Beyond?

A. We approached BBBY and then BBBY connected us to the executive team and the

A. Dahiya

Board and then we had conversations with one of their financial advisers at JP Morgan at that point in time to have the discussion with us, yeah.

Q. And what was Dream On Me's proposal at that time in 2021 or 222?

A. The proposal was based on that we have ability to come in, partner with them and help them drive the -- we were very confident of direct import product sourcing, increasing margin.

That's what Mark has been living his life on. That we can bring that on and help them and -- I mean we don't want to -- we don't know how this would pan out at that point in time, but Mark did tell me that he had investors who could invest in buybuy BABY because the brand was very strong and then could help them out and we could take that component out of Bed, Bath.

Q. Were you looking to invest into buybuy BABY in 2021 or 2022?

A. You can say strategic invest.

Q. Invest and then extract, I believe,

is the word you used?

A. Yes, disintegrate from the Bed Bath world.

Q. What happened with that proposal when you --

A. I think it was --

Q. Sorry I just want to finish my question so it's clear for the record. I know you have a response and it's natural to anticipate what I'm saying, but so the record is clear, please let me finish the question.

A. Yes.

(Whereupon, the record was read as requested.)

Q. -- when you made it to BBBY and/or Bed, Bath & Beyond?

A. Yes, when we had the discussion they said they were not ready yet.

Q. Okay. Was Dream On Me disappointed about that?

A. Yeah, I mean you can say because we truly believed and were passionate about making this brand not go that route that was all evident.

Q. You wanted the deal, right?

A. We wanted for the brand to survive, yes.

Q. Did you keep an eye on BBBY and/or Bed, Bath & Beyond after that deal fell through?

A. Yes, we did.

Q. Why did you do that?

A. Just to make sure that we are making our intentions clear, that we are an interested party in that brand.

Q. Are you aware that at some point in time that Bed, Bath & Beyond filed for bankruptcy?

A. Yes. I don't know the exact dates when they filed.

Q. Do you know when Dream On Me became aware of the bankruptcy?

A. I think we got -- I don't know the date whenever it was filed. You don't really come to know who is filing and when they are filing, but we knew from the credit situation that they were in and how they were paying us on shipments, so they were distressed

financially so the indicators were there. It could happen any time. Nobody would tell us exactly, but it was all there.

MR. MURPHY: Just to clarify, was your last question about Bed, Bath & Beyond or buybuy BABY bankruptcy? I couldn't tell.

MR. BERLOWITZ: I think I said Bed, Bath & Beyond. But, you know, the record will reflect what I said, I guess.

Is there a clarification that you want, Tom?

MR. MURPHY: No, that's fine.

Q. I believe you testified that just now that you were aware that Bed, Bath & Beyond was in distress before they filed for bankruptcy?

A. Yes.

Q. So were you keeping a closer eye on the potential bankruptcy as a result?

A. Yes, everybody was. And so there's a risk as we are suppliers. And I also don't remember clearly, but somewhere in March or

April, that I reached out again to the buybuy BABY leadership and they connected us again with a name in Bed, Bath & Beyond, to Bed, Bath & Beyond leadership saying we are interested and talk to them.

Q. I wanted to clarify to make sure we are all on the same page particularly in light of Tom's clarifying question.

Bed, Bath & Beyond filed for bankruptcy, correct?

A. Correct.

Q. Not buybuy BABY?

A. Buybuy BABY, I don't know whether it was a separate -- everything was together in terms that both were --

Q. And Bed, Bath & Beyond is the parent company to buybuy BABY, is that accurate?

A. Yes, parent company. I don't know their structure, whether it was buybuy BABY, Inc. or something like that, but you can say either it was their division or you can say it was a wholly owned subsidiary or something, I don't know.

A. Dahiya

Q. I'm just asking for your understanding. So that's your understanding?

A. Yeah.

Q. When did you become aware of the bankruptcy auction for the BBBY assets? By you, I'm asking Dream On Me.

A. I believe we had a meeting with Bed, Bath & Beyond. I don't remember when that was. Maybe May. Definitely it was after they had filed for bankruptcy. I don't know the exact date, but we were talking to Bed, Bath & Beyond on a potential plan to revive both Bed Bath and buybuy. That was the conversation.

And it was lead by their CEO, Suegov. So that's where we were, one of the parties to that conversation, how can we help Bed, Bath to restructure, to help in that situation, yeah.

Q. Do you know when Dream On Me started developing or working on a bid for BBBY's assets?

A. I would say -- if you say a proper bid, it was quite late I think. I think it

was somewhere around May or June.

Q. Late May or early June?

A. Yes, somewhere around that time. Because I do remember they were having every week, there were due dates, like Monday, Tuesday, we need the bid. On Friday, we need the bid. And then they'll get an extension. It was too much going on at that point.

Q. To clarify, are you saying due dates as D-U-E?

A. Yes.

Q. The due dates kept getting moved, is that right?

A. Yes, that whole process was a disaster.

Q. Do you know of a company called Go Global?

A. Yes, we were introduced to them, yes.

Q. Do you know around when you were introduced?

A. June. Somewhere in June. Lazard introduced us.

Q. I'm sharing a document with you

now. Do you see the document that I'm sharing.

A. Correct.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 2, as of this date.)

Q. This is a document -- it is an email from Milan Gandhi to Christian Feuer, Mark Srour and Avish Dahiya. It is dated June 10, 2023. It bears the Bates number DOM 10726.

On the first page, I will give you a quick moment to read this and let me know when you're done. Have you read it?

A. Give me a second.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Okay.

Q. Do you recognize this email?

A. Yes, I do.

Q. What is this email?

A. This is an introduction email that

A. Dahiya

I think Milan has responded to.

Q. It's an introduction to Go Global, is that right?

A. Yes, connect.

Q. And this introduction was made -- was this made by Lazard or Ankura?

A. Lazard.

Q. At this point were you being introduced to any other companies in relation to a potential bid for BBBY's assets?

A. At this point in time, we were also in discussion with a few other members -- remember we had conversations with Bed, Bath and we were still talking to some of those vendors, where they were with reference to revival of Bed, Bath or buybuy.

Q. Were you looking to partner with those vendors in relation to a bid at the bankruptcy auction?

A. Yes, that was the intent of that meeting with Bed, Bath, that how vendors can partner with them to revive the brand.

Q. Okay.

A. So it was the same conversation.

A. Dahiya

Q. Going back to your introduction to Go Global, do you know why Dream On Me was introduced to Go Global?

A. Lazard introduced us -- they must have spoken to Milan and they suggested that we work with -- there could be something in the partnership between us and Go Global and that we should talk.

Q. When you say "there could be something in the partnership," can you be more specific about what that partnership would look like or what was discussed in terms of --

A. No, I don't think so. There was not any specifics. It was more hey, Go Global could be a good partner, why don't you guys speak, figure it out, whatever.

Q. When you were introduced to Go Global at this time, were you interested in speaking to Go Global?

A. Yes.

Q. Why?

A. Because Lazard asked us to speak to them and we were willing to speak to them to

A. Dahiya

figure it out what that partnership could be.

Q. What did you hope, if anything, would come out of a partnership at this time with Go Global?

A. The part that everybody was looking at at that point in time was a -- how can you revive the brand in a going concern manner. And that was the focus, I would say, everybody had. And for that if it's a partnership, to look from the partnership angle because going concern was not that simple.

Q. This email is sent from Milan Gandhi, right?

A. Yes.

Q. Who is Milan Gandhi?

A. He's a financial consultant.

Q. Does he work at Dream On Me?

A. No, he is an independent consultant.

Q. Was he an independent consultant at this time for Dream On Me?

A. Correct.

Q. I will scroll down to this email

which is from Christian Tempke, the June 9, 2023 email. Please read this email and let me know when you're done.

A. Yes.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Okay.

Q. The second sentence reads, "Milan will add his client. I would encourage you to speak directly about a potential baby going concern transaction and see whether our partnership makes sense." Do you see that sentence?

A. Correct.

Q. There's no mention of the intellectual property in this email, is there?

A. No.

Q. No?

A. No.

Q. When did Dream On Me eventually become interested in the intellectual property assets of BBBY?

A. I would say given that everything

A. Dahiya

was happening in lightning speed, the core of the focus from Dream On Me has been to acquire or to save the brand because we believed in the brand. It didn't matter what instrument may have been used, but that's been the thinking since 2021, '22.

Q. So is it fair to say that Dream On Me was always interested potentially in the intellectual property assets of BBBY?

A. Yes, because whether you get --

MR. MURPHY: Objection.

THE WITNESS: Sorry, Tom.

MR. MURPHY: You can answer. I was just objecting to the question. You can answer.

A. Yes, because whether it was going concern, you would be getting the brand. You know, whether you're through the IP or by going concern means -- the core is the business that we know and the brand that we know. That's the core.

Q. After you received this introductory email, what did Dream On Me do?

A. This is on Saturday. I believe,

A. Dahiya

Milan spoke to him.

Q. Who is him?

A. To Christian.

Q. Do you know whether you decided to arrange a meeting?

A. What I remember is that when we spoke or when he spoke, that this needs to be done. There was an extreme urgency to -- I think they had to submit a bid or meet a timeline, which was like Tuesday or something next week.

We all knew these dates were just coming from nowhere. But something, there was an extreme urgency in talking immediately. That's probably what Lazard wanted, that these parties talk if there was something that can happen.

Q. Did Dream On Me arrange to have a meeting with Go Global?

A. I believe finally that is what happened, that we meet them and I think it was on Monday.

Q. What, in particular, was Dream On Me interested in discussing with Go Global?

A. Dahiya

A. Nothing in particular. I think it was all about, at a very high level, it was let's meet and then figure it out, what we -- where we are, where you are, is there a partnership.

I don't think there was any -- and whether we can do the timelines, whatever the timelines were.

Q. At this point in time, had Dream On Me done any due diligence for a bid for BBBY's assets?

A. We had gone through the data room so we had access to the data room. We had looked for that information, the P & L's, some work, some data has been looked at.

Some of the data that was shared to us was by the Bed, Bath leadership, all that was going on, and then our history, nothing new, our history with them for many years.

We knew a lot of members in their teams that we had relationships with and have worked together in the past. All that was in the play.

Q. You mentioned the data room, are

you referencing the Lazard data room?

A. Yes, correct.

Q. You had --

A. Buybuy BABY, Bed, Bath data room, yes, kind of.

Q. You had access to the Lazard data room at this time, is that right?

A. Yes.

Q. Are you aware that other companies interested in placing a potential bid also had access to the Lazard data room?

A. Correct, everybody had.

Q. Everybody had access to the Lazard data room?

A. Yes, whoever was interested in the brand, yes.

Q. Was the Lazard data room populated with hard data?

A. Can you ask the question again.

Q. Sure. I'll ask a different question.

Did you look at the Lazard data room at that time?

A. Yes, we were looking at it.

Q. And what was in the Lazard data room?

A. They had everything from, you name it, stores, websites, marketing data, tech data, HR data, you know, a lot of data was there.

Q. And that data was made available to anyone who wanted to -- who was participating or wanted to develop a bid, is that right?

A. Correct.

Q. A company wouldn't store its own personal findings on the Lazard data room, is that right?

A. Wouldn't, but if I asked anything from Bed, Bath and they had to work on that data, they had to update the data room so the data room continued to evolve. Since we started on a daily basis, every day that data room would change.

Q. When a company would make a request of Lazard, Lazard would process that request and populate the data room, but then that data was available to everyone, is that right?

A. Correct.

Q. Okay.

A. Correct.

Q. When I asked you if Dream On Me had conducted any due diligence up to that point, you said that you looked at that Lazard data room, is that right?

A. Yes, we knew what the data was. We knew the scope of the data that was there so we had a fairly good idea about all the data in that room.

Q. At this time on June 10, the date of this email, had you taken any of that data and processed it or developed it into your own thesis, into your own documents at Dream On Me?

A. No, we didn't.

Q. No documents?

A. No, we were reviewing all these and maybe individually making our own analysis, but -- if you're saying any complicated models trying to see what this business looks like, no.

Q. When you say we were reviewing this

data and maybe making our own analysis, was that analysis recorded in any way at this time?

A. No. I know that Amit was looking at the tech side of the data. He was doing his own thing on that.

I was looking at some data. Milan was looking at some of this data. And we were like, okay, this is what it is.

It was very complicated. People don't realize. It is highly complicated and even Bed, Bath didn't know this data well.

Q. And the data that you've reviewed is the data that was provided in the Lazard data room and available to all the potential bidders, correct?

A. Correct, that's what we were told.

Q. I'm sharing with you another document. Do you see it on the screen?

A. Yes.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

(Whereupon, at this time, a document was marked as Plaintiff's

Exhibit 3, as of this date.)

Q. This is an email from Avish Dahiya to Christian Feuer. It is cc'g Milan Ghandi, Mark Srour and Matthew Lapish. Subject is connect.

It has an attachment of a Go Global NDA and it bears Bates number beginning with DOM 10737.

Mr. Dahiya, do you recognize this document?

A. Yes.

Q. Also just, am I pronouncing your name correctly, Dahiya?

A. Yes.

Q. What is this document?

A. This is a communication regarding the NDA.

Q. Go Global had you sign an NDA, is that right?

A. Yes.

Q. Do you know why?

A. They wanted us to sign an NDA urgently because they cannot talk to us till that NDA was signed.

A. Dahiya

They believed they had certain information they wanted to share and they wanted an NDA to be signed.

Q. Were you interested in that information?

A. We didn't know what is the information so we don't know whether we're interested. We wanted to have the conversation if there was a partnership so we don't know what the information is.

At that point nobody told us this is the information that we'll share, but yes.

Q. It was communicated to you though that if you signed this NDA Go Global would share certain of its information with you?

A. Correct.

Q. Did you want to see that information?

A. Yes, we wanted to get on the conversation with them and yes, if that was something that they wanted to talk about, yes.

Q. I believe you said that Go Global wanted you to sign this, and I'm

paraphrasing, this NDA quickly; is that an accurate reflection of your testimony?

A. Yes, there was an extreme urgency.

Q. Urgency?

A. Yes. We -- even before Go Global came in, that urgency, the whole process had been run in a very urgent manner and, for lack of a better word, in a chaotic manner.

Q. Is it fair to say that one of the reasons that Go Global wanted you to sign this expeditiously is because of the schedule that was sent for the bankruptcy?

A. I can't really say, but yeah, they were pushing it hard.

There was a schedule, I don't exactly know, but there was something on Tuesday so they needed this to be done ASAP for us to have the conversation and needed to meet and then I think -- so that got pushed to Friday. I don't know.

Q. I believe you testified before, you would agree, that the schedule set up for the bankruptcy auction was short, is that right?

A. Yeah. Weekly, twice weekly, yeah.

Q. Very compressed, is that right?

A. Yes.

Q. And do you know whether Go Global set that schedule?

A. No, I don't know. I don't think so.

Q. You don't think so?

A. Yeah.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 4, as of this date.)

Q. I'm sharing another document with you. This document is titled Go Global nondisclosure agreement. It bears Bates number GG 8791.

Mr. Dahiya, do you recognize this document?

A. I do.

Q. What is this document?

A. It's the NDA that they had sent us.

Q. I will scroll down to the signature page.

A. Yes.

Q. Can you see that? We'll start with Go Global. The Go Global signer is Jeffrey Streader, is that right?

A. Yeah.

Q. He is the managing partner. It says that as his title, is that right?

A. Yeah.

Q. And do you see his signature there?

A. Yes.

Q. And to the right of that is the Dream On Me signature line. Do you see that?

A. Yes.

Q. It's signed by Avish Dahiya, is that right?

A. Correct.

Q. That's you?

A. Correct.

Q. Is that your signature?

A. Yes.

Q. Your title listed here is CMO and CTO, is that right?

A. Yes.

Q. What is a CMO?

A. Dahiya

A. Chief marketing officer. CTO is chief technology officer.

Q. Also I see that you're signing it on behalf of Dream On Me, Inc./DOM family. What is the DOM family?

A. DOM family is short form of DOM brands. You know, it's like a family of brands. We have multiple brands.

Q. Do you normally sign documents that way when you sign on behalf of DOM?

A. I don't remember, but I don't -- I don't know.

Q. Did you have authority to sign this document?

A. No, I didn't have authority to sign this.

Q. You didn't ask anyone for authority to sign this document?

A. I didn't have the concerned person --

Q. Say that again?

A. I didn't have a concerned person to --

Q. What do you mean by that?

A. This was on Saturday and it was -- yeah, so Mark wasn't available. We didn't have access to legal counsel, nothing when we signed this.

Q. I'm not asking if you had access to legal counsel. I'm asking if you had authorization from Dream On Me to execute this document?

A. No, I didn't have it at that point, no.

Q. You didn't ask Mark?

A. No.

Q. Is there anyone else you would have to ask to get authorization?

A. It's Mark.

Q. Not Joey?

A. No.

Q. Is there --

A. Joey was not involved in this process so he wouldn't know.

Q. Did you need to ask Mark for permission to sign any document on behalf of Dream On Me?

A. Yes. So yes, you'll say this is

the document and he has to say yes, good to go or whatever, yeah.

Q. And have you done so in the past?

A. Yes.

Q. Every single time?

A. As I remember, yes.

Q. Can you give me specific examples of agreements you've signed on behalf of Dream On Me in which you asked Mark for permission expressly?

A. Yes, there are many agreements, whether it's a retail agreement that comes in, you know, I'll ask him is it good to sign. And he'll agree or he'll have concerns or he'll tell me that this needs more vetting. That's what we do.

Q. I'm asking for a specific example.

A. Yes, Amazon contracts, retailer, yeah.

Q. You've always asked him, is that right?

A. Correct.

Q. You've never failed to ask him for authority before?

A. Dahiya

A. As I remember, yes.

Q. But you did so in this instance, is that right?

A. I didn't ask him.

Q. Why not?

A. He was not available and I just took a decision to sign.

Q. Did you read this document before you signed it?

A. It will show my incompetency, but I didn't.

Q. Did you have an attorney review it before you signed it?

A. No.

Q. Do you know if anyone at Dream On Me reviewed it before you signed it?

A. No.

Q. This is going to be repetitive, do you see the first paragraph, paragraph one?

A. Yes.

Q. Did you read that paragraph before you signed this?

A. Yes, I did read that one, yes.

Q. Do you see paragraph two on the

A. Dahiya

page in front of you?

A. I don't remember, but the usual notion is that it's a standard mutual nondisclosure agreement so that's what I believed this is. And it was my reason to sign it and send it quickly back.

Q. I'm just asking if you read paragraph two before you signed this document.

A. I don't remember.

Q. Okay. What about paragraph three, did you read paragraph three, I will scroll down, before you signed this document?

I realize it bleeds onto the top part of the right side of the page, let me know if you need me to scroll for you.

(Whereupon, at this time, there was a pause in the proceeding.)

A. I don't remember, but it seems very difficult for me to now think about that thing, but I think when I started to look at it, it's my viewpoint that this is a standard nondisclosure agreement so it's fine, you know. They have something they want to talk

A. Dahiya

about and that's what my thinking was at that point in time. This needs to be done ASAP and that's it.

Q. Did you review --

A. It was Sunday, I was home and -- yes, so go.

Q. Did you review paragraph three before you signed this document?

A. No.

Q. Did you review paragraph five before you signed this document? I can scroll if you need me to.

A. No, I didn't.

Q. Did you review paragraph 12, at the bottom of this page now, leading up to the top of the right side, did you review paragraph 12 before you signed this document?

A. No. I don't remember. I don't think so that I did.

Q. I believe you testified when I was asking you about paragraph one that you did review this paragraph before you signed it?

A. Yes.

Q. Is that right?

A. The one, yes.

Q. This paragraph says, "In connection with this discussion regarding the purpose defined below, Global may disclose proprietary information defined below to recipient. As a condition to such information being furnished to recipient, recipient agrees to treat any information concerning the target in accordance with the provisions of this agreement and/or to take or abstain from taking certain actions set forth herein." Do you see that?

A. Yes.

Q. And you read that before you signed this, correct?

A. Yeah.

Q. You didn't read any other paragraph?

A. Again, I -- yeah, no.

Q. You were aware after reading this paragraph that Go Global was going to disclose proprietary information to you, is that right?

A. Yeah. They know what that

A. Dahiya

information was, but they wanted to talk after this was being signed, after this being signed, yeah.

Q. You know what an NDA is, right?

A. Yes.

Q. You know it's used to protect, in some instances, the disclosure of information -- to protect against the disclosure of information?

A. Yeah. Yeah. It is a normal business practice. And usually I've seen in such cases, it's a mutual nondisclosure agreement because information is shared between both the parties.

Q. This is not a mutual nondisclosure agreement, isn't that right?

A. I thought it was a mutual agreement.

Q. Why did you think Go Global was giving you the NDA to sign?

A. Because they wanted to share information or they wanted to talk to us immediately and they wanted this to happen.

Q. And you were willing to receive

that information, correct?

A. Yeah, have the discussion and look at that information, yes.

Q. And that's why you signed the NDA, is that right?

A. Yeah, it's --

Q. At this point in time, and this agreement is dated June 10, 2023, had Dream On Me developed a financial model in relation to the bid for BBBY's assets?

A. I know we didn't have a financial formal bid for any buyout, no.

Q. I'm asking about, just to clarify, a financial bid, financial model and had Dream On Me developed a financial model at this time?

A. Whatever the models was in Bed, Bath were the models that we were using.

Q. What you say Bed, Bath, are you referring to the Lazard data room?

A. Yes.

Q. And again that stuff was available to everyone who was making --

A. Correct.

A. Dahiya

Q. Looking into a bid?

A. Correct.

Q. On June 6, 2023, is it fair to say that Dream On Me was interested in and working on developing a bid for BBBY's assets?

A. Yes.

Q. Who at Dream On Me was working on this?

A. Mark, financial was more of his, look at that data and understanding that. Milan was helping him.

Q. Anybody else?

A. No, not on the financial side, no.

Q. What about in other areas in relation to a bid for BBBY's assets?

A. Amit was working on it, but I don't know anyone else at that point in time.

Q. Was Jack Srour working on this potential deal?

A. Jack was involved because he was there in this.

Q. So --

A. He was giving his opinions and his

feedback.

Q. I believe you testified that Mark was involved, is that right?

A. Yes.

Q. And I believe you testified that Mark's involvement concerned looking at the financial model, is that accurate?

A. Correct.

Q. You testified that he understood the data, is that right?

A. The financial aspects of the business, that's what he does.

Q. Do you know if Mark was working on anything else in regards to this deal?

A. Maybe on the funding side, trying to talk to different people, yes.

Q. At this point in time, June 10, had Mark shown you any financial model that he was working on?

A. No, Mark -- Mark works a lot from his business acumen, right. Whatever my past experience with him is, that he just -- he doesn't rely on numbers. He has to have the business side of it, the value proposition of

A. Dahiya

it, can he improve it. He knows the business. He knows the product. He knows so it's all about how can I bring value to this. I have a source supply chain. I have a certain expertise, if financially put in, is it in the numbers.

Numbers are all over the place. It's very difficult for any model to really justify any numbers so his was always, hey, we know this well.

Let's say these numbers are wrong. We can still, knowing the business, we can still take value out. That's -- I think that's how his head is at. It's always -- that's what we have done always in the past deals. That's how he operates. That's Mark, you know.

And that's how he was working with his family and friends telling them that buybuy BABY is a great brand and we don't know where we will land, but hey, I'm here and I understand this. I can make it work, you know.

Q. Would you say that Mark like

operates on his gut?

A. Yes, a lot. A lot.

Q. And again, just to clarify, at this time Mark had not shown you a financial model that he had developed, is that right?

A. Yes, he was working on the models, all the financial things that were there in Bed, Bath. So he was quite deep into those data to see what they were saying.

Q. He was reviewing the data in the Lazard data room, is that right?

A. Yes.

Q. Was he reviewing other data?

A. Other than in the sense that we knew the people who were in Bed, Bath so we can talk to them. He had his own financial advisers.

I don't know who else he would have spoken to. I'm not privy to that.

Q. Fair enough.

A. Yeah.

Q. You mentioned Milan Gandhi, what is his role in relation to this deal?

A. So financial advice, his

A. Dahiya

facilitation capabilities, network. He brings phenomenal network to the table so we can reach out to anyone else, whether we need to reach out to Helco or reach out to this or that.

He's well in the network. We could talk to those people if need be, financial institutions that we can reach to. So he had that, the ability to talk to them, let's take their viewpoint, listen to them kind of. A guy who can tell you, okay, these are the risks from his perspective and make sure you look at these things before you make certain decisions. That has been his role.

Q. What due diligence was Milan specifically responsible for in relation to Dream On Me's development of a bid for BBBY's assets, if you know.

A. I remember that we had 20 hour days and we were just sleeping out of the office. It was all over the place. You know, if you ask me to go back, and it was a horrendous experience, and I -- he was trying to do -- everybody was trying to do the best they can

in that limitation that we were provided to operate in, you know.

Q. Did you feel that you were, that you did not have the resources at the time when you were developing this bid, the adequate resources to develop this bid?

A. Always short on resources. If somebody would have given us a hundred people, even that would have been short.

Q. How many people did you have?

A. I know somebody was working with Mark. He had his, whatever his connections, but the core members in the process were all of us, Amit, myself, Mark, Milan. Of course we had legal help, a legal team.

Mark had his team from supply chain that DOM has, imports coming from them. Them looking at some of the data points and giving him that feedback and his other financial guys he may have reached out to to just give their viewpoint, hey, what do you think about this, you know.

Q. You mentioned someone was working with Mark. Do you know who that was?

A. Dahiya

A. There was a gentleman, I don't remember his name.

Q. Was his name Scott Englander?

A. I believe he's his real estate partner.

Q. I'm asking if the person you're thinking of that Mark was working with, was it Scott Englander?

A. Maybe. His real estate partners and their teams could be working with Mark. Very difficult, again, I don't have that view. There was a gentleman working on some financials. His name was Yussi. Yussi or Yoshi.

Q. Do you know what Yussi's full name is?

A. Not right on the back.

Q. If I tell you Yussy's full name is Joseph Friedland, does that sound right to you?

A. Joseph Friedland, again, seems to be his partner in real estate, but there was somebody in financials that was helping him. Could be part of the same group. You know,

it could be -- you know, they must be working together on the financial side so it's difficult to really pinpoint.

Q. I'm going to throw out a few names. I realize you said you don't remember, but I will try and refresh your recollection.

Is the person that you're trying to think of who Mark worked with Jacob Sod?

A. Again, one of the investors, yeah, one of the investors.

Q. What about Charles Fern?

A. Charles Fern? Again one of the investors.

Q. Jacobi Azot, Jacoba Azot?

A. Must be one of his investors in real estate, yeah.

Q. I believe you testified that Amit was working on the technology side, is that right?

A. Correct.

Q. What else was he working on, if anything, if you know?

A. During this process his entire focus was on -- that was one area that I

A. Dahiya

personally was very concerned, the technology part of Bed, Bath and that we knew even when we were working with them, it's not something that came up overnight because we used to work with them. I've been working with the teams in the past and always this used to -- buybuy BABY is a challenge.

It used to be a challenge during even when buybuy BABY was operating. That they didn't know what the hell tech was doing. The systems and simple processes used to take forever. Getting one product line used to take 60 days, 90 days.

So there was a black hole somewhere in that so we needed to really make sure what that world looks like. That's intertwined to the core and that also brings the question of validation of those numbers in any of those core areas, God knows, you know, kind of situation.

Q. As of June 10, 2023, do you know if Amit had produced any written documentation with regard to an analysis that he developed relating to Dream On Me's bid for BBBY's

A. Dahiya

assets?

A. I don't recollect, but I know he had his viewpoint. Again, it was -- everybody was in those days. So he was talking to people. His viewpoint could be changing.

Again, though we look like a team, we were doing whatever in our own silo self to make sure you don't drop the ball and keep running with it kind of situation.

Q. I believe you also testified that Jack Srour had been involved, is that accurate?

A. Yes, he was in. I do remember him participating in the meeting and he did -- he did provide his feedback. Mark and him has a relationship, so yeah.

Q. When you say --

A. Plus he was in training, learning.

Q. When you say the meeting, what meeting are you referring to?

A. The one we had in the restaurant.

Q. Is that the June 12 in-person meeting between Dream On Me and Go Global?

A. June.

Q. June, this happened on June 10?

A. I feel -- no, June 12, correct, sorry.

Q. No problem. No problem. I was surprised.

A. June 12.

MR. MURPHY: Can we take a break for a moment. We can go straight through to lunch.

MR. BERLOWITZ: I was going to finish a couple of things and then we can take a break. I'm happy to take a break right now.

MR. MURPHY: I just -- it's been like an hour and 40.

MR. BERLOWITZ: Let's take a break now. How much time do you want?

MR. MURPHY: Just five or ten minutes.

MR. BERLOWITZ: Let's go ten minutes.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Dahiya

Q. I don't believe I'm displaying anything. Do you see the document I'm displaying to you? It should be the NDA that we've been discussing.

A. Yes.

Q. I believe that you testified that you don't have a formal title with Dream On Me, is that right?

A. Formal title? I didn't get your question.

Q. My question is, did you previously testify that you do not have a formal title with Dream On Me?

A. No, I said titles don't mean anything at Dream On Me because people do everything.

Q. Okay. So when you put your title as CMO, CTO, I guess my question is why did you choose those roles as your title?

A. Those are assigned -- it means -- it doesn't mean that I only do CMO or CTO. That's what I was saying.

Q. You do more?

A. Yes.


A. Dahiya

Q. But you are the CMO of Dream On Me?

A. Correct.

Q. And you are the CTO of Dream On Me, is that right?

A. Yes.

Q. How big, when I say big, I'm saying about the number of employees, how big is Dream On Me, if you know?

A. 150, 200 people is a guess.

Q. I prefer you not to guess. If that is an estimate based on your personal knowledge, I will accept it.

A. Yes, estimate.

Q. Does anyone at Dream On Me report to you?

A. We have a flat structure so we have teams, but we don't have a hierarchy.

Q. Do you know if Dream On Me has an operating agreement?

A. I don't know, not aware.

Q. Do you know if Dream On Me has a Board of Directors?

A. Not aware.

Q. I believe you previously testified

that you work for Dream On Me Industries, is that right?

A. Correct.

Q. You signed this document Dream On Me, Inc. though?

A. Yes.

Q. Do you see that?

A. Yes, I can see that.

Q. Why did you do that?

A. It's in our world when we write Dream On Me, Inc. it's like we are saying Dream On Me Industries Inc. I don't know --

Q. Is that also why you wrote DOM family?

A. Yes. Yes, that's how we write it.

Q. Did you sign an NDA with Lazard, do you know if you did that?

A. Yes.

Q. Yes, you know?

A. Yes, with Bed, Bath, correct.

Q. And did you sign that document?

A. I don't remember.

Q. Do you know if you signed any other NDA's related to this potential acquisition

A. Dahiya

of BBBY's assets?

A. I don't believe so.

Q. Have you signed NDA's before?

A. Yeah, it's a usual document. Mutual NDA's are very common and in my life time I would have signed many mutual NDA's yes.

Q. I believe you testified previously that you were running 20 hour workdays while you were working on a potential bid for BBBY's assets, is that right?

A. Yeah.

Q. Was everyone on the team, by team I'm referring to yourself, Mark, Milan, Amit and Jack, were they all working long hours?

A. I believe so. Everybody was. Everybody was. Maybe some people were running early in the morning, some people were working late. It was all over the place, but yes everybody was --

Q. I believe you even used the word chaos or chaotic to describe it, is that accurate?

A. Yes, the process was chaotic.

A. Dahiya

Q. Can you explain a little bit more about why you think the process was chaotic?

A. Many reasons. Information, too much information, information changing on a daily basis. The company is unfortunately -- Bed, Bath was into GOB, going out of business sale. That's happening live while you're trying to buy an asset.

And they are depleting the asset value. That's happening. You're trying to raise capital. You know, what really is the -- it's like a moving target. I would say you're trying to aim at a moving target and that target keeps changing.

It's not one target, but the target keeps changing. It could -- the target could change, so yeah. Just the nature of this whole deal, it was chaotic.

Q. So very, very difficult time?

A. Yes.

Q. Very, very stressful?

A. Yes.

Q. A lot of information floating around?

A. Yes.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 5, as of this date.)

Q. I'm showing you another document. This document is an email from Abhischek Pathania. I apologize for mispronouncing that name. You are one of the recipients, Avish?

A. Yes.

Q. I apologize. Is it okay if I call you Avish?

A. Yes.

Q. You can call me Steve.

A. Yes.

Q. Thank you. I appreciate that. This was sent to you, an email dated June 10, 2023 and it bears Bates number GG 9434. I will give you a moment to read the top email. Let me know when you're done.

A. Yes.

Q. Do you recognize this email?

A. Yes.

Q. What is it?

A. This is the access to the data room with that signed NDA.

Q. So after you signed the NDA on behalf of Dream On Me, were you and Dream On Me granted access to Go Global's data room?

A. Yes.

Q. That is separate from the Lazard data room, correct?

A. Correct.

Q. And you knew that at the time of this email?

A. Yes, it was a different -- it was not the same data room, yes.

Q. Do you know whether you or anyone else at Dream On Me accessed that data room?

A. I know I did.

Q. When you accessed the data room, what did you see?

A. When I went to the data room I saw a lot of data that was from -- which is buybuy BABY data that we had looked at in the past and -- yeah.

A. Dahiya

Q. Did you see anything else that you hadn't seen before in the past?

A. Yes, there was, what do you call it, a Go Global presentation in that they talked about Go Global and there was a presentation which we had seen in the past which was buybuy BABY'S presentation.

Q. Well, I'm asking you if there was any documents that you viewed that you hadn't seen in the past?

A. At that time, these were all, the only documents. We had no time to really go through any documents regarding this.

I think what was the financial need of theirs was one document, and that was the conversation we were having, and then the presentation. Those were the only four documents.

Q. When you are talking about the financial need, are you referring to, I'm going to be a little bit general about it, but the Go Global financial LRP model?

A. Yes, you can say that and the so-called Go Global LRP model was the baby

LRP model. It's a derivative of that model that we were already looking.

Q. When you say it was a derivative of the baby model --

A. Because we had the data that we had looked at from the Lazard data room and they're modeling on that for the funding part of it.

Q. So they had taken the Lazard data and manipulated it in some way in their document?

A. Yes, something like that, yeah. That's the first realization that okay, fine, this is the data they have.

Q. Had you seen that before?

A. No. I had seen it before in the sense because I have seen that baby model, but I could see that there was differentiation in what they were trying to do for the raising of the capital.

Q. What could you see in terms of that differentiation?

A. They were trying to show that so much funding is required, so much funding we

A. Dahiya

are funding. You know, we are going to put -- they had -- I think that they didn't define whose coming in, but I think it was Sparrow. We need X, Y, Z capital. These are the players where we need to get the capital. We're going to invest [REDACTED] to [REDACTED]. That's what that data talked about, yes.

Q. And is it your understanding that data was based on -- is it your understanding that was based on data in the Lazard data room?

A. They had to derive it out of that data.

Q. That information itself wasn't in the Lazard data room?

A. Yes, that specifically wasn't -- yes.

Q. Your understanding was that that was Go Global's work, right?

A. Yes. They asking for funding was their work, correct.

Q. At this time on June 10 when you're viewing the data room, had Dream On Me done a similar analysis?

A. No, because we are looking at the same model as an assumption of capital need and how to target the asset was completely different than the approach that they were taking.

Q. Had Dream On Me at this time developed a document with similar analysis to the one that you were looking at with regard to Go Global's LRP model?

A. No, we didn't have a professional model like that to say.

Q. Okay.

A. Mark was working on his side so he was working with his numbers, whatever he was doing.

Q. What did you do when you first got access to the data, to the Go Global data room?

A. Yeah, I took a copy of that and I sent out the model and the presentation to the group, which is Milan, Mark and Amit.

Q. Did you download the contents of the Go Global data room to --

A. Yes.

Q. -- your computer?

A. Yes.

Q. Did you save those contents?

A. Yes.

Q. You circulated it among Dream On Me's personnel, is that right?

A. Yes, only to three people who were part of this process.

Q. Do you recall testifying about a June 12 in-person meeting between Dream On Me and Go Global?

A. Yes.

Q. Did you attend that meeting?

A. Yes.

Q. Do you know who else attended that meeting?

A. Lazard team -- not Lazard, sorry, Go Global team, there were three members. I think Christian was there, their CFO and a lady by the name of Deborah. And there was another person from Ankura. What was her name?

Q. Was it Kathleen Louster?

A. Yes, you're right. And then there

A. Dahiya

was Mike Bristol.

Q. Were you just referring to the notes we discussed earlier to see that --

A. Yes.

Q. Just checking. Leading up to that dinner, after you had scheduled that dinner, but before the dinner had happened, what was your expectation about what would be discussed at that dinner?

A. I think the key element was numbers don't mean anything, it's the chemistry, meeting of people that's more important.

That's as to Mark. That's how he has done business. For him, it was very important to see who are the people behind the people that we are talking about, so that was the key part of the meeting.

Like let's meet. Let's see who are these people are and let's talk. That's what was very important in Mark's view.

Q. So was this meeting very much introductory, getting to know each other, seeing if there was chemistry between the parties?

A. Dahiya

A. Correct.

Q. How do you think the meeting went?

A. It's a first meeting. I think the conversations was all about the process, you know, everybody had challenges of trying to do whatever we are trying to do.

And Ankura, which was there, which was trying -- I don't remember, but I feel they were trying to bring the urgency again to the table that they needed something quickly from Mark.

I don't have the details, but it was a funding finance agreement signed that they can submit with the deal. It was like too much from the first meeting point of view, of course, greet, meet, but there was a strong need to move forward fast. And that we were in these deadlines. That was one of the conversations, yes.

Q. And again, the need to move fast was because of the deadlines for the bankruptcy auction, right?

A. Yes. And we told them, you know, our thing, we will just ask for more time.

A. Dahiya

Like we -- this can't be happening. We are to get -- our ask was let's get two weeks, right, a bandwith of two weeks together. That nobody needs to tell us that we need to do this.

That's what we were telling them, let's just ask them, this is not doable. It's a moving target. You can't do it.

Q. What did you think of the Go Global team after the June 12 meeting?

A. Skeptical. We didn't have -- we came to know that there were other members in the Global universe that we had to meet and should meet. That was one.

The second is I don't think we got the pulse, the very speed at which this had to be happened, we didn't get the pulse that even they knew what they were doing or they were in a position to pull this off.

Q. Were you interested -- keep going. I didn't mean too interrupt you.

A. Yes, sorry. That was my ending.

Q. Were you interested in further discussions with Go Global following this

June 12 meeting?

A. I don't know how we left it at. We said we'll get back kind of situation. Then hey, let's meet everyone and come to our office. That's what finally happened. And an invitation to, what was his name, Jeff.

Q. Jeff Streader?

A. Yes. Invitation for him to come over and meet in-person and let's talk further in a shorter time for a dinner to make a decision on a [REDACTED] or [REDACTED] investment and not knowing really what we are doing.

Q. Did you speak with Mark about the June 12 meeting after it happened?

A. I believe so. After the dinner, yes, we had some conversation. Even I was not very confident.

I think we were just testing, what do you mean, what do you think. Maybe Jack was there too. What do you feel. We all were not feeling very confident.

Q. You're not feeling very confident, that's your testimony?

                          A. Yes.

Q. You said you were skeptical, right?

A. Yes.

Q. But you still wanted to hear more, is that fair?

A. No. The idea was one, that not all the players were there so we should have all the partners in. That's one thing. That if you have to, okay, but it's too short a time.

This could have been with anyone. It's too short a time, too fast. Are we trying to judge this too fast, right?

Q. Right.

A. We just met. It was just a typical business that hey, it's not adding up. It's like you're not getting the feel that they know enough about the business, whatever that was like. It definitely meant another meeting.

Q. Did you tell Mark that you didn't like Go Global after this meeting?

A. Skeptical would be the word.

Q. You didn't say I don't like them?

A. How should I put it? I don't like

them? You can't trust them, yeah. The other word was I can't trust.

Q. Sorry, I am -- I don't understand your response.

A. I would say can't trust them.

Q. Why do you think that?

A. Again, too fast. And I don't -- just the dynamics, the people in the play. Yes, just the nature of this whole process that you can't just do it blind, whatever.

Q. But again, and that was driven by the fact, at least in part, that the scheduling was very compressed, is that right?

A. Part of the problem.

Q. Were there other reasons that you didn't trust Go Global?

A. Just many things. Like it's too short a time. So okay, you're struggling to brand this and now you have to work with a partner to do a joint brand with a limited time to really understand two partners. You're complicating this to four-X.

Q. I understand that. I understand

the piece where it's a compressed time frame, you're tracking to get to know these people. I understand that piece.

I want to know if there's another reason why you thought that you couldn't trust Go Global other than the compressed timeline?

A. Yes, their financial ability was in question, whether they can -- whether they do have the funds and whether they can pull this off, yes.

Q. Before you had access to the Go Global data room, did you know what their financial position was?

A. No.

Q. You knew after you got access to the Go Global data room?

A. Yes, whatever was there.

Q. Okay.

A. We looked at it, yeah.

Q. Did you know the financial position of any other potential bidder in this auction?

A. When you say financial position of others, in what sense? Their ability to do

A. Dahiya

the job?

Q. Let me clarify. You testified that one reason you felt skeptical or you couldn't trust Go Global was because of the financial position that you reviewed in the documents they provided you in their data room, is that accurate? That's one reason, is that accurate?

A. Yes. I mean the conversation where we are talking about, the 12th of June meeting, and that conversation didn't deliver, right, and didn't solve that problem, yes.

Q. So I want to know, you got that information from Go Global. Did you get that kind of information from any other potential bidder in relation to the BBBY bankruptcy auction?

A. No, but it means whether we know -- it doesn't mean that somebody gives us an Excel and that is the financial ability of someone, no. That's not how financial ability comes. It comes from what have they done, where they are in the business. So

A. Dahiya

when we talking about Bed, Bath & Beyond with other partners to partner, we knew those guys. Right, $300 million company, $500 million, a billion dollar company, right. They're coming in, hey, let's work together. Yes, if you ask me do they have financial ability? I would have said yes.

Here we didn't have enough. We don't know what their current financial whereabouts was, where they were, no data.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

MR. BERLOWITZ: I'm displaying an email to you now. This email is from Mark Srour to Milan Gandhi, Jack Srour and Avish Dahiya. It is dated June 13. The subject is BBBY investment. And it bears Bates number beginning with DOM 2770.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 6, as of this date.)

Q. This is a two page email and I will give you a moment to read the first page.

Let me know when you are finished and I will scroll down to the second page.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Okay.

Q. This is the second page. Let me know when you're finished reading.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Okay.

Q. I realize this represents -- the top email is from Mark. I'm interested in the email that's below that that's from Milan dated June 13 sent to Mark and you are cc'd on this.

A. Yes.

Q. The first sentence says, "Yesterday's dinner was necessary to understand views and ask of both parties and here are my views." Do you see that sentence?

A. Correct, I do.

Q. And the yesterday dinner, is that in reference to the June 12 meeting?

A. Dahiya

A. Yes. This is dated the 13th so yesterday would be the 12th, yes.

Q. The next paragraph, the first sentence you write, "Investment opportunity, this is a once in a lifetime --"

MR. MURPHY: Objection. He didn't write this.

MR. BERLOWITZ: Thank you.

Q. Milan writes, "Investment opportunity. This is a once in a lifetime opportunity to be one of the owners of such an iconic retail brand." Do you see that sentence?

A. Yes.

Q. Do you see that sentence?

A. Yes.

Q. Do you agree with that sentence?

A. Yes.

Q. At the bottom of the page, the last sentence, "If we do not participate, there is a risk that one of our competitors may join and we lose." Do you see that sentence?

A. Yes.

Q. Do you agree with that sentence?

A. No.

Q. Why not?

A. Such a complex transaction, moving target, so many variables, my viewpoint would be, God knows. It's Milan's viewpoint probably.

Q. That's fair. This is Milan's viewpoint. It's his email.

One more sentence I want to read to you, the last sentence in this paragraph here that begins with technology, "Technology, funding, supply chain and Human capital functions, they're all inherent risks and we will be going into unchartered terrain, but Newco management working collectively as a team and collaborated nicely, BBBY can again be go-to place for U.S. consumers." Do you see that sentence?

A. Yes.

Q. The part where Milan says we will be going into unchartered terrain, do you see that?

A. Yes.

Q. Do you agree with that?

A. Dahiya

A. How do I -- I don't know what he is -- what is the context he's alluding to, but I would say every business is unchartered. Even restarting the same damn business, it's unchartered, same difficulties. This is 101.

You have to solve technology. You have supply chain problem, the funding problem. These are basic fundamentals of running any new company.

I don't know what's unchartered. It means whoever, whether it's us, it's unchartered. If somebody says otherwise, who knows. Nobody is an expert.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

Q. I'm now displaying a different email to you. It's sent from you to Scott Englander. It cc's Mark. It's dated June 16. 3032 Bates number. Do you see this.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 7, as of this date.)

A. Dahiya

Q. Do you see this email?

A. Yes.

Q. Do you recognize this email?

A. Now I do. It's Friday the 16th.

Q. The first sentence or I guess the second sentence you write, "The window of opportunity is short, but with huge upscale." Do you see that sentence?

A. Yes.

Q. What did you mean by the window of opportunity is short?

A. This could be with reference to same, that there's a time stamp to anything that we are trying to do.

Q. What did you mean by huge upscale?

A. Huge upscale in the sense that the brand has a huge potential, right. That's the message in there.

Q. Is it fair to say that Dream On Me was extremely excited about potentially winning a bid for BBBY's assets?

A. Yes, that's been there since '21.

Q. Below this email you can see on June 16 at 8:04 a.m., Mark is writing,

"Scott, we are running out of time." Do you see that?

A. Yes.

Q. You do see that?

A. Yes.

Q. And that's just reflective of what we discussed before with regard to the fact that the timeline on the bid was extremely compressed. Does that seem fair?

A. Yes, this -- this has been the case since day one.

Q. The email at the very bottom that is sent by Scott Englander says, "Just so you are aware, Yussy was oversees the last two weeks. He says he will review the materials over the weekend and will call you on Monday." Do you see that sentence or those two sentences?

A. Yes, I do.

Q. And do you see where he says he will review the materials over the weekend?

A. Uh-hum.

Q. Is that a yes?

A. Yes.

A. Dahiya

Q. Do you know what materials Scott is referring to in this email?

A. From this, I don't remember.

Q. Do you know who Scott Englander is?

A. One of Mark's partners.

Q. Are you guessing?

A. I assuming he is -- Scott is his partner in real estate.

Q. Do you know if Scott Englander works for Dream On Me?

A. No.

Q. No, you don't know or no, he does not work there?

A. He does not work there.

Q. Do you know if Scott Englander received Go Global's model?

A. I don't know.

Q. You don't know --

A. I don't know whether -- what he got.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

Q. I'm displaying another document to you. The top email is from Mark dated

A. Dahiya

June 14. It is to Charles DOM, but the email below that I see is drafted by you to Mark and Milan dated June 11th. Do you see that?

A. Uh-hum. Yes.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 8, as of this date.)

Q. The email is Bates stamped DOM 2943. You write in this email, "Attached is the investment presentation by Go Global on BBB and the financial model." Do you see that?

A. Yes.

Q. Do you see the next sentence that says they are bidding [REDACTED], expect another [REDACTED]s working capital to run the business with [REDACTED] plus stores. Do you see that?

A. Yes, as per the data, yes.

Q. Did you know before you got access to Go Global's data room that they were going to be bidding [REDACTED]?

A. No.

Q. Did you know that they were going

to be bidding ██████████ before you signed the NDA?

A. No.

Q. Did you know that they would expect another ██████████ as working capital before you got access to the Go Global data room?

A. No.

Q. Did you know this before you signed the NDA?

A. No.

Q. Below there's a graphic. There's a piece, I don't know -- I want you to tell me a little bit about this. Where did you get this graphic?

A. This is the only piece that I could figure it out that hey, this is something that concerns Mark because if he's planning to partner, then that's what that looks like.

So this was -- that caption, Mark doesn't read his emails, and my thing was okay, here it is, this is what you can -- they have said family office. You could be a family office here, that they are thinking of investing, wanting you to invest.

A. Dahiya

This was a more telling them that hey, this is what their investment requirement is.

Q. My question is, where did you get this graphic?

A. Should be from one of the Excels.

Q. From the Go Global model?

A. Yes, one of their Excels.

Q. Did you have this information that is contained in this graphic before you signed the NDA?

A. No, we didn't.

Q. Did you have this information before you accessed and downloaded the documents in the Go Global data room?

A. No, we didn't.

Q. Is this information contained in Go Global's LRP financial model, if you know?

A. Yes, could be.

Q. Okay.

A. They have their investment, what they were asking, seeking that data, yes.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 9, as of this date.)

A. Dahiya

Q. I'm sharing another email with you. This email is from Mark to Michael Tennyson and Gary Mason. It is dated June 14. It bears Bates number DOM 2969.

MR. MURPHY: Are we marking these in sequential numbers?

MR. BERLOWITZ: Yes.

Q. I realize you are not on the top email, but you did write the bottom portion of this email and this bottom portion is what we just reviewed, is that right?

A. Correct.

Q. And at the top you can see that Mark is forwarding your email to Michael Tennyson, is that right?

A. That's what it shows.

Q. He's forwarding it to Gary Mason, is that right?

A. Yes.

Q. Michael Tennyson is not a Dream On Me employee, is that right?

A. No.

Q. He doesn't own Dream On Me either, is that right?

A. I don't have that information.

Q. You don't know whether Michael -- that's fine.

A. That's inside information. That's a Mark question.

Q. That's fair. Do you know if Gary Mason works for Dream On Me?

A. No.

Q. No, you don't know or no, he doesn't?

A. No, he doesn't.

Q. This email contains an attachment, a couple of attachments, one of which is the 1.6.1 Go Global baby LRP model, version 9.8 updated 6.7 version 2. Do you see that?

A. Yes.

Q. Is it fair to say that Mark is sending here the Go Global model to people who do not work for Dream On Me?

A. Yes.

Q. Did you ever become aware that Mark had sent the GG model to people who did not work for Dream On Me?

A. He may have sent the model to his

A. Dahiya

investors to get their -- this is what -- this is -- when is it dated? Probably he's getting their -- I don't know what his intent was. Maybe getting their input, what do you think, is it worth investing or do you guys want to invest. I don't know the purpose, but yeah.

Q. My question is, did you become aware at a certain time that Mark had done this? The date was June 14.

A. It means to this email?

Q. Either.

A. Are you asking in general?

Q. In general.

A. Yes, I'm aware. I don't remember again, specifically, but if it was previous, and it is going beyond, I would have told him that hey, we can just share the Lazard versus this, it's -- I would have told him that.

Q. Do you know whether you became aware that Mark had circulated Go Global's model to people who did not work for Dream On Me?

A. I don't remember.

A. Dahiya

Q. Can you approximate?

A. Should be around this time, June, July, maybe whatever.

Q. Okay.

A. I have -- till I really look at specifics to figure out and then think it through, yeah.

Q. There did become a time when you learned this information, is that right?

A. Yes.

Q. When you learned that Mark had sent Go Global's model to people who did not work for Dream On Me, did you talk to Mark?

A. I don't remember. If something has happened, I would have -- I would have spoken or emailed or something, even my opinion. I don't know in what context now or this is generally I would -- my mind would do that. I don't know when --

Q. Okay. It's okay if you don't remember.

MR. MURPHY: Don't guess. Just say what you know.

A. Yeah, I don't know.

A. Dahiya

Q. Seeing this email now, if you learned that Mark had disclosed Go Global's financial model to someone who did not work from Dream On Me, would you have spoken to him about it?

A. My understanding with this would be if these people are his associates or partners or whatever, then he has the ability to share at this moment if this is the 14th. I don't know. He is seeking funding for a project or getting their opinion, I don't know.

Q. Did you ever tell Mark not to share the GG's model outside of Dream On Me employees or agents?

A. I don't believe it was shared with anyone else. He may have -- whether I remember what I told him or not, again I don't know. I don't remember.

Q. Okay.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 10, as of this date.)

Q. I'm now displaying an email sent by

A. Dahiya

Avish to Mark and Milan. It is dated June 14. The subject is Go Global BBB document link.

A. Yes.

Q. It contains a number of attachments including the GG baby LRP model version 9. And it bears Bates number DOM 2800. Do you see this document, Avish?

A. Yes.

Q. You wrote this email, is that right?

A. Yes.

Q. There's no content to this email other than a Dropbox link, is that right?

A. Correct.

Q. Does Dream On Me use Dropbox?

A. Yes, we do.

Q. Does it use it to store documents?

A. Yes.

Q. Does it use Dropbox to share documents?

A. Yes.

Q. Does it use any other platform to store and/or share documents?

A. Dahiya

A. Again, this may be a Steve question, but from what I know, we do Google. We use Google Share and we use Dropbox.

Q. In this instance, it appears that you're using Dropbox, is that fair?

A. Yes.

Q. Did you use Dropbox in relation to the potential bid you were developing for BBBY's assets?

A. No, this was just letting them know that, the data is here.

Q. No. No, I'm asking whether Dream On Me used Dropbox to store and share documents in relation to its bid for BBBY's assets?

A. Yes, we had Lazard data in Dropbox.

Q. Did you put other data in the Dropbox?

A. Yes, Lazard data was there. This was there and if there was any other working docs, yes.

Q. Did you put Go Global's model in the Dropbox?

A. Yes, it was there. That's what I'm

sharing.

Q. Are you aware whether the documents contained in this Dropbox had been produced in this action?

A. Is that question to me?

Q. Yes.

A. Can you ask again.

Q. Sure. Do you know whether the documents stored on the Dropbox had been produced in this action?

A. I believe so. They have access from our legal team.

Q. What other documents did you store on the Dropbox other than Go Global's model and the Lazard data?

A. Anything else that we were working on. These are the two main directories so I would have added data too because Lazard was getting updated frequently with whatever we asked them and they were getting updated so we would know the data would come. They wouldn't give it to us and then they send us an email, but guess what, it gets updated instantly to Lazard's data base. Whoever

asked what was happening, that that was the working -- a lot of the working docs were coming like that.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 11, as of this date.)

Q. I'm sharing another document. This is an email you wrote on June 19. You sent it to Jacob Sod and Scott Englander. Milan Gandhi and Mark Srour cc'd. Subject is buybuy BABY. It Bates number DOM 10868.

In this email you're providing a link to the Dream On Me Dropbox, is that right?

A. Yes.

Q. And you're sending that link to Jacob Sod, is that right?

A. Correct.

Q. Is Jacob Sod a Dream On Me employee?

A. No.

Q. You're also sending this email to Scott Englander. Is Scott Englander a Dream

On Me employee?

A. No.

Q. At this time did your Dropbox contain the Go Global model?

A. Yes.

Q. There is an email from Scott at the very bottom. It says here is the chain and I see that there's nothing here. Do you remember what was here?

A. I don't remember. I don't remember this email. Can you go up.

Q. Yes.

(Whereupon, at this time, the attorney scrolled through the exhibit as requested.)

A. Also just to add that if you're sharing a Dropbox, they don't have -- people won't have access to everything in the Dropbox.

Q. Did you restrict access in the Dropbox?

A. Yeah.

Q. Did you?

A. Yes.

A. Dahiya

Q. Did you prevent Jacob Sod or Scott Englander from viewing the Go Global model?

A. Yes.

Q. You specifically did that?

A. Yes, this -- this is the reason we are -- I'm now looking at it, the reason I'm saying it, he's accessing Lazard. It's important that he gets the Lazard approval.

Q. Who else would have known that you restricted access to Go Global's documents in the Dream On Me data room?

A. Nobody else would.

Q. Just you?

A. Yes. I mean if I'm sending the link then I'm -- you cannot go anywhere else apart from what I'm asking you to see. That's it. It's only that. It's only that history to review.

Q. So the other documents I believe you testified that were in this Dropbox were the Lazard data, is that right?

A. Yes.

Q. Was there a reason that Jacob Sod or Scott Englander couldn't access the Lazard

data room?

A. No, not possible.

Q. What do you mean by not possible?

A. I mean if I am not sending them, then they don't have the data.

Q. Okay.

MR. BERLOWITZ: Tom, I think I may have made this request yesterday, I'll re-up it, to the extent that there is an email chain contained below here's the chain, I'm asking for the production of the native or whatever you can provide me to demonstrate what is -- what I think is additional content appendage to this email.

MR. MURPHY: All right.

MR. BERLOWITZ: Thank you.

Q. I'm showing you a different email. The top email is from Mark. It is to Scott Englander. Avish was cc'd. This email bears Bates number DOM 3039.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

(Whereupon, at this time, a

document was marked as Plaintiff's Exhibit 12, as of this date.)

Q. I believe you testified you know Scott Englander, is that right?

A. He's Mark's partner or his real estate partner. That's -- I don't know Scott any more than that.

Q. In this email Mark is saying let's schedule a call for Sunday, is that accurate?

A. That's what this email says, yes.

Q. Did you participate in that call?

A. If that call happened, most likely yes.

Q. Do you remember that call?

A. There were too many calls. You know, there must have been at times ten, 12 calls. It's very difficult to really pinpoint a call.

Q. Do you recall speaking to Scott Englander?

A. I'm sure I may have spoken to him.

Q. Do you recall speaking to Scott Englander about Go Global's model?

A. I doubt -- highly doubt we

specifically talked about anything to do with Go Global.

Q. I'm not asking for your speculation. I want to know whether, you know, if you did.

A. I don't know.

Q. You don't know?

MR. MURPHY: Don't speculate, Avish.

THE WITNESS: Yes.

A. I read this.

MR. BERLOWITZ: We're 12:50 right now. I think it's probably a good time to break for lunch if that's okay with you.

MR. MURPHY: Yes.

MR. BERLOWITZ: How much time do you want? Do you want to come back at one?

MR. MURPHY: In ten minutes?

MR. BERLOWITZ: Two.

MR. MURPHY: How are you doing time-wise? We can do 1:30 if you think that would help move it along.

A. Dahiya

MR. BERLOWITZ: I don't think I have more to do. I don't think I have a ton more to do.

MR. MURPHY: Okay. If you think you're kind of on track to get through this, I'm fine with two.

THE WITNESS: Works for me.

MR. BERLOWITZ: Let's come back at two.

(Whereupon, at this time, there was a luncheon recess.)

A-F-T-E-R-N-O-O-N S-E-S-S-I-O-N

CONTINUED EXAMINATION

BY STEVEN BERLOWITZ, ESQ.:

Q. Avish, do you recall an in-person meeting that was held on June 15 between Dream On Me and Go Global?

A. Yes.

Q. And are you aware whether that meeting was recorded?

A. Not at that time. It was -- I think it was -- yes, probably during the meeting, if I'm not wrong. Probably -- sometime in the meeting.

A. Dahiya

Q. Were you aware during the meeting that the meeting was being recorded?

A. Yes, I think so. At the point where we had a break out, that's the point.

Q. Okay.

A. Yes.

Q. How did you become aware that the meeting was being recorded?

A. I believe I was -- we were trying to resolve the discrepancy, so I was working with Christian trying to figure out the numbers, that there was a big problem with them investing/not investing.

And then I happened to go out because no one else was there and I believe Milan was only there or something and I went out.

And then I saw Mark and, what's his name, Jack were looking into the video. And I must have been there for a few minutes. It didn't make -- It didn't make any value to me, right.

I think I went back in, if I'm not wrong, to speak to Christian or Milan was still there, something, so it was during that

time, yes.

Q. Did you watch a live feed of the video when you were with Jack and Milan?

A. Yes, well -- Milan, I don't know whether he was there.

Q. Sorry, with Jack and Mark?

A. There was Milan in the room when they were watching that so like, okay, you know, we have a bigger problem because I wanted to update them on the numbers. That was my purpose.

Q. Do you know if anyone from Dream On Me told Go Global or the Ankura representatives that the meeting was being recorded?

A. I don't believe so because this was a new facility, right. It's a -- I haven't moved into that facility. So it's a new facility.

We know that we have surveillance, but didn't know whether we were being recorded or otherwise.

Q. After the meeting concluded, did you tell Go Global or Ankura that Dream On Me

A. Dahiya

had recorded the meeting?

A. No, we didn't. I don't know if somebody did, but I never had any conversation.

Q. You're not aware of anyone else who did tell Go Global or Ankura that Dream On Me recorded the meeting?

A. I don't know.

Q. Do you know if you watched the recording of the meeting after the meeting was held?

A. I was sent a link in October, September or October when they got notice from Go Global. Mark had sent me an email asking me to check the video.

Q. Why did he want you to check the video, did he tell you?

A. No. I think so he forwarded that video, the context was that they were suing us and, you know, what happened, you know.

Q. How did the meeting go on June 15?

A. It was interesting dynamics. Of course, Jeff couldn't make it. He had, I think, some board meeting or something or he

A. Dahiya

couldn't come, but he was there for the entire meeting on video.

There was another gentleman who was with him who was on the video. And then we had the rest of the team on our side. We had, of course, Milan, me, Mark.

The meeting was -- if I had to put it in short, the meeting was one-sided trying to say that they have -- they have the expertise to operate and the other side thinks that we don't -- the other side saying it's not making sense if you're not participating as a partner.

Q. What do you mean by -- finish your answer. I didn't mean to interrupt.

A. Sorry, go ahead. Sorry.

Q. What do you mean by participate as a partner? Can you expand on that, please?

A. Participate as a partner is that we have to have an equal say in the business and equal participation in the business.

Q. Was Go Global, I'm speaking generally now, but you can correct me, was Go Global's proposal that Go Global would be the

general partner and run the day-to-day business if Dream On Me and Go Global won the joint bid? Do you know that?

A. Yes. They wanted to be an operating partner, correct.

Q. How did DOM view that proposal?

A. So, there were a few challenges even before the meeting or during the meeting that was coming out very clearly.

One misalignment with them investing/not investing was a big piece that came out. Because I spent a lot of time trying to figure out why. So I know that well.

15, 20 went to zero. What the heck happened. Second was then nothing else changes like in the dynamics of the business.

Another thing what we couldn't wrap around was that Go Global was trying to tell us that we do not have the capability of running a business, right. That they have the expertise. Whereas, you know, when we are looking at the business, we are saying the business comprises of two main

A. Dahiya

categories. So the entire business is on furniture and gears, which we know very well, right. So 60/70 percent of the business could be that category which is our core categories and knowing what we know, which is how do we increase the margin in the business, because numbers were irrelevant.

Numbers couldn't help us because they were a moving target. You can put any number.

Also knowing that the entire -- the cohesive, what you call, the intertwining of many departments, how do I figure out whether they have marked those numbers properly within these two divisions, Bed, Bath or buybuy.

What we knew is what we knew well. We were very confident that we know the categories. We know the business. We've been in the business for a very long and we have the ability to drive that.

And the meeting was kind of one-sided. Go Global trying to tell us that they know better how to operate and we don't know the

A. Dahiya

business kind of scenario, apart from the investment problem.

Q. Do you think that Dream On Me knew better?

A. I'm not saying we knew -- definitely they don't know what they were claiming. Everybody is trying to land somewhere, you know. It's better to accept that we're going to land somewhere versus saying that we know it all. That's all.

Q. But was one of the sticking points for doing a joint bid here that Go Global would be in charge, is that right?

A. One of the problems, but the bigger, again, as I said from our Tuesday or Monday meeting, that we were skeptical. And then what I think falls off the cliff is when we realize they were not investing.

Q. Do you know if Mark ever said, you know, or complained about not being in charge during that meeting either in front of Go Global or privately after that meeting to you?

A. Control or shared control was

important. It was important. Mark always operates that way, especially when you're doing a partnership.

Q. Sorry?

A. So that's his -- that's where his mind set is, that we're partners.

Q. I want to clarify, you said control or shared control was important to Mark, is that right?

A. Yes.

Q. And Go Global was proposing that Dream On Me wouldn't be in control, correct?

A. Correct, without their investment, that they would be the operating partner with control and Dream On Me will not have any say in the operating of the business.

Q. When did you become aware that that was part of Go Global's proposal for a potential joint bid with Dream On Me?

A. During the meeting somewhere. I think Mark was looking at the numbers and they were looking at numbers and then what they were presenting didn't match.

Like it was like a surprise for everyone

A. Dahiya

because I don't think we were looking at that. We were still talking about capabilities and what this partnership may look like and, you know, we didn't look at numbers. We were just talking at a high level before that got busted and like, you know, these numbers are not matching.

Then, of course, we went through the whole process to figure why we have one number, why you guys told us Monday some number and now another number. That's the confusion.

Q. How did you leave that meeting with Go Global?

A. Not very positive. I think both parties were not happy with the outcome. It's like you end the meeting without ending the meeting. Very upset and whatever it is, we are shocked. Everybody is trying to wield that. That's what I would say.

Q. After the meeting ended on June 15, did you and Mark, and possibly other members who participated from Dream On Me, have some sort of postmortem meeting or discussion?

A. Dahiya

A. I specifically don't remember that, but the conversations it was more like validation that they were not there, right, they were still struggling to figure this out.

Q. Do you recall whether you discussed with Mark or anyone else at Dream On Me after this meeting whether Dream On Me would pursue a bid without Go Global?

A. I didn't have that conversation on this day, but I don't know what others did.

Q. Do you recall whether that conversation was held on another day?

A. We were on that path so I don't know whether that conversation -- we were on a path to do something about this asset. That's always been the path.

Q. So --

A. It's just the partnership didn't happen. We were also trying to do the same, trying to figure it out.

Q. Dream On Me was always going to make a bid?

A. Yes. We were still trying to

A. Dahiya

figure this out, yes, how, you know, in this whole confusion. And we just realized they were in the same boat. They didn't know enough.

Q. Yes or no, Dream On Me was always going to make a bid with or without Go Global?

A. I would say so, yes.

Q. I'm showing you an email. It is from Mark to Steve Goodman. Avish you are cc'd. So is Milan. It is dated June 19, 2023, DOM 11080.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 13, as of this date.)

(Whereupon, at this time, an exhibit was displayed via Zoom.)

Q. The email from Mark says, "Avish send what we have. Don't worry about the DNA." Do you see that?

A. Yes.

Q. I realize that Mark wrote DNA. Is it your understanding reading this email and the pieces below that Mark meant NDA?

A. Dahiya

A. Yes, possibly NDA.

Q. NDA stands for nondisclosure agreement?

A. Yes.

Q. Down here on June 19, 2023 at 11:37, you can see that Mark is sending an email and he's saying, "Hi Steve. Was nice talking to you. Avish, please forward all information that we have." Do you see that?

A. Yes.

Q. Did you forward all information that you had?

A. I don't know what I sent. I need to see what I sent, but from below that if you see, it looks like that's the Lazard data or the presentation we had.

Q. Well, that's the email from Mark in which he's saying Avish, please forward it. You haven't even done that yet at this point, I believe, is that fair to say?

A. I have to look at this email. As of now, from whatever I'm saying, did Mark send the PDF? Do you know?

Q. I don't know.

A. I don't know what?

MR. MURPHY: There's an email from Avish above it.

A. Hi Steve, attached -- so this says if we are sending, from what I am reading Hi Steven -- give me a second.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Yes, looks that I am telling that we need to get a NDA signed with Lazard if you want to share that information, yes, that's what I'm seeing.

Q. Right, what I want to focus here is on all information. At this point you had Go Global's financial model, right?

A. Yes, agreed.

Q. And at this point you had downloaded all the documents from Go Global's data room, is that right?

A. Yes.

Q. Did you send that information as part of this request from Mark?

A. I don't believe so.

Q. Okay.

A. It makes no sense.

Q. Okay. When Mark said don't worry about the DNA, I think we can agree he meant NDA here. What did you do after he wrote that?

A. I don't remember.

Q. Did you send the information without getting an NDA?

A. I don't remember.

Q. Has Mark asked you to send information that is potentially -- that might potentially require an NDA, but without an NDA? Let me rephrase.

Has Mark told you to disregard getting an NDA before?

A. He understands what an NDA is, you know.

Q. Sorry?

A. He understands what an NDA means, nondisclosure.

Q. I'm asking if Mark has asked you other times to disregard getting an NDA before sending out information?

A. I don't remember.

A. Dahiya

Q. I want to double back to the June 15 meeting real quick.

At that point, what due diligence had Dream On Me performed in relation to a potential bid for BBBY assets?

A. I believe we had meetings with -- we were in touch with Lazard and we were in touch with 6th Street or -- Mark was working in the background in the financials from both investors and nobody really -- if you ask whether we had a bid, we didn't have a bid. We didn't have a -- just because we didn't -- we had no way to know when this will conclude because there was too many moving parts. It required funding. It required, as I said, it required all the data points that were in play including stores.

When we are saying ongoing or as a going concern, it was extremely hard to say we had a firm bid. We had an idea. We knew we had to do whatever it takes to get the asset. That's the underlying fact.

Q. At that point, again, that point was June 15, had Dream On Me created any

independent documents that constituted its due diligence?

A. I don't know.

Q. You don't know whether Dream On Me had created documents?

A. On the bidding side you're saying or on the due diligence?

Q. I guess let's do both.

A. We had a viewpoint for sure.

Q. Did you create any documents at that point that recorded your viewpoint?

A. I don't know.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 14, as of this date.)

Q. I'm sharing another email with you. This email is from Patty Wu. It is sent to Brenda Shay and yourself Avish.

It is dated June 19, 2023 and the subject is DOM due diligence. And it bears Bates number DOM 10877.

Do you recognize this email, Avish?

A. Dahiya

A. I do.

Q. The first line says, and this is from Patty, "Hi Brendan. DOM will be starting the due diligence project." Do you see that sentence?

A. Yes.

Q. Had DOM started its due diligence project at this point yet?

A. No, we were already in the process.

Q. On June 19 you were already in the due diligence process?

A. Yes.

Q. Do you know why Patty is writing DOM will be starting the due diligence process. Sorry, this says project. I want to clarify that.

Do you know why Patty is saying DOM will be starting the due diligence project?

A. I believe, I had this conversation with Patty, this was a time when we were seeking more involvement with our team and she couldn't give that time to us. So she said she'll send out and ask Lazard to make sure those resources are available to us.

A. Dahiya

And the problem was in normal due course, that could have happened, but because there was so much taken from these resources over a period of time, that it was very hard for us to -- she kind of reset and said hey, they want this to happen. It's like a permission she's trying to get from them again and saying we are in, we want more interaction and don't stop that.

It was a challenging time to get anyone's time. There were so many companies trying to go in.

Q. At this point, is it fair to say that DOM was behind on its due diligence?

A. We were always behind.

Q. You were always behind?

A. Yeah. And I don't know if there was anybody who was ahead.

Q. Do you know if other potential bidders had done more due diligence than Dream On Me?

A. Potentially. We had spoken to a few who went to the data room, spent a week, and they said how they couldn't crack it.

A. Dahiya

This will take very long time for us to do and exited out.

Q. Do you know if Go Global had done more due diligence than DOM at this point on June 19?

A. Could have. You know they portrayed that they did. That's how they projected so they could have.

It doesn't matter if you did more due diligence or not. Yes, they could have spent more hours trying to decode this.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

Q. I'm sharing another email with you. This email is from you Avish. It is sent to Mark. It is dated June 23, 2023 and it bears Bates number beginning with DOM 11644.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 15, as of this date.)

Q. The email that you write at the very top reads, "They should not use Go Global data. Scrap that." Do you see that sentence?

A. Dahiya

A. Yes.

Q. Why are you telling Mark not to use Go Global data?

A. Because we know that we have to use Lazard. I'm just worried that he made -- he may unknowingly share the wrong file. I'm telling him make sure we share the right data.

Q. When you -- sorry, go on.

A. That's about it. Trying to make sure or make him aware that, you know, I hope -- there were hundreds of versions we were having and making sure not to use.

Q. When you say they should not use Go Global data, is the "they" referring to Joseph Friedland?

A. Can you go down?

Q. Of course.

(Whereupon, at this time, the attorney scrolled through the exhibit as requested.)

A. I want to make sure what the context is.

(Whereupon, at this time, there was

a pause in the proceeding.)

A. So there is -- okay.

Q. I'll repeat my question. Is the "they" that you're referring to at the top of this email, is that referring to, in part, Joseph Friedland?

A. Yes.

Q. Is it also referring to Scott Englander?

A. Yes.

Q. Is it also referring to Yisroel Friedman?

A. Yes.

Q. Do you know who Yisroel Friedland is?

A. I don't. Must be partners, all of them.

MR. MURPHY: Don't guess.

Q. If you don't know --

A. I don't know.

Q. That's fine. At this point, do you know whether Joseph Friedland or Scott Englander had the Go Global data?

A. I don't believe they had Go Global

A. Dahiya

data, but if you go down in the email, looks like Mark did share a partial -- if you go further down.

Q. Do you want me to keep scrolling?

A. That's what it looks like.

Q. So I'll repeat my question. Do you know at this time whether Mark or anyone at Dream On Me had shared the Go Global data with Joseph Friedland or Scott Englander?

A. I don't know. But I -- yes, I don't know.

Q. If you knew that Mark had done that, would you have told him, as you do here, to scrap that data?

A. Yes. It means -- at this point in time, could be that if you have sent anything, that's not the data that we are working on. It's like -- that doesn't make sense.

Q. Would there have been another reason that you would have told him to scrap that data?

A. No.

Q. What about the fact that there was

an NDA in place?

A. Yeah, NDA, but my first reason would be that that's not the data we are basing it on.

Q. Okay.

A. It's very simple. You're remiss.

Q. At this point did it not concern you that there was an NDA in place and that potentially Go Global data was being shared outside of Dream On Me?

A. Did I know that there was an NDA?

Q. Sorry, what did you say?

A. I know there was an NDA.

Q. So I'm saying at this point, did it concern you at all that there was an NDA in place and Go Global data was being shared?

A. In the context to this email, I think it looks more like that is making sure that we are not sharing the wrong information.

Q. Now what I'm asking about is, at this point, on June 23, you know there's an NDA in place between Go Global and Dream On Me, is that accurate?

A. Yes.

Q. Would it concern you to learn at this point, in light of the fact that you are aware of the NDA, that Go Global data and information and documents are being shared outside of Dream On Me?

A. Yes. And I would have brought that up if that was the case.

Q. Okay.

A. Again, everything is happening at a lightning speed.

Q. At this point, on June 23, what due diligence had Dream On Me conducted?

A. June 23?

Q. And just to clarify, in relation to the bid, a potential bid or BBBY's assets.

A. And when was, if I may ask, was the IP assets bid? If someone can answer.

Q. I do not recall. But my question is, at this point, on June 23, what due diligence had Dream On Me conducted in relation to its potential bid for BBBY's assets?

A. For one thing, that we would have

A. Dahiya

gone further in our tech assessment because that was a big piece that was being managed. I know Mark was continuing to work on his financials. Those are the two big pieces that was being worked on.

They would have been in a better idea of the process because I know -- I can't really answer for Amit, but he was talking to vendors indirectly, past employees, just to understand the tech.

Q. Had that been reduced into any kind of written document?

A. Could be. You have to ask him. But I know he was making notes or whatever.

Q. Is the answer you don't know?

A. Yes, you have to ask him.

Q. At this point on June 23 did you have concerns about the due diligence Dream On Me had conducted to date?

A. I would say yes. This is even after we acquired the assets. It was still there even after we acquired the assets.

Q. I don't mean to put words in your mouth, do you know if anyone from Lazard ever

A. Dahiya

challenged your understanding of your ability to do a deal with relation to this bid?

A. I'm sure that -- again, I don't remember the specifics, but there were concerns about -- the concerns were whether you have financial ability, you know. All along those concerns were always there, so I don't want know the context you're asking but --

Q. Did you have a concern about Dream On Me's teams and professionals to perform the work to get this deal done?

A. With respect to the timing and speed at which we were working, yes, it always was a challenge.

Q. You weren't concerned about your internal capabilities?

A. It's always there, but we -- from whatever we had done in the past, you know, we have delivered. That's there, but concern was always there.

Q. This was a large investment, is that right?

A. Yes.

A. Dahiya

Q. Did you feel that you had the team to accomplish this deal?

A. Whether DOM had the team, in some cases, in some places, maybe we were behind. There was no way to pull this due diligence to the extent that -- which is considered regular because that's a timeline between three to six months and this was weeks. It didn't matter.

So one of the things that I did mention before, that even if you had a hundred people, this was a daunting task, so yes, we were challenged.

(Whereupon, at this time, an exhibit was displayed via Zoom.)

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 16, as of this date.)

Q. I'm showing you an email written by you sent to Milan and Mark. It's dated June 23. The subject is BBBY cash flow model. There's a two page -- it is a three page email and the first page bears Bates number DOM 11714. This is a kind lengthy

email so I will --

A. Could you go down. Let me read the bottom.

Q. Yes.

(Whereupon, at this time, the attorney scrolled through the exhibit as requested.)

A. Go to the --

Q. You want to do it in reverse?

A. Yes.

Q. That's fine.

(Whereupon, at this time, the attorney scrolled through the exhibit as requested.)

A. If you could go down.

(Whereupon, at this time, the attorney scrolled through the exhibit as requested.)

A. Okay.

Q. Now you're responding so I'll go to the top email.

A. Yes.

(Whereupon, at this time, the attorney scrolled through the exhibit as

requested.)

Q. Do you recognize this email?

A. Yes.

Q. You wrote this email, right?

A. Yes.

Q. What is this email?

A. I would say first frustration, ideally frustration.

Q. Let's go through this line by line. Second sentence says, "They," being Lazard, "are indirectly telling us to do our own work." Yes or no; do you see that sentence?

A. Yes.

Q. Had Dream On Me not done its own workup until this point; yes or no?

A. We had done our work, but we needed -- again, this goes back to my previous statement where we were struggling to get more help from the teams because they were reaching a point where they couldn't provide us that help without the approval of the business. They spent a lot of time with everyone else, including us, to that point. And they were like okay, now we wanted

the help to clear these models. And the data point was with them.

If you really see how the model is made, the model is pulling certain information that we never had even in the data room, it was not there.

Q. So Avish --

A. It was a data pull.

Q. Avish, with respect, I'm asking you yes or no. Do you understand?

A. Yes.

Q. I would appreciate it if you would answer yes or no. I will ask you if I want elaboration. Do you understand?

A. Got it.

Q. At this point, was Dream On Me behind in its work to prepare a bid and perform due diligence in relation to a bid on the BBBY assets; yes or no?

A. Yes.

Q. The next sentence reads, "This also shows our inability to do certain due diligence internally." Do you see that sentence; yes or no?

A. Yes.

Q. Here you are expressing your concerns that you have telegraphed to Lazard that Dream On Me is incapable of doing certain due diligence internally, is that accurate; yes or no?

MR. MURPHY: Objection. You can answer.

A. Repeat the question again, Steven.

Q. Can you please.

(Whereupon, the record was read as requested.)

A. Yes, with reference to the time provided.

Q. The next sentence reads, "Every other bidder has done more extensive work." Do you see that sentence?

A. Yes.

Q. At that time every other bidder had done more extensive work, is that your opinion that you are expressing here, correct?

A. Yes but --

Q. Excuse me; yes or no?

A. The context is wrong. This email is --

Q. Excuse me; yes or no?

MR. MURPHY: He can elaborate on his answer.

MR. BERLOWITZ: I asked him a yes or no question.

MR. MURPHY: If you know.

MR. BERLOWITZ: Tom, you can clean him up afterwards.

Q. Avish, you can answer.

A. I don't know. I don't know for sure.

Q. But you wrote every other bidder has done more extensive work on June 23, is that right?

A. That's what I've written, yes.

Q. You also write, "We have to develop this ourselves based on what has already been shared." Do you see that sentence?

A. Yes.

Q. At this point you had not developed the work yourselves, is that accurate; yes or no?

A. It was in the works.

Q. But it hadn't yet been completed at this time, is that right?

A. It never got completed.

Q. Never got completed?

A. Yeah, that's -- who has completed it?

Q. You write in this same sentence, "Based on what has been already shared," what had already been shared at that point? I am asking you to elaborate now.

A. All the information that Lazard has been sharing and their teams have been sharing, Alixpartners, ENG, whoever. That's what it is.

Q. Did that include the information you received from Go Global's data room?

A. No.

Q. But at this point in time you had received access to Go Global's data room, is that correct?

A. Yes.

Q. You had downloaded all the contents that of data room, is that correct?

A. Yes.

Q. You next write, "Milan, can you help? Can we even do this?" Do you see those two sentences?

A. Yes.

Q. You are questioning whether you can accomplish this deal, is that right?

A. Yes, in the time frame, yes.

Q. And you're questioning, in part, because of the lack of work you have done up to this point, is that right?

MR. MURPHY: Objection.

A. Again, from time being point of view, yes.

Q. Because the time was really short, is that right?

A. As I said --

Q. Is that right, part of the reason is because the time is short; yes or no?

A. Yes.

Q. You hadn't done enough work yet, is that right?

A. Yes.

Q. You continue, "If we cannot even

A. Dahiya

give them what they need, we look highly unprofessional not knowing what we are doing."

Did you feel that you were looking highly unprofessional to Lazard; yes or no?

A. I don't know about highly, but we could do a better job.

Q. You wrote highly unprofessional, is that right?

A. Yes.

Q. Those are your words?

A. Yes. Again, there is a context to this.

Q. You next write, "Today they challenged our due diligence and understanding of running this business by asking us if we really know what it will take to run the business, cash flow positively and if our numbers were matching the ask." Do you see that sentence?

A. Yes.

Q. Did Dream On Me know or have an understanding of how to run this business; yes or no?

A. We had --

Q. Yes or no?

A. No.

Q. The next paragraph begins with, "Lack of proper internal teams and professionals to work on this project, we are all shooting in the dark with no internal capabilities to help." Do you see that sentence?

A. Yes.

Q. That Dream On Me had a lack of proper internal teams and professionals to work on that project, is that true; yes or no?

A. Yes.

Q. You also write, "We are all shooting in the dark with no internal capabilities."

Is it your opinion at this time that Dream On Me did not have internal capabilities to help; yes or no?

A. Yes.

Q. You next write, "While we were trying to do deals, there should have been a

team of ours with legal, financial and technology capabilities working in the background on due diligence and working with their operating teams." Do you see that sentence?

A. Yes.

Q. Dream On Me did not have teams working with legal, financial and technological capabilities in the background, did they; yes or no?

A. No.

Q. I'm looking at the paragraph, we have one expert, Amit, but I will go to the middle of the paragraph. I don't want this to get confusing, it says, "This is a large investment."

You wrote, in part, this is a large investment. Do you see that?

A. Yes.

Q. And I believe you testified that you believed that this was a large investment, is that accurate?

A. Yes.

Q. You next write, "We do not know

much about other areas to validate transition and validation of information." Do you see that sentence?

A. Yes.

Q. Is it true that Dream On Me did not know much about other areas to validate transition and validation of information?

A. Validation was always a concern.

Q. You next write, "We are just going with BBB team data and did not do any due diligence on the data in the data room." Do you see that sentence?

A. Yes.

Q. Is it true that at this point Dream On Me had not done any due diligence on the data? I assume you were referring to the Lazard data room?

A. Yes.

Q. I'm looking at the paragraph that says, "Like Go Global which had a team of eight working on BBB, we should have, by now, made a team of experts who would have been looking at all aspects of this business and have a plan of execution during transition

time." Do you see that?

A. Yes.

Q. You agree that Go Global had a team of experts, is that right?

A. Yes.

Q. And Dream On Me did not, is that right?

A. Yes.

Q. You write, "It is so critical and urgent for us to have this team in place who are fully focused on this transaction." Do you see that sentence?

A. Yes.

Q. You did not have a team in place who was fully focused on this transaction, is that true?

A. Not the size of the team that needed to be focused, yes.

Q. You needed a larger team, correct?

A. Always.

Q. You next write, "Our partners need information and we needed to build the terms and investment models/deal sheet that we could have presented including NDAs." Do you

see that sentence?

A. Yes.

Q. At this point, you had not developed a model or deal sheet, is that correct?

A. Mark was working on this so this is -- he was working in the background with his partners on this so that's my view. Whatever I have written --

Q. You wrote this email, correct?

A. Yes.

Q. You remember writing this email?

A. Yes.

Q. When you wrote this email, was it your opinion, based on your personal knowledge, that Dream On Me had not built an investment model or deal sheet?

A. That was my opinion.

Q. It didn't exist, is that right?

A. It was there, but in the form of my expectation, it's not there. It's still in the making.

Q. You were still developing it, is that fair?

A. Dahiya

A. Yes.

Q. Wasn't done?

A. It was never done.

Q. It was never done. You next write, "We have been sharing information across all and exposing ourselves in the process." Do you see that sentence?

A. Yes.

Q. You agree that Dream On Me had been sharing information, is that correct?

A. Yes.

Q. You agree that Dream On Me had been sharing information with non-Dream On Me personnel, is that correct?

A. Yes.

Q. And you're expressing here your concern about exposure, is that correct?

A. Correct.

Q. And you're concerned about exposing documents that you should not have, documents and information, is that correct?

MS. MOORE: Objection.

A. You have to know what you are -- because it's still in the making. You

can't -- you can't just share information without fully completing it. That's the context, yeah.

Q. You are concerned that Dream On Me is just willy-nilly sharing information, is that right?

MR. MURPHY: Objection.

A. In the making -- in the making.

Q. I'm going now to the portion of the email chain which is from Brendan Shay. He writes, "We understand that in order to secure financing, you are looking to incorporate transaction sources and uses and weave in the impact of the capital structure on cash flow, but that portion of the model should be built and supported by you, the buyer." Do you see that sentence?

A. Yes.

Q. At this point, had Dream On Me built and supported that?

A. Mark was working on this.

Q. Mark had not finished it, is that right?

A. Yes, because all data was changing

so we could never finish because the model was changing always.

Q. Did Mark show you what he was working on; yes or no? Yes or no?

A. Yes.

Q. He did show you?

A. Yes. Yeah.

Q. Did he show you a document?

A. He was working with someone which I stated before and --

Q. Did he show you a document?

A. There was an Excel that he was working on.

Q. What is the name of that Excel?

A. I have to check.

Q. Okay. Do you know, yes or no, did you review that Excel?

A. Yes, I've seen that.

Q. Yes or no, would you consider that Excel document deficient in complying with the opinion that you are expressing throughout your email on June 23?

MR. MURPHY: Objection.

Q. You can answer.

A. Dahiya

A. I don't know.

Q. Is your response I don't know?

A. Yeah. The model can always be better. I'm never happy with any model.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 17, as of this date.)

(Whereupon, at this time, an exhibit was displayed via Zoom.)

Q. This is an email that you sent to Milan and Mark. It is dated June 25. It bears Bates number DOM 11729.

I will represent to you that you are writing in response to the email we just discussed. As you can see, I will show it to you real quick, but I would like you to read just this top, this top email.

(Whereupon, at this time, there was a pause in the proceeding.)

Q. This is Milan writing, but you have your comments below and I'm going to ask you -- I can't tell which are your comments.

I actually want you to identify them for me, but I will give you an opportunity first

to read the email and let me know when you need me to scroll down for you.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Okay.

(Whereupon, at this time, the attorney scrolled through the exhibit as requested.)

A. I really don't know whose and what comment is on this.

Q. Let's just go to the top so I can make this clear for the record.

This is an email that Avish, you wrote, is that right, at the top?

A. Yes.

Q. And you write my comments below, is that right?

A. Yes.

Q. And you're commenting on an email -- you're providing comments to an email that Milan wrote, is that right?

A. Yes, seems like.

Q. Are you able to identify which are your comments?

A. I'm not able to.

Q. At this point, June 25, had DOM prepared a vision statement; yes or no?

A. No, we were using the dec that was by the buybuy BABY team.

Q. At this point, yes or no, had DOM prepared a vision statement; yes or no?

A. No.

Q. At this point, had DOM prepared a turnaround strategy; yes or no?

A. We had our idea and --

Q. Yes or no?

MR. MURPHY: I think that can be more than a yes or no question.

MR. BERLOWITZ: I'm asking for a yes or no response.

Q. If you say you cannot answer or you do not know, that is also fine.

A. Turnaround strategy, yes.

Q. You had developed that yes, that's your testimony?

A. Yes, we had a fairly good idea.

Q. At this point had Dream On Me developed a marketing strategy; yes or no?

A. Dahiya

A. No.

Q. No?

A. No.

Q. At this point, had Dream On Me developed a technology transfer and operating plan; yes or no?

A. Yes, they were working on it.

Q. At this point, had Dream On Me developed a financial model?

A. I don't know.

Q. At this point had Dream On Me developed a due diligence report?

A. No.

Q. Okay.

A. Not to the level we wanted, no. It was in the works.

(Whereupon, at this time, a document was marked as Plaintiff's Exhibit 18, as of this date.)

(Whereupon, at this time, an exhibit was displayed via Zoom.)

Q. I'm showing you another document. This is an email from Milan Gandhi to you Avish and cc'g a number of people, Ian

Winter, Jacob Sod, Mark Srour, Belhassen, Gregory Price, Stephanie Sweeney and Brendan Scott. It is dated June 28 and the first page bears Bates number DOM 14065.

Do you recognize this document, Avish?

A. I believe it was sent -- yes.

Q. You recognize it, yes?

A. Yes.

Q. I want to draw your attention to the point number two over here, the financial model. I will read it to you.

It says, "Financial model. He said they can make their people available as needed, but they cannot be responsible for any work and so he suggested we hire an outside firm to prepare a comprehensive financial model with business assumptions and plan." Do you see that sentence?

A. Yes.

Q. At this point Dream On Me had not developed a comprehensive financial model, is that correct?

A. Yes, it was in the works.

Q. You had to hire an outside firm to

do it apparently, is that right?

A. Outside firm or help also, what do you say, within buybuy BABY, Alixpartners.

Q. Because Dream On Me didn't have the work done, right?

A. It was not --

Q. Yes or no?

A. No.

Q. No, you had the work done?

A. Some work done.

Q. You had not completed the work, is that right?

A. Yes.

MR. BERLOWITZ: I think I'm almost done. I want to take a quick break.

MR. MURPHY: Okay. So how much time would you like?

MR. BERLOWITZ: Can I take ten minutes?

MR. MURPHY: That's fine.

MR. BERLOWITZ: We'll be back in ten minutes. 3:20.

(Whereupon, at this time, there was a pause in the proceeding.)

A. Dahiya

Q. Avish, we've talked about the NDA between GG and Dream On Me a lot today. Do you recall that?

A. Yes.

Q. When did you tell Mark about the NDA?

A. I don't remember, but I did send out an email to him on the NDA, like it's -- like with an attached NDA.

Q. I will agree with you. I believe I've seen those emails. Did you ever have a conversation with Mark about the NDA?

A. Yes, somewhere -- I don't exactly know, but there was a conversation about us not able to -- like it would stop us from bidding.

Q. When was that conversation?

A. After the IP, I believe. I'm not really sure, but somewhere when we were going for the store bidding.

Q. So you had this conversation with Mark concerning the NDA after the auction for the intellectual property, but before the auction for the store leases, is that right?

A. Dahiya

A. Somewhere in that timeline. I'm not really sure.

Q. I understand. I'm just trying to get a sense of this now. What was that conversation like? What did you say to him and what did he say to you?

A. He was extremely angry.

Q. Mark was angry?

A. Yes.

Q. Why?

A. That I signed an NDA he didn't know all the details about.

Q. Did he say anything else to you?

A. And that I didn't read through it and he was upset. Upset at that and that if there was something, then I was supposed to tell him and any concern on that.

Q. When he learned about the NDA, did you and Mark read the NDA?

A. No.

Q. No. Did you show Mark the NDA?

A. I don't remember.

Q. Do you know if Mark read the NDA after you told him about it?

A. I don't know.

Q. Dream On Me still placed a bid for store leases, correct?

A. Yes.

Q. At the time that Dream On Me placed a bid for store leases, you had told Mark about the NDA, is that correct?

A. I believe so.

Q. Do you know whether Dream On Me obtained consent from Go Global to submit a bid without Go Global?

A. I don't remember anything -- I'm not aware of it.

Q. You're not aware of a consent?

A. That's right.

Q. You haven't seen anything in writing --

A. No.

Q. -- that is if anyone ever told you that they received permission from Go Global?

A. No.

Q. Are you involved with the buybuy BABY acquisition company?

A. Yes, part of the transition team.

A. Dahiya

Q. Can you tell me more about what you do there?

A. Presently helping with the marketing and the digital side of the business.

Q. Do you have a title with that company?

A. Acting CMO. It's the same marketing lead and digital lead.

Q. You're the chief marketing officer?

A. Yes. We don't have anybody yet.

Q. Do you know how the buybuy BABY acquisition company is doing financially?

A. Not good. It's losing dollars -- losing millions of dollars.

Q. Do you know why it's losing millions of dollars?

A. I think part of the problem is -- this is my opinion, part of the problem is we acquired -- we set it up within 90 days. We had to get all the merchandise, stores, go live in a very short time and we didn't get good merchandise in that short time because vendors were not ready yet with the right

A. Dahiya

merchandise. So it looks like we made some bad purchases at that point in time. We have a lot of inventory not moving resulting into losses.

Q. If you had done more due diligence or more work on a financial model, do you think you could have avoided some of those losses?

A. No financial model could have done this. I have to see if somebody had a financial model that could predict this, no.

Q. What about if you had done more preparation? Do you think you could have minimized some of those losses?

A. Always efficiency can be increased. There's no shortage of doing things better, yes. Yes, always there.

Q. Do you know when the baby IP auction was held?

A. Yes, I was there.

Q. When was it held?

A. I don't know the date, but I was there.

Q. If I told you it was held on

June 28, does that refresh your memory?

A. June 28?

Q. June 28, 2023 to be clear.

A. So then that's the date. The date doesn't recollect, but I know I was there.

Q. That doesn't refresh your recollection?

A. No.

Q. No, okay. Did you need to create a model before bidding for the intellectual property?

A. No model was working.

Q. That's not my question. My question is, did Dream On Me need to create a model before?

A. No.

Q. No?

A. No, we didn't have to create it.

Q. Why not?

A. Because this was an IP buyout, IP purchase.

Q. So did you have a model when you bid for the intellectual property?

A. We had models, yes, but we didn't

had to have a model to bid.

Q. Did you need to create a model before Dream On Me bought the store leases?

A. Yes, we worked on few scenarios before we got the stores.

MR. BERLOWITZ: I have no further questions.

MR. MURPHY: No questions from me.

(Whereupon, at this time, the examination of this witness concluded at 3:30 p.m. )

A C K N O W L E D G M E N T

STATE OF )
:ss
COUNTY OF )

I, AVISH DAHIYA, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of October 2, 2024; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_________________________
AVISH DAHIYA

Signed and subscribed to before me, this ________ day of ___________________, 2024

________________________________
Notary Public, State of New York

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| A. Dahiya | Mr. Berlowitz | 7 |

E X H I B I T S

| PLAINTIFF'S | DESCRIPTION | FOR ID |
|---|---|---|
| Exhibit 1 | 30(b)(6) | 20 |
| Exhibit 2 | Email - DOM 10726 | 42 |
| Exhibit 3 | Email - DOM 10737 | 53 |
| Exhibit 4 | Email - NDA GG 8791 | 57 |
| Exhibit 5 | Email - GG 9434 | 84 |
| Exhibit 6 | Email - DOM 2770 | 99 |
| Exhibit 7 | Email - DOM 3032 | 103 |
| Exhibit 8 | Email - DOM 2943 | 107 |
| Exhibit 9 | Email - DOM 2969 | 109 |
| Exhibit 10 | Email - DOM 2800 | 114 |
| Exhibit 11 | Email - DOM 10868 | 118 |
| Exhibit 12 | Email - DOM 3039 | 121 |
| Exhibit 13 | Email - DOM 11080 | 135 |
| Exhibit 14 | Email - DOM 10877 | 140 |
| Exhibit 15 | Email - DOM 11644 | 143 |
| Exhibit 16 | Email - DOM 11714 | 151 |

E X H I B I T S (Cont'd)

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 17 | Email - DOM 11729 | 168 |
| Exhibit 18 | Email - DOM 14065 | 171 |

REQUESTS/PRODUCTION

| DESCRIPTION | PAGE |
|---|---|

C E R T I F I C A T E

I, JENNIE FANTASIA, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose deposition is hereinbefore set forth, was duly sworn by me and;

THAT the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related either by blood or marriage; to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of October, 2024.

Jennie Fantasia Kilgallen

A

**A-F-T-E-R-N-O-O-N** 124:13
**a.m** 1:12 104:25
**Abhischek** 84:9
**ability** 9:16,25 11:7 22:23 35:9 72:10 97:8,25 98:22,24 99:8 114:9 130:22 150:2,7
**able** 20:18,24 21:5,13,21 22:4,12 22:17 169:24 170:2 174:16
**abstain** 65:12
**accept** 80:13 131:9
**access** 49:14 50:7,12,14 60:4,6 85:4 85:8 89:18 97:12,16 107:21 108:7 117:12 119:19,21 120:11,25 157:21
**accessed** 85:18,20 109:14
**accessing** 120:8
**accomplish** 151:3 158:8
**accurate** 32:5 39:19 56:3 69:8 77:14 82:24 98:8,9 122:10 147:25 155:7 156:24 161:23
**acquire** 47:4
**acquired** 149:22,23 177:21
**acquisition** 81:25 176:24 177:14
**acronym** 30:17
**Acting** 177:9
**action** 13:11 24:16,21 25:19 117:5 117:11 184:15
**actions** 65:12
**acumen** 69:22
**add** 46:10 119:17
**added** 17:9 117:19
**adding** 17:10 95:16
**addition** 10:24
**additional** 121:15
**address** 5:25
**adequate** 73:7
**advanced** 11:13,19,21
**advertising** 13:5,5
**advice** 71:25
**adviser** 15:25
**advisers** 35:3 71:18
**affect** 9:14
**against-** 1:6
**age-related** 10:13
**agency** 4:11
**agents** 114:16
**agree** 56:23 61:15 101:18,25 102:25 138:4 163:4 165:10,13 174:11
**agreed** 3:4,9,13 4:3 137:17
**agreement** 57:17 61:13 63:5,24 65:11 66:14,17,19 67:9 80:20 92:14 136:4
**agreements** 61:9,12
**agrees** 65:9
**ahead** 18:24 29:2 33:16,16 128:17 142:19
**aim** 83:14
**Alixpartners** 157:15 173:4
**alluding** 103:3
**Amazon** 13:5 61:19
**Amit** 22:17,24 26:2 53:5 68:18 73:15 75:18 76:23 82:15 89:22 149:9 161:14
**analysis** 21:14 52:21 53:2,3 76:24 88:25 89:8
**analyzing** 20:21
**and/or** 15:11 36:16 37:5 65:11 115:25
**angle** 45:12
**angry** 175:8,9
**animation** 14:18
**Ankura** 43:7 90:22 92:8 126:14,25 127:7
**answer** 6:18 11:5 22:23 30:9 32:14 47:14,16 128:16 148:19 149:9,16 154:14 155:9 156:6,12 167:25 170:18
**answers** 10:21 181:12
**anticipate** 36:11
**anybody** 17:23 68:14 142:19 177:12
**anyone's** 142:12
**anytime** 7:14
**apart** 120:17 131:2
**apologize** 84:10,14
**apparently** 173:2
**appearing** 5:12
**appears** 116:5
**appendage** 121:15
**appreciate** 84:19 154:13
**approach** 33:23 34:22 89:5
**approached** 34:22,24
**approval** 120:9 153:22
**approximate** 113:2
**Approximately** 16:16
**April** 39:2
**area** 12:14 13:19 75:25
**areas** 18:21 23:10 68:16 76:20 162:2,7
**arrange** 48:6,19
**arrested** 9:9
**ASAP** 56:18 64:3
**asked** 10:21 44:24 51:15 52:5 61:10 61:21 117:21 118:2 138:11,22 156:7
**asking** 8:4 13:2 30:8 40:2,7 60:6,7 61:18 63:8 64:22 67:14 74:7 86:9 88:21 109:22 112:14 116:13 120:17 121:12 123:4 127:16 138:22 147:22 150:9 154:10 157:12 159:18 170:16
**aspects** 69:12 162:24
**assessment** 149:2
**asset** 83:9,10 89:4 134:17 139:22
**assets** 19:2 21:23 28:9 33:9,18 40:6 40:23 43:11 46:24 47:10 49:12 67:11 68:7,17 72:19 77:2 82:2,12 104:22 116:10,16 139:6 148:17 148:19,24 149:22,23 154:20
**assigned** 79:21
**assisted** 22:2,9
**associates** 114:8
**assume** 162:17
**assuming** 106:8
**assumption** 89:3
**assumptions** 172:18
**attached** 107:10 137:5 174:10
**attachment** 54:7 111:13
**attachments** 111:14 115:6
**attend** 12:9 90:14
**attended** 90:16
**attention** 172:10
**attorney** 1:16 62:13 119:15 144:21 152:7,14,18,25 169:8
**attorneys** 2:4,9 5:4 23:20
**auction** 33:9 40:6 43:20 56:24 92:23 97:23 98:19 174:23,25 178:20
**authority** 59:14,16,18 61:25
**authorization** 60:8,15
**available** 51:8,24 53:16 60:3 62:7 67:23 141:25 172:14
**Avenue** 2:10
**Avish** 1:14 5:13,23 23:6 42:12 54:3 58:15 84:12,15 99:17 115:2,9 121:21 123:10 124:16 135:11,19 136:9,19 137:4 140:21,25 143:16 154:8,10 156:12 169:14 171:25 172:6 174:2 181:7,17
**avoided** 178:8
**aware** 10:23 37:13,19 38:17 40:5 50:10 65:21 80:21,24 105:15 111:22 112:10,16,22 117:3 124:20 125:2,8 127:6 132:18 144:12 148:5 176:14,15
**Azot** 75:15,15

B

**B** 15:6 31:6,6,14,14 182:7 183:2
**Babies** 34:2,9,10,12
**baby** 13:16,17,19 14:4 15:5 21:23 28:20 29:5 33:2,3 34:8,15 35:18 35:23 38:7 39:3,13,14,18,21 46:11 50:5 70:21 76:8,10 85:24 86:25 87:5,18 111:15 115:7 118:14 170:6 173:4 176:24 177:13 178:19
**BABY'S** 86:8
**back** 7:10 8:15 11:15 16:16 44:2 63:7 72:23 74:18 94:4 123:19 124:9 125:23 139:2 153:18 173:22
**background** 139:10 161:4,10 164:8
**bad** 178:3

**bag** 14:9
**ball** 77:10
**bandwith** 93:4
**bankruptcy** 33:9,13,14 37:15,19 38:7,19,22 39:10 40:6,11 43:20 56:13,24 92:23 98:18
**base** 117:25
**based** 35:8 80:12 88:10,11 156:20 157:10 164:16
**basic** 103:10
**basing** 147:5
**basis** 30:24 51:19 83:6
**Basking** 6:3
**bassinets** 29:9
**Bates** 42:13 54:8 57:17 84:21 99:19 103:21 107:9 110:5 115:8 118:14 121:22 140:24 143:18 151:24 168:13 172:5
**Bath** 21:17 34:14,23 35:21 36:3,17 37:6,14 38:6,10,17 39:4,5,10,17 40:9,13,14,19 43:14,17,22 49:18 50:5 51:16 53:13 67:19,20 71:9 71:16 76:3 81:21 83:7 99:2 130:16
**bathroom** 7:15
**BBB** 107:12 115:3 162:11,22
**BBBY** 21:17 22:6 33:19 34:22,24 34:24 36:16 37:5 40:6 46:24 47:10 98:18 99:18 102:17 139:6 151:22 154:20
**BBBY's** 19:2 22:14 28:9 33:9 40:23 43:11 49:12 67:11 68:6,17 72:18 76:25 82:2,12 104:22 116:10,15 148:17,23
**bears** 42:13 54:8 57:17 84:21 99:19 110:5 115:8 121:21 140:23 143:17 151:24 168:13 172:5
**bed** 21:17 29:11 34:14,22 35:21 36:3,17 37:6,14 38:6,9,17 39:4,4 39:10,17 40:9,13,14,18 43:14,17 43:22 49:18 50:5 51:16 53:13 67:18,20 71:9,16 76:3 81:21 83:7 99:2 130:16
**beds** 32:25
**beginning** 54:8 99:19 143:18
**begins** 102:12 160:5
**behalf** 11:2,6 59:5,11 60:23 61:9 85:7
**behavior** 31:8
**Belhassen** 172:2
**belief** 5:11
**believe** 13:2 18:9 19:4,7 26:5 30:22 32:3,15 35:25 38:16 40:8 47:25 48:21 55:24 56:22 64:21 69:3,6 74:5 75:18 77:12 79:2,7 80:25 82:3,9,17,22 94:17 114:17 117:12 120:20 122:4 125:10,16 126:17 136:21 137:24 139:7 141:20 145:25 161:21 172:7 174:11,19 176:9
**believed** 34:19 36:23 47:5 55:2 63:6 161:22
**Berkman** 2:4,15 6:8
**Berlowitz** 2:6 5:6 6:5,7 9:22 19:22 25:13 26:16 38:9 78:12,18,22 99:14 101:9 110:8 121:8,18 123:13,18,22 124:2,9,15 156:7,10 170:16 173:15,19,22 180:7 182:5
**best** 5:10 11:7 21:11 22:23 72:25
**better** 34:15 56:9 130:25 131:5,9 149:7 159:8 168:5 178:17
**beyond** 21:17 34:14,23 36:17 37:6 37:14 38:7,10,18 39:4,5,10,17 40:9,13 99:2 112:18
**bid** 19:2 21:22,25 22:2,5,8,10 28:9 40:22,25 41:7,8 43:11,19 48:10 49:11 50:11 51:10 67:11,13,15 68:2,6,17 72:18 73:6,7 76:25 82:11 104:22 105:9 116:9,15 129:4 131:13 132:20 134:10,24 135:7 139:6,12,12,21 148:17,17 148:19,23 150:3 154:18,19 176:3 176:7,12 179:24 180:2
**bidder** 97:22 98:18 155:17,20 156:15
**bidders** 53:17 142:21
**bidding** 107:16,23 108:2 140:7 174:17,21 179:11
**big** 10:6 80:7,7,8 125:13 129:12 149:3,5
**bigger** 126:10 131:16
**billion** 99:5
**bit** 22:21 31:12 83:2 86:22 108:14
**black** 76:15
**bleeds** 63:15
**blind** 96:11
**blood** 184:14
**Blue** 15:7
**BMS** 12:12
**board** 35:2 80:23 127:25
**boat** 135:4
**body** 13:12
**bottom** 64:16 101:20 105:13 110:10,11 119:8 152:4
**bought** 180:4
**brand** 35:19 36:24 37:3,12 43:23 45:8 47:4,5,18,21 50:17 70:21 96:21,22 101:13 104:18
**brands** 59:8,9,9
**break** 7:15,18,20 78:9,14,15,18 123:15 125:5 173:16
**Brenda** 140:21
**Brendan** 141:4 166:11 172:3
**briefly** 14:25
**bring** 26:18 35:14 70:4 92:10
**brings** 72:3 76:18
**Bristol** 91:2
**broad** 14:20
**brother** 17:24
**brought** 8:16 34:10 148:8
**build** 163:23
**built** 164:17 166:17,21
**business** 16:22,24 22:15 30:15,18 30:19 31:7,7 34:7 47:21 52:23 66:12 69:13,22,25 70:3,13 83:7 91:15 95:16,18 98:25 103:4,6 107:18 128:21,22 129:3,18,22,24 129:25 130:2,4,8,20,21 131:2 132:17 153:23 159:17,19,24 162:24 172:18 177:6
**businesses** 28:14
**busted** 133:7
**busy** 24:4
**buy** 31:14 83:9
**buybuy** 34:15 35:18,23 38:7 39:2 39:13,14,18,21 40:14 43:17 50:5 70:20 76:8,10 85:24 86:8 118:14 130:17 170:6 173:4 176:23 177:13
**buyer** 166:18
**buying** 31:19,20
**buyout** 67:13 179:21

**C**

**C** 2:2 30:16 31:6 181:2 184:2,2
**call** 26:16 29:11 84:14,17 86:4 105:17 122:10,12,13,15,19 130:13
**called** 10:16 41:17
**calls** 122:16,18
**capabilities** 72:2 133:4 150:18 160:9,19,22 161:3,10
**capability** 129:21
**capable** 10:8
**capacity** 10:17,25
**capital** 83:12 87:21 88:5,6 89:3 102:13 107:17 108:6 166:15
**caption** 108:20
**career** 14:20
**carry** 29:13
**case** 31:17 34:14 105:11 148:9
**cases** 66:13 151:5
**cash** 151:22 159:19 166:16
**categories** 29:15 130:2,6,20
**category** 29:5 130:5
**cc'd** 100:15 118:13 121:21 135:12
**cc'g** 54:4 171:25
**cc's** 103:20
**Cedar** 15:7
**censure** 13:11
**Centre** 2:5
**CEO** 40:16
**certain** 8:14 55:2,16 65:12 70:6 72:14 112:10 154:5,23 155:6
**certificate** 12:7,8
**certificates** 12:25
**certification** 3:6 11:13,19,23

**certifications** 13:4
**certify** 181:7 184:6,13
**CFO** 90:20
**chain** 18:20 70:5 73:17 102:13 103:9 119:8 121:11,12 166:11
**challenge** 76:8,9 150:16
**challenged** 150:2 151:14 159:16
**challenges** 92:6 129:8
**challenging** 142:11
**change** 51:20 83:18
**changed** 17:6,8 31:12,25
**changes** 129:17
**changing** 77:7 83:5,15,17 166:25 167:3
**chaos** 82:23
**chaotic** 56:9 82:23,25 83:3,19
**charge** 131:14,21
**Charles** 75:12,13 107:2
**check** 25:9 127:16,17 167:16
**checking** 91:6
**chemistry** 91:12,24
**chief** 59:2,3 177:11
**choose** 79:20
**Christian** 2:17 42:11 46:2 48:4 54:4 90:20 125:12,24
**chronological** 15:2
**circulated** 90:6 112:22
**Civil** 1:18
**claiming** 131:8
**clarification** 38:13
**clarify** 9:24 38:5 39:7 41:10 67:14 71:4 98:3 132:8 141:17 148:16
**clarifying** 9:23 39:9
**clean** 156:10
**clear** 10:23 36:9,12 37:11 154:2 169:13 179:4
**clearly** 38:25 129:10
**client** 46:10
**cliff** 131:18
**closer** 38:21
**CMO** 58:22,25 79:19,22 80:2 177:9
**cohesive** 130:13
**collaborated** 102:17
**collecting** 25:18
**collection** 24:20
**collectively** 102:16
**college** 11:15 12:13
**come** 35:9 37:22 45:4 94:5,9 117:22 123:19 124:9 128:2
**comes** 17:12 61:13 98:24,24
**coming** 48:13 73:18 88:4 99:6 118:4 129:10
**comment** 169:11
**commenting** 169:20
**comments** 168:22,23 169:17,21,25
**common** 82:6
**communicated** 25:21 55:14
**communication** 54:17
**companies** 11:6 14:2,25 27:25 43:10 50:10 142:12
**company** 8:10,17 16:6,20 17:12 28:7,8 39:18,20 41:17 51:12,21 83:6 99:4,5 103:11 176:24 177:8 177:14
**competition** 31:23
**competitors** 101:22
**complained** 131:21
**complete** 181:11
**completed** 6:25 157:3,5,6,7 173:12
**completely** 89:4
**completing** 166:3
**complex** 102:4
**complicated** 52:22 53:11,12
**complicating** 96:24
**complying** 167:21
**component** 35:21
**comprehensive** 172:17,22
**compressed** 57:2 96:14 97:2,7 105:10
**comprises** 129:25
**computer** 90:2
**concern** 45:8,12 46:12 47:18,20 139:20 147:8,16 148:3 150:11,21 162:9 165:18 175:18
**concerned** 59:20,23 69:7 76:2 150:17 165:20 166:5
**concerning** 21:16 65:10 174:23
**concerns** 61:15 108:18 149:19 150:6,6,8 155:4
**conclude** 139:14
**concluded** 126:24 180:11
**condition** 65:7
**conditions** 9:13
**conducted** 4:5 52:6 148:14,22 149:20
**conference** 1:18 4:6,10,13 5:12
**confident** 35:11 94:19,23,24 130:19
**confidential** 21:7
**confusing** 161:16
**confusion** 133:13 135:3
**connect** 43:5 54:6
**connected** 34:25 39:3
**connection** 65:3
**connections** 73:13
**consent** 4:15 5:6,7 176:11,15
**consider** 167:20
**considered** 4:16 151:7
**constituted** 140:2
**consultant** 45:18,21,22
**consulting** 13:18,21 14:10
**consumer** 30:16
**consumers** 102:18
**Cont'd** 183:2
**contain** 119:5
**contained** 109:10,17 117:4 121:11
**contains** 111:13 115:6
**content** 115:14 121:15
**contents** 89:23 90:4 157:24
**context** 103:3 113:18 127:20 144:24 147:18 150:9 156:2 159:13 166:4
**continue** 33:15 158:25
**continued** 51:18 124:14
**continuing** 149:4
**contracts** 61:19
**contribute** 16:7
**control** 4:11 131:25,25 132:8,9,13 132:16
**conversation** 40:15,18 43:25 55:10 55:21 56:19 86:17 94:18 98:10,12 127:5 134:11,14,16 141:20 174:13,15,18,22 175:6
**conversations** 35:2 43:14 92:5,20 134:3
**convicted** 9:10
**copy** 89:20
**core** 47:2,20,22 73:14 76:18,20 130:5
**corporations** 13:20
**correct** 11:23 15:12 19:21 29:17 39:11,12 42:4 45:24 46:15 50:3 50:13 51:11 52:2,4 53:17,18 55:17 58:17,19 61:23 65:16 67:2 67:25 68:3 69:9 75:21 78:4 80:3 81:4,21 85:11,12 88:22 92:2 100:23 110:13 115:16 118:20 128:24 129:6 132:13,14 155:23 157:22,25 163:20 164:6,11 165:11,15,18,19,22 172:23 176:4 176:8 181:11,13
**correctly** 10:20 54:14
**cost** 14:15
**counsel** 3:6 4:4,8,21 5:9 19:24 60:4 60:7
**counseled** 19:12
**COUNTY** 181:5
**couple** 78:13 111:14
**course** 11:9,12 34:6 73:15 92:17 127:24 128:7 133:9 142:3 144:19
**court** 1:2 3:17 4:2,7,11,22 5:9,21 5:23,24 6:20 7:2,9
**crack** 142:25
**create** 140:11 179:10,15,19 180:3
**created** 139:25 140:6
**credentials** 12:25
**credit** 37:23
**cribs** 32:25
**crime** 9:10
**critical** 163:10
**crosstalk** 7:4
**CTO** 58:23 59:2 79:19,22 80:4
**current** 99:10
**currently** 15:10
**customer** 31:5,7,8,19,19 32:5
**customers** 16:3,4,21,23 32:4

**D**

**D** 5:17 30:15 181:2 182:2
**D-U-E** 41:11
**Dahiya** 1:15 5:13,23 6:1,7 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1,12 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1,3,10,14 55:1 56:1 57:1,19 58:1,15 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1,17 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:7,17 182:5
**daily** 51:19 83:6
**damn** 103:5
**dark** 160:8,18
**data** 20:19,25 21:3,8 24:9,10,11,13 24:17 25:23 31:10 49:13,14,16,17 49:25 50:2,5,7,12,15,18,19,23 51:2,5,6,6,6,8,13,17,17,18,19,23 51:24 52:7,9,10,11,14 53:2,6,8,9 53:13,14,15,16 67:21 68:12 69:11 71:10,11,12,14 73:19 85:4,8,11 85:16,18,20,22,23,24 87:6,7,10 87:15 88:8,10,11,11,14,16,24 89:18,18,24 97:13,17 98:7 99:11 107:20,22 108:7 109:15,22 116:12,17,18,20 117:16,19,22,25 120:12,22 121:2,6 136:16 137:20 139:17 142:24 143:24 144:4,9,16 145:24 146:2,9,15,18,23 147:4,10 147:17 148:5 154:2,6,9 157:18,21 157:25 162:11,12,12,17,18 166:25
**date** 1:19 5:3 14:21 20:3 37:21 40:12 42:9 52:13 54:2 57:14 84:7 99:23 103:25 107:8 109:25 112:11 114:24 118:9 122:3 135:16 140:18 143:21 149:20 151:19 168:8 171:20 178:23 179:5,5
**dated** 42:12 67:9 84:20 99:17 100:15 101:2 103:20 106:25 107:4 110:4 112:3 115:2 135:12 140:22 143:17 151:21 168:12 172:4
**dates** 37:16 41:6,11,13 48:13
**daunting** 151:13
**DAVIS** 2:9
**day** 51:19 105:12 134:12,14 181:19 184:19
**day-to-day** 18:19 129:2
**days** 31:6,13 72:20 76:14,14 77:5 177:21
**deadlines** 92:19,22
**deal** 37:2,6 68:21 69:15 71:24 83:19 92:15 150:3,13 151:3 158:8 164:5,18
**deals** 70:16 160:25
**Deborah** 90:21
**dec** 170:5
**decided** 48:5
**decision** 62:8 94:12
**decision-making** 11:12,20 12:7
**decisions** 72:15
**decode** 143:12
**dedicated** 18:22
**deep** 71:9
**defendant** 1:15 2:9 8:3,24
**defendants** 1:10 5:8
**deficient** 167:21
**define** 88:4
**defined** 65:5,6
**definitely** 40:10 95:19 131:7
**degree** 11:18,21,24 12:6,19
**degrees** 12:4
**deliver** 98:13
**delivered** 150:21
**demonstrate** 121:14
**departments** 130:14
**depending** 17:25
**depleting** 83:10
**deposed** 6:12 8:20
**deposition** 1:14 4:5 6:16 10:6,16 22:18 23:3,22,25 24:7 26:7,10 27:9 181:9 184:7
**derivative** 87:2,4
**derive** 88:13
**describe** 11:9 13:14 82:23
**DESCRIPTION** 182:8 183:3,8
**designing** 28:15
**details** 92:13 175:13
**develop** 51:10 73:7 156:19
**developed** 52:15 67:10,16 71:6 76:24 89:8 156:23 164:5 170:21 170:25 171:6,10,13 172:22
**developing** 22:2,9 28:8 40:22 68:6 73:6 116:9 164:24
**development** 21:22 22:5 72:18
**difference** 27:25 28:3
**different** 50:21 69:17 85:15 89:5 103:18 121:19
**differentiation** 87:20,23
**difficult** 63:21 70:9 74:12 75:4 83:20 122:18
**difficulties** 103:7
**digital** 15:7 177:5,10
**diligence** 49:11 52:6 72:16 139:4 140:3,8,23 141:5,8,12,15,19 142:15,21 143:5,11 148:14,22 149:19 151:6 154:19,24 155:6 159:16 161:4 162:12,16 171:13 178:6
**dinner** 91:7,7,8,10 94:11,17 100:19 100:24
**direct** 30:16 35:11
**directly** 46:11
**director** 25:4
**directories** 117:18
**Directors** 80:23
**disappointed** 36:20
**disaster** 41:16
**disciplinary** 13:11
**disciplined** 19:11
**disclose** 65:5,23
**disclosed** 114:3
**disclosure** 66:8,10
**discount** 31:22
**discounting** 31:24
**discrepancy** 125:11
**discussed** 27:3,10 44:13 91:4,10 105:8 134:7 168:16
**discussing** 48:25 79:5
**discussion** 23:10 35:4 36:18 43:13 65:4 67:3 133:25
**discussions** 93:25
**disintegrate** 36:3
**displayed** 19:18 42:6 53:23 57:11 84:4 99:13 103:17 106:23 118:6 121:24 135:18 140:15 143:14 151:16 168:10 171:22
**displaying** 79:2,4 99:14 103:18 106:24 114:25
**disregard** 138:15,23
**disrupt** 14:13
**distress** 38:18
**distressed** 37:25
**DISTRICT** 1:2,2
**division** 39:23
**divisions** 130:16
**DNA** 135:21,23 138:4
**doable** 93:8
**docs** 116:22 118:3
**document** 19:15,20 20:2,4 23:9 24:20 41:25 42:2,8,10 53:20,25

54:11,16 57:13,15,16,20,22 59:15 59:19 60:9,23 61:2 62:9 63:10,14 64:9,12,18 79:3 81:5,22 82:5 84:6 84:8,9 86:16 87:12 89:8 99:22 103:24 106:24 107:7 109:24 114:23 115:4,9 118:8,10 122:2 135:15 140:17 143:20 149:13 151:18 167:9,12,21 168:7 171:19 171:23 172:6

**documentation** 76:23

**documents** 10:5,8 20:19,20,21,21 20:22,22 21:2,24 22:7 24:6,15 25:18 26:6,19,24 52:16,19 59:10 86:10,13,14,19 98:6 109:15 115:19,22,25 116:15 117:3,10,14 120:11,20 137:19 140:2,6,11 148:6 165:21,21

**doing** 34:13 53:6 76:11 77:9 89:16 93:19 94:14 123:23 131:13 132:4 155:5 159:4 177:14 178:17

**dollar** 99:5

**dollars** 177:15,16,18

**DOM** 16:11 17:15 42:13 54:8 59:6 59:7,7,11 73:18 81:14 99:19 107:2,9 110:5 115:8 118:14 121:22 129:7 135:13 140:23,24 141:4,8,15,18 142:15 143:5,18 151:4,25 168:13 170:3,7,10 172:5 182:10,11,14,15,16,17,18,19,20 182:21,22,23,24 183:4,5

**dominating** 30:20

**double** 139:2

**doubt** 122:25,25

**download** 89:23

**downloaded** 21:2 109:14 137:19 157:24

**downloading** 20:20

**drafted** 107:3

**draw** 172:10

**Dream** 1:9,9 6:10,11 11:2,2 15:3,10 15:11,15,16,19,22,24 16:11,12,15 17:7,18,20 18:8,10,11,13,14,25 19:5,13,24 21:2,6,16,23 22:6 24:16 25:4,16 27:13,15,16,18,20 27:23 28:5,9,10,11,12,19 29:14 29:18,22 30:20,25 32:3,7,15,18 33:4,17 35:6 36:20 37:18 40:7,21 44:3 45:19,23 46:22 47:3,8,24 48:19,24 49:10 52:5,16 58:13 59:5 60:8,24 61:10 62:16 67:9,16 68:5,9 72:18 76:25 77:25 79:8,14 79:16 80:2,4,9,15,19,22 81:2,5,12 81:13 85:7,7,18 88:24 89:7 90:6 90:11 104:20 106:11 110:21,24 111:8,20,24 112:23 113:14 114:5 114:15 115:17 116:13 118:16,21 118:25 120:12 124:18 126:13,25 127:7 129:3 131:4 132:13,16,20 133:24 134:8,9,23 135:6 139:5,25 140:5 142:22 146:9 147:11,24 148:7,14,22 149:19 150:11 153:15 154:17 155:5 159:23 160:12,21 161:8 162:6,15 163:7 164:17 165:10,13 166:5,20 170:24 171:5,9,12 172:21 173:5 174:3 176:3,6,10 179:15 180:4

**dressers** 32:25

**drive** 6:2 35:10 130:22

**driven** 96:12

**driver's** 5:16

**drop** 77:10

**Dropbox** 115:15,17,21 116:4,6,8,14 116:17,19,24 117:4,10,15 118:16 119:4,18,20,22 120:21

**dropped** 17:9

**due** 41:6,10,13 49:11 52:6 72:16 139:4 140:3,8,23 141:5,8,12,15 141:19 142:2,15,21 143:5,10 148:13,21 149:19 151:6 154:19 154:23 155:6 159:16 161:4 162:11,16 171:13 178:6

**duly** 5:18 184:8

**dynamics** 96:9 127:23 129:17

**E**

**E** 2:2,2 181:2,2 182:2,7 183:2 184:2 184:2

**E-commerce** 16:4,19,25 22:15 30:19,21,23 31:25

**E-commerce-related** 14:8

**earlier** 91:4

**early** 30:21 41:3 82:19

**earn** 12:19

**education** 11:10

**effect** 3:16

**effects** 14:18

**efficiency** 178:16

**eight** 162:22

**either** 39:23 110:24 112:13 131:22 184:14

**elaborate** 156:5 157:12

**elaboration** 154:15

**elasticities** 31:20

**element** 91:11

**email** 21:9 42:11,22,24,25 45:14,25 46:3,3,17 47:24 52:14 54:3 84:9 84:20,22,25 85:14 99:15,15,24 100:13,14 102:9 103:19 104:2,4 104:24 105:13 106:3,25 107:2,9 107:10 110:2,3,10,11,15 111:13 112:12 114:2,25 115:11,14 117:24 118:11,15,24 119:7,12 121:11,16,19,20,21 122:9,11 127:15 135:10,19,24 136:8,18,22 137:3 140:19,20,25 143:15,16,22 145:6 146:2 147:18 151:20,24 152:2,22 153:3,5,7 156:2 164:11 164:13,15 166:11 167:23 168:11 168:15,18 169:2,14,21,22 171:24 174:9 182:10,11,12,13,14,15,16 182:17,18,19,20,21,22,23,24 183:4,5

**emailed** 113:17

**emails** 108:21 174:12

**employed** 15:16

**employee** 110:22 118:22 119:2

**employees** 80:8 114:16 149:10

**employer** 8:18

**encourage** 46:10

**ended** 133:22

**ENG** 157:15

**engages** 29:14

**engineering** 11:11,18,25 12:12

**Englander** 74:4,9 103:20 105:14 106:5,10,16 118:12,25,25 120:3 120:25 121:21 122:5,21,24 145:10,24 146:10

**enterprise** 34:16

**entertainment** 13:23

**entire** 75:24 128:3 130:2,12

**entrepreneur** 12:23

**entrepreneurial** 17:14

**equal** 128:21,22

**especially** 132:3

**ESQ** 2:6,11,15 6:5 124:15

**estate** 28:17 74:5,10,23 75:17 106:9 122:7

**estimate** 80:12,14

**eventually** 46:22

**everybody** 38:23 45:6,10 50:13,14 72:25 77:5 82:17,18,21 92:6 131:8 133:20

**evident** 36:25

**evolve** 51:18

**exact** 37:16 40:12

**exactly** 38:4 56:16 174:14

**examination** 3:7,14 6:4 124:14 180:11 182:4

**examined** 5:20

**example** 16:24 17:2 61:18

**examples** 61:8

**Excel** 98:22 167:13,15,18,21

**Excels** 109:6,8

**excited** 104:21

**Excuse** 155:25 156:4

**execute** 60:8

**execution** 162:25

**executive** 34:25

**exhibit** 19:18 20:3 42:6,9 53:23 54:2 57:11,14 84:4,7 99:13,23 103:17,25 106:23 107:8 109:25 114:24 118:6,9 119:15 121:24 122:3 135:16,18 140:15,18 143:14,21 144:21 151:16,19 152:7,14,18,25 168:8,10 169:8 171:20,22 182:9,10,11,12,13,14 182:15,16,17,18,19,20,21,22,23

182:24 183:4,5
**exist** 164:20
**existing** 28:7
**exited** 143:3
**expand** 29:4 128:19
**expect** 107:16 108:5
**expectation** 91:9 164:22
**expeditiously** 56:12
**experience** 13:15 30:5,12 31:2 32:4 69:23 72:24
**expert** 103:15 161:14
**expertise** 70:6 128:10 129:23
**experts** 162:23 163:5
**explain** 83:2
**exposing** 165:7,20
**exposure** 165:18
**express** 4:15
**expressing** 155:3,22 165:17 167:22
**expressly** 61:11
**extension** 41:8
**extensive** 155:17,21 156:16
**extent** 21:11 22:3,16,20 121:10 151:7
**extract** 35:25
**extracted** 34:18
**extreme** 48:9,15 56:4
**extremely** 104:21 105:9 139:20 175:8
**eye** 37:5 38:21
**eyesight** 10:11

**F**

**F** 184:2
**Facebook** 13:8
**facilitation** 72:2
**facility** 32:22 126:18,19,20
**fact** 5:13 96:13 105:8 139:23 146:25 148:4
**fact-finding** 21:15
**failed** 61:24
**fair** 47:8 56:10 68:4 71:21 95:6 102:8 104:20 105:10 111:7,18 116:6 136:21 142:14 164:25
**fairly** 52:11 170:23
**Falcon** 2:4,15 6:8
**falls** 131:18
**familiar** 27:13,15,18,23 33:8,11
**family** 59:5,6,7,8 70:20 81:15 108:23,24
**Fantasia** 184:4,22
**far** 34:15
**fast** 92:18,21 95:12,13 96:8
**Federal** 1:17 3:2
**feed** 126:3
**feedback** 69:2 73:20 77:17
**feel** 22:16 73:4 78:4 92:9 94:22 95:17 151:2 159:5
**feeling** 94:23,24
**fell** 37:6
**felt** 16:7 98:4
**Fern** 75:12,13
**Feuer** 2:17 42:11 54:4
**figure** 44:18 45:2 49:4 108:17 113:7 125:12 129:14 130:14 133:10 134:5,22 135:2
**file** 144:7
**filed** 37:14,17,21 38:18 39:10 40:11
**filing** 3:7 37:22,23
**finally** 48:21 94:6
**finance** 92:14
**financial** 35:3 45:18 67:10,12,15,15 67:16 68:11,15 69:8,12,19 71:5,8 71:17,25 72:8 73:20 75:3 86:15 86:21,23 97:8,14,21,24 98:5,22 98:23 99:7,10 107:12 109:18 114:4 137:16 150:7 161:2,9 171:10 172:11,13,17,22 178:7,10 178:12
**financially** 38:2 70:6 177:14
**financials** 74:14,24 139:10 149:5
**financing** 166:13
**find** 16:21
**findings** 51:13
**fine** 22:25 25:14 38:15 63:24 87:14 111:4 124:7 145:22 152:12 170:19 173:21
**finish** 7:5 28:25 36:8,12 78:13 128:15 167:2
**finished** 100:2,8 166:23
**firm** 6:8 139:21 172:16,25 173:3
**first** 5:18 33:17 42:15 62:20 87:14 89:17 92:4,16 99:25 100:18 101:4 104:6 141:3 147:3 151:24 153:8 168:25 172:4
**five** 20:24 64:11 78:20
**flat** 80:17
**floating** 83:24
**flow** 151:22 159:19 166:16
**focus** 12:14 16:8 45:9 47:3 75:25 137:14
**focused** 163:12,16,19
**following** 93:25
**follows** 5:20
**force** 3:15
**forever** 76:13
**form** 3:10 59:7 164:21
**formal** 67:13 79:8,10,13
**former** 8:17,17
**forth** 65:13 184:8
**forward** 92:18 136:9,12,19
**forwarded** 127:19
**forwarding** 110:15,18
**foundation** 30:19
**four** 20:13,14 86:18
**four-X** 96:24
**frame** 97:2 158:9
**frank** 28:2
**frequently** 117:20
**Friday** 41:7 56:20 104:5
**Friedland** 74:20,22 144:17 145:7 145:15,23 146:10
**Friedman** 145:13
**friends** 70:20
**front** 26:13 63:2 131:22
**frustration** 153:8,9
**full** 74:16,19
**fully** 163:12,16 166:3
**functions** 102:13
**fundamentals** 103:10
**funding** 69:16 87:8,25,25 88:2,21 92:14 102:12 103:9 114:11 139:16
**funds** 97:10
**furnished** 65:8
**furniture** 15:6 29:7,7,8 32:23,24 33:2,3 130:3
**further** 3:9,13 4:12 93:24 94:11 146:4 149:2 180:7 184:13
**future** 5:3

**G**

**G** 181:2
**Gandhi** 42:11 45:15,17 71:23 99:16 118:13 171:24
**Gary** 110:4,18 111:7
**gear** 29:9
**gears** 130:3
**general** 14:18 86:22 112:14,15 129:2
**generally** 14:3 113:19 128:24
**gentleman** 74:2,13 128:4
**getting** 41:13 47:18 76:13 91:23 95:17 112:4,5 114:12 117:20,21 138:9,15,23
**GG** 57:18 84:21 111:23 115:7 174:3 182:12,13
**GG's** 114:15
**Ghandi** 54:4
**give** 7:16 8:15 31:13,15 42:15,18 61:8 73:21 84:22 99:25 117:23 137:7 141:23 159:2 168:25
**given** 46:25 73:9 181:13 184:11
**gives** 98:21
**giving** 66:21 68:25 73:19
**Global** 1:3 6:9,10 15:6,7 41:18 43:3 44:3,4,8,17,20,21 45:5 48:20,25 54:7,19 55:15,24 56:6,11 57:4,16 58:4,4 65:5,22 66:20 77:25 86:5,6 86:23,25 89:18,24 90:12,19 93:10 93:14,25 95:22 96:18 97:7,13,17 98:5,16 107:11 108:7 109:7,15 111:15,19 115:3 119:5 120:3 123:3 124:18 126:14,25 127:7,15 128:23,25 129:3,20 130:24 131:13,23 132:12 133:15 134:10 135:8 143:4,24 144:4,16 145:24 145:25 146:9 147:10,17,24 148:5

162:21 163:4 176:11,12,21
**Global's** 85:8 88:20 89:10 106:17
    107:22 109:18 112:22 113:13
    114:3 116:23 117:15 120:11
    122:24 128:25 132:19 137:16,19
    157:18,21
**go** 1:3 6:9,10,14 10:22 20:8 29:2
    33:16,16 36:24 41:17 43:3 44:3,4
    44:8,16,19,21 45:5 48:20,25 54:7
    54:19 55:15,24 56:6,11 57:4,16
    58:4,4 61:3 64:7 65:22 66:20
    72:23 77:25 78:10,22 85:8 86:5,6
    86:13,23,25 88:20 89:10,18,24
    90:12,19 93:10,25 95:22 96:18
    97:6,12,17 98:5,16 106:17 107:11
    107:22 108:7 109:7,15,17 111:15
    111:19 112:22 113:13 114:3
    115:3 116:23 117:15 119:5,12
    120:3,11,16 122:24 123:3 124:18
    125:15 126:14,25 127:7,15,22
    128:17,23,24,25 129:3,20 130:24
    131:13,22 132:12,19 133:15
    134:10 135:7 137:15,19 142:13
    143:4,23 144:4,10,15,18 145:24
    145:25 146:2,3,9 147:10,17,24
    148:5 152:3,9,16,21 153:10
    157:18,21 161:14 162:21 163:4
    169:12 176:11,12,21 177:22
**go-to** 102:17
**GOB** 83:7
**God** 76:20 102:6
**goes** 153:18
**going** 6:14 10:4,22 19:15 23:12
    34:17 41:9 44:2 45:8,12 46:12
    47:17,20 49:19 62:19 65:22 75:5
    78:12 83:7 86:22 88:2,7 93:21
    102:15,22 107:22,25 112:18
    131:10 134:23 135:7 139:19
    162:10 166:10 168:22 174:20
**good** 6:6 25:6 44:17 52:11 61:2,14
    123:14 170:23 177:15,24
**Goodman** 135:11
**goods** 29:10
**Google** 13:8 116:3,4
**graduate** 12:9,15,17,22
**graduation** 12:21
**granted** 85:8
**graphic** 108:12,15 109:5,10
**great** 70:21
**GREENBAUM** 2:9
**greet** 92:17
**Gregory** 172:3
**grew** 19:9
**ground** 6:14
**group** 74:25 89:22
**grow** 16:20
**growth-related** 14:7
**guess** 30:9 38:12 79:19 80:10,11
    104:6 113:23 117:24 140:9

145:19
**guessing** 106:7
**gut** 71:2
**guy** 22:19 25:3 72:12
**guys** 24:9,14 27:5 44:18 73:21 99:4
    112:6 133:11

**H**

**H** 5:17,17 182:7 183:2
**hand** 184:19
**happen** 38:3 48:18 66:24 134:21
    142:7
**happened** 34:8 36:5 48:22 78:3
    91:8 93:18 94:6,16 113:16 122:13
    125:15 127:21 129:16 142:3
**happening** 47:2 83:8,11 93:2 118:2
    148:11
**happens** 31:21
**happy** 7:11,16 78:14 133:17 168:5
**hard** 13:8 50:19 56:15 139:20
    142:5
**hats** 14:5 17:18,19
**he'll** 61:15,15,16
**head** 6:20 70:15
**hear** 95:5
**heavy** 28:16
**heck** 129:15
**Helco** 72:5
**held** 1:18 124:17 127:12 134:14
    178:20,22,25
**hell** 76:11
**help** 6:15 35:10,14,20 40:18,19
    73:16 123:25 130:9 153:20,22
    154:2 158:4 160:9,22 173:3
**helped** 15:25
**helping** 16:20 68:13 74:24 177:4
**hereinbefore** 184:8
**hereto** 3:5
**hereunto** 184:19
**Heritage** 15:5
**hey** 44:16 70:10,22 73:22 94:5
    95:16 99:6 108:17 109:2 112:19
    142:6
**Hi** 136:8 137:5,6 141:4
**hierarchy** 80:18
**high** 49:3 133:6
**highly** 53:12 122:25 159:2,6,7,9
**Highway** 2:5
**hire** 172:16,25
**history** 49:19,20 120:19
**hold** 15:21
**hole** 76:15
**home** 64:6
**hope** 10:6,19 45:3 144:13
**horrendous** 72:23
**hour** 72:20 78:17 82:10
**hours** 82:16 143:12
**HR** 51:6
**huge** 29:13 104:8,16,17,18

**Human** 102:13
**hundred** 73:9 151:12
**hundreds** 144:13

**I**

**Ian** 171:25
**iconic** 101:13
**ID** 182:8
**idea** 52:11 95:7 139:21 149:7
    170:12,23
**ideally** 153:9
**identify** 168:24 169:24
**identity** 21:25 22:8
**immediately** 48:15 66:24
**impact** 9:25 166:15
**import** 35:11
**important** 91:13,16,21 120:9 132:2
    132:2,9
**imports** 73:18
**improve** 70:2
**in-person** 77:24 90:11 94:10
    124:16
**inability** 154:23
**Inc.'s** 21:6
**Inc./DOM** 59:5
**incapable** 155:5
**include** 157:17
**included** 22:7
**including** 20:19 21:24 115:7 139:18
    153:24 163:25
**incompetency** 62:11
**incorporate** 166:14
**increase** 130:7
**increased** 178:16
**increasing** 35:12
**independent** 45:20,22 140:2
**Index** 1:6
**India** 12:12 14:12
**indicators** 38:2
**indirectly** 149:10 153:12
**individual** 10:17,24
**individually** 52:21
**individuals** 21:25 22:9
**industries** 1:9 6:11 11:2 15:4,11,15
    15:19,22 16:12 18:10 27:16,20
    28:6,10,11,12 29:14,18 81:2,13
**industry** 13:17
**information** 12:16,20 21:8 49:15
    55:3,6,8,11,13,16,19 65:6,8,9,23
    66:2,9,10,14,23 67:2,4 83:4,5,5
    83:24 88:15 98:16,17 109:9,13,17
    111:2,5 113:10 136:10,12 137:12
    137:15,22 138:8,12,24 147:21
    148:6 154:5 157:13,17 162:3,8
    163:23 165:6,11,14,22 166:2,6
**inherent** 102:14
**initially** 10:16
**input** 112:5
**inside** 111:5

**insights** 16:2
**instance** 62:3 116:5
**instances** 66:8
**instantly** 117:25
**institutions** 72:9
**instrument** 47:6
**intellectual** 46:17,23 47:10 174:24 179:11,24
**intent** 43:21 112:4
**intentions** 37:11
**interaction** 142:10
**interest** 18:8
**interested** 33:18,24 34:4 37:12 39:6 44:20 46:23 47:9 48:25 50:11,16 55:5,9 68:5 93:21,24 100:13 184:16
**interesting** 127:23
**internal** 150:18 160:6,8,13,18,21
**internally** 154:24 155:6
**interrupt** 28:24 93:22 128:16
**intertwined** 76:17
**intertwining** 130:13
**introduced** 41:19,22,24 43:10 44:4 44:5,19
**introduction** 42:25 43:3,6 44:2
**introductory** 47:24 91:23
**invented** 14:22
**inventory** 178:4
**invest** 35:18,22,24,25 88:7 108:25 112:7
**investigation** 21:15
**investing** 108:25 112:6 125:14 129:12 131:19
**investing/not** 125:14 129:11
**investment** 94:13 99:18 101:5,10 107:11 109:3,21 131:3 132:14 150:23 161:17,19,23 163:24 164:18
**investments** 28:17
**investors** 35:18 75:10,11,14,16 112:2 139:11
**invitation** 94:7,9
**involved** 18:25 19:3 24:19,23 60:20 68:22 69:4 77:13 176:23
**involvement** 69:7 141:22
**IP** 21:23 47:19 148:19 174:19 178:19 179:21,21
**irrelevant** 130:8
**issues** 10:12
**items** 32:18 33:4

**J**

**Jack** 68:20,22 77:13 82:16 94:21 99:16 125:19 126:4,7
**Jacob** 75:9 118:12,19,21 120:2,24 172:2
**Jacoba** 75:15
**Jacobi** 75:15
**Jeff** 94:7,8 127:24
**Jeffrey** 58:4
**Jennie** 1:19 184:4,22
**Jersey** 2:10 6:3 32:21
**JESSICA** 2:15
**job** 19:13 98:2 159:8
**Joey** 17:24 18:3,5,11,25 60:17,20
**Joey's** 18:5
**join** 101:22
**joint** 17:11 96:22 129:4 131:13 132:20
**Joseph** 74:20,22 144:17 145:7,23 146:10
**JP** 35:3
**judge** 95:13
**July** 113:4
**jump** 16:6
**June** 41:2,3,23,23 42:13 46:2 52:13 67:9 68:4 69:18 76:22 77:24 78:2 78:3,3,4,8 84:20 88:23 90:11 93:11 94:2,16 98:11 99:17 100:15 100:25 103:21 104:25 107:2,4 110:4 112:11 113:3 115:3 118:11 124:17 127:22 133:22 135:12 136:6 139:3,25 140:22 141:11 143:6,17 147:23 148:13,15,21 149:18 151:22 156:16 167:23 168:12 170:3 172:4 179:2,3,4
**justify** 70:10

**K**

**K** 181:2
**K-A-C-H-T-A-N** 25:15
**Kachtan** 25:15
**Kathleen** 90:24
**keep** 17:3 37:5 77:10 93:21 146:5
**keeping** 38:21
**keeps** 83:15,17
**kept** 17:10 41:13
**key** 91:11,18
**Kilgallen** 1:20 184:22
**kind** 13:6 32:24 50:6 72:11 76:20 77:11 94:4 98:17 124:6 130:23 131:2 142:6 149:12 151:25
**knew** 34:8 37:23 48:13 49:21 52:9 52:10 71:16 76:3 85:13 93:19 97:16 99:3 130:18,18 131:4,6 139:21 146:13
**know** 7:9,14 10:20 14:19 16:21,22 18:7,18,24 22:18,20 23:21 24:23 27:4,5,24 28:2,6,7,16 29:10,12,25 30:2,13 31:17 32:10,13,13 33:15 33:17 34:7 35:16 36:10 37:16,18 37:20,22 38:10 39:14,20,25 40:12 40:21 41:17,21 42:16 44:3 46:4 47:19,21,22 48:5 51:6 53:5,13 54:22 55:7,8,11 56:17,21 57:4,6 59:8,13 60:21 61:14 62:16 63:16 63:25 65:25 66:5,7 67:12 68:19 69:14 70:11,18,21,24 71:19 72:19 72:22 73:3,12,23,25 74:16,25 75:2,23 76:11,20,22 77:3 80:9,19 80:21,22 81:13,18,20,24 83:12 84:23 85:17,19 88:2 90:16 91:23 92:6,24 93:13 94:3 95:18 97:3,5 97:13,21 98:15,20 99:10 100:2,8 103:2,12 106:2,5,10,13,16,18,19 106:20 107:21,25 108:5,9,13 109:18 111:3,7,10 112:4,7,21 113:18,20,24,25 114:11,13,20 116:3,11 117:9,22 122:4,7,17 123:5,6,7,8 126:5,10,13,21,22 127:3,9,10,21,21 129:4,14,23 130:3,6,19,20,24,25 131:7,9,11 131:20,21 133:5,8 134:12,16 135:2,4 136:14,24,25 137:2 138:18 139:14 140:4,5,13 141:14 141:18 142:18,20 143:4,7 144:5 144:12 145:15,20,21,23 146:8,11 146:12 147:12,14,23 149:4,8,15 149:16,25 150:7,9,20 156:9,13,13 159:7,18,23 161:25 162:7 165:24 167:17 168:2,3 169:2,10 170:19 171:11 174:15 175:12,24 176:2 176:10 177:13,17 178:19,23 179:6
**knowing** 32:4 70:13 94:13 130:6,12 159:3
**knowledge** 5:11 21:12 80:13 164:17
**known** 120:10
**knows** 32:5 70:2,3,3 76:20 102:6 103:15

**L**

**L** 181:2
**L's** 49:15
**lack** 56:9 158:11 160:6,12
**lady** 90:21
**land** 33:25 70:22 131:8,10
**Lapish** 54:5
**large** 13:20 150:23 161:16,18,22
**larger** 163:20
**late** 40:25 41:3 82:20
**law** 4:17 6:8
**lawsuit** 8:3,9,13,16,25 9:7
**lawsuits** 9:3
**lawyer** 23:4
**Lazard** 41:23 43:7,8 44:5,24 48:16 50:2,7,12,14,18,23 51:2,13,22,22 52:7 53:15 67:21 71:12 81:17 85:10 87:7,10 88:11,16 90:18,18 112:19 116:17,20 117:16,19 120:8,9,22,25 136:16 137:11 139:8 141:24 144:6 149:25 153:11 155:4 157:13 159:6 162:18
**Lazard's** 117:25
**lead** 40:16 177:10,10

**leadership** 33:23 39:3,5 49:18
**leading** 64:16 91:6
**learn** 23:19 148:3
**learned** 113:10,12 114:3 175:19
**learning** 77:20
**leases** 22:7 174:25 176:4,7 180:4
**leave** 133:14
**left** 94:3
**legal** 27:5 60:4,7 73:16,16 117:13 161:2,9
**lengthy** 151:25
**let's** 11:15 49:4 70:12 72:10 78:18 78:22 91:19,19,20 93:3,7 94:5,10 99:6 122:9 124:9 140:9 153:10 169:12
**letters** 10:13
**letting** 116:11
**level** 49:3 133:7 171:16
**license** 5:16
**licenses** 12:25
**licensing** 13:11
**life** 35:14 82:6
**lifetime** 101:6,11
**light** 39:9 148:4
**lightning** 47:2 148:12
**liking** 31:9
**limitation** 73:2
**limited** 20:20 21:24 22:7 96:22
**line** 58:13 76:13 141:3 153:10,10
**link** 115:4,15 118:15,18 120:16 127:13
**list** 29:13
**listed** 58:22
**listen** 72:11
**litigation** 4:19 26:25
**little** 22:20 83:2 86:22 108:14
**live** 14:14 83:8 126:3 177:23
**living** 35:13
**Livingston** 2:10
**LLC** 1:3 6:10
**LLP** 2:9
**location** 20:25
**locations** 4:8
**long** 82:16 130:21 143:2
**look** 17:13 44:13 45:11 50:23 63:22 67:3 68:12 72:14 77:8 113:6 133:5,5 136:22 159:2
**looked** 24:10 49:15,16 52:7 85:24 87:7 97:20
**looking** 17:12 24:11 26:11 31:11 35:22 43:18 45:6 50:25 53:5,8,9 68:2 69:7 73:19 87:3 89:2,9 120:7 125:19 129:24 132:22,23 133:2 159:5 161:13 162:20,24 166:13
**looks** 25:14 52:23 76:17 108:19 136:16 137:10 146:2,6 147:19 178:2
**lose** 101:23
**losing** 177:15,16,17
**losses** 178:5,9,15
**lot** 16:4,4 17:17,19 49:21 51:6 69:21 71:3,3 83:24 85:23 118:3 129:13 153:23 174:3 178:4
**Louster** 90:24
**LRP** 86:23,25 87:2 89:10 109:18 111:15 115:7
**lunch** 78:11 123:15
**luncheon** 124:12

**M**

**M** 181:2
**M-U-N-I-R-E** 15:6
**main** 117:18 129:25
**making** 24:17 36:24 37:11 52:21 53:2 67:24 128:13 144:14 147:19 149:15 164:23 165:25 166:9,9
**managed** 149:3
**management** 13:18,21 14:10,19 102:16
**managing** 58:7
**manipulated** 87:11
**manipulating** 20:21
**manner** 4:14 45:8 56:8,9
**manufacture** 32:19,20,22
**manufactured** 32:21
**manufactures** 33:5
**manufacturing** 18:20 28:15 32:16
**March** 38:25
**margin** 35:12 130:7
**Mark** 2:19 16:8 17:22 18:4,4 24:3 26:2 28:16 30:2 35:13,17 42:12 54:5 60:3,12,16,22 61:10 68:11 69:3,14,19,21,21 70:17,25 71:5 73:13,15,17,25 74:8,11 75:9 77:17 82:15 89:14,22 91:14 92:12 94:15 95:21 99:16 100:13,15 103:20 104:25 106:25 107:3 108:18,20 110:3,15 111:6,18,22 112:10,22 113:12,14 114:3,14 115:2 118:13 121:20 122:9 125:18 126:7 127:15 128:7 131:20 132:2,9,22 133:23 134:8 135:11,19,23,25 136:7,18,23 137:23 138:3,11,15,22 139:9 143:17 144:3 146:3,8,13 149:4 151:21 164:7 166:22,23 167:4 168:12 172:2 174:6,13,23 175:9 175:20,22,24 176:7
**Mark's** 29:24 69:7 91:21 106:6 122:6
**marked** 20:2 42:8 53:25 57:13 84:6 99:22 103:24 107:7 109:24 114:23 118:8 122:2 130:15 135:15 140:17 143:20 151:18 168:7 171:19
**market** 30:16,21 31:21,24
**marketing** 16:5,20 51:5 59:2 170:25 177:5,10,11
**marking** 110:6
**marriage** 184:14
**Mason** 110:4,18 111:8
**match** 132:24
**matching** 133:8 159:20
**materials** 105:16,22 106:2
**matter** 6:10 8:20,22 47:5 143:10 151:10 184:17
**Matthew** 54:5
**mattresses** 29:6 32:20,21 33:7
**Me's** 18:25 35:6 72:18 76:25 90:7 150:12
**mean** 35:15 36:22 59:25 79:15,22 91:12 93:22 94:21 98:10,21 104:11,16 120:15 121:4,5 128:15 128:16,18 149:24
**meaning** 15:24
**means** 14:7 47:20 79:21 98:20 103:13 112:12 138:20 146:16
**meant** 95:19 135:25 138:4
**media** 13:22,22 14:17 15:7
**medical** 9:13
**medication** 9:12,19,25
**meet** 23:24 24:3 48:10,22 49:4 56:19 91:19 92:17 93:14,15 94:5 94:10
**meeting** 4:10 40:8 43:22 48:6,20 77:16,21,22,25 90:11,14,17 91:13 91:18,22 92:3,4,16 93:11 94:2,16 95:20,22 98:12 100:25 124:17,21 124:24,25 125:2,3,9 126:15,24 127:2,8,11,11,22,25 128:3,8,9 129:9,9 130:23 131:17,22,23 132:21 133:14,18,19,22,25 134:9 139:3
**meetings** 139:7
**members** 43:13 49:21 73:14 90:19 93:13 133:23
**memory** 9:14 179:2
**mention** 46:16 151:11
**mentioned** 9:4 13:2 32:15 49:25 71:23 73:24
**merchandise** 177:22,24 178:2
**message** 104:19
**messaging** 21:9
**met** 95:15
**metal** 29:8
**Michael** 110:3,15,21 111:3
**middle** 161:15
**Mike** 91:2
**Milan** 26:2 42:11 43:2 44:6 45:14 45:17 46:9 48:2 53:8 54:4 68:13 71:23 72:16 73:15 82:15 89:22 99:16 100:14 101:10 102:21 107:4 115:2 118:12 125:16,24 126:4,5,8 128:7 135:12 151:21 158:3 168:12,21 169:22 171:24
**Milan's** 102:6,8
**million** 88:7 94:12 99:4,5 107:16,17

107:23 108:2,6
**millions** 177:16,18
**mind** 113:19 132:7
**minimized** 178:15
**minutes** 78:21,23 123:21 125:20
173:20,23
**misalignment** 129:11
**mispronouncing** 84:10
**misunderstood** 9:20
**mixed** 14:8
**model** 67:10,15,16 69:8,19 70:9
71:5 86:23,25 87:2,2,5,18 89:3,10
89:12,21 106:17 107:12 109:7,18
111:15,19,23,25 112:23 113:13
114:4,15 115:7 116:23 117:15
119:5 120:3 122:24 137:16
151:23 154:4,5 164:5,18 166:16
167:2 168:4,5 171:10 172:12,13
172:17,22 178:7,10,12 179:11,13
179:16,23 180:2,3
**modeling** 87:8
**models** 14:13 52:23 67:18,19 71:7
154:2 179:25
**models/deal** 163:24
**MOISHE** 2:18
**moment** 42:16 78:10 84:22 99:25
114:10
**Monday** 41:6 48:23 105:18 131:17
133:11
**months** 151:9
**MOORE** 2:15 165:23
**Morgan** 35:3
**morning** 6:6 82:19
**mothership** 34:10
**mouth** 149:25
**move** 92:18,21 123:25
**moved** 41:13 126:19
**movements** 6:19,21
**moving** 83:13,14 93:9 102:4 130:10
139:15 178:4
**multiple** 14:5 28:14 59:9
**Munire** 15:5
**MURPHY** 2:11 5:7,14 9:20 17:3
23:6,12 25:12 38:5,15 47:12,14
78:9,16,20 101:7 110:6 113:23
121:17 123:9,17,21,23 124:5
137:3 145:19 155:8 156:5,9
158:13 166:8 167:24 170:14
173:17,21 180:9
**mutual** 63:4 66:13,16,18 82:6,7

**N**

**N** 2:2 181:2,2 182:2
**name** 5:22 6:7 18:5 25:5 39:4 51:4
54:14 74:3,4,14,16,19 84:11
90:21,23 94:7 125:19 167:15
**names** 14:24 75:5
**native** 121:13
**natural** 36:10

**nature** 8:12 83:18 96:10
**NDA** 54:7,18,19,23,25 55:4,15 56:2
57:23 66:5,21 67:5 79:4 81:17
85:5,6 108:3,10 109:11 135:25
136:2,3 137:11 138:5,9,13,14,16
138:17,20,23 147:2,3,9,12,14,16
147:24 148:5 174:2,7,9,10,13,23
175:12,19,20,22,24 176:8 182:12
**NDA's** 81:25 82:4,6,7
**NDAs** 163:25
**necessary** 100:19
**need** 7:8,15 25:8 41:7,7 60:22
63:17 64:13 72:4,8 86:15,21 88:5
88:6 89:3 92:18,21 93:5 136:14
137:11 159:2 163:22 169:3
179:10,15 180:3
**needed** 13:6 16:6,8 24:18 56:18,19
76:16 92:11 153:18 163:19,20,23
172:14
**needs** 48:8 61:16 64:3 93:5
**network** 72:2,3,7
**never** 61:24 127:4 154:6 157:5,6
165:4,5 167:2 168:5
**new** 1:2,21 2:5,10 5:20 6:3 16:21
32:21 49:19 103:11 126:18,19
181:22 184:5
**Newco** 102:15
**nice** 136:8
**nicely** 102:17
**NJ** 5:16
**No.1:23-cv-07987** 1:6
**nod** 6:20
**non-Dream** 165:14
**nondisclosure** 57:17 63:5,24 66:13
66:16 136:3 138:21
**normal** 66:11 142:2
**normally** 59:10
**Notary** 1:20 3:15 5:19 181:22
184:4
**note** 7:17 10:15
**notes** 26:9,12,13,17,18 27:2 91:4
149:15
**notice** 19:23 26:22 127:14
**notion** 31:14 63:4
**number** 10:20 20:13,14,24 21:5,13
21:21 22:4,12 42:13 54:8 57:18
80:8 84:21 99:19 103:21 110:5
115:6,8 118:14 121:22 130:11
133:11,12,12 140:24 143:18
151:25 168:13 171:25 172:5,11
**numbers** 69:24 70:7,8,10,12 76:19
89:15 91:11 110:7 125:13 126:11
130:8,9,15 132:22,23 133:6,8
159:20

**O**

**O** 181:2
**oath** 7:23 181:9
**objecting** 47:15

**objection** 4:25 5:3,5 47:12 101:7
155:8 158:13 165:23 166:8
167:24
**objections** 3:10
**obtained** 176:11
**October** 1:12 127:13,14 181:10
184:20
**off-shoring** 14:11
**office** 72:21 94:6 108:23,24
**officer** 59:2,3 177:11
**okay** 17:10 20:17 21:18 25:13 28:4
36:20 42:21 43:24 46:8 52:3
53:10 63:12 72:12 79:18 84:14
87:14 89:13 95:10 96:20 97:19
100:6,11 108:22 109:20 113:5,21
113:21 114:21 121:7 123:15
124:5 125:6 126:9 137:25 138:3
145:3 147:6 148:10 152:20
153:25 167:17 169:6 171:15
173:17 179:10
**once** 101:6,11
**one-sided** 128:9 130:23
**ongoing** 139:19
**operate** 73:3 128:11 130:25
**operates** 70:17 71:2 132:3
**operating** 15:25 76:10 80:20 129:6
132:15,17 161:5 171:6
**opinion** 113:17 114:12 155:22
160:20 164:16,19 167:22 177:20
**opinions** 68:25
**opportunity** 101:5,11,12 104:8,12
168:25
**ops** 18:19
**optimum** 14:15
**order** 15:2 166:12
**outcome** 133:17 184:17
**outside** 114:15 147:11 148:7
172:16,25 173:3
**overnight** 76:5
**oversees** 105:15
**owned** 39:24
**owners** 101:12
**ownership** 18:8,9 31:18
**owns** 18:13

**P**

**P** 2:2,2 49:15
**p.m** 180:12
**page** 39:8 42:15 57:25 63:2,16
64:16 99:24,25 100:3,7 101:20
151:23,24,24 172:5 182:4 183:3,8
**paid** 31:16
**pan** 35:16
**paragraph** 62:20,20,22,25 63:9,12
63:13 64:8,11,15,18,22,23 65:3
65:19,22 101:4 102:11 160:5
161:13,15 162:20
**paraphrasing** 56:2
**parent** 39:18,20

**part** 45:6 63:15 74:25 76:3 87:8
  90:9 91:18 96:13,16 102:21
  132:19 137:23 145:6 158:10,19
  161:18 176:25 177:19,20
**partial** 146:3
**participate** 101:21 122:12 128:18
  128:20
**participated** 133:24
**participating** 4:9 51:9 77:16
  128:13
**participation** 128:22
**particular** 48:24 49:2
**particularly** 39:8
**parties** 3:5 4:4,16 40:17 48:17
  66:15 91:25 100:20 133:17
  184:15
**Partly** 24:22
**partner** 34:18 35:9 43:18,23 44:17
  58:7 74:6,23 96:22 99:3 106:9
  108:19 122:6,7 128:14,19,20
  129:2,6 132:15
**partners** 18:10 74:10 95:9 96:23
  99:3 106:6 114:9 132:7 145:17
  163:22 164:9
**partnership** 14:11,12 16:3 44:8,11
  44:12 45:2,4,11,11 46:13 49:6
  55:10 132:4 133:4 134:20
**partnerships** 14:7,12
**parts** 139:15
**party** 37:12
**passionate** 36:23
**path** 134:15,17,18
**Pathania** 84:10
**Patty** 140:20 141:4,14,18,21
**pause** 20:16 25:11 42:20 46:7 63:19
  78:25 100:5,10 137:9 145:2
  168:20 169:5 173:25
**paying** 37:24
**payments** 8:14
**PDF** 136:24
**PELTZ** 2:18
**penalty** 7:23
**pending** 7:18
**people** 25:25 30:22 53:11 69:17
  71:16 72:8 73:10,11 77:6 79:16
  80:10 82:18,19 90:8 91:13,16,17
  91:20 96:9 97:3 111:19,23 112:23
  113:13 114:8 119:18 151:13
  171:25 172:14
**percent** 17:25 31:22,22 130:4
**Perfect** 10:15
**perform** 150:12 154:19
**performed** 21:16 139:5
**period** 142:5
**perjury** 7:24
**permission** 60:23 61:11 142:8
  176:21
**person** 59:21,23 74:7 75:8 90:22
**personal** 51:13 80:12 164:16

**personally** 8:4 30:4 76:2
**personnel** 90:7 165:15
**perspective** 72:13
**phenomenal** 72:3
**physical** 6:19
**physically** 4:24
**piece** 97:2,4 108:13,16 129:12
  149:3
**pieces** 135:25 149:5
**pinpoint** 75:4 122:19
**place** 70:8 72:22 82:21 102:18
  147:2,9,17,24 163:11,15
**placed** 176:3,6
**places** 151:5
**placing** 50:11
**plaintiff** 1:5,16 2:4 6:9 8:2,7
**Plaintiff's** 20:2 42:8 53:25 57:13
  84:6 99:22 103:24 107:7 109:24
  114:23 118:8 122:2 135:15
  140:17 143:20 151:18 168:7
  171:19 182:8 183:3
**plan** 40:13 162:25 171:7 172:18
**planning** 108:18
**plastic** 29:8
**platform** 4:10 115:24
**play** 49:24 96:9 139:18
**players** 88:6 95:8
**please** 6:18,25 7:5,9,14,17 11:9
  13:14,25 20:13 28:25 29:3 36:12
  46:3 128:19 136:9,19 155:11
**PLLC** 2:4,15
**Plus** 77:20
**point** 33:23 35:4,17 37:13 41:9 43:9
  43:12 45:7 49:10 52:6 55:12
  60:10 64:3 67:8 68:19 69:18
  92:16 125:4,5 136:20 137:15,18
  139:4,24,24 140:12 141:9 142:14
  143:5 145:22 146:16 147:8,15,23
  148:4,13,21 149:18 153:16,21,24
  154:3,17 156:23 157:11,20
  158:12,14 162:15 164:4 166:20
  170:3,7,10,24 171:5,9,12 172:11
  172:21 178:3
**points** 73:19 131:12 139:17
**policies** 21:8,9,10
**populate** 51:23
**populated** 50:18
**portion** 110:10,11 166:10,16
**portrayed** 143:8
**position** 15:21 93:20 97:14,21,24
  98:6
**positive** 133:16
**positively** 159:19
**possession** 26:25
**possible** 121:3,4
**possibly** 133:23 136:2
**post-acquisition** 22:13
**postmortem** 133:25
**potential** 38:22 40:13 43:11 46:11

  50:11 53:16 68:21 81:25 82:11
  97:22 98:17 104:18 116:9 132:20
  139:6 142:20 148:17,23
**potentially** 47:9 104:21 138:12,13
  142:23 147:10
**practice** 66:12
**predict** 178:12
**prefer** 80:11
**preferences** 31:10
**preparation** 26:6,10 178:14
**prepare** 23:2,21,25 24:7 27:9
  154:18 172:17
**prepared** 11:5 20:9 170:4,8,10
**presence** 4:24
**present** 2:14 4:4
**presentation** 86:5,7,8,18 89:21
  107:11 136:17
**presented** 5:15 163:25
**presenting** 132:24
**Presently** 177:4
**Pretty** 16:5 29:12
**prevent** 120:2
**previous** 8:10 112:17 153:19
**previously** 79:12 80:25 82:9
**price** 31:20 172:3
**printout** 20:5 26:20,21
**prior** 33:13
**privately** 131:23
**privy** 71:20
**probably** 48:16 102:7 112:3 123:14
  124:23,24
**problem** 22:21 78:6,6 96:16 98:14
  103:9,9 125:13 126:10 131:3
  142:2 177:19,20
**problems** 131:15
**Procedure** 1:18
**proceeding** 7:24 20:16 25:11 42:20
  46:7 63:19 78:25 100:5,10 137:9
  145:2 168:20 169:5 173:25
**process** 6:15 33:12 41:15 51:22
  56:7 60:21 73:14 75:24 82:25
  83:3 90:9 92:5 96:10 133:10
  141:10,12,16 149:8 165:7
**processed** 52:15
**processes** 76:12
**produced** 24:15 27:2 76:23 117:4
  117:11
**product** 31:13,15,21 35:11 70:3
  76:13
**production** 26:17 121:12
**products** 14:14 28:16,20
**professional** 12:24 89:11
**professionals** 150:12 160:7,13
**program** 11:14 12:22
**project** 18:2 114:12 141:5,9,16,19
  160:7,14
**projected** 143:9
**projects** 18:2
**pronouncing** 10:19 54:13

**proper** 40:24 160:6,13
**properly** 130:15
**property** 46:17,24 47:10 174:24 179:12,24
**proposal** 35:6,8 36:5 128:25 129:7 132:19
**proposing** 132:12
**proposition** 69:25
**proprietary** 65:6,23
**protect** 66:7,9
**protocols** 21:7
**provide** 77:17 121:13 153:22
**provided** 53:15 73:2 98:7 155:15
**providing** 118:15 169:21
**provisions** 65:11
**Public** 1:21 3:15 5:19 181:22 184:5
**pull** 93:20 97:10 151:6 154:9
**pulling** 154:5
**pulse** 93:17,18
**purchase** 179:22
**purchases** 178:3
**purchasing** 33:18
**purpose** 4:18 65:4 112:7 126:12
**pursuant** 1:17
**pursue** 134:9
**pushed** 56:20
**pushing** 56:15
**put** 25:22 70:6 79:18 88:3 95:25 116:18,23 128:8 130:10 149:24

**Q**

**question** 3:11 7:2,6,8,11,18,19 9:16 9:21 25:6 27:24 29:24 36:9,12 38:6 39:9 47:15 50:20,22 76:18 79:11,12,19 97:9 109:4 111:6 112:9 116:3 117:6 145:4 146:7 148:20 155:10 156:8 170:15 179:14,15
**questioning** 158:7,10
**questions** 6:18 10:21 11:6 22:22 23:10 180:8,9
**quick** 18:24 42:16 139:3 168:17 173:16
**quickly** 56:2 63:7 92:11
**quite** 31:12 40:25 71:9

**R**

**R** 2:2 34:2,2,9,9,11,12,13 184:2
**raise** 83:11
**raising** 87:21
**ran** 32:12
**Rappaport** 2:4,15 6:8
**re-up** 121:10
**reach** 72:4,5,5,9
**reached** 39:2 73:21
**reaching** 153:21
**read** 7:10 10:14 20:13 36:14 42:16 42:17 46:3 62:9,22,24 63:8,13 65:15,18 84:22 99:25 102:10 108:21 123:12 152:3 155:12 168:17 169:2 172:12 175:15,20 175:24 181:8
**reading** 10:8 65:21 100:8 135:24 137:6
**reads** 46:9 143:23 154:22 155:16
**ready** 36:19 177:25
**real** 18:24 28:17 74:5,10,23 75:17 106:9 122:6 139:3 168:17
**realization** 87:14
**realize** 27:22 53:12 63:15 75:6 100:12 110:9 131:19 135:23
**realized** 135:3
**really** 14:20 30:22 37:21 56:14 70:9 75:4 76:16 83:12 86:13 94:13 96:23 113:6 122:18 139:11 149:8 154:4 158:16 159:18 169:10 174:20 175:3
**reason** 7:16 63:6 97:5 98:4,8 120:6 120:7,24 146:22 147:3 158:19
**reasons** 56:11 83:4 96:17
**recall** 90:10 122:20,23 124:16 134:7,13 148:20 174:4
**receive** 11:24 66:25
**received** 11:21 12:3 47:23 106:17 157:18,21 176:21
**recess** 124:12
**recipient** 65:7,8,9
**recipients** 84:11
**recognize** 20:4 42:22 54:10 57:19 84:25 104:4 140:25 153:3 172:6,8
**recollect** 77:3 179:6
**recollection** 75:7 179:8
**record** 4:22 5:22 36:9,11,14 38:11 155:12 169:13 181:11,12 184:11
**recorded** 4:13 6:17 53:3 124:21 125:3,9 126:16,22 127:2,8 140:12
**recording** 4:14 127:11
**reduced** 149:12
**reference** 43:16 100:25 104:13 155:14
**referencing** 50:2
**referred** 10:18
**referring** 16:11 24:14 26:21 67:21 77:22 82:15 86:21 91:3 106:3 144:16 145:5,6,9,12 162:17
**reflect** 38:11
**reflection** 56:3
**reflective** 105:7
**refresh** 75:7 179:2,7
**regard** 19:12 76:24 89:9 105:8
**regarding** 8:14 24:14 54:17 65:4 86:14
**regards** 69:15
**regular** 151:8
**reiterate** 23:18
**related** 26:24 81:25 184:14
**relating** 76:25
**relation** 24:20 25:18 43:10,19 67:10 68:17 71:24 72:17 98:18 116:8,15 139:5 148:16,23 150:3 154:19
**relationship** 77:18
**relationships** 49:22
**rely** 69:24
**remember** 13:7 15:3 25:7 38:25 40:9 41:5 43:14 48:7 59:12 61:7 62:2 63:3,11,20 64:19 72:20 74:3 75:6 77:15 81:23 92:9 106:4 112:16,25 113:15,22 114:19,20 119:10,11,11 122:15 134:2 138:7 138:10,25 150:5 164:13 174:8 175:23 176:13
**remiss** 147:7
**remote** 4:8
**remotely** 4:6 5:19
**repeat** 145:4 146:7 155:10
**repeated** 7:9
**repetitive** 62:19
**rephrase** 7:12 138:14
**report** 17:20,22,24 80:15 171:13
**reporter** 1:20 4:2,7,22 5:9,21,24 6:21 7:3,10
**reporting** 4:11 18:3
**represent** 5:10 6:9 19:22 168:14
**representatives** 126:15
**represents** 100:12
**request** 51:21,22 121:9 137:23
**requested** 36:15 119:16 144:22 152:8,15,19 153:2 155:13 169:9
**REQUESTS/PRODUCTION** 183:7
**require** 138:13
**required** 87:25 139:16,16,17
**requirement** 109:3
**research** 21:14
**reserved** 3:11
**reset** 142:6
**resolve** 125:11
**resources** 73:5,7,8 141:25 142:4
**respect** 150:14 154:10
**respective** 3:6
**respond** 7:2,19
**responded** 43:2
**responding** 152:21
**response** 36:10 96:5 168:3,15 170:17
**responses** 6:22 7:3
**responsibilities** 16:18 17:6 19:8
**responsible** 72:17 172:15
**rest** 128:6
**restarting** 103:5
**restaurant** 77:23
**restrict** 119:21
**restricted** 120:11
**restructure** 40:19
**result** 38:22
**resulting** 178:4

**retail** 1:3 6:9 22:6,14 29:19,20,22
  29:25 30:2,4,12,14,15,25 31:5,5
  31:12 32:7,10 61:13 101:13
**retailer** 61:19
**retention** 21:8,9,10
**reverse** 152:10
**review** 24:6 26:6 62:13 64:5,8,11
  64:15,17,23 105:16,22 120:19
  167:18
**reviewed** 20:6 53:14 62:17 98:6
  110:12
**reviewing** 20:20 23:9 24:14 52:20
  52:25 71:11,14
**revival** 43:17
**revive** 40:14 43:23 45:8
**Ridge** 6:3
**right** 10:12 15:4 17:9 18:12 19:9
  22:19 26:7 27:13,17 30:15 32:16
  37:2 41:14 43:4 45:15 50:8 51:10
  51:14,25 52:8 54:20 56:24 57:2
  58:5,8,12,16,23 61:22 62:4 63:16
  64:17,25 65:24 66:5,17 67:6 69:4
  69:11,22 71:6,12 74:18,20 75:20
  78:15 79:9 80:5 81:3 82:12 88:20
  90:7,25 92:23 93:4 95:3,13,14
  96:15 98:13 99:4,5 104:18 110:12
  110:16,19,22,25 113:10 115:12
  115:15 118:16,19 120:22 121:17
  122:5 123:13 125:22 126:18
  129:22 130:4 131:14 132:10
  134:4 137:14,16,20 144:8 150:24
  153:5 156:17 157:4 158:8,12,17
  158:19,23 159:10 163:5,8 164:20
  166:7,24 169:15,18,22 173:2,6,13
  174:25 176:16 177:25
**risk** 38:24 101:22
**risks** 72:13 102:14
**Rockville** 2:5
**role** 71:24 72:15
**roles** 79:20
**room** 20:19 21:2,3 49:13,14,25
  50:2,5,8,12,15,18,23 51:3,13,17
  51:18,20,23 52:8,12 53:16 67:21
  71:12 85:4,8,11,16,18,20,22 87:7
  88:12,16,24 89:19,24 97:13,17
  98:7 107:22 108:7 109:15 120:12
  121:2 126:8 137:20 142:24 154:6
  157:18,21,25 162:12,18
**Roseland** 2:10
**route** 34:19 36:24
**ROWE** 2:9
**Rule** 1:17
**rules** 1:17 6:15
**run** 30:7,8 32:7,10 56:8 107:17
  129:2 159:19,24
**running** 77:11 82:10,19 103:10
  105:2 129:22 159:17

                    **S**

**S** 2:2 5:17 182:7 183:2
**S-E-S-S-I-O-N** 124:13
**safe** 17:17
**sale** 83:8
**Saturday** 47:25 60:2
**save** 47:4 90:4
**saw** 85:22 125:18
**saying** 36:11 39:5 41:10 52:22
  71:10 79:23 80:7 81:12 120:8
  122:9 128:12 129:24 131:6,11
  136:8,19,23 139:19 140:7 141:18
  142:9 147:15
**says** 58:8 65:3 100:18 102:21
  103:14 105:14,16,21 107:16
  119:8 122:11 135:19 137:5 141:3
  141:16 153:11 161:16 162:21
  172:13
**sberlowitz@frblaw.com** 2:7
**scenario** 131:2
**scenarios** 180:5
**schedule** 56:12,16,23 57:5 122:10
**scheduled** 91:7
**scheduling** 96:14
**school** 12:9,11,15
**science** 12:16,20
**scope** 52:10
**Scott** 74:4,9 103:19 105:2,14 106:2
  106:5,8,10,16 118:12,25,25 119:7
  120:2,25 121:20 122:5,7,20,23
  145:9,23 146:10 172:4
**scrap** 143:24 146:15,22
**screen** 10:5,6,9 53:20
**scroll** 20:12 45:25 57:24 63:13,17
  64:13 100:3 169:3
**scrolled** 119:15 144:21 152:7,14,18
  152:25 169:8
**scrolling** 146:5
**sealing** 3:7
**second** 10:9 34:7 42:18 46:9 93:16
  100:3,7 104:7 129:16 137:7
  153:11
**secret** 21:8
**secure** 166:13
**security** 21:6
**see** 8:16 19:19 42:2 46:12,13 52:23
  53:20 55:18 58:3,10,13 59:4
  62:20,25 65:13 71:10 79:3 81:8,9
  85:21 86:2 87:19,22 91:4,16,19
  100:21 101:13,16,23 102:18,22
  103:21 104:2,9,24 105:3,5,18,21
  107:3,4,12,15,18 110:14 111:16
  115:9 119:9 120:17 135:21 136:7
  136:10,15,16 141:6 143:24
  153:13 154:4,24 155:18 156:21
  158:4 159:21 160:9 161:5,19
  162:3,13 163:2,13 164:2 165:8
  166:18 168:16 172:19 178:11
**seeing** 91:24 114:2 137:13
**seeking** 109:22 114:11 141:22

**seen** 66:12 86:3,7,11 87:16,17,18
  167:19 174:12 176:17
**self** 77:9
**send** 63:7 117:23 135:20 136:24
  137:22 138:8,11 141:24 174:8
**sending** 111:19 118:18,24 120:15
  121:5 136:7 137:6 138:24
**sense** 46:13 71:15 87:18 97:25
  104:17 128:13 138:2 146:20
  175:5
**sent** 19:23 45:14 56:13 57:23 84:20
  89:21 100:15 103:19 105:14
  111:23,25 113:12 114:25 118:11
  127:13,15 136:14,15 140:20
  143:16 146:17 151:21 168:11
  172:7
**sentence** 46:9,14 100:18,22 101:5
  101:14,16,18,21,23,25 102:10,11
  102:19 104:6,7,9 105:18 107:15
  141:6 143:25 153:11,13 154:22
  154:25 155:16,18 156:21 157:9
  159:21 160:10 161:6 162:4,13
  163:13 164:2 165:8 166:18
  172:19
**sentences** 105:19 158:5
**separate** 4:8 39:15 85:10
**September** 127:14
**sequential** 110:7
**set** 56:23 57:5 65:12 132:7 177:21
  184:8,19
**seven** 21:13
**share** 19:15 22:21 24:9,13 25:22
  31:24 55:3,13,16 66:22 112:19
  114:10,14 115:21,25 116:4,14
  137:12 144:7,8 146:3 166:2
**shared** 27:4,7 49:17 66:14 114:17
  131:25 132:9 146:9 147:10,17
  148:6 156:21 157:10,11
**sharing** 19:19 20:22 22:25 25:23
  41:25 42:3 53:19 57:15 110:2
  117:2 118:10 119:18 140:19
  143:15 147:20 157:14,15 165:6
  165:11,14 166:6
**Shay** 140:21 166:11
**she'll** 141:24
**sheet** 163:24 164:5,18
**sheets** 29:11
**shipments** 37:25
**shocked** 133:20
**shooting** 160:8,18
**short** 56:24 59:7 73:8,10 95:10,12
  96:20 104:8,12 128:9 158:16,20
  177:23,24
**shortage** 178:17
**shorter** 94:11
**show** 10:8 62:11 87:24 167:4,7,9,12
  168:16 175:22
**showing** 10:4 84:8 121:19 135:10
  151:20 171:23

**shown** 69:19 71:5
**shows** 110:17 154:23
**shrug** 6:19
**side** 13:22,23 28:17 53:6 63:16 64:17 68:15 69:16,25 75:3,19 89:14 128:6,11,12 140:7 177:5
**sign** 54:19,23 55:25 56:11 59:10,11 59:14,16,19 60:23 61:15 62:8 63:7 66:21 81:17,22
**signature** 57:24 58:10,13,20
**signed** 3:14,16 54:25 55:4,15 58:15 60:5 61:9 62:10,14,17,23 63:9,14 64:9,12,18,23 65:15 66:3,4 67:5 81:5,24 82:4,7 85:5,6 92:14 108:2 108:9 109:11 137:11 175:12 181:19
**signer** 58:4
**significantly** 31:25
**signing** 59:4
**silo** 77:9
**similar** 34:12 88:25 89:8
**simple** 45:13 76:12 147:7
**single** 61:6
**sir** 5:25
**site-work** 16:5
**sites** 16:23
**situation** 34:2,3,9 37:23 40:20 76:21 77:11 94:4
**six** 21:5 151:9
**size** 163:18
**skeptical** 93:12 95:3,23 98:4 131:17
**skip** 18:24
**sleeping** 72:21
**small** 10:13
**SMITH** 2:9
**so-called** 86:25
**Sod** 75:9 118:12,19,21 120:2,24 172:2
**soft** 29:10
**solve** 98:13 103:8
**somebody** 73:9,12 74:24 98:21 103:14 127:4 178:11
**sooner** 14:14
**sorry** 9:19 28:24 29:2 30:16 33:16 36:8 47:13 78:5 90:18 93:23 96:4 126:7 128:17,17 132:5 138:19 141:16 144:10 147:13
**sort** 133:25
**sound** 74:20
**source** 70:5
**sources** 166:14
**sourcing** 28:15 35:11
**SOUTHERN** 1:2
**space** 30:21 31:5,6
**Sparrow** 88:5
**speak** 44:18,24,25 46:11 94:15 125:24
**speaking** 44:21 122:20,23 128:23
**specialize** 28:19
**specific** 44:12 61:8,18
**specifically** 24:11 72:17 88:17 112:17 120:5 123:2 134:2
**specifics** 44:16 113:7 150:5
**speculate** 123:9
**speculation** 123:5
**speed** 47:2 93:17 148:12 150:15
**spent** 129:13 142:24 143:12 153:23
**spoke** 23:4,7,13 48:2,8,8
**spoken** 44:6 71:20 113:16 114:5 122:22 142:23
**Srour** 2:19 10:19 18:5 42:12 54:5 68:20 77:13 99:16,16 118:13 172:2
**ss** 181:4
**stamp** 104:14
**stamped** 107:9
**standard** 63:4,23
**stands** 136:3
**Stanford** 11:13,16
**start** 16:10,14 58:3
**started** 16:17,19 17:7 40:22 51:19 63:22 141:8
**starting** 141:5,15,19
**startups** 13:19 14:14
**state** 1:21 5:4,16,19 181:4,22 184:5
**stated** 16:23 167:11
**statement** 30:25 31:4 153:19 170:4 170:8
**statements** 23:19
**STATES** 1:2
**stenographically** 6:17
**Stenotype** 1:20
**Stephanie** 172:3
**steps** 27:8
**Steve** 24:25 25:2,3,22 84:17 116:2 135:11 136:8 137:5
**Steven** 2:6 6:5,7 25:6,15 124:15 137:7 155:10
**sticking** 131:12
**stint** 13:22
**stipulate** 4:21
**stipulated** 3:4,9,13 4:3,12 5:5
**STIPULATIONS** 3:2
**stop** 142:10 174:16
**storage** 20:25
**store** 16:22 17:2 22:6 30:6 51:12 115:19,25 116:14 117:14 174:21 174:25 176:4,7 180:4
**stored** 117:10
**stores** 29:19,21,23 30:7,8 32:8,11 51:5 107:18 139:18 177:22 180:6
**storing** 21:7
**story** 17:16
**straight** 78:10
**strategic** 11:20,22 12:6 14:6 35:24
**strategy** 14:11 16:2,3 170:11,20,25
**Streader** 58:5 94:8
**streamline** 6:15
**Street** 139:9
**stressful** 83:22
**strollers** 29:9
**strong** 35:19 92:17
**structure** 39:21 80:17 166:15
**struggling** 96:20 134:5 153:19
**studied** 11:11
**studies** 21:15
**stuff** 67:23
**subcategories** 29:6,13
**subject** 54:5 99:18 115:3 118:13 140:23 151:22
**subjected** 13:10
**submit** 48:10 92:15 176:11
**subscribed** 181:19
**subsidiary** 39:24
**Suddenly** 17:10
**Suegov** 40:16
**suffering** 34:13,15
**suggested** 44:6 172:16
**suing** 127:20
**Suite** 2:5
**Sunday** 64:6 122:10
**Sunrise** 2:5
**suppliers** 38:24
**supply** 18:20 70:5 73:17 102:13 103:9
**support** 21:25 22:8,14
**supported** 166:17,21
**supposed** 8:15 175:17
**sure** 10:7,14 20:9 24:18 33:22 37:10 39:7 50:21 72:13 76:16 77:10 117:9 122:22 140:10 141:25 144:8,12,14,23 147:19 150:4 156:14 174:20 175:3
**surprise** 132:25
**surprised** 78:7
**surveillance** 126:21
**survive** 37:3
**suspended** 19:12
**swear** 4:20,23
**Sweeney** 172:3
**switch** 27:12
**sworn** 3:16 5:19 184:8
**systems** 76:12

**T**

**T** 181:2 182:7 183:2 184:2,2
**table** 72:3 92:11
**take** 6:21,22 7:3,17 26:9 31:18 35:20 65:11 70:14 72:10 76:12,14 78:9,14,14,18 143:2 159:18 173:16,19
**taken** 1:16 27:8 52:14 87:10 142:4 181:9
**takes** 139:22
**talk** 22:19 24:5 39:6 44:9 48:17 54:24 55:22 63:25 66:2,23 69:17

71:17 72:7,10 91:20 94:10 113:14
**talked** 86:6 88:8 123:2 174:2
**talking** 40:12 43:15 48:15 77:6 86:20 91:17 98:11 99:2 133:3,6 136:9 149:9
**target** 65:10 83:13,14,15,16,16,17 89:4 93:9 102:5 130:10
**task** 151:13
**team** 34:25 73:16,17 77:8 82:14,14 90:18,19 93:11 102:16 117:13 128:6 141:22 151:2,4 161:2 162:11,21,23 163:4,11,15,18,20 170:6 176:25
**teams** 49:21 74:11 76:7 80:18 150:12 153:20 157:14 160:6,13 161:5,8
**tech** 12:16,20 51:5 53:6 76:11 149:2,11
**tech-related** 14:8
**technological** 161:10
**technology** 22:14 59:3 75:19 76:2 102:12,12 103:8 161:3 171:6
**telegraphed** 155:4
**tell** 14:2 17:16 23:13,13 35:17 38:3 38:8 61:16 72:12 74:19 93:5 95:21 108:13 114:14 126:25 127:7,18 129:20 130:24 168:23 174:6 175:18 177:2
**telling** 70:20 93:7 109:2 137:10 144:3,8 153:12
**Tempke** 46:2
**ten** 16:16 19:5 78:20,22 122:17 123:21 173:19,23
**Tennyson** 110:3,16,21
**terms** 25:17 39:16 44:14 87:22 163:23
**terrain** 102:15,22
**testified** 5:20 19:8 26:5 32:3 38:16 56:22 64:21 69:3,6,10 75:18 77:12 79:7 80:25 82:9 98:3 120:21 122:4 161:21
**testify** 9:17 10:2 20:10,18,25 21:6 21:14,22 22:5,13 79:13
**testifying** 7:23 10:24,25 90:10
**testimony** 29:16 56:3 94:25 170:22 181:9,12 184:11
**testing** 94:20
**thank** 6:6 22:25 84:19 101:9 121:18
**theirs** 86:16
**thesis** 52:16
**thing** 53:7 63:22 92:25 95:9 108:21 129:19 148:25
**things** 14:5 17:10 23:15 71:8 72:14 78:13 96:19 151:11 178:17
**think** 13:5 36:7 37:20 38:9 40:25 40:25 43:2 44:15 48:10,22 49:2,7 56:20 57:6,8 63:21,22 64:20 66:20 70:14 73:22 75:9 83:3 86:15 88:3,4 90:20 91:11 92:3,4 93:10,16 94:20,21 96:7 112:6 113:7 121:8,15 123:14,24 124:2,3 124:5,23 125:4,23 127:19,25 131:4,18 132:22 133:2,16 138:4 147:19 170:14 173:15 177:19 178:8,14
**thinking** 47:7 64:2 74:8 108:24
**thinks** 128:11
**THOMAS** 2:11
**thought** 66:18 97:6
**three** 63:12,13 64:8 90:8,19 151:9 151:23
**throw** 75:5
**till** 54:24 113:6
**time** 1:19 3:11 5:2 7:4 19:7,9,17,25 20:15 25:10 33:23 35:4,7,17 37:14 38:3 41:4 42:5,7,19 43:12 44:20 45:4,7,23 46:6 49:10 50:8 50:24 52:13 53:4,22,24 57:10,12 61:6 63:18 64:3 67:8,17 68:19 69:18 71:5 73:5 78:19,24 82:7 83:20 84:3,5 85:13 86:12,13 88:23 89:7 92:25 94:11 95:10,12 96:20,23 97:2 99:12,21 100:4,9 103:16,23 104:14 105:2 106:22 107:6 109:23 112:10 113:3,9 114:22 118:5,7 119:4,14 121:23 121:25 123:14,18 124:11,22 126:2 129:13 135:14,17 137:8 140:14,16 141:21,23 142:5,11,12 143:2,13,19 144:20,25 146:8,17 151:15,17 152:6,13,17,24 153:23 155:14,20 157:4,20 158:9,14,16 158:20 160:20 163:2 168:6,9,19 169:4,7 171:18,21 173:18,24 176:6 177:23,24 178:3 180:10
**time-wise** 123:24
**timeline** 48:11 97:7 105:9 151:8 175:2
**timelines** 26:12 49:8,9
**times** 14:23 122:17 138:23
**timing** 150:14
**title** 15:23 58:8,22 79:8,10,13,18,20 177:7
**titled** 57:16
**titles** 17:15 79:15
**tmurphy@greenbaumlaw.com** 2:12
**today** 5:12 9:17 10:2 23:3 26:19 31:10 159:15 174:3
**Toddler** 32:25
**told** 53:18 55:12 92:24 112:18,20 114:19 126:14 133:11 138:15 146:14,22 175:25 176:7,20 178:25
**Tom** 38:14 47:13 121:8 156:10
**Tom's** 39:9
**ton** 124:4
**top** 63:15 64:17 84:22 100:13 106:25 110:9,14 121:20 143:23 145:5 152:22 168:18,18 169:12 169:15
**topic** 20:13,13,24 21:5,13,21 22:4 22:12
**topics** 20:9,13 27:12
**touch** 139:8,9
**Toys** 34:2,9,13
**track** 124:6
**tracking** 97:3
**trade** 21:7
**training** 77:20
**transaction** 46:12 102:4 163:12,16 166:14
**transcript** 181:8,10 184:10
**transfer** 171:6
**transition** 162:2,8,25 176:25
**treat** 65:9
**trial** 3:12 8:22
**true** 30:13 160:14 162:6,15 163:17 181:11,13 184:11
**truly** 36:23
**trust** 96:2,3,6,18 97:6 98:5
**truthfully** 9:17 10:2
**try** 75:7
**trying** 14:12 23:18 24:8 28:24 52:23 69:16 72:24,25 75:8 83:9 83:11,14 87:20,24 92:6,7,9,10 95:12 104:15 125:10,12 128:9 129:13,20 130:24 131:8 133:20 134:21,22,25 142:8,13 143:12 144:11 160:25 175:4
**Tuesday** 41:7 48:11 56:17 131:16
**turnaround** 170:11,20
**twice** 56:25
**two** 27:25 62:25 63:9 93:3,4 96:23 99:24 105:15,19 117:18 123:22 124:7,10 129:25 130:16 149:5 151:23 158:5 172:11
**type** 17:14
**typical** 95:15

**U**

**U.S** 102:18
**Uh-hum** 105:23 107:5
**unauthorized** 4:17
**unchartered** 102:15,22 103:5,6,12 103:14
**underlying** 139:23
**understand** 6:23 7:6,11,12,20,22 22:24 30:15,18 31:4,8,9 70:23 96:4,23,25,25 97:4 100:20 149:11 154:11,15 166:12 175:4
**understanding** 31:3 40:3,3 68:12 88:9,10,19 114:7 135:24 150:2 159:17,24
**understands** 138:17,20
**understood** 69:10

**unfortunately** 83:6
**UNITED** 1:2
**universe** 15:24 17:15 93:14
**unknowingly** 144:7
**unprofessional** 159:3,6,9
**update** 51:17 126:11
**updated** 23:5 111:16 117:20,21,24
**updating** 18:3
**upscale** 104:8,16,17
**upset** 133:19 175:16,16
**urgency** 48:9,15 56:4,5,7 92:10
**urgent** 56:8 163:11
**urgently** 54:24
**use** 115:17,19,21,24 116:4,4,8 143:23 144:3,5,14,15
**uses** 166:14
**usual** 63:3 82:5
**usually** 66:12

**V**

**V** 5:17
**validate** 162:2,7
**validation** 76:19 134:4 162:3,8,9
**value** 69:25 70:4,14 83:10 125:21
**variables** 102:5
**vendors** 34:7 43:16,19,22 149:10 177:25
**venture** 17:11
**venues** 16:21
**verbal** 6:22
**verbally** 6:18
**version** 111:15,16 115:7
**versions** 144:13
**versus** 6:10 18:3 34:20 112:19 131:10
**vetting** 61:17
**video** 4:6,13 125:19 126:4 127:16 127:18,20 128:3,5
**view** 74:13 91:21 92:16 129:7 158:15 164:9
**viewed** 86:10
**viewing** 88:24 120:3
**viewpoint** 63:23 72:11 73:22 77:4,6 102:5,6,9 140:10,12
**views** 100:20,21
**violation** 4:17
**visibility** 27:6
**vision** 170:4,8
**visual** 14:18
**voice** 17:4

**W**

**W** 181:2
**wait** 6:25 7:5
**waived** 3:8
**walk** 13:25 14:24
**Walmart** 16:24 17:2
**want** 9:24 10:7,15,23 20:8 23:20 33:25 35:15 36:8 38:14 55:18 63:25 78:19 97:5 98:15 102:10 108:13 112:7 123:5,19,19 127:17 132:8 137:12,14 139:2 141:16 142:7,9 144:23 146:5 150:9 152:10 154:14 161:15 168:24 172:10 173:16
**wanted** 37:2,3 39:7 48:16 51:9,10 54:23 55:3,4,9,20,22,25 56:11 66:2,22,23,24 95:5 126:11 129:5 153:25 171:16
**wanting** 108:25
**warehousing** 18:20
**wasn't** 60:3 88:15,17 165:3
**watch** 126:3
**watched** 127:10
**watching** 126:9
**Watchung** 6:2
**water** 7:15
**way** 53:3 59:11 87:11 132:3 139:14 151:6 184:16
**we'll** 55:13 58:3 94:4 173:22
**we're** 55:8 88:7 123:13 131:10 132:7
**we've** 79:5 130:20 174:2
**wear** 17:17
**weave** 166:15
**web** 1:18 4:9 5:12
**websites** 51:5
**week** 41:6 48:12 142:24
**weekend** 105:17,22
**weekly** 56:25,25
**weeks** 93:3,4 105:16 151:9
**went** 11:15 85:22 92:3 125:17,23 129:15 133:9 142:24
**weren't** 8:20 150:17
**whereabouts** 99:10
**WHEREOF** 184:18
**wholly** 39:24
**wield** 133:20
**willing** 44:25 66:25
**willy-nilly** 166:6
**window** 104:7,11
**winning** 104:22
**Winter** 172:2
**witness** 1:15 4:7,20,23,25 5:11,15 5:18 6:2 9:6 17:5 23:17 47:13 123:11 124:8 180:11 182:4 184:7 184:12,18
**won** 129:3
**wood** 29:7 33:6
**word** 36:2 56:9 82:22 95:23 96:3
**words** 149:24 159:12
**work** 13:14,19 14:6 15:10,14 17:15 44:7 45:19 49:16 51:16 70:23 76:6 81:2 88:20,22 96:21 99:6 106:14,15 111:20,24 112:23 113:13 114:4 149:4 150:13 153:13,17 154:18 155:17,21 156:16,24 158:11,22 160:7,14 172:15 173:6,10,11,12 178:7
**workdays** 82:10
**worked** 8:11 13:18 14:2,25 23:21 25:17 49:23 75:9 149:6 180:5
**working** 16:10,14 17:7 25:20,24 40:22 68:6,9,18,20 69:14,20 70:19 71:7 73:12,24 74:8,11,13 75:2,19,22 76:4,6 82:11,16,20 89:14,15 102:16 107:17 108:6 116:21 117:17 118:3,3 125:11 139:9 146:19 150:15 161:3,4,9 162:22 164:7,8 166:22 167:5,10 167:14 171:8 179:13
**works** 14:16 18:11,14 69:21 106:11 111:8 124:8 157:2 171:17 172:24
**workup** 153:16
**world** 32:2 36:4 76:17 81:11
**worried** 34:16 144:6
**worry** 135:20 138:3
**worth** 112:6
**wouldn't** 17:8 51:12,15 60:21 117:23 132:13
**wrap** 129:19
**write** 81:11,16 101:5,8 104:7 107:10 110:10 143:22 156:19 157:9 158:3 159:15 160:17,24 161:25 162:10 163:10,22 165:5 169:17
**writes** 101:10 166:12
**writing** 104:25 141:14 164:13 168:15,21 176:18
**written** 4:15 76:23 149:13 151:20 156:18 164:10
**wrong** 70:12 124:24 125:24 144:7 147:20 156:2
**wrote** 81:14 115:11 118:11 135:23 138:5 153:5 156:15 159:9 161:18 164:11,15 169:14,22
**Wu** 140:20

**X**

**X** 1:3,11 88:5 182:2,7 183:2

**Y**

**Y** 5:17 88:5
**yeah** 10:14 11:8,11 13:9 14:4,4,19 14:21 16:22 18:4,13,19 20:11 22:3 24:12,17 26:11,15 28:18 30:3,14 35:5 36:22 40:4,20 56:14 56:25,25 57:9 58:6,9 60:3 61:3,20 65:17,20,25 66:4,11,11 67:3,7 71:22 75:10,17 77:18 82:5,13 83:18 85:25 87:13 89:20 96:2 97:20 112:8 113:8,25 119:23 142:18 147:3 157:7 166:4 167:8 168:4
**years** 13:17,23 16:16 19:5 49:20
**yesterday** 10:18 24:5 100:24 101:3 121:9

**Yesterday's** 100:19
**Yisroel** 145:12,15
**York** 1:2,21 2:5 5:20 181:22 184:5
**Yoshi** 74:15
**Yussi** 74:14,14
**Yussi's** 74:16
**Yussy** 105:15
**Yussy's** 74:19

**Z**

**Z** 88:5
**zero** 129:15
**Zoom** 4:9 19:18 42:6 53:23 57:11
   84:4 99:13 103:17 106:23 118:6
   121:24 135:18 140:15 143:14
   151:16 168:10 171:22

**0**

**07068** 2:10

**1**

**1** 20:3 182:9
**1.6.1** 111:15
**1:30** 123:24
**10** 42:13 52:13 67:9 69:18 76:22
   78:3 84:20 88:23 114:24 182:18
**10:00** 1:12
**101** 103:7
**103** 182:15
**107** 182:16
**10726** 42:14 182:10
**10737** 54:9 182:11
**10868** 118:14 182:19
**10877** 140:24 182:22
**109** 182:17
**11** 118:9 182:19
**11:37** 136:7
**11080** 135:13 182:21
**114** 182:18
**11570** 2:5
**11644** 143:18 182:23
**11714** 151:25 182:24
**11729** 168:13 183:4
**118** 182:19
**11th** 107:4
**12** 21:21 64:15,18 77:24 78:4,8
   90:11 93:11 94:2,16 100:25 122:3
   122:17 182:20
**12:50** 123:13
**121** 182:20
**12th** 98:11 101:3
**13** 22:4 99:17 100:15 135:16
   182:21
**135** 182:21
**13th** 101:2
**14** 22:12 107:2 110:4 112:11 115:3
   140:18 182:22
**140** 182:22
**14065** 172:5 183:5

**143** 182:23
**14th** 114:10 184:19
**15** 88:7 124:17 127:22 129:15
   133:22 139:3,25 143:21 182:23
**150** 80:10
**151** 182:24
**16** 13:16 103:21 104:25 151:19
   182:24
**168** 183:4
**16th** 104:5
**17** 13:16 168:8 183:4
**171** 183:5
**18** 171:20 183:5
**19** 118:11 135:12 136:6 140:22
   141:11 143:6

**2**

**2** 1:12 42:9 111:16 181:10 182:10
**20** 31:21,22 72:20 82:10 88:7 94:12
   129:15 182:9
**200** 80:10
**2021** 33:20 34:5,21 35:7,23 47:7
**2022** 34:5,21 35:23
**2023** 42:13 46:3 67:9 68:4 76:22
   84:21 135:13 136:6 140:22
   143:17 179:4
**2024** 1:12 181:10,20 184:20
**21** 104:23
**22** 33:20 47:7
**222** 35:7
**23** 143:17 147:23 148:13,15,21
   149:18 151:22 156:16 167:23
**25** 168:12 170:3
**265** 2:5
**2770** 99:20 182:14
**28** 172:4 179:2,3,4
**2800** 115:8 182:18
**2943** 107:10 182:16
**2969** 110:5 182:17

**3**

**3** 54:2 182:11
**3:20** 173:23
**3:30** 180:12
**30** 13:23
**30(b)(6)** 1:17 19:23 26:22 182:9
**300** 99:4
**3032** 103:21 182:15
**3039** 121:22 182:20

**4**

**4** 57:14 182:12
**40** 78:17 94:12
**42** 182:10

**5**

**5** 6:2 84:7 182:13
**50** 2:5
**500** 99:4

**53** 182:11
**57** 182:12

**6**

**6** 68:4 99:23 182:14
**6.7** 111:16
**60** 76:14
**60/70** 130:4
**6th** 139:9

**7**

**7** 103:25 182:5,15
**70** 107:16,23 108:2
**75** 2:10

**8**

**8** 107:8 182:16
**8:04** 104:25
**84** 182:13
**8791** 57:18 182:12

**9**

**9** 46:2 109:25 115:7 182:17
**9.8** 111:15
**90** 17:25 76:14 107:17 108:6
   177:21
**90-plus** 107:18
**9434** 84:21 182:13
**99** 182:14