

Alan Schachter
Senior Managing Director
**Guidepost Solutions LLC**
260 Madison Avenue, 3rd Floor
New York, NY 10016
+1 917.539.0002
guidepostsolutions.com



Go Global Retail LLC

v.

Dream on Me Industries, Inc. and Dream on Me, Inc.

United States District Court Southern District of New York
Case No.: 1:23-cv-07987-AS

Expert Report By
Alan Schachter, CPA/ABV/CFF, CVA, CFE

November 15, 2024

The following report is furnished for the sole and exclusive use of the client to whom it is provided. I often use third party sources and database providers in the course of my work. I believe that the sources and methodologies I use are reliable; however, I make no representation or guarantees as to the accuracy or completeness of information obtained through third party sources and database providers. **PRIVILEGED AND CONFIDENTIAL**

## TABLE OF CONTENTS

Description of Assignment.................................................................................................. 3

Professional Qualifications................................................................................................ 3

    Alan Schachter............................................................................................................. 3

Data and Other Information Considered............................................................................ 4

Relevant Background Information ..................................................................................... 4

    Parties Involved ........................................................................................................... 4

    Nature of the Case ...................................................................................................... 6

    Trade Secrets Background............................................................................................ 8

    Durable Baby Goods Stores Industry Background ...................................................... 9

Summary of My Conclusions............................................................................................ 10

    Overview of Calculated Damages............................................................................... 10

Calculation of Damages................................................................................................... 10

    Damages Period.......................................................................................................... 10

    Damages Under DTSA ................................................................................................ 12

        Actual Damages ..................................................................................................... 12

        Unjust Enrichment.................................................................................................. 18

    Damages Under New York Common Law Misappropriation of Trade Secrets ........... 19

    Damages Under Breach of Contract .......................................................................... 20

        Expectation Damages ............................................................................................ 21

        Compensatory Damages ........................................................................................ 21

Summary of Conclusions................................................................................................. 22

## EXHIBITS AND APPENDICES

Exhibit 1 – Summary of Damages .................................................................................... 24

Exhibit 2 – Avoided Development Costs .......................................................................... 25

Exhibit 3A – Lost Profits (Management Fees and Carried Interest) – Including E-Commerce Sales ........... 26

Exhibit 3B – Calculation of 20% Carried Interest – Including E-Commerce Sales ........................ 27

Exhibit 3C – Calculation of Management Fees – Including E-Commerce Sales.......................... 28

Exhibit 3D – Projected EBITDA of BBBY – Including E-Commerce Sales......................................................29

Exhibit 4A – Lost Profits (Management Fees and Carried Interest) – Excluding E-Commerce Sales ...........30

Exhibit 4B – Calculation of 20% Carried Interest – Excluding E-Commerce Sales.......................................31

Exhibit 4C – Calculation of Management Fees – Excluding E-Commerce Sales ...........................................32

Exhibit 4D – Projected EBITDA of BBBY – Excluding E-Commerce Sales ....................................................33

Exhibit 5A – Reasonable Royalties– Including E-Commerce Sales ..............................................................34

Exhibit 5B – Reasonable Royalties– Excluding E-Commerce Sales..............................................................35

Exhibit 6A – Weighted Average Cost of Capital ........................................................................................36

Exhibit 6B – Cost of Equity (Build-Up Method) .........................................................................................37

Appendix A – Curriculum Vitae of Alan Schachter, CPA/ABV/CFF, CVA, CFE..............................................38

Appendix B – Curriculum Vitae of Katerina Gaebel, CPA, CFE, Certified DeFi Expert.................................43

Appendix C – Documents and Information Considered...............................................................................45

Appendix D – Professional Qualifications of Go Global ..............................................................................48



# DESCRIPTION OF ASSIGNMENT

Guidepost Solutions LLC ("Guidepost") was engaged by Falcon Rappaport & Berkman LLP ("Counsel"), legal counsel for Go Global Retail LLC ("Go Global" or "Plaintiff"), in the Matter of Go Global Retail LLC v. Dream on Me Industries, Inc., and Dream on Me, Inc. ("Defendant") Case Number 1:23-cv-07987-AS, which is currently pending in the United Stated District Court, Southern District of New York (the "Matter"). Specifically, Counsel requested that I calculate economic damages as well as provide expert witness testimony related to the Matter. In addition, Counsel has asked me to assume that the Plaintiff will prevail on issues of liability related to the Defendant.

Guidepost has not conducted a financial statement audit pursuant to US Generally Accepted Auditing Standards or any other attest function. I have, however, prepared my report in accordance with the American Institute of Certified Public Accountants ("AICPA") Statements on Standards for Forensic Services No. 1, and have complied with the AICPA's Professional Code of Conduct.

Guidepost's work was limited to the specific procedures and analyses described herein and based on the information made available. Accordingly, changes in circumstances after the date of this report (such as availability of additional documentation, new testimony or other additional information relating to the facts and circumstances relied upon in preparing this report) could affect my findings and conclusions. As such, I reserve the right to revise this report, if necessary.

This information has been prepared solely in connection with my services as an expert witness in this Matter and is not intended for reliance in any other context.

Guidepost and its employees have no present or anticipated financial interest in this matter. Fees for this engagement are based upon the hourly billing rates of the Guidepost employees. My fees are not contingent on the outcome of this matter.

# PROFESSIONAL QUALIFICATIONS

## Alan Schachter

I earned a Bachelor of Science in Accounting and Finance from the Wharton School at the University of Pennsylvania, as well as a Master of Business Administration degree in Accounting and an Advanced Graduate Certificate in Taxation from Pace University. I am a Certified Public Accountant (CPA) and hold licenses in New York and Connecticut. I am also Accredited in Business Valuation (ABV) and Certified in Financial Forensics (CFF) from the AICPA. I am also a Certified Fraud Examiner (CFE) accredited by Association of Certified Fraud Examiners, and a Certified Valuation Analyst (CVA) accredited by the National Association of Certified Valuators and Analysts (NACVA).

I am a Senior Managing Director and practice leader of the Economic Damages and Business Valuation Practice at Guidepost. I have extensive experience calculating economic damages and valuing privately held companies. I have lectured on these subjects extensively. My experience includes litigation and valuation assignments related to the



determination of economic damages, including damages related to intellectual property disputes. I have qualified and testified as an expert in over 125 matters. In addition, I have been appointed by the Superior Court of Connecticut as a Fiduciary to wind up operations of a Connecticut-based high-yield debt fund. I was also appointed as a receiver by the New York State Department of Health for three healthcare facilities. In addition, I was appointed as a receiver by the New York State Liquor Authority to operate a discotheque in New York City.

My curriculum vitae (CV) is attached as **Appendix A**.

I was assisted by Katerina Gaebel ("Gaebel"), Guidepost Senior Consultant and forensic accountant. Gaebel's CV is attached as **Appendix B**.

# DATA AND OTHER INFORMATION CONSIDERED

My analysis is based on the documentation and information listed in **Appendix C**. The documents and information utilized in my report are the types of documents and information upon which experts in my field typically rely on when performing such analyses.

Additional information may come to my attention during this litigation, which may affect my analysis. I reserve the right to amend my analysis and this report should additional or updated information become available. In addition, I reserve the right to prepare additional supplemental materials such as summaries, exhibits, or charts for trial, as well as to provide opinions and other materials in response to any expert opinions provided on behalf of Defendant.

# RELEVANT BACKGROUND INFORMATION

## Parties Involved

**Plaintiff**

Go Global is a Delaware limited liability company that functions as a brand investment platform, focusing on identifying investment opportunities to enhance brand equity in the consumer products and retail sectors.[1] Specifically, Go Global has acquired distressed retail brands through the bankruptcy court by using its proprietary financial models and expertise.

Jeffery Streader ("Streader") is the founder, sole member, and managing partner of Go Global.[2]

---

[1] Amended Complaint filed December 22, 2023 ("Complaint"), ¶1-3, and 15.
[2] https://www.goglobalretail.com

*CONFIDENTIAL*



Christian Feuer ("Feuer") is the managing director of Go Global.[3]

Yuen Chau ("Chau") is a senior partner at Go Global.[4]

Deborah Gargiulo ("Gargiulo") is a partner at Go Global.[5]

Rosa Costa ("Costa") is Vice President of Global Business Development and Licensing at Janie and Jack.[6]

See Appendix C for detail on Streader, Feuer, Chau, Gargiulo, and Costa's background.

### Defendants

Dream on Me Industries, Inc. ("DOM Industries") is a New Jersey corporation operating as a designer, manufacturer, and supplier of baby products.[7] Dream on Me, Inc. is an affiliate of DOM Industries (collectively "DOM"). DOM sells baby furniture to retailers such as Amazon and Wayfair.[8] It is my understanding that DOM has no experience in identifying investment opportunities to enhance brand equity in the consumer products and retail sectors.

Mark Srour ("Srour") is the owner of DOM.[9]

Avish Dahiya ("Dahiya") is the Chief Marketing Officer/Chief Technology Officer of DOM.[10]

Milan Gandhi ("Gandhi") is the CFO/COO of Welspun USA, Inc. and was advising DOM regarding its interest in purchasing BBBY.[11]

### Other Involved Parties

buybuy Baby ("BBBY") was a subsidiary of Bed Bath & Beyond, Inc. ("BB&B") that sold baby products and furniture.[12]

---

[3] Amended Complaint, ¶36.
[4] https://www.goglobalretail.com/chau
[5] https://www.goglobalretail.com/gargiulo
[6] https://theorg.com/org/janie-and-jack/org-chart/rosa-costa. Janie and Jack is one of Go Global's successful investments in the retail industry.
[7] Amended Complaint, ¶17-18.
[8] Amended Complaint, ¶60.
[9] Amended Complaint, ¶42.
[10] Ibid.
[11] Amended Complaint, ¶37 and 40.
[12] Amended Complaint, ¶25.



## Nature of the Case

In or around March 2023, Go Global learned that BB&B planned to file for bankruptcy.[13] As such, Go Global developed its proprietary model to forecast the potential future success of BBBY if Go Global acquired the going concern and/or intellectual property assets and other assets of BBBY.[14]

On April 23, 2023, BB&B filed a voluntary petition for relief under Chapter 11 bankruptcy.[15] On April 25, 2023, the Bankruptcy Court approved bidding on the sale of BB&B and BBBY's assets.[16] The Bankruptcy Court then ordered an auction of BBBY's intellectual property assets to be held on June 28, 2023, and the sale of all BBBY's assets on June 29, 2023.[17]

On June 9, 2023, Feuer was introduced to Gandhi by Lazard, financial consultants to DOM, to discuss DOM co-investing alongside Go Global in Go Global's capital structure of equity investors (the "Joint Bid").[18] A introductory meeting was then set up for Feuer, Gandhi, Srour, and Dahiya to attend on June 10, 2023.[19] On that same day, DOM circulated a signed Non-Disclosure Agreement ("NDA") to Go Global, which enabled them to get access to Go Global's data room so that they may freely discuss the Joint Bid.[20]

The NDA stated that Go Global would provide DOM with proprietary information and also prohibited DOM from sharing Go Global's proprietary assets with third parties or using the information for any purpose other than the development of the Joint Bid with Go Global. In addition, the NDA prohibited DOM from submitting a bid without Go Global's participation, or, absent Go Global's participation, Go Global's written consent. After signing the NDA, DOM gained access to Go Global's data room containing BBBY's financial data, Go Global's annotated versions of this data, Go Global's proprietary forecasts, financial models, strategic operating plans, and important and valuable customer data which was secured by Go Global.[21] DOM accessed the data room on June 10, 2023 and June 14, 2023 and downloaded all of these documents.[22]

Various meetings and discussions occurred between Go Global and DOM regarding the Joint Bid. On June 28, 2023, the auction was held on BBBY's intellectual property assets -DOM placed and won a bid of $15.5 million. This bid was placed

---

[13] Amended Complaint,  ¶ 26.
[14] Amended Complaint,  ¶ 28.
[15] Amended Complaint,  ¶ 33.
[16] Amended Complaint,  ¶ 34.
[17] Amended Complaint,  ¶ 35.
[18] Amended Complaint,  ¶ 7 and 36-40.
[19] Amended Complaint,  ¶ 41-42.
[20] Amended Complaint,  ¶ 7-8.
[21] Amended Complaint,  ¶ 10 and 48.
[22] Amended Complaint,  ¶ 49 and 74.



without Go Global's participation.[23] On June 29, 2023, DOM also purchased eleven leases for BBBY retail locations for $1,700,000.[24] On July 11, 2023, these assets were approved to be sold to DOM.[25]

Throughout this entire process, both Go Global and DOM assembled dedicated teams to work on the project. While Go Global's team brought the necessary professional expertise and experience to effectively execute the acquisition,[26] DOM's team lacked the expertise required to make meaningful progress on their initiative.[27]

It is my understanding that Go Global would not have conferred with, or given access to their data room to, DOM had they known that DOM would have placed a bid without Go Global. As such, the following is alleged:[28]

    a. These acts have caused damages to Go Global, including but not limited to lost profits, loss of goodwill, loss of competitive advantages, and business opportunities;

    b. DOM was unjustly enriched as a result of using Go Global's proprietary information;

    c. DOM continues to unjustly enrich itself by using Go Global's proprietary information to maximize the value of the BBBY intellectual property and leases purchased and operate the business;

    d. Go Global was damaged and irreparably harmed, and continues to be damaged and irreparably harmed, as a direct and proximate cause of DOM's actions;

    e. DOM circulated the full model that they had obtained from Go Global's data room and distributed those documents to a number of potential investors that had interest in assisting in funding the project[29]; and

    f. DOM harmed Go Global by destroying their trade secrets as soon as the model was used by DOM, as Go Global's competitor, and wrongfully distributed to outside parties, pursuant to the NDA.

It is also my understanding that all BBBY's brick and mortar stores will be closed by the end of 2024, with sales only continuing to occur via online traffic.[30] This supports the fact that DOM had little to no expertise in operating durable baby goods stores.

---

[23] Amended Complaint, ¶ 104.
[24] Amended Complaint, ¶ 111.
[25] Amended Complaint, ¶ 106.
[26] See Appendix D for a listing of all professional experience for the individuals on the Go Global team.
[27] Deposition of Avish Dahiya taken on October 2, 2024 at 10:00 a.m. (the "Dahiya Deposition") ¶ 152-164.
[28] Amended Complaint, ¶ 164-167.
[29] In light of the short period to consummate the Joint Bid, it was distributed to outside parties in order to generate enough funds to fund DOM's sole bid.
[30] https://www.usatoday.com/story/money/retail/2024/10/22/buybuy-baby-locations-closing/75792448007/

CONFIDENTIAL

## Trade Secrets Background

The Defend Trade Secrets Act ("DTSA") defines a trade secret as:

> *"all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if -*
> - *the owner thereof has taken reasonable measures to keep such information secret, and*
> - *the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."[31]*

Under the DTSA, trade secrets encompass a wide range of confidential business information that provides a competitive edge, including financial models, methodologies, and strategies. When it comes to acquiring a business through bankruptcy and growing it, trade secrets may include proprietary financial models that outline how a company's financial position is assessed, forecasting techniques, investment strategies, and post-acquisition growth methodologies. These methodologies might involve specific approaches to restructuring a distressed company, improving operational efficiency, or identifying cost-saving opportunities—critical components for successfully turning around a business post-acquisition.

Trade secrets can only be safeguarded if these models and strategies remain unknown to any third party except for those on the development team. If these models and strategies become known to any party other than the developer, the value of the trade secret is diminished or destroyed, and that information no longer has trade secret status or protection. If a business's approach to growing post-bankruptcy acquisitions is copied or disclosed without authorization, it could undermine the company's strategic positioning in future deals, potentially leading to lost profits or competitive harm.

For the purposes of this Matter, I assume that Go Global's annotated versions of BBBY's financial data, Go Global's proprietary forecasts, financial models, and strategic operating plans shared with DOM under the NDA meets the definition of trade secret under federal and New York State law (the "Model").

---

[31] 18 U.S.C. § 1836.



## Durable Baby Goods Stores Industry Background[32]

**Products**

The U.S. durable baby goods retail industry, includes products such as:

- Baby furniture (including cribs);
- Strollers;
- Car seats; and
- Other mobile carries and baby accessories.

**Consumers**

A majority of consumers in this space are aged 25 to 44, representing 62.2% of purchases, followed by those aged 45 and older at 24%. Consumers aged 24 and younger make up just 13.8% of the market, reflecting the fact that younger individuals are less likely to be purchasing baby goods compared to those in their childbearing years.

**Declining Birth Rates**

Although economic optimism typically encourages increased spending on baby goods as families plan for children, the ongoing decline in birth rates in the U.S. has weakened overall demand for these products. Despite this, the industry has seen modest growth, with an estimated 1.1% increase in revenue over the past five years, reaching $11.4 billion in 2024. However, this growth has been uneven, with a 0.8% decline projected for 2024 alone, reflecting broader market pressures.

**Competition**

The industry's competitive landscape is increasingly challenging for traditional brick-and-mortar baby goods retailers. In particular, online-only retailers such as Wayfair and Overstock are posing a growing threat by offering greater convenience, lower operating costs, and more competitive pricing. These online giants benefit from the absence of physical storefronts, allowing them to significantly reduce operating expenses. This cost advantage enables them to offer lower prices, which appeals to price-conscious consumers—particularly in the highly competitive baby goods market, where products like strollers, cribs, and car seats are seen as essential purchases. In addition, online platforms allow retailers to provide detailed product descriptions, customer reviews, and additional information about product safety, which is especially important for parents seeking the best products for their children. As more traditional retailers look to enhance their online presence, they will face strong competition from well-established e-commerce players, making it difficult for newer or smaller entrants to succeed in the market.

**New Retailers Entering the Market**

New retailers entering the durable baby goods space will find it particularly difficult to compete with well-established players. Many established stores have built strong reputations for offering high-quality products, which helps differentiate them from their competitors. Finding reliable distributors and securing inventory will also be a significant challenge for new entrants, who will need to develop relationships with reputable suppliers in order to compete on product

---

[32] IBISWorld Industry Report for Durable Baby Goods Stores in the US, NAICS 44911, dated July 2024. IBISWorld Industry Risk Rating Report for Durable Baby Goods Stores in the US, OD4386, dated June 2024.



availability and quality. The industry's heavy reliance on labor to set up storefronts, assist customers, and manage employees presents additional challenges for brick-and-mortar stores, which often face higher operational costs compared to online-only retailers. As the competition from online giants and big-box stores intensifies, traditional retailers must find ways to balance the costs of physical operations with the demand for a more flexible, customer-friendly experience.

**Fragmented Market**

The industry itself remains highly fragmented, with no single company able to capture a dominant share of the market. Since the exit of Babies "R" Us from the retail landscape, smaller players have attempted to capture a greater share of the market, but they continue to face steep competition from larger, more established retailers. For instance, Williams-Sonoma, Inc. is the most well-known player in the durable baby goods space, but it holds just 2.4% of the market share ($290.7 million out of an approximate total market share of $12 billion). This fragmented nature of the market means that no company has a significant advantage in terms of scale, and smaller retailers must compete fiercely to establish a foothold. Despite these challenges, the overall market is expected to grow modestly, with projected revenue increasing at a compound annual growth rate (CAGR) of 1.1%, reaching $12.7 billion by 2029. This growth will likely be driven by rising disposable incomes and increased demand for durable, high-quality baby products, though competition from both online retailers and big-box stores will continue to present significant hurdles. Retailers that can successfully navigate this competitive environment and offer a combination of convenience, quality, and value will be best positioned to thrive in the coming years.

# SUMMARY OF MY CONCLUSIONS

## Overview of Calculated Damages

Using the data from documents referenced in Appendix C and assumptions listed above, I calculated damages to range from **$1,545,813** to **$37,292,525**, as reflected in the table below.

# CALCULATION OF DAMAGES

## Damages Period

In calculating the damages, I focused on the period from July 11, 2023, through July 10, 2028 (the "Damages Period"). This five-year timeframe was selected for two primary reasons. First, the Bankruptcy Court approved the sale of BBBY's intellectual property to DOM on July 11, 2023, marking the point at which DOM gained control over the relevant assets and the potential for economic gain from the intellectual property in question. Second, based on my understanding of Go Global's business plans and Model, it was intended that the business would be sold after a five-year holding period. This aligns with the expected trajectory of the business and the time frame over which damages can be reasonably



assessed, ensuring that the calculation is consistent with the anticipated period of operations and the ultimate exit from the business entity.

| Summary of Damages | | |
|---|---|---|
| | Estimated Damages | Related Exhibit |
| Damages Under Defend Trade Secrets Act (DTSA) | | |
| Avoided Development Costs | $ 1,545,813 | Exhibit 2 |
| Lost Profits (Including E-Commerce) | 26,257,965 | Exhibit 3A |
| Lost Profits (Excluding E-Commerce) | 4,628,110 | Exhibit 4A |
| Reasonable Royalty  (Including E-Commerce) | 37,292,525 | Exhibit 5A |
| Reasonable Royalty  (Excluding E-Commerce) | 11,775,383 | Exhibit 5B |
| Unjust Enrichment | - | n/a |
| | | |
| Damages Under New York Misappropriation of Trade Secrets | | |
| Avoided Development Costs | $ 1,545,813 | Exhibit 2 |
| Lost Profits (Including E-Commerce) | 26,257,965 | Exhibit 3A |
| Lost Profits (Excluding E-Commerce) | 4,628,110 | Exhibit 4A |
| Reasonable Royalty  (Including E-Commerce) | 37,292,525 | Exhibit 5A |
| Reasonable Royalty  (Excluding E-Commerce) | 11,775,383 | Exhibit 5B |
| Unjust Enrichment | - | n/a |
| | | |
| Damages Under Breach of Contract | | |
| Expectation Damages (Lost Profits (Including E-Commerce)) | $ 26,257,965 | Exhibit 3A |
| Expectation Damages (Lost Profits (Excluding E-Commerce)) | 4,628,110 | Exhibit 4A |
| Compensatory Damages (Avoided Development Costs) | 1,545,813 | Exhibit 2 |
| Nominal Damages | - | n/a |

Guidepost

## Damages Under DTSA

The DTSA is a federal law that provides a private civil cause of action for the misappropriation of trade secrets.[33] To qualify for protection under the DTSA, the information in question must derive independent economic value from not being generally known, and the owner must have taken reasonable measures to keep it secret.[34] Misappropriation occurs when someone acquires a trade secret through improper means, such as theft, bribery, or breach of a duty to maintain secrecy.

The DTSA permits recovery for certain damages- (1) "damages for <u>actual loss,</u>" (2) "damages for any <u>unjust enrichment</u> caused by the misappropriation of trade secrets not addressed in computing damages for actual loss" or (3) "in lieu of damages measured by any other methods, … [damages] measured by imposition of liability for a <u>reasonable royalty</u> for the misappropriator's unauthorized disclosure or use of the trade secret."[35]

As such, I have calculated damages in the form of actual losses, unjust enrichment, and reasonable royalty for the Damages Period. The calculation of these damages is discussed in further detail below.

### Actual Damages

Actual damages, also known as compensatory damages, for intellectual property misappropriation are intended to compensate the Plaintiff for actual losses caused by a wrongful act.[36] Compensatory damages include, but are not limited to, lost profits, reasonable royalties, and the cost of developing the trade secret.[37]

#### Avoided Development Costs
In the context of calculating damages, avoided development costs represent a viable method for quantifying the financial impact of a trade secret misappropriation.[38] This approach involves assessing the costs that the Defendant would have incurred had they developed the product in question, rather than relying on the misappropriated Model. By calculating these avoided costs, I can estimate the economic benefit derived by the Defendant from using the trade secrets without incurring the associated development expenses, which were incurred by Plaintiff.

---

[33] 18 U.S.C § 1836.

[34] 18 U.S.C § 1839.

[35] 18 U.S.C. § 1836(b)(3)(B)(i)-(ii) and Better Holdco, Inc. v. Beeline Loans Inc., 666 F. Supp. 3d 328, 392 (S.D.N.Y. 2023).

[36] AICPA Forensic & Valuation Services Practice Aid on "Calculating Damages in Intellectual Property Disputes", Fourth Edition.

[37] Ibid. LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp. 182, 185 (S.D.N.Y. 2002).

[38] See Syntel Sterling Best Shores Mauritius Limited v. The TriZetto Group, Inc., 68 F.4th 792, 812 (2d Cir. 2023). "Where disclosure of a trade secret  has destroyed [the secret's] competitive edge . . . the plaintiff's costs of developing the product may be the best evidence of the (now-depleted) value that the plaintiff placed on the secret." Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc., 2023 WL 1116090, at *3 (S.D.N.Y. Mar. 13, 2023) (citing E.J. Brooks Co. v. Cambridge Sec. Seals, 31 N.Y.3d 441, 454 (N.Y. 2018)).



The methodology for determining avoided development costs typically involves a detailed analysis of the various expenses that would have been necessary for the development process. This includes labor costs, materials, research and development expenditures, and overhead costs attributable to the project.

In this Matter, the Model shared with DOM under the NDA was Go Global's trade secrets, as defined by the DTSA. When the Model was acquired, disclosed, and utilized by DOM, Go Global not only lost the chance to secure the acquisition but also incurred the complete destruction of its trade secrets. The costs associated with the resources expended in developing the Model are a portion of actual damages (the "Avoided Development Costs"). The Model represented a strategic investment of time and effort, specifically tailored to aid in the process of the Joint Bid. Because of the competitive nature inherent to an auction, Defendants' use of Plaintiff's Model to compete against Plaintiff, resulted in the diminishment or total loss of Plaintiff's Model to Plaintiff. Meanwhile, the Defendants benefitted from Plaintiff's work without having to incur the cost of developing that work.

The Avoided Development Costs consist of the following, each of which is discussed in further detail below:
1. Legal costs;
2. Ankura consulting costs;
3. Personnel compensation to Streader, Feuer, Gargiulo, Schrieber, Stephens, and Fong; and
4. Payments to Mo Beig, consultant.

### Legal Costs
I assumed that the legal fees included in the avoided development costs amount to $108,810.50, based on the legal invoices provided by Falcon, Rappaport, and Berkman. These invoices have been reviewed and used as the basis for calculating the relevant legal expenses, which are incorporated into the overall development cost analysis. These legal fees are directly related to the development process and ensure an accurate representation of the avoided costs in my financial overview.

### Ankura Consulting Costs
I assumed that the consulting fees included in the avoided development costs amount to $31,502.52, based on the invoices provided by Ankura for due diligence services and invoices related to the upkeep of the data room. These invoices have been reviewed and serve as the foundation for calculating the relevant consulting expenses, which are incorporated into the overall cost analysis. This assumption reflects the due diligence work performed by Ankura and ensures an accurate representation of the avoided costs in my financial overview.

### Go Global Personnel Compensation
I calculated the Go Global personnel compensation based on the hourly consulting rates provided by Ankura, as the services Ankura provided are very similar in nature to those performed by Go Global's team. Ankura's rates served as a benchmark for estimating the compensation, given the comparable scope of work involved. The assumption is that the tasks carried out by Go Global personnel align closely with those outlined in the due diligence services provided by Ankura, making their hourly rates a benchmark reference for my calculation.



In addition to the hourly rates, I utilized the total number of hours based on a spreadsheet provided by Chau. He examined his calendar history, reviewed relevant calls, and cross-referenced emails to determine the time spent on related tasks. This comprehensive approach helped ensure that my estimates appear to be reasonable and reflect the actual work performed. By utilizing Ankura's consulting rates with Chau's time tracking, I arrived at a fair and reasonable calculation for the Go Global personnel compensation.

*Payments to Mo Beig*

Similarly, I calculated the compensation for Mo Beig, the CFO of Janie and Jack who assisted, based on the hourly consulting rates provided by Ankura, as the nature of his involvement—reviewing and providing an opinion on the model during the development period—was similar to the services provided by Ankura's team. The total hours spent by Mo Beig on this task were also estimated by Chau, who reviewed his calendar history, calls, and emails to accurately determine the time dedicated to the review. By using Ankura's rates and Chau's detailed time tracking, I was able to accurately estimate the compensation for Mo Beig's contribution to the project.

The total avoided development costs calculated is **$1,545,813**, as shown in **Exhibit 2.**

## Lost Profits

Under the DTSA, lost profits are deemed to be actual damages that Plaintiff can claim in a trade secrets misappropriation case. Lost profits refer to the financial harm a Plaintiff suffers as a result of the Defendant's alleged wrongful use or disclosure of the Plaintiff's trade secrets. In this Matter, the Model shared with DOM under the NDA contained Go Global's trade secrets, as defined by the DTSA.

To accurately determine lost profits, it is essential to establish the anticipated profits had the Joint Bid proceeded as originally planned. It is my understanding that, had the Joint Bid consummated, Go Global would have acted as the general partner and implemented a two-and-twenty model, wherein Go Global would receive an accrued 2% annual management fee on equity received (the "Management Fees") and 20% of the total to be distributed upon the company's sale in five years, after the debt, initial investor funds, and interest owed to investors were paid out (the "Carried Interest"). I calculated the Management Fees and Carried Interest as discussed below.

*Carried Interest*

To calculate the carried interest of 20%, I followed a detailed process that involved projecting the company's future financial performance, estimating its value, and then calculated the carried interest on the remaining funds after deducting relevant debt and equity.

Guidepost

First, I projected BBBY's future sales by completing the following:

1. I received historical sales data (only brick and mortar) for all 11 stores purchased by DOM from Gargiulo, which was provided to her by BBBY, covering the following periods:[39]
   a. March 1, 2019 through February 28, 2020;
   b. March 1, 2021 through February 28, 2022; and
   c. March 1, 2022 through December 31, 2022. To account for the partial year in this last period, I annualized the data to reflect a full year.
2. I then calculated a base sales amount by averaging the sales from all three periods and used this average to project net sales during the Damages Period (the "Base Sales").
3. To calculate the projected net sales for the period from July 11, 2023 through February 29, 2024, I applied a 45.05% growth rate (as provided through discussions with Feuer) to the Base Sales of $80,305,762, resulting in projected sales of $116,483,507. Since this period represents only 64% of a full year, I multiplied the $116,483,507 by 64%, yielding a total projected net sales amount of $74,549,445 for the first period.
4. The projected net sales for the period from March 1, 2024 through February 28, 2025, totaling $168,959,328, were calculated by applying the 45.05% growth rate provided by Feuer to the $116,483,507 in full-year sales from the previous period.
5. For the remaining three periods (March 1, 2025 through July 10, 2028), I adjusted the growth rates to reflect industry benchmarks. These industry growth rates are extracted from the IBISWorld Industry Report for Durable Baby Goods Stores in the US (US OD4386, NAICS 44911), dated July 2024. As the IBISWorld growth rates are based on a calendar year, I have adjusted each calendar year rate by weighting it according to the number of days in the calendar year that fall within my fiscal year. For example, to weight the growth rates of 0.60% for 2025 and 1.8% for 2026 over the fiscal year from March 1, 2025, to February 28, 2026, I calculated the weighted growth rate based on the number of days in each period (305 days in 2025 and 58 days in 2026), resulting in an overall weighted growth rate of approximately 0.79%.

Next, I calculated the company's EBITDA by deducting the cost of goods sold and operating expenses excluding depreciation, amortization, taxes, and depletion, using industry data to ensure these figures were in line with similar companies.[40] For the final period, which was only 36% of a year, I annualized the EBITDA to get an equivalent full-year figure. See **Exhibit 4D.**

This EBITDA value was then multiplied by a multiple of 7, based on industry standards,[41] to estimate the company's projected value at the time of sale. I then discounted this value to present value, using an appropriate discount rate of 19.57% to account for the time value of money.

---

[39] Note: no data for 2020 was provided due to the impact of COVID-19.
[40] In a typical lost profit's calculation only variable expenses are deducted. However, as this is structured as a two-and-twenty model distribution, the profits must be based on EBITDA.
[41] I reviewed the multiples for Carters Inc. and The Children's Place as reflected on Capital IQ.

Once I had the present value of the company, I deducted the debt assumed, which was based on a $15 million term sheet provided prior to the bid.[42] It is my understanding that this term sheet was based on 95 stores. Since the bid only resulted in the purchase of 11 stores, I adjusted the debt figure to approximately $2 million. To do this, I first calculated the per-store debt by dividing the $15 million by 95, which gave a value of $157,895 per store. I then multiplied this amount by 11 stores, resulting in $1,736,842, and rounded it up to approximately $2 million.

I also deducted $36 million owed to investors, based on discussion with Feuer, and accounted for the 8% interest due to these investors.

After these deductions, I calculated the 20% carried interest based on the remaining value, which represents the share of profits that would be distributed to the general partner, in this case Go Global, after the repayment of debt, return of invested capital, and payment of interest on return of investment.

Using the methodology discussed above, I have calculated the total carried interest to be **$4,017,327**. See **Exhibit 4B**.

As the carried interest amount above only includes net sales from brick-and-mortar stores, we have also calculated lost profits including e-commerce sales. In this calculation, we have been asked to assume that e-commerce sales are not store specific, as customers can be anywhere and purchase an item online.

In this calculation, we have received information reflecting e-commerce sales of $813,385,807 for the fiscal year ended February 28, 2022. I have also received information from Gargiulo, provided to her by BBBY, reflecting the average net sales per transaction. My understanding is that historical data for e-commerce sales for the periods ended February 28, 2020 and December 31, 2020 is not available and therefore I was not provided with this historical data. I have utilized the growth rates of average net sales per transaction to calculate the e-commerce sales during these periods. I have then averaged these sales to come to an average historical e-commerce sales amount of $815,664,199.

To grow this e-commerce net sales amount, I have assumed that e-commerce sales would have decreased by 68% in the first period, and decreased 54% in the second year, based on discussions with Feuer, Streader, and Gargiulo. After the first two periods, we have grown e-commerce sales using industry rates.

Using this methodology, I have calculated the total carried interest to be **$25,647,182**. See **Exhibit 3B**.

_Management Fees_
To calculate the management fees, I first started with the assumed equity of $36 million owed to investors, which was based on discussions with Feuer.

---

[42] This term sheet was provided by MidCap Financial dated June 5, 2023.



For the first couple of periods, I distributed the management fees in line with the growth rate applied to sales (45%). This was based on the expectation that significant investment in inventory and sales expansion would drive early-stage growth and, correspondingly, higher capital would be needed during this period.

For the remaining years, I assumed that the remainder of equity would be distributed evenly. This approach allowed us to reflect the expected pattern of business development, where the initial heavy investment and growth would taper off, leading to more consistent and predictable management fees in the later years. By allocating the fees in this manner, I ensured that the management fee structure was closely tied to the company's growth trajectory, with higher early-stage growth and a more balanced distribution as the business matured.

I then present valued the annual expected management fees resulting in a total management fee value of **$610,783.** See **Exhibit 3C and 4C**.

The total lost profits (Management Fees and Carried Interest) excluding e-commerce sales calculated is **$4,628,110**, as reflected on **Exhibit 4A**.

The total lost profits (Management Fees and Carried Interest) including e-commerce sales calculated is **$26,257,965**, as reflected on **Exhibit 3A**.

### Reasonable Royalty

If avoided development costs, lost profits and unjust enrichment cannot be readily calculated, the court may award a reasonable royalty for the Defendant's use of the trade secrets. This is typically based on what a willing buyer and willing seller would have agreed to for the use of the information. The reasonable royalty method is a technique commonly employed in the assessment of intangible asset value. This method estimates the value of an intangible asset by calculating the royalties that a hypothetical licensor would charge a licensee for the use of that intellectual property. The underlying principle is that the value of an intangible asset can be derived from the revenues that would be generated through its licensing if it were used by a third party.

This method has several advantages, including its alignment with market-based approaches and its ability to provide a tangible metric for valuing intangible assets. However, it is essential to consider its limitations, such as the availability and reliability of comparable licensing data, which can impact the accuracy of the valuation.

It is my understanding that Go Global did not want their Model to be publicly known. For the purposes of this report, I'm assuming that this Model was in fact a trade secret. However, in this specific calculation, I have assumed that if Go Global had been willing to make their Model publicly available, they would have opted to license it to a third party and receive a reasonable royalty.

To apply the Reasonable Royalty method, I followed these steps:

1. First, I calculated the expected net sales of the brick and mortar 11 stores purchased by DOM during the Damages Period ("Projected Net Sales"). To calculate the Projected Net Sales of the BBBY stores, I have used the same projected net sales as calculated under the lost profits method, as discussed earlier in this report and reflected on Exhibit 4B.

Guidepost

2. Next, the appropriate royalty rate was identified. To determine this rate, I analyzed two comparable licensing agreements within the same industry[43] (with a median of 2.50%) and had discussions with Rosa Costa[44] about royalties she has seen in the industry (approximately 7%). Based on my analysis, I have determined that a royalty rate of 4% is appropriate, as it is the average of the comparable agreement median and the rates as seen in the industry by Costa (the "Reasonable Royalty Rate").

3. Once the Reasonable Royalty Rate was established, I applied it to the Projected Net Sales over the Damages Period to get the value of the expected reasonable royalties ("Pre- Tax Reasonable Royalties").

4. I then applied a 45% tax rate to the Pre-Tax Reasonable Royalties to arrive at an after-tax reasonable royalty (the "After-Tax Reasonable Royalty"). I have used 45% to be conservative.

5. Lastly, I present value the After- Tax Reasonable Royalties over the Damages Period.

I have calculated a total reasonable royalty of **$11,775,383**, as shown in **Exhibit 5B.**

As the calculation above only includes net sales from brick-and-mortar stores, we have also calculated reasonable royalty including e-commerce sales to be **$37,292,525**. See **Exhibit 5A**.

## Unjust Enrichment

Unjust enrichment occurs when one party benefits at the expense of another in a manner that is deemed unjust or inequitable. The concept of unjust enrichment is particularly relevant in this case, as DOM has derived unfair benefits at the expense of Go Global due to the breach of the NDA and granting of access to Go Global's Model and trade secrets to potential investors. By improperly utilizing Go Global's Model to submit its own bid for BBBY, DOM gained a competitive advantage. This unauthorized use of proprietary information not only undermines the collaborative intent of the Joint Bid but also demonstrates a clear case of benefiting from Go Global's intellectual property without compensation or consent.

Unjust enrichment cannot be awarded if the party has already received another form of damages for the same claim. The principle of avoiding double recovery means that a party cannot be compensated twice for the same loss or harm.

In this case, unjust enrichment is not applicable because the Defendant did not derive any financial benefit from the wrongful use of the Model. A review of BBBY's internally prepared income statements shows a net loss of ($5,094,586) for the period of July 2023 through December 2023[45] and a net loss of ($12,290,418) for the period of January 2024

---

[43] I reviewed agreements from multiple different databases and excluded many agreements because they were either not comparable to BBBY or prior to 2013. I have included royalty rates for (1) an agreement between Beyond, Inc. and Kirkland's Inc. dated October 21, 2024 and (2) an agreement between Cherokee Inc. and Target General Merchandise, Inc. dated January 29, 2013.
[44] See Rosa Costa's experience in Appendix D.
[45] BBBY099-101.



through July 2024.[46] It is evident that, despite having access to the Model, the Defendants' were unable to grow the company on their own, as they lacked the necessary professional expertise to effectively leverage the information.[47]

The table below summaries the damages calculated under the DTSA.

| Summary of Damages Under DTSA | | |
|---|---|---|
| **Damages Method** | **Estimated Damages** | **Related Exhibit** |
| Avoided Development Costs | $ 1,545,813 | Exhibit 2 |
| Lost Profits (Including E-Commerce) | 26,257,965 | Exhibit 3A |
| Lost Profits (Excluding E-Commerce) | 4,628,110 | Exhibit 4A |
| Reasonable Royalty  (Including E-Commerce) | 37,292,525 | Exhibit 5A |
| Reasonable Royalty  (Excluding E-Commerce) | 11,775,383 | Exhibit 5B |
| Unjust Enrichment | - | n/a |

## Damages Under New York Common Law Misappropriation of Trade Secrets

In addition to the federal DTSA, many states have their own laws governing the protection of trade secrets. In this Matter, Plaintiff is also pursuing a claim under New York's common law doctrine of trade secret misappropriation. This doctrine predates the DTSA and provides an alternative avenue for relief.

The damages analysis for the New York common law claim would follow a similar framework as the DTSA. Plaintiffs can seek to recover their actual damages in the form of lost profits and development costs, as well as the Defendant's unjust enrichment.

As such, I have calculated damages under New York Common Law Misappropriation of Trade Secrets in the form of actual losses, reasonable royalties, and unjust enrichment for the Damages Period. These damage amounts were calculated in the same manner as under the DTSA. The table below summarizes damages under New York Common Law Misappropriation of Trade Secrets.

---

[46] BBBY096-8.
[47] It is also my understanding that all BBBY's brick and mortar stores will be closed by the end of 2024, with sales only continuing to occur via online traffic. Additionally, Dahiya states that they did not have the experience in his deposition on pages 150-163 and 170-180.

Guidepost

| Summary of Damages Under New York Misappropriation of Trade Secrets | | |
| --- | --- | --- |
| Damages Method | Estimated Damages | Related Exhibit |
| Avoided Development Costs | $ 1,545,813 | Exhibit 2 |
| Lost Profits (Including E-Commerce) | 26,257,965 | Exhibit 3A |
| Lost Profits (Excluding E-Commerce) | 4,628,110 | Exhibit 4A |
| Reasonable Royalty  (Including E-Commerce) | 37,292,525 | Exhibit 5A |
| Reasonable Royalty  (Excluding E-Commerce) | 11,775,383 | Exhibit 5B |
| Unjust Enrichment | - | n/a |

## Damages Under Breach of Contract

In breach of contract cases, damages are awarded to compensate the non-breaching party for the losses they have incurred as a result of the breach. The primary goal of damages in a breach of contract case is to put the injured party in the position they would have been in had the contract been fully performed. Under contract law, there are several types of damages that may be awarded, depending on the nature of the breach, the specific circumstances, and the damages that can be reasonably proven.[48]

| Summary of Damages Under Breach of Contract | | |
| --- | --- | --- |
| Damages Method | Estimated Damages | Related Exhibit |
| Expectation Damages (Lost Profits (Including E-Commerce)) | $ 26,257,965 | Exhibit 3A |
| Expectation Damages (Lost Profits (Excluding E-Commerce)) | 4,628,110 | Exhibit 4A |
| Compensatory Damages (Avoided Development Costs) | 1,545,813 | Exhibit 2 |
| Nominal Damages | - | n/a |

For the breach of contract claim, the primary damages are:
1. Expectation Damages: This covers the profits the Plaintiff would have earned if the Defendant had not breached the NDA and the parties had carried out the Joint Bid as planned.

---

[48] All breach of contract damages types are per the "New York Breach of Contract Damages" written by Julie Amadeo, Justin Ben-Asher, James Carolan, and Chris Paparella, Steptoe published in November 2020 in Bloomberg Law.



2.  Compensatory Damages: This covers the loss Plaintiff incurred as a result of the Defendant's breach of the NDA.
3.  Nominal Damages: If actual monetary damages cannot be quantified, the court may still award nominal damages (a small, symbolic amount) to recognize the defendant's breach of contract.

## Expectation Damages

The expected damages under breach of contract are calculated as lost profits. In this Matter, the Model shared with DOM under the NDA was Go Global's trade secret, as defined by the DTSA. The misuse of the Model has led to significant lost profits that must be calculated to determine the financial impact of Defendant's alleged act. Lost profits under breach of contract were calculated the same way as under the DTSA and New York Common Law Misappropriation of Trade Secrets.

As such, the total lost profits, excluding e-commerce sales, calculated is **$4,628,110**, as shown in **Exhibit 4A,** and the lost profits including e-commerce sales calculated is **$26,257,965**, as shown in **Exhibit 3A**.

## Compensatory Damages

The compensatory damages under breach of contract are intended to restore the Plaintiff to the position they would have been in had the wrongful act not occurred, effectively making them "whole" by compensating them for the loss suffered. Go Global incurred costs associated with the resources expended in developing the Model, as discussed previously in the Avoided Development Costs section. DOM's conduct diminished the value of Go Global's trade secrets. Avoided Development Costs incurred under breach of contract were calculated the same way as under the DTSA and New York Common Law Misappropriation of Trade Secrets.

As such, the total avoided development costs calculated is **$1,545,813**, as shown in **Exhibit 2.**

The table below summarizes the damages calculated under breach of contract.

| Summary of Damages Under Breach of Contract | | |
|---|---|---|
| **Damages Method** | **Estimated Damages** | **Related Exhibit** |
| Expectation Damages (Lost Profits (Including E-Commerce)) | $ 26,257,965 | Exhibit 3A |
| Expectation Damages (Lost Profits (Excluding E-Commerce)) | 4,628,110 | Exhibit 4A |
| Compensatory Damages (Avoided Development Costs) | 1,545,813 | Exhibit 2 |
| Nominal Damages | - | n/a |

Guidepost

# SUMMARY OF CONCLUSIONS

Based on the information set forth in this report and the accompanying exhibits, coupled with my experience, education and knowledge of damage calculations related to intellectual property, it is my opinion that the potential damages to the Plaintiff in this Matter range between **$1,545,813** and **$37,292,525**, as summarized in the table below.

| Summary of Damages | | |
|---|---|---|
| | Estimated Damages | Related Exhibit |
| <u>Damages Under Defend Trade Secrets Act (DTSA)</u> | | |
| Avoided Development Costs | $   1,545,813 | Exhibit 2 |
| Lost Profits (Including E-Commerce) | 26,257,965 | Exhibit 3A |
| Lost Profits (Excluding E-Commerce) | 4,628,110 | Exhibit 4A |
| Reasonable Royalty  (Including E-Commerce) | 37,292,525 | Exhibit 5A |
| Reasonable Royalty  (Excluding E-Commerce) | 11,775,383 | Exhibit 5B |
| Unjust Enrichment | - | n/a |
| | | |
| <u>Damages Under New York Misappropriation of Trade Secrets</u> | | |
| Avoided Development Costs | $   1,545,813 | Exhibit 2 |
| Lost Profits (Including E-Commerce) | 26,257,965 | Exhibit 3A |
| Lost Profits (Excluding E-Commerce) | 4,628,110 | Exhibit 4A |
| Reasonable Royalty  (Including E-Commerce) | 37,292,525 | Exhibit 5A |
| Reasonable Royalty  (Excluding E-Commerce) | 11,775,383 | Exhibit 5B |
| Unjust Enrichment | - | n/a |
| | | |
| <u>Damages Under Breach of Contract</u> | | |
| Expectation Damages (Lost Profits (Including E-Commerce)) | $ 26,257,965 | Exhibit 3A |
| Expectation Damages (Lost Profits (Excluding E-Commerce)) | 4,628,110 | Exhibit 4A |
| Compensatory Damages (Avoided Development Costs) | 1,545,813 | Exhibit 2 |
| Nominal Damages | - | n/a |

Under Federal and New York State law, in addition to the damages, the legal framework permits the award of exemplary and punitive damages, which can be as high as two times the amount of the damage award.

In reaching my conclusions, I have calculated economic damages to a reasonable degree of accounting certainty. I have applied generally accepted damage methodologies reliably applied to the facts of this case, which can be easily replicated. The procedures performed were limited to those described herein based on the documents provided to date and other information obtained. Information obtained subsequent to the date of this report may affect this analysis. to the extent that additional information is provided, I reserve the right to update and supplement my analysis. My procedures were performed solely with respect to the above referenced matter. This report is not to be reproduced, distributed, disclosed or used for any other purpose.

CONFIDENTIAL



Respectfully submitted,

_/s/ Alan Schachter_____
Alan Schachter, CPA/ABV/CFF, CVA, CFE
November 15, 2024

**Exhibit 1**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Summary of Damages**

| | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/28/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 | Total |
|---|---|---|---|---|---|---|---|
| Avoided Development Costs [1] | $ 197,864 | $ 309,163 | $ 309,163 | $ 309,163 | $ 309,163 | $ 111,299 | $ 1,545,813 |
| Lost Profits (Including E-Commerce) [2] | 305,989 | 264,275 | 14,618 | 12,225 | 10,224 | 25,650,633 | 26,257,965 |
| Lost Profits (Excluding E-Commerce) [3] | 305,989 | 264,275 | 14,618 | 12,225 | 10,224 | 4,020,778 | 4,628,110 |
| Reasonable Royalty (Including E-Commerce) [4] | 8,923,753 | 8,404,430 | 7,084,407 | 6,027,404 | 5,108,952 | 1,743,578 | 37,292,525 |
| Reasonable Royalty (Excluding E-Commerce) [5] | 1,548,382 | 3,029,814 | 2,553,943 | 2,172,892 | 1,841,788 | 628,564 | 11,775,383 |

**Note**

[1]   See Exhibit 2. Amortized over the 5 year period.
[2]   See Exhibit 3A.
[3]   See Exhibit 4A.
[4]   See Exhibit 5A.
[5]   See Exhibit 5B.

**Exhibit 2**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Avoided Development Costs**

| | Development Cost | Rate per Hour | Hours | Total |
|---|---|---|---|---|
| [1] | Legal fees | n/a | n/a | $    108,810.50 |
| [2] | Ankura Capital consulting | n/a | n/a | 31,502.52 |
| [3] | Go Global Employee - Jeff Streader | $   900 | 350 | 315,000.00 |
| [3] | Go Global Employee - Christian Feuer | $   900 | 315 | 283,500.00 |
| [3] | Go Global Employee - Yuen Chau | $   750 | 310 | 232,500.00 |
| [3] | Go Global Employee - Deborah Gargiulo | $   750 | 225 | 168,750.00 |
| [3] | Go Global Employee - Chris Schreiber | $   650 | 200 | 130,000.00 |
| [3] | Go Global Employee - Thoryn Stephens | $   650 | 275 | 178,750.00 |
| [3] | Go Global Employee - Eric Fong | $   650 | 80 | 52,000.00 |
| [3] | Consulting costs paid to Mo Beig | $   750 | 60 | 45,000.00 |
| | | | | $   1,545,813.02 |

**Note**

[1]  Per Falcon, Rappaport & Berkman invoices provided.

[2]  Per Ankura invoices provided.

[3]  The rate per hour was estimated based on the consulting rates of Ankura for individuals in the
similar position for each employee. The hours assumed were based on estimated hours worked on
the project, as discussed in detail in the text.

**Exhibit 3A**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Lost Profits (Management Fees and Carried Interest) - Including E-Commerce Sales**

| | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/28/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 | Total |
|---|---|---|---|---|---|---|---|
| [1] Present Value of Expected Management Fees | | | | | | | |
| [2] Present Value of 20% Carried Interest | | | | | | | |
| **Lost Profits (Management Fees and Carried Interest)** | | | | | | | |

**Notes**

[1]  See Exhibit 3C.

[2]  See Exhibit 3B.

**Exhibit 3B**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**20% Carried Interest  - Including E-Commerce Sales**

| | Total |
|---|---|

[1] EBITDA at Exit
[2] Exit Multiple
[3] Valuation at Exit

[4] Present value period (years)
Weighted Average Cost of Capital (WACC)
Present Value Factor

Present Value of Valuation

[5] Debt from MidCap
[6] Investor Funds
8% Interest on Investor Funds
Total Distributed to Debtors and Investors

[7] Total Remaining to Be Distributed

20% Carried Interest

**Notes**

[1] EBITDA at 7/10/2028, annualized. See Exhibit 3D.

[2] Per industry exit multiples for comparable companies (Carters Inc. and The Children's Place, Inc.).

[3] EBITDA at exit multiplied by Exit Multiple of 7.

[4] Present value of terminal year.

[5] Adjusted the $15M debt per the term sheet provided from MidCap. Divided the $15M by 95 ($157,895) multiplied by 11 stores ($1,736,842). We then rounded this value up to $2M.

[6] We assumed $36M, based on discussions with Feuer.

[7] Present value of valuation less the total distributed to debtors and investors.

**Exhibit 3C**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Management Fees - Including E-Commerce Sales**

| | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/28/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 | Total |
|---|---|---|---|---|---|---|---|
| [1] Expected Annual Equity Invested | | | | | | | |
| [2] Management Fee Percentage to Go Global | | | | | | | |
| Expected Management Fees Paid to Go Global | | | | | | | |
| [3] Present value period (years) | | | | | | | |
| [4] Weighted Average Cost of Capital (WACC) | | | | | | | |
| [5] Present Value Factor | | | | | | | |
| **Present Value of Expected Management Fees** | | | | | | | |

**Notes**

[1] Assumed that the total equity value would have been contributed at the same rate that sales growth is estimated in the first two periods, then equally contributed for the remainder of the periods.

[2] It is our understanding that Go Global, as general partner, would receive a management fee of 2% of equity received.

[3] Cash flows are discounted at mid-year as sales are generally earned evenly throughout the year.

[4] See Exhibit 6A.

[5] Present value factor using the WACC as the discount rate.

**Exhibit 3D**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Projected EBITDA of BBBY - Including E-Commerce Sales**

| | Historical Net Sales of BBBY [1] | | | | Projected EBITDA of BBBY [3] | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 3/1/2019 - 2/28/2020 | 3/1/2021 - 2/28/2022 | 3/1/2022 - 12/31/2022 (Annualized) | Average | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/29/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 |
| [3] Net Brick & Mortar Sales by Store | | | | | | | | | | |
| Braintree, MA (#3060) | | | | | | | | | | |
| Bridgewater, NJ (#3037) | | | | | | | | | | |
| Rockville, MD (#3001) | | | | | | | | | | |
| Cherry Hill, NJ (#3010) | | | | | | | | | | |
| Woodbridge, NJ (#3130) | | | | | | | | | | |
| Scarsdale, NY (#3002) | | | | | | | | | | |
| Springfield, VA (#3008) | | | | | | | | | | |
| Newark, DE (#3046) | | | | | | | | | | |
| Amherst, NY (#3083) | | | | | | | | | | |
| West Hartford, CT (#3121) | | | | | | | | | | |
| Paramus, NJ  (#3003) | | | | | | | | | | |
| Total Net Brick & Mortar Sales | | | | | | | | | | |
| [4] E-Commerce Sales | | | | | | | | | | |
| Total Net Sales | | | | | | | | | | |
| [3] Net Sales Growth Rate | | | | | | | | | | |
| Projected COGS | | | | | | | | | | |
| [6] COGS % | | | | | | | | | | |
| Projected Gross Profit | | | | | | | | | | |
| [6] Gross Profit % | | | | | | | | | | |
| Projected Expenses | | | | | | | | | | |
| [7] Expense % | | | | | | | | | | |
| Projected EBITDA | | | | | | | | | | |
| **Annualized EBITDA** | | | | | | | | | | |

**Notes**

[1]  Actual brick and mortar historical revenue of BBBY as provided by BBBY to Go Global. Go Global was not provided 2020 because it was during COVID-19.

[2]  Prior year net sales multiplied by the Net Sales Growth Rate in the relevant damages period.

[3]  These are the 11 stores DOM purchased in the bankruptcy auction.

[4]  E-Commerce sales per information provided by Gargiulo.

[5]  Growth rate for the first year is per the Go Global model adjusted to reflect the 11 stores as prepared by Feuer (see Exhibit 5). It is our understanding that the growth rates in the initial period would be substantial, as they would need to grow inventory. Growth rates for the remaining periods are per the IBISWorld Industry Report for the Durable Baby Goods Stores in the US, US OD4386, NAICS 44911, dated July 2024 (shown below). We have averaged the growth rate for the respective years in each period. For example, to weight the growth rates of 0.60% for 2025 and 1.8% for 2026 over the fiscal year from March 1, 2025, to February 28, 2026, we calculated the weighted growth rate based on the number of days in each period (305 days in 2025 and 58 days in 2026), resulting in an overall weighted growth rate of approximately 0.79%.

| Year | Growth Rate |
|---|---|
| 2023 | |
| 2024 | |
| 2025 | |
| 2026 | |
| 2027 | |
| 2028 | |

[6]  5-year average industry percentages based on the IBISWorld Industry Report for the Durable Baby Goods Stores in the US, US OD4386, NAICS 44911, dated July 2024.

[7]  5-year average industry percentages based on the IBISWorld Industry Report for the Durable Baby Goods Stores in the US, US OD4386, NAICS 44911, dated July 2024. This percentage is the total of the following expenses: salaries and wages, advertising, rent paid, repairs, bad debts, employee benefit programs, and compensation of officers.

**Exhibit 4A**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Lost Profits (Management Fees and Carried Interest) - Excluding E-Commerce**

| | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/28/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 | Total |
|---|---|---|---|---|---|---|---|
| [1] Present Value of Expected Management Fees | | | | | | | |
| [2] Present Value of 20% Carried Interest | | | | | | | |
| **Lost Profits (Management Fees and Carried Interest)** | | | | | | | |

**Notes**

[1] See Exhibit 4C.

[2] See Exhibit 4B.

**Exhibit 4B**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**20% Carried Interest - Excluding E-Commerce**

|  | **Total** |
|---|---|

[1] EBITDA at Exit

[2] Exit Multiple

[3] Valuation at Exit

[4] Present value period (years)

Weighted Average Cost of Capital (WACC)

Present Value Factor

Present Value of Valuation

[5] Debt from MidCap

[6] Investor Funds

8% Interest on Investor Funds

Total Distributed to Debtors and Investors

[7] Total Remaining to Be Distributed

20% Carried Interest

**Notes**

[1] EBITDA at 7/10/2028, annualized. See Exhibit 4D.

[2] Per industry exit multiples for comparable companies (Carters Inc. and The Children's Place, Inc.).

[3] EBITDA at exit multiplied by Exit Multiple of 7.

[4] Present value of terminal year.

[5] Adjusted the $15M debt per the term sheet provided from MidCap. Divided the $15M by 95 ($157,895) multiplied by 11 stores ($1,736,842). We then rounded this value up to $2M.

[6] We assumed $36M, based on discussions with Feuer.

[7] Present value of valuation less the total distributed to debtors and investors.

**Exhibit 4C**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Management Fees - Excluding E-Commerce**

| | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/28/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 | Total |
|---|---|---|---|---|---|---|---|
| [1] Expected Annual Equity Invested | | | | | | | |
| [2] Management Fee Percentage to Go Global | | | | | | | |
| Expected Management Fees Paid to Go Global | | | | | | | |
| [3] Present value period (years) | | | | | | | |
| [4] Weighted Average Cost of Capital (WACC) | | | | | | | |
| [5] Present Value Factor | | | | | | | |
| **Present Value of Expected Management Fees** | | | | | | | |

**Notes**

[1] Assumed that the total equity value would have been contributed at the same rate that sales growth is estimated in the first two periods, then equally contributed for the remainder of the periods.

[2] It is our understanding that Go Global, as general partner, would receive a management fee of 2% of equity received.

[3] Cash flows are discounted at mid-year as sales are generally earned evenly throughout the year.

[4] See Exhibit 6A.

[5] Present value factor using the WACC as the discount rate.

**Exhibit 4D**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Projected EBITDA of BBBY - Excluding E-Commerce**

| | Historical Net Sales of BBBY [1] | | | | Projected EBITDA of BBBY [2] | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 3/1/2019 - 2/28/2020 | 3/1/2021 - 2/28/2022 | 3/1/2022 - 12/31/2022 (Annualized) | Average | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/28/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 |
| [3] Net Brick & Mortar Sales by Store | | | | | | | | | | |
| Braintree, MA (#3060) | | | | | | | | | | |
| Bridgewater, NJ (#3037) | | | | | | | | | | |
| Rockville, MD (#3001) | | | | | | | | | | |
| Cherry Hill, NJ (#3010) | | | | | | | | | | |
| Woodbridge, NJ (#3130) | | | | | | | | | | |
| Scarsdale, NY (#3002) | | | | | | | | | | |
| Springfield, VA (#3008) | | | | | | | | | | |
| Newark, DE (#3046) | | | | | | | | | | |
| Amherst, NY (#3083) | | | | | | | | | | |
| West Hartford, CT (#3121) | | | | | | | | | | |
| Paramus, NJ (#3003) | | | | | | | | | | |
| Total Net Brick & Mortar Sales | | | | | | | | | | |
| [4] Net Sales Growth Rate | | | | | | | | | | |
| Projected COGS | | | | | | | | | | |
| [5] COGS % | | | | | | | | | | |
| Projected Gross Profit | | | | | | | | | | |
| [5] Gross Profit % | | | | | | | | | | |
| Projected Expenses | | | | | | | | | | |
| [6] Expense % | | | | | | | | | | |
| Projected EBITDA | | | | | | | | | | |
| **Annualized EBITDA** | | | | | | | | | | |

**Notes**

[1]  Actual e-commerce and brick and mortar historical revenue of BBBY as provided by BBBY to Go Global. Go Global was not provided 2020 because it was during COVID-19.

[2]  Prior year net sales multiplied by the Net Sales Growth Rate in the relevant damages period.

[3]  These are the 11 stores DOM purchased in the bankruptcy auction.

[4]  Growth rate for the first year is per the Go Global model adjusted to reflect the 11 stores as prepared by Feuer (see Exhibit 5). It is our understanding that the growth rates in the initial period would be substantial, as they would need to grow inventory. Growth rates for the remaining periods are per the IBISWorld Industry Report for the Durable Baby Goods Stores in the US, US OD4386, NAICS 44911, dated July 2024 (shown below). We have averaged the growth rate for the respective years in each period. For example, to weight the growth rates of 0.60% for 2025 and 1.8% for 2026 over the fiscal year from March 1, 2025, to February 28, 2026, we calculated the weighted growth rate based on the number of days in each period (305 days in 2025 and 58 days in 2026), resulting in an overall weighted growth rate of approximately 0.79%.

| Year | Growth Rate |
|---|---|
| 2023 | |
| 2024 | |
| 2025 | |
| 2026 | |
| 2027 | |
| 2028 | |

[5]  5-year average industry percentages based on the IBISWorld Industry Report for the Durable Baby Goods Stores in the US, US OD4386, NAICS 44911, dated July 2024.

[6]  5-year average industry percentages based on the IBISWorld Industry Report for the Durable Baby Goods Stores in the US, US OD4386, NAICS 44911, dated July 2024. This percentage is the total of the following expenses: salaries and wages, advertising, rent paid, repairs, bad debts, employee benefit programs, and compensation of officers.

**Exhibit 5A**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Reasonable Royalties**

| | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/28/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 | Total |
|---|---|---|---|---|---|---|---|
| [1] Projected Net Sales of BBBY | | | | | | | |
| [2] Royalty Rate | | | | | | | |
| Pre-Tax Reasonable Royalties | | | | | | | |
| [3] Tax Rate | | | | | | | |
| After-Tax Reasonable Royalties | | | | | | | |
| [4] Present value period (years) | | | | | | | |
| [5] Weighted Average Cost of Capital (WACC) | | | | | | | |
| [6] Present Value Factor | | | | | | | |
| **Present Value of Reasonable Royalties** | | | | | | | |

**Notes**

[1] See Exhibit 3D.

[2] The average of the royalty rate provided by Rosa Costa (7.0%) and the average industry rates extracted from 2 agreements (3% and 2%) is 4.0%.

[3] We have assumed 45% to be conservative.

[4] Cash flows are discounted at mid-year as sales are generally earned evenly throughout the year.

[5] See Exhibit 6A.

[6] Present value factor using the WACC as the discount rate.

**Exhibit 5B**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Reasonable Royalties**

| | 7/11/2023 - 2/29/2024 | 3/1/2024 - 2/28/2025 | 3/1/2025 - 2/28/2026 | 3/1/2026 - 2/28/2027 | 3/1/2027 - 2/29/2028 | 3/1/2028 - 7/10/2028 | Total |
|---|---|---|---|---|---|---|---|
| [1] Projected Net Sales of BBBY | | | | | | | |
| [2] Royalty Rate | | | | | | | |
| Pre-Tax Reasonable Royalties | | | | | | | |
| [3] Tax Rate | | | | | | | |
| After-Tax Reasonable Royalties | | | | | | | |
| [4] Present value period (years) | | | | | | | |
| [5] Weighted Average Cost of Capital (WACC) | | | | | | | |
| [6] Present Value Factor | | | | | | | |
| **Present Value of Reasonable Royalties** | | | | | | | |

**Notes**

[1] See Exhibit 3D.

[2] The average of the royalty rate provided by Rosa Costa (7.0%) and the average industry rates extracted from 2 agreements (3% and 2%) is 4.0%.

[3] We have assumed 45% to be conservative.

[4] Cash flows are discounted at mid-year as sales are generally earned evenly throughout the year.

[5] See Exhibit 6A.

[6] Present value factor using the WACC as the discount rate.

**Exhibit 6A**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Weighted Average Cost of Capital**

**Cost of Equity**

[1] Cost of Equity - Build-Up Method - CRSP Deciles Size Premia Study

**Cost of Equity ($R_e$)**

**Cost of Debt**

[2] Pre-tax Cost of Debt
[3] Less: Income Tax Factor

**After-tax Cost of Debt ($R_d$)**

[4] **Capitalization Structure**

Equity % of Capital ($W_e$)
Debt % of Capital ($W_d$)

**Weighted Average Cost of Capital**

Weighted Cost of Equity ($R_e$) x ($W_e$)
Weighted Cost of Debt ($R_d$) x ($W_d$)

Weighted Average Cost of Capital

**Weighted Average Cost of Capital (rounded)**

**Note**

[1] See Exhibit 6B.
[2] Market Yield on U.S. Treasury Securities at 5-Year Constant Maturity, Quoted on an Investment Basis, Percent, Daily, Not Seasonally Adjusted as of July 11, 2023.
[3] As BBBY is an LLC, the tax would be "passed through" to the owners of BBBY. As we do not know what the owners tax bracket is, we have excluded the income tax factor from this calculation.
[4] Based on the assumed capital structure as reflected on Exhibit 3B.

**Exhibit 6B**
**Go Global Retail LLC v. Dream on Me Industries, Inc., et al.**
**Cost of Equity - Build-Up Method - CRSP Deciles Size Premia Study**



[1] Risk Free Rate

[2] Equity Risk Premium

[3] Industry Risk Premium

[4] Size Risk Premium

[5] Company Specific Risk Premium

Cost of Equity

**Cost of Equity (rounded)**

**Note**

[1] Normalized risk-free rate as of the Damages Date (Kroll Cost of Capital Navigator).

[2] Recommended rate as of the Damages Date (Kroll Cost of Capital Navigator).

[3] GICS 255040 Industry Risk Premium (Kroll Cost of Capital Navigator).

[4] Size Premium based on deciles of the NYSE/NYSE MKT/NASDAQ 10B Decile category (Kroll Cost of Capital Navigator).

[5] Additional risk associated with the industry and BBBY.

**APPENDIX A**

# ALAN SCHACHTER, CPA, ABV, CFF, CVA, CFE

260 Madison Avenue, 3rd Floor, New York, NY 10016 | aschachter@guidepostsolutions.com

**Curriculum Vitae**

## EXECUTIVE SUMMARY

Mr. Schachter has been a senior executive and partner in various consulting and accounting firms for 40 years. His experience includes assisting government agencies, private companies and their counsel with complex valuation, economic damages, and compliance issues. During his professional career, he has been very active in several types of matters that relate to intellectual property, healthcare, financial services, franchising, white-collar criminal defense, personal injury, matrimonial, wrongful termination, partnership disputes, and other civil & criminal matters. During those cases, he has also been effective testifying during deposition and trial.

## PROFESSIONAL HISTORY

- Guidepost Solutions LLC, Senior Managing Director, Economic Damages & Business Valuation, 2021
- Citrin Cooperman & Company, LLP, Partner, Valuation and Forensic Services Group, 2009 – 2021
- Willamette Management Associates, Managing Director Northeast Region Litigation and Valuation Consulting, 2003 – 2009
- Centerprise Advisors Litigation & Valuation Services, Managing Director, 2001 – 2003
- Scillia, Dowling & Natarelli, CPAs and Advisors, Managing Director, 2001 – 2003
- Urbach Kahn & Werlin, Shareholder, Litigation, 1989 – 2000
- Schachter & Co., Owner, 1979 – 1989
- Schachter & Horan, Partner, 1974 – 1979
- Lester Witte & Co., Partner, 1969 – 1974
- H.A. Schachter & Co., May 1965 – Dec. 1965
- H.A. Schachter & Co., 1967 – 1969
- Peat Marwick Mitchell & Co., 1966 – 1967

## EDUCATION

- B.S. Economics, Wharton School, University of Pennsylvania, 1965
- MBA, Pace University, 1972
- Advanced Certificate of Taxation, Pace University, 1987

**APPENDIX A**

**PROFESSIONAL DESIGNATIONS**

- Accredited in Business Valuation, AICPA, 1998 – present
- Certified in Financial Forensics, AICPA, 2008 – present
- Certified Public Accountant, New York, 1969 – present
- Certified Public Accountant, Connecticut, 2001 – present
- Certified Fraud Examiner, 1993 – present
- Certified Valuation Analyst, 1997 – present
- Medicare Hearing Officer, 1979 – 1986
- New York State Department of Health Approved Receiver, 1986 – present
- President, Fairfield County Estate Planning Counsel, 2013 – present

**GOVERNMENT APPOINTMENTS**

- Receiver of New York State Department of Health
- Appointed by the New York State Liquor Authority to serve as a receiver of a major New York City nightclub cabaret and discotheque
- Special Consultant to the New York State Department of Taxation and Finance, Office of Tax Enforcement, 1996 – 2000
- New York State Department of Health RUGS Advisory Committee, 1984 – 1987
- Receiver/Fiduciary appointed by Superior Court of Connecticut regarding liquidation of hard money lender and high yield debt fund, 2012 – 2015

**MEMBERSHIPS & CHAIRMANSHIPS**

- Member, Advisory Council, Connecticut Society of CPAs, 2011
- Chairman, Healthcare Committee, Connecticut Society of CPAs, 2011
- Member, American Institute of Certified Public Accountants, 1969 – present
- Member, New York State Society of Certified Public Accountants, 1969 – present
- Member, Connecticut Society of Certified Public Accountants, 2001 – present
- Chair and Member, Litigation Support Committee of New York State Society of CPAs, 1992 – 1998
- Member, Association of Fraud Examiners, 1993 – present
- Health Care Financial Management Association, 1970 – 2000
- Member, National Association of Certified Valuation Analysts, 1997 – present
- American Academy of Matrimonial Lawyers: Financial Services Committee, 1992 – 1996
- President and Member, Fairfield County Estate Planning Council, 2012 – present
- Member, Leadership Initiative Board, National Association of Certified Valuation Analysts, 2023 – present
- Member, Leadership Initiative Board – Artificial Intelligence Task Force, National Association of Certified Valuation Analysts, 2023 – present

**APPENDIX A**

<u>CONFERENCES & SPEAKING ENGAGEMENTS</u>

Lectures regarding business valuation and damage claims before the following organizations:

- National Health Lawyers Association, Legal Accounting Defense Team, 1984
- New York State Society of Certified Public Accountants, Various Seminars of Valuation of Closely Held Businesses and Litigation Support Topics, 1992 – 1998
- New York State Bar Association, Various Valuation Seminars, 1992 – 1999
- Health Care Financial Management Association, Valuation of Health Care Facilities, 1994
- American Institute of Certified Public Accountants and Illinois CPA Foundation, Engagement Approach to Researching, Evaluation and Understanding the Company, 1995
- New York State Supreme Court Justices, Valuation of Businesses and Professional Practices, 1996
- Association of the Bar of the City of New York, New York State Tax Amnesty Act, 1997
- Gerontology Institute, Nursing Home Fraud & Abuse and Corporate Compliance, 1998
- State & Local Government Benefits Association, Detecting Health Care Fraud and Abuse, 1998
- The American College of Health Care Administrators, New York Chapter, Corporate Compliance Programs and Enforcement Initiatives in Health Care, 1998
- Practicing Law Institute, Basic Accounting for the General Practitioner, 1999 – 2000
- The Center to Promote Health Care Studies, Inc., Fraud and Abuse, Corporate Compliance and Revenue Recognition, 2000
- New York State Health Facilities Association, Nursing Home Corporate Compliance Plans, 2001
- Connecticut State Bar Association, Valuation of Intellectual Property, 2002
- The Regional Bar Association/Family Law Section Valuation of Intellectual Property, 2002
- Quinnipiac Law School-Compliance Workshop for Meeting HIPAA 2000 Regulations, 2002
- Connecticut Society of Certified Public Accountants, Valuing a Professional Practice, 2002
- Massachusetts Society of Certified Public Accountants Conference, Developing Niche Practices, 2002
- Critical Issues in Electronic Discovery, 2003
- National Association of Certified Valuation Analysts, Divorce in Connecticut – An Update, 2005
- American Society of Appraiser, Intellectual Property Valuation and Damages, 2006
- National Association of Certified Valuation Analysts, Economic Damages Related to Intellectual Property Infringement Lawsuits, 2008
- National Business Institute, Effectively Using Experts in Family Law, 2008

# APPENDIX A

- Business Valuation Resources, "M&A and Valuation in the Financial Services Space in the Current Market Environment," 2009
- Commercial Law League of America, 89th Annual New York Meeting, Successful Cross-Examination of a Business Valuation Expert, 2009
- National Association of Certified Valuation Analysts – New York State, "Intellectual Property – Valuation and Litigation," 2011
- New York State Bar Association, Commercial Bar Association, "Valuation of a Franchised Business," January 27, 2016
- Annual Meeting of the IFA, "The Proper Filing of an Item 19 in the Franchisor's Disclosures Document," February 23, 2016

## PUBLICATIONS

- "Pre-indictment Strategy for the Attorney-Accountant Defense Team in White Collar Fraud Cases." *Criminal Law Journal*, 1979.
- "The Role of the Legal Accounting Defense Team." *American Law Report*, 1982.
- "Role of the Investigative Accountant." *Handbook of Financial Planning for Divorce and Separation*, 1988.
- "Fraud in the Health Care Industry: The Auditors Responsibility Under SAS 82." *American Institute of Certified Public Accountants (publication and video),* 1998.
- "Applying Basic Business Valuation Techniques to a Specialized Business (Ocean-Going Tankers)." *Encyclopedia of Matrimonial Practice,* 1991.
- "The Investigative Accountant and Confidentiality in a Criminal Tax Fraud Investigation." *The CPA Journal,* 1993.
- "Innocent Spouse Considerations for Parties Contemplating a Joint Return." *NYS Society of Certified Public Accountants,* 1994.
- "Corporate Compliance Plans for Health Care Providers." *American Institute of Certified Public Accountants*, 2000.
- "The Investigative Accountant and Confidentiality in a Criminal Tax Fraud Case." *Journal of Construction Accounting & Taxation*, 2002.
- "Protecting Attorney-Expert Communications, Avoiding Inadvertent Disclosures, and Related Issues." Co-Author Thomas J. Finn, Esq., Willamette Management Associates *Insights*, Summer 2004.
- "Intellectual Property in Matrimonial Cases" *American Journal of Family Law,* 2006.
- "The Importance of Financial Statement Analysis in Business Valuations Performed During the Course of Commercial Litigation, Willamette Management Associates *Insights*, Autumn 2006.
- "Just How Much Is That Business Worth?" *Connecticut Law Tribune*, 2008.
- "The Valuation of Intellectual Property for Family Law Purposes." Willamette Management Associates *Insights*, Special Issue 2008.

# APPENDIX A

- "A Roadmap to Cross-Examining a Valuation Expert in Family Law Litigation." Willamette Management Associates *Insights*, Special Issue 2008.
- "An Introduction to Goodwill." *New York Law Journal*, 2009.
- "Know and Protect Intellectual Property's Worth." *New York Law Journal*, 2011.
- "Trademark Infringement Damages: Calculate Appropriately." *New York Law Journal*, 2015.

**APPENDIX B**

KATERINA GAEBEL, CPA, CFE, CERTIFIED DEFI EXPERT
Senior Consultant
212-817-6736
kgaebel@guidepostsolutions.com

---

BUSINESS EXPERIENCE

- Guidepost Solutions LLC, Senior Consultant, 2024 – Present
- Citrin Cooperman & Company, LLP, Forensic Accountant, Forensic, Litigation, and Valuation Services Group, 2016 - 2023

EDUCATION

- Master of Science in Forensic Accounting, University at Albany, State University of New York, May 2016
- Bachelor of Science in Accounting, University at Albany, State University of New York, May 2015

LICENSES / CERTIFICATES

- Certified Public Accountant in New York
- Certified Public Accountant in New Jersey
- Certified Fraud Examiner
- Certified DeFi Expert

PROFESSIONAL MEMBERSHIPS

- Member of the American Institute of Certified Public Accountants (AICPA)
- Member of the Association of Certified Fraud Examiners (ACFE)
- Member of the New York State Society of Certified Public Accountants (NYSSCPA)
- Chair of the NYSSCPA Digital Assets Committee for fiscal year 2023
- Vice Chair of the NYSSCPA Digital Assets Committee for fiscal year 2022
- Member of the NYSSCPA Digital Assets Committee for fiscal year 2020 and 2021
- Member of the NYSSCPA Litigation Services Committee for fiscal year 2018 and 2019
- Member of the Citrin Cooperman Digital Assets Committee for fiscal year 2018 through 2023

PUBLICATIONS

- Published "*Fraud in the Age of Virtual Currency*" in the AICPA Fall 2022 Quarterly Newsletter (November 2022), co-written with Mark DiMichael
- Quoted in "*Promises and Pitfalls*" written by Paul Kilby published in the July/August 2022 issue of the ACFE Fraud Magazine
- Published "*Common Cryptocurrency Frauds*" in the NYSSCPA Tax Stringer (December 2020)
- Published "*A Forensic Guide to Finding Cryptocurrency in Divorce Litigation*" in the NYSSCPA Tax Stringer (September 2018), co-written with Mark DiMichael

SPEAKING ENGAGEMENTS

- Co-presented "Deciphering the Blockchain" with Mark DiMichael for the NYSSCPA Business Valuation and Litigation Services Conference (May 2024)

**APPENDIX B**

- Presented a digital assets "hot tip" on a panel for the New Jersey State Bar Association Family Law Retreat (March 2024)
- Moderated the "Digital Assets in the Alternative Investment Industry" panel for the NYSSCPA Alternative Investment Fund Conference (November 2022)
- Co-presented "Cryptocurrency Fraud & Forensics: What Valuation Professionals Need to Know" with Mark DiMichael for Business Valuation Resources (July 2021)
- Presented "Introduction to Decentralized Finance" for the Citrin Cooperman Digital Assets committee (July 2021)
- Co-presented "Crypto Asset Location, Investigation, and Seizure" with Mark DiMichael for the NYSSCPA Business Valuation and Litigation Services Committee in August 2020, the NYSSCPA Digital Asset Committee (September 2020), and NYSSCPA Business Valuation and Litigation Services Conference (May 2021)
- Co-presented "Forensic Accounting and Cryptocurrency" with David Lomas for Drexel University (May 2021)
- Presented "Cryptocurrency – Fraud and Forensic Accounting for Digital Assets" for Citrin Cooperman's C-Suite MasterSnacks Webinar Series (April 2021)
- Co-presented "Microsoft Excel Expert Skills" with Michael Dyner for Citrin Cooperman (October 2018)


AWARDS

- Recipient of the NYSSCPA Emerging Leader Award ("Forty Under Forty") in July 2021

## APPENDIX C
## DOCUMENTS AND INFORMATION CONSIDERED

1. AICPA Statements on Standards for Forensic Services No. 1
2. AICPA Professional Code of Conduct
3. Amended Complaint filed December 22, 2023
4. Defend Trades Secret Act (18 U.S. Code §1836. – Civil Proceedings)
5. Deposition of Jeffrey Streader taken on September 30, 2024 at 10:01 a.m.
6. Deposition of Mark Srour taken on October 1, 2024 at 10:00 a.m.
7. Deposition of Avish Dahiya taken on October 2, 2024 at 10:00 a.m.
8. Deposition of Christian Feuer taken on October 7, 2024 at 10:00 a.m.
9. Deposition of Yuen Chau taken October 16, 2024 at 2:30 p.m.
10. Deposition of Deborah Gargiulo taken October 18, 2024 at 9:58 a.m.
11. Deposition of Kathleen Lauster taken October 10, 2024 at 10:00 a.m.
12. Deposition of Milan Gandhi taken October 17, 2024 at 10:00 a.m.
13. Nondisclosure Agreement between Go Global Retail, LLC and DOM dated June 10, 2023.
14. June 15, 2023 meeting transcript prepared by Bee Reporting Agency, Inc.
15. Exhibit 9 - DOM0000075 financial model
16. IBISWorld Industry Report for Durable Baby Goods Stores in the US, NAICS 44911, dated July 2024
17. IBISWorld Industry Risk Rating Report for Durable Baby Goods Stores in the US, OD4386, dated June 2024
18. Opinion and Order filed April 26, 2024.
19. Historical profit and loss statements of the following BBBY stores (location and store number) for the periods of March 1, 2019 through February 28, 2020, March 1, 2021 through February 28, 2022, and March 1, 2022 through December 31, 2022.
    a. Braintree, MA (#3060)
    b. Bridgewater, NJ (#3037)
    c. Rockville, MD (#3001)
    d. Cherry Hill, NJ (#3010)
    e. Woodbridge, NJ (#3130)
    f. Scarsdale, NY (#3002)
    g. Springfield, VA (#3008)
    h. Newark, DE (#3046)
    i. Amherst, NY (#3083)
    j. West Hartford, CT (#3121)
    k. Paramus, NJ (#3003)
20. Legal bills of Falcon, Rappaport and Berkman related to development costs.
21. Ankura bills related to this matter.
22. Discussions with Christian Feuer.
23. Discussions with Yuen Chau.
24. Discussions with Jeffrey Streader.
25. Discussions with Deborah Gargiulo.
26. Discussions with Rosa Costa.
27. Letter from Ankura to Go Global reflecting Ankura's typical hourly rates by level dated November 7, 2024.
28. Estimate of hours worked on the development of the model, prepared by Yuen Chau.
29. Market Yield on U.S. Treasury Securities at 5-Year Constant Maturity, Quoted on an Investment Basis, Percent, Daily, Not Seasonally Adjusted as of July 11, 2023.
30. Kroll Cost of Capital Navigator to calculate the cost of equity.

CONFIDENTIAL

**APPENDIX C**
**DOCUMENTS AND INFORMATION CONSIDERED**

31. Go Global presentation on Market Information for the Baby and Childrens Retail industry.

32. Better Holdco, Inc. v. Beeline Loans Inc., 666 F. Supp. 3d 328, 392 (S.D.N.Y. 2023).

33. AICPA Forensic & Valuation Services Practice Aid on "Calculating Damages in Intellectual Property Disputes", Fourth Edition.

34. AICPA Forensic & Valuation Services Practice Aid on "Calculating Lost Profits"

35. LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp. 182, 185 (S.D.N.Y. 2002).

36. Syntel Sterling Best Shores Mauritius Limited v. The TriZetto Group, Inc., 68 F.4th 792, 812 (2d Cir. 2023).

37. Capital IQ financial data, capital structure data, financial ratios, credit ratios, implied valuation, valuation chart, and credit health panel information for Carter's, Inc. (NYSE:CRI) and The Children's Place, Inc. (NasdaqGS:PLCE) as of July 11, 2023.

38. Summary of Terms for a revolving line of credit and term loan provided to Buy Buy Baby, Inc. and subsidiaries (as borrower) by MidCap Financial Funding / MidCap Financial Services (as agent/servicer) dated June 5, 2023.

39. ktMine database.

40. Agreement between Beyond, Inc. and Kirkland's Inc. dated October 21, 2024 (unique code RR20241022T03201) as provided by Royalty Range.

41. Agreement between Cherokee Inc. and Target General Merchandise, Inc. dated January 29, 2013 (unique code RR20240916T03201) as provided by Royalty Range.

42. buybuyBABY profit and loss statement for the period of July 2023 through December 2023 (BBBY099-101).

43. buybuyBABY profit and loss statement for the period of January 2024 through July 2024 (BBBY096-8).

44. Economic Damages in Intellectual Property written by Daniel Slottje copyright 2006

45. Intellectual property toolkit – Trade Secrets published by the United States Patent and Trademark Office

46. 5 NACVA pamphlet that we sent to Steve

47. Economic analysis of nonpatent intellectual property rights and damages measures by Elizabeth A. Evans and Peter P. Simon, Fourth and Fifth Editions

48. Town & Country Linen Corp. v. Ingenious Designs LLC, Not Reported in Fed. Supp. (2022)

49. Calculating and proving damages by Kristopher A. Boushie, Christopher H. Spadea, and Martin F. Cunnif as published in the Law Journal Press in 2016

50. Emails sent from DOM to potential investors (DOM0003023-11645).

51. Miscellaneous correspondence (DOM0015676, DOM0015877, DOM0016441, DOM0017431, DOM0017850).

52. Miscellaneous financing documents (DOM0012302, DOM0012303).

53. https://law.cornell.edu/uscode/text/18/1836

54. https://www.goglobalretail.com/chau

55. https://www.goglobalretail.com/gargiulo

56. https://theorg.com/org/janie-and-jack/org-chart/rosa-costa

57. https://www.usatoday.com/story/money/retail/2024/10/22/buybuy-baby-locations-closing/75792448007/

58. https://content.next.westlaw.com/Glossary/PracticalLaw/Ib8d9eb890fbe11e698dc8b09b4f043e0?transitionType=Default&cont extData=(sc.Default)

59. https://content.next.westlaw.com/practical-law/document/I0f9fbffdef0811e28578f7ccc38dcbee/trade-secret?viewType=FullText&originationContext=document&transitionType=DocumentItem&ppcid=2370c4a1144042a1b3fe1826dfe63992&contextData=(sc.Glossary)

60. https://www.steptoe.com/a/web/209139/3ZEZ74/new_york_breach_of_contract_damageseco73244.pdf

61. https://www.linkedin.com/in/jeffstreader/

62. https://www.linkedin.com/in/deborahgargiulo/

63. https://www.linkedin.com/in/yuenchau/

64. https://www.linkedin.com/in/christianfeuer/

**APPENDIX C**
**DOCUMENTS AND INFORMATION CONSIDERED**

Guidepost

65. https://www.linkedin.com/in/rosa-costa-46606115/
66. https://www.royaltyrange.com/home/blog/what-is-the-royalty-relief-methodology-relief-from-royalty-method
67. https://blogs.cfainstitute.org/investor/2019/01/11/a-renaissance-in-intangible-valuation-five-methods/
68. https://www.linkedin.com/pulse/two-caveats-relief-from-royalty-method-use-license-agreements-/
69. https://www.valupaedia.com/index.php/business-dictionary/428-relief-from-royalty-method
70. https://quickreadbuzz.com/2021/12/08/business-valuation-robert-reilly-intellectual-property-valuations/
71. https://quickreadbuzz.com/2021/12/15/business-valuation-robert-reilly-intellectual-property-valuations-2/
72. https://quickreadbuzz.com/2022/01/05/business-valuation-robert-reilly-intellectual-property-valuations-3/
73. https://quickreadbuzz.com/2022/01/12/business-valuation-robert-reilly-intellectual-property-valuations-4/
74. https://quickreadbuzz.com/2022/01/19/business-valuation-robert-reilly-intellectual-property-valuations-5/
75. Miscellaneous bate stamped documents from data room:
    a. DOM0015208
    b. DOM0015273
    c. DOM0015275
    d. DOM0015278
    e. DOM0015292
    f. DOM0015294
    g. DOM0015298
    h. DOM0015304
    i. DOM0015409
    j. DOM0015585
    k. DOM0015676
    l. DOM0015679
    m. DOM0015877
    n. DOM0016307
    o. DOM0016395
    p. DOM0016441
    q. DOM0017431
    r. DOM0017436
    s. DOM0017452
    t. DOM0017695
    u. DOM0017850
    v. DOM0017852
    w. DOM0017958
    x. DOM0017980
    y. DOM0017981
    z. DOM0017987
    aa. DOM0017988

*CONFIDENTIAL*

**APPENDIX D**
**GO GLOBAL TEAM PROFESSIONAL EXPERIENCE**

**Jeffery Streader[1]**

Streader is exceptionally qualified to acquire and revitalize companies in bankruptcy, drawing on his extensive experience across various leadership roles in the retail and apparel sectors. His career began with 18 years at Oxford Industries, where he held progressively responsible management positions in sales, vendor management, product development, and global sourcing. This foundational experience equipped him with a deep understanding of the industry, enabling him to effectively manage complex operations and drive profitability.

Following his tenure at Oxford, Streader served as Vice President of Apparel and Textile Software at Fasturn LLC, where he was instrumental in developing cutting-edge technologies to enhance transparency in design and supply chains. This role demonstrated his ability to leverage technology for operational improvements, a crucial skill in today's competitive landscape.

As Vice President of Global Sourcing at VF Corporation, Streader managed global sourcing for an $850 million coalition, overseeing the transition from an internal manufacturing model to a balanced global supply chain. His leadership in planning, compliance, and vendor management underscores his capability to navigate intricate sourcing challenges and optimize costs.

Streader further solidified his expertise as President of Kellwood Global, where he implemented a centralized operational platform for a publicly traded corporation. He directly managed a team of 840 associates and was responsible for key areas such as operational strategy, inventory management, and global sourcing.

In his role as Senior Vice President of Global Supply Chain at Guess, he provided leadership across multiple regions, driving improvements in product development and logistics. His experience as Operating Partner at Marlin Equity Partners, where he led investments in the apparel sector, highlights his strategic acumen in identifying and executing market opportunities.

Finally, as Global Chief Operating Officer at Billabong, Streader directed operational turnarounds, ensuring alignment across IT, retail, and global supply chains. His consulting work at American Apparel further demonstrated his ability to guide companies through critical transitions, particularly during financial distress.

Overall, Streader's comprehensive background in retail management, global sourcing, and operational leadership uniquely positions him to successfully acquire and transform distressed companies into profitable enterprises. His proven track record of strategic growth and turnaround management makes him a valuable asset in the field.

---

[1] https://www.linkedin.com/in/jeffstreader/

# APPENDIX D
# GO GLOBAL TEAM PROFESSIONAL EXPERIENCE

## Christian Feuer[2]

Feuer is exceptionally qualified to acquire and revitalize companies in bankruptcy, leveraging his extensive background in product strategy, merchandising, and operational leadership across various retail sectors. His career began as Director of Product and Merchandising Strategy at Otto Group in Germany, where he oversaw product strategy for the world's largest catalog company, managing a significant revenue stream exceeding $15 billion. His ability to troubleshoot and optimize strategies for international subsidiaries underscores his expertise in global operations and market adaptability.

Transitioning to the role of Vice President of Advertising and Business Development at Newport News, Feuer successfully contributed to profit growth of over $25 million and achieved a remarkable 40% sales increase. His subsequent position as Senior Vice President of Marketing and Advertising at Spiegel involved developing and implementing a comprehensive growth plan that led to a 40% increase in sales and an impressive annual EBITDA improvement exceeding $100 million. These experiences highlight his strategic acumen and capability to drive substantial financial performance in competitive environments.

As President and CEO of uBid.com, he implemented a full-price e-commerce site that increased pro forma profitability by over $25 million, demonstrating his innovative approach to online retail. His tenure as COO of Spiegel Brands allowed him to lead the acquisition and merger of multiple brands, developing turnaround plans that significantly improved operational efficiency.

In his role as President for Blair Corporation and later as CEO for Draper's & Damons, Feuer demonstrated his expertise in turnaround management, achieving notable EBITDA increases and reorganizing companies for sustainable growth. His leadership at Haband, where he successfully navigated the company through a Chapter 11 process while increasing EBITDA post-emergence, exemplifies his ability to manage distressed assets effectively.

Throughout his career, including his long-term role as CEO for International Retail Acquisition Group and his advisory work for Project Owl, Feuer has consistently demonstrated his capacity for strategic growth and operational excellence. His extensive experience in retail, combined with a proven track record of leading successful turnarounds, positions him as a highly qualified candidate to acquire and transform companies facing financial challenges into profitable enterprises.

## Yuen Chau[3]

Yuen Chau ("Chau") is exceptionally qualified to acquire companies in bankruptcy and drive them toward profitability within five years, backed by a diverse and extensive career in finance and business restructuring. Beginning as an analyst at Morgan Stanley in Japan, he gained foundational experience in systems development, where he designed and automated trading applications for the bond trading desk. This technical expertise allowed him to develop real-time pricing modules that enhanced financial reporting and control, demonstrating his ability to leverage technology for operational efficiency.

---

[2] https://www.linkedin.com/in/christianfeuer/
[3] https://www.linkedin.com/in/yuenchau/

# APPENDIX D
## GO GLOBAL TEAM PROFESSIONAL EXPERIENCE

Transitioning to a role as Associate Director at Citi, Chau managed and structured equity offerings in emerging markets across Asia, providing him with a deep understanding of financial markets and corporate finance. His subsequent position at UBS further refined his skills in institutional sales and relationship management, where he established valuable connections in the convertible bond market. These roles emphasized his strong analytical capabilities and his aptitude for navigating complex financial landscapes.

As Executive Director at Quam Capital Limited, Chau co-founded an online investment resource that focused on technology and small-cap growth companies, showcasing his entrepreneurial spirit and ability to drive innovation. His tenure as Vice President of Investments at Bigfoot Ventures allowed him to analyze early-stage startups, where he conducted due diligence and assisted portfolio companies in refining their business opportunities and operational strategies.

In his role as Director at Tech Growth Global, Chau co-managed significant restructuring initiatives, honing his expertise in business turnaround strategies. As Chief Operating Officer of Ark One, he was instrumental in launching a multi-strategy hedge fund, developing operational processes and compliance policies that ensured effective risk management. His consulting experience at Cleveland Street Group further solidified his reputation as a strategic advisor in acquisitions and partnerships.

Most recently, as a Senior Partner at Go Global, Chau has focused on investment analysis and due diligence, applying his extensive background to identify and structure profitable opportunities. With this comprehensive skill set, Chau is uniquely positioned to acquire and revitalize distressed companies, implementing strategic initiatives that lead to sustainable growth and profitability.

### Deborah Gargiulo[4]

Deborah Gargiulo ("Gargiulo") is highly qualified to acquire companies in bankruptcy and lead them to profitability within five years, supported by a rich background in financial leadership and strategic planning. Her career began as Assistant Corporate Controller at Donna Karan, where she managed all financial and strategic planning efforts, including board presentations and financial reporting for both domestic and international operations. Her role as a liaison for due diligence during the company's acquisition discussions with LVMH further showcased her ability to navigate complex financial transactions and identify business opportunities.

As CFO at Jones New York, Gargiulo was instrumental in enhancing company profitability, achieving a remarkable 26% increase in operating profit. She identified $8 million in savings through corporate restructuring initiatives and streamlined supply chain operations, demonstrating her strategic acumen and operational efficiency. Her tenure at SKINS, a publicly traded footwear start-up, involved building the company from the ground up, where she managed all financial operations, capital funding, and public filings, highlighting her expertise in startup environments and venture capital relationships.

---

[4] https://www.linkedin.com/in/deborahgargiulo/

APPENDIX D
## GO GLOBAL TEAM PROFESSIONAL EXPERIENCE

Gargiulo's experience as Vice President of Finance at GUESS further solidified her strategic leadership capabilities. She maximized profits and cash flow through effective contingency planning and led initiatives that identified revenue opportunities and cost efficiencies. Her role as CFO and Senior Vice President of Finance and Operations at Ralph Lauren was pivotal in driving international growth initiatives, increasing revenue by 45% and retail locations by 25%, while implementing a comprehensive real estate strategy backed by rigorous financial metrics.

In her most recent positions, including Chief Administrative Officer at Worth New York and CFO at Trish McEvoy, Gargiulo focused on revitalizing growth strategies and operational efficiencies, successfully aligning financial and operational goals to maximize profits. Her involvement with Chief, a private network for women in executive roles, underscores her commitment to leadership and empowerment. With this extensive and diverse experience, Gargiulo is exceptionally positioned to acquire and transform distressed companies, implementing strategic initiatives that drive them toward sustainable profitability.

### Rosa Costa[5]

Rosa Costa ("Costa") is highly qualified to acquire and transform companies in bankruptcy into profitable entities, drawing from her extensive experience in apparel management, international business development, and strategic consulting. As Division President for Trimera Group for 15 years, she reported directly to the CEO and oversaw a team of 50, managing the lifestyle brand division with an annual budget of $18 million. Her leadership resulted in the successful launch of an e-commerce site that generated approximately $10 million CAD in sales, showcasing her ability to develop and execute effective growth strategies in a competitive market.

In her role as Vice President of International Business Development and Licensing for Hudson Jeans, Costa was instrumental in expanding the brand's global presence. She developed branding, pricing, and merchandising strategies that successfully established Hudson Jeans in the EU, APAC, and South America. Her efforts to expose the brand to top-tier international retailers, such as Harrods and Nordstrom, reflect her deep understanding of market dynamics and her capacity to forge strategic partnerships that enhance brand visibility and profitability.

As the founder of Apropos Consulting, Costa provided specialized consulting services focused on licensing, franchising, and international expansion, helping companies achieve long-term sustainability and profitability. This experience has equipped her with a comprehensive perspective on business growth and operational efficiency. Additionally, her tenure as Vice President of Global Business Development and Licensing at Janie and Jack further underscores her expertise in driving brand expansion and maximizing market potential.

Costa's robust background in managing complex projects, developing successful business strategies, and fostering international partnerships positions her as a highly capable leader. Her proven track record in transforming businesses through innovative approaches and strategic planning makes her uniquely qualified

---

[5] https://www.linkedin.com/in/rosa-costa-46606115/

**APPENDIX D**
**GO GLOBAL TEAM PROFESSIONAL EXPERIENCE**

to navigate the challenges associated with acquiring and revitalizing distressed companies, ultimately leading them toward profitable futures.