**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GO GLOBAL RETAIL LLC, | |
| Plaintiff, | 1:23-cv-07987 (AS) |
| -against- | **AFFIDAVIT OF JEFFERY STREADER** |
| DREAM ON ME INDUSTRIES, INC., and DREAM ON ME, INC. | |
| Defendants. | |

I, JEFFERY STREADER, being duly sworn, hereby depose and state as follows:

1.      I am the founder and managing partner of Go Global Retail, LLC ("Go Global").

2.      I have personal knowledge concerning the facts alleged herein.

3.      I submit this affidavit in support of Go Global's Motion for Summary Judgment in the above captioned matter.

4.      Go Global is a private equity and brand investment firm that identifies opportunities to build brand equity in consumer products and retail stores, frequently but not exclusively from distressed retail assets.

5.      Go Global has successfully acquired brands such as Janie and Jack, HATCH Studios, Modcloth, and Brums Milano.

6.      In or around March 2023, I learned that Bed Bath & Beyond, Inc. ("BedBath") planned to file for bankruptcy protection, and would auction off assets for one of its subsidiaries called Buy Buy Baby ("Baby").

7.      After learning of the auction for Baby's bankruptcy assets ("Baby Bankruptcy Auction"), Go Global contacted representatives at Lazard Freres & Co. LLC ("Lazard"), the

banker running the Baby Bankruptcy Auction. The Lazard bankers were familiar with Go Global Retail and our ability to acquire and build brands, especially in the children's market.

8. In or around March 17, 2023, Go Global obtained access to Lazard's data room ("Lazard Data Room").

9. The Lazard Data Room contained historical information and data on Baby.

10. Go Global began to review, develop, and structure a bid to win the Baby Bankruptcy Auction.

11. Over time, and as Go Global furthered its due diligence, the information inside the Lazard Data Room was populated, in part, based upon Go Global's requests to Lazard for additional information about Baby.

12. The Lazard Data Room contained hundreds of documents.

13. To help structure its bid, Go Global developed confidential and proprietary information, including annotated versions of Baby's historical data, gross sales projections, sales forecasts, target net revenues, an analysis of the strengths and weaknesses of Baby's retail stores and e-commerce business, and projections on how much and which merchandise to stock ("Financial Model").

14. Go Global also developed confidential and proprietary information concerning how much Go Global should bid in the upcoming Bankruptcy Auction, and how much capital Go Global would need to operate the resulting business ("Bidding Strategy").

15. Equally important, Go Global developed confidential and proprietary information concerning Baby's technology stack transition and migration plan, which included implementing Go Global's proprietary technology playbook and cost cutting measures ("Technology Plan").

16.     Go Global treated its Financial Model, Bidding Strategy, and Technology Plan (together, the "Proprietary Information") as confidential trade secret information.

17.     Go Global dedicated approximately 1,755 hours developing the Proprietary Information.

18.     The value of Go Global's Proprietary Information, based upon capital investment and labor, is at least $1,545,813.

19.     Go Global did not publicly distribute its Proprietary Information.

20.     No other company employs the same proprietary methods, analysis, or combination of formulas as Go Global in developing Go Global's Proprietary Information.

21.     Go Global stored its Proprietary Information inside a password protected data room ("Go Global Data Room") administered by Ankura Capital Advisors, LLC ("Ankura").

22.     Go Global did not share the Proprietary Information outside of Go Global unless Go Global first obtained a non-disclosure agreement ("NDA") to ensure the security and secrecy of the Proprietary Information.

23.     The Baby Bankruptcy Auction was a competition among industry rivals for Baby's assets.

24.     Go Global's Proprietary Information was valuable to Go Global and Go Global's competitors in the Baby Bankruptcy Auction because it outlined Go Global's views on how to successfully structure, bid, win, and operate Baby's business.

25.     Go Global's Proprietary Information provided Go Global with a commercial advantage from not being publicly known because the Proprietary Information was useful to Go Global's efforts to structure, submit, and win a competitive bankruptcy auction.

26.     On June 9, 2023, Go Global was introduced to Dream on Me, Inc. and Dream on Me Industries, Inc. (together "DOM" or "Defendants"), another company that was interested in participating in the Baby Bankruptcy Auction.

27.     This introduction was made by Lazard.

28.     Lazard told Go Global that DOM was a supplier of baby furniture for Baby.

29.     Lazard told Go Global that DOM was not a retailer, and that DOM was interested in investing into a group that was looking to acquire the Baby brand.

30.     Lazard furthermore told Go Global that DOM was ideally interested in partnering with a group that had retail experience.

31.     DOM told Go Global that it was too far behind on its due diligence to participate in the Baby Bankruptcy Auction.

32.     DOM also told Go Global that DOM lacked the necessary retail experience to operate brick and mortar retail stores.

33.     DOM told Go Global that they would not bid for the Baby Bankruptcy Assets unless they had a partner who could assist them with due diligence, and who had retail experience.

34.     DOM further told Go Global that DOM was interested in investing into the Go Global capital structure to join Go Global's other shareholders.

35.     Go Global believed that DOM wanted to join Go Global as a Limited Partner, and was satisfied to let Go Global occupy the role of General Partner.

36.     As part of its duties as General Partner, Go Global would manage the day-to-day operations of the resulting business, with the Limited Partners acting as passive investors.

37.     On June 10, 2023, Go Global sent DOM a proposed NDA, which DOM signed.

4

38.    Go Global wanted DOM to sign an NDA because Go Global understood that DOM was a potential competitor in the Baby Bankruptcy Auction, and that Go Global's Proprietary Information was commercially valuable to Go Global and auction competitors such as DOM.

39.    On the basis of the aforementioned representations by DOM, and after fully executing the NDA on June 10, 2023, Go Global provided DOM access to Go Global's Data Room, which included Go Global's Financial Model, Bidding Strategy, and other confidential and proprietary information Go Global used to structure its proposed bid.

40.    DOM was also interested in Go Global's Technology stack transition and migration plan (Technology Plan), which Go Global shared with DOM.

41.    Go Global did not share any of its Proprietary Information with DOM before DOM executed the NDA.

42.    Go Global and DOM met for two in-person meetings, the first on June 12, 2023 ("June 12 Meeting"), and the second on June 15, 2023 ("June 15 Meeting").

43.    The June 15 Meeting was held at DOM's New Jersey offices.

44.    I attended the June 15 Meeting virtually via Zoom.

45.    Unbeknownst to myself or anyone from Go Global or Ankura at the time, DOM recorded the June 15 Meeting.

46.    I was unaware that DOM was recording the June 15 Meeting when it occurred.

47.    I did not give my consent to be recorded.

48.    Go Global and DOM were unable to agree to a joint partnership.

49.    On June 28, 2023, DOM submitted a successful bid of $15.5 million for Baby's intellectual property assets ("Baby IP") without Go Global.

50.    Despite DOM's successful bid for Baby's IP, Go Global still had an opportunity to purchase Baby's Bankruptcy Assets as a going concern, which would have included Baby's IP Assets.

51.    However, the price DOM bid for Baby's IP set a minimum floor value for the price of the Baby assets as a going concern.

52.    DOM overpaid for the Baby IP.

53.    DOM's bid for the Baby IP inflated the value Go Global would need to commit in order to win Baby's business as a going concern.

54.    Although DOM paid $15.5 million for the Baby IP, the BedBath IP had likewise been auctioned as part of BedBath's bankruptcy, and was sold to Overstock.com for approximately $21.5 million.

55.    As Baby's parent company, the value of BedBath's IP should have been significantly higher than Baby's.

56.    Before it was auctioned, Go Global estimated the value of BedBath's IP to be between approximately ██████ and ██████.

57.    Thus, when the BedBath IP sold for only $21.5 million, this indicated that the value of the Baby IP would fall by a material amount.

58.    Go Global still made efforts at the end of June through July 2023 to see if it could justify bidding on the Baby Bankruptcy Assets.

59.    Ultimately, Go Global was unable to justify submitting a bid for Baby's Bankruptcy Assets because DOM's $15.5 million bid artificially inflated the floor price of the assets.

60.    DOM's bid for the Baby IP prevented Go Global from participating in the auction for Baby's Going Concern.

61.    I declare under penalty of perjury that the foregoing is true and correct.


Dated: Rockville Centre, New York
       December 20, 2024

_Jeffery Stre_____

Jeffery Streader

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _San Francisco_

Subscribed and sworn to (or affirmed) before me on this ___20th___ day of _December_, 20_24_, by _Jeffery Streader_ , proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____ (Seal)

APRIL M. JOHNSON
Notary Public - California
San Francisco County
Commission # 2380962
My Comm. Expires Nov 13, 2025