**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GO GLOBAL RETAIL LLC,

                               Plaintiff,

              -against-

DREAM ON ME INDUSTRIES, INC.,
and DREAM ON ME, INC.,

                           Defendants.

1:23-cv-07987 (AS)

**Oral Argument Requested**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

ARGUMENT ......................................................................................................... 5

I.    DOM's BREACH OF CONTRACT DIRECTLY AND PROXIMATELY CAUSED GO GLOBAL DAMAGES................................................................................... 5

    A.    DOM's Breach of the NDA's Non-Circumvention Clause Directly and Proximately Caused Go Global Damages. ............................................................. 6

    B.    DOM's Breach of the Non-Disclosure and Scope of use Clauses Directly and Proximately Caused Go Global Damages............................................................... 9

       i.    DOM's Disclosure of Go Global's Proprietary Information Damaged Go Global. ... 9

       ii.   DOM's Use of Go Global's Proprietary Information Damaged Go Global. ............ 10

II.   GO GLOBAL PROVIDED DOM PROPRIETARY TRADE SECRET INFORMATION……………………………………………………………………11

    A.    DOM's Claim that the Turnaround Strategy was Located in the Lazard Data Room is Unsupported and Demonstrably False. ................................................................ 11

    B.    Go Global's Financial Model and Data Room are Distinct from BBBY's Model and Lazard's Data Room. ...................................................................................... 12

       i.    The Go Global Financial Model is a Custom Document Developed by Go Global, Which is Distinct from the BBBY Model........................................................ 12

ii.    Go Global's Data Room Contained a Bespoke Selection of Key Documents from

Lazard Data Room ................................................................................................ 15

iii.    DOM's Purported Review of the BBBY Model is False and Irrelevant. ............. 16

C.    DOM Admits That DOM Reviewed Go Global's Technology Plan.....................16

III.    DOM MISAPPROPRIATED GO GLOBAL's PROPRIETARY TRADE SECRET

INFORMATION..................................................................................................... 17

A.    DOM Used Go Global's Proprietary Information to Raise Investment Capital,

Accelerate and Avoid the Cost of Due Diligence, and Unfairly Compete in the Baby

Bankruptcy Auction. .......................................................................................... 18

B.    DOM's Admission that it Conducted no Due Diligence Before Meeting Go Global has

no Bearing on DOM's use of Go Global's Proprietary Information. ................................. 20

C.    DOM Concedes that it Developed its Financial Model After Winning the Baby IP

Auction.................................................................................................... 21

IV.    DOM UNJUSTLY ENRICHED ITSELF....................................................... 22

V.    GO GLOBAL's EXPERT OPINION REGARDING LOST PROFITS IS

ADMISSIBLE................................................................................................ 23

CONCLUSION ................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328 (S.D.N.Y. 2023) ...................... 24

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017) ........................ 22

*Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495 (S.D.N.Y. 2017) ............................................ 19

*Castle v. United States*, 2017 WL 6459514, (N.D.N.Y. Dec. 18, 2017) ...................................... 23

*Deebs v. Alstom Transp., Inc.*, 346 Fed.Appx. 654 (2d Cir. 2009) .............................................. 12

*Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*, 980 F.3d 1117 (7th Cir. 2020) ...................... 10

*Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003) .................................................... 8, 12

*Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, 2017 WL 3309724, (S.D.N.Y. Aug. 2, 2017) ................................................................................................................................. 8

*Jones v. Harris*, 665 F. Supp. 2d 384 (S.D.N.Y. 2009) ............................................................... 23

*KCG Holdings, Inc. v. Khandekar*, 2020 WL 1189302, (S.D.N.Y. Mar. 12, 2020)…...............…20

*Shamrock Power Sales, LLC v. Scherer*, 2015 WL 5730339, (S.D.N.Y. Sept. 30, 2015)……....20

*Matarese v. Moore-McCormack Lines*, 158 F.2d 631 (2d Cir. 1946) .......................................... 22

*Net2Globe Intern., Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436 (S.D.N.Y. 2003) ............................................................................................................................................. 23

*North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999) .............................................. 10

*Quantlab Techs., Ltd. (BVI) v. Kuharsky*, 696 Fed. App'x 682 (5th Cir. 2017) .................... 10, 20

*Ross v. F.E.I., Inc.*, 150 A.D.2d 228 (1st Dept. 1989) ................................................................. 22

*Senior by Senior v. Eihab Human Services, Inc.*, 2019 WL 8128563, (E.D.N.Y. Oct. 10, 2019) 23

*Smithfield Ham and Products Co., Inc. v. Portion Pac Inc.*, 905 F. Supp. 346 (E.D. Va. 1995) . 10

*Wilmington PT Corp. v. Parker*, 2024 WL 1348746, at *2 (E.D.N.Y. Mar. 29, 2024) ............... 11

**Statutes**

18 U.S.C. § 1839(5)(A) .................................................................................................................. 18

18 U.S.C. § 1839(5)(B) .................................................................................................................. 19

Restatement (First) of Torts § 757 ................................................................................................ 10

## PRELIMINARY STATEMENT

This matter concerns Dream on Me Industries, Inc. and Dream on Me, Inc.'s ("DOM") breach of a non-disclosure agreement ("NDA") by improperly sharing and using confidential and proprietary trade secret information belonging to Go Global Retail, LLC ("Go Global") in furtherance of bidding upon, and winning, bankruptcy assets belonging to Buy Buy Baby ("Baby" or "Baby Bankruptcy Assets"). It is undisputed that DOM was late to the auction process, behind on its work to review data and structure a bid, and had no experience with 363 bankruptcy proceedings nor the operation of brick and mortar retail stores. It is additionally undisputed that DOM made these same representations to Go Global as the predicate to a potential joint partnership and Go Global's sharing of its trade secret information ("Proprietary Information"), which Go Global developed in relation to purchasing Baby's Bankruptcy Assets.

In furtherance of their discussions for a joint bid, DOM promised that it would hold Go Global's Proprietary Information in confidence, use Go Global's Proprietary Information solely for the development of a joint bid with Go Global, and only bid if done so jointly with Go Global. DOM breached each of these promises. There is no question that DOM unlawfully disclosed Go Global's Proprietary Information to raise investment capital, relied upon Go Global's Proprietary Information to increase its knowledge base and avoid the time and cost to perform due diligence, and ultimately developed a bid for, and won, Baby's Bankruptcy Assets based upon its weaponization of Go Global's Proprietary Information, but without Go Global's participation or consent.

DOM now moves for summary judgment dismissing Go Global's claims for breach of contract, misappropriation of trade secrets, unjust enrichment, and attorneys' fees. *First*, DOM argues that Go Global is entitled to no damages because "Go Global would be in the exact same

position that it is today" regardless of whether DOM had breached the NDA. *See* ECF 61-2 at 1. DOM's argument ignores that DOM utilized Go Global's Proprietary Information, including DOM's knowledge of Go Global's bidding strategy and capital structure, to push Go Global out of the bankruptcy process by materially increasing the overall price of the Baby Bankruptcy Assets. DOM further overlooks that, in addition to breaching the Non-Circumvention Clause (which prohibited DOM from bidding without Go Global), DOM also unlawfully disclosed and used Go Global's Proprietary Information in furtherance of DOM's solo bid. DOM's numerous breaches of the NDA indisputably damaged Go Global by forcing it out of the Baby Bankruptcy Auction and injuring the Proprietary Information Go Global had developed through extensive effort and expense for this use.

*Second*, DOM argues that Go Global never provided it with trade secret information, including Go Global's Technology Plan, and even if Go Global had, DOM argues that Go Global is incapable of establishing that DOM relied upon the same. This is demonstrably false. Go Global unquestionably provided DOM with Go Global's proprietary trade secret information, which DOM did not have access to until Go Global shared it. The evidentiary record establishes, and DOM concedes, that DOM was behind on its due diligence, and needed Go Global to remain competitive in the Baby Bankruptcy Auction. The evidence further proves that DOM used Go Global's Proprietary Information to develop a "Go Forward Plan," and avoid the cost of due diligence. Moreover, DOM admits that it reviewed Go Global's Technology Plan to develop DOM's "Technology Roadmap." DOM's own executives recognized the value of this information, and even quipped that it would be willing to compensate Go Global for this "legwork," yet never did.

2

*Third*, DOM argues that Go Global cannot establish its claim for unjust enrichment because Go Global is unable to prove that it provided a direct benefit to DOM, and because the cause of action is duplicative of Go Global's claim for breach of contract. Both arguments fail. Go Global provided DOM with a direct benefit in the form of Go Global's Proprietary Information, which DOM disclosed to raise money, reviewed to accelerate its due diligence and development of work-product, and otherwise utilized in order to circumvent Go Global from winning the bankruptcy auction. DOM offered to pay for Go Global's "legwork" and has admitted that DOM would be less competitive without Go Global's Proprietary Information. Go Global thus indisputably provided a direct benefit to DOM. Moreover, Go Global's claim for unjust enrichment is a viable alternative claim to Go Global's breach of contract, rendering dismissal inappropriate.

*Finally*, DOM argues that Go Global's expert opinion regarding lost profits must be excluded because the opinion lacks factual support. DOM's argument should be denied as premature since motions *in limine* are typically not filed or decided until the eve of trial. Regardless, DOM fails to identify a single substantive issue regarding the Schacter Report's purported lack of factual support, instead raising questions that go to the weight of the evidence, not admissibility. The Schachter Report has sufficient factual support.

Accordingly, for these reasons, discussed in more detail below, the Court should deny DOM's Motion for Summary Judgment in its entirety.

## STATEMENT OF FACTS

Go Global is a brand investment platform that identifies opportunities to build brand equity in consumer products and retail stores, frequently but not exclusively from distressed retail assets. ECF 66-1 at ¶ 1. In or around March 2023, Go Global learned that Bed Bath & Beyond ("BedBath") planned to file for bankruptcy protection, expressed interest in the potential purchase

3

of BedBath's bankruptcy assets, and began reviewing data in relation to the same. ECF 66-1 at ¶¶ 22-23. In particular, Go Global was interested in purchasing the assets belonging to one of BedBath's subsidiaries, Buy Buy Baby ("Baby" or "Baby Bankruptcy Assets"). ECF 66-1 at ¶ 22.

From March through July 2023, Go Global used its proprietary modeling techniques and experience to forecast the success of a potential purchase of the Baby Bankruptcy Assets, which included Baby's intellectual property ("Baby IP") as well as Baby's business as a going-concern. ECF 66-1 at ¶¶ 23-49. Go Global developed proprietary trade secret information in the form of a Financial Model, Bidding Strategy, and Technology Plan (together, "Proprietary Information"). In furtherance of its potential acquisition, Go Global retained Ankura Capital Advisors, LLC ("Ankura") to assist it in raising capital and structuring a bid. ECF 66-1 at ¶ 57. Go Global stored its Proprietary Information in a data room operated by Ankura ("Go Global Data Room"). ECF 66-1 at ¶ 58.

On June 9, 2023, Go Global was introduced to Dream on Me, Inc. and Dream on Me Industries, Inc. ("DOM" or "Defendants") to discuss a potential joint partnership in relation to the purchase of Baby's Bankruptcy Assets. ECF 61-1 at ¶ 17. DOM told Go Global that it did not have retail experience and was behind on its work to structure a bid for Baby's Bankruptcy Assets. ECF 66-1 at ¶¶ 81-91. On June 10, 2023, Go Global sent an NDA, which DOM signed and returned that same day. *See id.* at ¶ 21. Following execution of the NDA, DOM gained access to Go Global's Data Room. *See id.* at ¶ 25. DOM downloaded the contents of Go Global's Data Room, including Go Global's Proprietary Information. *See id.*

Go Global and DOM held two in-person meetings, the first on June 12, 2023, and the second on June 15, 2023. *See id.* at ¶ 26. Go Global and DOM were unable to agree to a joint partnership following these meetings. *See id.* at ¶ 27.

On June 14, 2023, DOM's CEO, Mark Srour, shared Go Global's Financial Model and other proprietary information with Michael Tennyson, Gary Mason, Joseph "Yussy" Friedland, Scott Englander, and Jacob Sod, none of whom were covered by the NDA. *See* ECF 66-1 at ¶¶ 119-28. On June 19, 2023, DOM's Chief Marketing Officer, Avish Dahiya, circulated an email with the subject line "BBB Go Forward Plan we can use," which attached sales forecasts, store recommendations, and growth strategies that comprised "about 90% of the plan Go Global was going forward with." *See id.* at ¶ 131. DOM also repeatedly cited Go Global's Proprietary Information in internal work-product, e-mails, and text messages as DOM developed its solo bid. *See, e.g.*, ECF 66-24; ECF 66-28; ECF 66-30 at 8.

On June 28, 2023, DOM bid for and won the Baby Intellectual Property Assets ("Baby IP") for $15.5 million. ECF 61-1 at ¶ 38, 40. DOM's bid for Baby's IP was done without Go Global's participation or consent. *See id.* at ¶¶ 38-40. Notwithstanding DOM's June 28, 2023, bid, Go Global still had the opportunity to win Baby's Assets, including the Baby IP, at a subsequent auction. *See id.* at ¶¶ 42. Go Global thus continued to structure its bid and assemble capital after the Baby IP auction. Ultimately, Go Global was unable to justify a bid for Baby's Bankruptcy Assets because of DOM's use of Go Global's Proprietary Information to overbid for Baby's IP. *See id.* at ¶ 193-98.

## ARGUMENT

### I.    DOM'S BREACH OF CONTRACT DIRECTLY AND PROXIMATELY CAUSED GO GLOBAL DAMAGES.

DOM asserts that "there are no facts to support any measure of damages that were caused by any alleged breach of the NDA by DOM." ECF 61-2 at 13. Specifically, DOM claims that "Go Global decided not to bid on the BBBY assets," that "DOM's participation in the IP auction had no bearing on whether Go Global participated in the auction," and therefore "DOM cannot be

liable for doing so independently." *Id.* at 14. DOM also argues that had it not won the Baby IP auction, then Ziff Davis, Inc. ("Ziff Davis") would have. *Id.* According to DOM, Go Global suffered no damages because "Go Global would be in literally the exact same position that it is today if DOM had not won the IP auction" and therefore DOM claims that Go Global cannot establish "any damages that are directly traceable to any breach of the NDA by DOM." *Id.* DOM is wrong.

DOM's breach of the Non-Circumvention Clause harmed Go Global by forcing it out of the bankruptcy auction. Indeed, DOM's breach resulted in a $15.5 million price tag for Baby's IP. Because Go Global sought to purchase Baby's entire business as a going concern, including Baby's IP, DOM's use of Go Global's Proprietary Information to place a bid dramatically inflated the price Go Global would have to pay, knowingly foreclosing Go Global's ability from winning the auction. Additionally, DOM's argument that Go Global suffered no damages from DOM's breach of the NDA is belied by undisputed evidence that DOM unlawfully disclosed and utilized Go Global's Proprietary Information in furtherance of DOM's solo bid.

## A. <u>DOM's Breach of the NDA's Non-Circumvention Clause Directly and Proximately Caused Go Global Damages.</u>

Pursuant to the terms of the NDA, DOM had agreed to bid jointly with Go Global (ECF 66-20 at ¶ 12), but instead circumvented this promise, bid without Go Global, and won Baby's IP for $15.5 million. *See* ECF 66-1 at ¶¶ 158-59, 187, 201. However, even after the Baby IP Auction had concluded, Go Global still had the opportunity to purchase the Baby IP, Baby store leases, and inventory, as a going concern. *See id.* at ¶ 162. The catch was that any such bid would include the Baby IP, the price for which had previously been set by DOM at $15.5 million. *See id.* at ¶ 168. This $15.5 million price tag was thus now baked into any bid that Go Global, or any other bidder, would have to pay in order to win Baby's assets. *See id.*

At the time of the Baby IP Auction, DOM had material information about Go Global and Go Global's intentions, capital structure, and bidding strategy, and used this information to advantage itself against Go Global. For example, DOM knew that Go Global was not interested in Baby's IP alone, but rather sought to purchase Baby's business as a going concern. *See id.* at ¶ 190. DOM also knew that the auction had been bifurcated, and that the Baby IP assets were going to be auctioned off first. *See id.* at ¶ 189. DOM viewed Go Global as the party most likely to win the Baby Bankruptcy Assets. *See id.* at ¶ 97. Finally, DOM knew how much Go Global anticipated bidding, and was aware of the amount of capital Go Global sought to raise. *See id.* at ¶¶ 113-14. DOM thus knew it could circumvent or otherwise push Go Global out of the bankruptcy auction because DOM had key information regarding Go Global's financial and strategic position. *See* ECF 66-3 (Streader Dep.) at 71:3-18; ECF 66-5 (Gargiulo Dep.) at 59:7-10.

Accordingly, DOM improperly disregards that its breach of the Non-Circumvention Clause damaged Go Globally by inflating the price that Go Global would have to pay for Baby's business, and ultimately drove Go Global out of the auction process. *See* ECF 66-3 (Streader Dep.) at 71:8-18; ECF 66-5 (Gargiulo Dep.) at 59:7-10; ECF 66-6 (Chau Dep.) at 103:6-105:3; ECF 66-11 (Lauster Dep.) at 69:8-14.

In the alternative, DOM claims that if it had not won the Baby IP auction, then the second-place bidder, Ziff Davis, would have. ECF 61-2 at 14. Even if this were not undue speculation – which it is – DOM has conceded that Ziff Davis was working alongside Go Global because Ziff Davis was interested in acquiring Baby's going concern. *See* ECF 61-1 at ¶ 43. Indeed, because Ziff Davis is not an "operator," they required an entity with retail experience, like Go Global, to execute brick and mortar store operations. *See* ECF 66-3 (Streader Dep.) at 98:15-99:1.

Regardless, DOM ignores that DOM would have paid any amount to win the Baby Assets, and thus its participation incontrovertibly inflated the price of the Baby IP. *See* ECF 66-1 at ¶¶ 176-79. DOM, Ziff Davis, and the other bidders participated in numerous rounds of bidding. *See* ECF 66-1 at ¶¶ 179-87. During the Baby IP Auction, DOM increased its bid ceiling to a maximum of $10.2 million and then later to $20 million. DOM ultimately won the Baby IP for $15.5 million, but quite irrationally was willing to pay as much for the asset as necessary in order to win the auction. *See id.* Neither DOM nor Go Global can predict who would have won the Baby IP, and for what amount, in the absence of DOM's inflationary bidding. Accordingly, DOM's argument is unsupported speculation, which this Court need not consider. *See Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, 2017 WL 3309724, at *6 (S.D.N.Y. Aug. 2, 2017) (speculative and unsupported evidence insufficient to establish burden on summary judgment); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (unsupported factual assertions must be disregarded).

This Court should likewise not countenance DOM's assertion that Go Global did not participate in the auction because Go Global "failed to secure the capital" it needed and chose not to participate. ECF 61-2 at 13-14. In particular, DOM argues that Go Global's investor, Axar, "declined to invest with Go Global" on June 26, 2023. *Id.* Even without Axar, Go Global had the investors and capital to make a bid. *See* ECF 66-3 (Streader Dep.) at 97:24-99:1; ECF 66-4 (Feuer Dep.) at 90:15-20; ECF 66-6 (Chau Dep.) at 111:7-16. Go Global's ability to bid was instead foreclosed by DOM's breach of the Non-Circumvention Clause, which resulted in significantly inflating the price of the assets for Go Global in the auction for the going concern. *See* ECF 66-1 at ¶¶ 187, 194-98.

DOM's claim that it was allegedly Go Global's "choice" not to bid is belied by DOM's admission that Go Global continued its efforts through July to piece together a potential bid for Baby's going concern after DOM had artificially inflated the overall acquisition price based upon its use of Go Global's Proprietary Information. *See* ECF 61-1 at ¶¶ 33-34; ECF 66-1 at ¶¶ 153-56; ECF 66-3 (Streader Dep.) at 71:3-18. Moreover, Go Global had secured DOM's promise that DOM would not bid without Go Global, which Go Global was entitled to rely upon. *See* ECF 66-20 (NDA) at ¶ 12. Having breached that promise to unfairly advantage itself in its winning bid for Baby's IP, DOM cannot now blame Go Global. *See* ECF 66-3 (Streader Dep.) at 71:3-18, 97:24-99:1; ECF 66-4 (Feuer Dep.) at 90:15-20; ECF 66-5 (Gargiulo Dep.) at 59:7-14; ECF 66-6 (Chau Dep.) at 111:7-16; ECF 66-11 (Lauster Dep.) at 69:8-14.

**B.  <u>DOM's Breach of the Non-Disclosure and Scope of use Clauses Directly and Proximately Caused Go Global Damages.</u>**

Even assuming that DOM's breach of the Non-Circumvention Clause failed to damage Go Global – which it did not – DOM still breached other provisions of the NDA, causing Go Global direct and proximate harm. Go Global shared its Proprietary Information with DOM after DOM promised that it would hold Go Global's Proprietary Information in confidence, use Go Global's Proprietary Information solely for the development of a joint bid with Go Global, and only bid if done so jointly with Go Global. *See* ECF 66-20 (NDA) at ¶¶ 2-3, 12. DOM breached each of these promises. Indeed, DOM's papers focus solely on the breach of the Non-Circumvention Clause (ECF 61-2 at 12-15), while conveniently ignoring DOM's unauthorized disclosure and misuse of Go Global's Proprietary Information.

  i. <u>DOM's Disclosure of Go Global's Proprietary Information Damaged Go Global.</u>

It is undisputed that DOM unlawfully disclosed Go Global's Financial Model and Bidding Strategy to Michael Tennyson ("Tennyson"), Gary Mason ("Mason"), Joseph "Yussy" Friedland

("Friedland") Scott Englander ("Englander"), and Jacob Sod ("Sod"). *See* ECF 66-7 (Srour Dep.) at 53:4-55:16, 72:22-73:3; ECF 66-20 (NDA) at ¶ 3; *see also* ECF 66-25; ECF 66-26; ECF 66-27. DOM's unlawful disclosure directly and proximately damaged Go Global by diminishing or destroying the value of Go Global's Proprietary Information. *See North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) ("a trade secret once lost is, of course, lost forever"); *Smithfield Ham and Prods. Co., Inc. v. Portion Pac Inc.*, 905 F. Supp. 346, 350 (E.D. Va. 1995) ("[T]he value of the trade secret as an asset of the company is diminished by its disclosure whether or not the person acquiring it uses it competitively").

   ii.   DOM's Use of Go Global's Proprietary Information Damaged Go Global.

DOM also breached the NDA by utilizing Go Global's Proprietary Information to develop its own bid without Go Global. As discussed above, and in Go Global's Motion for Summary Judgment (*see* ECF 66 at 15-16), DOM used Go Global's Proprietary Information to substantiate its requests for investment capital. *See* ECF 66-7 (Srour Dep.) at 71:14-25. DOM also used Go Global's Proprietary Information to accelerate its due diligence, develop a "Go Forward Plan," and target and neutralize Go Global as a competitive bidder in the Baby Bankruptcy Auction, all in violation of the NDA. *See* ECF 66 at 15-20; ECF 66-28 (June 19, 2023, Email re: Go Forward Plan).

In doing so, DOM injured Go Global by diminishing or destroying the commercial advantage and value of the Proprietary Information. *See* Restatement (First) of Torts § 757, cmt. c (Am. L. Inst. 1939) ("One who has a trade secret may be harmed . . . by the use of his secret in competition with him"); *Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*, 980 F.3d 1117, 1131-32 (7th Cir. 2020) (upholding award of damages for avoided development costs where defendant "used [plaintiff's] confidential information to thoroughly evaluate what it would take to compete in new market"); *Quantlab Techs., Ltd. (BVI) v. Kuharsky*, 696 Fed. App'x 682, 690 (5th Cir.

2017) (upholding liability where defendant used "stolen trade secrets" to help "find investors").
Accordingly, the Court should deny DOM's Motion for Summary Judgment seeking dismissal of
Go Global's claims for breach of contract (First Cause of Action) and attorneys' fees (Second
Cause of Action).

## II.    GO GLOBAL PROVIDED DOM PROPRIETARY TRADE SECRET INFORMATION.

DOM asserts that Go Global identified only two "proprietary" documents, – (1) the Go
Global Financial Model, and (2) the Acquisition and Turnaround Strategy ("Turnaround
Strategy") – that the information in the Financial Model is reproduced in the Turnaround Strategy,
and that the latter was available to all bidders in the Lazard Data Room. ECF 61-2 at 16. DOM
furthermore argues that Go Global's Financial Model was a reproduction of BBBY's 95-store
model, and that Go Global's Data Room "was essentially a duplicate of the Lazard Data Room
that DOM already had access to in May 2023." *Id.* Finally, DOM argues that Go Global never
divulged Go Global's technology plan to DOM, and thus withheld its actual trade secret
information. DOM's assertions are unsupported and contradicted by the evidentiary record.

### A.   <u>DOM's Claim that the Turnaround Strategy was Located in the Lazard Data Room is Unsupported and Demonstrably False.</u>

DOM asserts, without evidence, that the Turnaround Strategy (ECF 66-45, Defendants'
Exhibit AO) was available in the Lazard Data Room. ECF 61-2 at 16. Although DOM argues this
point in its motion papers, it makes no mention of it in its 56.1 Statement of Facts. Indeed, DOM's
only reference to the Turnaround Strategy in its 56.1 Statement of Facts proffers that the document
was one of two documents that Go Global purportedly claims are proprietary and not stored in the
Lazard Data Room. *See* ECF 66-1 at ¶ 15. DOM conspicuously makes no assertion, nor factually
supports, that the Turnaround Strategy was ever stored in the Lazard Data Room. *See generally*
ECF 61-1. DOM's unsupported factual allegation is insufficient as a matter of law. *See Wilmington*

*PT Corp. v. Parker*, 2024 WL 1348746, at *2 (E.D.N.Y. Mar. 29, 2024) ("[U]nsupported assertion[s] cannot create even a genuine dispute of fact, much less conclusively decide [any] question"); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (holding unsupported factual assertions must be disregarded); *see also Deebs v. Alstom Transp., Inc.*, 346 Fed.Appx. 654, 656 (2d Cir. 2009) (party's "self-serving" deposition testimony held insufficient on summary judgment).

Regardless, DOM's claim is also demonstrably false. The only evidence in the record concerning the storage of the Turnaround Strategy document establishes that it was in Go Global's Data Room, <u>not</u> in Lazard's Data Room. *See* ECF 61-17 (Defendants' Exhibit M) at 4 (file path: Project Bathwater/1.1 Buy Buy Baby/1.1.6 Go Global Model and Investor Presentation); ECF 66-3 (Streader Dep.) at 79:24-80:2; *see also* Lauster Affidavit at ¶¶ 9-15.

### B. <u>Go Global's Financial Model and Data Room are Distinct from BBBY's Model and Lazard's Data Room.</u>

DOM argues that Go Global's Financial Model was nothing more than a reproduction of BBBY's 95-store model, and that Go Global's Data Room "was essentially a duplicate of the Lazard Data Room that DOM already had access to in May 2023." ECF 61-2 at 16. As further described below, this is false.

#### i. <u>The Go Global Financial Model is a Custom Document Developed by Go Global, which is Distinct from the BBBY Model.</u>

DOM fails to support its argument that Go Global's Financial Model "is nothing more than Go Global's spin [on] the BBBY Model." ECF 61-2 at 16. Indeed, DOM relies upon testimony from Go Global's Feuer, the primary author of Go Global's Financial Model, but succeeds only in establishing that Feuer created the Financial Model by personally manipulating Baby's historical data. *See* ECF 61-2 at 16. In particular, Feuer testified that he reviewed Baby's historical data, performed due diligence, and manipulated the projections to comport with his independent

findings. *See* ECF 66-4 (Feuer Dep.) at 77:9-14, 88:6-19; *see also* ECF 66-4 (Feuer Dep.) at 84:24-85:2 ("[I]f you go and take the [BBBY] model and compare it [to Go Global's Financial Model], the numbers have very few if any real[] compar[ison].") .

DOM's argument furthermore depends upon self-serving and inconsistent testimony from DOM's CEO, Srour, and CMO, Dahiya. *See* ECF 61-2 at 16. Srour testifies that he relied solely upon Dahiya for the understanding that Go Global failed to provide novel information to DOM. *See* ECF 66-7 (Srour Dep.) at 45:3-46:18. But Dahiya's testimony only validates that Go Global's Financial Model was <u>different</u> from the BBBY Model. ECF 66-8 (Dahiya Dep.) at 86:20-88:22.

DOM points to no specific similarities or copying between the BBBY Model and Go Global's Financial Model because it cannot. Indeed, Go Global's Financial Model (ECF 66-15) retains BBBY's "original data room projections," which are displayed directly alongside Go Global's "5 Year Plan" projections, and are decidedly not the same as Go Global's:



A direct comparison establishes that the Go Global Financial Model is fundamentally different from the BBBY Model. Critically, Go Global's Financial Model heavily deviates from BBBY's because it prudently anticipated Baby would struggle to reach sales targets due to its depletion of inventory during bankruptcy. *See* ECF 66-1 at ¶¶ 40, 196. To this end, unlike the BBBY Model, Go Global Financial Model forecasts the months July and August of 2023. More

significantly, however, the models anticipate materially different sales projections, particularly for the period directly following Baby's exit from bankruptcy. For example, Go Global expected only ▮▮▮▮▮▮▮▮▮ in sales in September 2023, whereas BBBY predicted ▮▮▮▮▮▮ BBBY's model anticipated sales thus exceeds Go Global's by ▮▮▮▮ Additionally, the Go Global Gross profit for September was projected at ▮▮▮▮▮ whereas the BBBY Model expected ▮▮▮▮▮ The Go Global gross profit expectations are therefore ▮▮▮ below BBBY's projections.



The BBBY Model also assumes that it would require only ▮▮▮▮▮▮ worth of inventory, whereas Go Global assumes that it will require ▮▮▮▮▮▮▮ for the corresponding period:

In addition, Go Global and BBBY's models differ in their EBITDA projections. EBITDA in the BBBY Model shows a loss of $1 million in September 2023. In contrast, Go Global projected

14

a loss of ███████ for the same period. Go Global's anticipated loss, as compared to the BBBY Model's projection, is ██████ larger.



One of the major reasons Go Global projected reduced sales expectations and higher inventory costs as compared to BBBY is based upon Baby's low level of inventory during bankruptcy. *See* ECF 66-1 at ¶¶ 40, 196. Notably, Baby was depleting its inventory – indeed it was effectively conducting a fire sale – while it was in bankruptcy. *See id.* Go Global's Financial Model accounts for the inventory depletion with lower sales projections and more capital devoted to replenishing inventory immediately following Baby's purchase out of bankruptcy. BBBY's Model, created by Lazard, the same banker running the bankruptcy auction, paints a much rosier picture that fails to take this into account. *See* ECF 66-4 (Feuer Dep.) at 21:14-25. Accordingly, the Go Global and BBBY Models are undisputedly distinct, as the Go Global Financial Model contains annotated proprietary financial data, which is separate and apart from what was available in the Lazard Data Room, and was the product of the hard work and expertise of Go Global's team.

     ii.   <u>Go Global's Data Room Contained a Bespoke Selection of Key Documents from Lazard Data Room</u>

DOM also argues that Go Global's Data Room "was essentially a duplicate of the Lazard Data Room." ECF 61-2 at 16. Again, this assertion is untrue. The Go Global Data Room reproduced some of the data in the Lazard Data Room, but only after reviewing and curating the

information. The result was that Go Global's Data Room contained a bespoke selection of key documents from among the large swath of data and information populated in the Lazard Data Room. *See* ECF 66-3 (Streader Dep.) at 42:4-11; ECF 66-8 (Dahiya Dep.) at 83:2-19; ECF 66-11 (Lauster Dep.) at 55:8-22.

It is uncontested that DOM's ability to perform due diligence was particularly problematic for DOM due to the sheer volume of information in the Lazard Data Room. *See* ECF 66-8 (Dahiya Dep.) at 83:2-19; ECF 66-33. DOM's access to Go Global's Data Room enabled DOM to accelerate its due diligence by relying on the culled data set and financial modeling Go Global had already assembled. *See* ECF 66-28 (June 19, 2023, Email re: Go Forward Plan). Moreover, it is undisputed that DOM did so. On June 19, 2023, Dahiya emailed Srour and Gandhi a "Go Forward Plan" comprised from "about 90% of the plan Go Global was going forward with." *See id.*

### iii.  DOM's Purported Review of the BBBY Model is False and Irrelevant.

Finally, DOM argues that it "had reviewed the BBBY Model prior to ever being introduced to Go Global." ECF 61-2 at 17. Aside from being false, this assertion is irrelevant. DOM has already conceded that it conducted no due diligence in advance of meeting with Go Global. *See, e.g.*, *id.* at 19; *see also* ECF 66-33 ("We are just going with BBB Team data and did not do any due diligence on the Data in the [Lazard] Data room"). DOM thus contradicts its own assertion. Even assuming DOM's claim were true, Go Global's Financial Model was the only model of the two backed by an independent application of due diligence DOM had failed but needed to perform. DOM thus did not have access to a plan that <u>verified</u> Baby's projected performance until they received Go Global's Financial Model.

### C.  **DOM Admits That DOM Reviewed Go Global's Technology Plan.**

*Lastly*, DOM is wrong that Go Global did not provide its Technology Plan to DOM. *See* ECF 61-2 at 16-17. DOM's self-serving assertion is contradicted by DOM's internal work-product,

emails, and testimony. For example, in DOM's Technology Roadmap, on a slide entitled "How did we get here?" DOM unequivocally concedes that DOM "review[ed] goglobals' [*sic*] technology and product plan," as well as Go Global's technology stack in order to "understand how [Go Global] think[s]" and to assess the "risk [to] DOM if [Go Global's] approach is followed." ECF 66-30 at DOM0018452.

Go Global furthermore engaged DOM in extended email correspondence and discussions regarding DOM's technology questions. *See* ECF 66-20 (NDA) at ¶ 9 (noting Proprietary Information could be furnished to DOM "orally, in writing, by demonstration or electronically"). Thus, on June 12, 2023, DOM's Malhotra emailed technology questions to Go Global regarding Baby's technology budget, information and systems migration, cybersecurity, and vendor contracts. *See* ECF 66-10 (Malhotra Dep.) at 37:23-39:3, 61:10-62:5; *see also* ECF 66-32.

The next day, on June 13, 2023, Go Global's Stephens met with Malhotra where they discussed Baby, BedBath, and the Baby/BedBath technology vendors, including Go Global's view on the technology migration plan. *See* ECF 66-10 (Malhotra Dep.) at 61:24-25 ("[Stephens was] telling me, ok, this is how we're thinking about [Baby's technology]"); *see also* ECF 66-10 (Malhotra Dep.) at 68:13-19, 74:2-12. Thus, DOM's argument that Go Global failed to provide its Technology Plan is without merit.

### III.    DOM MISAPPROPRIATED GO GLOBAL'S PROPRIETARY TRADE SECRET INFORMATION.

DOM argues that Go Global's claims for misappropriation of trade secrets fail "because there is no evidence that DOM used or relied on the materials" in Go Global's Data Room. ECF 61-2 at 18. Specifically, DOM claims that it "was already familiar with the contents of the Lazard Data Room" and "already had possession of a 95-store model before it was ever introduced to Go Global." *Id.* at 18-19. DOM further posits that its admission that DOM "was behind on due

17

diligence" is evidence that "DOM was not relying on any information from Go Global as it continued to consider participating in the IP Auction." *See id.* at 19. Lastly, DOM asserts that it prepared its own models following the Baby IP Auction, which DOM then used to purchase 11 store leases. *Id.*

DOM's arguments overlook that DOM employed Go Global's Proprietary Information to raise investment capital, accelerate and avoid the cost of conducting due diligence, and used DOM's knowledge of Go Global's Bidding Strategy to isolate and neutralize Go Global in the Bankruptcy Auction. *See* ECF 66 at 15-20.

### A. DOM Used Go Global's Proprietary Information to Raise Investment Capital, Accelerate and Avoid the Cost of Due Diligence, and Unfairly Compete in the Baby Bankruptcy Auction.

DOM mischaracterizes Go Global's claims for misappropriation when it states that "Go Global's DTSA and misappropriation causes of action are premised on the allegation that DOM used and relied on the information contained in the [Go Global] Data Room." ECF 61-2 at 18. While Go Global asserts that DOM did in fact use, and thus misappropriate, Go Global's Proprietary Information, Go Global additionally asserts that DOM improperly acquired and disclosed the same.

Despite DOM's inexperience, requests for assistance, and unequivocal assurances regarding the use of Go Global's Proprietary Information (*see* ECF 66-1 at ¶¶ 63, 65, 81-92), DOM always intended to submit a bid with or without Go Global. *See id.* at ¶ 157. Go Global relied upon DOM's material misrepresentations when it provided DOM access to its Proprietary Information. *See id.* at ¶ 94. DOM's conduct thus amounts to misappropriation through improper acquisition. *See* 18 U.S.C. § 1839(5)(A).

DOM furthermore admits that it shared Go Global's Financial Model with Tennyson, Mason, Friedland, Englander, and Sod to raise investment capital. *See* ECF 66-1 at ¶¶ 119-29.

Notably, at the time DOM disclosed Go Global's Financial Model, DOM had no financial model or investment term sheets of its own. *See* ECF 66-8 (Dahiya Dep.) at 156:15-157:5; ECF 66-33 at DOM0011715 ("Our partners need information, and we needed to build the terms and investment models/deal sheet that we could have presented, including NDA's."). DOM thus used Go Global's Financial Model as a stand-in, circulating it to potential investors, and even claiming that Go Global's Financial Model established that the investment was "a good deal." *See* ECF 66-7 (Srour Dep.) at 71:14-25. Ultimately, Englander, Friedland, and Sod invested with DOM. *See id.* at 66:9-16, 205:22-206:9. DOM's unlawful disclosure is by itself sufficient to establish misappropriation under New York common law and the DTSA. *See* 18 U.S.C. § 1839(5)(B) (misappropriation includes "<u>disclosure</u> or use of a trade secret . . . without express or implied consent") (emphasis added); *see also Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 511 (S.D.N.Y. 2017) (defendant's admission that he distributed purported trade secret information sufficient to establish that defendant had disclosed or disseminated trade secrets in violation of contractual obligation).

DOM likewise used Go Global's Proprietary Information to develop its personal knowledge to accelerate DOM's due diligence, data review, and the development of work-product in relation to structuring a bid for Baby's Bankruptcy Assets. DOM freely admits that it used Go Global's Proprietary Information to develop a "Go Forward Plan" based upon sales forecasts, store recommendations, and growth strategies that DOM knew comprised "about 90% of the plan Go Global was going forward with." ECF 66-28. DOM similarly concedes that it extracted and reviewed information from Go Global concerning Go Global's Technology Plan. *See* ECF 66-30 at 8. DOM frequently discussed and tracked Go Global's efforts in DOM's WhatsApp message group, including identifying the amount of money Go Global was considering bidding. *See* ECF 66-24 at DOM0010096.

19

Lastly, DOM used Go Global's Proprietary Information to isolate and neutralize Go Global in the Bankruptcy Auction. Go Global would never have shared its Proprietary Information with DOM unless it received assurances that DOM was not going to use the information against Go Global. DOM provided those assurances, and even signed an NDA. *See generally* ECF 66-20. DOM's knowledge of Go Global's plans, including how much Go Global anticipated bidding and the amount of money Go Global believed was necessary to run the resulting business, was key information to any bidder. This information was particularly significant to DOM because of DOM's tardiness to the auction process, lack of due diligence, and DOM's view that Go Global was the party most likely to win the Baby Bankruptcy Auction. *See* ECF 66-23 (June 15, 2023, Tr.) at 204:13-17; *see also* ECF 66-10 (Malhotra Dep.) at 188:5-18; ECF 66-11 (Lauster Dep.) at 56:24-57:12.

DOM's use of Go Global's Proprietary Information to raise investment capital, increase its knowledge to accelerate its due diligence, and obtain a material unfair advantage in the Bankruptcy Auction constitutes misappropriation. *See Quantlab*, 696 Fed.Appx. at 690 (finding misappropriation where defendant used "stolen trade secrets" to help "find investors"); *KCG Holdings, Inc. v. Khandekar*, 2020 WL 1189302, at *11 (S.D.N.Y. Mar. 12, 2020) (granting summary where defendant used "template[s] or sample[s]" to "learn" and "develop [defendant's] personal knowledge"); *Shamrock Power Sales, LLC v. Scherer*, 2015 WL 5730339, at *28 (S.D.N.Y. Sept. 30, 2015) (granting summary judgment where defendant used plaintiff's pricing information to outbid plaintiff's manufacturer for contracts).

### B. DOM's Admission that it Conducted no Due Diligence Before Meeting Go Global has no Bearing on DOM's use of Go Global's Proprietary Information.

DOM required Go Global's Proprietary Information and other work-product because DOM was late to the bankruptcy auction; behind on its data review, development of financial modeling,

and other critical documents; and understaffed with insufficient resources or personnel to catch up. *See* ECF 66 at 17-18. Indeed, DOM does not contest this fact, instead relying upon its own admission that its failure to conduct due diligence establishes its purported lack of reliance on Go Global's Proprietary Information. *See* ECF 61-2 at 19. But as already established above, DOM employed Go Global's Proprietary Information to raise investment capital, avoid development and due diligence costs, and neutralize Go Global in the Bankruptcy Auction, all at Go Global's expense and to Go Global's detriment. The fact that DOM still had no idea how to structure a competitive bid as of June 23, 2023 (ECF 66-33), merely confirms DOM's utter failure of preparation, as well as further validates DOM's motivation for misappropriating Go Global's Proprietary Information in the first place. DOM's lack of due diligence does not insulate it from liability.

### C.  <u>DOM Concedes that it Developed its Financial Model After Winning the Baby IP Auction.</u>

DOM claims that it retained Mr. Moskowitz, BBBY, and Alix Partners collectively to fashion a financial model, which DOM then used to purchase 11 store leases. ECF 61-2 at 19. Crucially, DOM relies upon two paltry email chains (Defendants' Exhibits AC and AD) to allegedly establish that it "created an 11 store model that DOM used as the basis for its business." *Id.* DOM's proffered emails prove that DOM worked on an 11 store model; they do not prove that DOM did so without reliance on any of Go Global's work.

DOM admits that it did not develop its own financial model until <u>after</u> the Baby IP Auction, which was held on June 28, 2023. By that time, DOM had already disclosed Go Global's Financial Model to raise investment capital (ECF 66-25; ECF 66-26; ECF 66-27), mined Go Global's Proprietary Information to accelerate its due diligence and develop a "Go Forward Plan" (ECF 66-28), and utilized its knowledge of Go Global's Bidding Strategy to circumvent Go Global from

winning the Baby Bankruptcy Assets. DOM thus unequivocally used and misappropriated Go Global's Proprietary Information. At best, it remains a question of fact whether DOM also employed Go Global's Proprietary Information to assist it in developing DOM's 11 store model.

## IV.    DOM UNJUSTLY ENRICHED ITSELF.

DOM's argument that Go Global cannot make out a claim for unjust enrichment is based solely on the grounds that Go Global has not "conferred a specific o[r] direct benefit on DOM." ECF 61-2 at 20. The evidentiary record plainly contradicts DOM's assertion. DOM disclosed Go Global's Proprietary Information to raise money for a solo bid, analyzed Go Global's Financial Model to learn from it and accelerate its due diligence, developed a "Go Forward Plan" based upon Go Global's Financial Model and other Proprietary Information, and utilized its knowledge of Go Global's Bidding Strategy to gain a competitive advantage in the Baby Bankruptcy Auction. *See supra*, at 17-20. In fact, DOM openly admitted that Go Global's Proprietary Information was valuable to DOM, offered to pay Go Global for the "legwork," and furthermore conceded that DOM needed Go Global to remain competitive in the Bankruptcy Auction. *See* ECF 66-23 (June 15, 2023 Tr.) at 133:13-16; ECF 66-24 at 5.

Go Global's information therefore conferred a specific and direct benefit upon DOM at Go Global's expense, and for which equity and good conscience require restitution. *See Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 199 (S.D.N.Y. 2017) (disclosure of plaintiff's information in exchange for compensation deemed a "use" that granted defendant a "pecuniary benefit"); *see also Ross v. F.E.I., Inc.*, 150 A.D.2d 228, 232 (1st Dept. 1989) (unjust enrichment generally requires that "a party hold property under such circumstances that in equity and good conscience he ought not to retain it"); *Matarese v. Moore-McCormack Lines*, 158 F.2d 631, 634 (2d Cir. 1946) (finding unjust enrichment where "the relationship between the parties before and after the disclosure . . . the specific character, novelty, and patentability of plaintiff's invention,

the subsequent use made of it by defendants, and the lack of compensation given to the plaintiff – all indicate that the application of the principle of unjust enrichment is required").

DOM furthermore argues that Go Global's unjust enrichment claim must be dismissed as duplicative of Go Global's claim for breach of contract. ECF 61-2 at 21. However, DOM ignores that "a claim of unjust enrichment may serve as a basis for recovery should a trier of fact determine that . . . no valid contract was formed or that the contractual obligations did not encompass the events underlying the asserted basis for [a party's] unjust enrichment claim." *Net2Globe Int'l Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 466 (S.D.N.Y. 2003). Indeed, DOM hints, but does not argue, that it believes the NDA is invalid. *See* ECF 61-1 at ¶¶ 19-23. Go Global's claim for unjust enrichment is thus a valid alternative cause of action.

Finally, DOM argues that Go Global cannot maintain its claim for constructive trust because of Go Global's inability to establish its claim for unjust enrichment. However, Go Global has a viable claim for unjust enrichment. *See supra*. Accordingly, the Court should reject DOM's argument to dismiss Go Global's claim for constructive trust.

## V.    GO GLOBAL'S EXPERT OPINION REGARDING LOST PROFITS IS ADMISSIBLE.

DOM's argument that the Schachter Report "fails to establish a sufficient factual basis to calculate lost profits under the *Daubert* standard" is premature and incorrect. *See* ECF 61-2 at 23. "Generally, courts have declined to reach the merits of motions *in limine* at a summary judgment setting." *Senior by Senior v. Eihab Hum. Servs., Inc.*, 2019 WL 8128563, at *4 (E.D.N.Y. Oct. 10, 2019). The Court can and should deny DOM's application to exclude on this basis alone. *See id.*; *see also Castle v. United States*, 2017 WL 6459514, at *16 (N.D.N.Y. Dec. 18, 2017) (denying as premature motion *in limine* filed at summary judgment stage); *Jones v. Harris*, 665 F. Supp. 2d 384, 404 (S.D.N.Y. 2009) (*in limine* motions should "not be filed until the eve of trial").

In addition to its procedural deficiency, DOM's argument is likewise substantively flawed because it fails to identify a single specific portion of the lost profits calculation that is based upon unreliable data or information. Instead, DOM argues the Schachter Report "fails to explain (a) how [selling, general, and administrative cost] projections bear any relation to any alleged 'trade secret,' (b) why [Schachter] did not use Go Global's prior methodology, (c) how the projected SG&A bears any relation to any alleged 'trade secret,' (d) why the Go Global Model was not materially flawed by using a significantly higher expense ratio, or (e) why DOM should be responsible for speculative damages arising from those sales." ECF 61-2 at 25. These are red herrings and strawmen concerning irrelevant data and causation, not arguments about Go Global's failure to factual support its lost profits calculation. Indeed, DOM's argument goes to the weight of Schachter's opinion, not its admissibility. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023) (rejecting attack on expert report that argued expert "should have looked at [party's] actual data rather than obtaining information from interviewing employees").

DOM appears to take particular issue with the fact that the Schachter Report does not employ Go Global's Financial Model as part of its calculation. In fact, direct application of Go Global's Financial Model was not possible because DOM purchased Baby's IP for $15.5 million and leases for 11 retail stores for $1.7 million, which Go Global's Model does not account for or anticipate. To calculate lost profits, Schachter was thus forced to develop a new model based upon historical sales data from the 11 stores purchased by DOM and growth assumptions derived from a combination of Go Global's Feuer and IBISWorld Industry Report for Durable Baby Goods Stores in the US. *See* ECF 66-17 at 15. Accordingly, Schachter's damages model is based upon

the plain and reasonable assumption that DOM would have won the same Bankruptcy Assets jointly with Go Global, per the terms of the NDA.

DOM further argues that the Schachter Model is baseless speculation because it assumes a "two and twenty" fee structure for Go Global. ECF 61-2 at 24. DOM suggests that this assumption is somehow uncommon or speculative, when the opposite is true. A "two and twenty" model is a standard compensation structure for General Partners, such as Go Global. *See* ECF 66-3 (Streader Dep.) at 22:24-23:7.

Accordingly, the Schachter Model is reasonable and sufficient for this stage of litigation and the Court should deny DOM's motion to exclude Schachter's expert opinion regarding lost profits.

## **CONCLUSION**

For the reasons set forth above, this Court should deny DOM's Motion for Summary Judgment in its entirety.

Dated: Rockville Centre, New York
   January 9, 2025

     **FALCON RAPPAPORT & BERKMAN LLP**

    By: */s/ Moish E. Peltz*
      Moish E. Peltz, Esq.
      Steven C. Berlowitz, Esq.
      265 Sunrise Highway, Suite 50
      Rockville Centre, New York 11570
      Tel: (516) 599-0888

      *Attorneys for Plaintiff Go Global Retail LLC*