## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GO GLOBAL RETAIL LLC,<br><br>   Plaintiff,<br><br> v.<br><br>DREAM ON ME INDUSTRIES, INC.,<br>and DREAM ON ME, INC.,<br><br>   Defendants. | Case No. 1:23-cv-07987-AS<br><br>**CIVIL ACTION**<br><br>**COUNTERSTATEMENT OF MATERIAL FACTS PURSUANT TO RULE 56.1** |

Plaintiff hereby provides the following Response and Counterstatement of Material Facts to Defendants' Statement of Material Facts not in Dispute pursuant to Local Civil Rule 56.1.

1.  Buy Buy Baby (stylized as "buybuy BABY" and referred to herein as "BBBY") is a North American specialty baby retailer selling a wide assortment of baby essentials and nursery furnishings. *See* Declaration of Thomas K. Murphy III[1], Ex. A, Declaration of Holly Etlin, at ¶19.

Response: Admit.

2.  In 2007, BBBY was acquired by Bed Bath & Beyond ("BB&B" or "Debtor"). *Id.*, Ex. B, BB&B SEC Form 8-K.

Response: Admit.

3.  At the time of acquisition, BBBY operated eight stores, and as of April 2023, BBBY had approximately 120 stores across the United States and an online e-commerce business. *Id.*, Ex. A, Declaration of Holly Etlin, at ¶40.

Response: Admitted in part, denied in part.

---

[1] All exhibits referenced herein are attached to the Declaration of Thomas K. Murphy III.

Go Global **admits** that, per the cited Declaration of Holly Etlin at ¶ 40, BBBY had approximately 120 stores across the United States.

Go Global **denies** the remaining portions of Paragraph 3. DOM's proffered evidence fails to establish that: "At the time of acquisition, BBBY operated eight stores," that BBBY had approximately 120 stores as of April 2023, or that BBBY operated "an online e-commerce business." The Declaration cited at ¶ 40 states in full: "The Company initiated incremental store closures in its Bed Bath & Beyond banner with the ultimate goal of operating approximately 360 profitable stores, in addition to the approximately 120 buybuy BABY stores, across the United States. The Company closed unprofitable and marginally profitable stores and exited out of the Canadian market."

4.    DOM is a New Jersey corporation operating as a designer, manufacturer, and supplier of baby products who was historically a large supplier to BBBY. Ex. C, Dep. Trans. of Avish Dahiya, at 28:12-21.

Response: Admitted in part, denied in part.

Go Global **admits** that Dream on Me Industries, Inc. and Dream on Me, Inc. (collectively, "DOM") are New Jersey companies that operate as a designer, manufacturer, and supplier of baby products.

Go Global **denies** the remaining portions of Paragraph 4. DOM's proffered evidence fails to support that DOM "was historically a large supplier to BBBY." *See* Defendants' Ex. C, Dep. Trans. of Avish Dahiya, at 28:12-21 (Q: What does Dream on Me Industries do? A: They're in multiple businesses from manufacturing to sourcing to designing products to -- and I know Mark is heavy into the real estate side of the investments so year, so I would

- - that's what I would say. Q: And does Dream on Me specialize in baby products? A: Yes.).

5.      In 2021 or early 2022, DOM initially had discussions with BB&B about acquiring BBBY or BBBY's assets. *Id.* at 33:17-36:27; Ex. D, Dep Trans. of Mark Srour, at 21:9-22:8. Those conversations did not result in an agreement, but DOM remained interested in BBBY. *Id.*

Response: Admit.

**The Bankruptcy Filing and The Lazard Data Room**

6.      On April 23, 2023, BB&B filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). *Id.*, Ex. E, Chapter 11 Voluntary Petition.

Response: Admit.

7.      Prior to the bankruptcy filing, BB&B engaged financial advisory firm, Lazard, Inc ("Lazard"), to solicit interest in a going-concern sale transaction. Ex. A, Declaration of Holly Etlin, at ¶73.

Response: Admit.

8.      In connection with marketing the BB&B assets, Lazard established a data room (the "Lazard Data Room") that was populated with a vast amount of Debtor documents, including those containing BBBY's historical financial performance, future financial projections, models, corporate strategy, and other corporate information. *Id.*, Ex. F, Dep. Trans. of Deborah Gargiulo, at 19:13-21:3.

Response: Admitted in part, denied in part.

Go Global **admits** only that Lazard established the Lazard Data Room in connection with BB&B assets, and that it contained a vast amount of documents and information.

Go Global **denies** the remaining assertions in Paragraph 8. DOM's proffered evidence fails to establish that the Lazard Data Room "was populated with . . . Debtor documents, including those containing BBBY's historical financial performance, future financial projections, models, corporate strategy, and other corporate information." Rather, DOM's proffered evidence discusses that Lazard had two data rooms: the "Lazard data room" (Defendants' Ex. F, Dep. Trans. of Deborah Gargiulo at 20:7) and the "clean data room" (*Id.* at19:20), and that the clean data room contained payroll records (*Id.* at 20:9-14).

9.      At least thirty potential investors, including DOM and Go Global, executed non-disclosure agreements with Lazard that gave them access to the Lazard Data Room to conduct due diligence. *Id.*, Ex. A, Declaration of Holly Etlin, at ¶74.

Response: Admit.

10.      DOM executed a non-disclosure agreement with Lazard on May 6, 2023, and in the subsequent weeks, DOM reviewed the available information and engaged Lazard in discussions regarding the information contained in the Lazard Data Room. *Id.*, Ex. G, Emails Confirming Data Room Access; Ex. C, Dep. Trans. of Avish Dahiya, at 50:24-52:12; Ex. AR Dep. Trans of Amit Maholtra at 34:23-35:15. Therefore, DOM was already familiar with the contents of the Lazard Data Room, and  DOM already had possession of a ██ store model before it was ever introduced to Go Global. *Id.*

Response: Admitted in part, denied in part.

Go Global **admits** only that DOM's email refers to a non-disclosure agreement provided to Lazard on May 6, 2023, and that in subsequent weeks DOM reviewed and discussed information contained in the Lazard Data Room per Defendants' Ex. G Emails.

Go Global **denies** the remaining assertions in Paragraph 10. DOM's proffered evidence fails to establish that "DOM was already familiar with the contents of the Lazard Data Room" and that "DOM already had possession of a ██ store model before it was ever introduced to Go Global." Rather, the cited Emails and Testimony merely support that DOM had access to the Lazard Data Room.

Go Global furthermore **denies** that DOM was "already familiar with the contents of the Lazard Data Room" and that "DOM already had possession of a ██-store model before it was ever introduced to Go Global" because DOM has admitted that it failed to look at documents contained in the Lazard Data Room. *See* Defendants' Ex. C, Dep. Trans. of Avish Dahiya, at 162:10-19; ECF 66-33 at DOM0011714 ("A lot of information is in the [Lazard] Data Room that we should have looked at regarding HR, Legal, leases, stores, finance and budgets, [and] planning[.]")

**Go Global Background and Purported Confidential Information**

11.    Go Global is a self-described "brand investment platform" whose strategy is based on implementing its "Technology, Customer Engagement and Operational Expertise." *See* https://www.goglobalretail.com/strategy.

Response: Admit.

12.    Go Global does not deploy any of its own funds. *See* Ex. H, Dep. Trans of Jeffrey Streader at 22:10–23:7. Instead, Go Global partners with other parties with capital to invest in distressed retail brands, which Go Global then operates. *Id.* Go Global is then compensated for managing investments on behalf of the "investors" who provide funding. *Id.*

Response Admitted in part, denied in part.

Go Global **admits** that "Go Global partners with other parties with capital to invest in distressed retail brands, which Go Global then operates."

Go Global **denies** that it "does not deploy any of its own funds." *See* Defendants' Ex. H, Dep. Trans. of Jeffrey Streader at 42: 20-23; Defendants' Ex. AS, Dep. Trans. of Christian Feuer at 79:25-80:4.

13.     On May 12, 2023, Go Global retained Ankura Capital Advisors LLC ("Ankura") to assist Go Global in securing funding for a potential purchase of BBBY as a going concern. *Id.*, Ex. I, Agreement between Go Global and Ankura.

<u>Response</u>: Admitted in part, denied in part.

Go Global **admits** that it retained Ankura on May 12, 2023.

Go Global **denies** that Ankura was retained to "secure funding for a potential purchase of BBBY as a going concern." Instead, Plaintiff entered an agreement with Ankura Capital Advisors, LLC "to raise debt and/or equity financing and to provide assistance with acquiring Buy Buy Baby out of bankruptcy." *See* Defendants' Ex. I, Agreement between Go Global and Ankura.

14.     Ankura established a data room (the "Ankura Data Room") that was populated with certain documents – the vast majority of which were also contained in the Lazard Data Room. *Id.*, Ex. C, Dep. Trans. of Avish Dahiya, at 85:20–88:22.

<u>Response</u>: Admitted in part, denied in part.

Go Global **admits** only that Ankura established the Ankura Data Room, and that it contained Buy Buy Baby data. *See* Defendants' Ex. C, Dep. Trans. of Avish Dahiya, at 85:22-25.

Go Global **denies** the remaining assertions in Paragraph 14. DOM's proffered evidence fails to establish that "the vast majority [of the Ankura Data Room documents] were also contained in the Lazard Data Room." Rather, Dahiya's cited testimony merely states he "saw a lot of data that was from - - which is buybuy Baby data." *See* Defendants' Ex. C, Dep. Trans. Of Avish Dahiya, at 85:22-25. The Ankura Data Room contained Go Global's Financial Model, information Go Global requested from BBBY that was not initially in the Lazard Data Room, and other documents including case studies and customer data that Go Global developed or obtained at its own expense. *See* ECF 66-3 (Streader Dep. Tr.) at 27:12-24; ECF 66-4 (Feuer Dep. Tr.) at 56:7-10; ECF 66-11 (Lauster Dep. Tr.) at 23:3-7, 55:8-22; ECF 66-43 (Streader Aff.) at ¶ 16.

15.     In fact, the only two proprietary documents related to BBBY that have been identified as not being otherwise available in the Lazard Data Room were the Go Global Model and the Acquisition and Turnaround Strategy presentation dated June 2023. *Id.*; Ex. N., the Go Global Model; *See* Ex. AO, Go Global Presentation.

Response: Admitted in part, denied in part.

Go Global **admits** that the Go Global Model and the Acquisition and Turnaround Strategy presentation dated June 2023 were not available or stored in the Lazard Data Room.

Go Global **denies** the remaining assertions in Paragraph 15. DOM's proffered evidence wholly fails to support that the Go Global Model and the Acquisition and Turnaround Strategy presentation dated June 2023 were indeed "the only two proprietary documents related to BBBY that have been identified as not being otherwise available in the Lazard Data Room." (emphasis added). The Ankura Data Room contained Go Global's Financial Model, information Go Global requested from BBBY that was not initially in the Lazard

Data Room, and other documents including case studies and customer data that Go Global developed or obtained at its own expense. *See* ECF 66-3 (Streader Dep. Tr.) at 27:12-24; ECF 66-4 (Feuer Dep. Tr.) at 56:7-10; ECF 66-11 (Lauster Dep. Tr.) at 23:3-7, 55:8-22; ECF 66-43 (Streader Aff.) at ¶ 16.

16.     It is undisputed by Christian Feuer who was responsible for creating the vast majority of the Go Global Model that it was a manipulation of the Lazard Model and that it was changing often, almost daily during June 2023. *See* Ex. AS, Dep Trans. Christian Feuer at 77:9-14; 84:6-19; 85:5-7.

Response: Admitted in part, denied in part.

Go Global **admits** that "the vast majority of the numbers [in the Go Global Model] come from [Feuer] because they have been heavily manipulated." *See* Defendants' Ex. AS, Dep Trans. Christian Feuer at 84: 17-19.

Go Global **denies** that the Go Global Model was a mere "manipulation of the Lazard Model and that it was changing daily." In comparison to the Lazard Model, Feuer specifically testified that the Go Global Model was "heavily manipulated," and that "the numbers have very few if any really comparable . . . they are all different; I mean partially different." *Id*., 84:19, 85:2-4. Feuer leveraged his knowledge, experience, and due diligence of BBBY assumptions and projections to develop the Go Global Model. *Id.* at 84:6-86:3, 86:11-90:14, 122:10-123:3. The Go Global Model also included a resized store fleet based upon Gargiulo's review and analysis of BBBY's retail stores. *See* ECF 66-4 (Feuer Dep. Tr.) at 21:3-22:15, 84:6-19, 95:24-96:24, 104:13-105:12, 122:10-123:3; ECF 66-5 (Gargiulo Dep. Tr.) at 30:7-20, 31:4- 12, 41:3-8. Regarding changes to the Go Global Model, Feuer testified "I wouldn't say daily [changes], but often." *Id*. at 85:7.

**Go Global and DOM's Brief Relationship**

17.     Go Global and DOM were introduced by Lazard and engaged in discussions to potentially be involved in a group together to purchase BBBY for a grand total of six days from June 9, 2023 until June 15, 2023. *Id.*, Ex. J, Introductory E-mails.

Response: Admitted in part, denied in part.

Go Global **admits** that Go Global and DOM were introduced by Lazard via e-mail.

Go Global **denies** the remaining assertions in Paragraph 17. DOM's proffered evidence fails to support that Go Global and DOM "engaged in discussions to potentially be involved in a group together to purchase BBBY for a grand total of six days from June 9, 2023 until June 15, 2023." Rather, the Emails are dated June 9, 2023 through June 10, 2023, and only show the introduction by Lazard along with the execution of Go Global's NDA so that discussions could then ensue. *See* Defendants' Ex. J, Introductory E-mails.

18.     On Saturday, June 10, 2024, DOM and Go Global exchanged brief introductory emails in order to set up a call. *Id.* The discussions between Go Global and DOM were urgent because Lazard required that investors submit a bid by June 16, 2023 and a fully binding bid by June 19, 2023. *Id.*, Ex. K, E-mails re: Bid Deadlines.

Response: Admit.

19.     Unprompted and without context, on Saturday, June 10, 2024, Go Global submitted the NDA to DOM. *Id.*, Ex. J, Emails re: NDA.

Response: Deny.

Go Global **denies** that "on Saturday, June 10, 2024, Go Global submitted the NDA to DOM." The proffered evidence establishes that Christian Feuer sent Go Global's NDA to DOM on June 10, 2023. *See* Defendants' Ex. J, Emails re: NDA.

Go Global furthermore **denies** that it sent the NDA "unprompted and without context." DOM's proffered evidence fails to support DOM's characterization. *Id.* Moreover, DOM understood the context of the NDA in light of their review of its contents, and given the circumstances of DOM's introduction to Go Global by Lazard. *See* Defendants' Ex. C, Dep. Trans. of Dahiya at 62:19-24; Defendants' Ex. J, at DOM002710 (introducing Go Global and DOM "to speak directly about a potential Baby going concern transaction").

20.    There were limited employees available to review the document since it was a Saturday, as Go Global's CEO and legal counsel both observe Shabbat. *Id.*, Ex. D, Dep. Trans. of Mark Srour, at 62:9-12; 164:10-15; Ex. C, Dep. Trans. of Avish Dahiya, at 60:2-5.

Response: Admitted in part, denied in part.

Go Global **admits** that Christian Feuer sent Go Global's NDA to DOM on June 10, 2023, and that June 10, 2023 was a Saturday.

Go Global **denies** the remaining assertions in Paragraph 20. DOM's proffered evidence fails to support that "[t]here were limited employees available to review the document." Rather, Dahiya testified that "Mark wasn't available" and there was no "access to legal counsel." *See* Defendants' Ex. C, Dep. Trans. of Avish Dahiya, at 60:2-5. DOM's cited testimony furthermore fails to establish that Go Global's CEO and legal counsel both observe Shabbat. Moreover, Dahiya, as DOM's CMO and CFO, was available, authorized to sign, and did in fact sign the NDA. *See* Dep. Trans. of Avish Dahiya at 66:5-67:7, 82:4-8; *see also* ECF 66-20 (NDA) at GG-0008794. There is thus no indication that "[t]here were limited employees available to review the document."

21.    Approximately two and a half hours receiving it, Avish Dahiya, DOM's Chief Marketing Officer and Chief Technology Officer, returned the signed NDA. *Id.*, Ex. J, Emails Regarding the NDA.

Response: Admit.

22.    Mr. Dahiya recalled "[Go Global] wanted us to sign an NDA urgently because they cannot talk to us till that NDA was signed." *Id.*, Ex. C, Dep. Trans. of Avish Dahiya, at 54:19-25.

Response: Admitted in part, denied in part.

Go Global **admits** that it would not speak with DOM regarding the substance of a potential joint partnership until Go Global obtained an executed NDA. *See* Defendants' Ex. C, Dep. Trans. of Avish Dahiya, at 54:19-25.

Go Global **denies** that DOM's proffered evidence establishes that Go Global wanted DOM to sign the NDA "urgently." Rather, the email to DOM merely states: "I am attaching our NDA as well." *See* Defendants' Ex. J, Introductory E-mails.

23.    In fact, Mr. Dahiya did not have the authority to sign the NDA, and he admitted that he did not read the NDA before signing it. *Id.* at 59:14-17; 62:9-12; Ex. D, Dep. Trans. of Mark Srour, at 29:9-21.

Response: Deny.

Go Global **denies** that Mr. Dahiya did not have the authority to sign the NDA. Dahiya regularly signs NDAs on behalf of DOM. *See* Dep. Trans. of Avish Dahiya at 66:5-67:7, 82:4-8. Mr. Dahiya is the Chief Marketing Officer and Chief Technology Officer of Dream On Me, and he made a decision to sign this NDA. *Id.* at 55:24-59:3, 62:7-8.

Go Global furthermore **denies** that Dahiya did not read the NDA before signing it. *Id.* at 62:19-24. Dahiya was aware of the purpose of the NDA, and knew that Go Global would

share confidential and proprietary information with DOM after DOM executed the NDA. *Id.* at 66:20-67:4.

24.     The NDA between Go Global and DOM sets forth non-disclosure and non-circumvention obligations, but the NDA specifically provides that its terms do not apply to "information that was already known" to DOM. Ex. L, the NDA at ¶¶.4,9.

Response: Deny.

The NDA between Go Global and DOM specifically provides that:

> Recipient acknowledges that its obligations under this Agreement with regards to the Proprietary Information of the Target shall remain in effect for as long as the Proprietary Information remains confidential. The foregoing obligations shall not apply if and to the extent that: (a) Recipient establishes that the information communicated was already known to Recipient, without obligation to keep it confidential, prior to the time of its receipt from the Target or Global.

*See* Defendants' Ex. L, the NDA at ¶ 4.

25.     Ankura then granted DOM access to the Ankura Data Room, and DOM reviewed certain contents of the Ankura Data Room and downloaded certain documents. *Id.*, Ex. M, Ankura Data Room Activity Log.

Response: Admitted in part, denied in part.

Go Global **admits** that "Ankura then granted DOM access to the Ankura Data Room."

Go Global **denies** that "DOM reviewed certain contents of the Ankura Data Room and downloaded certain documents." Rather, DOM has admitted that it downloaded the entire contents of the Ankura Data Room. *See* ECF 66-8 (Dahiya Dep.) at 157:20-158:2

26.     On June 12, 2023 and June 15, 2023, key members of DOM and Go Global met in person to discuss jointly investing in BBBY. *Id.*, Ex. D, Dep. Trans. of Mark Srour, at 40:19 – 42:3, 53:10-15.

Response: Admit.

DOM's cited testimony wholly fails to establish the proffered fact that: "On June 12, 2023 and June 15, 2023, key members of DOM and Go Global met in person to discuss jointly investing in BBBY." *See* Defendants' Ex. D, Dep. Trans. of Mark Srour, at 40:19 – 42:3 (discussing DOM's lack of experience in operating technology for retail stores), 53:10-15 ("…Bates number DOM 2969. It is an email from Mark to Michael Tennyson and Gary Mason dated June 24, 2023 and this will be Plaintiff's Exhibit 7. (Whereupon, at this time, a document was marked as Plaintiff's…)"). Nonetheless, Go Global **admits** that "On June 23, 2023, and June 15, 2023, key members of DOM and Go Global met in person to discuss jointly investing in BBBY." *See* ECF 66-3 (Streader Dep. Tr.) at 40:22-41:14; ECF 66-4 (Feuer Dep. Tr.) at 49:23-50:16; ECF 66-5 (Gargiulo Dep. Tr.) at 17:11-25; ECF 66-7 (Srour Dep. Tr.) at 83:17-19; ECF 66-8 (Dahiya Dep. Tr.) at 90:10-25; ECF 66-11 (Lauster Dep. Tr.) at 34:14-35:8, 39:8-17.

27.     Following these in-person meetings, No agreement could be made between DOM and Go Global because they had fundamental differences and could not agree upon an investment strategy, in part, because (a) Go Global was only interested in operating BBBY, but not investing its own capital in BBBY; (b) DOM was only interested in potential partners that would invest their own capital; and (c) DOM was only interested in investing if they were a general partner involved in the day-to-day operation. *Id.*, Ex. C, Dep. Trans. of Avish Dahiya, at 128:23 – 131:3, Ex. D, Dep. Trans. of Mark Srour, at 36:10 – 38:11; Ex. H, Jeffrey Streader Dep. Trans. at 28:12-29:5.

Response: Admitted in part, denied in part.

Go Global **admits** only that no agreement was reached between DOM and Go Global for a joint partnership in relation to bidding for BBBY's assets.

Go Global **denies** the remaining assertions in Paragraph 27. No agreement was reached between DOM and Go Global for various reasons, including that DOM's CEO insisted on playing a role in the new business's operations and furthermore sought to obtain certain fees for doing so. *See* ECF 66-7 (Srour Dep. Tr.) at 36:23-37:19, 103:6-11; *see also* ECF 66-23 (June 15 Tr.) at 113:23-25 (Srour: "whatever [Go Global is] charging, make us [part] of that thing."), 133:17-23, 135:9-20 (Srour: "I know I'm moving my office to the Buy Buy office over there . . . . I'm not looking only just to do purchasing. I'm looking to run the show"), 189:20-21 (Srour: "I'm out of control, don't you understand that?"). This contradicts what DOM had initially communicated to Go Global, including that DOM lacked operational retail experience and was too far behind on its due diligence to consummate a deal on its own. *See* ECF 66-5 (Gargiulo Dep. Tr.) at 18:24-19:12; ECF 66-11(Lauster Dep. Tr.) at 36:2-22.

28.     Notably, up until the June 15, 2023 meeting, DOM had been under the impression that Go Global would be investing their own capital along with DOM since the Go Global Model clearly reflected that Go Global would be contributing ███████████ *Id.*, Ex. C, Dep. Trans. of Avish Dahiya, at 87:24-88:8; Ex. N, Go Global Model.

Response: Deny.

DOM's proffered evidence fails to establish that "up until the June 15, 2023 meeting, DOM had been under the impression that Go Global would be investing their own capital along with DOM." Rather, although the Go Global Model includes a note regarding ███████ in capital contribution, Go Global made it consistently clear that it was not looking to invest its own capital related to BBBY. *See* ECF 66-3 (Streader Dep. Tr.) at 61:2-14; ECF 66-5

(Gargiulo Dep. Tr.) at 18:24-19:12; ECF 66-6 (Chau Dep. Tr.) at 34:7-35:5; ECF 66-11

(Lauster Dep. Tr.) at 36:9-22; ECF 66-43 (Streader Aff.) at ¶¶ 28-36.

29.    After the June 15, 2023 meeting, Go Global ceased communicating with DOM, but

it continued to engage in discussions with other investors regarding the acquisition of BBBY. *Id.*,

Ex. G, Dep. Trans. of Jeffrey Streader at 64:3-9 and Ex. O, E-mail Exchange Between Go Global

and Ankura.

Response: Admitted in part, denied in part.

Go Global **admits** only that Go Global continued to engage in discussions with other

investors regarding the acquisition of BBBY.

Go Global **denies** the remaining assertions of Paragraph 29. DOM's proffered evidence

fails to establish that "Go Global ceased communicating with DOM." Rather, DOM's

evidence discusses Go Global's contingent bid for buybuy Baby (*see* Defendants' Ex. G,

Dep. Trans. of Jeffrey Streader at 64:3-9), and Go Global's continued efforts to acquire

BBBY (*see* Defendants' Ex. O, E-mail Exchange Between Go Global and Ankura).

**Go Global's Subsequent Efforts to Obtain BBBY Without DOM and the IP Auction**

30.    On June 16, 2023, the day after Go Global last met with DOM, Go Global made a

███████ contingent bid without DOM to acquire BBBY as a going concern with ██ stores. Of

the ████████ offer, approximately ███████████ was attributed to the BBBY intellectual

property.  *Id.*, Ex. P, Draft Bid.

Response: Admit.

31.    Go Global's bid, however, was determined not to be a qualifying bid as Go Global

had not firmly established that it had secured the necessary funding to complete the transaction.

*Id.*, Ex. O, E-mail Exchange Between Go Global and Ankura.

Response: Deny.

Go Global's offer was always contingent on its "ability to firm up the last open details of [Go Global's] offer." *See* Defendants' Ex. O, E-mail Exchange Between Go Global and Ankura.

32.     After failing to submit a qualifying bid, Go Global advised that it was withdrawing from the bidding process. *Id.*, Ex. Q, Withdrawal Email.

Response: Admitted in part, denied in part.

Go Global **admits** only that it sent an email on June 26, 2023, in which it stated that it was withdrawing from the bidding process, but **denies** that it in fact withdrew or that the reason for the purported withdrawal was due to Go Global's alleged "fail[ure] to submit a qualifying bid[.]" *See* ECF 66-34, 66-35. Rather, Go Global's stated reason to Ankura was that it had "concluded that the brand has suffered material deterioration the last year and during the going out of business process" and thus advised it was "withdrawing from this process." *See* Defendants' Ex. Q, Withdrawal Email. However, the process was dynamic, and Go Global was continuing to work to submit a bid, and indeed Go Global re-entered the bidding process later that same day. *See* ECF 66-35.

33.     On June 26, 2023, Go Global sent an email to Lazard advising that it was withdrawing from the process. *Id.*

Response: Admit.

34.     Notwithstanding that email, Go Global continued to have discussions with investors regarding a potential investment, including with Axar Capital Management LP ("Axar"), who Go Global referred to as a cornerstone investor, and with Sixth Street Partners, a then current

lender to BB&B.  *Id.*, Ex. H, Dep. Trans. of Jeffrey Streader at 70:12-24; Ex. R, Go Global Emails; Ex. S, Go Global Emails.

> Response: Admit.

35.     However, in an email dated June 26, 2023, Axar declined to invest with Go Global for the acquisition of BBBY, in part, because Go Global was not contributing any funding.  *Id.*, Ex. T, Email Communications between Go Global and Axar.

> Response: Admitted in part, denied in part.
>
> Go Global **admits** that Axar's Andrew Axelrod wrote to Streader explaining that Go Global "putting no money in" was an issue for Axar.
>
> Go Global **denies** that DOM's proffered evidence establishes that "Axar declined to invest with Go Global . . . ." Go Global further **denies** that Axar declined to invest with Go Global "because Go Global was not contributing any funding." Axar has never lent money to partners "on unrealized carry." *See* Defendants' Ex. T at GG-0027532. Axar listed various issues concerning an investment with Go Global, including that Axar is "not in the business of retail turnarounds or even retail investing." *See id.*

36.     Said Axar, "[t]his is a great bet for Go Global … It's not for [Axar] investors". *Id.* As of June 27, 2023, Go Global was aware that it did not have the financing in place to make an offer, and wrote in an email that "[i]f the auction is tomorrow or this week – we are not going to participate." *Id.*, Ex. S, Emails between Go Global and Lazard.

> Response: Admitted in part, denied in part.
>
> Go Global **admits** that on June 27, 2023, Andrew Axelrod wrote to Jeffrey Streader "[t]his is a great bet for Go Global . . . It's not for [Axar] investors." *See* Defendants' Ex. T.

Go Global further **admits** that on June 27, 2023, Jeffrey Streader wrote that "if the auction is tomorrow or this week – we are not going to participate. Regrettably." Defendants' Ex. S, Emails between Go Global and Lazard.

Go Global **denies** DOM's assertion that "[a]s of June 27, 2023, Go Global was aware that it did not have the financing in place to make an offer . . . ." DOM's proffered evidence does not list lack of "financing" as one of the reasons Go Global would not bid. *See* Defendants' Ex. S. Rather, Go Global's email states that it would not bid because of, among other things, (1) brand damage; (2) vendor (product) recovery and reset concerns; and (3) tight liquidity for year 1. *See id.* Go Global's purported inability to finance its bid was not a reason it did not participate in the auction. ECF 66-3 (Streader Dep. Tr.) at 71:3-18; ECF 66-4 (Feuer Dep. Tr.) at 90:15-20; ECF 66-5 (Gargiulo Dep. Tr.) at 34:19-22. Go Global was unable to bid because DOM's conduct, which set the price of Baby's IP at $15.5 million, made it uneconomical to do so. *See* ECF 66-1 at ¶ 197-98.

37.     Ultimately, it is undisputed that Go Global did not submit a qualifying bid. *See* Ex. AS, Dep Trans. Christian Feuer at 115:9-116:18.

Response: Admit.

38.     The dates of the auctions related to the Section 363 sale of BBBY kept changing, but ultimately the IP Auction to be held on June 28, 2023, independent of any going concern assets. *Id.*, Ex. U, Order Approving the Auction; Ex. V, Notice of Cancellation.

Response: Admit.

39.     Notably, Go Global did not attend nor participate in the IP Auction. *Id.*, Ex. H, Dep. Trans. of Jeffrey Streader at 29:3-5.

Response: Admit.

40.     During the IP Auction, investment firm Ziff Davis, Inc. bid $15 million for the BBBY intellectual property, and DOM subsequently bid $15.5 million which ended up being the winning bid. *Id.*, Ex. H, Dep. Trans. of Jeffrey Streader at 28:16-22.

Response: Deny.

DOM's proffered evidence fails to establish the fact that: "During the IP Auction, investment firm Ziff Davis, Inc. bid $15 million for the BBBY intellectual property, and DOM subsequently bid $15.5 million which ended up being the winning bid." *See* Defendants' Ex. H, Dep. Trans. of Jeffrey Streader at 28:16-22. (Q: So that I'm correct that Go Global did not participate in the IP auction; is that correct? A: No. That is not our business. No. We want people, inventory, we want - - we want to fix the house but not, um, do a reset and there is many companies in the industry today that buy the IP. We want to fix it and go with it and bring the people with us.).

41.     Avish Dayiha admitted on June 23, 2023 that DOM was behind on due diligence. *See* Ex. AL, DOM Email.

Response: Admit.

42.     Notwithstanding that Go Global did not attend the IP Auction and Go Global's prior statement of withdrawing from the process, Go Global continued to seek funding to acquire the Baby intellectual property and certain store leases even after the IP auction. *Id.*, Ex. W, Go Global Email Exchange.

Response: Admit.

43.     This post-IP Auction plan sought to have Ziff Davis (the second highest bidder at the IP Auction), Axar, and Sixth Street partner with Go Global to bid on BBBY as a going concern. *Id.*

Response: Admit.

44. Ultimately, Go Global's efforts to cobble together investors failed again, and, on July 7, 2023, Go Global wrote, "[o]ur pencils are down." *Id.*, Ex. X, Go Global Email Exchange.

Response: Admitted in part, denied in part.

Go Global **admits** that it wrote on July 7, 2023 "[o]ur pencils are down."

Go Global **denies** that it was unable to "cobble together investors." DOM's proffered evidence does not support that assertion, but rather indicates that Go Global had investment from Axar, Ziff Davis, and Perot. *See* Defendants' Exhibit X. Go Global has always maintained that it did not bid on the Baby Assets due to DOM's various misconduct. *See* ECF 66-43 (Streader Aff.) at ¶¶ 54-60; *see also* ECF 66-3 (Streader Dep. Tr.) at 68:15-69:10; 71:3-18, 97:24-98:14; ECF 66-4 (Feuer Dep. Tr.) at 76:2-23, 90:15-20; ECF 66-5 (Gargiulo Dep. Tr.) at 46:12-14, 50:25-51:4, 59:6-10; ECF 66-6 (Chau Dep. Tr.) at 103:6-105:3. Go Global was unable to bid because DOM's misconduct, which set the price of Baby's IP at $15.5 million, made it uneconomical to do so. *See* ECF 66-1 at ¶ 197-98.

45. DOM's bid was approved by the Bankruptcy Court, and it acquired the BBBY's intellectual property for $15.5 million. *Id.*, Ex. Y, Order Approving Asset Sale.

Response: Admit.

46. On July 19, 2023, the Debtors conducted an auction for certain BBBY store leases. Again, Go Global did not participate in that auction. *Id.*, Ex. Z, Notice of Successful Bidder.

Response: Admitted in part, denied in part.

Go Global **admits** that Debtors conducted an auction for certain BBBY store leases on July 19, 2023.

Go Global **denies** that DOM's citation to the Notice of Successful Bidder establishes the proffered fact that: "Go Global did not participate in that auction." *See* Defendants' Ex. Z, Notice of Successful Bidder.

47.     At the Lease Auction, DOM successfully bid on the leases for 11 Baby stores. *Id.*, Ex. Z, Notice of Successful Bidder.

Response: Admit.

48.     At no time did Go Global and DOM ever discuss an 11 store model, and, in fact, Go Global never created a model that was for less than ▮ stores. *Id.*, Ex. AA, Go Global's 22 Store Model and Ex. F, Dep. Trans. Deborah Gargiulio at 43:6-20.

Response: Admit.

**DOM's Model**

49.     BBBY prepared a 50 and 75 door model for DOM after DOM won the IP auction, and DOM forwarded those models to Yosef Moskowitz of Slate Equities to prepare DOM's own model. *Id.*, Ex. AB, Email Forwarding Models.

Response: Admit.

50.     Mr. Moskowitz worked directly with BBBY and Alix Partners, to prepare a wholly unique model for BBBY. *Id.*, Ex. AC, Emails with BBBY and Mr. Moskowitz.

Response: Admitted in part, denied in part.

Go Global **admits** only that Mr. Moskowitz worked with BBBY and Alix Partners.

Go Global denies the remaining assertions in Paragraph 50. DOM's proffered evidence fails to establish that Mr. Moskowitz "prepare[d] a wholly unique model for BBBY."

51.     Go Global has not alleged that Mr. Moskowitz viewed Go Global's model nor that his model was derived from Go Global's model. After several working sessions with BBBY and

-21-

Alix Partners, Mr. Moskowitz ultimately created an 11 store model that DOM used as the basis for its business. *Id.*, Ex. AH, 11 Store Model.

<u>Response</u>: Admitted in part, denied in part.

Go Global **admits** that Go Global's Amended Complaint does "not allege[] that Mr. Moskowitz viewed Go Global's model nor that his model was derived from Go Global's model[.]"

Go Global **denies** the remaining assertions in Paragraph 51. DOM's proffered evidence fails to establish that Mr. Moskowitz created an 11 store model "[a]fter several working sessions with BBBY and Alix Partners." *See* Defendants' Ex. AH, 11 Store Model. Go Global further **denies** that the proffered evidence establishes that DOM used the 11 store model "as the basis for [DOM's] business." DOM admits that it did not develop its own financial model until <u>after</u> the Baby IP Auction, which was held on June 28, 2023. *See* ECF 61-2 at 19. By that time, DOM had already disclosed Go Global's Financial Model to raise investment capital and mined Go Global's Proprietary Information to accelerate its due diligence and develop a "Go Forward Plan." *See* ECF 66-25, 66-26, 66-27. Furthermore, any information DOM provided to create the 11 store model was influenced by the plans and due diligence Go Global imparted on DOM pursuant to the NDA. *See* ECF 66-25, 66-26, 66-27.

52.    As clearly reflected in email communications, DOM requested that BBBY pare down their 50 store model to a list of 12 to 15 stores. *See* Ex. AD, Emails Regarding Stores.

<u>Response</u>: Deny.

DOM's proffered evidence does not support the fact that "DOM requested that BBBY pare down their 50 store model to a list of 12 to 15 stores." *See* Defendants' Ex. AD, Emails.

Rather, the emails discuss 14 stores in total for the BBB regional plan. *See* Defendants' Ex. AD, Emails Regarding Stores.

53.     Patty Wu, BBBY's former CEO, created a 14 store regional store model which DOM in part relied upon when purchasing the 11 stores. *Id.*

<u>Response</u>: Deny.

DOM's proffered evidence fails to establish the fact that "Patty Wu, BBBY's former CEO, created a 14 store regional store model which DOM in part relied upon when purchasing the 11 stores." *See* Defendants' Ex. AD, Emails Regarding Stores. Rather, the Emails Regarding Stores show discussions resulting in a 14 store Regional Plan without reference to any model in support thereof. *Id*.

**<u>Go Global's Case Study</u>**

54.     In late July, following the IP Auction and the Lease Auction, Go Global prepared a case study to explain to its investors why it passed on the opportunity to acquire BBBY or any of its assets.  *Id.*, Ex. AI, Go Global Case Study.

<u>Response</u>: Admitted in part, denied in part.

Go Global **admits** that it prepared a document assessing its efforts to acquire Buy Buy Baby. *See* Defendants' Exhibit AI at 1.

Go Global **denies** that the aforementioned document was prepared "to explain to its investors why it passed on the opportunity to acquire BBBY or any of is assets." Rather, Go Global created and used this as a marketing document. *See* ECF 66-6 (Chau. Dep. Tr.) at 100:2-10.

55.     Go Global first explained its investment thesis:

██████████████████████████████████████████



*Id.*

<u>Response</u>: Admit.

56.    Then, Go Global explained why it ultimately passed on the Baby opportunity:



*Id.*

<u>Response</u>: Admitted in part, denied in part.

Go Global **admits** that the relevant document provides the above referenced statements.

Go Global **denies** that the aforementioned document was prepared to "explain[] why it ultimately passed on the Baby opportunity." Rather, Go Global created and used this as a marketing document. *See* ECF 66-6 (Chau. Dep. Tr.) at 100:2-10.

57.    The Case Study was authored by Yuen Chau who testified that the statement above in bold was accurate. *See* Ex. AT, Dep Trans of Yuen Chau at 102:18-103:5.

<u>Response</u>: Admitted in part, denied in part.

Go Global **admits** that the aforementioned document was authored by Yuen Chau.

Go Global **denies** that the aforementioned document was a "case study." Rather, Go Global created and used this as a marketing document. *See* ECF 66-6 (Chau. Dep. Tr.) at 100:2-10.

### Go Global's Expert Report and Speculative Damages

58.    Go Global served the expert report of Alan Schachter to "calculate economic damages" (the "Schachter Report"). *Id.*, Ex. AJ, Alan Schacter's Expert Report.

Response: Admit.

59.    To calculate lost profits (both including and excluding e-commerce sales), Schachter created his own independent projection model for BBBY (the "Schachter Model") which is wholly different from the Go Global Model and is premised on Go Global, DOM, and other parties jointly acquiring the BBBY intellectual property, and the 11 store leases ultimately acquired by DOM. *Id.*

Response: Admitted in part, denied in part.

Go Global **admits** that Schacter calculated lost profits by creating an independent Model, and assumed that Go Global, DOM and other parties would jointly acquire BBBY's assets.

Go Global **denies** that the Schachter Model "is wholly different form the Go Global Model." Rather, the Schachter Model is tailored to calculate lost profits based on "the anticipated profits had the Joint Bid proceeded as originally planned" between Go Global and DOM. *See* Defendants' Ex. AJ, Alan Schacter's Expert Report at 14.

60.    Without any factual basis, Schachter assumes that Go Global and DOM would have made a joint bid to acquire BBBY, and that bid would have proceeded "as planned." *Id.* However, DOM and Go Global never agreed to the terms of a potential joint bid. Thus, Schacter's creation of the terms of a planned joint bid are simply made up and entirely speculative. *Id.*

<u>Response</u>: Deny.

Go Global **denies** that "[w]ithout any factual basis, Schachter assumes that Go Global and DOM would have made a joint bid to acquire BBBY" and that "Schachter's creation of the terms of a planned joint bid are simply made up and entirely speculative." Alan Schacter's Expert Report calculated lost profits based on "the anticipated profits had the Joint Bid proceeded as originally planned" between Go Global and DOM. *See* Defendants' Ex. AJ, Alan Schacter's Expert Report at 14. Additionally, Alan Schacter's Expert Report calculated expectation damages pursuant to DOM's breach of the non-disclosure agreement ("NDA"): "This covers the profits the Plaintiff would have earned if the Defendant had not breached the NDA and the parties had carried out the Joint Bid as planned." *Id*. at 20.

61.    The Schachter Report further fails to address why he rejected the Go Global Model even though that is the alleged "trade secret" that is the basis of Go Global's claims in this case. *Id.*

<u>Response</u>: Deny.

Alan Schacter's Expert Report calculated expectation damages pursuant to DOM's breach of the non-disclosure agreement ("NDA"): "This covers the profits the Plaintiff would have earned if the Defendant had not breached the NDA and the parties had carried out the Joint Bid as planned." *Id*. at 20.

62.    The Schachter Model projects the operating results of the 11 BBBY brick and mortar stores and the e-commerce business for a five-year period.  *Id.* Specifically, the Schachter Model projects that e-commerce sales over a five-year period would approximately $1.7 billion, which accounts for 67% of total net sales which Schachter admits is a number that was provided

to him by Go Global, but oddly this figure is materially different from the contemporaneous projections shared by Go Global with DOM. Similarly, Schachter bases the projected net sales for 11 brick and mortar stores on his own independent analysis of the historical operating results for those 11 stores. *Id.*

Response: Admitted in part, denied in part.

Go Global **admits** that the "Schachter Model projects the operating results of the 11 BBBY brick and mortar stores and the e-commerce business for a five year period." Go Global further **admits** that Schachter "base[d] the projected net sales for 11 brick and mortar stores on his own independent analysis of the historical operating results for those 11 stores."

Go Global **denies** that DOM's proffered evidence establishes that Schachter's calculation of "$1.7 billion [of e-commerce sales] . . . is materially different from the contemporaneous projections shared by Go Global with DOM." Go Global is unable to unequivocally reference the purported "figure [that] is materially different from the contemporaneous projections shared by Go Global with DOM" due to DOM's failure to explicitly cite to the referenced numbers or projections with any specificity. Further, to the extent applicable, DOM fails to provide any analysis or calculation in support of the proffered conclusions in Paragraph 62. Nevertheless, notwithstanding the foregoing, presuming that DOM is referencing the Projected EBITDA of BBBY and added the E-Commerce Sales [Line 4] for the period July 11, 2023 through July 10, 2028, that amount is actually $1,687,995,138.[2] Additionally, Go Global's Model simply does not reference e-commerce sales, and thus Go Global is required to presume that DOM is referencing digital sales. The results are not

materially different from the "67% of total net sales" provided by Go Global. The Go Global Model digital sales result in 65.2% of the total net sales for a five-year period.

63.     The Schachter Model projects that the total operating income generated from e-commerce and 11 brick and mortar stores would amount to approximately $302 million over a five-year period.  *Id.*

Response: Deny.

The Schachter Model projects that the total operating income generated would amount to $301,677,215[3] over a five-year period. *See* Defendants' Ex. AJ, Alan Schacter's Expert Report at 29, Projected EBITDA of BBBY line item.

64.     On the other hand, the Go Global Model, which projects the results from operating e-commerce and ▮ stores, reflects that Go Global would generate operating income of approximately ▮▮▮▮ over a five-year period, so only an additional ▮▮▮▮ being generated with ▮ additional stores over a ▮▮▮ period. *Id.*, Ex. N, Go Global's Model.

Response: Deny.

The Go Global Model projects an operating income of ▮▮▮▮[4] over a five-year period. *See* Defendants' Ex. N, Go Global's Model, Operating Income Line Item. Accordingly, the Go Global Model projects an additional ▮▮▮▮[5] in operating income than the Schachter Model.

65.     Indeed, without a factual basis or explanation, the Schachter Model shows that income equal to ▮ of total net sales would have been achieved when Go Global only projected

---

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[4] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█ *Id.*, Ex. AJ, Alan Schacter's Expert Report. Additionally, the Schachter Model projects that the selling, general, and administrative expenses ("SG&A") would amount to █ of total net sales, based on his own independent analysis when the Go Global Model projects that SG&A amounting to █ of total net sales. *Id.*

> Response: Deny.

> Go Global denies that any of the assertions in the referenced Schachter Model projections in Paragraph 65 are without factual basis or explanation. Moreover, DOM fails to explicitly cite or otherwise specifically identify the numbers referenced in the Schachter Model or Go Global Model. Nevertheless, Go Global denies all proffered amounts in Paragraph 65. Rather, the Schachter Model projected income equal to █ of total net sales, whereas Go Global Model projected █ The Schachter Model projects expenses at █ and the Go Global Model projects that SG&A amounts to █ *See* Defendants' Ex. AJ, Alan Schacter's Expert Report at 29.

> **Counterstatement of Material Facts**

> 66.    The prospective Go Global-DOM partnership was presented to Go Global as a pragmatic joining of Go Global's due diligence, modeling, and operational experience with DOM's capital. *See* ECF 66-43 (Streader Aff.) at ¶¶ 28-36; ECF 66-3 (Streader Dep. Tr.) at 61:2-14; ECF 66-11 (Lauster Dep. Tr.) at 36:9-22; ECF 66-5 (Gargiulo Dep. Tr.) at 18:24-19:12; ECF 66-6 (Chau Dep. Tr.) at 34:7-35:5.

> 67.    DOM communicated to Go Global that it was interested in joining Go Global as a limited partner investor. *See* ECF 66-3 (Streader Dep. Tr.) at 61:2-14; ECF 66-6 (Chau Dep. Tr.) at 26:8-13, 29:4-20.

68.     Avish Dahiya, who signed Go Global's non-disclosure agreement ("NDA") on behalf of DOM, understood that the purpose of the NDA was to enable Go Global to safely share its Proprietary Information with DOM for the purposes of discussing a potential joint partnership. *See* ECF 66-8 (Dahiya Dep. Tr.) at 62:19-24, 65:3-17, 66:20-67:7; ECF 66-20 (NDA) at ¶ 1.

69.     The NDA defines "Proprietary Information" as "information concerning [BBBY] . . . information concerning [Go Global] . . . and all information derived therefrom including without limitation, trade secrets (under state law and the Defend Trade Secrets Act), know-how, summaries, notes, processes, ideas, contracts, other technical, business, financial, customer, and product development plans, forecasts, strategies, customer lists and data, financial information, employee information, pricing data, sales data, intellectual property of any nature, marketing plans, website designs, internet marketing or sales practices or strategies, and records containing or otherwise reflecting such information." *See* ECF 66-20 (NDA) at ¶ 9.

70.     The NDA requires DOM to "hold in confidence and not disclose, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose, the Proprietary Information or any portion thereof." *Id.* at ¶ 3.

71.     After DOM executed the NDA, DOM and Go Global held a meeting on June 15, 2023 (June 15 Meeting). *See* ECF 66-3 (Streader Dep. Tr.) at 40:22-41:14; ECF 66-5 (Gargiulo Dep. Tr.) at 17:11-15; ECF 66-11 (Lauster Dep. Tr.) at 39:8-17; ECF 66-7 (Srour Dep. Tr.) at 83:17-19. Unbeknownst to Go Global, DOM was secretly recording and surreptitiously reviewing the June 15 Meeting audio-video footage in real time. *See* ECF 66-7 (Srour Dep. Tr.) at 94:9-96:22; ECF 66-8 (Dahiya Dep. Tr.) at 124:16-126:2. Thereafter, DOM also referenced the recorded

June 15 Meeting in attempt to circumvent Go Global in the Bankruptcy Auction. *See* ECF 66-23 (June 15 Meeting Tr.) at 93:14-18.

72.     On June 14, 2023, DOM disclosed Go Global's Financial Model to non-DOM employees. *See* ECF 66-25 at DOM0002969; ECF 66-7 (Srour Dep. Tr.) at 53:8-55:22, 54:5-8, 61:10-18, 63:16-64:9, 65:11-17, 72:6-24, 197:6-11; ECF 66-26 at DOM0002995; ECF 66-8 (Dahiya Dep. Tr.) at 118:21-23.

73.     Go Global ultimately provided DOM access to Go Global's Proprietary Information because Go Global relied on DOM's representations, oral and in writing, that DOM would limit its use of Go Global's Proprietary Information to the development of a potential joint bid with Go Global, hold Go Global's Proprietary Information in confidence, and would not pursue an independent bid for Baby's Bankruptcy Assets without Go Global. *See* Peltz Decl., Exhibit 18 (NDA) at ¶¶ 2-3, 12; *see also* Exhibit 1 (Streader Dep. Tr.) at 35:12-22; Exhibit 2 (Feuer Dep. Tr.) at 54:17-23, 55:12-19.

74.     DOM used Go Global's Proprietary Information in DOM's solo bid for the Baby Bankruptcy Assets. *See* ECF 66-28 at DOM0010953; ECF 66-29 at DOM0018444; ECF 66-30 at DOM0018452; *see also* ECF 66-6 (Chau Dep. Tr.) at 43:14-44:9.

75.     DOM was always going to submit a bid for the Baby Bankruptcy Assets, with or without Go Global. *See* ECF 66-7 (Srour Dep. Tr.) at 39:25-40:8, 104:12-18, 105:5-8; ECF 66-8 (Dahiya Dep. Tr.) at 135:6-9.

76.     After Go Global made the decision to withdraw from the auction process, Jeffrey Streader received encouragement from Lazard to remain in the auction and Go Global reversed the decision to withdraw. *See* ECF 66-35 at GG-0034330; ECF 66-5 (Gargiulo Dep. Tr.) at 54:19-55:10; ECF 66-28 at DOM0010953.

77.    Ziff Davis and Go Global then had discussions regarding partnering to obtain Baby's going concern. *See* ECF 61-1 at ¶ 43.

78.    Ziff Davis is not an "operator" of retail stores and thus required an entity with retail experience, like Go Global, to execute brick and mortar store operations. *See*; ECF 66-3 (Streader Dep.) at 98:15-99:1.

79.    The Baby IP Auction occurred on June 28, 2023. *See* ECF 66-37.

80.    DOM attended the Baby IP Auction at the New York offices of the law firm Kirland & Ellis LLP. *See* ECF 66-8 (Dahiya Dep. Tr.) at 178:19-21; ECF 66-13 (June 29 Bankruptcy Order) at DOM0004314.

81.    The Baby IP Auction lasted for approximately three or four hours and saw multiple rounds of bidding. *See* ECF 66-9 (Gandhi Dep. Tr.) at 111:4-112:15.

82.    DOM increased the maximum bid it would place as the Baby IP Auction proceeded. *See* ECF 66-37.

83.    During the Baby IP Auction, DOM authorized a maximum bid of $10.2 million. ECF 66-37 at DOM0013036.

84.    DOM subsequently exceeded this threshold, at one point placing a bid for $11 million, while also authorizing a new maximum bid of $20 million. *Id*.

85.    DOM ultimately paid $15.5 million for the Baby IP, and Srour was willing to pay more. *See* ECF 66-5 (Gargiulo Dep. Tr.) at 48:14-49:24; ECF 66-7 (Srour Dep. Tr.) at 202:5-21.

86.    At the same time, the value of the Baby IP and Going Concern was consistently falling with each passing day because Baby was sustaining brand damage and selling out its inventory. *See* ECF 66-5 (Gargiulo Dep. Tr.) at 36:22-37:20, 42:12-43:16, 68:15-21; ECF 66-6 (Chau Dep. Tr.) at 103:6-105:3; ECF 66-8 (Dahiya Dep. Tr.) at 83:2-19.

87.     DOM knew details about Go Global's anticipated bid, the amount it would pay for each of the intellectual property and going concern, Go Global's projected costs to run the same, investment structure, and profits upon exit. *See* ECF 66-7 (Srour Dep. Tr.) at 202:22-203:2; ECF 66-8 (Dahiya Dep. Tr.) at 97:12-15, 107:21-108:11; ECF 66-25 at DOM0002969.

88.     DOM knew that the Bankruptcy Auction for the Baby IP and the Baby Going Concern would occur on separate days, with the Baby IP auction occurring first. *See* ECF 66-7 (Srour Dep. Tr.) at 200:24-201:10

89.     DOM also knew that Go Global was interested in purchasing Baby's entire business operation as a whole. *See* ECF 66-3 (Streader Dep. Tr.) at 28:9-15; ECF 66-8 (Dahiya Dep. Tr.) at 45:3-13.

90.     DOM had access to Go Global's Bidding Strategy, and the narration and thinking of the Go Global executives who were forming that strategy in real time. *See* ECF 66-7 (Srour Dep. Tr.) at 202:22-203:2; ECF 66-8 (Dahiya Dep. Tr.) at 107:9-108:11; ECF 66-16 at DOM0002943-44.

91.     DOM viewed Go Global as the potential bidder with the highest chance of winning the Baby Bankruptcy Auction. ECF 66-23 (June 15 Meeting Tr.) at 204:13-17; *see also* ECF 66-10 (Malhotra Dep. Tr.) at 188:5-18; ECF 66-11 (Lauster Dep. Tr.) at 56:24-57:12.

92.     On June 23, 2023, Avish Dahiya admitted the following regarding DOM: "Every other bidder has done more extensive work." Further Dahiya questioned, "Can [DOM] even do this? If we cannot give them what they need, we look highly unprofessional not knowing what we are doing." *See* Defendants' Ex. AL, DOM Email.

93.     Despite DOM's $15.5 million successful bid for Baby's IP on June 28, 2023, Go Global still had an opportunity to purchase the entire Baby business, including Baby's IP as a

going concern. *See* ECF 66-13 (June 29 Bankruptcy Notice) at DOM004313-14; ECF 66-38 at GG-0048828; ECF 66-3 (Streader Dep. Tr.) at 70:21-24, 78:6-9, 97:24-98:3; ECF 66-5 (Gargiulo Dep. Tr.) at 49:13-50:4, 51:9-22.

94.     At the same time, the value of the Baby IP and Going Concern was consistently falling with each passing day because Baby was sustaining brand damage and selling out its inventory. *See* Peltz Decl., ECF 66-5 (Gargiulo Dep. Tr.) at 36:22-37:20, 42:12-43:16, 68:15-21; ECF 66-6 (Chau Dep. Tr.) at 103:6-105:3; ECF 66-8 (Dahiya Dep. Tr.) at 83:2-19.

95.     Ultimately, due to DOM's overvalued $15.5 million bid for the Baby IP, Go Global was not able to justify paying the inflated price for Baby's distressed assets as a going concern. *See* ECF 66-3 (Streader Dep. Tr.) at 68:15-69:10; 71:3-18, 97:24-98:14; ECF 66-4 (Feuer Dep. Tr.) at 76:2-23; ECF 66-5 (Gargiulo Dep. Tr.) at 46:12-14, 50:25-51:4, 59:6-10; ECF 66-6 (Chau Dep. Tr.) at 103:6-105:3.


**FALCON RAPPAPORT & BERKMAN LLP**

By:    */s/ Moish E. Peltz*
          Moish E. Peltz, Esq.
          Steven C. Berlowitz, Esq.
          265 Sunrise Highway, Suite 50
          Rockville Centre, New York 11570
          Tel: (516) 599-0888

          *Attorneys for Plaintiff Go Global Retail LLC*

Dated: January 9, 2025