UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GO GLOBAL RETAIL LLC,

              Plaintiff,

    v.

DREAM ON ME INDUSTRIES, INC.,
and DREAM ON ME, INC.,

                       Defendants.

Case No. 1:23-cv-07987-AS

**CIVIL ACTION**

**ORAL ARGUMENT REQUESTED**

---

**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION FOR SUMMARY
JUDGMENT FILED BY PLAINTIFF GO GLOBAL RETAIL LLC**

---

GREENBAUM, ROWE, SMITH & DAVIS LLP
260 Madison Avenue
20th Floor
New York, New York 10016
(973) 535-1600
Attorneys for Defendants, Dream On Me Industries, Inc.
and Dream On Me, Inc.

Of Counsel and on the Brief:
Thomas K. Murphy III, Esq.
Darren C. Barreiro, Esq. (admitted pro hac vice)
Judah Skoff, Esq. (admitted pro hac vice)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS..............................................................................................3

    The Bankruptcy Filing and The Lazard Data Room................................................3

    Go Global Background and Purported Confidential Information............................4

    Go Global and DOM's Brief Relationship .............................................................4

    Go Global's Subsequent Efforts to Obtain BBBY Without DOM And the IP Auction.........6

    DOM's Model .........................................................................................................7

    Go Global's Case Study..........................................................................................8

STATEMENT OF LAW ................................................................................................10

    POINT I ..................................................................................................................11

    THE INFORMATION PROVIDED TO DOM BY GO GLOBAL WERE
    NOT PROPRIETARY TRADE SECRETS.............................................................11

    POINT II..................................................................................................................18

    GO GLOBAL HAS FAILED TO ESTABLISH THAT IT HAS
    SUSTAINED ANY DAMAGES AS A RESULT OF ANY OF DOM'S
    ACTIONS ...............................................................................................................18

      A.    Damages Based on Contract Provision Alone........................................19

      B.    Damages Based Upon Diminished/Destroyed Value .............................20

      C.    Damages Related to "Muscling: Out of the Auction ..............................21

POINT III ....................................................................................................................22

    GO GLOBAL HAS FAILED TO ESTABLISH THAT DOM'S
    ALLEGED BREACH OF CONTRACT DIRECTLY AND
    PROXIMATELY CAUSED GO GLOBAL ANY DAMAGES ......................................22

POINT IV ....................................................................................................................24

    GO GLOBAL'S UNJUST ENRICHMENT AND CONSTRUCTIVE
    TRUST CLAIMS FAIL AS A MATTER OF LAW .....................................................24

CONCLUSION ......................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)...................................................................................8

*Alessi Equip., Inc. v. American Piledriving Equip., Inc.*,
578 F.Supp.3d 467 (S.D.N.Y. 2022)..........................................................14

*Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*,
830 F.2d 13 (2d Cir. 1987).........................................................................17

*Bear, Stearns Funding, Inc. v. Interface Grp.*,
361 F.Supp.2d 283 (S.D.N.Y.2005)............................................................15

*Brown v. Cnty. of Nassau*,
736 F. Supp. 2d 602 (E.D.N.Y. 2010) .........................................................9

*Caro Capital, LLC v. Koch*,
653 F. Supp. 3d 108 (S.D.N.Y. 2023)........................................................22

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*,
602 F. Supp. 3d 663 (S.D.N.Y. 2022).........................................................10

*Chambers v. TRM Copy Ctrs. Corp.*,
43 F.3d 29 (2d Cir. 1994)............................................................................8

*Djonbalic v. City of New York*,
2000 WL 1146631 (S.D.N.Y. 2000) ............................................................8

*Estee Lauder Companies Inc. v. Batra*,
430 F. Supp. 2d 158, 163 (S.D.N.Y. 2006).................................................15

*Gallo v. Prudential Residential Servs., Ltd. Partnership*,
22 F.3d 1219 (2d Cir. 1994).........................................................................9

*Gen. Elec Co. v. Macejka*,
675 fN.Y.S. 2d 420 (1998)..........................................................................16

*Hudson Riverkeeper Fund v. Atlantic Richfield Co.*,
138 F.Supp.2d 482 (S.D.N.Y.2001).............................................................9

*Iacobelli Constr. v. County of Monroe*,
32 F.3d 19 (2d Cir.1994)..............................................................................9

*In re Bayou Hedge Funds Inv. Litig.*,

472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007)...................................................................23

*In re Chowaiki & Co. Fine Art Ltd.,*
    593 B.R. 699 (Bankr. S.D.N.Y. 2018)...................................................................23

*In re Joint E. & S. Dist. Asbestos Litig.,*
    964 F.2d 92 (2d Cir.1992).......................................................................................9

*In re Waypoint Leasing Holdings Ltd.,*
    607 B.R. 143 (Bankr. S.D.N.Y. 2019).................................................................20

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,*
    920 F.2d 171 (2d Cir. 1990)...........................................................................12, 13

*Int'l Creative Mgmt., Inc. v. Abate,*
    No. 07 CIV. 1979 PKL, 2007 WL 950092 (S.D.N.Y. Mar. 28, 2007)...................17

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,*
    920 F. 2d 171, 173 (2d Cir. 1990)........................................................................12

*Jiminez v. Dreis & Krump Mfg. Co.,*
    736 F.2d 51 (2d Cir.1984)........................................................................................9

*KCG Holdings, Inc. v. Khandekar,*
No. 17-CV-3533 (AJN), 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020)...........14

*Krofft Ent., Inc. v. CBS Songs, a Div. of CBS, Inc.,*
    653 F. Supp. 1530 (S.D.N.Y. 1987)......................................................................20

*LinkCo v. Fujitsu Ltd.,*
    230 F.Supp.2d 492 (S.D.N.Y.2002)......................................................................16

*Mandell v. The County of Suffolk,*
*316 F.*3d 368, 374-377 (2d Cir. 2002)........................................................................9

*Medinol Ltd. v. Bos. Sci. Corp.,*
    346 F. Supp. 2d 575 (S.D.N.Y. 2004)..............................................................10, 11

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank,*
    392 F.3d 520 (2d Cir. 2004)..................................................................................20

*Pure Power Boot Camp, Inc. v.fWarrior Fitness Boot Camp, LLC,*
813 F.Supp. 2d 489, 534 (S.D.N.Y. 2011).................................................................22

*Rapco Foam, Inc. v. Scientific Applications, Inc.,*
    479 F.Supp. 1027 (S.D.N.Y. 1979) .........................................................................9

*Reyes v. New York State Office of Children and Family Services,*
    2003 WL 21709407 (S.D.N.Y. 2003) ......................................................................9

*Sandoz Inc. v. Cediprof, Inc.,*
    No. 20 CIV. 5568, 2020 WL 4482634 (S.D.N.Y. Aug. 3, 2020) ............................18

*Schatzki v. Weiser Capital Mgmt., LLC,*
    995 F. Supp. 2d 251 (S.D.N.Y. 2014) ...............................................................22, 23

*Structured Capital Solutions, LLC v. Commerzbank AG,*
    *1777 F. Supp.3d 816 (S.D.N.Y. 2016)* ................................................................14

*TNS Media Rsch., LLC v. Tivo Rsch. & Analytics, Inc.,*
    629 F. App'x 916 (Fed. Cir. 2015) ....................................................................15

*Wilder v. World of Boxing LLC,*
    310 F. Supp. 3d 426 (S.D.N.Y. 2018) ................................................................20

*Zirvi v. Flatley,*
    433 F. Supp. 3d 448 (S.D.N.Y.), *aff'd,* 838 F. App'x 582 (2d Cir. 2020) ........................10, 16

**Rules**

Rule 56.1 ...........................................................................................................4

**Statutes**

18 U.S.C.A. § 1836 ...........................................................................................16

8 U.S.C. § 1836(b)(3)(C)-(D) ............................................................................16

**Other Autorities**

Trade Secrets Act ..............................................................................................16

**PRELIMINARY STATEMENT**

This matter arises from the allegations that Dream On Me Industries, Inc. and Dream On Me, Inc. (collectively "DOM") breached a Non-Disclosure Agreement (the "NDA") by improperly using alleged trade secret information obtained from Go Global LLC ("Go Global") to successfully bid on the intellectual property assets of Buy Buy Baby ("BBBY") at a bankruptcy auction on June 28, 2023 (the "IP Auction") -  an auction in which Go Global did not participate which is fatal to its claims.

DOM filed its own motion for summary judgment because Go Global has failed to establish that it provided DOM with any novel information or trade secrets, nor has it established how the alleged breach of the NDA caused any damage to Go Global when it did not participate in the IP Auction or otherwise place a qualifying bid for BBBY as a going concern. Therefore, the NDA is unenforceable due to a lack of consideration provided to DOM for the NDA and, even it was enforceable, Go Global did not sustain any damages as a result of any of DOM's actions an essential element to a breach of contract claim. DOM firmly believes that its motion for summary judgment should be granted. However, if the Court denies DOM's motion under the heightened burden placed upon the party moving for summary judgment, it must also deny summary judgment in favor of Go Global because, at the very least, there are questions of fact as to whether trade secrets were provided to DOM and whether any of the facts at issue caused any damage to Go Global which preclude summary judgment in favor of Go Global.

As an initial matter, Go Global's motion for summary judgment completely ignores DOM's expert report that disputes the existence of actionable trade secrets. This omission alone should be fatal to Go Global's motion.

Go Global's motion alleges that the trade secrets fall into three categories: 1) the Technology Plan which was referred to internally as their "secret sauce"; 2) Go Global's Financial

1

Model; and 3) its Bidding Strategy. As made clear by Go Global's internal e-mails, Go Global did not share its technology plan which it even called its "secret sauce" with DOM, and, in fact, it never intended to do so. This "secret sauce" appears to be something that would actually be considered a trade secret unlike the model discussed below.

Go Global further admits that its Financial Model and Bidding Strategy were essentially compiled into a **single** document, Go Global's 95-store model. However, that model was nothing more than a slightly modified version of the 95-store model which was made available to all of the bidders, including DOM. Those modifications do not transform the generally available model into Go Global's trade secrets. Further, a bidding strategy for a 95-store model is of virtually no relevance to a bid in an auction for intellectual property only, and there is no evidence of reliance by DOM on Go Global's model at any time before, during or after the IP Auction.

Regardless, Go Global either chose not to bid or failed to bid because it could not raise the necessary capital rendering their bidding strategy moot. Indeed, Go Global failed to submit a qualifying bid for BBBY and did not secure the financing to make an offer. If DOM had not bid other qualifying bidders would have acquired BBBY at the IP auction – the second highest bid was only $500,000 less than DOM's winning bid, so the theory that DOM overpaid or unreasonably drove up the price of the intellectual property is meritless. Obviously, even if DOM did not bid, Go Global would be in the exact same position that it is today. Therefore, Go Global cannot trace any of its alleged damages to DOM.

Because there are at the very least questions of fact related to causation, reliance and damages, Go Global's motion for summary judgment must be denied.

## STATEMENT OF FACTS

DOM is a New Jersey corporation operating as a designer, manufacturer, and supplier of baby products who was historically a large supplier to BBBY. *See* Declaration of Thomas K. Murphy III[1], Ex. A, Dep. Trans. of Avish Dahiya, at 28:12-21.   In 2021 or early 2022, DOM initially had discussions with Bed Bath & Beyond Inc. ("BB&B") about acquiring BBBY or BBBY's assets. *Id.* at 33:17-36:27; Ex. B, Dep Trans. of Mark Srour, at 21:9-22:8.

### The Bankruptcy Filing and The Lazard Data Room

Prior to its bankruptcy filing, BB&B engaged financial advisory firm, Lazard, Inc ("Lazard"), to solicit interest in a going-concern sale transaction. Ex. C, Declaration of Holly Etlin, at ¶73. In connection with marketing the BB&B assets, Lazard established a data room (the "Lazard Data Room") that was populated with a vast amount of BBBY's documents, including those containing BBBY's historical financial performance, future financial projections, models, corporate strategy, and other corporate information. Ex. D, Dep. Trans. of Deborah Gargiulo, at 19:13-21:3. At least thirty potential investors, including DOM and Go Global, executed non-disclosure agreements with Lazard that gave them access to the Lazard Data Room to conduct due diligence with DOM receiving access on May 6, 2023. Ex. A, Declaration of Holly Etlin, at ¶74. DOM reviewed the available information, including BBBY's 95-store model, and engaged Lazard in discussions regarding the information contained in the Lazard Data Room. Ex. E, E-mails Confirming Data Room Access; Ex. A, Dep. Trans. of Avish Dahiya, at 50:24-52:12; Ex. F, Dep. Trans. of Amit Maholtra at 34:23-35:15.

---

[1] All exhibits referenced herein are attached to the Declaration of Thomas K. Murphy III.

**Go Global Background and Purported Confidential Information**

Go Global retained Ankura Capital Advisors LLC ("Ankura") to assist it in raising capital and structuring a going concern bid. Go Global's Rule 56.1 Statement of Facts ("SOF") at ¶ 57. In May 2023, Ankura established a data room (the "Ankura Data Room") that was populated with certain documents – the vast majority of which were also contained in the Lazard Data Room.  Ex. A, Dep. Trans. of Avish Dahiya, at 85:20–88:22. It is undisputed by Christian Feuer who was responsible for creating the vast majority of the Go Global Model that it was a manipulation of the BBBY Model and that it was changing often, almost daily during June 2023. *See* Ex. G, Dep Trans. of Christian Feuer at 77:9-14; 84:6-19; 85:5-7.

**Go Global and DOM's Brief Relationship**

Go Global and DOM were introduced by Lazard and engaged in discussions to potentially be involved in a group together to purchase BBBY for a grand total of six days from June 9, 2023 until June 15, 2023. Ex. H, Introductory E-mails.

On Saturday, June 10, 2024, DOM and Go Global exchanged brief introductory emails in order to set up a call. *Id.* The discussions between Go Global and DOM were urgent because Lazard required that investors submit a bid by June 16, 2023 and a fully binding bid by June 19, 2023. *Id.*, Ex. I, E-mails re: Bid Deadlines.

Unprompted and without context, on Saturday, June 10, 2024, Go Global submitted the NDA to DOM. *Id.*, Ex. H, Emails re: NDA. There were limited employees available to review the document since it was a Saturday, as Go Global's CEO and legal counsel both observe Shabbat. Ex. B, Dep. Trans. of Mark Srour, at 62:9-12; 164:10-15; Ex. A, Dep. Trans. of Avish Dahiya, at 60:2-5. A little over two hours after receiving it, Avish Dahiya, DOM's Chief Marketing Officer and Chief Technology Officer, returned the signed NDA. Ex. H, E-mails re: the NDA. Mr. Dahiya

recalled "[Go Global] wanted us to sign an NDA urgently because they cannot talk to us till that NDA was signed." Ex. A, Dep. Trans. of Avish Dahiya, at 54:19-25. In fact, Mr. Dahiya did not have the authority to sign the NDA, and he admitted that he did not read the NDA before signing it. *Id.* at 59:14-17; 62:9-12; Ex. B, Dep. Trans. of Mark Srour, at 29:9-21. The NDA between Go Global and DOM sets forth non-disclosure and non-circumvention obligations, but the NDA specifically provides that its terms do not apply to "information that was already known" to DOM. Ex. J, the NDA at ¶¶4,9.

On June 12, 2023 and June 15, 2023, key members of DOM and Go Global met in person to discuss jointly investing in BBBY. Ex. B, Dep. Trans. of Mark Srour, at 40:19 – 42:3, 53:10-15. Following these in-person meetings, no agreement could be made between DOM and Go Global because they had fundamental differences and could not agree upon an investment strategy, in part, because (a) Go Global was only interested in operating BBBY, but not investing its own capital in BBBY; (b) DOM was only interested in potential partners that would invest their own capital; and (c) DOM was only interested in investing if they were a general partner involved in the day-to-day operation. Ex. A, Dep. Trans. of Avish Dahiya, at 128:23 – 131:3, Ex. B, Dep. Trans. of Mark Srour, at 36:10 – 38:11; Ex. K, Jeffrey Streader Dep. Trans. at 28:12-29:5. Notably, up until the June 15, 2023 meeting, DOM had been under the impression that Go Global would be investing their own capital along with DOM since the Go Global Model clearly reflected that Go Global would be contributing ███████████████. Ex. A, Dep. Trans. of Avish Dahiya, at 87:24-88:8; Ex. L, Go Global's 95-store model at 2. After the June 15, 2023 meeting, Go Global ceased communicating with DOM, but it continued to engage in discussions with other investors regarding the acquisition of BBBY. Ex. K, Dep. Trans. of Jeffrey Streader at 64:3-9; Ex. M, E-mail Exchange Between Go Global and Ankura.

**Impact and Timing of Overstock.com's Bid on Bed Bath and Beyond**

Go Global's activity log demonstrates that DOM viewed Go Global's 95 store model between June 10 and June 14, 2023. Ex., Activity Log. On June 22, 2023, Overstock.com, Inc. was selected as the Successful Bidder of Bed Bath & Beyond Inc. Ex. N, Order. According to Go Global, the Overstock bid price changed the landscape of the BBBY bid and potentially devalued the BBBY bid on the market. Ex. O, Dep. Transcript of Deborah Gargiulo at 49:2-50:14.

**Go Global's Subsequent Efforts to Obtain BBBY Without DOM And the IP Auction**



On June 16, 2023, the day after Go Global last met with DOM, Go Global made a ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ without DOM to acquire BBBY as a going concern with ▓▓▓▓▓. Of the ▓▓▓▓▓▓ offer, approximately ▓▓▓▓▓▓▓▓▓ was attributed to the BBBY intellectual property. Ex. P, Draft Bid. Go Global's bid, however, was determined not to be a qualifying bid as Go Global had not firmly established that it had secured the necessary funding to complete the transaction. Ex. M, E-mail Exchange Between Go Global and Ankura.

After failing to submit a qualifying bid, Go Global sent an e-mail to Lazard on June 26, 2023 advising that it was withdrawing from the bidding process.  Ex. Q, Withdrawal E-mail. Notwithstanding that email, Go Global continued to have discussions with investors regarding a potential investment, including with Axar Capital Management LP ("Axar) among other potential investors.  Ex. R, Go Global E-mails; Ex. S, Go Global E-mails, Ex. K, Dep. Trans. of Jeffrey Streader at 70:12-24.  However, as of June 27, 2023, Go Global was aware that it did not have the financing in place to make an offer, and Jeffrey Streader, Go Global's founder and CEO, wrote in an email that "[i]f the auction is tomorrow or this week – we are not going to participate." Ex. R, Emails between Go Global and Lazard. Ultimately, it is undisputed that Go Global did not submit a qualifying bid. *See* Ex. G, Dep. Trans. Christian Feuer at 115:9-116:18.

The dates of the auctions related to the Section 363 sale of BBBY kept changing, but ultimately the IP Auction to be held on June 28, 2023, independent of any going concern assets. Ex. T, Order Approving the Auction; Ex. U, Notice of Cancellation. Notably, Go Global did not attend nor participate in the IP Auction. Ex. K, Dep. Trans. of Jeffrey Streader at 29:3-5. During the IP Auction, investment firm Ziff Davis, Inc. bid $15 million for the BBBY intellectual property, and DOM subsequently bid $15.5 million which ended up being the winning bid. *Id.*, Ex. K, Dep. Trans. of Jeffrey Streader at 28:16-22. DOM bid at the IP auction even though Avish Dayiha admitted on June 23, 2023 that it was behind on due diligence. *See* Ex. V, DOM E-mail.

Notwithstanding that Go Global did not attend the IP Auction and Go Global's prior statement of withdrawing from the process, Go Global continued to seek funding to acquire the Baby intellectual property and certain store leases even after the IP auction. *Id.*, Ex. W, Go Global Email Exchange. Ultimately, Go Global's efforts to cobble together investors failed again, and, on July 7, 2023, Go Global wrote, "[o]ur pencils are down." *Id.*, Ex. X, Go Global Email Exchange. DOM's bid was approved by the Bankruptcy Court, and it acquired the BBBY's intellectual property for $15.5 million. *Id.*, Ex. Y, Order Approving Asset Sale.

On July 19, 2023, the Debtors conducted an auction for certain BBBY store leases. Again, Go Global did not participate in that auction. *Id.*, Ex. Z, Notice of Successful Bidder. At the Lease Auction, DOM successfully bid on the leases for 11 Baby stores. *Id.* At no time did Go Global and DOM ever discuss an 11-store model, and, in fact, Go Global never created a model that was for less than 22 stores. Ex. AA, Go Global's 22-Store Model and Ex. D, Dep. Trans. Deborah Gargiulio at 43:6-20.

**<u>DOM's Model</u>**

BBBY prepared a 50 and 75 door model for DOM after DOM won the IP auction, and DOM forwarded those models to Yosef Moskowitz of Slate Equities to prepare DOM's own model. Ex. AB, Email Forwarding Models. Mr. Moskowitz worked directly with BBBY and Alix Partners, to prepare a wholly unique model for BBBY. *Id.*, Ex. AC, Emails with BBBY and Mr. Moskowitz. Go Global has not alleged that Mr. Moskowitz viewed Go Global's 95-store model nor that his model was derived from Go Global's 95-store model. After several working sessions with BBBY and Alix Partners, Mr. Moskowitz ultimately created an 11-store model that DOM used as the basis for its business. Ex. AD, 11-Store Model. As clearly reflected in email communications, DOM requested that BBBY pare down their 50 store model to a list of 12 to 15 stores. *See* Ex. AE, Emails Regarding Stores. Patty Wu, BBBY's former CEO, created a 14 store regional store model which DOM in part relied upon when purchasing the 11 stores. *Id.*

**<u>Go Global's Case Study</u>**

In late July, following the IP Auction and the Lease Auction, Go Global prepared a case study to explain to its investors why it passed on the opportunity to acquire BBBY or any of its assets. *Id.*, Ex. AF, Go Global Case Study. In the Case Study, Go Global explained why it ultimately passed on the Baby opportunity:



████████████████████████████████████████████████████

*Id.*

    The Case Study was authored by Yuen Chau who testified that the statement above in bold was accurate. *See* Ex. AG, Dep Trans of Yuen Chau at 102:18-103:5.

### DOM's Expert Report of Adam Hanover

    The BBBY 95 Store Model, the Go Global 95 Store Model, and the Schachter Model all projected e-commerce would account for over █████ of total net sales. *See* Ex. AH, Hanover Report at 21. Accordingly, functioning IT systems are critical to achieving those sales. Go Global prepared a technology plan, which is referred to as its "secret sauce" but there is no evidence that it was ever provided to DOM. *Id.* at 22. Accordingly, whatever the alleged trade secrets were, they did not include Go Global's technology plan. Interestingly, the BBBY 95 Store Model and the Go Global 95 Store Model both projected an ████████████ "IT Transformation" costs in the first year of the projection period. *Id.*

    Putting aside the relevance of the Go Global 95 Store Model, to the extent that that model contained any trade secrets, those secrets would have to be the ***modifications*** that Go Global made to the BBBY model. *Id.* And, DOM also had access to the unmodified BBBY 95-store model. Accordingly, to discern those modifications, and by definition, any alleged trade secrets, I compared the Go Global 95 Store to the BBBY 95-store model. *Id.* The following figure is a comparison of those two models.



As shown in the comparison, Go Global's modifications to the BBBY 95 Store Model were not significant. *Id.* at 23. Again, whatever the alleged trade secrets were is simply not apparent, nor is it apparent why the alleged trade secrets are different from any of the information contained in the Lazard Data Room. *Id.* at 23.

## STATEMENT OF LAW

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *Djonbalic v. City of New York*, 2000 WL 1146631, 4 (S.D.N.Y. 2000); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994). The Court must view all facts in the light most favorable to the non-moving party and resolve all factual disputes in the non-movant's favor, and to defeat a summary judgment motion, the non-moving party need only offer sufficient proof to allow a reasonable factfinder to decide in its favor." *Reyes v. New York State Office of Children and Family Services*, 2003 WL 21709407, 3 (S.D.N.Y. 2003) (quoting *Mandell v. The County of Suffolk*, 316 F.3d 368, 374-377 (2d Cir. 2002). The Court may grant summary judgment only when "no reasonable trier of fact could find in favor of the non-moving party." *Id.* (citing *Allen*, 64 F.3d at 79).

## POINT I

## THE INFORMATION PROVIDED TO DOM BY GO GLOBAL WERE NOT PROPRIETARY TRADE SECRETS

A plaintiff claiming misappropriation of a trade secret must prove that: "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Rapco Foam, Inc. v. Scientific Applications, Inc.,* 479 F.Supp. 1027, 1029 (S.D.N.Y. 1979). "Courts have recognized that 'the grant of a motion for summary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony.'" *Brown v. Cnty. of Nassau,* 736 F. Supp. 2d 602, 620 (E.D.N.Y. 2010) (quoting *Webster v. Offshore Food Serv., Inc.,* 434 F.2d 1191, 1193 (5th Cir. 1970)). "[W]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment." *Hudson Riverkeeper Fund v. Atlantic Richfield Co.*, 138 F.Supp.2d 482, 488 (S.D.N.Y.2001). *See also Iacobelli Constr. v. County of Monroe*, 32 F.3d 19, 25–26 (2d Cir.1994) (denying summary judgment where expert affidavit raised genuine issue of material fact); *In re Joint E. & S. Dist. Asbestos Litig.*, 964 F.2d 92, 96 (2d Cir.1992) (same); *Jiminez v. Dreis & Krump Mfg. Co.*, 736 F.2d 51, 54 (2d Cir.1984) (same).

Moreover, "[t]he existence of a trade secret is generally a question of fact." *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y.), *aff'd,* 838 F. App'x 582 (2d Cir. 2020). *See also Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022) ("the question of whether proprietary information qualifies as a trade secret is ordinarily a question of fact."); *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 607 (S.D.N.Y. 2004) (determining whether a trade secret exists "can be a fact intensive analysis.").

In this case, DOM's expert report of Adam J. Hanover, CPA, JD, CIRA, CFF (the "Hanover Report") raises a genuine issue of material fact as to whether the information contained

in the Ankura Data Room constituted proprietary trade secret information. *See* Ex. AH, Hanover Report at 21. Notably, Go Global completely ignored the Hanover Report in its motion for summary judgment. As noted by Mr. Hanover, Go Global's own expert Alan Schachter essentially fails to address the lack of trade secrets in his report in noting the following.

> Schachter only states ***in one part of one sentence*** covering the entirety of his report that the alleged trade secrets include "Go Global's annotated versions of the [Baby] data, Go Global's proprietary forecasts, financial models, and strategic operating plans." Schachter collectively refers to that information as the "Model," but Schachter provides ***no details*** about (a) the alleged annotations nor provides any examples, (b) the alleged financial models nor what is special or unique about them, and (c) the alleged strategy or even a sample of any such strategy.

*Id.* at 21; see also Ex. AI, Schachter Report at 8.

In its motion for summary judgment, Go Global alleges that the trade secrets fall into three categories: 1) the Technology Plan which was referred to internally as their "secret sauce"; 2) Go Global's Financial Model; and 3) its Bidding Strategy. However, by Go Global's own admission, Go Global did not reveal its allegedly proprietary technology plan to DOM even though Go Global and DOM had several communications regarding a future technology plan at BBBY. *See* Ex. AJ, Go Global E-mails. Indeed, on June 12, 2023, Amit Mahlotra, a DOM consultant, asked some brief technical questions of Thoryn Stephens, a Go Global employee, which prompted Mr. Stephens to then schedule a call with DOM to discuss further. *Id.* On June 13, 2023, prior to Thoryn Stephens and DOM's call regarding the technology plan, Jeffrey Streader wrote to Thoryn Stephens:

> Nice work on the answers Thoryn
> In your 1x1 call today
> Remember - they do not have the secret sauce and we will not give it to them.
> This is a high level overview of our blueprint - we have done this before - the cut and stand up - the extraction -
> We are not giving the plans away
> Do not have their commitment yet - We do not want to embolden them to move forward with out us. Slim chance.
> Keep it high level but informative.

*Id.* Jeffrey Streader testified at his deposition that the "secret sauce" discussed in this email is the technology plan. Ex. K, Dep. Trans. of Jeffrey Streader at 53:19-55:18. Mr. Streader further explained that he had multiple conversations with Mr. Stephens reiterating that he should not give away the technology plan to DOM. *Id.* at 55:2-18. They merely discussed a "high level overview" and were "not giving the plans away." Ex. AJ, Go Global E-mails. Therefore, Go Global appears to have been withholding its actual trade secrets even though DOM has executed the NDA meaning that there was no consideration provided by Go Global in connection with the NDA. *Id.*

Go Global also identifies its Financial Model and Bidding Strategy which were essentially compiled into a **single** document, Go Global's 95-store model. *Id.*, Ex. L, Go Global's 95-Store Model. However, Go Global's 95-store model was nothing more than a slightly modified version of BBBY's 95-store model which was made available to all of the bidders, including DOM. *See id*; Ex. AK, BBBY's 95-Store Model. As shown in the Hanover Report comparison between the models, Go Global's modifications to BBBY's 95-store model were not significant, and they do not transform the generally available model into Go Global's trade secrets. Ex. AH, Hanover Report at 22-23. For instance, BBBY's 95-store model projected an ███████ "IT Transformation" cost in the first year of the projection period. Ex. AK, BBBY's 95-Store Model. And, the Go Global 95 Store Model reflected the exact same amount. Ex. L, Go Global's 95-Store Model. The Hanover report demonstrates that Go Global slightly modified the total net sales, total gross profit, and EBITDA of BBBY's model. Ex. AH, Hanover Report at 23. However, Go Global's 95-store model does not explain how it derived the slightly modified total net sales, total gross profit, and EBITDA. Ex. L, Go Global's 95-Store Model.

Indeed, DOM did not notice any differences between the information stored in the Lazard data room and the Ankura data room. Mark Srour related:

> As I mentioned before, what Go Global did, they went ahead -- they had access to the Lazard data room.  They were able -- whatever was there, they transferred it into their own data room and they just changed the name.
> They removed whatever was the buybuy BABY there and they put Go Global.
> […]
> Again, as far as I'm concerned, I know that [Go Global] copied the information that was at Lazard and that information was provided by the buybuy BABY team at that time.

Ex. B, Dep. Trans. of Mark Srour 45:3-20. The lack of unique work product in the Ankura Data Room results in a material issue of fact regarding if the work constitutes a trade secret.

When determining whether a trade secret exists, Courts in the Second Circuit consider the following factors in determining whether information qualifies as a trade secret:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (citation omitted).

Here, Go Global has not established that the information is confidential or the value of the information to the business and to its competitors which is evident by real life results. Indeed, despite reaching out to over three hundred investors, Go Global was unable to secure investors to execute their 95-store model and bidding strategy. Ex. AL, Go Global E-mail Exchange; Ex. W, E-mail's Between Go Global and Axar; Ex. X, Go Global E-mail Exchange. Thus, the market weighed the value of Go Global's 95-store model and rejected it. *Id.* Moreover, Go Global's plan was of no value to DOM because it was stale by the time of DOM's bid. Go Global's activity log demonstrates that DOM viewed Go Global's 95-store model between June 10 and June 14, 2023. *See* Ex. N, Activity Log. On June 22, 2023, Overstock.com, Inc. was selected as the Successful

Bidder of Bed Bath & Beyond Inc. *See* Ex. O, Order. According to Go Global, the Overstock bid price changed the landscape of the BBBY bid and potentially devalued the BBBY bid on the market. Ex. D, Dep. Trans. of Deborah Gargiulo at 49:2-50:14. Therefore, Go Global's 95-store model created weeks earlier was ultimately highly inaccurate and would have virtually no value to any of its competitors, including DOM.

Go Global claims that its information was vital to DOM's bid, and Go Global rests this conclusion on DOM's lack of due diligence, but Go Global ignores that it pitched to DOM a ███ ██████ for a going concern for 95 stores which is essentially irrelevant to a $15.5 million bid on intellectual property only. *See* Ex. AH, Hanover Report at 26. In an e-mail on June 23, 2023, Avish Dayiha acknowledged internally that DOM was significantly behind in the due diligence process, but it is also clear from this e-mail that DOM was not relying on Go Global's due diligence. *See* Ex. V, DOM Email. Rather, DOM went through the bid process largely based on gut instinct which is Mark's typical style of operation. *Id.*, Ex. A, Dep. Trans. of Avish Dahiya 69:10 -73:23. Indeed, Mr. Srour and DOM had been interested in BBBY for years, and he did not base his bid off any financial modeling but simply continued to bid until he won:

> Q.  How did you reach that number?
> A.  We were bidding at the auction.
> Q.   How did you determine that that was the number that you wanted to bid?
> A.  I didn't have no number with me.
> Q.   Sorry, can you repeat that?
> A.   I did not have a number with me or  a max to get the IP.  I wanted it and I was willing to pay higher than that. So for me the 15 and a half million  dollars was a bargain.

Ex. B, Dep. Transcript of Mark Srour 202:11-21.

Lastly, the information could be properly acquired or duplicated by others. The vast majority of the information in the Ankura Data Room was either duplicated or at most manipulated from the documents and data contained in the Lazard Data Room. Indeed, Go Global created its

95-store model by making modifications to BBBY's 95-store model made available to all bidders, and many other bidders likely made similar such calculations of their own. Ultimately, since Go Global failed to provide any novel information or ideas to DOM, there was no breach, and the NDA unenforceable due to a lack of consideration. See *Structured Capital Solutions, LLC v. Commerzbank AG, 1777* F. Supp.3d 816, 825 *(S.D.N.Y. 2016) citing Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 380 (2d Cir.2000) (holding that in submission of idea cases breach of contract claims require "a showing that the disclosed idea was novel to the buyer in order to find consideration"); *Alessi Equip., Inc. v. American Piledriving Equip., Inc.*, 578 F.Supp.3d 467, 500 (S.D.N.Y. 2022) (consideration exists if "something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him.").

Go Global cites a variety of cases to support its contention that Go Global's allegedly proprietary information constitutes a trade secret. All of these cases can be distinguished from the facts in this matter.

Specifically, in *KCG Holdings, Inc. v. Khandekar* the parties did not dispute that the predictive models were trade secrets. No. 17-CV-3533 (AJN), 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020). In contrast, this matter involves a dispute of fact regarding the information constitutes trade secrets. Moreover, *KCG Holdings* involved computer code used for securities trading rather than a modified financial model like the one at issue here. *Id.* In *Estee Lauder Companies Inc. v. Batra*, the trade secrets at issue included plans for the launch of new Estee Lauder products, including new product development plans for the next three years, the marketing, geographic plans and the channels of distribution for these products, over the next six to nine months. 430 F. Supp. 2d 158, 163 (S.D.N.Y. 2006). The documents at issue here are not comparable in their complexity or confidentiality, especially since the "secret sauce" Technology

Plan was withheld – Go Global's Model (for 95 stores) provided no information on how the business would actually be operated. *See* Ex. L, Go Global's 95-Store Model.

In *Flatiron Health, Inc. v. Carson* the Court did not rule that the information at issue in the case was a trade secret. 602 F. Supp. 3d 482, 487 (S.D.N.Y. 2020). Rather, the Court simply defined the term "trade secrets" to clarify its order in a preliminary injunction. *Id.* at 484. The Court found that "the term 'trade secrets; as used in this Order shall refer to all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible." *Id.* at 487. This general definition employed by the court for the purpose of maintaining the status quo does not support the proposition that any information concerning business and finances constitutes a trade secret. Moreover, not all financial information constitutes a trade secret. *See Bear, Stearns Funding, Inc. v. Interface Grp.*, 361 F.Supp.2d 283, 305–06 (S.D.N.Y.2005) (finding that financial information, including terms of a loan agreement, and personal financial information, is not a trade secret). Further, in other cases cited by Go Global, the courts held that market research and business goals are not trade secrets. *See TNS Media Rsch., LLC v. Tivo Rsch. & Analytics, Inc.*, 629 F. App'x 916, 933 (Fed. Cir. 2015) ("It is also true that market research and business goals are not protectable trade secrets."); *LinkCo v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 500 (S.D.N.Y.2002) ("Marketing concepts and new product ideas are not considered trade secrets. Similarly, information consisting simply of business possibilities or goals is not a trade secret."). Go Global also attempts to rely upon *Gen. Elec. Co. v. Macejka* in which the parties sought discovery in proceedings for review of real property tax assessments on its property. 675 N.Y.S.2d 420 (1998). The Court found that the petitioner had made necessary minimum showing that the material sought, insofar as it relates

-17-

to price, cost of materials or labor and profit figures, constitutes information of is trade secret and that respondents have not demonstrated that discovery of same is indispensable. *Id.* However, this matter is incomparable as it does not involve a cause of action involving trade secrets and involves an entirely different legal standard. *Id.*

Go Global also seeks exemplary damages and reasonable attorneys' fees pursuant to 18 U.S.C.A. § 1836 which establishes remedies "[i]n a civil action brought under this subsection with respect to the misappropriation of a trade secret." Thus, a party must first establish the misappropriation of a trade secret before the Court grants any remedies including exemplary damages and reasonable attorneys' fees. Here, material questions of fact preclude the determination that a trade secret exists. *See Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y.).

Based on the above, it is evident that there is a material dispute of fact regarding if the information at issue constitutes a trade secret that precludes Go Global's request for summary judgment in connection with Go Global's claim under the Trade Secrets Act (Fifth Cause of Action), Common Law Misappropriation (Sixth Cause of Action), and claim for damages under 8 U.S.C. § 1836(b)(3)(C)-(D).

## POINT II

### GO GLOBAL HAS FAILED TO ESTABLISH THAT IT HAS SUSTAINED ANY DAMAGES AS A RESULT OF ANY OF DOM'S ACTIONS

Go Global contends that DOM damaged Go Global because 1) the NDA provides that a breach of the covenants contained in the agreement will cause "irreparable harm" to Go Global; 2) DOM's disclosure of the allegedly proprietary information to unauthorized third-parties diminished or destroyed the value of Go Global's asset, and 3) DOM damaged Go Global by "muscling" it out of the BBBY auction. Material issues of fact dispute the existence of damages under all three bases.

### A. Damages Based on Contract Provision Alone

As an initial matter, Courts in this District have held that [a plaintiff] cannot rely on the contract provision alone to demonstrate irreparable harm." *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 CIV. 1979 PKL, 2007 WL 950092, at *6 (S.D.N.Y. Mar. 28, 2007) ("[t]his Court is aware of no authority indicating that such a contract provision entitles the plaintiff to a *per se* finding of irreparable harm."). *See also North Atlantic Instruments,* 188 F.3d at 49 (finding that language in employment agreement stating that breach of confidentiality clause would cause "irreparable injury" to employer was some evidence, although not conclusive evidence, of irreparable harm). ("This Court is aware of no authority indicating that such a contract provision entitles the plaintiff to a *per se* finding of irreparable harm."); *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co*., 830 F.2d 13 (2d Cir. 1987) ("We also agree with the district court that the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary relief is appropriate.").

"While such provisions merit careful consideration by the Court, they cannot substitute for the factual determination of whether [the plaintiff] has demonstrated actual and imminent irreparable harm." *Sandoz Inc. v. Cediprof, Inc.*, No. 20 CIV. 5568, 2020 WL 4482634, at *2 (S.D.N.Y. Aug. 3, 2020). "Quite simply, a party may not contract its way to a finding of irreparable harm, and where (as here) a plaintiff cannot otherwise demonstrate irreparable harm, such provisions do not carry the day." *Id.* Thus, Go Global's conclusory allegation of irreparable harm must be supported by facts which do not exist in this case. As set forth below, no harm, much less irreparable harm was sustained by Go Global.

**B.  Damages Based Upon Diminished/Destroyed Value**

Second, Go Global alleges that DOM's disclosure of its information diminished or destroyed the value of an asset that Go Global had developed. However, Go Global's asset did not diminish because DOM bid at the IP auction. Ultimately, Go Global's asset diminished because it was a bidding strategy and financial model that failed to secure funding and was ultimately not used by Go Global when they passed on bidding as set forth in their post-mortem Case Study. Ex. AF, Go Global Case Study. Indeed, even prior to DOM's bid, Go Global was aware that it did not have the financing in place to make an offer, and wrote in an email that "[i]f the auction is tomorrow or this week – we are not going to participate." Ex. R, Emails between Go Global and Lazard. Furthermore, if DOM had not bid other qualifying bidders would have acquired BBBY at the auction. During the IP Auction, investment firm Ziff Davis, Inc. bid $15 million for the BBBY intellectual property, and DOM subsequently bid $15.5 million. *See* Ex. K, Dep. Trans. of Jeffrey Streader at 28:16-22. If DOM had not bid $15.5 million, then Ziff Davis would have won the IP Auction. Therefore, Go Global would have been in exactly the same position even if DOM did not bid.

Additionally, Go Global did not expend resources creating an investment presentation and bidding strategy in reliance on DOM. Go Global began preparing its bid (and its 95 Store Model) several months before it ever met DOM. SOMF at ¶¶ 22-23, 51, 156. Go Global began seeking investors to fund the acquisition in March of 2023. Go Global and Ankura had canvased over 300 investors in the months prior to meeting DOM. *See* Ex. AL, Go Global Emails. After meeting with DOM twice, Go Global characterized those meetings and interactions with DOM as merely a "5 day time delay and disappointing set back us." *See* Ex. M, Go Global Emails. Thus, Go Global

cannot trace its time, effort, and expenses to DOM when Go Global incurred many of those expenses months before meeting DOM. DOM was merely a 5-day time delay.

### C. Damages Related to "Muscling: Out of the Auction

Lastly, Go Global alleges DOM damaged Go Global by "muscling" Go Global out of the BBBY Bankruptcy Auction. However, as set forth above Go Global did not participate in the BBBY auction because either Go Global failed to secure funding or it simply passed. Ex. AF, Go Global Case Study. Go Global even continued to seek funding for the go forward auction even after DOM won the BBBY IP auction. *See* Ex. W, Go Global Email Exchange. Thus, DOM did not "muscle" Go Global out of the auction, and this assertion is meritless.

Go Global also fails to explain how DOM inflated the price of the BBBY IP. An additional bidder also was willing to pay a similar price point. Ziff Davis bid $15 million and DOM bid $15.5 million. *See* Ex. K, Dep. Trans. of Jeffrey Streader at 28:16-22. Additionally, Go Global had initially valued a bid for the ███████████████ SOMF ¶ 174.

Go Global seems to suggest that Overstock's bid deflated the valuation of BBBY's assets. SOMF ¶¶ 170-175. Thus, according to Go Global, the BBBY bid should have been significantly less than $15.5 million. However, Go Global supports this contention with conclusory opinion testimony from Go Global employees. Go Global has not provided any factual evidence to establish that the Overstock bid deflated the value of BBBY as a result of any action by DOM. Moreover, as previously stated, Ziff Davis bid on BBBY's IP for $15 million. Certainly, DOM did not artificially inflate the IP's value by bidding the required additional $500,000.

Based on the above, it is clear that Go Global has not established that any damages that are directly traceable to any breach of the NDA by DOM. *See In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143, 154 (Bankr. S.D.N.Y. 2019) (finding that the suggestion that the Debtors were

damaged defies common sense even under the assumption that the defendant breached the NDA).

Therefore, Go Global's motion for summary judgment as to its Breach of Contract claim (First

Cause of Action) and its claim for Attorneys' Fees (Second Cause of Action) must be denied.

### POINT III

### GO GLOBAL HAS FAILED TO ESTABLISH THAT DOM'S ALLEGED BREACH OF CONTRACT DIRECTLY AND PROXIMATELY CAUSED GO GLOBAL ANY DAMAGES

Under Federal Law, "[c]ausation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis in original). "It is not enough to show that an expenditure was in reliance on the contract. It must be shown that *but for* the breach the expenditure would have been reimbursed by expected gains". *Krofft Ent., Inc. v. CBS Songs, a Div. of CBS, Inc.*, 653 F. Supp. 1530, 1534 (S.D.N.Y. 1987) "This requires a showing that the damages were 'directly traceable to the breach, not remote or the result of other intervening causes.'" *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 445 (S.D.N.Y. 2018). Moreover, damages "may be so remote as not to be directly traceable to the breach, or they may be the result of *other intervening causes,* and then they cannot be allowed." *Nat'l Mkt. Share, Inc.*, 392 F.3d at 525

Go Global contends that DOM violated the NDA, but there are no facts to support any measure of damages that were caused by any alleged breach of the NDA by DOM. Go Global did not expend resources to creates its bidding strategy and 95-store model in reliance on DOM, and Go Global's team dedicated over three months and 1,700 hours to structuring a bid largely before it even knew who DOM was and after it had no intention of proceeding with DOM. Go Global's SOMF at ¶¶ 22-23, 51, 156. Indeed, DOM created the Go Global Model before ever meeting DOM,

and DOM was simply one of numerous investors to which Go Global sent the model in an attempt to make a bid on BBBY.

Furthermore, as discussed above, Go Global was aware that it did not have the financing in place to make an offer prior to Dream on Me's bid on June 28, 2023. Go Global did not secure the capital required for it to bid on BBBY which is why Go Global did not submit a qualifying bid or be otherwise involved in any auction for the BBBY assets. Thus, DOM's participation in the IP auction had no bearing on whether Go Global participated in the auction. Lastly, if DOM had not bid other qualifying bidders would have acquired BBBY at the auction. If DOM had not bid $15.5 million, then Ziff Davis would have won the IP auction. *See* Ex. K, Dep. Trans. of Jeffrey Streader at 28:16-22.

Go Global further claims that "DOM had agreed to bid jointly with Go Global." Plaintiff's Memorandum of Law at 23. However, it is undisputed that no such agreement existed. Following Go Global and DOM's in-person meetings, no agreement was made because they had fundamental differences and could not agree upon an investment strategy, in part, because (a) Go Global was only interested in operating BBBY, but not investing its own capital in BBBY; (b) DOM was only interested in potential partners that would invest their own capital; and (c) DOM was only interested in investing if they were a general partner involved in the day-to-day operation. *Id.*, Ex. A, Dep. Trans. of Avish Dahiya, at 128:23 – 131:3, Ex. B, Dep. Trans. of Mark Srour, at 36:10 – 38:11; Ex. K, Jeffrey Streader Dep. Trans. at 28:12-29:5. Prior to the June 15, 2023 meeting, DOM had been under the impression that Go Global would be investing their own capital along with DOM since the Go Global Model clearly reflected that Go Global would be contributing ███ ███ in capital. *Id.*, Ex. A, Dep. Trans. of Avish Dahiya, at 87:24-88:8; Ex. L, Go Global Model.

-23-

Lastly, Go Global makes an issue out of the videotaping of the June 15, 2023 meeting between DOM and Go Global. See SOF ¶¶107-113. However, while a videotape exists, there is no evidence that the videotaping relevant to their claims, the bidding process or the failure of the potential relationship, and no evidence that the videotape caused any damage to Go Global. Go Global couldn't come up with any financing, much less the ███████████ set forth in the Go Global Model.

Based on the above, it is clear that Go Global has failed to establish causation which is an essential element of its breach of contract claim. Therefore, Go Global's summary judgment motion must be denied as to its Breach of Contract claim (First Cause of Action) and its claim for Attorneys' Fees (Second Cause of Action).

**POINT IV**

**GO GLOBAL'S UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST CLAIMS FAIL AS A MATTER OF LAW**

For Go Global to establish that DOM was unjustly enriched under New York Law, Go Global must demonstrate that (1) DOM was enriched, (2) at Go Global's expense, and (3) equity and good conscience require restitution. *See Caro Capital, LLC v. Koch*, 653 F. Supp. 3d 108, 119 (S.D.N.Y. 2023). The measure of damages for unjust enrichment is "measured by a defendant's unjust gain, rather than by a plaintiff's loss." *Schatzki v. Weiser Capital Mgmt., LLC*, 995 F. Supp. 2d 251, 253 (S.D.N.Y. 2014) (citing *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F.Supp.2d 489, 534 (S.D.N.Y. 2011). "Furthermore, the alleged 'benefit must be 'specific' and 'direct.'" *Id.* (quoting *In re Bayou Hedge Funds Inv. Litig.*, 472 F.Supp.2d 528, 532 (S.D.N.Y.2007).

DOM disputes that Go Global conferred a specific of direct benefit on DOM. Notably, Go Global's expert, Alan Schachter, does not dispute that DOM failed to receive a benefit. In Mr.

-24-

Schacter's expert report he states that "[i]n this case, unjust enrichment is not applicable because the Defendant did not derive any financial benefit from the wrongful use of the Model." *See* Ex. AI, Schacter Report at 18. Mr. Schacter further noted that DOM has operated BBBY at a ███████████ and thus DOM has not been unjustly enriched. *Id.* Indeed, DOM's expert notes that BBBY has generated ███████████████████████████████ since BBBY's IP and other assets were acquired by DOM. *See* Ex. AH, Hanover Report at 16. Therefore, it is undisputed that Go Global was not unjustly enriched and Go Global's unjust enrichment claim must be dismissed.

Similarly, Go Global has not established a claim for constructive trust. Under New York law, the absence of unjust enrichment precludes a request for a constructive trust. *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 718 (Bankr. S.D.N.Y. 2018). Here, Go Global cannot establish a constructive trust because Go Global has failed to demonstrate that DOM was enriched. Based on the foregoing, Go Global's summary judgment on its unjust enrichment and constructive trust claim must be denied.

## CONCLUSION

Based on the foregoing, Defendants Dream On Me Industries, Inc. and Dream On Me, Inc. respectfully request that this Court deny Plaintiff Go Global's motion for summary judgment in its entirety.

Respectfully submitted,

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
Attorneys for Defendants,
Dream On Me Industries, Inc. and Dream On Me, Inc.

By: _____*s/ Thomas K. Murphy III*_____
Thomas K. Murphy III, Esq.

January 9, 2024

-25-