**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

GO GLOBAL RETAIL LLC,

                              Plaintiff,                              1:23-cv-07987 (AS)

          -against-

DREAM ON ME INDUSTRIES, INC.,
and DREAM ON ME, INC.

                              Defendants.

**DEFENDANTS' RESPONSES TO PLAINTIFF'S 56.1 STATEMENT OF FACTS**

I.    **BACKGROUND.**

      1.      Go Global is a private equity and brand investment firm that identifies opportunities to build brand equity in consumer products and retail stores, frequently but not exclusively from distressed retail assets. Declaration of Moish E. Peltz, December 20, 2024 ("Peltz Decl."), Exhibit 1 (Streader Dep. Tr.) at 13:11-14; Exhibit 41 (Streader Aff.) at ¶ 4.

      **Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

      2.      Go Global has successfully acquired brands such as Janie and Jack, HATCH Studios, Modcloth, and Brums Milano. Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 21:4-22:1; Exhibit 41 (Streader Aff.), at ¶ 5.

      **Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

      3.      Jeffrey Streader ("Streader") is the founder and managing member of Go Global. Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 13:24-25, 20:20-21:3.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

4.    Christian Feuer ("Feuer") is a Managing Director at Go Global. Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 14:18-20.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

5.    Feuer has over one decade of experience compiling financial models for brick and mortar retail brands and stores. Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 21:3-22:16.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

6.    Feuer formerly worked as a marketing executive for companies including the Otto Group, Newport News, and Spiegel Group, and then subsequently began working to purchase and turnaround various retail businesses, before joining Go Global. *See* Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 10:19-14:17.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

7.    Deborah Gargiulo ("Gargiulo") is a Partner with Go Global. Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 7:19-22.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

8.      Gargiulo has two decades of experience with retail organizations and formerly served as CFO for both Trish McEvoy and Ralph Lauren. Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 8:13-9:1.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

9.      Yuen Chau ("Chau") is a Senior Partner with Go Global who is primarily responsible for evaluating potential deals, speaking with investors, and performing due diligence. Peltz Decl., Exhibit 4 (Chau Dep. Tr.) at 9:3-10.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

10.     Chau's role at Go Global involves the evaluation of potential deals, due diligence, and document and work-flow management. *See* Peltz Decl., Exhibit 4 (Chau Dep. Tr.) at 9:3-10.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

11.     Dream on Me Industries, Inc., and Dream on Me, Inc. are New Jersey companies that design, manufacture, and supply baby products such as strollers, walkers, bedrails, and cribs. Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 43:24-44:6; Exhibit 43 (Answer) at ¶ 18.

**Response:** Admitted

12.     Mark Srour ("Srour") is the owner and CEO of Dream on Me, Inc. and Dream on Me Industries, Inc.  *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 13:7-12; Exhibit 43 (Answer) at ¶ 42.

**Response:** Admitted

13.    Avish Dahiya is the Chief Marketing Officer and Chief Technology Officer at Dream on Me Industries, Inc., and assists with strategy and insights. Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 15:21-16:9, 58:22-59:3; Exhibit 43 (Answer) at ¶ 42.

**Response:** Admitted

14.    Milan Gandhi is an advisor to Dream on Me Industries, Inc. who assists with accounting work. Peltz Decl., Exhibit 7 (Gandhi Dep. Tr.) at 15:4-12.

**Response:** Admitted

15.    Amit Malhotra was formerly an advisor to Dream on Me Industries, Inc. who assisted Dream on Me Industries, Inc. with the plan to extract technology related to the purchase of Baby's Bankruptcy Assets. Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 19:22-25.

**Response:** Admitted

16.    Jack Srour ("J. Srour") was formerly an employee of Dream on Me Industries, Inc., and assisted his father, Mark Srour, with his real estate business, and also advised Mark regarding the auction off assets for Baby Bankruptcy Auction. Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 155:17-156:11.

**Response:** Admitted

17.    Lazard Freres & Co. LLC ("Lazard") is the banker that was running the Baby Bankruptcy Auction. *See* Peltz Decl., Exhibit 41 (Streader Aff.) at ¶ 7; Exhibit 4 (Chau Dep. Tr.) at 13:6-12; Exhibit 9 (Lauster Dep. Tr.) at 45:12-19; Exhibit 40 at GG-0012965.

**Response:** Admitted

## II.    BED BATH AND BEYOND FILED FOR BANKRUPTCY.

18.    Buy Buy Baby ("Baby") was a retail chain that sells clothing, strollers, and other items for use by babies and infants. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 22:2-9; Exhibit 6 (Dahiya Dep. Tr.) at 34:4-20.

**Response:** Admitted

19.    Baby was a subsidiary of Bed Bath & Beyond, Inc. ("BedBath"). *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 26:5-27:5; Exhibit 9 at 41:18-25; Exhibit 10 (July 11 Bankruptcy Order) at 32.

**Response:** Admitted

20.    On April 23, 2023, BedBath filed for Chapter 11 bankruptcy protection. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 26:5-27:5; Exhibit 10 (July 11 Bankruptcy Order) at 32.

**Response:** Admitted

21.    On April 25, 2023, the United States Bankruptcy Court for the District of New Jersey entered an Order approving the auction and bidding procedures, stalking horse bid procedures, and scheduling bid deadlines authorizing the auction of BedBath's Bankruptcy Assets, which included the intellectual property related to BedBath's Baby brand (the "Baby IP") as well as Baby's going-concern (the "Baby Going-Concern," and together with the Baby IP the "Baby Bankruptcy Assets"). *See* Peltz Decl., Exhibit 11 (June 29, 2023, Bankruptcy Order) at 1.

**Response:** Admitted

## III.    GO GLOBAL DEVELOPED PROTECTABLE TRADE SECRET INFORMATION.

22.    In or around March 2023, Go Global learned that BedBath planned to file for bankruptcy protection and would auction off assets for its subsidiary, Baby ("Baby Bankruptcy

Auction"). *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 26:8-27:5; Exhibit 2 (Feuer Dep. Tr.) at 86:4-10; Exhibit 4 (Chau Dep. Tr.) at 10:9-12; Exhibit 41 (Streader Aff.) at ¶ 6.

 **Response:** Admitted

23. Following news of BedBath's bankruptcy, Go Global began work structuring a bid for a potential bankruptcy auction of Baby's Assets. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 26:5-27:5; Exhibit 2 (Feuer Dep. Tr.) at 86:4-10; Exhibit 3 (Gargiulo Dep. Tr.) at 10:2-9; Exhibit 4 (Chau Dep. Tr.) at 13:6-12; *see also* Exhibit 39 at GG-0033172.

 **Response:** Admitted

24. Go Global's efforts included multiple work streams and the development of various kinds of work product, including a comprehensive financial model selecting and annotating the most relevant Baby historical data and using the Go Global team's experience to generate realistic forward-looking projections and store recommendations. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 50:5-16; Exhibit 2 (Feuer Dep. Tr.) at 21:3-22:15; Exhibit 3 (Gargiulo Dep. Tr.) at 10:19-11:3, 30:7-15; Exhibit 4 (Chau Dep. Tr.) at 13:6-12.

 **Response:** DOM admits this Go Global's contention and testimony.

25. In or around March 17, 2023, Go Global obtained access to Lazard's data room ("Lazard Data Room"). *See* Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 86:4-10; Exhibit 40 at GG-0012965.

 **Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

26. The Lazard Data Room contained historical information and data on Baby. *See* Peltz Decl., Exhibit 41 (Streader Aff.) at ¶ 9; Exhibit 2 (Feuer Dep. Tr.) at 121:15-122:9.

 **Response:** Admitted

27.     The information inside the Lazard Data Room was, in part, updated and continuously populated based upon Go Global's requests to Lazard for information. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 27:12-24.

**Response:** Admitted.

28.     The Lazard Data Room contained hundreds of documents. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 83:2-84:2; Exhibit 8 (Malhotra Dep. Tr.) at 32:8-20.

**Response:** Admitted.

29.     All potential bidders who desired access to the Baby data in the Lazard Data Room were permitted so long as they signed an NDA with Lazard. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 27:6-24; Exhibit 2 (Feuer Dep. Tr.) at 123:5-13; Exhibit 6 (Dahiya Dep. Tr.) at 50:14-17.

**Response:** Admitted.

30.     Go Global used information in the Lazard Data Room to help it develop its business thesis, complete due diligence, and develop confidential and proprietary information that would assist Go Global in structuring a bid. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 27:6-24; Exhibit 2 (Feuer Dep. Tr.) at 119:11-120:7, 121:15-122:9; Exhibit 4 (Chau Dep. Tr.) at 13:6-12; Exhibit 12 at GG-0013660.

**Response:** DOM admits that Go Global used information in the Lazard Data Room to help it develop its business thesis and complete due diligence. However, DOM denies that Go Global developed proprietary information. *See* Declaration of Thomas K. Murphy III ("Murphy Decl."), Ex. AH, Hanover Report at 21.

31.     Go Global also arranged meetings with BedBath and Baby executives as part of Go Global's due diligence in furtherance of structuring a bid. *See* Peltz Decl., Exhibit 1 (Streader Dep.

Tr.) at 27:6-24; Exhibit 2 (Feuer Dep. Tr.) at 119:11-120:7, 121:15-122:9; Exhibit 4 (Chau Dep. Tr.) at 13:6-12; Exhibit 12 at GG-0013660.

**Response:** Admitted.

32.    Feuer and Gargiulo developed Go Global's Financial Model ("Financial Model") based upon the historical data provided to Go Global in the Lazard Data Room, as well as Go Global's discussions with BedBath and Baby executives. *See* Peltz Decl., Exhibit 13 (Financial Model); *see also* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 50:5-16; Exhibit 2 (Feuer Dep. Tr.) at 21:3-22:15; Exhibit 3 (Gargiulo Dep. Tr.) at 27:12-21, 30:7-15.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

33.    Among other things, Feuer was responsible for developing the return on investment calculation; estimates of required working capital; estimates and/or projections related to inventory purchases regarding how much and when to purchase, as well as sales concerning the same. *See* Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 77:9-14, 87:15-24.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

34.    Although the Go Global Financial Model uses as an input and retains Baby's historical data – which was not developed by Go Global – the Go Global Financial Model also contains proprietary data exclusively developed by Go Global. For example, this data includes Go Global's projected sales, expenses, costs, and growth assumptions across Baby's retail brick and mortar and digital channels, which were developed by Go Global based upon Go Global's knowledge, due diligence, and industry and business expertise. *See* Peltz Decl. Exhibit 2 (Feuer

Dep. Tr.) at 84:7-85:4, 86:21-87:3, 87:15-24, 91:2-5, 96:15-24, 97:12-99:2, 100:11-21; Exhibit 13 (Financial Model).

**Response:** DOM admits that the Go Global Financial Model uses as an input and retains Baby's historical data – which was not developed by Go Global. However, Go Global denies that the Go Global Financial Model also contains proprietary data exclusively developed by Go Global. *See* Murphy Decl., Ex. AH, Hanover Report at 21-23.

35.    Go Global reviewed all of the documents in the Lazard Data Room and consolidated and curated this data into a comprehensive data set of documents representing a concise and accurate picture of only the most relevant Baby documents, which Go Global stored in the Go Global Data Room. *See* Peltz Decl. Exhibit 9 (Lauster Dep. Tr.) at 55:8-22.

**Response:** DOM admits this is Go Global's Contention and Ms. Lauster's testimony.

36.    In particular, Go Global used the Baby documents to generate the following original data, which was then consolidated into its Financial Model:

    a.  Go Global annotated versions of Baby's data;

    b.  Gross sales projections;

    c.  Proposed distribution structures for capital investors;

    d.  Sales forecasts;

    e.  Target net revenues;

    f.  Go Global's views of the strengths and weaknesses of Baby's retail stores and e-commerce business; and

    g.  Projections of how much and which merchandise to stock.

*See* Peltz Decl., Exhibit 13 (Financial Model).

a.  DOM admits that Go Global placed brief comments next to BBBY's 95 store selection. Those annotations largely consisted of the cryptic comment ████ ██████████████ or the comment ████████████

b.  DOM admits Go Global made minor modifications to BBBY's figures related to the "store gross profit," "digital gross profit," and "total gross profit." However, those figures are remarkably similar to the figures in the BBBY model. The following figure is a comparison of those two models.



*See* Murphy Decl., Ex. AH, Hanover Report at 23.

c.  DOM admits Go Global made minor modifications to BBBY's figures related to the "store sales," "digital sales," and "total net sales." However, those figures are remarkably similar to the figures in the BBBY model. The following figure is a comparison of those two models.



*See* Murphy Decl., Ex. AH, Hanover Report at 23.

    a.    DOM denies that Go Global's 95 store model contains "target net revenues." The phrase is nowhere in Go Global's 95 store model.

    b.    DOM denies that Go Global's 95 store model included original data concerning Go Global's views of the strengths and weaknesses of Baby's retail stores and e-commerce business.

    c.    DOM denies that Go Global's 95 store model included original data concerning "projections of how much and which merchandise to stock."

*See* Peltz Decl., Exhibit 13, Go Global's 95-store model; Murphy Decl., Ex. AH, Hanover Report at 21-23; Murphy Decl., Ex. AK, BBBY's 95-store model.

    37.    Feuer developed the Go Global Financial Model by first reviewing the historical data provided by BedBath concerning Baby. Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 21:3-22:15.

    **Response:** Admitted.

    38.    Feuer next reviewed Baby's projections and attempted to substantiate them as compared to the Baby historical data. Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 21:3-22:15, 84:6-86:3.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

39.     Feuer manipulated the information he was provided, based on his experience and knowledge concerning business turnaround, to generate Go Global's forward-looking projections that comported with Feuer's understanding of "what we were able to expect based on the due diligence that we conducted." Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 84:6-86:3, 86:11-90:14, 122:10-123:3.

**Response:** DOM admits that Go Global's 95-store model was originally prepared by Alix Partners, Baby's financial advisor, with minor modifications made by Go Global. *See* Peltz Decl., Exhibit 13, Go Global's 95-store model; Murphy Decl., Ex. AH, Hanover Report at 21-23; Murphy Decl., Ex. AK, BBBY's 95-store model.

40.     One particular challenge that Feuer encountered in developing the Financial Model was that Baby's inventory was being sold out, and the best inventory was going first. As a result, Feuer's plan needed to consider how much money it would cost to buy the right mix of new inventory to generate the sales the resulting business would need to get off the ground. Thus, the challenge at the beginning was that Baby required cash, "because [Baby] lost a lot of money because of low sales, but [also] needed cash in order to acquire inventory in order [to generate] sales[.]" Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 88:7-89:18; *see also* Exhibit 1 (Streader Dep. Tr.) at 98:4-14; Exhibit 2 (Feuer Dep. Tr.) at 89:19-90:14; Exhibit 3 (Gargiulo Dep. Tr.) at 43:6-16; Exhibit 4 (Chau Dep. Tr.) at 103:6-105:3.

**Response:** DOM admits this Go Global's contention and testimony.

41.     Feuer also reduced his financial modeling to various graphs and slides, which illustrated Go Global's projections related to Baby's inventory buildup, monthly sales, annual

sales, overhead expenses, and more. *See* Peltz Decl., Exhibit 13 (Financial Model at slides tab); *see also* Exhibit 2 (Feuer Dep. Tr.) at 91:2-13.

**Response:** DOM admits this Go Global's contention and testimony.

42.    Gargiulo was responsible for evaluating Baby's retail stores and providing recommendations for which stores Go Global should purchase and keep open following a successful bid. Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 10:19-11:3, 30:7-15.

**Response:** DOM admits this Go Global's contention and testimony.

43.    Gargiulo's analysis included a review of in-store and e-commerce sales. Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 95:24-96:24; Exhibit 3 (Gargiulo Dep. Tr.) at 30:7-20.

**Response:** DOM admits this Go Global's contention and testimony.

44.    Unlike the historical raw data, which Lazard provided to all potential bidders, Go Global's Financial Model resized the retail store fleet based on Gargiulo's recommendations, and outlined a growth strategy based upon Feuer's projections. *See* Peltz Decl. Exhibit 2 (Feuer Dep. Tr.) at 21:3-22:15, 84:6-19, 104:13-105:12, 122:10-123:3; Exhibit 3 (Gargiulo Dep. Tr.) at 31:4-12, 41:3-8.

**Response:** DOM cannot admit or deny that Go Global's contention that the Go Global's 95 store model "resized the retail store fleet" from BBBY's 95 store model. The phrase "resized" is undefined and ambiguous. DOM denies that Go Global's 95 store model outlined a "growth strategy." *See* Peltz Decl., Exhibit 13, Go Global's 95-store model.

45.    Go Global's Financial Model, which projected an increase in annual sales (Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 91:14-92:25; *see also* Exhibit 13 (Financial Model)), was predicated upon turning Baby "into a marketplace where [Go Global] would have been able to offer basically a much broader range of products than [Baby] was offering originally, by allowing

others to take advantage of the massive . . . customer traffic which was going to the online business." Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 93:13-18; *see also* Exhibit 3 (Gargiulo Dep. Tr.) at 38:1-3.

**Response:** DOM denies that Go Global's Financial Model projected an increase in annual sales. Go Global's 95-store model projected a decrease in net sales compared to BBBY's 95-store model. *See* Murphy Decl., Ex. AH, Hanover Report at 23.

46.     Ultimately, Go Global's Financial Model was "put together by a group of people who" "spent a lot of time analyzing [and] distilling what was analyzed into a plan of how to turn a business around that was usually underperforming" in order to create "a blueprint [of] what to do and how to do it, what to focus on and what to expect. And that is exactly what [Go Global] provided and put together there." Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 104:13-105:12; *see also* Exhibit 1 (Streader Dep Tr.) at 46:9-47:6.

**Response:** DOM admits that Go Global's 95-store model was originally prepared by Alix Partners, Baby's financial advisor, with minor modifications made by Go Global. *See* Peltz Decl., Exhibit 13, Go Global's 95-store model; Murphy Decl., Ex. AH, Hanover Report at 21-23; Murphy Decl., Ex. AK, BBBY's 95-store model. DOM admits that it is Go Global's contention that Go Global's 95 store model was "put together by a group of people who" "spent a lot of time analyzing [and] distilling what was analyzed into a plan of how to turn a business around that was usually underperforming" in order to create "a blueprint [of] what to do and how to do it, what to focus on and what to expect. And that is exactly what [Go Global] provided and put together there."

47.     In addition to financial projections and store recommendations, the Financial Model also contained information concerning Go Global's structure for a bid, including the amount of money Go Global anticipated proffering as a bid as well as the amount of capital Go Global

believed was necessary to operate the resulting business ("Bidding Strategy"). *See* Peltz Decl., Exhibit 13 (Financial Model); Exhibit 14 at DOM0002943-44.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

48.    Go Global initially anticipated placing a bid of approximately ▬▬▬, with another ▬▬▬ for working capital to operate the business. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 107:21-24, 108:5-8; Exhibit 14 at DOM0002943.

**Response:** Admitted.

49.    In addition, Go Global also developed confidential and proprietary information concerning Baby's technology stack transition and migration plan, which included implementing its proprietary technology playbook and cost-cutting measures ("Technology Plan").  *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 53:19-57:4.

**Response:** DOM admits this is Go Global's Contention. DOM denies that DOM received Go Global's technology plan. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 53:19-55:14 and 82:8-83:14. In addition, DOM denies that the Financial Model and Bidding Strategy, and Technology Plan constitute proprietary information. *See* Murphy Decl., Ex. AH, Hanover Report at 21-23.

50.    The Financial Model, Bidding Strategy, and Technology Plan comprise the Proprietary Information that Go Global provided to DOM. *See* Pelz Decl., Exhibit 41 (Streader Aff.) at ¶ 16.

**Response:** DOM denies that DOM received Go Global's technology plan. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 53:19-55:14 and 82:8-83:14. In addition, DOM denies that the

Financial Model and Bidding Strategy, and Technology Plan constitute proprietary information. *See* Murphy Decl., Ex. AH, Hanover Report at 21.

51.     Go Global dedicated approximately 1,755 hours developing the Proprietary Information. *See* Pelz Decl., Exhibit 41 (Streader Aff.) at ¶ 17.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

52.     The value of Go Global's Proprietary Information, based upon capital investment and labor, is approximately $1,545,813. *See* Peltz Decl., Exhibit 15 (Go Global Expert Damages Report) at 14.

**Response:** DOM denies the value of Go Global's Proprietary Information, based upon capital investment and labor, is approximately $1,545,813. *See* Murphy Decl., Ex. AH, Hanover Report at 35.

53.     Go Global's Proprietary Information is not publicly available. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 39:13-20; Exhibit 4 (Chau Dep. Tr.) at 31:12-22; Exhibit 41 (Streader Aff.) at ¶ 19.

**Response:** DOM admits this is Go Global's Contention. DOM denies that it received proprietary information from Go Global. *See* Murphy Decl., Ex. AH, Hanover Report at 21-23. DOM does not have knowledge or information to rely upon to provide a basis to deny the remaining allegations in this contention.

54.     Go Global and its employees and agents treated the Proprietary Information as confidential trade secret information. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 39:13-20; Exhibit 4 (Chau Dep. Tr.) at 31:12-22; Exhibit 9 (Lauster Dep. Tr.) at 15:4-9, 30:24-31:11; Exhibit 41 (Streader Aff.) at ¶ 16.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

55.     No other company employs the same proprietary methods, analysis, or combination of formulas as Go Global. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 83:15-84:1; Exhibit 2 (Feuer Dep. Tr.) at 56:7-10.

**Response:** Denied. DOM refers to the similar BBBY 95-store model.  *See* Peltz Decl., Exhibit 13, Go Global's 95-store model; Murphy Decl., Ex. AK, BBBY's 95-store model; Murphy Decl., Ex. AH, Hanover Report at 21-23.

56.     Go Global used its Proprietary Information to help it structure a bid as part of a competitive bankruptcy auction against rival businesses. *See* Exhibit 41 (Streader Aff.) at ¶¶ 13-15, 23.

**Response:** DOM denies that the Bidding Strategy constituted Proprietary Information. *See* Murphy Decl., Ex. AH, Hanover Report at 21.

57.     Plaintiff retained Ankura Capital Advisors, LLC ("Ankura") to assist Plaintiff in raising investment capital and structuring Plaintiff's bid and financial model for the upcoming bankruptcy auction. *See* Peltz Decl., Exhibit 9 (Lauster Dep. Tr.) at 12:18-13:2.

**Response:** Admitted.

58.     Go Global stored its Proprietary Information inside a password protected Data Room ("Go Global Data Room") administered by Ankura. *See* Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 56:7-10; Exhibit 9 (Lauster Dep. Tr.) at 23:3-7.

**Response:** DOM admits that information was stored in the Go Global Data Room. DOM denies that that this information was proprietary. *See* Murphy Decl., Ex. AH, Hanover Report at 21.

59.     Because the Baby Bankruptcy Auction was a competition among industry rivals for valuable assets, Go Global was concerned about sharing its Proprietary Information with investors or auction competitors. *See* Peltz Decl., Exhibit 31 (Streader Aff.) at ¶¶ 23, 38.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

60.     Go Global did not share its Proprietary Information with a potential investor or partner unless Go Global obtained a signed non-disclosure agreement to protect its information. *See* Peltz Decl., Exhibit 41 (Streader Aff.) at ¶ 41; Exhibit 1 (Streader Dep. Tr.) at 32:13-33:21; Exhibit 4 (Yuen Dep. Tr.) at 31:12-22; Exhibit 3 (Gargiulo Dep. Tr.) at 15:12-16:4.

**Response:** DOM denies that Go Global's information was proprietary. *See* Murphy Decl., Ex. AH, Hanover Report at 21. DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny the remaining allegations in this contention.

## IV.     <u>LAZARD INTRODUCED DOM TO GO GLOBAL.</u>

61.     On June 9, 2023, Christian Tempke, a managing director at Lazard Freres & Co. LLC ("Lazard"), emailed Go Global's managing director Christian Feuer to introduce him to Dream on Me, Inc.'s Milan Gandhi ("Gandhi"). Peltz Delc., Exhibit 16 at DOM0010726.

**Response:** Admitted.

62.     The purpose of the introduction was to explore a potential partnership between Go Global and DOM for a joint bid for Baby's Bankruptcy Assets. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 31:10-14; 61:2-14; Exhibit 5 (Srour Dep. Tr.) at 24:2-17; Exhibit 9 (Lauster Dep. Tr.) at 36:9-22.

**Response:** Admitted.

63.     The prospective Go Global-DOM partnership was presented to Go Global as a pragmatic joining of Go Global's due diligence, modeling, and operational experience with DOM's capital. *See* Peltz Decl., Exhibit 41 (Streader Aff.) at ¶¶ 28-36; Exhibit 1 (Streader Dep. Tr.) at 61:2-14; Exhibit 9 (Lauster Dep. Tr.) at 36:9-22; Exhibit 3 (Gargiulo Dep. Tr.) at 18:24-19:12; Exhibit 4 (Chau Dep. Tr.) at 34:7-35:5.

**Response:** DOM denies that the prospective Go Global-DOM partnership was presented to Go Global as a pragmatic joining of Go Global's due diligence, modeling, and operational experience with DOM's capital. Up until the June 15, 2023 meeting, DOM had been under the impression that Go Global would be investing their own capital along with DOM since the Go Global Model clearly reflected that Go Global would be contributing ███████████████ *See* Peltz Decl., Exhibit 13 (Go Global's 95-store model); Exhibit 6 (Dahiya Dep. Tr.) at 87:24-88:8. DOM was only interested in investing if they were a general partner involved in the day-to-day operation. *Id.*, Exhibit 5 (Srour Dep. Tr.) at 36:10 – 38:11; Exhibit 6 (Dahiya Dep. Tr.) at 128:23 – 131:3; Exhibit 1 (Streader Dep. Tr.) at 28:12-29:5.

64.     DOM knew that Go Global had invested resources in furtherance of developing a bid for Baby's Bankruptcy Assets. *See* Peltz Decl., Exhibit 5, (Srour Dep. Tr.) at 116:19-117:6.

**Response:** Admitted.

65.     DOM communicated to Go Global that it was interested in joining Go Global as a limited partner investor. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 61:2-14; Exhibit 4 (Chau Dep. Tr.) at 26:8-13, 29:4-20.

**Response:** DOM denies that DOM communicated to Go Global that it was interested in joining Go Global as a limited partner investor. Up until the June 15, 2023 meeting, DOM had been under the impression that Go Global would be investing their own capital along with DOM

19

since the Go Global Model clearly reflected that Go Global would be contributing ███████ ████. *See* Peltz Decl., Exhibit 13 (Go Global's 95-store model); Exhibit 6 (Dahiya Dep. Tr.) at 87:24-88:8. DOM was only interested in investing if they were a general partner involved in the day-to-day operation. *Id.*, Exhibit 5 (Srour Dep. Tr.) at 36:10 – 38:11; Exhibit 6 (Dahiya Dep. Tr.) at 128:23 – 131:3; Exhibit 1 (Streader Dep. Tr.) at 28:12-29:5.

66.     On June 9, 2023, following receipt of Tempke's email, Feuer responded by proposing a meeting with Gandhi for June 10, 2023. Peltz Decl., Exhibit 16 at DOM0010726.

**Response:** Admitted.

67.     On June 10, 2023, Gandhi responded to Feuer's email that he would be happy to speak with Feuer, and added DOM owner, Mark Srour, and DOM's Chief Marketing Officer, Avish Dahiya ("Dahiya"), to the email chain to coordinate their availability for a meeting. Peltz Decl., Exhibit 16 at DOM0010726.

**Response:** Admitted.

68.     In response to Gandhi's email, Feuer replied that he was available in the afternoon to meet, and also attached a copy of Go Global's Non-Disclosure Agreement ("NDA") for DOM's review. Peltz Decl., Exhibit 17 at GG-0009434.

**Response:** Admitted.

69.     Dahiya advised that he would return an executed copy of the NDA in advance of the meeting with Feuer. Peltz Decl., Exhibit 17 at GG-009434.

**Response:** Admitted.

70.     Go Global wanted Defendants to sign an NDA because they understood that Defendants represented a potential competitor to Go Global in the Baby Bankruptcy auction. *See*

Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 35:12-22; Exhibit 2 (Feuer Dep. Tr.) at 63:7-23; Exhibit 41 (Streader Affidavit) at ¶ 38.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

71.    Specifically, as pertains to Defendants, Plaintiff was concerned that Defendants would use Go Global and its Proprietary Information as a launching pad for Defendants' independent bid without Go Global. Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at. 35:12-22.

**Response:** DOM denies that Go Global's information was proprietary. *See* Hanover Report at 21. DOM admits that it is Go Global's Contention that Plaintiff was concerned that Defendants would use Go Global and its Proprietary Information as a launching pad for Defendants' independent bid without Go Global.

72.    DOM's Dahiya, who signed the NDA on behalf of DOM, understood that the purpose of the NDA was to enable Go Global to safely share its Proprietary Information with DOM for the purposes of discussing a potential joint partnership. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 62:19-24, 65:3-17, 66:20-67:7; Exhibit 18 (NDA) at ¶ 1.

**Response:** DOM denies that Go Global's information was proprietary. *See* Hanover Report at 21. DOM admits the remaining allegations in this contention.

73.    The NDA defines "Proprietary Information" as "information concerning [BBBY] . . . information concerning [Go Global] . . . and all information derived therefrom including without limitation, **trade secrets (under state law and the Defend Trade Secrets Act)**, know-how, summaries, notes, processes, ideas, contracts, other technical, business, financial, customer, and product development plans, forecasts, strategies, customer lists and data, financial information, employee information, pricing data, sales data, intellectual property of any nature,

21

marketing plans, website designs, internet marketing or sales practices or strategies, and records containing or otherwise reflecting such information." Peltz Decl., Exhibit 18 (NDA) at ¶ 9 (emphasis added).

**Response:** DOM admits this is a quote from the NDA.

74.    The NDA requires DOM to "hold in confidence and not disclose, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose, the Proprietary Information or any portion thereof." Peltz Decl., Exhibit 18 (NDA) at ¶ 3.

**Response:** DOM admits this is a quote from the NDA.

75.    The NDA also limits DOM's scope of use of the Proprietary Information to include solely "the evaluation of [Baby], any Transaction, the terms of any Transaction and any investment vehicle or fund established by [Go] Global, in connection with a potential investment, or any other business with [Baby]. The disclosure of the Proprietary Information does not confer upon [DOM] any license, interest or rights of any kind in or to the Proprietary Information." Peltz Decl., Exhibit 18 (NDA) at ¶ 2.

**Response:** DOM admits this is a quote from the NDA.

76.    The NDA prohibited DOM from "directly or indirectly, solicit[ing], encourag[ing], negotiat[ing], or discuss[ing] with [Baby], or enter[ing] into any agreement, understanding or commitment regarding a possible transaction, sale, merger, combination, consolidation, joint venture, partnership, recapitalization, restructuring, refinancing or other disposition of all or any material part of [Baby] or its subsidiaries or any of [Baby's] or its subsidiaries' assets or issued or unissued capital stock other than involving the potential Transaction with [Go] Global, and only then with knowledge and express consent of [Go] Global ("Non-Circumvention Obligation"). The

Non-Circumvention Obligation set forth herein shall terminate only upon written notice by Global of termination of discussions with [Baby] regarding the Transaction or [DOM] believes in good faith that such potential Transaction has terminated." Peltz Decl., Exhibit 18 (NDA) at ¶ 12.

**Response:** DOM admits this is a quote from the NDA.

77.     Dahiya executes nondisclosure agreements as part of his routine business practice on behalf of DOM, and has done so numerous times. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 66:5-15, 81:24-82:8.

**Response:** Denied. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 29:9-21; Exhibit 6 (Dahiya Dep. Tr.) at 59:10-61:7

78.     On June 10, 2023, Dahiya returned an executed copy of the NDA to Go Global. Peltz Decl., Exhibit 17 at GG-009434; *see also* Exhibit 6 (Dahiya Dep. Tr.) at 57:15-58:21.

**Response:** Admitted.

79.     Dahiya signed the NDA on behalf of Dream on Me, Inc./DOM Family (DOM) in his capacity as DOM's Chief Marketing Officer and Chief Technology Officer. Peltz Decl., Exhibit 18 (NDA) at GG-0008794.

**Response:** DOM admits that Avish Dahiya signed the NDA on behalf of Dream on Me, Inc./DOM Family (DOM) in his capacity as DOM's Chief Marketing Officer and Chief Technology Officer. DOM denies that Mr. Daiyha had authority to sign the NDA. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 29:9-21; Exhibit 6 (Dahiya Dep. Tr.) at 59:10-61:7.

80.     On June 10, 2023, Abhishek Pathania, a senior associate at Ankura, transmitted the fully executed copy of the NDA to DOM. Peltz Decl., Exhibit 17 at GG-009434.

**Response:** Admitted.

81.     Following delivery of the fully executed NDA, Kathleen Lauster ("Lauster") held a brief introductory Zoom meeting with Srour, Dahiya, and Gandhi. Peltz Decl., Exhibit 9 (Lauster Dep. Tr.) at 30:9-31:11; Exhibit 19 at GG-009422.

**Response:** Admitted.

82.     Among other things, one purpose of the introductory zoom meeting was to confirm that, before granting DOM access to Go Global's Data Room, DOM would not submit its own bid, separate from Go Global, to compete with Go Global in the Baby Bankruptcy Auction. Peltz Decl., Exhibit 9 (Lauster Dep. Tr.) at 30:9-31:11; Exhibit 19 at GG-009422.

**Response:** DOM denies that DOM stated it would not submit its own bid, separate from Go Global, to compete with Go Global in the Baby Bankruptcy Auction. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 104:12-105:8; Exhibit 6 (Dahiya Dep. Tr.) at 134:7-135:9.

83.     During the June 10, 2023, Zoom between Lauster, Srour, Dahiya, and Gandhi, DOM disclosed that DOM was too far behind in its due diligence to participate in the Bankruptcy Auction without a partner such as Go Global. *See* Peltz Decl., Exhibit 9 (Lauster Dep. Tr.) at 36:9-22, 37:18-38:5.

**Response:** DOM denies that DOM disclosed that DOM was too far behind in its due diligence to participate in the Bankruptcy Auction without a partner such as Go Global. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 104:12-105:8; Exhibit 6 (Dahiya Dep. Tr.) at 134:7-135:9.

84.     DOM also communicated to Go Global that DOM lacked the necessary retail experience to operate brick and mortar retail stores, had not conducted due diligence on the information contained in the Lazard data room, and therefore would not do a deal unless they had "a partner with retail knowledge," such as Go Global. Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 63:12-23; *see also* Exhibit 2 (Feuer Dep. Tr.) at 50:17-51:6; Exhibit 3 (Gargiulo Dep. Tr.) at 17:21-

18:13, 18:25-19:12; Exhibit 9 (Lauster Dep. Tr.) at 36:9-22, 37:18-38:5; *see also* Exhibit 20 at GG-0013000 ("[DOM] clearly stated that they are not bidding without us").

**Response:** DOM denies that DOM disclosed that DOM was too far behind in its due diligence to participate in the Bankruptcy Auction without a partner such as Go Global. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 104:12-105:8; Exhibit 6 (Dahiya Dep. Tr.) at 134:7-135:9.

85.    According to DOM, the Baby historical data available to them in the Lazard Data Room was complicated, voluminous, and constantly changing. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 52:25-53:18, 82:22-83:9; Exhibit 7 (Gandhi Dep. Tr.) at 89:22-90:10.

**Response:** Admitted.

86.    This challenge was further compounded by the fact that DOM was understaffed and without the appropriate expertise or resources to work on such a large and complicated project. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 73:4-23.

**Response:** DOM admits that Avish Dahiya testified that DOM was short on resources. DOM denies the remaining allegations in this contention.

87.    DOM is a baby furniture manufacturer that makes products such as cribs, bedrails, strollers and walkers, and many other baby-related products. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 43:24-44:6; Exhibit 6 (Dahiya Dep. Tr.) at 28:19-29:17; Exhibit 7 (Gandhi Dep. Tr.) at 16:19-17:3; Exhibit 43 (Answer) at ¶ 60.

**Response:** Admitted.

88.    DOM does not operate, or have experience operating, retail stores. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 41:14-16; Exhibit 6 (Dahiya Dep. Tr.) at 29:18-21, 32:7-14; Exhibit 7 (Gandhi Dep. Tr.) at 17:4-7, 28:16-20; Exhibit 3 (Gargiulo Dep. Tr.) at 18:24-19:12.

**Response:** DOM admits it does not operate, or have experience operating, retail stores. However, DOM has experience in retail. Additionally, DOM's CEO and manager, Mark Srour had experience owning and operating five retail stores. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 12:2-18, 41:14-16; Exhibit 6 (Dahiya Dep. Tr.) at 29:18-21, 32:7-14; Exhibit 7 (Gandhi Dep. Tr.) at 17:4-7, 28:16-20.

89.     In particular, although DOM sought to purchase and operate brick and mortar retail stores, DOM had no prior experience doing so. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 41:15-42:12; Exhibit 6 (Dahiya Dep. Tr.) at 29:18-30:10.

**Response:** DOM admits it sought to purchase and operate brick and mortar retail stores. However, DOM denies that its employees had no prior experience doing so. However, employees of DOM had experience operating brick and mortar retail stores. DOM's CEO and manager, Mark Srour had experience owning and operating five retail stores. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 12:2-18; Exhibit 6 (Dahiya Dep. Tr.) at 29:18-30:10.

90.     DOM's core project team consisted of only four people, including Mark Srour, Avish Dahiya, Milan Gandhi, and Amit Malhotra, none of whom had experience with Section 363 bankruptcy proceedings, brand resuscitation, or retail store management or operations. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 25:24-26:4, 73:11-16.

**Response:** DOM admits its core project team consisted of four people, including Mark Srour, Avish Dahiya, Milan Gandhi, and Amit Malhotra none of whom had experience with Section 363 bankruptcy proceedings. However, DOM denies that none of them had experience with retail store management or operations. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 12:2-18. Additionally, DOM worked with its supply chain team on the Baby project. *See* Peltz Decl.,

(NDA) at ¶¶ 2-3, 12; *see also* Exhibit 1 (Streader Dep. Tr.) at 35:12-22; Exhibit 2 (Feuer Dep. Tr.) at 54:17-23, 55:12-19.

      **Response:** DOM denies that DOM represented that it would not pursue an independent bid for Baby's Bankruptcy Assets without Go Global. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 104:12-105:8; Exhibit 6 (Dahiya Dep. Tr.) at 134:7-135:9. DOM denies that that this information was proprietary. *See* Murphy Dec., Ex. AH, Hanover Report at 21. DOM refers to the NDA for its terms. *See* Peltz Decl., Exhibit 18 (NDA)

      95.    DOM did not have access to any of Go Global's Proprietary Information, including Go Global's Financial Model or Bidding Strategy, before it received access to Go Global's Data Room on June 10, 2023. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 85:17-88:22.

      **Response:** DOM admits it did not have access to Go Global's Financial Model or Bidding Strategy, before it received access to Go Global's Data Room on June 10, 2023. However, DOM had access to the Lazard data room which contained a similar version of Go Global's Financial Model. *See* Peltz Decl., Exhibit 13, Go Global's 95-store model; Murphy Dec., Ex. AH, Hanover Report at 21-23; Murphy Dec., Ex. AK, BBBY's 95-store model.

      96.    Go Global did not share any of its Proprietary Information with DOM until DOM signed Go Global's NDA. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 85:17-88:22; *see also* Exhibit 2 (Feuer Dep. Tr.) at 55:12-19; Exhibit 3 (Gargiulo Dep. Tr.) at 15:24-16:4.

**Response:** DOM denies that that this information was proprietary. *See* Murphy Dec., Ex. AH, Hanover Report at 21. DOM admits the remaining allegations in this contention.

      97.    Go Global was perceived by DOM as the potential bidder with the highest chance of winning the Baby Bankruptcy Auction. Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 204:13-17; *see also* Exhibit 8 (Malhotra Dep. Tr.) at 188:5-18; Exhibit 9 (Lauster Dep. Tr.) at 56:24-57:12.

(NDA) at ¶¶ 2-3, 12; *see also* Exhibit 1 (Streader Dep. Tr.) at 35:12-22; Exhibit 2 (Feuer Dep. Tr.) at 54:17-23, 55:12-19.

**Response:** DOM denies that DOM represented that it would not pursue an independent bid for Baby's Bankruptcy Assets without Go Global. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 104:12-105:8; Exhibit 6 (Dahiya Dep. Tr.) at 134:7-135:9. DOM denies that that this information was proprietary. *See* Murphy Dec., Ex. AH, Hanover Report at 21. DOM refers to the NDA for its terms. *See* Peltz Decl., Exhibit 18 (NDA)

95.    DOM did not have access to any of Go Global's Proprietary Information, including Go Global's Financial Model or Bidding Strategy, before it received access to Go Global's Data Room on June 10, 2023. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 85:17-88:22.

**Response:** DOM admits it did not have access to Go Global's Financial Model or Bidding Strategy, before it received access to Go Global's Data Room on June 10, 2023. However, DOM had access to the Lazard data room which contained a similar version of Go Global's Financial Model. *See* Peltz Decl., Exhibit 13, Go Global's 95-store model; Murphy Dec., Ex. AH, Hanover Report at 21-23; Murphy Dec., Ex. AK, BBBY's 95-store model.

96.    Go Global did not share any of its Proprietary Information with DOM until DOM signed Go Global's NDA. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 85:17-88:22; *see also* Exhibit 2 (Feuer Dep. Tr.) at 55:12-19; Exhibit 3 (Gargiulo Dep. Tr.) at 15:24-16:4.

**Response:**  DOM denies that that this information was proprietary. *See* Murphy Dec., Ex. AH, Hanover Report at 21. DOM admits the remaining allegations in this contention.

97.    Go Global was perceived by DOM as the potential bidder with the highest chance of winning the Baby Bankruptcy Auction. Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 204:13-17; *see also* Exhibit 8 (Malhotra Dep. Tr.) at 188:5-18; Exhibit 9 (Lauster Dep. Tr.) at 56:24-57:12.

**Response:** Admitted.

98.     DOM's Dahiya downloaded and saved the entire contents of the Go Global Data Room, including Go Global's Financial Model and Bidding Strategy. Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 89:23-90:5, 116:18-117:2.

**Response:** DOM admits that it downloaded the contents of the Go Global Data Room, including Go Global's 95 Store model.

99.     Dahiya also distributed Go Global's Financial Model and Bidding Strategy to Srour, Gandhi, and Malhotra. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 89:17-22; Exhibit 14 at DOM0002943.

**Response: Response:** DOM admits that Stour, Gandhi, Dahiya and Maholtra had access to the contents of the Go Global Data Room, including Go Global's 95 Store model.

100.     The Go Global Data Room included (1) all financial data related to BBBY; (2) Go Global's annotated versions of BBBY data; (3) Go Global's proprietary forecasts, financial models, and strategic operating plans that Go Global had prepared in anticipation of making a bid for BBBY's assets; and (4) valuable customer data that Go Global had secured at its own cost and negotiation. *See* Peltz Decl. Exhibit 2 (Feuer Dep. Tr.) at 104:13-105:12; Exhibit 9 (Lauster Dep. Tr.) at 55:8-22.

**Response:** DOM denies that the record supports that the Global Data Room included (1) all financial data related to BBBY; (2) Go Global's annotated versions of BBBY data; (3) Go Global's proprietary forecasts, financial models, and strategic operating plans that Go Global had prepared in anticipation of making a bid for BBBY's assets; and (4) valuable customer data that Go Global had secured at its own cost and negotiation. DOM denies that the Global Data Room included valuable customer data that Go Global had secured at its own cost and negotiation. *See*

Peltz Decl., Exhibit 13, Go Global's 95-store model; Murphy Dec., Ex. AH, Hanover Report at 21-23; Murphy Dec., Ex. AK, BBBY's 95-store model.

101.    On June 12, 2023, representatives from DOM, including M. Srour, J. Srour, Dahiya, and Gandhi, joined representatives from Go Global and Ankura, including Christian Feuer, Deborah Gargiulo, Kathleen Lauster, and Matthew Lapish for a dinner meeting to discuss the potential DOM-Go Global joint partnership (the "June 12 Meeting"). Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 90:10-25; Exhibit 9 (Lauster Dep. Tr.) at 34:14-35:8; Exhibit 2 (Feuer Dep. Tr.) at 49:23-50:16; Exhibit 3 (Gargiulo Dep. Tr.) at 17:16-25.

**Response:** Admitted.

102.    On June 15, 2023, Go Global representatives Feuer and Gargiulo, and Ankura representatives Lauster and Lapish, met with DOM representatives M. Srour, J. Srour, Dahiya, and Gandhi at DOM's New Jersey offices to continue discussing DOM joining Go Global's group of capital investors (the "June 15 Meeting").  *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 40:22-41:14; Exhibit 3 (Gargiulo Dep. Tr.) at 17:11-15; Exhibit 9 (Lauster Dep. Tr.) at 39:8-17; Exhibit 5 (Srour Dep. Tr.) at 83:17-19.

**Response:** DOM admits that to June 15, 2023, Go Global representatives Feuer and Gargiulo, and Ankura representatives Lauster and Lapish, met with DOM representatives M. Srour, J. Srour, Dahiya, and Gandhi at DOM's New Jersey offices to continue discuss Baby (the "June 15 Meeting"). DOM denies that DOM met with Go Global to discuss joining Go Global's group of capital investors. DOM had been under the impression that Go Global would be investing their own capital along with DOM since the Go Global Model clearly reflected that Go Global would be contributing ███████████████. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 87:24-88:8, 32:7-14; Exhibit 13 (Go Global's 95-store model). DOM was only interested in investing if

they were a general partner involved in the day-to-day operation. *Id.* Exhibit 5 (Srour Dep. Tr.) at 36:10 – 38:11; Exhibit 6 (Dahiya Dep. Tr.) at 128:23 – 131:3; Exhibit 1 (Streader Dep. Tr.) at 28:12-29:5.

103.    Streader and Chau also remotely participated in the June 15 Meeting via Zoom. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 40:22-41:11; Exhibit 4 (Chau Dep. Tr.) at 34:4-22.

**Response:** Admitted.

104.    During the June 15 Meeting, DOM's owner, Mark Srour, offered to pay for the "legwork" that Go Global had performed to date. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 113:3-13.

**Response:** DOM admits that Mr. Srour indicated that he would be happy to pay for half of the "legwork" in the context of a potential partnership.

105.    Unbeknownst to Go Global, DOM secretly recorded the June 15 Meeting. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 94:9-96:22; Exhibit 6 (Dahiya Dep. Tr.) at 124:16-126:2.

**Response:** DOM admits that the conference room where the June 15 meeting takes place has a surveillance system that records activity inside the conference room.

106.    DOM never disclosed to Go Global that DOM recorded the June 15 Meeting. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 97:9-21; Exhibit 6 (Dahiya Dep. Tr.) at 126:13-127:5.

**Response:** Admitted.

107.    DOM admits that it was surreptitiously reviewing the June 15 Meeting audio-video footage in real time, and used this information in the course of the June 15 Meeting and afterwards. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 94:14-96:5, 97:22-98:12; Exhibit 6 (Dahiya Dep. Tr.) at 125:2-126:23.

**Response:** DOM admits that it reviewed the June 15 Meeting audio-video footage in real time. DOM denies that the citation supports Go Global's contention that DOM used this information in the course of the June 15 Meeting and afterwards. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 94:14-96:5, 97:22-98:12; Exhibit 6 (Dahiya Dep. Tr.) at 125:2-126:23.

108.    In addition to recording its conversations with Go Global, DOM also recorded Go Global's private discussions during the course of the June 15 Meeting. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 86:1-6; Exhibit 5 (Srour Dep. Tr.) at 94:14-96:5.

**Response:** DOM admits that the conference room where the June 15 meeting takes place has a surveillance system that records all activity inside the conference room.

109.    At various points during the June 15 Meeting, DOM left Go Global alone so that Go Global could hold private, internal discussions about their negotiations with DOM. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 86:1-7.

**Response:** DOM denies that the citation supports the contention that DOM left Go Global alone so that Go Global could hold private, internal discussions about their negotiations with DOM. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 86:1-7.

110.    Go Global was concerned about DOM listening to their conversation, and therefore took precautions such as closing the door to the conference room, and lowering the volume on the computer so that the virtual attendees (Streader and Chau) could speak without being overheard outside of the room. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 86:1-23 (Lauster: "No, nobody is in the room. Matthew is shutting the door so we can talk freely. We believe we can talk freely"), 104:11-14 (Gargiulo: "I'm just saying. I'm suspicious of them hearing us." Lauster: "I mean, that's a good point, they could be listening to us right now. They're outside –")

**Response:** Admitted.

111.    During the private discussion, Go Global representatives spoke about the amount of equity they believed they needed to "stand up" the Baby business, as well as the amount Go Global anticipated bidding. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 92:14-17, 93:14-18.

**Response:** DOM denies that the citation supports the contention that during the private discussion, Go Global representatives spoke about the amount of equity they believed they needed to "stand up" the Baby business, as well as the amount Go Global anticipated bidding. DOM admits that Go Global representatives spoke about making an offer during that conversations. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 92:14-17, 93:14-18.

112.    DOM would subsequently reference Go Global's discussion in internal text messages as they attempted to circumvent Go Global in the Bankruptcy Auction. *Compare* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 93:14-18 ("[F]rom a pricing perspective, I think what we discussed makes sense . . . making an offer of something, like ███████████ or something around that"), *with* Exhibit 22 at DOM0010096 ("We know [Go Global is considering] somewhere between ███████████ . . . for going concern").

**Response:** DOM denies that the citation supports the contention that DOM attempted to circumvent Go Global in the Bankruptcy Auction. *Compare* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 93:14-18 ("[F]rom a pricing perspective, I think what we discussed makes sense . . . making an offer of something, like ███████████ or something around that"), *with* Exhibit 22 at DOM0010096 ("We know [Go Global is considering] somewhere between ███████████ . . . for going concern").

113.    Go Global representatives also discussed the need for them to submit a bid deposit by the next day, June 16, 2023, and the status of their capital structure as it related to the deposit requirement. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 97:24-98:19.

**Response:** Admitted.

114.    In particular, Go Global's Feuer stated that they would need either DOM or another entity to satisfy the deposit requirement. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 99:12-19. These statements provided DOM with further insight into the status of Go Global's capital structure and Go Global's capability to succeed in the bankruptcy auction. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 97:24-99:19.

**Response:** DOM admits that Go Global's Feuer stated that they would need either DOM or another entity to satisfy the deposit requirement. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 99:12-19. DOM denies that the citation supports the contention that these statements provided DOM with further insight into the status of Go Global's capital structure and Go Global's capability to succeed in the bankruptcy auction. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 97:24-99:19.

115.    During the June 15 Meeting, Go Global explained to DOM that Go Global's business structure for the new company entailed Go Global earning sponsor, diligence, and management fees. *See* Peltz Decl. Exhibit 1 (Streader Dep. Tr.) at 22:24-23:7; Exhibit 3 (Gargiulo Dep. Tr.) 24:16-25:15.

**Response:** Admitted.

116.    In particular, Go Global's fee structure involved Go Global earning a 2 percent management fee based on the purchase price of the assets. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) 24:16-25:15; Exhibit 5 (Srour Dep. Tr.) at 112:25-114:4.

**Response:** Admitted.

117.    Go Global's management fees were a sticking point for DOM during the June 15 Meeting because DOM wanted to participate in the management of the business and earn potential fees or other financial compensation for its contribution to the new company's success. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 203:3-11; Exhibit 21 (June 15 Meeting Tr.) at 53:8-22.

**Response:** Admitted.

118.    Ultimately, Go Global and DOM did not reach an agreement regarding a potential joint partnership. *See* Peltz Decl., Exhibit 22 at DOM0010096 (Dahiya: "We are going solo").

**Response:** Admitted.

## V.    DOM MISAPPROPRIATED GO GLOBAL'S PROPRIETARY INFORMATION.

119.    Unbeknownst to Go Global, on June 14, 2023, DOM owner, Mark Srour, disclosed, via e-mail, Go Global's Financial Model to other prospective DOM co-investors Michael Tennyson ("Tennyson") and Gary Mason ("Mason"). Peltz Decl., Exhibit 23 at DOM0002969; *see also* Exhibit 5 (Srour Dep. Tr.) at 53:8-55:22.

**Response:** Admitted.

120.    On June 14, 2023, Srour e-mailed Tennyson and Mason in order to convince them to invest with DOM, writing: "Mike. Look in to it. It's a great investment." Peltz Decl., Exhibit 24 at DOM0002995; *see also* Exhibit 5 (Srour Dep. Tr.) at 61:10-18.

**Response:** Admitted**.** This e-mail was sent on June 14, 2023, prior to the meeting on June 15, 2023, at a time when DOM was still considering a partnership with Go Global. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 93:10-94:14127:22-134:10; Exhibit 5 (Srour Dep. Tr.) at 102:15-25.

121.    Neither Tennyson nor Mason are DOM employees or agents. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 54:5-8.

**Response:** DOM admits that Tennyson and Mason were potential investors/sources of capital.

122.    On June 14, 2023, Srour likewise disclosed Go Global's Financial Model to Scott Englander ("Englander") and Joseph "Yussy" Friedland ("Friedland"). Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 65:11-13.

**Response:** Admitted**.** June 14, 2023 was prior to the meeting on June 15, 2023,  at a time when DOM was still considering a partnership with Go Global. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 93:10-94:14127:22-134:10; Exhibit 5 (Srour Dep. Tr.) at 102:15-25.

123.    On June 14, 2023, Srour wrote to Friedland concerning the Bankruptcy Auction and potential bid to purchase Baby's Assets that Srour was "going in heavy in to this investment. [T]hat's my business for the last 43 years. Will like you to come in with me." Peltz Decl., Exhibit 25 at DOM0003028.

**Response:** Admitted**.** June 14, 2023 was prior to the meeting on June 15, 2023,  at a time when DOM was still considering a partnership with Go Global. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 93:10-94:14127:22-134:10; Exhibit 5 (Srour Dep. Tr.) at 102:15-25.

124.    Srour also held conversations with Englander and Friedland concerning the Go Global Financial Model. Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 65:14-17.

**Response:** DOM admits that Mr. Srour testified that he discussed Go Global's 95 store model with Englander and Friedland.

125.    Srour told Englander that, based upon the Go Global Financial Model, the opportunity to purchase Baby's Assets was a good deal. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 71:14-25.

**Response:** Admitted.

126.    Neither Englander, nor Friedland, are DOM employees or agents. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 63:16-64:9.

**Response:** DOM admits that Englander and Friedland were potential investors/sources of capital.

127.    Englander furthermore disclosed Plaintiff's Financial Model to Jacob Sod ("Sod"). *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 72:22-24, 197:6-11.

**Response:** Admitted.

128.    Sod is not an employee or agent of DOM. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 72:6-21, Exhibit 6 (Dahiya Dep. Tr.) at 118:21-23.

**Response:** DOM admits that Sod was a potential investors/sources of capital.

129.    After receiving and discussing Plaintiff's Financial Model, Englander, Friedland and Sod all invested with Defendants, contributing $2 million, $8 million, and $20 million, respectively. *See* Peltz Decl., Exhibit 5 (Srour. Dep. Tr.) at 66:9-16, 205:22-206:5, 206:6-9.

**Response:** DOM admits Mr. Srour testified that Englander, Fried and Sod were prepared to invest the listed amounts. *See* Peltz Decl., Exhibit 5 (Srour. Dep. Tr.) at 66:9-16, 205:22-206:5, 206:6-9.

130.    DOM additionally used Go Global's Proprietary Information as a benchmark to assist with and accelerate DOM's due diligence and development of work product in relation to structuring a bid for the Baby Bankruptcy Assets. *See* Peltz Decl., Exhibit 26 at DOM0010953;

Exhibit 27 at DOM0018444; Exhibit 28 at DOM0018452; *see also* Exhibit 4 (Chau Dep. Tr.) at 43:14-44:9.

**Response:** DOM denies that the citation supports the contention that DOM used Go Global's Proprietary Information as a benchmark to assist with and accelerate DOM's due diligence and development of work product in relation to structuring a bid for the Baby Bankruptcy Assets. *See* Peltz Decl., Exhibit 26 at DOM0010953; Exhibit 27 at DOM0018444; Exhibit 28 at DOM0018452; *see also* Exhibit 4 (Chau Dep. Tr.) at 43:14-44:9. DOM further denies that that this information was proprietary. *See* Murphy Dec., Ex. AH, Hanover Report at 21.

131.    On June 19, 2023, Dahiya sent an e-mail with the subject line "BBB Go Forward Plan we can use" to Srour and Gandhi, which attached sales forecasts, store recommendations, and growth strategies, while noting that "these documents are about 90% of the plan Go Global was going forward with." DOM0010953.

**Response:** DOM admits that on June 19, 2023, Dahiya sent an e-mail with the subject line "BBB Go Forward Plan we can use" to Srour and Gandhi, which attached Baby sales forecasts, store recommendations, and growth strategies from the Lazard Data Room, while noting that "these documents are about 90% of the plan Go Global was going forward with." DOM0010953.

132.    On August 1, 2023, Amit Malhotra sent an e-mail to Srour and Dahiya with the subject line "buybuybBaby Launch / Integrated Tech Plan & Budget Outlay," which attached a document titled "Technology Roadmap." *See* Peltz Decl., Exhibit 27 at DOM0018444; Exhibit 28 at DOM0018445-52.

**Response:** Admitted.

133.    DOM's Technology Roadmap contains a slide detailing how DOM arrived at its plan, which included "review[ing] goglobal's tech and product plan . . . reviewing [Go Global's]

tech stack, partners and risk on DOM" in order to "understand how [Go Global] think[s]." Peltz Decl., Exhibit 28 at DOM0018452.

**Response:** DOM admits that there is a Technology Roadmap document. *See* Peltz Decl., Exhibit 28 at DOM0018452.

134.    DOM's technology specialist, Amit Malhotra ("Malhotra") was interested in learning more about Go Global's Technology Plan, and requested meetings with Go Global's technology specialist, Thoryn Stephens ("Stephens"), to extract additional information. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 24:9-25:5, 68:4-19; 76:25-79:14; Exhibit 29 at DOM0003098; Exhibit 30 at GG-0008935.

**Response:** DOM admits that Mr. Maholtra had a conversation with Thoryn Stephens and discussed certain areas of the due diligence, but the subsequent meetings did not occur. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 37:8-39:7; 176:2-21.

135.    Malhotra requested information from Stephens concerning the technology budget, information and systems migration, cybersecurity, and vendor contracts. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 37:23-39:3; Exhibit 30 at GG-0008935-36.

**Response:** DOM admits that Mr. Maholtra had a conversation with Thoryn Stephens and discussed certain areas of the due diligence, but the subsequent meetings did not occur. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 37:8-39:7; 176:2-21.

136.    Through Malhotra, DOM learned about the due diligence and other work Go Global had performed related to Baby's technology. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 61:10-62:5.

**Response:** DOM admits that Malhotra, DOM learned about some of the due diligence and other work Go Global had performed related to Baby's technology. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 61:10-62:5. However, DOM denies learning about Go Global's proprietary technology plan. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 53:19-55:18; *See* Murphy Decl., Ex. AJ, Go Global E-mails.

137.    Malhotra admits that Go Global was further along in their analysis of Baby's technology than DOM. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 44:5-11.

**Response:** Admitted.

138.    Malhotra further admits that Go Global had spent more time speaking with Baby's technology "vendors like Oracle, Infosys, all the vendors that buybuy BABY was working with. Go Global spent more time with them." Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) 44:5-20.

**Response:** Admitted.

139.    In contrast to Go Global's efforts related to Baby and BedBath's technology, DOM had not spent much time speaking with Baby's technology vendors. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 44:12-20.

**Response:** Admitted.

140.    DOM was late in commencing work related to the Bankruptcy Auction to review information, assemble a plan, and structure a bid for the Baby Bankruptcy Assets. Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 40:21-41:2.

**Response:** DOM admits that Mr. Dahiya testified that they started working on the "proper bid" in late May or early June which he characterized as "quite late." Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 40:21-41:2.

141.    On June 12, 2023, DOM's Malhotra emailed Go Global to request whether it would "be possible to connect me with the [Go Global] technology team so we can get on a call, to get a little deeper." Peltz Decl., Exhibit 30 at GG-008935.

**Response:** Admitted

142.    In response, DOM's Malhotra and Go Global's Stephens had a meeting on June 13, 2023. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 60:13-61:9.

**Response:** Admitted.

143.    During this meeting, Stephens told Malhotra about the conversations Stephens was having with Baby, BedBath, and the Baby/BedBath technology vendors, including Go Global's view on the technology migration plan. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 61:24-25 ("[Stephens was] telling me, ok, this is how we're thinking about [Baby's technology]"); *see also* Exhibit 8 (Malhotra Dep. Tr.) at 68:13-19, 74:2-12.

**Response:** DOM admits that during this meeting, Stephens told Malhotra about the conversations Stephens was having with Baby, BedBath, and the Baby/BedBath technology vendors. However, Malhotra did not see Go Global's technology migration plan. *See* Peltz Decl., Exhibit 8 (Malhotra Dep. Tr.) at 61:24-25 ("[Stephens was] telling me, ok, this is how we're thinking about [Baby's technology]"); *see also* Exhibit 8 (Malhotra Dep. Tr.) at 68:13-19, 74:2-12.

144.    At the time DOM and Go Global initiated discussions regarding a joint bid, DOM was behind in its work to conduct due diligence, prepare a financial model, and develop work product related to structuring a bid for the Baby Bankruptcy Assets. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 142:14-16, 154:17-21; Exhibit 7 (Gandhi Dep. Tr.) at 28:8-15; Exhibit 22 at DOM0010096 (A. Dahiya: "Without go global our chances reduce as we are 4 weeks behind.").

**Response:** Admitted.

145.    At the time DOM and Go Global initiated discussions regarding a joint bid, DOM had conducted minimal to no due diligence and developed no work product to assist with their work related to the bid, including an "investment model" and "deal sheet[s]." *See* Peltz Decl., Exhibit 31 at DOM0011714-15; *see also* Exhibit 6 (Dahiya Dep. Tr.) at 156:23-157:5.

**Response:** DOM admits that at the time DOM and Go Global initiated discussions regarding a joint bid, DOM had conducted minimal due diligence and did not develop an "investment model" and "deal sheet[s]." DOM denies that the citation supports Go Global's content that DOM had conducted no due diligence and developed no work product to assist with their work related to the bid. *See* Peltz Decl., Exhibit 31 at DOM0011714-15; *see also* Exhibit 6 (Dahiya Dep. Tr.) at 156:23-157:5.

146.    DOM admits that it had the opportunity but failed to review data and information in the Lazard Data Room concerning "HR, Legal, leases, stores, finance and budgets, [and] planning," that "[e]very other bidder [had] done more extensive work," and that DOM "[l]ack[ed] proper internal teams/professionals" and were "shooting in the dark with no internal capabilities to help." Peltz Decl., Exhibit 31 at DOM0011714-15.

**Response:** DOM denies that the email admits that DOM had the opportunity but failed to review data and information in the Lazard Data Room concerning "HR, Legal, leases, stores, finance and budgets, [and] planning." DOM admits that the email exists and refers to it for its full contents. *See* Peltz Decl., Exhibit 31 at DOM0011714-15.

147.    DOM similarly did not have the expertise or staffing capabilities to assist with structuring the bid. *See* Peltz Decl., Exhibit 31 at DOM0011714; *see also* Exhibit 6 (Dahiya Dep. Tr.) at 150:11-16, 160:12-16, 160:20-23, 163:4-9, 163:15-21.

**Response:** DOM admits that on June 23, 2023, Dahiya wrote that DOM currently did not have the expertise or staffing capabilities to assist with structuring the bid. *See* Peltz Decl., Exhibit 31 at DOM0011714; *see also* Exhibit 6 (Dahiya Dep. Tr.) at 150:11-16, 160:12-16, 160:20-23, 163:4-9, 163:15-21.

148.    DOM admits that it had no idea how to run the resulting business it was attempting to purchase out of bankruptcy. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 159:23-160:4; Exhibit 31 at DOM0011714-15.

**Response:** DOM admits that on June 23, 2023, Dahiya wrote that at the time DOM had no idea how to run the resulting business it was attempting to purchase out of bankruptcy. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 159:23-160:4; Exhibit 31 at DOM0011714-15.

149.    On June 23, 2023, Dahiya, who had been spearheading the Baby Project with Srour, wrote and sent an internal e-mail to Gandhi and Srour, in which he admits that there were questions about whether DOM had completed, or was capable of performing, its own work related to structuring a bid (the "June 23 E-mail"). *See* Peltz Decl., Exhibit 31 at DOM0011714-15.

**Response:** Admitted. DOM refers to the subject e-mail for its full contents. *See* Peltz Decl., Exhibit 31 at DOM0011714-15.

150.    In the June 23 E-mail, Dahiya discussed how DOM was struggling to put together a viable plan to run the resulting business (DOM0011714 ("can we even do this?")) after Lazard, the banker in charge of the Baby Bankruptcy Auction, "challenged [DOM's] due diligence and understanding of running this business" and furthermore questioned if DOM knew "what it will take to run the business cash flow positively and if our numbers were matching the ask." Peltz Decl., Exhibit 31 at DOM0011714

**Response:** Admitted. DOM refers to the subject e-mail for its full contents. *See* Peltz Decl., Exhibit 31 at DOM0011714-15.

151.    In the June 23 E-mail, Dahiya also concedes that DOM did "not know much about other areas to validate transition," had only reviewed "BBB Team data and did not do any due diligence on the Data in the [Lazard] Data room," was "shooting in the dark with no internal capabilities to help" and that "[e]very other bidder has done more extensive work." Peltz Decl., Exhibit 31 at DOM0011714.

**Response:** Admitted. DOM refers to the subject e-mail for its full contents. *See* Peltz Decl., Exhibit 31 at DOM0011714-15.

152.    In the June 23 E-mail, Dahiya additionally admits that DOM had "been sharing information . . . and exposing [DOM] in the process." Peltz Decl., Exhibit 31 at DOM0011715.

**Response:** Admitted. DOM refers to the subject e-mail for its full contents. *See* Peltz Decl., Exhibit 31 at DOM0011714-15.

## VI.    <u>GO GLOBAL BRIEFLY EXITED AND THEN IMMEDIATELY RE-ENTERED THE AUCTION PROCESS.</u>

153.    On June 26, 2023, Streader made the decision to withdraw Go Global from the auction process. *See* Peltz Decl., Exhibit 32 at GG-0034333.

**Response:** Admitted.

154.    However, that same day, Streader received encouragement from Lazard to remain in the auction, and reversed the decision to withdraw. *See* Peltz Decl., Exhibit 33 at GG-0034330; *see also* Exhibit 3 (Gargiulo Dep. Tr.) at 54:19-55:10.

**Response:** Admitted.

155.    Throughout the auction process, Go Global was widely perceived to be the preferred bidder. *See* Peltz Decl., Exhibit 9 (Lauster Dep. Tr.) at 53:3-21; Exhibit 21 (June 15 Meeting Tr.) at 204:13-17.

**Response:** Admitted.

156.    Go Global ultimately continued to structure a bid for Baby's Bankruptcy Assets through July. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 54:19-55:2.

**Response:** Admitted.

## VII.    DOM SUBMITTED A BID WITHOUT GO GLOBAL.

157.    According to DOM's CEO and owner, Mark Srour, DOM was always going to submit a bid for the Bankruptcy Assets, with or without Go Global. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 39:25-40:8, 104:12-18, 105:5-8; Exhibit 6 (Dahiya Dep. Tr.) at 135:6-9.

**Response:** Admitted.

158.    On or around June 15, 2023, DOM made the decision to move forward with a bid without Go Global. *See* Peltz Decl., Exhibit 21 (June 15 Meeting Tr.) at 201:1-7.

**Response:** Admitted.

159.    DOM did not inform Go Global that it was going to participate in the Bankruptcy Auction without Go Global, nor did DOM obtain oral or written consent from Go Global to do so. Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 168:6-169:11; Exhibit 6 (Dahiya Dep. Tr.) at 176:10-16.

**Response:** Admitted.

160.    On June 16, 2023, Go Global submitted a draft bid for the Baby Bankruptcy Assets to Lazard. *See* Peltz Decl., Exhibit 34 at GG-0008707; *see also* Exhibit 1 (Streader Dep. Tr.) at 64:7-9; Exhibit 2 (Feuer Dep. Tr.) at 70:14-24; Exhibit 3 (Gargiulo Dep. Tr.) at 31:15-16.

**Response:** Admitted.

161.    On June 28, 2023, DOM submitted a successful solo bid of $15.5 million for the Baby IP. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 50:24-51:4; Exhibit 10 (July 11 Bankruptcy Order); Exhibit 35 at DOM0014035; Exhibit 43 (Answer) at ¶ 105.

**Response:** Admitted.

## VIII.    GO GLOBAL CONTINUED TO PURSUE BID FOR ENTIRE BABY BUSINESS.

162.    Despite DOM's $15.5 million successful bid for Baby's IP on June 28, 2023, Go Global still had an opportunity to purchase the entire Baby business, including Baby's IP as a going concern. *See* Peltz Decl., Exhibit 11 (June 29 Bankruptcy Notice) at DOM004313-14; Exhibit 36 at GG-0048828; *see also* Exhibit 1 (Streader Dep. Tr.) at 70:21-24, 78:6-9, 97:24-98:3; Exhibit 3 (Gargiulo Dep. Tr.) at 49:13-50:4, 51:9-22.

**Response:** Admitted.

163.    The auction for Baby's IP was separate from the auction for Baby's Going Concern. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 49:25-50:4; Exhibit 36 at GG-0048828.

**Response:** Admitted.

164.    The auction for Baby's Going-Concern, originally scheduled for June 29, 2023, the day after the auction for the Baby IP, was moved to July 7, 2023. *See* Peltz Decl., Exhibit 11 (June 29 Bankruptcy Order) at DOM004313; Exhibit 36 at GG-0048828.

**Response:** Admitted.

165.    Lazard, as the banker in charge of the Baby Bankruptcy Auction, preferred to be able to sell the entire business to a single purchaser. *See* Peltz Decl., Exhibit 33 at GG-0034330; *see also* Exhibit 3 (Gargiulo Dep. Tr.) at 49:13-50:4.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

166.    Lazard also encouraged Go Global to remain in the auction process. *See* Peltz Decl., Exhibit 33 at GG-0034330; *see also* Exhibit 3 (Gargiulo Dep. Tr.) at 54:19-55:10.

**Response:** Admitted.

167.    Accordingly, Go Global continued to pursue structuring a bid for Baby's Bankruptcy Assets even after DOM had placed its bid for the Baby IP. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 70:21-24, 78:6-9, 97:24-98:3; Exhibit 3 (Gargiulo Dep. Tr.) at 49:13-50:4, 51:9-11.

**Response:** Admitted.

168.    However, Go Global had to reassess its bid structure to account for DOM's $15.5 million valuation of the Baby IP, which was now incorporated into any valuation of the bid Go Global would make for the going concern. *See* Peltz Decl., Exhibit 36 at GG-0048828; *see also* Exhibit 1 (Streader Dep. Tr.) at 71:3-18; Exhibit 3 (Gargiulo Dep. Tr.) at 50:25-51:4.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

169.    Around the same time that the Baby Bankruptcy Auction was occurring, Baby's parent, BedBath, was also selling other assets, including BedBath's intellectual property. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 48:17-49:24.

**Response:** Admitted.

170.    Overstock.com purchased the BedBath IP for approximately $21.5 million ("BedBath IP"). *See* Peltz Decl., Exhibit 37 (June 21 Bankruptcy Order) at 14.

**Response:** Admitted.

171.    However, Overstock.com's purchase price of $21.5 million was a relatively low amount that surprised the market and Go Global. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 37:11-20, 49:6-12, 50:5-14.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

172.    Go Global had originally valued BedBath's IP at between approximately ███████ ████, and Baby's IP at around ██████████ *See* Peltz Decl., Exhibit 34 at GG-0008707; Exhibit 41 (Streader Aff.) at ¶ 56.

**Response:** Admitted.

173.    As BedBath's subsidiary, a lower valuation for Bedbath's IP would result in a commensurate decrease in any valuation for Baby's IP. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 48:14-49:24.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

174.    Before Overstock.com bid on the BedBath IP, Go Global had valued a bid for the Baby IP at ██████████. *See* Peltz Decl., Exhibit 34 at GG-0008707; *see also* Exhibit 4 (Chau Dep. Tr.) at 103:18-105:3.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

175.    After Overstock.com bid on the BedBath IP, Go Global was "concerned" that "such a low bid" would mean "that the IP would go for even less on the Buy Buy Baby side. So it took the value out of it." Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 49:6-12.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

176.    DOM's owner, Mark Srour, saw the purchase of Baby as an opportunity he was not going to let slip by. Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 202:5-21, 203:19-204:4.

**Response:** Admitted.

177.    The Baby IP Auction occurred on June 28, 2023. *See* Peltz Decl., Exhibit 35.

**Response:** Admitted.

178.    DOM attended the Baby IP Auction at the New York offices of the law firm Kirland & Ellis LLP. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 178:19-21; Exhibit 11 (June 29 Bankruptcy Order) at DOM0004314.

**Response:** Admitted.

179.    At the Baby IP Auction, Srour had no ceiling for how much he would bid to win the assets. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 202:5-21.

**Response:** DOM admits that Mr. Srour did not have a set bidding ceiling. DOM denies the citation supports the contention that Srour had "no" ceiling for how much he would bid to win the assets. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 202:5-21.

180.    Approximately six or seven other entities participated in the Baby IP Auction. *See* Peltz Decl., Exhibit 7 (Gandhi Dep. Tr.) at 110:2-13, 112:4-7.

**Response:** Admitted.

181.    In order to remain in the auction, DOM was required to continue beating the high bid. *See* Peltz Decl., Exhibit 7 (Gandhi Dep. Tr.) at 111:4-18.

**Response:** Admitted.

182.    Had DOM decided that they did not want to beat the present high bid, DOM would have been removed from the process. *See* Peltz Decl., Exhibit 7 (Gandhi Dep. Tr.) at 111:4-18.

**Response:** Admitted.

183.    The Baby IP Auction lasted for approximately three or four hours and saw multiple rounds of bidding. *See* Peltz Decl., Exhibit 7 (Gandhi Dep. Tr.) at 111:4-112:15.

**Response:** Admitted.

184.    DOM increased the maximum bid it would place as the Baby IP Auction proceeded. *See* Peltz Decl., Exhibit 35.

**Response:** Denied to the extent that it implies that DOM ever set a maximum bidding amount. DOM admits that Mr. Srour did not have a set bidding ceiling. DOM denies the citation supports the contention that Srour had "no" ceiling for how much he would bid to win the assets. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 202:5-21.

185.    During the Baby IP Auction, DOM authorized a maximum bid of $10.2 million. Peltz Decl., Exhibit 35 at DOM0013036.

**Response:** Denied to the extent that it implies that DOM ever set a maximum bidding amount. DOM admits that Mr. Srour did not have a set bidding ceiling. DOM denies the citation supports the contention that Srour had "no" ceiling for how much he would bid to win the assets. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 202:5-21.

186.    DOM subsequently exceeded this threshold, at one point placing a bid for $11 million, while also authorizing a new maximum bid of $20 million. Peltz Decl., Exhibit 35 at DOM0013036.

**Response:** DOM admits that it placed a bid for $11 million, while also authorizing a new maximum bid of $20 million. Peltz Decl., Exhibit 35 at DOM0013036.

187.    Srour ultimately paid $15.5 million for the Baby IP, and was willing to pay more. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 48:14-49:24; Exhibit 5 (Srour Dep. Tr.) at 202:5-21.

**Response:** Admitted

188.    DOM knew details about Go Global's anticipated bid, the amount it would pay for each of the intellectual property and going concern, and Go Global's projected costs to run the same, investment structure, and profits upon exit. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 202:22-203:2; Exhibit 6 (Dahiya Dep. Tr.) at 97:12-15, 107:21-108:11; Exhibit 23 at DOM0002969.

**Response:** Denied. DOM only had knowledge of Go Global's bidding strategy of June 15, 2023, and DOM did not have knowledge of Go Global's bidding strategy at the time of the auction or after the Overstock.com purchase of BB&B. *See* Peltz Decl., Exhibit 2 (Feuer Dep. Tr.) at 77:9-14; 84:6-19; 85:5-7. *See* Murphy Decl., Ex. AH, Hanover Report at 26; Ex. N, Activity Log.

189.    DOM knew that the Bankruptcy Auction for the Baby IP and the Baby Going Concern would occur on separate days, with the Baby IP auction occurring first. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 200:24-201:10.

**Response:** Admitted

190.    DOM also knew that Go Global was interested in purchasing Baby's entire business operation as a whole. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 28:9-15; Exhibit 6 (Dahiya Dep. Tr.) at 45:3-13.

**Response:** Admitted

191.    DOM had access to Go Global's Bidding Strategy, and the narration and thinking of the Go Global executives who were forming that strategy in real time. *See* Peltz Decl., Exhibit

5 (Srour Dep. Tr.) at 202:22-203:2; Exhibit 6 (Dahiya Dep. Tr.) at 107:9-108:11; Exhibit 14 at DOM0002943-44.

**Response:** DOM denies that it had access to Go Global's Bidding Strategy, and the narration and thinking of the Go Global executives who were forming that strategy in real time. DOM admits that Go Global informed DOM of a proposed bid for the 95-store model between June 10 and June 15, 2023. *See* Peltz Decl., Exhibit 13 (Go Global's 95-store model).

192.    DOM did not know Go Global's Bidding Strategy before signing the NDA. *See* Peltz Decl., Exhibit 6 (Dahiya Dep. Tr.) at 107:21-108:11.

**Response:** Admitted

193.    DOM utilized its knowledge of Go Global's Bidding Strategy to "box out" Go Global from making a bid at all. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 71:3-18.

**Response:** DOM denies the citation supports the contention that DOM utilized its knowledge of Go Global's Bidding Strategy to "box out" Go Global from making a bid at all. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 71:3-18. During the IP Auction, investment firm Ziff Davis, Inc. bid $15 million for the BBBY intellectual property, and DOM subsequently bid $15.5 million. *See* Ex. H, Dep. Trans. of Jeffrey Streader at 28:16-22. If DOM had not bid $15.5 million, then Ziff Davis would have won the IP auction.

194.    Specifically, in bidding $15.5 million for the Baby IP, DOM purposefully pegged that asset with a valuation that "artificially inflated where the overall acquisition in an ongoing purchase would have to be based upon the need for working capital in the business and for transition of technology and stand up of [the] new co[mpany]." Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 71:3-18; *see also* Exhibit 4 (Chau Dep. Tr.) at 103:6-105:3.

**Response:** DOM denies the citation supports the contention that in bidding $15.5 million for the Baby IP, DOM purposefully pegged that asset with a valuation that "artificially inflated where the overall acquisition in an ongoing purchase would have to be based upon the need for working capital in the business and for transition of technology and stand up of [the] new co[mpany]." Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 71:3-18; *see also* Exhibit 4 (Chau Dep. Tr.) at 103:6-105:3. During the IP Auction, investment firm Ziff Davis, Inc. bid $15 million for the BBBY intellectual property, and DOM subsequently bid $15.5 million. *See* Ex. H, Dep. Trans. of Jeffrey Streader at 28:16-22. If DOM had not bid $15.5 million, then Ziff Davis would have won the IP auction. Thus, the value was not artificially inflated but reflective of the market.

195. In other words, due to DOM's $15.5 million valuation, in order for Go Global to win Baby's business as a going concern, Go Global "would have to justify a higher bid to investors" for an asset that Go Global knew was overvalued based upon DOM's successful bid. Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 59:7-10; *see also* Exhibit 1 (Streader Dep. Tr.) at 68:15-69:10; 71:3-18, 97:24-98:14; Exhibit 3 (Gargiulo Dep. Tr.) at 50:24-51:4; Exhibit 4 (Chau Dep. Tr.) at 103:6-105:3.

**Response:** DOM denies the citation supports the contention that the asset was overvalued based upon DOM's successful bid. Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 59:7-10; *see also* Exhibit 1 (Streader Dep. Tr.) at 68:15-69:10; 71:3-18, 97:24-98:14; Exhibit 3 (Gargiulo Dep. Tr.) at 50:24-51:4; Exhibit 4 (Chau Dep. Tr.) at 103:6-105:3.

196. At the same time, the value of the Baby IP and Going Concern was consistently falling with each passing day because Baby was sustaining brand damage and selling out its inventory. *See* Peltz Decl., Exhibit 3 (Gargiulo Dep. Tr.) at 36:22-37:20, 42:12-43:16, 68:15-21; Exhibit 4 (Chau Dep. Tr.) at 103:6-105:3; Exhibit 6 (Dahiya Dep. Tr.) at 83:2-19.

**Response:** DOM admits this is Go Global's Contention. DOM does not have knowledge or information to rely upon to provide a basis to deny this contention.

197.    Ultimately, due to DOM's overvalued $15.5 million bid for the Baby IP, Go Global was not able to justify paying the inflated price for Baby's distressed assets as a going concern. *See* Peltz Decl., Exhibit 1 (Streader Dep. Tr.) at 68:15-69:10; 71:3-18, 97:24-98:14; Exhibit 2 (Feuer Dep. Tr.) at 76:2-23; Exhibit 3 (Gargiulo Dep. Tr.) at 46:12-14, 50:25-51:4, 59:6-10; Exhibit 4 (Chau Dep. Tr.) at 103:6-105:3.

**Response:** DOM denies that Go Global was not able to justify paying the inflated price for Baby's distressed assets as a going concern due to DOM's overvalued $15.5 million bid for the Baby IP.  Prior to DOM's $15.5 million bid, Go Global failed to submit a qualifying bid and Go Global failed to secure the necessary funding to complete the transaction.  *See* Murphy Decl., Ex. M, E-mail Exchange Between Go Global and Ankura; Ex. AH, Hanover Report at 24-25.

198.    DOM's bid for the Baby IP prevented Go Global from participating in the Baby Going Concern auction. *See* Peltz Decl., Exhibit 41 (Streader Aff.) at ¶¶ 54-60; *see also* Exhibit 2 (Streader Dep. Tr.) at 71:3-18; Exhibit 3 (Gargiulo Dep. Tr.) at 58:20-59:14.

**Response:** DOM denies that DOM's bid for the Baby IP prevented Go Global from participating in the Baby Going Concern auction. Prior to DOM's $15.5 million bid, Go Global failed to submit a qualifying bid and Go Global failed to secure the necessary funding to complete the transaction.  *See* Murphy Decl., Ex. M, E-mail Exchange Between Go Global and Ankura; Ex. AH, Hanover Report at 24-25.

199.    On July 11, 2023, the United States Bankruptcy Court for the District of New Jersey approved the sale of the Baby IP to DOM. *See* Peltz Decl., Exhibit 10 (July 11, 2023 Bankruptcy Order).

**Response:** Admitted.

200.    On July 18, 2023, Go Global sent DOM a pre-litigation demand letter. *See* Peltz Decl., Exhibit 38 at GG-0012966-67.

**Response:** Admitted.

201.    DOM purchased 11 leases for retail brick and mortar stores for $1.7 million on July 19, 2023. *See* Peltz Decl., Exhibit 5 (Srour Dep. Tr.) at 133:6-13; Exhibit 6 (Dahiya Dep. Tr.) at 176:3-5; Exhibit 43 (Answer) at ¶ 111.

**Response:** Admitted.

202.    On September 14, 2023, Go Global filed a Complaint against DOM in United States Federal District Court, Southern District of New York. *See* ECF 5.

**Response:** Admitted.

203.    On November 21, 2023, DOM filed its Motion to Dismiss Go Global's Complaint. *See* ECF 16.

**Response:** Admitted.

204.    Go Global then filed an Amended Complaint on December 22, 2023. *See* ECF at 29.

**Response:** Admitted.

205.    DOM filed its Motion to Dismiss Go Global's Amended Complaint on January 31, 2024. *See* ECF 30.

**Response:** Admitted.

206.    Go Global filed its Opposition to DOM's Motion to Dismiss the Amended Complaint on February 29, 2024. *See* ECF 33.

**Response:** Admitted.

207.    DOM filed its Reply Motion in Support of Defendants' Motion to Dismiss Go Global's Amended Complaint on March 15, 2024. *See* ECF 34.

**Response:** Admitted.

208.    The Court denied DOM's Motion to Dismiss Go Global's Amended Complaint on April 26, 2024. *See* ECF 42.

**Response:** Admitted.

209.    In or about October 2024, DOM's Baby operation announced that it would be closing its retail stores, and switching to an online-only model. *See* Peltz Decl., Exhibit 42.

**Response:** Admitted.

## DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS

1.    DOM is a New Jersey corporation operating as a designer, manufacturer, and supplier of baby products who was historically a large supplier to BBBY. *See* Declaration of Thomas K. Murphy III, Ex. A, Dep. Trans. of Avish Dahiya, at 28:12-21.

2.    In 2021 or early 2022, DOM initially had discussions with Bed Bath & Beyond Inc. ("BB&B") about acquiring BBBY or BBBY's assets. *Id.* at 33:17-36:27; Ex. B, Dep Trans. of Mark Srour, at 21:9-22:8.

### The Bankruptcy Filing and The Lazard Data Room

3.    Prior to its bankruptcy filing, BB&B engaged financial advisory firm, Lazard, Inc ("Lazard"), to solicit interest in a going-concern sale transaction. *Id.*, Ex. C, Declaration of Holly Etlin, at ¶73.

4.    In connection with marketing the BB&B assets, Lazard established a data room (the "Lazard Data Room") that was populated with a vast amount of Debtor documents,

including those containing BBBY's historical financial performance, future financial projections, models, corporate strategy, and other corporate information. *Id.*, Ex. D, Dep. Trans. of Deborah Gargiulo, at 19:13-21:3.

5.    At least thirty potential investors, including DOM and Go Global, executed non-disclosure agreements with Lazard that gave them access to the Lazard Data Room to conduct due diligence with DOM receiving access on May 6, 2023. *Id.*, Ex. A, Declaration of Holly Etlin, at ¶74.

6.    DOM reviewed the available information, including BBBY's 95-store model, and engaged Lazard in discussions regarding the information contained in the Lazard Data Room. *Id.*, Ex. E, E-mails Confirming Data Room Access; Ex. A, Dep. Trans. of Avish Dahiya, at 50:24-52:12; Ex. F, Dep. Trans. of Amit Maholtra at 34:23-35:15.

### Go Global Background and Purported Confidential Information

7.    Go Global retained Ankura Capital Advisors LLC ("Ankura") assist it in raising capital and structuring a going concern bid. Go Global's Rule 56.1 Statement of Facts ("SOF") at ¶ 57.

8.    In May 2023, Ankura Capital Advisors LLC ("Ankura") established a data room (the "Ankura Data Room") that was populated with certain documents – the vast majority of which were also contained in the Lazard Data Room. *Id.*, Ex. A, Dep. Trans. of Avish Dahiya, at 85:20–88:22.

9.    It is undisputed by Christian Feuer who was responsible for creating the vast majority of the Go Global Model that it was a manipulation of the BBBY Model and that it was changing often, almost daily during June 2023. *See id.*, Ex. G, Dep Trans. of Christian Feuer at 77:9-14; 84:6-19; 85:5-7.

**Go Global and DOM's Brief Relationship**

10.    Go Global and DOM were introduced by Lazard and engaged in discussions to potentially be involved in a group together to purchase BBBY for a grand total of six days from June 9, 2023 until June 15, 2023. *Id.*, Ex. H, Introductory E-mails.

11.    On Saturday, June 10, 2024, DOM and Go Global exchanged brief introductory emails in order to set up a call. *Id.* The discussions between Go Global and DOM were urgent because Lazard required that investors submit a bid by June 16, 2023 and a fully binding bid by June 19, 2023. *Id.*, Ex. I, E-mails re: Bid Deadlines.

12.    Unprompted and without context, on Saturday, June 10, 2024, Go Global submitted the NDA to DOM. *Id.*, Ex. H, Emails re: NDA. There were limited employees available to review the document since it was a Saturday, as Go Global's CEO and legal counsel both observe Shabbat. *Id.*, Ex. B, Dep. Trans. of Mark Srour, at 62:9-12; 164:10-15; Ex. A, Dep. Trans. of Avish Dahiya, at 60:2-5. A little over two hours after receiving it, Avish Dahiya, DOM's Chief Marketing Officer and Chief Technology Officer, returned the signed NDA. *Id.*, Ex. H, E-mails re: the NDA.

13.    Mr. Dahiya recalled "[Go Global] wanted us to sign an NDA urgently because they cannot talk to us till that NDA was signed." *Id.*, Ex. A, Dep. Trans. of Avish Dahiya, at 54:19-25.

14.    In fact, Mr. Dahiya did not have the authority to sign the NDA, and he admitted that he did not read the NDA before signing it. *Id.* at 59:14-17; 62:9-12; Ex. B, Dep. Trans. of Mark Srour, at 29:9-21.

15.    The NDA between Go Global and DOM sets forth non-disclosure and non-circumvention obligations, but the NDA specifically provides that its terms do not apply to "information that was already known" to DOM. *Id.*, Ex. J, the NDA at ¶¶4,9.

16.     On June 12, 2023 and June 15, 2023, key members of DOM and Go Global met in person to discuss jointly investing in BBBY. *Id.*, Ex. B, Dep. Trans. of Mark Srour, at 40:19 – 42:3, 53:10-15.

17.     Following these in-person meetings, no agreement could be made between DOM and Go Global because they had fundamental differences and could not agree upon an investment strategy, in part, because (a) Go Global was only interested in operating BBBY, but not investing its own capital in BBBY; (b) DOM was only interested in potential partners that would invest their own capital; and (c)  DOM was only interested in investing if they were a general partner involved in the day-to-day operation.  *Id.*, Ex. A, Dep. Trans. of Avish Dahiya, at 128:23 – 131:3, Ex. B, Dep. Trans. of Mark Srour, at 36:10 – 38:11; Ex. K, Jeffrey Streader Dep. Trans. at 28:12-29:5.

18.     Notably, up until the June 15, 2023 meeting, DOM had been under the impression that Go Global would be investing their own capital along with DOM since the Go Global Model clearly reflected that Go Global would be contributing █████████████ *Id.*, Ex. A, Dep. Trans. of Avish Dahiya, at 87:24-88:8; Ex. L, Go Global's 95-store model at 2.

19.     After the June 15, 2023 meeting, Go Global ceased communicating with DOM, but it continued to engage in discussions with other investors regarding the acquisition of BBBY. *Id.*, Ex. K, Dep. Trans. of Jeffrey Streader at 64:3-9; Ex. M, E-mail Exchange Between Go Global and Ankura.

**Impact and Timing of Overstock.com's Bid on Bed Bath and Beyond**

20.     Go Global's activity log demonstrates that DOM viewed Go Global's 95 store model between June 10 and June 14, 2023. *See* Declaration of Thomas K. Murphy III, Ex. N, Activity Log.

21.    On June 22, 2023, Overstock.com, Inc. was selected as the Successful Bidder of Bed Bath & Beyond Inc. *See* Declaration of Thomas K. Murphy III, Ex. O, Order.

22.    According to Go Global, the Overstock bid price changed the landscape of the BBBY bid and potentially devalued the BBBY bid on the market. *Id.*, Ex. D, Dep. Trans. of Deborah Gargiulo at 49:2-50:14.

### Go Global's Subsequent Efforts to Obtain BBBY Without DOM And the IP Auction

23.    On June 16, 2023, the day after Go Global last met with DOM, Go Global made a ███████████████████████ without DOM to acquire BBBY as ███████████████████ Of the ██████████ approximately ██████████ was attributed to the BBBY intellectual property. *Id.*, Ex. P, Draft Bid.

24.    Go Global's bid, however, was determined not to be a qualifying bid as Go Global had not firmly established that it had secured the necessary funding to complete the transaction. *Id.*, Ex. M, E-mail Exchange Between Go Global and Ankura.

25.    After failing to submit a qualifying bid, Go Global sent an e-mail to Lazard on June 26, 2023 advising that it was withdrawing from the bidding process. *Id.*, Ex. Q, Withdrawal E-mail.

26.    Notwithstanding that email, Go Global continued to have discussions with investors regarding a potential investment, including with Axar Capital Management LP ("Axar") among other potential investors. *Id.*, Ex. R, Go Global E-mails; Ex. S, Go Global E-mails, Ex. K, Dep. Trans. of Jeffrey Streader at 70:12-24.

27.    However, as of June 27, 2023, Go Global was aware that it did not have the financing in place to make an offer, and Jeffrey Streader, Go Global's founder and CEO, wrote in

an email that "[i]f the auction is tomorrow or this week – we are not going to participate." *Id.*, Ex.
R, Emails between Go Global and Lazard.

28.     Ultimately, it is undisputed that Go Global did not submit a qualifying bid. *See id.*,
Ex. G, Dep. Trans. Christian Feuer at 115:9-116:18.

29.     The dates of the auctions related to the Section 363 sale of BBBY kept changing,
but ultimately the IP Auction to be held on June 28, 2023, independent of any going concern assets.
*Id.*, Ex. T, Order Approving the Auction; Ex. U, Notice of Cancellation.

30.     Notably, Go Global did not attend nor participate in the IP Auction. Ex. K, Dep.
Trans. of Jeffrey Streader at 29:3-5. During the IP Auction, investment firm Ziff Davis, Inc. bid
$15 million for the BBBY intellectual property, and DOM subsequently bid $15.5 million which
ended up being the winning bid. *Id.*, Ex. K, Dep. Trans. of Jeffrey Streader at 28:16-22.

31.     DOM bid at the IP auction even though Avish Dayiha admitted on June 23, 2023
that it was behind on due diligence. *See id.*, Ex. V, DOM E-mail.

32.     Notwithstanding that Go Global did not attend the IP Auction and Go Global's prior
statement of withdrawing from the process, Go Global continued to seek funding to acquire the
Baby intellectual property and certain store leases even after the IP auction.  *Id.*, Ex. W, Go Global
Email Exchange.

33.     Ultimately, Go Global's efforts to cobble together investors failed again, and, on
July 7, 2023, Go Global wrote, "[o]ur pencils are down."  *Id.*, Ex. X, Go Global Email Exchange.

34.     DOM's bid was approved by the Bankruptcy Court, and it acquired the BBBY's
intellectual property for $15.5 million. *Id.*, Ex. Y, Order Approving Asset Sale.

35.     On July 19, 2023, the Debtors conducted an auction for certain BBBY store leases.
Again, Go Global did not participate in that auction.  *Id.*, Ex. Z, Notice of Successful Bidder.

36.    At the Lease Auction, DOM successfully bid on the leases for 11 Baby stores. *Id.* At no time did Go Global and DOM ever discuss an 11-store model, and, in fact, Go Global never created a model that was for less than 22 stores. *Id.*, Ex. AA, Go Global's 22-Store Model and Ex. D, Dep. Trans. Deborah Gargiulio at 43:6-20.

**DOM's Model**

37.    BBBY prepared a 50 and 75 door model for DOM after DOM won the IP auction, and DOM forwarded those models to Yosef Moskowitz of Slate Equities to prepare DOM's own model. *Id.*, Ex. AB, Email Forwarding Models.

38.    Mr. Moskowitz worked directly with BBBY and Alix Partners, to prepare a wholly unique model for BBBY. *Id.*, Ex. AC, Emails with BBBY and Mr. Moskowitz.

39.    Go Global has not alleged that Mr. Moskowitz viewed Go Global's 95-store model nor that his model was derived from Go Global's 95-store model, and after several working sessions with BBBY and Alix Partners, Mr. Moskowitz ultimately created an 11-store model that DOM used as the basis for its business. *Id.*, Ex. AD, 11-Store Model.

40.    As clearly reflected in email communications, DOM requested that BBBY pare down their 50 store model to a list of 12 to 15 stores. *See id.*, Ex. AE, Emails Regarding Stores.

41.    Patty Wu, BBBY's former CEO, created a 14 store regional store model which DOM in part relied upon when purchasing the 11 stores. *Id.*

**Go Global's Case Study**

42.    In late July, following the IP Auction and the Lease Auction, Go Global prepared a case study to explain to its investors why it passed on the opportunity to acquire BBBY or any of its assets. *Id.*, Ex. AF, Go Global Case Study.

43.     In the Case Study, Go Global explained why it ultimately passed on the Baby

opportunity:



*Id.*

44.     The Case Study was authored by Yuen Chau who testified that the statement

above in bold was accurate. *See id.*, Ex. AG, Dep Trans of Yuen Chau at 102:18-103:5.

**DOM's Expert Report of Adam Hanover**

45.     The BBBY 95 Store Model, the Go Global 95 Store Model, and the Schachter

Model all projected e-commerce would account for over 64% of total net sales.  *See id.,* Ex. AH,

Hanover Report at 21.

46.     Accordingly, functioning IT systems are critical to achieving those sales. Go Global

prepared a technology plan, which is referred to as its "secret sauce" but there is no evidence that

it was ever provided to DOM. *Id.* at 22.

47.    Accordingly, whatever the alleged trade secrets were, they did not include Go Global's technology plan. Interestingly, the BBBY 95 Store Model and the Go Global 95 Store Model both projected an ▮▮▮▮▮▮ "IT Transformation" costs in the first year of the projection period. *Id.*

48.    Putting aside the relevance of the Go Global 95 Store Model, to the extent that that model contained any trade secrets, those secrets would have to be the ***modifications*** that Go Global made to the Debtors' model. *Id.*

49.    And, DOM also had access to the unmodified BBBY 95 Store Model. Accordingly, to discern those modifications, and by definition, any alleged trade secrets, I compared the Go Global 95 Store to the BBBY' 95 Store Model. Id. The following figure is a comparison of those two models.



50. As shown in the comparison, Go Global's modifications to the BBBY 95 Store Model were not significant. *Id.* at 23.

51. Again, whatever the alleged trade secrets were is simply not apparent, nor is it apparent why the alleged trade secrets are different from any of the information contained in the Lazard Data Room. *Id.* at 23.

**GREENBAUM, ROWE, SMITH & DAVIS LLP**

Attorneys for Defendants,
Dream On Me Industries, Inc. and
Dream on Me, Inc.


By:    *s/ Thomas K. Murphy III*

    Thomas K. Murphy III, Esq.

Dated: January 9, 2025