# EXHIBIT C

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF HOLLY ETLIN, CHIEF**
**RESTRUCTURING OFFICER AND CHIEF FINANCIAL**
**OFFICER OF BED BATH & BEYOND INC., IN SUPPORT**
**THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Holly Etlin, hereby declare under penalty of perjury:

---

[1]    The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of
the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the
website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.   The
location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these
Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

1.      I am the Chief Restructuring Officer and Chief Financial Officer at Bed Bath & Beyond, Inc. and I have served as CFO since February 7, 2023, and was recently appointed CRO. I am also a Partner & Managing Director of the financial advisor to the Debtors, AlixPartners, LLP ("AlixPartners"), where I have worked since 2007.  I have more than 30 years of experience in providing turnaround services for companies in the retail industry and have frequently been appointed as Interim CEO, Interim CFO and Chief Restructuring Officer of these businesses.  I am admitted to the American College of Bankruptcy and the International Insolvency Institute and am a Certified Turnaround Professional (CTP) and Certified Insolvency Reorganization Advisor (CIRA).  I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      I submit this declaration to provide an overview of the Debtors' business and these chapter 11 cases (the "Chapter 11 Cases") and First Day Motions (as defined herein) filed by the Debtors.  In addition, **Exhibit A** addresses the First Day Motions (as defined herein) and **Exhibit B** is a structure chart reflecting an overview of the Debtors' corporate organization.  On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  To minimize the adverse effects on their business and facilitate a "smooth landing" in the Chapter 11 Cases, the Debtors also filed motions seeking certain "first day" relief (the "First Day Motions").

3.      Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my experience, knowledge, and familiarity with the Debtors' business and operations.  I am over the age of 18, and if called upon to testify, I would testify competently to the facts set forth in this declaration.

*     *     *     *     *

4.      At its peak, Bed Bath & Beyond operated the largest home furnishing retailer in the United States with over 970 stores across all 50 states, consistently at the forefront of major home and bath trends.  Operating stores spanning the United States, Canada, Mexico, and Puerto Rico, Bed Bath & Beyond offers everything from bed linens to cookware to electric appliances, home organization, baby care, and more.

5.      The past twelve months have undoubtedly been the most difficult and turbulent in Bed Bath & Beyond's storied history.  From "meme stock" mania to credit agreement defaults and back again, the Company explored all potentially value-maximizing alternatives in an effort to turn around its business and stave off chapter 11.  All of this has come on the heels of the retail apocalypse and global pandemic that has permanently changed consumer behavior as the world knows it.

6.      In response to both macroeconomic factors and more specific business challenges for Bed Bath & Beyond, current leadership formulated and attempted to implement a turnaround plan that was designed to refocus the business on its founding principles and restore consumer confidence in this iconic retail giant.

7.      Defying all expectations over the past four months, Bed Bath & Beyond secured credit agreement waivers and amendments and was able to access the equity markets in February and March in a last-ditch effort to avoid bankruptcy.  But, in-store sales continued to decline—with fourth quarter sales falling by almost $1 billion dollars year over year—and strained vendor credit relationships which led to a lack of inventory.  And notwithstanding painstaking, creative, and exhaustive efforts to right the ship along the way, Bed Bath & Beyond is simply

unable to service its funded debt obligations while simultaneously supplying sufficient inventory to its store locations. All of which necessitates the filing of these chapter 11 cases.

8. Bed Bath & Beyond closed over 430 locations across the United States and Canada before filing these chapter 11 cases, implementing full scale winddowns of their Canadian business and the Harmon branded stores. While the commencement of a full chain wind-down is necessitated by economic realities, Bed Bath & Beyond has and will continue to market their businesses as a going-concern, including the buybuy Baby business. Bed Bath & Beyond has pulled off long shot transactions several times in the last six months, so nobody should think Bed Bath & Beyond will not be able to do so again. To the contrary, Bed Bath & Beyond and its professionals will make every effort to salvage all or a portion of operations for the benefit of all stakeholders.

9. To facilitate this process, Bed Bath & Beyond secured $40 million in new money debtor-in-possession financing. Moreover, Bed Bath & Beyond has filed a motion to establish procedures to govern an efficient, public, and flexible auction process to realize the full value of existing assets. Bed Bath & Beyond has likewise proposed procedures to govern a wind-down process for all of its assets, including of the liquidation of inventory in all retail stores and distribution centers. Bed Bath & Beyond believes the framework and roadmap of these combined procedures will best maximize value for all stakeholders.

*　　*　　*　　*　　*

## I.     From Humble Beginnings.

10.    The Bed Bath & Beyond story originates
with Lenny and Warren—two retailing icons whose last
names need no mention in the world of specialty home
furnishing.   As friends and executives at the struggling
American discount chain Arlans in the 1960s, Leonard
Feinstein and Warren Eisenberg saw what others did not.



There was an impending department store shakeout and a window of opportunity into specialty

retailing that was, in their view, ripe for the taking.  "It was the beginning of the designer approach

to linens and housewares," Lenny reflected.[2]  This prescient sense of a looming and seismic shift

in retailing trends towards specialty stores led Lenny and Warren to resign their senior posts at

Arlans and bet big on themselves.  In 1971, with an investment of $50,000 each, a small chain of

specialty linen and bath shops known as Bed 'n Bath was born.  The philosophy was simple:  offer

name brands at a discount.  With one store in Springfield, New Jersey, near where Warren lived

and another store in Cedarhurst, New York, closer to where Lenny resided, the two friends

embarked on a more than 50-year long journey to develop the ultimate American titan in

specialty retail.

11.    Beginning in the 70's and continuing through the 80's, Warren and Lenny rode the

wave of American consumerism and new retail economics.  The stores were initially small—about

2,500 square feet—and sold towels, linens, bedding, and bath accessories.  An increase in the

supply of regional malls, super-regional malls, power centers, and strip centers triggered a shift

from solely urban retail to suburban retail.  And by 1985, Bed 'n Bath had expanded to 11 stores

---

[2]    *Bed Bath & Beyond Inc.* – Company Profile, Information, Business Description, History, Background Information
on Bed Bath & Beyond Inc., REFERENCE FOR BUSINESS, https://www.referenceforbusiness.com/history2/22/Bed-
Bath-Beyond-Inc.html.

spanning New York, New Jersey, Connecticut, and California. A wave of competition followed, as Bed 'n Bath had, at that point, set the stage for a surge of similar bed and bath specialty retailers—including Linens 'n Things, Pacific Linen, and Luxury Linens. Nevertheless, Warren and Lenny were able to adapt Bed 'n Bath to stay ahead of their competition. In 1985, Bed 'n Bath opened its first superstore, paving the road for other American big-box retailers to follow suit. The new superstore, a 20,000-square-foot outlet, offered wide-ranging inventory options and low prices across a litany of product lines, standing in stark contrast with the select offerings of department store chains. Lenny and Warren recognized that consumers preferred a wider range of merchandise at comparably low prices. Most other independent retailers either followed the department store merchandising approaches or the merchandising styles fashioned by discount retailers. Bed 'n Bath, on the other hand, pioneered "category killing" retail—scalable specialty retail chains that surpassed competition through broad product offerings in a specific category at affordable prices.

12.     Continued organic growth throughout the 80's necessitated a name change in 1987; Bed 'n Bath became Bed Bath & *Beyond*—a name that more accurately reflected the superstore's widespread and diverse offerings. The Company had expanded the superstore footprint to Virginia, Illinois, Maryland, and Florida, and expanded its inventory beyond designer linens and bath products to hard goods categories like electronic appliances and other housewares. Notwithstanding significant growth, Lenny and Warren maintained a strong culture built off superior customer service (both at the in-store and corporate level), word-of-mouth advertising, and a familial and warm atmosphere. Indeed, Lenny and Warren worked the floor of their stores every Saturday, tidying up merchandise and picking up litter.

13.     Lenny and Warren decided to take Bed Bath & Beyond public in June 1992. Trading on the NASDAQ exchange under the ticker BBBY, Bed Bath & Beyond quickly became

a Wall Street sweetheart.  Over the following year, the stock surged over 100% as the Company

announced record sales for fiscal year 1993.  On top of product line development advanced through

pioneering the superstore concept, the Company adopted integrated computer-based inventory

management systems, which helped the Company remain competitive.  By 1999, the Company's

sales passed $1 billion—its eighth consecutive year of record earnings (a streak that would

continue for several more years).

14.    As Bed Bath & Beyond entered the new millennium, it operated over 250 stores

following expansion into Rhode Island, Idaho, Maine, Mississippi, and North Dakota.  By 2001,

Bed Bath & Beyond's success was unmistakable as it doubled sales to over $2 billion and ended

the year with a store count of over 300 locations in 43 states.  Bed Bath & Beyond's affordable

prices, warehouse merchandising style, and conservative advertising budgets helped continue to

secure record earnings and profits for the Company.  Bed Bath & Beyond became well known for

its then-unique store philosophy of "pile it high, let it fly," with product stocked floor to ceiling

throughout its stores; consumers flocked to its stores, never knowing what they may come across

during their expedition through the store's isles, ever-searching for that perfect "treasure."  Bed

Bath & Beyond's philosophy focused on getting customers physically into their stores to drive

sales and revenue, even creating what has been heralded as 

one of the greatest retail coupons of all time.  This strategy

led to financial success and propelled Bed Bath & Beyond

to become one of the first superstores in the United States.

15.    After surviving the 2008 recession and outlasting its main competitor at the time,

Linens 'n Things,[3] Bed Bath & Beyond was positioned to reap the rewards of a post-recession

---

[3]    In May 2008, Linens 'n Things filed for chapter 11 bankruptcy and ultimately liquidated.

booming market.  The brand became part of the cultural conversation, appearing in the hit comedy

film "The Other Guys" and featured in TV shows such as "30 Rock," "Parks and Recreation," and

"Broad City."

16.      Beginning in the mid-2000s, online shopping introduced itself to mainstream

America.  This would forever change retail more broadly.  As the internet's novelty started to wear

off, monetization methods and platforms became more sophisticated, allowing forward-thinking

businesses to reach more consumers.  Online shopping or "e-commerce" allowed customers to

instantly compare prices with other stores and use coupons digitally, all from the comfort of their

home.  By 2010, for the first time in online shopping history, United States online sales surpassed

$1 billion on a single day.  Bed Bath & Beyond was slow to embrace and adopt the e-commerce

boom, which was pioneered, advanced, and utilized to great success by direct competitors like

Target, Walmart, and Amazon.  While Bed Bath & Beyond had been on the leading edge of many

brick and mortar critical retail trends, the Company's reluctance to compete in the e-commerce

space was one of the consequential, early decisions that ultimately led to this day.

## II.      Bed Bath & Beyond Today.

### A.      Bed Bath & Beyond.

17.      Today, Bed Bath & Beyond is a leading 

specialty home retailer in North America with 360 stores in

the United States, offering customers a wide assortment of

domestic merchandise and home furnishings.  Bed Bath &

Beyond is the preferred destination in the home space, particularly in key product categories

including bedding, bath, kitchen food prep, home organization, and indoor décor and offers high

quality and differentiated products, services, and solutions for the home and heart-felt life events.

These include certain life events that evoke strong emotional connections such as getting married,

8

moving to a new home, having a baby, going to college, and decorating a room—which Bed Bath & Beyond supports through its wedding registries and mover and student life programs.

18.    In addition to its flagship in-store presence, Bed Bath & Beyond sells products through its website, BedBathandBeyond.com.  Products available through the website consist of items available in stores in addition to certain items that are only available online.  A portion of the items that are exclusively sold online include products that Bed Bath & Beyond does not keep in stock and has "drop-shipped" from vendors directly to customers when ordered.  Aside from drop-shipped merchandise, Bed Bath & Beyond fulfills approximately 70% of online orders from the Company's fulfillment centers and fulfills approximately 30% from its stores.

**B.    buybuy BABY.**



19.    Founded in 1996, buybuy BABY was acquired in 2007 and has become a leading specialty baby retailer throughout North America.  buybuy BABY sells a wide assortment of baby essentials and nursery furnishings and aims to be a one-stop-shop for all products needed for infants.  The product selection has historically consisted of items for children through age one, but buybuy BABY recently expanded the assortment to include more prenatal supplies and products for children through age four.  buybuy BABY has thrived by building trust with parents, supporting their needs, and empowering families to celebrate every milestone—big and small—together.

20.    buybuy BABY stores are well-known for their knowledgeable and friendly staff, who are trained to help parents find the right products for their children.  buybuy BABY also offers an extensive selection of products, regular sales events, and services such as the ability to create and manage a baby registry, advice for expecting parents and new parents, and a rewards program for loyal customers.

### III.     The Decline and its Effects.

### A.     Early Signs of Business Deterioration.

21.     In January 2014, Bed Bath & Beyond's stock hit an all-time high of $80 per share. That zenith, however, was quickly followed by a volatile period.  By 2018, the stock had fallen to $14 per share, erasing $15 billion in value.  Much of this diminution came as Bed Bath & Beyond struggled to keep up with its rivals who previously invested heavily in both stores and e-commerce capabilities.  In addition, Bed Bath & Beyond's costs steadily increased, leading operating margins to decline from 16.5% in fiscal 2011 to less than 4% in fiscal 2018.  In early 2019, the Company reported its seventh consecutive quarter of declining same-store sales and reported its first annual loss and sales decline in its nearly three decades as a public company, with profit plunging 48% year-over-year.  Furthermore, its supply chain and method of product development and selection were outdated and supported by old systems.



Allan Sloan, Bed Bath & Beyond: How Stock Buybacks Undermined the Company, yahoo!news (Jan. 11, 2023) fig.1, https://news.yahoo.com/bed-bath-beyond-how-stock-buybacks-undermined-the-company-154202427.html

22.     The impact of macroeconomic and industry trends were apparent.  Over the past decade, multiple large brand store-front retailers have experienced distress attributed to the loss of crucial in-store foot traffic, declining in-store sales, the growth of e-commerce giants, and a

younger generation of customers who are more inclined to order items on the internet with expedited shipping options that allow for same-day delivery of items.  Bed Bath & Beyond was another major retailer that succumbed to these pressures by failing to expeditiously adapt to changing consumer shopping behavior.  In March 2019, a group of activist investors had seen enough and voiced their frustrations—claiming Bed Bath & Beyond failed to adapt allowing costs to increase and eroding value for shareholders.  In response, Bed Bath & Beyond overhauled its board of directors (the "Board"), and CEO Steven Temares stepped down, ending his 16-year tenure.

23.    The overhauled leadership of Bed Bath & Beyond made a concerted effort to revitalize its brand and regain its status as the go-to bed and home superstore.  For the first time, Bed Bath & Beyond decided to pull its leadership from outside the Company, hiring 30-year retail veteran Mark Tritton as CEO in 2019.  Tritton came to Bed Bath & Beyond from his position as Chief of Merchandising at Target after successfully implementing Target's merchandising strategy and building a strong own-brands portfolio—a core driver of top-line growth for Target.

24.    The Company attempted to implement similar strategies that had recently made Target so successful by focusing on creating Bed Bath & Beyond private-label brands and pursuing a growth strategy.  Bed Bath & Beyond's new vision was a digital-first, customer-focused omnichannel retailer with a more curated, inspirational, and differentiated product collection across categories; this also meant a significant deduction of national brands and changes to previous long-standing vendor relationships.  The Company hoped this would enhance margins and create an improved value proposition for the consumers.

25.    Unfortunately, this strategy proved not to be successful.  Traffic, market share, and important customer programs such as loyalty and registry were impacted.  Changes were ushered in faster than the Company built systems to support them, and the transformation strategy proved

too much for Bed Bath & Beyond's supply chain to handle. Customers were confused as they visited Bed Bath & Beyond stores that looked nothing like the stores that had engendered their loyalty over decades, with well-known national brands like KitchenAid mixers and Calphalon cookware being replaced for private-label brands that customers did not want.

26.     The self-inflicted disruption occurred at the same time brick and mortar retailers across the globe felt the unprecedented disruption caused by the COVID-19 pandemic. As a result of the COVID-19 pandemic, the retail industry entered a new reality, requiring Bed Bath & Beyond to make difficult decisions to protect the safety of its associates, customers, and the long-term future of the Company. In compliance with local mandates, on March 23, 2020, Bed Bath & Beyond implemented temporary closures of retail banner stores across the United States and Canada.

27.     Along with the health and safety issues, the pandemic also exacerbated supply chain problems, serving as the driving force behind inflationary pressures that led to higher inventory costs and reductions in consumer discretionary spending. Bed Bath & Beyond's massive shift towards private-label brands resulted in longer lead times to produce and ship to stores when compared to the more easily accessible national brands upon which Bed Bath & Beyond built its reputation and customer base.

28.     Despite these headwinds, in late 2020, Bed Bath & Beyond announced plans to buy back $675 million of its common stock. That included an immediate $225 million accelerated

share repurchase program (the "ASR Program") and additional buybacks of up to $450 million.  The Company became increasingly aggressive about its share buyback plans and increased its total buyback target from $675 million to $825 million in December 2020, and again to $1 billion in April 2021, even



Aisha Khan, *$BBBY Is Going Beyond Its Buyback Scheme*, 2iQ (5 Nov. 2021) fig.1, https://www.2iqresearch.com/blog/bed-bath-buyback-and-beyond-2021-11-05.

though Bed Bath & Beyond's finances and overall economic trends among retail companies were weakened by the pandemic.  In November 2021, the Company confirmed that it would complete the full $1 billion ASR Program by the end of fiscal 2021, rather than over the proposed three-year period.  This decision was based upon risk-adjusted forecasts by management and subject to diligence and deliberation by the Board.  Bed Bath & Beyond's accelerated ASR Program caused some concerns amongst its merchandise suppliers, with vendors fearing the Company would not have enough cash on hand to pay them in full, resulting in some vendors scaling back their business with Bed Bath & Beyond.

29.    As of November 2020, Bed Bath & Beyond had about $1.5 billion of cash on hand, compared to roughly $1.2 billion of debt.  But, over the span of 18 months following implementation of the ASR Program, together with the unexpected drastic and continual decline in Bed Bath & Beyond's stock price, Bed Bath & Beyond's liquidity position stressed the financial stability of the Company.

30.    Around this time Bed Bath & Beyond became part of the "meme-stock" movement started and fueled on Reddit boards and social media websites.  The wild ride started in the winter of 2021, but was taken to new heights in March 2022, when RC Ventures LLC ("RC Ventures"),

an activist investment firm led by Chewy co-founder, GameStop chairman, and "meme investor," Ryan Cohen, revealed a 9.8% stake in Bed Bath & Beyond. With this investment, Cohen sought to turn Bed Bath & Beyond into another GameStop or AMC[4] meme-stock beneficiary. Bed Bath & Beyond checked the two boxes needed to become a meme-stock: (i) a troubled financial situation and (ii) nostalgia value.[5]



31.     RC Ventures sent a letter criticizing the Company's strategy, pushing for strategic changes, including selling off its buybuy BABY banner, and exploring a sale of the entire company. Weeks after RC Ventures disclosed its stake in the Company, Bed Bath & Beyond came to an agreement with the activist firm, agreeing to add three directors of RC Ventures' choosing to the Board.



32.     During this period, former management's decision to reduce historically successful marketing vehicles—like the famous mailed Bed Bath & Beyond coupons—directly impacted in-store traffic. As lower traffic effected Bed Bath & Beyond's ability to capture in-store sales, the Company was also operating under the unprecedented supply chain conditions that

---

[4]     *See* Alexander Gladstone, *How Reddit Renegades Helped Theater Giant AMC Avoid a Tragic Ending*, THE WALL STREET JOURNAL (Feb. 26, 2021), https://www.wsj.com/articles/how-reddit-renegades-helped-theater-giantamc-avoid-a-tragic-ending-11614358803?mod=article_inline ("What happened to AMC is a testament to a new force in financial markets: small-time investors whose collective power, often fueled by social media hype, can help determine a company's fate.").

[5]     *See* Matt Levine, *Bed Bath & Beyond Missed the Memes*, The Bloomberg Opinion (Aug. 31, 2022) https://www.bloomberg.com/opinion/articles/2022-08-31/bed-bath-beyond-missed-the-memes?sref=SRcMqdrY.

impacted global trade in 2021 and early 2022.[6]  As time passed, global supply chain hardships and

inflationary conditions worsened, further disrupting Bed Bath & Beyond's situation.  The speed

of industry inflation and lead time pressures outpaced the Company's plans to offset these

headwinds.  And as a result, Bed Bath & Beyond failed to pivot fast enough—especially on price

and margin recovery.

33.     The Company also implemented changes to its domestic distribution strategy—the

network through which product is delivered to stores.  The distribution strategy was not equipped

for these changes to the upstream supply chain, nor resilient in the face of the pandemic-related

issues that occurred at the Port of Los Angeles, which severely affected many companies.[7]  The

Company wound up with empty shelves as factory closures and shipping bottlenecks delayed the

arrival of the new private-label goods.  Once the items hit stores, they did not resonate with

shoppers.  As a result, Bed Bath & Beyond was unable to achieve sufficient levels of inventory to

meet demand over the important 2021 holiday season, leading to frustrated customers and sharp

declines in sales.  During third quarter of 2021, an estimated $100 million of sales were not fulfilled

due to out-of-stocks and in the fourth quarter of 2021, an estimated $175 million of sales were not

delivered.  By the end of 2021, Bed Bath & Beyond reported net losses of $559.6 million, a

decrease of approximately 14.8% compared to fiscal year 2020.

34.     Vendors and licensees grew concerned by the pace and scale of changes the

Company was undergoing.  During the first half of calendar '22, Bed Bath & Beyond further tested

its important vendor relationships by slowing payments and trimming down its orders quarter after

---

[6]     Like many other retailers, increased shipping costs during and post pandemic pressured the Company's margins.
        In September 2021, the Company's gross margins fell 640 basis points to 30.3% from 36.7% year-over-year.

[7]     Augusta Saraiva & Brendan Murray, *Every Step of the Global Supply Chain Is Going Wrong—All at Once*,
        BLOOMBERG (Nov. 23, 2021), https://www.bloomberg.com/graphics/2021-congestion-at-americas-busiest-port-
        strains-global-supply-chain/?leadSource=uverify%20wall.

quarter to focus on its private-label brands—forcing vendors to look to other stores and websites. The Company's cash position forced management to limit the "open-to-buy"—which enables merchandisers to replenish inventory.  As the Company's financials worsened, tensions with its merchandise suppliers grew.

35.     After successive quarters of earnings misses and failing to meet targets, continuing share price decreases, and spiraling expenses, Mark Tritton was excused on June 29, 2022. Contemporaneously, Bed Bath & Beyond reported that net sales in the first quarter fell by 25% year over year.  Board member Sue Gove was named the interim CEO and was subsequently named permanent CEO.

**B.     New Leadership's Transformation Plan.**

36.     Gove has over 30 years' experience within the retail industry serving a variety of senior financial, operating, and strategic roles that included president and chief executive officer of Golfsmith International Holdings and chief operating officer of Zale Corporation.  She also served as a senior advisor for a global professional services firm, where she primarily focused on advisory and turnaround services for retail companies.  Before her appointment as interim CEO, Gove served as an independent director on the Board, spent years as a member of the nominating and corporate governance committee, and was chair of the strategy committee.

37.     Under Gove's leadership, Bed Bath & Beyond realigned its executive leadership team to reflect a pivot in strategic priorities and completed a 20% reduction of its corporate and supply chain operations workforce.  New leadership focused on returning Bed Bath & Beyond to its roots.  The Company took swift actions in its efforts to rebalance and improve inventory.  Such actions included adjusting merchandise allocations to lead with customer preference, bringing back popular national brands, and introducing new, emerging direct-to-consumer brands.  Bed

Bath & Beyond worked expeditiously to increase the inventory proportion of national brands where possible with the intention to increase inventory penetration over the long term.

38.     Bed Bath & Beyond exited one-third of its private-label brands by discontinuing three of its nine labels.  The breadth and depth of inventory across Bed Bath & Beyond's six remaining private-label brands have been substantially reduced, with the intention to decrease levels to 20%—reflecting a more balanced sales to stock ratio moving forward.

39.     Bed Bath & Beyond's teams worked closely with supplier and vendor partners to ensure customers had access to a strong assortment of their favorite brands across both store and digital channels.  Bed Bath & Beyond hosted a supplier event in Fall 2022 in an effort to both build new relationships and strengthen existing ones, address any issues to ensure strong support, and to work collaboratively to create the best experience for shared customers.

40.     The Company initiated incremental store closures in its Bed Bath & Beyond banner with the ultimate goal of operating approximately 360 profitable stores, in addition to the approximately 120 buybuy BABY stores, across the United States.  The Company closed unprofitable and marginally profitable stores and exited out of the Canadian market.

41.     Bed Bath & Beyond also began implementing significant selling, general, and administrative expense reductions to right-size its cost structure.  These changes reflect Bed Bath & Beyond's immediate priorities to resolve merchandising, inventory, and in-store traffic issues, align with changes of their store footprint, lower private-label brands development, and defer longer-term strategic initiatives.

42.     Additionally, Bed Bath & Beyond took steps to further reduce its capital spending. In fiscal 2022, planned capital expenditures were forecasted to be $250 million, compared to the $400 million previously disclosed, and were expected to provide sufficient strategic investment in technology, digital capabilities and offerings, and store maintenance.

43. In the midst of implementing these transformation plans, in August 2022, a little over five months after taking a stake in the company, RC Ventures took advantage of a rally in the Company's stock price and announced the sale of its 9.5 million shares in Bed Bath & Beyond, representing about 11.8% of Bed Bath & Beyond's then outstanding shares. At its August peak, Bed Bath & Beyond reached $30 per share, which was up nearly 500% for the month. The shares finished at $18.55, down 20%—after RC Ventures and Cohen's proposal to sell his shares was revealed—before falling an additional 35% in after-hours trading following securities filings confirming RC Ventures' divesture.

44. Later, Bed Bath & Beyond, Cohen, and the late CFO Gustavo Arnal[8] were named in a $1.2 billion shareholder class-action securities fraud complaint. The complaint alleged the defendants "engaged in a fraudulent scheme to artificially inflate the price of BBBY publicly traded stock" by "blatantly" misrepresenting "the value and profitability of BBBY" and making false and misleading Securities and Exchange Commission filings.

## IV. Exhaustively Explored All Alternatives.

45. As challenges continued throughout 2022, the Company pursued multiple alternatives to generate runway for its business changes to bear fruit.

### A. Early Efforts - FILO Facility, Exchange Offer, and August ATM.

46. On August 31, 2022, Bed Bath & Beyond secured financing commitments for more than $500 million, including its newly expanded $1.13 billion Prepetition ABL Facility and the new $375 million Prepetition FILO Term Loan Facility. The Prepetition FILO Term Loan Facility was part of Bed Bath & Beyond's strategy to increase its liquidity to re-engage with former vendors

---

[8] After his passing, the complaint was amended to drop Arnal as a defendant and all claims that Arnal colluded with Cohen to boost the Company's share price were removed.

and suppliers.  To implement Bed Bath & Beyond's refocus on national brands and win back lost customers, the Company needed to repair the strained relationships with its vendors.

47.    On October 18, 2022, Bed Bath & Beyond developed a series of prospective debt exchange transactions designed to strengthen its balance sheet by addressing a 2024 debt maturity and seeking to delever its long-term unsecured debt.  The Company believed these transactions would provide a comprehensive solution that offered the best path forward for the future of the Company.

48.    Bed Bath & Beyond offered to exchange its 2024 Notes, 2034 Notes, and 2044 Notes (collectively,  the "Existing Notes") for New Secured Notes[9] (collectively, the "Exchange Offers").  Holders of the 2024 Notes would have the option to exchange their 2024 Notes for New Second Lien Non-Convertible Notes, or New Second Lien Convertible Notes while Holders of the 2034 Notes and the 2044 Notes would have the option to exchange for New Third Lien Convertible Notes.

49.    The original deadline for participating in the Exchange Offers was November 15, 2022, which was extended multiple times.  Ultimately, after failing to satisfy certain applicable conditions, Bed Bath & Beyond terminated the Exchange Offers on January 5, 2023. None of the Existing Notes that were tendered in the Exchange Offers were accepted and no consideration was paid to holders of the Existing Notes who tendered their Existing Notes in the Exchange Offers.  All Existing Notes were promptly returned or credited back to their respective holders.

---

[9]    The New Secured Notes include 3.693% Senior Second Lien Secured Non-Convertible Notes due 2027 (the "New Second Lien Non-Convertible Notes"), new 8.821% Senior Second Lien Secured Convertible Notes due 2027 (the "New Second Lien Convertible Notes"), and new 12.000% Senior Third Lien Secured Convertible Notes due 2029 (the "New Third Lien Convertible Notes" or the "New Third Lien Secured Notes" and, together with the New Second Lien Non-Convertible Notes and the New Second Lien Convertible Notes, collectively the "New Secured Notes").

50.     In August of 2022, the Company also entered into an Open Market Sale Agreement with Jefferies LLC, as sales agent, to offer and sell up to 12,000,000 shares of common stock in an at the market (or ATM) offering program generating aggregate gross proceeds of approximately $115 million from the program, which were used for general corporate purposes, including to drive immediate strategic priorities such as rebalancing the Company's assortment and inventory and reducing debt.

**B.      The Holiday Season Default.**

51.     During the holiday season, unlike in years past, the Company did not have the financial flexibility to sufficiently restock inventory levels due to persistently deteriorating liquidity and tightening vendor credit.  By December 2022, the Company's stores were nearly 35% percent out of stock.  Following a holiday season in which sales fell nearly 50% from the same period a year before, Bed Bath & Beyond triggered multiple events of defaults under its financing facilities.  In December 2022, after the Company's Lenders took note of decreased inventory levels, JPMorgan, in its capacity as administrative agent under the Prepetition Credit Agreement, delivered two notices to the Company adding additional reserve amounts and lowering the advance rate (the "Reserve Notices"), resulting in the Company having to provide weekly certifications of its borrowing base.  In January 2023, due to the "roll-forward" of the Company's inventory base following the holiday sales season, the Debtors had borrowed in excess of the permitted borrowing base under the Prepetition Credit Agreement.  As the Company worked through this issue, in mid-January, the Company failed to timely deliver the weekly borrowing base certificates and other related deliverables required under the Prepetition Credit Agreement and failed to comply with a fixed charge coverage ratio for the four fiscal quarter period ended November 26, 2022 (the "Events of Default").  Because of the liquidity situation and the continued decline in inventory

level, the Company found itself in the position of a nearly $200 million overadvance under its Prepetition ABL Facility.

52.     On January 23, 2023, advisors to JPMorgan informed the Debtors that, as a result of the ongoing Events of Default, a cash dominion period (the "Cash Dominion Period") had occurred, and JPMorgan delivered the applicable dominion notices.   On January 25, 2023, JPMorgan sent a notice of acceleration and default interest (the "Acceleration Notice") to the Debtors as a result of the ongoing Events of Default.  The Acceleration Notice notified the Debtors that:  (i) the principal amount of the Prepetition Credit Facilities, together with accrued interest thereon, a FILO premium and all fees and other obligations under the Prepetition Credit Agreement, were due and payable immediately, (ii) the Debtors were required to cash collateralize letters of credit, and (iii) the interest rates under the Prepetition Credit Agreement were raised by 2%.

> **C.      February Equity Raise.**

53.     Following the Event of Default and Acceleration Notice, the Debtors planned for all alternatives, including a chapter 11 filing.  In connection with the Debtors' evaluation of strategic and financial alternatives, certain third-party investors expressed interest in providing the Debtors with substantial equity financing in light of the Company's depressed share price and continued trading volatility.  More specifically, the Debtors were approached by Hudson Bay Capital Management, LP ("Hudson Bay").

54.     The Debtors engaged in extensive and difficult negotiations with Hudson Bay and the Prepetition Secured Lenders culminating in the closing of an underwritten public offering of (i) shares of the Series A convertible preferred stock (the "Preferred Stock"), (ii) warrants to purchase shares of Series A Convertible Preferred Stock (the "Preferred Stock Warrants") and (iii) warrants to purchase Common Stock on February 7, 2023 (collectively, the "Offering").  The

Company received gross proceeds of approximately $225 million on the closing date of the Offering and had the opportunity to receive up to an additional approximately $800 million of gross proceeds upon the forced exercise of the Preferred Stock Warrants.  Between February 7, 2023 and March 27, 2023, the holder of the Preferred Stock Warrants exercised their rights for aggregate gross proceeds to the Company of $135,014,000.  In total the Company received approximately $360,000,000 of aggregate gross proceeds in connection with the Offering.  Concurrently, the Debtors and the Prepetition Secured Lenders entered into a waiver and amendment to the Amended Credit Agreement (the "Second Amended Credit Agreement"), pursuant to which the Prepetition Secured Lenders agreed to (i) waive the outstanding Events of Default under the credit facilities; and (ii) rescind the implementation of Acceleration Notice and the default interest owed on outstanding obligations.  The Second Amended Credit Agreement also extended the Cash Dominion Period until all obligations were paid in full and all outstanding commitments were terminated and decreased the total revolving commitment from approximately $1.13 billion to $565 million and provided for an increase of $100 million in the FILO facility (the "FILO Upsize") from $375 million to $475 million.

55.    The Company viewed the amount of proceeds to be raised from the Offering as sufficient to implement its transformation plan.  The Company did not remain idle with the extended lifeline provided by the Offering and continued implementing its large-scale operational initiatives designed to sustain the new vison of the business.  These initiatives involved reducing its corporate work force head count by approximately 40%, closing, approximately 100 additional underperforming stores, and commencing the closing of six distribution warehouses.

56.    Unfortunately, under the terms of the Second Amended Credit Agreement, the Debtors were required to use the net proceeds from the initial closing of the Offering, along with the FILO Upsize, to repay outstanding revolving loans under the Debtors' Prepetition ABL

Facility, including repayment of the nearly $200 million overadvance.  At this point the
Company's sales had dropped 60% on a comparable store basis, resulting in substantial ongoing
losses from operation; therefore, the remaining Offering proceeds went to cover operational losses
rather than to restoring inventory levels.

57.     The Company needed real runway to turn around its inventory and liquidity
position, which the Offering ultimately did not provide.  The Offering had the effect of diluting
the Company's common stock and reducing the share price, quickly jeopardizing the Company's
ability to meet the conditions, including maintaining a minimum share price, to force the exercise
of the Preferred Stock Warrants in the future and continue to raise capital per the terms of the
Preferred Stock Warrants.  In an effort to maintain access to the liquidity provided by the Preferred
Stock Warrants, on March 14, 2023, the Debtors amended its Preferred Stock Warrants to
temporarily adjust the minimum price threshold to $1.00 until April 3, 2023.  This amendment was
intended to further facilitate up to $100 million of additional funding in April 2023, for a
cumulative total of $460 million.



58.     But the stock continued to slide, and the Debtors had no certainty they would continue to maintain access to the liquidity provided by the Preferred Stock Warrant.  In response, on March 30, 2023—after raising an aggregate of $360 million in connection with the Offering—the Debtors terminated the Offering.

**D.      B. Riley At-the-Market Offering.**

59.     Concurrently with the exchange of the remaining Preferred Stock Warrants, the Company entered into a sales agreement with B. Riley Securities, Inc., as sales agent, to offer and sell up to $300 million of shares of its common stock from time to time through an "at-the-market" offering program (the "B. Riley ATM Program") with a maximum aggregate offering amount of up to $300 million.  The common stock of the Company was to be offered through B. Riley Securities Inc. ("B. Riley") as the Debtors' sales agent.  In addition to the B. Riley ATM Program, B. Riley Principal Capital II, LLC entered into a common-stock purchase agreement and a registration rights agreement (collectively, the "Committed Equity Facility") with the Company for the offer and sale of additional shares of common stock.  The net proceeds from the B. Riley ATM Program were used to prepay outstanding revolving loans under the Debtors' Prepetition ABL Facility and cash collateralize outstanding letters of credit, resulting in new credit under the Debtors' Prepetition ABL Facility.

60.     Additionally, on April 5, 2023, the Debtors entered into new vendor consignment program (the "Consignment Program") with ReStore Capital ("ReStore").     Under the Consignment Program, ReStore agreed to purchase up to $120 million, on a revolving basis at any given time, of pre-arranged merchandise from the Debtors' key suppliers to supplement inventory levels already sold at Bed Bath & Beyond and buybuy BABY.  This capital-light solution was undertaken to allow the Debtors to strengthen their merchandise availability and fulfill their

customer demands.    Unfortunately, this Consignment Program was not implemented due to additional lender constraints.

61.    The Offering and the B. Riley ATM Program provided the Debtors with much-needed cash infusions, which temporarily averted the need for a chapter 11 filing in February or March 2023.  The Debtors' cash burn continued while sales further declined due to lack of incoming merchandise, thus, preventing the Debtors from implementing their anticipated long-term operational restructuring while satisfying their restrictive debt obligations.  As such, the Debtors once again find themselves in an untenable liquidity position, necessitating the commencement of these Chapter 11 Cases.

## V.    Debtors' Prepetition Corporate and Capital Structure.

### A.    The Debtors' Corporate Structure.

62.    As set forth on the structure chart attached as **Exhibit B**, Bed Bath & Beyond has 78 wholly-owned subsidiary entities, 73 of which are Debtors in these Chapter 11 Cases, including 60 real estate special purpose subsidiaries, and four joint-venture entities that are non-Debtors.

63. The Debtors' corporate organizational structure is reflected, in simplified form, in the following chart:



64. The Debtors have approximately $1.8 billion in total funded debt obligations. This consists of approximately (a) $80.3 million in aggregate principal amount outstanding under the Prepetition ABL Facility (*plus* $102.6 million of outstanding letters of credit), (b) $547.1 million in aggregate principal amount outstanding under the Prepetition FILO Term Loan Facility, (c) $1.03 billion in outstanding Senior Unsecured Notes spread across three separate issuances with varying maturity dates and interest rates, and (d) $61.5 million of aggregate capital lease obligations:

| ($ in millions) | Maturity | Principal |
|---|---|---|
| **Secured Debt Facilities** | | |
| ABL Facility | August 9, 2026 | $80.3 |
| FILO Term Loan Facility | August 31, 2027 | $547.1 |
| Letters of Credit | — | $102.6 |
| Finance Leases | — | $61.5 |
| **Total Secured Debt** | | **$791.5** |
| **Unsecured Notes** | | |
| 3.749% Senior Notes Due 2024 | August 1, 2024 | $215.4 |
| 4.915% Senior Notes due 2034 | August 1, 2034 | $209.7 |
| 5.165% Senior Notes due 2044 | August 1, 2044 | $604.8 |
| **Total Unsecured Debt** | | **$1,029.9** |
| **Total Funded Debt** | | **$1,821.4** |

## 1. Funded Indebtedness.

### a. The ABL Facility and FILO Term Loan Facility.

65.     Bed Bath & Beyond Inc., as parent borrower, certain of its United States and Canadian subsidiaries, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "Prepetition ABL Agent" or "JPMorgan"), Sixth Street Specialty Lending, Inc. as the "first-in, last-out" agent (the "Prepetition FILO Agent" or "Sixth Street," together with JPMorgan, the "Lenders"), and certain lenders, are parties to that certain Amended and Restated Credit Agreement, dated as of August 9, 2021.[10]  Over the course of the several amendments the Prepetition Credit Agreement the aggregate revolving commitments are permanently reduced from $1,130,000,000 to $300,000,000 (the "Prepetition ABL Facility").   The Prepetition Credit Agreement also provides for a "first-in, last-out" term loan facility of $475,000,000

---

[10]    As amended by the First Amendment to the Amended and Restated Credit Agreement, dated as of August 31, 2022, as further amended by the Second Amendment to the Amended and Restated Credit Agreement, dated as of February 7, 2023, as further amended by the Third Amendment to Amended and Restated Credit Agreement and Waiver, dated as of March 6, 2023, as further amended by the Fourth Amendment to Amended and Restated the Credit Agreement and Waiver, dated as of March 30, 2023, as further amended by the Fifth Amendment to the Amended and Restated Credit Agreement, dated as of April 6, 2023, as further amended by the Fifth Amendment to the Amended and Restated Credit Agreement, dated as of April 20, 2023 and as may otherwise be amended, restated, supplemented, or otherwise modified from time to time (the "Prepetition Credit Agreement").

(the "Prepetition FILO Term Loan Facility" and together with the Prepetition ABL Facility,

the "Prepetition Credit Facilities").  The Prepetition ABL Facility matures on August 9, 2026 (or

on May 1, 2024 if the 2024 Notes (as defined below) are outstanding on such date).  The Prepetition

FILO Term Loan Facility matures on August 31, 2027 (or May 1, 2024 if the 2024 Notes (as

defined below) on such date).

66.    The Prepetition Credit Facilities are secured on a first priority basis (subject to

customary exceptions) on substantially all assets (other than certain real property or equipment

located in the United States that is owned by, or leased to, the Company or any of its subsidiaries

exceeding a certain threshold) of Bed Bath & Beyond and its subsidiaries that are borrowers or

guarantors under the Prepetition Credit Facilities.  Amounts available to be drawn from under the

Prepetition ABL Facility (including, in part, in the form of the issuance of letters of credit) are

equal to the lesser of (i) outstanding revolving commitments under the Prepetition Credit

Agreement and (ii) a borrowing base.  The term loans under the Prepetition FILO Term Loan

Facility are also subject to a borrowing base.

67.    As of the Petition Date, $547.1 million in borrowings remain outstanding under the

Prepetition FILO Term Loan Facility.

### 2.  Unsecured Bonds.

68.    Bed Bath & Beyond, Inc. is also obligated under the following three tranches of

unsecured debt securities:

(i)    **3.479% senior notes due 2024 (the "2024 Notes")**.  On July 17, 2014,
Bed Bath & Beyond issued $300 million of 3.478% senior unsecured
notes due August 1, 2024 (approximately $215.4 million of which
remains outstanding as of the Petition Date).  No other Debtor
guarantees or is otherwise obligated under the notes.

(ii)    **4.915% senior notes due 2034 (the "2034 Notes")**.  On July 17, 2014,
Bed Bath & Beyond issued $300 million of 4.915% senior unsecured
notes due August 1, 2034 (approximately $209.7 million of which

remains outstanding as of the Petition Date). No other Debtor guarantees or is otherwise obligated under the senior notes.

(iii)  **5.165% senior notes due 2044 (the "2044 Notes")**. On July 17, 2014, Bed Bath & Beyond issued $900 million of 5.165% of senior unsecured notes due August 1, 2044 (approximately $604.8 million of which remains outstanding as of the Petition Date). No other Debtor guarantees or is otherwise obligated under the notes.

### 3. Finance Leases.

69.   The Company executed the Dedicated Warehousing Agreement, dated as of July 2021, by and between Bed Bath & Beyond Inc. and Ryder and that Service Agreement, dated as of July 9, 2021 and any corresponding Statement of Works (the "DWA") to provide the Company with warehousing and logistics services at warehouse locations specific to the Frackville, Pennsylvania location.

70.   The Company executed that certain Industrial Lease Agreement, dated as of April 2021, by and between Bed Bath & Beyond Inc. and NP New Castle, LLC (the "ILA" and together with the DWA, the "Finance Leases") for the lease of the premises with all of the related improvements, all located in Frackville, Pennsylvania for distribution, warehousing, and general office use.

71.   As of the Petition Date, approximately $61.5 million remains outstanding under the Finance Leases.

### 4. Bed Bath & Beyond Equity.

72.   As of the Petition Date, Bed Bath & Beyond has 180 shares of Preferred Stock. Shares of Bed Bath & Beyond's common stock have traded on Nasdaq exchange under the symbol "BBBY." As of the Petition Date, approximately 739,056,836 shares of voting common shares were outstanding.

## VI.    Restructuring Actions.

### A.    Marketing and Lender Engagement.

#### (i)    Prepetition Marketing Efforts.

73.    Beginning in December 2022, Lazard commenced a process to solicit interest in a going-concern sale transaction that could be effectuated in chapter 11, as well as to solicit interest in providing postpetition financing.  Lazard initially reached out to a group of potential financial and strategic investors who are experienced in investing in the retail sector, operational turnarounds and/or distressed situations and held meetings with certain of those investors in late December 2022.  This initial group was comprised of approximately twenty investors, nine of which had executed nondisclosure agreements ("NDAs") by the second week of January 2023.  Those parties included various financial sponsors, strategic buyers, and money center banks.  Several of the parties contacted could have potentially been acquirors of some or all of the Company's businesses, as well as providers of postpetition financing to fund a going-concern reorganization.

74.    In mid-January 2023, efforts to identify a potential plan sponsor and investors to provide postpetition financing intensified, the universe of potential investors that Lazard engaged with expanded, and diligence continued.  The Company also received unsolicited inbounds from potential third-party financing sources who had some level of interest in potentially providing postpetition financing.  By the end of the month, it became apparent that the process was unlikely to yield a plan sponsor that would facilitate a going-concern reorganization.  By that time, Lazard had engaged with approximately 60 potential investors to solicit interest in serving as a plan sponsor, acquiring some or all of the Debtors' assets or businesses, or providing postpetition financing, and 30 of those parties had executed NDAs.

75.    While Lazard and the Company are still in contact with certain bidders in that process, to date, the Company has been yet to identify an executable transaction.

76.    Nonetheless, the Debtors are committed to achieving the highest or otherwise best bid for some or all of the Debtors' assets by marketing their assets pursuant to the Bidding Procedures, and, if necessary, conducting an auction for any of their assets.

**(ii)    DIP Financing.**

77.    By the DIP Motion filed contemporaneously herewith, the Debtors seek authorization from the Court to enter into the DIP Facility (as defined in the DIP Motion). The Debtors require immediate access to additional liquidity to ensure that they are able to continue to operate during these Chapter 11 Cases and maximize the value of their estates for the benefit of all parties in interest.

78.    As set forth in greater detail in the DIP Motion and the Kurtz Declaration, the Debtors, with the assistance of their advisors, undertook a comprehensive marketing process to solicit proposals for debtor-in-possession financing. These efforts culminated in the DIP Facility, which will fund the Debtors' working capital needs and the chapter 11 process.

79.    Sixth Street, together with any other parties that may become a party to the DIP Credit Agreement (the "DIP Lenders"), have agreed to provide the DIP Facility. While the Debtors approached numerous potential providers of debtor-in-possession financing, no viable third-party postpetition financing sources were available to the Debtors. In the absence of workable third-party financing proposals, and in light of the requirement under the Prepetition Credit Agreement to secure the support of both Sixth Street and the Prepetition ABL Lenders for any postpetition financing, the Debtors pushed the DIP Lenders to reach consensus on a combined proposal. Following round-the-clock, hard-fought negotiations, the Debtors and the DIP Lenders agreed upon the terms of a debtor-in-possession financing in the form of senior secured

postpetition financing on a superpriority basis under (1) a new money single draw term loan facility consisting of up to $40 million, and (2) a roll-up of Prepetition FILO Secured Obligations in the amount of $200 million.

80.    As described in the Etlin DIP Declaration, the Debtors require immediate access to additional liquidity to ensure that they are able to continue to operate during these Chapter 11 Cases and maximize the value of their estates for the benefit of all parties in interest.  Specifically, based on the Debtors' forecast, the Debtors anticipate that they will be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover the projected restructuring costs of these Chapter 11 Cases without access to the postpetition financing provided by the DIP Facility.  Critically, the liquidity provided by the DIP Facility is necessary to provide the Debtors' customers, vendors, and employees with comfort that the Debtors will continue to operate in the ordinary course of business during these Chapter 11 Cases.  Moreover, the DIP Facility provides for several reserves, totaling at least $36 +9million in aggregate proceeds, which will be used to fund costs associated with (a) allowed undisputed and unpaid administrative expense claims; (b) the orderly wind-down of the Debtors' businesses, and (c) obligations arising under the Worker Adjustment and Retraining Notification Act and state law equivalents.  Absent the creation of such funds, the Debtors' pathway to a successful emergence from the Chapter 11 Cases would be uncertain.

### (iii)    Value Maximizing Liquidation.

81.    The Debtors' management team and advisors determined that it is appropriate to close and wind down all 475 remaining brick-and-mortar stores.  The Debtors expect all Sales at the Closing Stores to be completed and the properties vacated by June 30, 2023.  The Debtors estimate that the aggregate net sales proceeds from all Sales will be approximately $718 million.

82. As part of the Company's efforts to wind-down its business, the Debtors expect to incur costs associated with issuing notices under the federal Worker Adjustment and Retraining Notification Act and state law equivalents (collectively, the "WARN Liabilities"). The Debtors have negotiated with their DIP lenders to make funds available sufficient to pay the expected costs associated with providing notice or paying amounts related to the WARN Liabilities. In particular, the DIP Order contemplates a WARN Reserve that sets aside certain amounts solely to pay amounts related to the WARN Liabilities, subject to the conditions described in the DIP Order.

## B. Heightened Corporate Governance.

83. In connection with consideration of strategic restructuring alternatives and in consultation with its advisors, Bed Bath & Beyond conducted a review of its existing corporate governance infrastructure. Bed Bath & Beyond and its advisors determined that it was in the best interest of the Company and its stakeholders to appoint one independent and disinterested director—Carol Flaton—as disinterested director to the Bed Bath & Beyond Inc. and two independent and disinterested directors—Pamela Corrie and Jonathan Foster—as disinterested directors or managers, as applicable, to the boards of directors or managers, as applicable, of certain of its direct and indirect subsidiaries (the "Subsidiary Disinterested Directors" and together with Carol Flaton, the "Disinterested Directors") that have commenced Chapter 11 Cases (each such entity, a "Designated Subsidiary," and each board thereof, a "Subsidiary Board," and together with the Board, the "Company Boards"). The Board and each Subsidiary Board appointed the Disinterested Directors and vested them with the authority to, among other things: (i) review and act upon any matters pertaining to the restructuring in which a conflict exists between the Company and its shareholders, creditors, affiliates, or the Company's directors and officers (the "Conflict Matters"); (ii) investigate and determine whether any matter arising in the restructuring constitutes a Conflict Matter; and (iii) conduct all investigations and analyses related to the Conflict Matters.

84.     Before the Petition Date, the Disinterested Directors commenced an investigation related to potential conflicts matters and such investigation is ongoing.

**C.      Bed Bath & Beyond and the CCAA Filing.**

85.     On February 10, 2023, BBB Canada Ltd. ("BBBC Ltd.") and Bed Bath & Beyond Canada L.P. ("BBBC LP," together with BBBC Ltd., the "BBB Canada") received creditor protection in Canada by way of an Initial Order granted by the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to the *Companies' Creditors Arrangement Act (Canada) R.S.C., 1985, c. C-36* (as amended, the "CCAA" and such proceeding, the "Canadian Proceeding"). BBBC LP is a borrower under the Prepetition Credit Agreement and BBBC Ltd. guaranteed applicable obligations thereunder. BBB Canada is winding down its business in Canada and liquidating its assets pursuant to an Order granted by the Canadian Court on February 21, 202.

86.     In light of the commencement of the Canadian Proceedings, the Debtors are also seeking approval of a customary cross-border insolvency protocol (the "Cross-Border Protocol") in an effort to ensure effective and efficient coordination and administration of the chapter 11 proceedings and the Canadian Proceedings. I am advised by Kirkland & Ellis LLP that approval of such a protocol is customary in cross-border insolvency filings of this nature and that the form of Cross-Border Protocol is consistent with protocols approved in other recent chapter 11 cases.

87.     As of the Petition Date, BBB Canada has nearly completed the liquidation of all of its inventory and other assets. It is anticipated that the liquidation will be completed by April 30, 2023, and the only assets that BBB Canada will hold are cash in the amount of approximately $5.5 million.

## VII.    Evidentiary Basis for Relief Requested in the First Day Motions.

88.    Contemporaneously with the filing of this Declaration, the Debtors have filed a number of First Day Motions seeking relief to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business and to ensure that their reorganization strategy can be implemented with limited disruptions to operations.

89.    Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their business with minimal disruption and thereby preserving value for the Debtors' estates and various stakeholders.  I have reviewed each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments, and otherwise continue their business operations as sought in the First Day Motions.  A list of the First Day Motions is set forth on **Exhibit A** attached hereto.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: April 23, 2023

By: */s/ Holly Etlin*

Name: Holly Etlin
Title: Chief Restructuring Officer and Chief
Financial Officer
Bed Bath & Beyond Inc.

**<u>Exhibit A</u>**

**Evidentiary Support for First Day Motions[1]**

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

## Evidentiary Support for First Day Motions[2]

I. **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Secured Claims of Critical Lien Claimants, (II) Confirming Administrative Expense Priority of Critical Outstanding Orders, and (III) Granting Related Relief (the "Lienholders Motion").**

1.  Pursuant to the Lienholders Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to pay Critical Lien Claims (as defined herein) in an amount not to exceed $17 million; (b) confirming the administrative expense priority status of Critical Outstanding Orders (as defined herein); and (c) granting related relief.

2.  In the ordinary course of business, the Debtors engage a limited number of providers for many of the critical products and services the Debtors depend upon to operate their businesses and service their customers.  Without strong vendor relationships, the Debtors' ability to maximize the value of their estates would be severely impacted.

3.  *Lien Claimants.*  The Debtors' business depends on the uninterrupted flow of inventory and other goods through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' inventory and merchandise ("Merchandise").  The Debtors rely on a number of third-party warehousemen (collectively, the "Warehousemen") and various freight vendors, ocean carriers, truckers, common or contract carriers, customs brokers, and other shipping services providers (the "Shippers," and together with the Warehousemen, the "Lien Claimants") for the receipt, distribution, and delivery of the Merchandise that the Debtors sell in their stores and on their e-commerce sales platforms.  Further, certain of the Lien Claimants provide services that are necessary and critical to enhance estate value (the "Critical Lien Claimants").  Those Critical Lien Claimants willing to provide the

---

[2]   To the extent there is any conflict or inconsistency between the relief described herein and the relief requested in the applicable First Day Motion, the relief requested in the applicable First Day Motion shall govern.

Debtors with goods on reasonable trade terms create considerable liquidity for the Debtors'
business and maintaining these trade terms is critical to the efficient administration of these
Chapter 11 Cases.  The Debtors can ill-afford severe disruption to their flow of Merchandise at
this critical juncture in these Chapter 11 Cases.

4.      In the ordinary course of business, Shippers and Warehousemen regularly have
possession of the Debtors' Merchandise, inventory, and other goods.  Under certain non-
bankruptcy laws, the Critical Lien Claimants may be able to assert liens on the goods in their
possession to secure payment of the charges or expenses incurred in connection with the third-
party shipping, storage, and other related charges (collectively, the "Critical Lien Claims").[3]
Accordingly, in the event certain of the Critical Lien Claims remain unpaid, those Critical Lien
Claimants are likely to attempt to assert such possessory liens, and may refuse to deliver or release
goods in their possession until their claims are satisfied and their liens redeemed.  The Critical
Lien Claimants' retention of the Debtors' goods and supplies would disrupt the Debtors' supply
chain and negatively affect the Debtors' ability to generate revenue and administer these
Chapter 11 Cases.

5.      The Debtors face incurred, but unpaid, claims for certain goods and services in
which such claimants may assert potential liens.  After a thorough analysis of options, the Debtors
believe that, in certain instances, the value of such goods to their estates likely far outweighs the
cost of payment of the claims.  The Debtors submit that the requested relief will allow the Debtors

---

[3]     For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a
lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date
of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and
for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their
sale pursuant to law."  *See* U.C.C. § 7-307(a) (2003).

to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' operations during these Chapter 11 Cases.

6.      Collectively, the Debtors estimate approximately $17 million of Critical Lien Claims are due and owing as of the Petition Date or will become due and owing on an interim basis pending entry of the Final Order.

7.      ***Customary Trade Terms.***  Subject to the Court's approval, the Debtors intend to pay Critical Lien Claims only to the extent necessary and critical to enhance estate value.  In return for paying the Critical Lien Claims, the Debtors will use commercially reasonable efforts to condition payment of the Critical Lien Claims upon each claimant's agreement to supply goods and services on terms that are acceptable to the Debtors in light of customary industry practices (the "Customary Trade Terms").  The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms condition to payment be made in writing.  The Debtors further seek authority to require more favorable trade terms from any Critical Lien Claimant as a condition to payment of any prepetition claim.  The Debtors have designated a core group of executives, advisors, and employees who have experience in the Debtors' businesses and chapter 11 cases to review, assess, and potentially recommend any payment on account of a Critical Lien Claim.

8.      In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by the Lienholders Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to

recharacterize and apply any payment made pursuant to the relief requested by the Lienholders Motion to such outstanding postpetition balance and such supplier will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

9.     ***Outstanding Orders.***  Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed and valid obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders that the Debtors determine are necessary and critical to enhance estate value (collectively, "Critical Outstanding Orders"), and  (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

10.     I believe that the relief requested in the Lienholders Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' efficient administration of these Chapter 11 Cases.  I believe that the relief requested in the Lienholders Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to facilitate a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders.

Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the

Lienholders Motion.

II.     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors
        to (A) Continue Use of Existing Business Forms and Records, (B) Maintain Existing
        Corporate Bank Accounts and Cash Management System, (C) Pay Prepetition Bank
        Fees Associated with the Cash Management System, and (D) Continue Performance
        of Intercompany Transactions; (II) Granting Administrative Expense Status to
        Postpetition Intercompany Balances; and (III) Waiving Certain U.S. Trustee
        Requirements for a Period Not to Exceed Thirty Days (the "<u>Cash Management
        Motion</u>").**

        11.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and

final orders: (a) authorizing the Debtors to (i) continue using their existing business forms and

records in the ordinary course of business, (ii) maintain the Bank Accounts and operate their Cash

Management System, (iii) pay prepetition Bank Fees associated with the Cash Management

System, and (iv) continue performing Intercompany Transactions (as such terms are defined

below) consistent with historical practices; (b) granting administrative expense status to

postpetition intercompany balances; (c) granting an interim suspension of the Debtors' compliance

with the deposit and investment guidelines set forth in section 345 of the Bankruptcy Code; and

(d) scheduling a final hearing 28 days after commencement of these Chapter 11 Cases to consider

entry of an order approving the relief requested herein on a final basis.

        12.     In the ordinary course of business, the Debtors and their non-Debtor affiliates[4]

(the "<u>Non-Debtor Affiliates</u>" and, together with the Debtors, the "<u>Company</u>") use a cash

management system (the "<u>Cash Management System</u>") as illustrated[5] on <u>Exhibit 1</u> of <u>Exhibit A</u>

---

[4]     Of the twenty-three Non-Debtor Affiliate accounts, two are held by Non-Debtor Affiliate Oak Insurance
        Company, Inc. ("<u>Oak Insurance</u>"),one is held by Non-Debtor Affiliate BBB Mexico LLC ("<u>BBB Mexico</u>"), and
        twenty are held by Canadian Non-Debtor Affiliates.

[5]     For illustrative purposes only. To the extent that the actual system varies from the illustration, the Debtors seek
        to maintain the existing system.

attached to the Cash Management Motion.  The main components of the Cash Management System include, among others, collections from brick-and-mortar store locations and credit card sales, transfers between Company entities, and disbursements to fund daily operations of the business. The Cash Management System is comparable to the centralized cash management systems used by other similarly-sized companies to manage the cash flow of operating units in a cost effective, efficient manner.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department (the "Treasury") maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions.  Additionally, the Debtors' corporate accounting department and the Treasury regularly reconcile the Debtors' books and records to ensure transfers are accounted for properly.

13.    As of the Petition Date, the Cash Management System is comprised of 77 bank accounts (such accounts, together with any other bank accounts the Debtors or their Non-Debtor Affiliates may open in the ordinary course of business, the "Bank Accounts")6 that are owned by the Debtors and certain Non-Debtor Affiliates and are maintained at various branches of 12 banks (such banks, collectively, the "Cash Management Banks").  Of the 77 total Bank Accounts, 20 are maintained by Canadian Non-Debtor Affiliates for purposes of funding the Company's Canadian businesses.  More specifically, the Cash Management System is comprised of:

---

6    The Bank Accounts are identified on Exhibit C attached to the Cash Management Motion.

| Cash Management Bank | Number of Bank Accounts |
|---|---|
| *Debtor Accounts* | |
| JPMorgan Chase Bank, N.A. ("JPMorgan") | 33 |
| Wells Fargo Bank, N.A. ("Wells Fargo") | 4 |
| MUFG Union Bank, N.A. ("Union Bank") | 3 |
| U.S. Bancorp ("U.S. Bank") | 3 |
| Union Bank of Switzerland ("UBS") | 3 |
| Fifth Third Bank, N.A. ("Fifth Third") | 2 |
| KeyBank N.A. ("KeyBank") | 2 |
| Banco Popular de Puerto Rico ("Banco Popular") | 1 |
| Truist Financial Corporation ("Truist") | 1 |
| First Hawaiian, Inc. ("First Hawaiian") | 1 |
| Morgan Stanley Smith Barney LLC ("Morgan Stanley") | 1 |
| *Total Debtor Accounts* | *54* |
| *Non-Debtor Affiliate Accounts* | |
| JPMorgan | 18 |
| The Bank of Nova Scotia ("Scotia Bank") | 4 |
| Wells Fargo | 1 |
| *Total Non-Debtor Affiliate Accounts* | *23* |

14.     The Debtors estimate that cash collections for the Cash Management System average approximately $300 million per month, including store cash receipts, credit and debit card receipts, and website sales.   The Debtors estimate that total disbursements will average approximately $200 million per month during these Chapter 11 Cases.   Because of the nature of the Debtors' business and the disruption to the business that would result if they were forced to close their existing bank accounts, I believe that it is critical that the Debtors' Cash Management System remain in place on a postpetition basis.

15.     Substantially all of the cash held in the Bank Accounts is subject to properly perfected security interests in favor of JPMorgan, in its capacity as the Prepetition ABL Agent under the Prepetition ABL Facility, subject to the priority of payments among the secured parties set forth in the Prepetition Credit Agreement.  As more fully described in this declaration, on January 23, 2023, the Prepetition ABL Agent informed the Debtors that, as a result of certain events of default, a cash dominion event had occurred under the Prepetition Credit Agreement, meaning that, on a daily basis during the Cash Dominion Period, the Prepetition ABL Agent sweeps cash amounts remaining in certain of the Debtors' accounts to pay down balances of the Prepetition ABL Obligations.  On February 6, 2023, the Debtors and the Prepetition Secured Lenders entered into the Second Amendment to the Prepetition Credit Agreement, pursuant to which, among other things, the Cash Dominion Period was extended until all obligations under the Prepetition Credit Agreement were paid in full and all outstanding commitments were terminated. Accordingly, as of the Petition Date, the Debtors are in cash dominion.  Furthermore, the Debtors' loan funding requests to make cash disbursements have remained subject to the consent of the Prepetition ABL Lenders and the Prepetition FILO Agent at times when the Prepetition ABL Facility and Prepetition FILO Facility were in default.

16.     Given the economic and operational scale of the Debtors' businesses, any further disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of the Debtors' estates and to their stakeholders.  Accordingly, to minimize disruption, the Debtors request authority to continue operating their Cash Management System in the ordinary course on a postpetition basis, consistent with historical practices.

17. **_Concentration Accounts_**. The Cash Management System is based around 19 concentration accounts maintained with JPMorgan (each a "Concentration Account" and, together, the "Concentration Accounts"), of which 12 are maintained in the United States[7] and 7 are maintained in Canada in local currencies, respectively. The Concentration Accounts located in the United States pool incoming funds, via daily sweeps, from the Debtors' domestic Collection and Store Depository Accounts (as defined below). These funds result from cash sales at the Debtors' domestic brick-and-mortar locations and various operating, deposit, and loan-funding receipts. As further described below, the Concentration Accounts, in turn, fund the Debtors' various Disbursement Accounts (as defined below), as needed, for their respective locations.

18. **_Store Depository Accounts._** The Company maintains various store-level deposit accounts (the "Store Depository Accounts") for their United States and Canadian store locations, respectively, into which all non-credit card, store-level cash sales are deposited by the store manager on a daily basis. Each Store Depository Account located within the United States pools cash collections from multiple of the Debtors' brick-and-mortar locations. Under ordinary circumstances, each week, armored cars collect and transfer cash from each of the Debtors' store locations to a depository account where the cash is counted and electronically deposited into the applicable Store Depository Accounts. At any given moment, there may be significant cash in transit in the armored car services, depending on the season. Cash deposited at the Store Depository Accounts (as defined below) is then either moved to Collection Accounts or automatically swept to the Concentration Accounts on a daily basis.

---

[7]    11 of the Concentration Accounts located in the United States are maintained by the Debtors and one Concentration Account located in the United States is maintained by Oak Insurance.

9

19.     **Collections Process.**   All remaining funds are deposited into seven primary collection accounts (the "Collection Accounts"), of which five are maintained domestically with JPMorgan and two are maintained with JPMorgan in Canada.  Credit card sales are processed through a third party, and the proceeds are deposited (net of fees, charge-backs, and returns) into the Collection Accounts.  The receipts primarily consist of income proceeds from stores (including those mentioned above), credit card funds, and e-commerce and website receipts.  Funds from the Collection Accounts are swept daily to the respective Concentration Accounts in the United States and in Canada.

20.     **Disbursement Process.**   The Concentration Accounts fund each of the Company's 21 disbursement accounts (the "Disbursement Accounts"), 14 of which are maintained by the Debtors and seven of which are maintained by Canadian Non-Debtor Affiliates.   The Disbursement Accounts located in the United States make disbursements to fund the Debtors' daily operations, such as accounts payable (including payments made to vendors and freight providers), payroll (including benefits), sales tax and other tax obligations, employee obligations, and rent.   Each of the 21 Disbursement Accounts is a zero-balance account maintained at JPMorgan and is funded by the Concentration Accounts on an as-needed basis.

21.     One of the Debtors' Disbursement Accounts is an existing letter of credit funding account, which the Debtors utilize to satisfy payment and/or reimbursement obligations resulting from draws  made by beneficiaries under issued and outstanding letters of credit (the "LC Funding Account").   The Debtors further anticipate, in connection with the DIP Orders, opening an additional letter of credit account during the postpetition period to cash collateralize their obligations for future draw requests under existing letters of credit with longer expiry terms (the "LC Cash Collateral Account").

22. The Debtors anticipate that disbursements from the Disbursement Accounts will be funded, as they have been in the ordinary course of business, from funds in the Concentration Accounts generated from the Debtors' operations and from the use of the Debtors' cash collateral and funds available under the postpetition financing facility. Because of the nature of the Debtors' business and the disruption that would result if the Debtors were forced to close their existing Bank Accounts, the continued existence of the Cash Management System is critical to the Debtors' restructuring efforts.

23. **_Intercompany Transactions._** In the ordinary course of business, the Debtors maintain business relationships with each other and their Non-Debtor Affiliates (the "Intercompany Transactions") resulting in intercompany receivables and payables in the ordinary course of business (the "Intercompany Claims"). The Intercompany Claims and Intercompany Transactions cover a number of different categories, including, for example, management services, licensing, and merchandising. Accordingly, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor or Non-Debtor Affiliate and/or by a Non-Debtor Affiliate to a Debtor. These Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' and Non-Debtor Affiliates' accounting records. The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transfers.

24. Intercompany Transactions involving Debtor-to-Debtor transfers are the most common. For example, in the ordinary course of business, the Debtors transfer funds between Concentration Accounts throughout the United States for purposes of providing cash support to other Debtor entities so that they can continue to operate and fund local operations. Lately, the

volume of these Intercompany Transactions has decreased as the Debtors have begun to wind down operations in various jurisdictions.

25. The Debtors have also transacted, on occasion, with Non-Debtor Affiliates Oak Insurance and BBB Mexico. Intercompany Transactions with Oak Insurance consist solely of reimbursement payments from Oak Insurance to Debtor Bed Bath & Beyond, Inc. for amounts paid on account of insurance claims. The Debtors estimate that Oak Insurance transfers approximately \$100,000–\$500,000 per month in reimbursement payments to Debtor Bed Bath & Beyond, Inc. Additionally, while the Debtors had historically made payments to BBB Mexico, they discontinued this practice at least two years ago. Accordingly, the Debtors generally do not transfer funds to Non-Debtor Affiliates. [8]

26. Any discontinuation of the Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors, their creditors, and other stakeholders.

27. ***Investment Accounts***. The Debtors maintain five investment accounts, along with six Concentration Accounts (included above) that also serve as investment accounts, comprised of: (a) five money market accounts maintained by the Debtors at JPMorgan (the "Money Market Accounts"); (b) one investment account maintained by the Debtors at Morgan Stanley (the "Morgan Stanley Account"); (c) three investment accounts maintained by the Debtors at UBS

---

[8] Since the commencement of Non-Debtor Affiliates BBB Canada Limited's and Bed Bath & Beyond Canada L.P.'s proceedings before the Ontario Court of Justice (Commercial List) (the "CCAA Court") under the Companies' Creditors Arrangement Act (the "CCAA," and such proceedings, the "CCAA Proceedings."), certain funds have been periodically swept from Canadian Bank Accounts to Bank Accounts located in the United States so such funds may be used to pay down the Debtors' obligations under the Prepetition Credit Agreement. Because the CCAA Court requires that the Canadian Non-Debtor Affiliates maintain a minimum balance in the Canadian Bank Accounts during the pendency of the CCAA Proceedings, the Company has been sweeping amounts in excess of the minimum threshold set by the CCAA Court from the Canadian Bank Accounts into Bank Accounts located in the United States once or twice weekly.

(the "UBS Accounts"); (d) one joint venture investment account maintained by a Non-Debtor Affiliate at JPMorgan (the "Joint Venture Account"); and (e) one captive insurance investment account maintained by a Non-Debtor Affiliate at JPMorgan (the "Captive Investment Account" and, together with the Money Market Accounts, the Morgan Stanley Account, the UBS Accounts, and the Joint Venture Account, the "Investment Accounts").  The Debtors have historically invested excess liquidity into Money Market Accounts on a daily basis in order to increase returns on excess liquidity.  Each of the Money Market Accounts is tied to a Concentration Account, and the excess liquidity was historically swept on a daily basis.  Given the recent decline in excess liquidity, however, the Debtors have temporarily paused these investment practices.  As of the Petition Date, the Money Market Accounts at JPMorgan are not active and do not hold funds (*i.e.*, the balance is approximately $0).

28.     Additionally, the Debtors have historically maintained certain other Investment Accounts to increase returns through alternate methods.  The Morgan Stanley Account previously held auction rate securities that the Debtors purchased more than 15 years ago, but the Morgan Stanley Account is no longer active.  The Debtors also used one UBS Account to effectuate the sale of the auction rate securities in February 2023.  The remaining UBS Accounts were previously utilized to make less flexible investments over longer investment periods than with the Money Market Accounts.  As of the Petition Date, the UBS Accounts are not active and do not hold funds (*i.e.*, the balance is approximately $0).

29.     ***Collateral Accounts.***  As described above, Non-Debtor Affiliate Oak Insurance maintains a Wells Fargo account to fund reimbursement payments to Debtor Bed Bath & Beyond, Inc. on a regular basis.

30. ***Escrow Accounts***. Debtor Bed Bath & Beyond, Inc. also maintains a legacy escrow account, Daniel Randolph Special Indemnity Escrow, with JPMorgan. This Bank Account is no longer active and, as of the Petition Date, has no balance.

31. ***Bank Fees***. On a monthly basis, the Debtors pay approximately $145,000 in service fees (before earnings credits) owed under their cash management and treasury services agreements covering the Bank Accounts (the "Bank Account Agreements") to the Cash Management Banks (the "Bank Fees"). The Debtors paid approximately $1.6 million on account of Bank Fees this fiscal year (after earnings credits). The Debtors estimate that they owe approximately $155,000 on account of Bank Fees as of the Petition Date and request authority to pay any outstanding Bank Fees owed under the Bank Account Agreements, including any prepetition amounts, in the ordinary course of business on a postpetition basis.

32. ***Critical Payment Processing Providers***. The Debtors incur processor fees (the "Processor Fees") in connection with their various service agreements with credit card processors (each, a "Payment Processing Provider"), such as Fiserve Inc. ("Fiserve") and Afterpay Limited, that relate to the processing of the Debtors' credit card and gift card transactions. Processor Fees are netted out of funds deposited to the Debtors' Collection Accounts. As of the Petition Date, the Debtors estimate that they owe approximately $1,100,000, which includes $400,000 to be netted out, on account of unpaid Processor Fees. The Debtors estimate that the remaining balance of $670,000 owed and payable to Fiserv pursuant to their agreements (the "FDMS Processing Agreements"). The Debtors seek authority to continue paying the Processor Fees, including the prepetition Processor Fees and fees owed under the FDMS Processing Agreements, in the ordinary course on a postpetition basis, consistent with historical practices.

14

33.  ***Debtors' Existing Check Stock & Business Forms***.  In the ordinary course of business, the Debtors also use JPMorgan to prepare preprinted and future checks.  Additionally, as part of the Cash Management System, the Debtors use a number of preprinted business forms in the ordinary course of their business, including letterhead, deposit slips, purchase orders, and invoices (collectively with checks, the "Business Forms").  Continuing to use the existing Business Forms will minimize expenses to the Debtors' estates, reduce confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, avoid the delay in conducting business, and ensure continuity and avoid confusion between the Debtors' Business Forms.  The Debtors seek authority to continue using their prepetition printed existing stock without reference therein to the Debtors' status as "Debtors in Possession," provided that the Debtors shall include the "Debtors in Possession" designation with the corresponding case number on all replacement stock Business Forms once the existing preprinted stock is depleted.

34.  The Debtors have prepared communication materials for use with the various parties with which they conduct business that will, among other things, inform such parties of the commencement of these Chapter 11 Cases.  The Debtors believe that these direct communications and the Debtors' noticing campaign, along with anticipated publicity of this filing, will provide adequate notice of the Debtors' status as debtors in possession.

35.  ***Compliance with Section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines***.  I understand that the Bank Accounts substantially comply with the requirements of section 345 of the Bankruptcy Code, and that the majority of the Debtors' active Bank Accounts are maintained at Cash Management Banks designated as authorized depositories by the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee"), pursuant to the

15

*Operating Guidelines for Chapter 11 Cases*, U.S. Department of Justice, United States Trustee Program, Region 3, (the "U.S. Trustee Guidelines").

36.     The Debtors submit that cause exists to temporarily suspend the requirements of section 345(b) for an interim period of thirty days from the Petition Date.   While 17 of the Company's 77 Bank Accounts are maintained at Cash Management Banks that I understand are not considered to be authorized depositories, each of these Bank Accounts is FDIC-insured. Additionally, 13 of these 17 Bank Accounts are Store Depository Accounts.   In many cases, the Store Depository Accounts are the only or nearest banks to these stores.   The remaining four Bank Accounts are Investment Accounts maintained at reputable banking institutions (Morgan Stanley and UBS) that have little to no activity.   As explained above, the Debtors have paused their investment practices, such that the UBS Accounts have balances of zero dollars, and the Morgan Stanley Account is no longer active.   To avoid the additional and unnecessary disruption to the Debtors' operations that I believe would ensue if the Debtors were required to close these accounts the Debtors submit that cause exists to suspend the requirements of section 345 for a period of 30 days.

37.     Moreover, as explained more fully in the Cash Management Motion, the Debtors seek a waiver of certain of the U.S. Trustee Guidelines, for an interim period of thirty days from the Petition Date, without prejudice to the Debtors' ability to seek further extensions to the extent applicable, requiring the Debtors to close all of their prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and obtain new business forms and statements. Although the Debtors are requesting a waiver of the requirement to close all Bank Accounts and do not currently have plans to open a new bank account, the Debtors may determine, in their

business judgment, that opening new bank accounts and/or closing existing Bank Accounts in the

ordinary course of business is in the best interests of their estates.

38.     I believe that the relief requested in the Cash Management Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors,

I respectfully submit that the Cash Management Motion should be approved.

### III.    Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent Effective as to the Petition Date, and (II) Granting Related Relief (the "<u>Kroll 156(c) Retention Application</u>").

39.     Pursuant to the Kroll 156(c) Retention Application, the Debtors seek entry of an

order (a) authorizing, but not directing, the Debtors to (i) appoint Kroll[9] as Claims and Noticing

Agent in their Chapter 11 Cases effective as to the Petition Date pursuant to the terms and

conditions of the Debtors' and Kroll's engagement agreement, and (b) granting related relief.  As

the Claims and Noticing Agent, Kroll will assume full responsibility for the distribution of notices

and the maintenance, processing, and docketing of proofs of claim filed in the Debtors'

Chapter 11 Cases.

40.     Based on my discussions with the Debtors' advisors, I believe that the Debtors'

selection of Kroll to act as the Claims and Noticing Agent is appropriate under the circumstances

and is in the best interest of the estates.  Moreover, it is my understanding, based on all engagement

proposals obtained and reviewed, that Kroll's rates are competitive and reasonable given Kroll's

quality of services and expertise.

---

[9]     Kroll is the trade name of Kroll Restructuring Administration LLC., and its subsidiaries.

41. The Debtors anticipate that there will be thousands of persons and entities to be noticed in these Chapter 11 Cases. In light of the number of parties in interest and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is in the best interests of the Debtors' estates and their creditors because it will provide the most effective and efficient means for, and relieve the Debtors and/or the Clerk's office from the administrative burden of, noticing and processing proofs of claim.

42. Accordingly, it is my opinion that the Court should approve the Kroll 156(c) Retention Application.

**IV. Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief (the "Case Management Motion").**

43. Pursuant to the Case Management Motion, the Debtors seek entry of an order: (a) authorizing, but not directing, the Debtors to (i) designate these Chapter 11 Cases as complex cases, and (ii) approving and implementing certain Case Management Procedures; and (b)granting related relief.

44. The Case Management Procedures, among other things, (a) establish requirements for filing and serving notices, motions, applications, declarations, affidavits, objections, replies, responses, memoranda, briefs, supporting documents and other papers filed in these Chapter 11 Cases, including with regard to any contested matters and any related adversary proceedings and any orders entered in these Chapter 11 Cases; (b) delineate standards for notices of hearings and agendas; (c) fix periodic omnibus hearing dates and provide mandatory guidelines for scheduling hearings and setting objection and reply deadlines; and (d) minimize potential burdens on the Court by limiting matters that are required to be heard by the Court.

45. There are thousands of creditors and parties in interest in these Chapter 11 Cases. Notice of all pleadings and other papers filed in this bankruptcy to each of these parties would be

extremely burdensome and costly to the estate. The costs of photocopying, postage, and other expenses associated with such large mailings would be excessive and practically prohibitive. I believe that the relief sought in the Case Management Motion is tailored to address such concerns while simultaneously ensuring timely notification to those parties actively participating in this case or those parties whose rights are directly affected by a given matter.

46. Given the size and complexity of these Chapter 11 Cases, I believe implementing the Case Management Procedures will facilitate the fair and efficient administration of these Chapter 11 Cases and promote judicial economy.

47. Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved.

**V. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File A Consolidated List of the Debtors' 30 Largest Unsecured Creditors (B) File A Consolidated List of Creditors in Lieu of Submitting A Separate Mailing Matrix for Each Debtor, (C) Redact Certain Personally Identifiable Information, (II) Waiving the Requirement to File A List of Equity Holders and Provide Notices Directly to Equity Security Holders, and (III) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

48. Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an interim and final order (a) authorizing, but not directing, the Debtors to (i) file a consolidated list of the Debtors' 30 largest unsecured creditors in lieu of filing separate creditor lists for each Debtor, (ii) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (iii) redact certain personally identifiable information, (b) waiving the requirement to file a list of equity holders and provide notices directly to equity security holders, and (c) granting related relief.

49. ***Consolidated Creditor Matrix***. I believe allowing the Debtors to prepare and maintain a Consolidated Creditor Matrix in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances of these Chapter 11 Cases where there are thousands of

creditors and parties in interest. Converting the Debtors' computerized information to a format compatible with the matrix requirements, as well as the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents. Accordingly, I believe that filing a Consolidated Creditor Matrix is in the best interests of the Debtors' estates.

50. ***Consolidated List of the 30 Largest Unsecured Creditors***. The Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors. I believe this will help alleviate administrative burdens, costs, and the possibility of duplicative service, and will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

51. ***Redact Certain Personally Identifiable Information***. I believe that it is appropriate to authorize the Debtors to redact certain personally identifiable information from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Creditor Matrix and Schedules and Statements, because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking. The Debtors shall provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other applicable filings redacted to the Court, the U.S. Trustee, counsel to the official committee of unsecured creditors appointed in these Chapter 11 Cases (if any), and any party in interest upon a request to the Debtors or to the Court that is reasonably related to these Chapter 11 Cases.

52. ***Waiving the Requirement to File a List of Equity Holders***. As of the Petition Date, Debtor Bed Bath & Beyond Inc. had one class of common stock outstanding to hundreds of equity holders. As an initial matter, Bed Bath & Beyond Inc. is a publicly-traded company with an

actively trading stock of approximately 739,056,836 million outstanding shares of common stock.

Bed Bath & Beyond Inc. does not maintain an Equity List and therefore must obtain the names

and addresses of its shareholders from a securities agent.  Further, the holders of such equity might

have changed hands before the Petition Date.  As such, Bed Bath & Beyond Inc. would have to

undertake an investigation and diligence to confirm the current list of the names and addresses of

its equity security holders.  I believe that preparing an Equity List with accurate names and last

known addresses and providing notices to all such parties of the commencement of these

Chapter 11 Cases would create a significant expense and administrative burden without a

corresponding benefit to the estates or parties in interest.

53.     Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor

Matrix Motion should be approved.

## VI.    Debtors' Motion Seeking Entry of an Order Extending Time to (I) File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief (the "SOFAs and Schedules Motion").

54.     Pursuant to the SOFAs and Schedules Motion, the Debtors seek entry of an order:

(a) authorizing, but not directing, the Debtors to extend the deadline by which the Debtors must

file their schedules of assets and liabilities, schedules of current income and expenditures,

schedules of executory contracts and unexpired leases, and statements of financial affairs

(collectively, the "Schedules and Statements") by 20 days, for a total of 34 days from the Petition

Date, to an including May 27, 2023 without prejudice to the Debtors' ability to request additional

extensions for cause shown; and (c) granting related relief.

55.     I believe that good and sufficient cause exists for granting an extension of time to

file the Schedules and Statements.  The ordinary operation of the Debtors' business requires the

Debtors to maintain voluminous books, records, and complex accounting systems.  To prepare the

Schedules and Statements, the Debtors must compile information from those books and records, and from documents relating to the claims of their thousands of creditors, and the Debtors' many assets and contracts. This information is extensive and located in numerous places throughout the Debtors' organization. Collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term—when these resources would be best used to stabilize the Debtors' business operations.

56.     The Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, but resources are strained.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist with stabilizing business operations during the initial postpetition period, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these Chapter 11 Cases, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.  The Debtors therefore request that the Court extend the initial 14-day period for an additional 20 days, without prejudice to the Debtors' right to request further extensions, for cause shown.

57.     Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the SOFAs and Schedules Motion.

**VII.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations, and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

58.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) maintain insurance and surety coverage entered into prepetition and pay related prepetition obligations, and (ii) renew, supplement,

modify, or purchase insurance and surety coverage in the ordinary course of business, and (b) granting related relief.

59. ***The Insurance Policies and Related Payment Obligations.*** In the ordinary course of business, the Debtors maintain 50 insurance policies (collectively, the "Insurance Policies," and, each individually, an "Insurance Policy") that are administered by various third-party insurance carriers (collectively, the "Insurance Carriers"). In addition to the Insurance policies, the Debtors maintain workers' compensation policies that are reflected in Exhibit C to the Insurance Motion, but for which relief is not sought in the Insurance Motion. The Insurance Policies provide coverage for, among other things, the Debtors' commercial property, commercial general liability, international casualty, commercial crime, cyber liability, earthquakes, director and officer liability, fiduciary liability, and terrorism. The coverage provided under these Insurance Policies extends to all jurisdictions in which the Debtors operate their businesses, including the United States, Canada, and Puerto Rico. The aggregate annual premium for the Insurance Policies is approximately $15 million, plus applicable taxes and surcharges.

60. The Insurance Policies are annual, two- or three-year policies that renew throughout the year based on when the policy was originally purchased. The Debtors do not believe any Insurance Policies will need to be renewed within 28 days after the Petition Date. The Debtors estimate that as of the Petition Date, there are approximately $3 million in premiums due on account of the Insurance Policies ("Outstanding Premiums"), from which the Insurance Broker will be paid a commission. Because all of the Insurance Policies are vital to efficiently administer the Debtors' estates during the pendency of these Chapter 11 Cases, the Debtors seek authority to honor any amounts owed on account of the Insurance Policies in the ordinary course of business to ensure uninterrupted coverage under the Insurance Policies.

61.     Pursuant to certain of the Insurance Policies, the Debtors are required to pay various deductibles or retention amounts (the "Insurance Deductible(s)"), depending upon the type of claim and Insurance Policy involved.  Under such Insurance Policies, the Insurance Carriers may pay claimants and then invoice the Debtors for any Insurance Deductible.  In such situations, the Insurance Carriers may have prepetition claims against the Debtors.  The Debtors risk losing their Insurance Policies if they fail to make their Insurance Deductible payments, which would not only greatly increase the risk related to the Debtors' operations, but may cause them to violate state laws requiring them to have such policies.  To avoid this outcome, the Debtors seek authority to honor any amounts owed on account of Insurance Deductibles in the ordinary course of business.

62.     Non-Debtor affiliate Oak Insurance Company Inc. (the "Captive Insurer") is a part of the Debtors' integrated risk policy and administers certain of the Debtors' historical workers' compensation and medical stop loss policies.  The Captive Insurer is a wholly owned subsidiary insurance provider and an integrated part of the Debtors' cash management system.  Workers' compensation premiums for the 2016–2021 policy period and medical stop loss premiums for the 2021 policy period are held by the Captive Insurer (the "Captive Insurance Policies").  When claims arising from the Captive Insurance Policies become due and owing, the Debtors pay such claims from a disbursement account and the Captive Insurer then transfers funds to the Debtors as reimbursement for such payments.  The Debtors do not pay premiums on account of the Captive Insurance Policies.  The Captive Insurer is vital to insuring parts of the business and protecting the Debtors' balance sheet, and the Debtors may violate certain contractual, regulatory, and financial requirements without the coverage it provides.  As of the Petition Date, the Debtors do not believe that they owe any amounts to the Captive Insurer on account of fees, commissions, or any other prepetition obligations.  Nevertheless, out of an abundance of caution, the Debtors seek authority

24

to honor any amounts owed to the Captive Insurer to ensure uninterrupted coverage under the Insurance Policies.

63. Certain of the Insurance Policies are subject to audits during or following expiration of their respective policy periods (the "Insurance Policy Audits"), which may result in an adjustment of the premiums owed on account thereof. As of the Petition Date, there are no Insurance Policy Audits presently being undertaken. [10] However, out of an abundance of caution, the Debtors seek authority to honor any amounts owed on account of any Insurance Policy Audits in the ordinary course of business.

64. Continuation of the Insurance Policies and entry into new Insurance Policies is essential to the administration of these Chapter 11 Cases. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities. The United States Trustee for the District of New Jersey (the "U.S. Trustee") also requires that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, the Debtors request authority to maintain their existing Insurance Policies, pay prepetition obligations related thereto, and enter into new Insurance Policies in the ordinary course of business.

65. The Debtors retain the services of an insurance broker and claims servicer to help manage their portfolios of risk. The Debtors obtain the majority of their Insurance Policies, including their commercial property, commercial general liability, international casualty,

---

[10] As discussed in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* filed contemporaneously herewith, the Debtors' workers compensation program is subject to regular audits (the "Workers' Compensation Audits"), which may result in an adjustment of the premiums owed on account thereof. Workers' Compensation Audits for prepetition premium payments will not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Workers' Compensation Audits is not known at this time.

commercial crime, director and officer liability, workers' compensation, and fiduciary liability
through their insurance broker, Willis Towers Watson ("WTW" or the "Insurance Broker").  The
Insurance Broker performs many services for the Debtors to help them obtain comprehensive
insurance coverage for their operations in a cost-effective manner, including managing renewal
data, marketing the Insurance Policies with respect to negotiating policy terms, provisions, and
premiums, handling claims, and providing ongoing support throughout the applicable policy
periods.

66.     The Debtors pay the Insurance Broker a fee for insurance advisory services through
statements of work.  The Insurance Broker also collects commission payments from the insurance
carriers, payable as part of the premiums paid on the Insurance Policies, for services rendered on
account of the Debtors' cyber liability, commercial property, and business travel accident
Insurance Policies, among others.  WTW also receives a quarterly fee for managing the Captive
Insurer, which includes a reimbursement, if any, for taxes paid by the Insurance Broker on behalf
of the Captive Insurer.  As of the Petition Date, the Insurance Broker is owed a commission on
account of the commercial property policies, which will be paid from the Outstanding Premiums.
The Debtors seek authority to honor the amount owed to the Insurance Broker to ensure
uninterrupted coverage under their Insurance Policies during the course of these Chapter 11 Cases.

67.     Additionally, WTW is the exclusive broker of record with respect to the Debtors'
director and officer Insurance Policies (the "D&O Policies").  In this capacity, WTW is authorized,
at the Debtors' direction, to negotiate changes with respect to the Debtors' existing D&O Policies
and to procure new D&O Policies for the Debtors.  Prior to the Petition Date, WTW assisted the
Debtors with procuring new director and officer runoff policies.  The Debtors pay WTW an annual
fee in connection with these services, as well as a commission, payable as part of the premiums

paid on the D&O Policies. As of the Petition Date, the Debtors do not believe that they owe any amounts to WTW on account of fees, commissions, or any other prepetition obligations in connection with the D&O policies. Nevertheless, out of an abundance of caution, the Debtors seek authority to honor any amounts owed to WTW to ensure uninterrupted coverage under their D&O Policies.

68.    The Debtors also maintain the services of CorVel Corporation (the "Claim Administrator") to manage workers' compensation and general liability claims. As of the Petition Date, the Debtors owe approximately $100,000 to the Claim Administrator on account of fees and other prepetition obligations. The Debtors seek authority to honor any amounts owed to the Claim Administrator to ensure uninterrupted management of workers' compensation and general liability claims during the course of these Chapter 11 Cases.

69.    ***The Debtors' Surety Bond Program.***  In the ordinary course of business, the Debtors are required to provide surety bonds (the "Surety Bonds") to certain third parties, often governmental units, or other public agencies, to secure the Debtors' payment or performance of certain obligations (the "Surety Bond Program").

70.    The Debtors currently maintain 10 Surety Bonds, in the aggregate amount of approximately $11.2 million, consisting of four tax bonds, one stay of execution bond, three mechanics lien release bonds, one construction bond, and one customs bond in the United States. The Debtors maintain one general customs bond with U.S. Customs and Border Protection (the "CBP Agency") to assure the CBP Agency of the Debtors' ability to pay any applicable duties,

penalties, or obligations, including any anti-dumping duties they may incur with respect to their imports.

71.     When a party that transacts with the Debtors requests a bond and the Debtors determine that they have better operational uses for cash and do not wish to provide the cash and cash equivalents necessary to satisfy such request, they may pursue a surety bond.  In such situations, sureties provide, upfront, the full amount of the requested cash and cash equivalents to the requesting party on behalf of the Debtors, in exchange for a fee from the Debtors and an amount of collateral to secure the bond issuance on the Debtors' behalf.  The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from an obligee (such as a government agency) to a surety.  To preserve estate value during these Chapter 11 Cases, the Debtors must maintain the existing Surety Bond Program, including paying bond premiums and related fees as they come due, providing the sureties (collectively, the "Sureties") with collateral, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of business, and executing other agreements, as appropriate, in connection with the Surety Bond Program.  Failing to provide, maintain, or timely replace their Surety Bonds may prevent the Debtors from complying with their federal law obligations, and consequently prevent them from undertaking essential functions, such as shipping goods.

72.     The premiums for the Surety Bonds are generally determined on a one- to six-year basis and are paid by the Debtors when the bonds are issued and upon renewal.  The aggregate annual premium for the Surety Bonds currently maintained by the Debtors is approximately $47,500.

73.     In addition, Sureties often require the Debtors to sign an agreement promising to pay the surety in the event the bond is called.  Unlike an insurance policy, if a surety incurs a loss

on a surety bond, it is entitled to recover the full amount of that loss from the principal (the Debtors). To that end, the Debtors are party to indemnity agreements (each an "Indemnity Agreement", and collectively, the "Indemnity Agreements") with certain of the Sureties that set forth each Surety's rights to recover from the Debtors. Pursuant to the Indemnity Agreements, the Debtors agree to indemnify the relevant Surety from any loss, charge, claim, demand, cost, liability, or expense which such Surety may incur on account of the issuance of any bonds on behalf of the Debtors. Additionally, each Indemnity Agreement allows the applicable Surety to request collateral from the Debtors from time to time. Pursuant to the Indemnity Agreements, as of the Petition Date, the Debtors maintain approximately $16.1 million in standing letters of credit issued by JPMorgan Chase Bank, N.A. as collateral in respect of the Surety Bond Program.

74.     WTW provides surety bond brokerage services to the Debtors and manages the Surety Bond Program, and Aon Reed Stenhouse Inc. ("Aon," together with WTW, the "Surety Bond Brokers") provided surety bond brokerage services to the Debtors in connection with their general customs bonds with the Canada Border Services Agency (the "CBSA"). The Surety Bond Brokers are paid a commission for their services related to surety bond coverage in connection with the Debtors' Surety Bond Program, which is payable as part of the premiums paid on the Surety Bond Program. As of the Petition Date, the Debtors do not believe that any amounts are owed to the Surety Bond Brokers on account of prepetition obligations associated with the Surety Bond Program. Nevertheless, out of an abundance of caution, the Debtors seek authority to pay any prepetition amounts owed to the Surety Bond Brokers in the ordinary course of business to ensure the Surety Bond Program remains uninterrupted postpetition.

75.     I believe that continuation and renewal of the Insurance Policies, and entry into new Insurance Policies, as needed, is essential to the preservation of the value of the Debtors' business

and operations, and that failure to receive the requested relief in the Insurance Motion at the outset
of these Chapter 11 Cases would expose the Debtors to direct liability for payment of claims
otherwise covered by the Insurance Policies. Moreover, in many instances, insurance coverage is
required by the regulations, laws, and contracts that govern the Debtors' commercial activities,
including the U.S. Trustee's requirements that a debtor maintain adequate insurance coverage
given the circumstances of its chapter 11 case. Accordingly, the Debtors request authority to
maintain their existing Insurance Policies, pay prepetition obligations related thereto, and enter
into new Insurance Policies in the ordinary course of business.

76.     I believe that continuing the Surety Bond Program is also necessary to maintain the
Debtors' import operations. The process of establishing a new Surety Bond Program would be
burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the Surety Bonds
in time to avoid defaults or other consequences of the applicable obligations. Failure to maintain
the Insurance Policies and Surety Bonds could have a detrimental impact on the administration of
these Chapter 11 Cases. Accordingly, the Debtors request authority to maintain their existing
Surety Bond Program, pay prepetition obligations related thereto, and enter into new Surety Bonds
in the ordinary course of business.

77.     I believe that the relief requested in the Insurance Motion is in the best interests of
the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to
continue to facilitate a timely and efficient process to maximize the value of the Debtors' estates
for the benefit of all stakeholders. Accordingly, on behalf of the Debtors, I respectfully submit
that the Insurance Motion should be approved.

## VIII.  Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").

78.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) authorizing, but not directing, the Debtors to procedurally consolidate and jointly administer these Chapter 11 Cases; and (b) granting related relief.  Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each Debtor entity.  The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration will also l allow the U.S. Trustee and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.  Additionally, parties in interest will benefit from the relief requested because (i) there are cost reductions associated with the joint administration of these Chapter 11 Cases and (ii) for ease of reference, there will be one main case docket of Bed Bath & Beyond Inc. throughout the Chapter 11 Cases.

79.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during these Chapter 11 Cases.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

## IX.  Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief (the "<u>NOL Motion</u>").

80.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders (a) approving certain notification and hearing procedures (the "<u>Procedures</u>") related to certain transfers of Bed Bath & Beyond Inc.'s common stock and Series A convertible preferred stock, or

any Beneficial Ownership (as defined under the applicable sections of the Internal Revenue Code)

therein (any such record or Beneficial Ownership of common stock, collectively, the "Common

Stock," and any such record or Beneficial Ownership of Series A convertible preferred stock,

the "Preferred Stock"), (b) directing that any purchase, sale, other transfer of Common Stock or

Preferred Stock in violation of the Procedures shall be null and void *ab initio*, and (c) granting

related relief.

81.     As of the end of February 25, 2023, the Debtors estimate they had NOLs in the

amount of approximately $1.6 billion and $5 million of federal tax credits (together with federal

NOL's, the "Tax Attributes").   They further estimate that they may generate additional Tax

Attributes in the current tax year, including during the pendency of these cases.

82.     I believe that implementation of the Procedures is necessary and appropriate to

preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  The Tax Attributes

may provide the potential for material future tax savings (including in post-emergence years) or

other potential tax structuring opportunities in these Chapter 11 Cases.  In addition, the Debtors

may utilize such Tax Attributes to offset any taxable income generated by transactions

consummated during these Chapter 11 Cases.  The termination or limitation of the Tax Attributes

could be materially detrimental to all parties in interest.

83.     I believe that the relief requested in the NOL Motion is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their business in chapter 11.   Accordingly, on behalf of the Debtors, I

respectfully submit that the NOL Motion should be approved.

**X.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

84.      Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to negotiate, remit and pay (or use tax credits to offset) certain accrued and outstanding prepetition obligations and other obligation accrued in the ordinary course of business on account of the Taxes and Fees and Assessments (each as defined below); (b) authorizing, but not directing, the Debtors to continue negotiating and paying the Taxes and Fees and Assessments accrued in the ordinary course of business on a postpetition basis; and (c) granting related relief.

85.      In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, and property taxes, as well as other governmental taxes, fees, and assessments (collectively, the "<u>Taxes and Fees</u>").[11]   The Debtors remit the Taxes and Fees to various governmental authorities (collectively, the "<u>Authorities</u>").  Additionally, the Debtors are and may continue to become subject to routine audit investigations on account of tax returns and/or tax obligations in respect of prior years ("<u>Audits</u>") during these Chapter 11 Cases, including, potentially, as a result of any voluntary disclosure agreements or similar procedural mechanisms (if applicable).  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors (such additional Taxes and Fees, "<u>Assessments</u>").  Taxes and Fees and Assessments are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.  The Debtors estimate that approximately $25.9 million in Taxes and Fees are outstanding as of the Petition Date, in addition to other amounts that will become due and owing to the Authorities after the Petition Date in the ordinary course.

---

[11]   By the Taxes Motion, the Debtors do not seek the authority to collect and remit state, provincial, and federal employee-related taxes and withholdings.  Such relief is instead requested in the Wages Motion.

86.     The Debtors believe that any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including that:  (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract them from their duties related to the Debtors' restructuring. Moreover, unpaid Taxes and Fees may result in fines and penalties, the accrual of interest, or both. Lastly, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and such funds may not constitute property of the Debtors' estates.

87.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**XI.     Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion").**

88.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors' to approve the Debtors' Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving Additional Assurance Requests (as such terms are defined in the Utilities Motion); and (d) granting related relief.

89.     In connection with the operation of their business and management of their approximately 650 retail locations, distribution centers, and corporate offices, the Debtors obtain necessary electricity, telephone, internet, natural gas, water, waste management, and other similar services (collectively, the "Utility Services") from a number of utility companies and brokers (collectively the "Utility Companies").

90.     On average, the Debtors pay approximately $4,663,223.45 each month for Utility Services, calculated as a historical average payment for the twelve-month period ended December 2022.  The Debtors do not anticipate this monthly average will change materially during the initial thirty days following the commencement of these Chapter 11 Cases.  The Debtors estimate that their cost for Utility Services during the next 30 days will be approximately $4,663,223.45.

91.     To provide additional assurance of payment, the Debtors propose to deposit $1,881,800.00 into a segregated account (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over the twelve-month period ending December 2022, and excludes Utility Services billed directly to the Landlords.

92.     The Debtors are conducting store closing sales for certain retail locations.  After these stores are closed and utility accounts associated therewith are settled, the Debtors will reduce the amount of the Adequate Assurance Deposit to reflect Utility services that are no longer being provided.  The applicable Utility Companies will be required to return deposits within a reasonable amount of time of receiving notice from the Debtors that the respective Utility Service is no longer in use.  Additionally, the Debtors seek approval of their proposed adequate assurance procedures, which set forth a streamlined process for Utility Providers to address potential concerns with

35

respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.

93.      I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and hence, the efficient administration of these Chapter 11 Cases.  The Debtors' retail locations, distribution centers, and corporate offices require electricity, telecommunications, heat, water, waste management, and other Utility Services to operate.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations may be severely disrupted, and such disruption would jeopardize the Debtors' ability to orderly effectuate the chapter 11 process.  Accordingly, it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.

94.      I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

**XII.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

95.      Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) pay all prepetition wages, salaries, reimbursable expenses, and other obligations incurred on account of the Employee Compensation and Benefits Programs (as defined in the Wages Motion) in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits Programs in the ordinary course of business during these Chapter 11 Cases and (b) granting related relief.

96.    The Debtors seek authority, but not direction, to continue, modify, supplement, and/or discontinue their Employee Compensation and Benefits Programs in the ordinary course of business and to pay the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Programs:

| Employee-Related Obligations | Amount of Relief Requested |
|---|---|
| Employee Compensation | $29.4 million |
| Independent Contractor Compensation | $389,000 |
| Payroll Processing Fees | $6.2 million |
| Withholding and Deduction Obligations | $10.9 million |
| Reimbursable Expenses | $1.2 million |
| Health Insurance Programs | $7.5 million |
| Life and AD&D Insurance Programs and Disability Benefits | $344,000 |
| Workers' Compensation | $14.7 million |
| Paid and Leave | $4.4 million |
| Postpetition Non-Employee Director Compensation | N/A |
| Supplemental Benefits Programs | $500,000 |
| **Total** | **$76,133,000** |

97.    For the avoidance of doubt, to the extent the Debtors seek to pay outstanding prepetition amounts on account of the Employee Compensation and Benefit Programs in excess of the Priority Claim Amount (as defined in the Wages Motion), I understand that the Debtors request such relief solely pursuant to the Final Order.

98.    As of the Petition Date, the Debtors employ approximately 14,000 Employees in the United States and Puerto Rico, approximately 6,000 of whom are employed on a full-time basis and approximately 8,000 of whom are employed on a part-time basis. Approximately, 1,600 Employees earn a salary and approximately 12,400 are paid on an hourly basis. In addition to the Employees, the Debtors have historically sourced critical labor support from various agencies and periodically retain specialized individuals as Independent Contractors to complete discrete projects. At this time, the Debtors retain approximately 50 Independent Contractors. I

37

believe the Independent Contractors are an important supplement to the efforts of the Debtors'
Employees.

99.     The Debtors' Employees and Independent Contractors perform a wide variety of
functions critical to the Debtors' operations at the Debtors' offices, distribution and fulfillment
centers, and stores.  Certain of these individuals are highly trained and have an essential working
knowledge of the Debtors' businesses that cannot be easily replaced.  The remainder of the
Employees and Independent Contractors provide services necessary to continue the Debtors'
operations and maximize the value of the Debtors' estates.  Without the continued, uninterrupted
services of their Employees and Independent Contractors, I believe the Debtors' ability to
efficiently conduct their business operations during the pendency of these Chapter 11 Cases will
be threatened, and the Debtors' reorganization efforts will be severely hampered.

100.     The vast majority of Employees rely exclusively or primarily on the Employee
Compensation and Benefits Programs to pay their daily living expenses and support themselves
and their families.  Thus, Employees will face significant financial consequences and hardship if
the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in
the ordinary course of business.  Consequently, I believe the relief requested in the Wages Motion
is necessary and appropriate.

101.     ***Employee Compensation.***  In the ordinary course of business, the Debtors incur
obligations on account of Employee Compensation.  The Debtors pay all Employee Compensation
on either a bi-weekly or weekly basis.  In the three months before the Petition Date, the Debtors
spent an average of approximately $13.8 million per week on account of Employee Compensation.
As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations
owed on account of Employee Compensation is approximately $29.4 million.

102. ***Independent Contractor Compensation***.   The Debtors pay the Independent Contractor Compensation directly through accounts payable or indirectly through one of the Payroll Processors.  The Independent Contractors perform certain services critical to the Debtors' operations, including, among other things, interim management, marketing, administrative functions, and operational functions related to the Debtors' businesses.  In the three months before the Petition Date, the Debtors spent a monthly average of approximately $200,000 on account of Independent Contractor Compensation.  As of the Petition Date, the Debtors estimate that approximately $389,100 is owed on account of accrued Independent Contractor Compensation.

103. ***Payroll Processing Fees***.   The Debtors retain and pay a monthly average of $1.7 million monthly in Payroll Processing Fees to (i) ADP, LLC, (ii) Workday, Inc., (iii) Blue Yonder, and (iv) Accenture plc in the United States and Puerto Rico to administer their payroll. As of the Petition Date, approximately $6.2 million is outstanding on account of the Payroll Processing Fees.

104. ***Withholding and Deduction Obligations***.  During each applicable pay period, the Debtors routinely deduct and withhold certain amounts from Employees' paychecks on account of Deductions and Payroll Taxes, including, without limitation, garnishments, levies, child support and related fees, pre-tax deductions payable pursuant to certain of the Debtors' Health and Welfare Programs, federal, state, and local income taxes, Social Security taxes, and Medicare taxes.  In the three months before the Petition Date, the average monthly Withholding and Deduction Obligations were approximately $21.1 million.   The Debtors estimate that approximately $10.9 million is accrued and owing on account of the Withholding and Deduction Obligations as of the Petition Date.  I understand that certain of the Withholding and Deduction Obligations are required by applicable federal and state laws.

105.    ***Reimbursable Expenses.***  In the ordinary course of business, the Debtors reimburse Employees and Directors who incur certain expenses in the scope of their duties.  These Reimbursable Expenses include reimbursements for:  (1) the use of Personal Funds and Personal Devices, (2) Corporate Purchase Cards, (3) Travel and Business Expenses, (4) the use of personal vehicles for business purposes, and (5) Relocation Expenses (each as more fully described in the Wages Motion).  The Reimbursable Expenses are administered by Cartus Corporation Oracle Corporation as the Expense Report Administrators.  The Debtors pay approximately $221,000 per month for the Expense Report Administrators' services.  I believe that the Debtors' inability to reimburse eligible Reimbursable Expenses would impose hardship on Employees where the obligations were incurred for the Debtors' benefit.

106.    In the three months before the Petition Date, the Debtors spent approximately $467,000 per month on account of the Reimbursable Expenses and the Expense Report Administrators, excluding amounts owed on account of the Relocation Expenses.  In the three months before the Petition Date, the Debtors approximately $2.0 million on account of Relocation Expenses with respect to a total of sixty-three Employees.  As of the Petition Date, the Debtors estimate that the aggregate amount of unpaid obligations on account of the Reimbursable Expenses and the Expense Report Administrators is approximately $1.2 million.

107.    ***Health and Welfare Programs.***  The Debtors offer a number of Health and Welfare Programs to eligible Employees.  The Debtors offer the Medical Plans through (i) self-funded plans administered by Aetna, Centivo, and OptumRx in most of the United States and (ii) fully-insured plans administered by Kaiser Permanente in most of the United States, HMSA in Hawaii, and Triple-S in Puerto Rico.  Premiums are paid to the Medical Plan Administrators monthly.  The Debtors pay amounts owing on account of the self-funded Medical Plans on either

a daily or weekly basis, as applicable. The total cost of the Medical Plans to the Debtors is approximately $5.1 million per month.[12] As of the Petition Date, the Debtors estimate that they owe approximately $5.5 million in claims and administrative costs on account of the Medical Plans.

108.    Certain Employees who participate in Medical Plans may also be eligible to enroll in an HSA or FSA. Approximately 1,900 Employees contribute to an HSA and approximately 400 Employees contribute to an FSA. The Debtors do not contribute to Employees' HSAs or FSAs, but the Debtors pay approximately $7,000 in monthly administrative fees to the Medical Plan Administrators on account of the HSA and FSAs. As of the Petition Date, the Debtors estimate that they owe approximately $5,000 on account of the HSA and FSAs.

109.    Additionally, the Debtors provide Employees with the opportunity to enroll in vision and dental plans. The Vision Plan, administered by EyeMed, and the Dental Plan, administered by MetLife, are fully insured plans. The monthly cost to the Debtors of the Vision Plan is approximately $53,000 and the monthly cost to the Debtors of the Dental Plan is approximately $74,000. As of the Petition Date, the Debtors estimate that approximately $37,000 is owed on account of the Vision Plan and approximately $115,000 is owed on account of the Dental Plan.

110.    The Debtors have historically also subsidized certain benefits under COBRA for former Employees for up to eighteen, and occasionally thirty-six, months following termination of employment. The COBRA Benefits are administered by BenefitConnect, and the Debtors contribute payments to the COBRA Benefits as part of their usual expenditures under the Medical

---

[12]    For the avoidance of doubt, the Debtors' costs on account of the Medical Plans is exclusive of any Employee contributions.

Plans.  As of the Petition Date, the Debtors estimate there is approximately $5.1 million to be remitted on behalf of COBRA Eligible Employees.

111.    The Debtors spend approximately $14.3 million per month on average on account of the Health Insurance Programs, excluding COBRA Benefits.  As of the Petition Date, the Debtors estimate they owe approximately $5.5 million of accrued but unpaid amounts on account of the Health Insurance Programs.

112.    *Life and AD&D Insurance and Disability Benefits.*  Additionally, the Debtors offer Basic Life and AD&D Insurance, optional Life and AD&D Insurance, Short-Term Disability Benefits, and Long-Term Disability Benefits (each as more fully described in the Wages Motion) for eligible Employees.  I understand that the Debtors are further obligated to provide Statutory Disability Insurance under certain state laws.  In the three months before the Petition Date, the Debtors paid an average of approximately $120,000 per month in premiums with respect to the Life and AD&D Insurance and approximately $361,000 per month in administrative fees and premiums with respect to the Disability Benefits.  As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance and Disability Benefits is approximately $369,000.

113.    *Workers' Compensation Program.*  The Debtors also maintain a Workers' Compensation Program at the levels required by laws in the states in which the Debtors operate. The Workers' Compensation Program is administered by Safety National, to which the Debtors pay approximately $1.2 million in premiums and fees annually.  Safety National holds two Letters of Credit, one valued at $4.25 million and one valued at $39.75 million, as insurance collateral to secure the Debtors' payment obligations on behalf of the Workers' Compensation Program, which automatically renews each year on March 1.  Payments on account of claims under the Workers'

Compensation Program are made daily. The Debtors also fund obligations under the Workers' Compensation Program arising from claims of less than $1 million from 2016 through 2021 through a $25 million balance held by the Captive Insurer. Safety National administers all claims from 2016 through 2021 that exceed $1 million. The Debtors believe that there are currently 437 open claims under the Workers' Compensation Program. As of the Petition Date, the Debtors estimate that approximately $14.7 million in unpaid obligations are outstanding on account of the Workers' Compensation Program.[13]

114.    I believe that failure to continue the Health and Welfare Programs would cause Employees to experience severe hardship and make it difficult to retain the Debtors' workforce. Additionally, I understand that the Debtors' failure to maintain the Workers' Compensation Program could result in the prohibition of the Debtors' operations in certain states under applicable law.

115.    ***Paid and Unpaid Leave.*** The Debtors provide leave to Employees in the form of Flexible Time Off, Vacation Leave, Holiday Leave, Paid Leave, and Unpaid Leave (each as more fully described in the Wages Motion). The Debtors' time off policies provide eligible Employees with Flexible Time Off with no annual limit, but such Flexible Time Off does not accrue. Employees accrue Vacation Leave on the first day of each month, beginning sixty days after the start of such Employee's employment, up to a maximum of twenty days of Vacation Leave. Unless required by applicable state law, accrued but unused Vacation Leave does not carry over to the next year. As of the Petition Date, the Debtors estimate that approximately $1.2 million in

---

[13]    While the Debtors estimate that approximately $9.9 million in aggregated unpaid obligations under the Workers' Compensation Program are payable from funds held by Safety National and the Captive Insurer, out of an abundance of caution, the Debtors seek relief to pay up to $14.7 million on account of prepetition obligations under the Workers' Compensation Program.

Vacation Leave has accrued but has not been used by Employees. Similarly, the Debtors also provide Holiday Leave, which accrues throughout the year. As of the Petition Date, the Debtors estimate that approximately $3.2 million in Holiday Leave has accrued.

116. The Debtors provide additional Paid Leave, including Paid Leave, Personal Days, and Parental Leave. The Debtors provide Unpaid Leave for additional sick leave, military leaves extending beyond 52 weeks, leave under the Family and Medical Leave Act, and other similar purposes. The Paid Leave and Unpaid Leave do not involve incremental cash outlays beyond standard payroll obligations. I understand that the Debtors may be obligated under applicable law to "cash out" Vacation Leave, Holiday Leave, and other Paid Leave pursuant to applicable law. I believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these Chapter 11 Cases. Further, the policies are broad-based programs upon which all Employees have come to depend.

117. ***Non-Insider Severance Program.*** The Debtors historically provided severance for the benefit of certain non-Insider Employees (the "Non-Insider Severance Program"), pursuant to which, the Debtors, in accordance with standard company guidelines, provided eligible Employees with payments at their base compensation levels and certain other benefits, such as contribution to COBRA Benefits, upon such Employee's termination (collectively, the "Non-Insider Severance Benefits"). The Debtors no longer administer the Non-Insider Severance Program, and for the avoidance of doubt, do seek authority to pay any amounts on account of prepetition Non-Insider Severance Benefits, excluding COBRA Benefits.

118. ***WARN Act Obligations.*** In the sixty days prior to the Petition Date, the Debtors issued notices pursuant to the Federal WARN Act to certain governmental entities and to 252 Employees that are expected to be impacted by a qualified "mass layoff" or "plant closing" at

seven facilities, including four distribution and fulfillment centers in Texas and three stores in New York (collectively, the "WARN Act Notices"). The WARN Act Notices each contemplate a termination date for the relevant Employees that is in accordance with the notice period under the WARN Act. The Debtors intend to continue to employ the Employees who received the WARN Act Notices through the WARN Act Termination date before terminating their employment. Accordingly, the Debtors do not anticipate incurring any postpetition severance obligations pursuant to the Federal WARN Act on account of Employees who received the WARN Act Notices.

119.    In addition to requirements under the Federal WARN Act, I understand that the Debtors must comply with various state law equivalent "mini-WARN Acts," including the NJ WARN Act. The Debtors have not issued any notices pursuant to the NJ WARN Act within the sixty days prior to the Petition Date. During these Chapter 11 Cases, the Debtors anticipate closing further offices, stores, and distribution and fulfillment centers during the postpetition period, and I understand that such closures may implicated the WARN Acts. To the extent the WARN Acts are implicated by these closures, or there are circumstances that may result in the accelerated closure of any impacted facilities, the Debtors seek authority to make payments on behalf of obligations incurred on account of the WARN Acts on a postpetition basis.

120.    ***Postpetition Non-Employee Director Compensation.*** As of the Petition Date, the Boards include eleven non-Employee individuals who serve as Directors for various Debtor entities. Nine of the non-Employee Directors receive an average annual Cash Retainer of $90,000, which is paid on a quarterly basis in arrears.[14] These non-Employee Directors also receive annual restricted stock awards under the Debtors' long term incentive program at a value of $150,000.

---

[14]    The Debtors paid the previous quarterly installment of the Cash Retainer in advance.

Additionally, non-Employee Directors are compensated for serving on and chairing the Boards'
various committees. The Committee Fees range from $5,000 to $25,000. The three Disinterested
Directors receive monthly cash payments of $30,000 and compensation of $5,000 on a per diem
basis if certain criteria are met. Non-Employee Directors are also entitled to expense
reimbursement for certain Reimbursable Expenses, such as Travel and Business Expenses. As of
the Petition Date, the Debtors do not believe they owe any amounts on account of
Director Compensation.

121. ***Supplemental Benefits Programs.*** The Debtors also provide their Employees the
opportunity to participate in Supplemental Benefits Programs, some of which are funded by the
Debtors. These Supplemental Benefits Programs include the Employee Relief Fund, Commuter
Accounts, Supplemental Health and Wellness Programs, Supplemental Medical Benefits
Programs, the Gift Card Program, the Associate Discount Program, the Legal Services Plan, and
Identity Theft Protection (each as more fully described in the Wages Motion). The Debtors utilize
the Benefit Plan Administrators to secure, administer, and manage the Supplemental Benefits
Programs for their Employees. The Debtors pay approximately $310,000 per month on account
of the Supplemental Benefits Programs and Benefit Plan Administrators, and, as of the Petition
Date, estimate that approximately $508,000 is accrued and outstanding on account of the
Supplemental Benefits Programs and Benefit Plan Administrators.

122. I believe the Employees provide the Debtors with services necessary to conduct the
Debtors' businesses, and the Debtors believe that absent the payment of the Employee
Compensation and Benefits Programs owed to the Employees, the Debtors may experience
Employee turnover and instability at this critical time in these Chapter 11 Cases. The Debtors
believe that without these payments, the Employees may become demoralized and unproductive

because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these Chapter 11 Cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses during these Chapter 11 Cases.

123.    I believe the relief requested in the Wages Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified. I understand the Debtors believe that without the relief requested in the Wages Motion, Employees may seek alternative employment opportunities, which would deplete the Debtors' workforce and hinder the Debtors' ability to operate their businesses.

124.    For the foregoing reasons, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during these Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

**XIII.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreements, (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief (the "Store Closing Motion").**

125. Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing the Debtors to assume those certain Consulting Agreements; (b) authorizing and approving the continuation or initiation of 473 store closings or similar themed sales at the stores listed on the schedules attached to the Interim Order (collectively, the "Closing Stores"), with such sales to be free and clear of all liens, claims, and encumbrances (the "Sales" or "Store Closings"), in accordance with the terms of the store closing sale guidelines in the United States (the "Sale Guidelines"), (c) authorizing customary bonuses to non-insider Closing Store employees who remain employed for the duration of the store closing process (the "Store Closing Bonuses"); (d) approving modifications to certain customer programs, including the return policy and acceptance of gift-cards and loyalty certificates; and (e) granting related relief.

126. ***Store Closings.*** Over the past several years, the Debtors have faced a challenging commercial environment brought on by increased competition, an unsuccessful foray into private label merchandise development, and the consumer shift away from shopping at brick-and-mortar stores. Given the expenses associated with a substantial brick-and-mortar presence, and the issues affecting the retail industry as a whole, a significant number of the Debtors' stores are operating at sub-optimal performance levels.

127. In the past 12 months, the Debtors have reduced their store footprint by approximately 482 stores, leaving the Debtors with approximately 473 stores as of the Petition Date. Ultimately, the Debtors' management team and advisors determined that it is appropriate to close and wind down any remaining brick-and-mortar stores that are not sold to a buyer pursuant

to the Debtors' bidding procedures. The Debtors expect all Sales at the Closing Stores to be completed in accordance with the milestones set forth in the DIP Orders. The Debtors estimate that the aggregate net sales proceeds from all Sales at the remainder of the Debtors' stores will be approximately $718 million.

128. ***Consulting Agreements.*** For over two years, the Debtors have engaged the Consultant to facilitate store closures for the Company. As a result, the Consultant has significant expertise and expert knowledge of the Debtors' business, their merchandise, and their store operations. Additionally, the Debtors and the Consultant is already party to the Consulting Agreements, which set forth the terms pursuant to which the Consultant has operated store closings for the Debtors for over two years. In light of this and the Consultant's historic success in closing other stores for the Debtors, the Debtors concluded in their business judgment that (a) the services of the Consultant are necessary (i) for a seamless and efficient large-scale store closing process, and (ii) to maximize the value of the saleable inventory located in the Closing Stores (as defined in the Consulting Agreements, the "Merchandise"), and the associated furniture, fixtures, and equipment (as defined in the Consulting Agreements, the "FF&E" and, together with the Merchandise, the "Store Closure Assets"), and (b) the Consultant is qualified and capable of performing the required tasks in a value-maximizing manner. Further, the Consultant is already in the process of liquidating inventory at most of the Closing Stores. The Store Closings are critical for the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases, and assumption of the Consulting Agreements will allow the Debtors to continue to conduct the Sales and Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

129.    ***Sale Guidelines.***  The Debtors seek approval of streamlined procedures to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances with proceeds thereof distributed in accordance with the Debtors' DIP orders.  The Sale Guidelines are substantially similar to sale guidelines approved in retail bankruptcies around the United States. The Debtors also seek approval of the Sale Guidelines to provide newspapers and other advertising media in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Bankruptcy Court's approval.

130.    ***Liquidation Sale Laws and Dispute Resolution Procedures***.  Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws") which hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Sale Guidelines, and to the extent such guidelines conflict with the Liquidation Sale Laws, the Sale Guidelines shall control.  Additionally, for the purpose of orderly resolving any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Sale Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Court authorize the Debtors to implement the Dispute Resolution Procedures.  The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Sale Guidelines and Dispute Resolution Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize the value of the Debtors' estates.

131.  **_Store Closing Bonus Plan._**  The Debtors are requesting the authority, but not the

obligation, to pay Store Closing Bonuses (the "Store Closing Bonus Plan") to store-level

non-insider employees during the Sales.  The Debtors believe that the Store Closing Bonus Plan

will motivate employees during the Sales and will enable the Debtors to retain those employees

necessary to successfully complete the Sales.

132.  The amount of the bonuses offered under the Store Closing Bonus Plan vary

depending upon a number of factors, including the employee's position with the Debtors and

duration of employment.  Payments under the program are made exclusively to non-insiders and

on the condition of employment through the date on which the respective employee's store closes.

The Debtors expect the total aggregate cost of Store Closing Bonuses paid will not exceed

$1.6 million, assuming one hundred percent of the eligible employees remain employed through

the duration of the Closing Sales at every Closing Store.

133.  Providing such non insider bonus benefits is critical to ensuring that key employees

that will be affected by the reduction in the Debtors' work force due to the Store Closings will

continue to provide critical services to the Debtors during the ongoing Store Closing process.

This will increase the likelihood of a successful Store Closing and encourage store management

to provide uninterrupted leadership during this challenging period.

134.  I believe that the Store Closings and the Sales represent the most efficient and

appropriate means of maximizing the value of the Store Closure Assets, while balancing the

potentially competing concerns of landlords and other parties in interest.  Delay in approving the

continuance of the Store Closings would diminish the recovery tied to monetization of the Store

Closure Assets for a number of reasons.  Thus, the Debtors will realize an immediate benefit in

terms of financial liquidity upon the sales of the Store Closure Assets and the termination of

operations at the Closing Stores.  Further, the swift and orderly authorization of the Sales will

allow the Debtors to timely reject store leases, and, therefore, avoid the accrual of unnecessary

administrative expenses for rent payment.

135.     ***Customer Programs***.  The Sales and Store Closings require that the Debtors make

certain modifications to their customer programs to reflect new realities. Accordingly, the Debtors

intend to implement the following changes in all Closing Stores, which will be clearly posted for

customers at cash registers and online for the duration of the Store Closings.

- ***Returns.***  For the first thirty days from the date of entry of the Interim Order, the Debtors shall accept returns of merchandise sold by the Debtors in the ordinary course of business so long as the return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered in the Store Closings. Returns of items sold on a "final" basis, included items sold in the Closing Stores on a "final" basis, shall not be accepted.

- ***Gift Cards, Gift Certificates, and Loyalty Certificates***.  For the first fourteen days from the date of entry of the Interim Order, the Debtors will continue to accept the Debtors' validly-issued gift certificates, gift cards, and loyalty certificates (including with respect to certificates issued in connection with the Welcome Rewards programs) issued prior to the Sale Commencement Date in their e-commerce business or in-stores in the ordinary course of business. After the expiration of the fourteen days to utilize gift certificates, gift cards, and loyalty certificates on the e-commerce platform or in-stores, all such validly issued gift certificates, gift cards, and loyalty certificates will no longer be accepted by the Debtors and deemed to have no remaining value. Notwithstanding any policy or state law to the contrary, the gift cards, gift certificates, and loyalty certificates are not redeemable for cash at any time.  The Debtors will not accept coupons for discounts on future purchases issued prior to the Petition Date.

- ***Latent Defects***.  The Debtors shall comply with all state and federal laws relating to implied warranties for latent defects and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales," as set forth in the Order.

136.     I believe that the relief requested in the Store Closing Motion is in the best interests

of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors

to efficiently administer their estates during the pendency of these Chapter 11 Cases.  Accordingly,

on behalf of the Debtors, I respectfully submit that the Store Closing Motion should be approved.

**XIV.    Debtors' Motion for Entry of an Order Implementing a Procedural Protocol for the Administration of Cross-Border Insolvency Proceedings (the "Cross-Border Protocol Motion").**

137.    Pursuant to the Cross-Border Protocol Motion, the Debtors seek entry of an order approving and implementing a procedural protocol to facilitate a coordinated administration of the Debtors' chapter 11 proceedings in the United States (the "Chapter 11 Cases") with the proceeding commenced by affiliate BBB Canada Ltd. ("BBB Canada") and, together with Bed Bath & Beyond Canada L.P. ("BBB Canada LP", the "Canadian Entities") and under the *Companies' Creditors Arrangement Act* (Canada) (the "CCAA Proceeding," and collectively with the Chapter 11 Cases, the "Restructuring Proceedings") to establish a clear framework of general principles that will govern the cross-border administration of the Restructuring Proceedings to the extent cross-jurisdictional issues arise during the pendency of either the Chapter 11 Cases or the CCAA Proceeding.

138.    In light of the risk that cross-border issues arise in the early days of these Chapter 11 Cases given the complex, transnational nature of the Chapter 11 Cases and the CCAA Proceeding, it is appropriate to install a protocol to preclude unnecessary confusion and ensure that:  (a) the Restructuring Proceedings are coordinated to avoid inconsistent or duplicative activities; (b) all parties are adequately informed of key issues concerning the Restructuring Proceedings; (c) the substantive rights of all parties are protected; and (d) the jurisdictional integrity of the Courts is preserved.

139.    Based on my discussions with our advisors, I believe that approving and implementing a procedural protocol will establish the necessary and appropriate means for communication between the Courts and will facilitate the requisite level of coordination with respect to cross-border matters arising in the Restructuring Proceedings.  In addition, the purely procedural and administrative nature of the Protocol does not adversely affect any party's

53

substantive rights.  Accordingly, I respectfully submit that the Cross-Border Protocol Motion should be approved.

**<u>Exhibit B</u>**

**Corporate Organizational Structure**



