# EXHIBIT G

Page 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------
 3   GO GLOBAL RETAIL LLC,
 4                 Plaintiff,
 5          -v-      Index No. 1:23-cv-07987-AS
 6   DREAM ON ME INDUSTRIES, INC., and DREAM ON ME,
     INC.,
 7
                  Defendants.
 8
     ------------------------------------------
 9
10
11       REMOTE VIDEOCONFERENCE DEPOSITION OF
12   CHRISTIAN FEUER, a Witness herein, taken by the
13   Defendant, on Monday, October 7, 2024, at 10:00
14   a.m., before Jeffrey Shapiro, a Stenographic
15   Reporter and Notary Public, within and for the
16   State of New York.
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1   A P P E A R A N C E S :
 2   GREENBAUM ROWE SMITH & DAVIS LLP
 3     Attorneys for the Defendants
 4     99 Wood Avenue South
 5     Iselin, New Jersey 08830
 6   BY:  THOMAS MURPHY, ESQ.
 7
 8
     FALCON RAPPAPORT & BERKMAN LLP
 9
       Attorneys for the Plaintiff
10
       265 Sunrise Highway, Suite 50
11
       Rockville Centre, New York 11570
12
     BY:  STEVEN BERLOWITZ, ESQ.
13
14
15   Also Present:
16   Mark Serure
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3
 4
 5
 6          IT IS HEREBY STIPULATED AND AGREED by
 7   and between the attorneys for the respective
 8   parties hereto, that the filing, sealing and
 9   certification be, and the same are hereby
10   waived;
11
12          IT IS FURTHER STIPULATED AND AGREED
13   that all objections, except as to the form of
14   the questions, shall be reserved to the time of
15   the trial;
16
17          IT IS FURTHER STIPULATED AND AGREED
18   that the within examination may be subscribed
19   and sworn to before any notary public with the
20   same force and effect as though subscribed and
21   sworn to before this Court.
22
23
24
25
```

Page 4

```
 1   Whereupon,
 2              CHRISTIAN FEUER,
 3   after having been first duly sworn, was examined
 4   and testified as follows:
 5              DIRECT EXAMINATION
 6   BY MR. MURPHY:
 7      Q.   State your name for the record.
 8      A.   Christian Feuer.
 9      Q.   What is your address?
10      A.   I'm living on 152 Wewaka Brook
11   Road, Bridgewater, Connecticut 06752.
12      Q.   Good morning, Mr. Feuer.  My name
13   is Tom Murphy.  I'm a lawyer at Greenbaum Rowe
14   Smith Davis.  We represent Dream on Me
15   Industries Inc., and Dream on Me Inc., in a
16   lawsuit against Go Global Retail LLC.
17      Do you understand that you're here
18   this morning in order to have your deposition
19   taken in connection with that case?
20      A.   Yes.
21      Q.   Can you hear and see me okay?
22      A.   Yes.
23      Q.   Have you ever had your deposition
24   taken before?
25      A.   No.
```



Page 5

Feuer

1
2      Q.   I will go through some brief
3   instructions before we begin.
4          You are under oath here today the same
5   way as if you were testifying in court.  The
6   court reporter, Jeff, who you see on your
7   screen, is going to be taking down everything
8   that is said while we're on the record today.
9   Therefore, it's important that you provide a
10  verbal response because he cannot transcribe
11  nods or other gestures.  It also makes his job
12  a lot easier if we don't talk over one another.
13  So even if you know where 'm going with my
14  question, let me finish before you begin to
15  answer and I will do the same for your answers.
16         If you don't understand a question let
17  me know and I'll rephrase it.  If you answer I
18  will assume you understood the question.  If
19  you don't know an answer that is not an issue
20  at all.  I don't want you to guess, I just want
21  to know what you know.  You may approximate,
22  but let us know you are approximating.  If you
23  need a break for any reason let us know as
24  well.  You just cannot take break while a
25  question is pending.

Page 6

Feuer

1
2          Do you understand these instructions?
3      A.   Yes.
4      Q.   Are you aware that Jeffrey Streader
5   was deposed in this case last week?
6      A.   Yes.
7      Q.   Have you spoken to Mr. Streader
8   about his deposition?
9      A.   Not directly, no.
10     Q.   When you say --
11     A.   Let me rephrase it.  It came up in
12  a conversation, so in that sense maybe I talked
13  to him.  I don't know.
14     Q.   Did you have a substantive
15  conversation with Mr. Streader about his
16  deposition?
17     A.   A group, yes.  I don't know what
18  substantive is.
19     Q.   Can you tell me what you remember
20  of your conversation with Mr. Streader about
21  this?
22     A.   About the deposition?
23     Q.   Yes?
24     A.   Let me think.  We talked about,
25  from his perspective the deposition went well.

Page 7

Feuer

1
2   He mentioned that he was able to answer all the
3   questions in a way that, from his perspective,
4   outlined our case.  It was basically a
5   conversation of what he mentioned.
6          (Brief discussion off the record.)
7   BY MR. MURPHY:
8      Q.   Mr. Feuer, besides speaking to Mr.
9   Streader, did you do anything else to prepare
10  for today's deposition?
11     A.   We had some conversations where I
12  received instructions from Mr. Berlowitz.
13         MR. BERLOWITZ:  I don't want you to
14     discuss what we discussed.  That is
15     privileged.
16  BY MR. MURPHY:
17     Q.   Mr. Feuer, I'm not entitled to know
18  what you and your attorney spoke about.  I
19  don't want to know what you and Mr. Berlowitz
20  actually spoke about.  I'm able to know you
21  guys did speak but not the substance of those
22  conversations.
23         Besides your attorney and Mr. Streader
24  did you speak to anybody else in preparation
25  for the deposition today?

Page 8

Feuer

1
2      A.   Talked about it, not necessarily in
3   preparation, but one other team member of the
4   Go Global team, Yuen Chau, was part of this
5   conversation as well as other team members from
6   FRB Law, the lawyers.
7      Q.   When you say Mr. Chau was present
8   during your conversations with the lawyers, is
9   that what you said?
10     A.   Yes; sometimes.
11     Q.   Did you review any documents in
12  preparation for the deposition today?
13     A.   Yes.
14     Q.   What did you review?
15     A.   I reviewed some of the e-mails that
16  had been provided to you, as well as our model.
17     Q.   It is my understanding that the
18  model was evolving and changing over time
19  during this process; is that correct?
20     A.   Yes.
21     Q.   When you said you reviewed the
22  model, was there a specific version tht you
23  reviewed?
24     A.   Correct.
25     Q.   What version did you review in



Page 9

1              Feuer
2  preparation for today's deposition?
3      A.   I think it was Version 9.
4      Q.   Do you know approximately what date
5  Version 9 would have been the current version?
6      A.   So I understand, you mean when it
7  was generated?
8      Q.   Yes.  What was the model you were
9  using?
10     A.   I think the model has a date on it,
11  which is 6/11, June 11.  That's what I think.
12     Q.   You mentioned that you reviewed
13  some e-mails.  Are there any e-mails
14  specifically that you remember reviewing?
15     A.   Any specific e-mail?
16     Q.   You mentioned you reviewed some
17  e-mails prior to the deposition.  I want to
18  know if there were any specific e-mails that
19  you remember reviewing?
20     A.   There were a whole host of e-mails
21  sent by -- I received files, many e-mails.
22     Q.   Did you bring any documents with
23  you today to the deposition?
24     A.   No.
25     Q.   I'm going to move on to some

Page 10

1              Feuer
2  background information about yourself.  What is
3  your highest level of education?
4      A.   I have a degree in agricultural
5  economics, equivalent to an American MBA in
6  economics.
7      Q.   Sorry; agricultural economics?
8      A.   Correct.
9      Q.   Where did you receive that degree
10  from?
11     A.   From Kiel University; K-I-E-L.
12     Q.   Thank you.  What year did you
13  receive that degree?
14     A.   1984.  If I remember correctly; so
15  long ago.  Actually, that's not true.  Actually
16  I have to remember, I started working in '84.
17  The degree, I got it in '82, I believe.  '82 or
18  '83; sorry.
19     Q.   You got your degree sometime in the
20  early 80s.  Can you walk me through your career
21  history since you received your degree?
22     A.   I learned, when I had my
23  agricultural economics degree, that I don't
24  want to have anything to do with agriculture.
25  I decided to go into marketing and was hired by

Page 11

1              Feuer
2  a company called the Otto Group, O-T-T-O, which
3  is a German mail order company operating
4  worldwide.  I started out there and became over
5  the years marketing director, an equivalent
6  probably, responsible for over a $3 billion
7  business for the strategic direction of that
8  entity within the group.
9       And then I came with the Otto Group to
10  the United States after ten years, where the
11  Otto Group owned the Spiegel Group,
12  S-P-I-E-G-E-L, which consisted of the catalogue
13  company Spiegel, Newport News and Eddie Bauer.
14      I started out in New York helping the
15  turnaround of Newport News, which was recently
16  acquired.  After four years with Newport News
17  and being very successful, I moved to
18  Chicago -- Newport News was based in New
19  York -- where I became the VP of marketing and
20  helped to turn around the Spiegel business,
21  which had three consecutive years, each year
22  more than $100 million and was able to come up
23  with a plan to become profitable within nine
24  months or less, actually, call it six months.
25      And after that I had the opportunity

Page 12

1              Feuer
2  to become CEO of an online business called
3  Uvid.com, U-V-I-D, which was a turnaround
4  situation.  After a year I sold that business.
5  I was asked to sell that business, and had been
6  the perfect immigrant story opportunity, where
7  after I left, not because I left, but after I
8  left Spiegel and Newport News got into Chapter
9  11 and I was able to acquire Spiegel and
10  Newport News out of that Chapter 11 through a
11  363 auction process, where I won the auction
12  and then decided to take in equity money.
13      And Golden Gate Capital became the
14  sponsor of the acquisition of the entities
15  Spiegel and Newport News.
16      I basically ran the business and then
17  this work got extremely well for Golden Gate
18  Capital, so that they decided or maybe I should
19  say something.  Golden Gate Capital had never
20  invested into a fashion/apparel company.  So we
21  were not high fashion but mass market fashions.
22  But they had never invested into the business
23  like that.  Since, for the simple reason that
24  how can you create fashion?  That was their
25  perspective.



Page 13

1              Feuer
2         And all four of us on the video wear
3    shirts.  How do you know which shirt will sell
4    well next year?  I was able to prove to them
5    that you never know exactly what item will sell
6    in the future.  You are able to plan this in a
7    way that, while each item purchased you're
8    always wrong, you can minimize how far off you
9    are, resulting that in total you're pretty much
10   right on and can plan for the failure, and that
11   runs into a mathematical business model.
12        That allowed them to justify the
13   investment.  And so over the next years we
14   acquired a lot of businesses where the entity
15   that we acquired somehow ran into trouble.  And
16   my role was to identify the reasons for the
17   trouble and developing the plan, how to turn
18   this business around.
19        And we did this, I think, until we
20   acquired one of 17 different brands.  And
21   different than the Golden Gate guys work with
22   me together on due diligence.  And post due
23   diligence I was the only one staying behind and
24   implementing the plan that we developed.
25        It worked out very well for Golden

Page 14

1              Feuer
2    Gate Capital and myself.  So after I went and
3    all kinds of different businesses during that
4    time frame.  Then afterwards I ran another
5    business.  And then I met Jeff Streader, who
6    has some shape and form a very similar
7    background as I do, where he has been an
8    operator and working with private equity.
9         But the difference between him and
10   myself is, other than he lives on the west and
11   I'm on the East Coast, he is a back-end guy,
12   meaning operations, sourcing, IT.  And I'm a
13   front end guy, how to generate sales and plan
14   businesses.
15        So that's sort of the story.  And so
16   we have been working for the last seven years
17   together at Go Global.
18   Q.    And your title at Go Global is
19   Managing Director?
20   A.    Correct.
21   Q.    Have you been a full-time employee
22   at Go Global during --
23   A.    I don't know the exact status.  I'm
24   not an employee with an employment contract.
25   Q.    Do you receive a salary?

Page 15

1              Feuer
2    A.    No; not from Go Global.
3    Q.    Do you have other employment that
4    you currently receive a salary from?
5    A.    I'm a board member of Janie and
6    Jack, an entity owned by Go Global.  I'm also
7    the co-CEO of a business called Myron.
8    Q.    What is Myron?
9    A.    It's a promotional product company
10   operating in the United States and Europe.
11   Q.    How are you compensated by Go
12   Global?
13   A.    I'm currently not compensated by Go
14   Global but I get compensated in case we do a
15   deal.  I'm also compensated by having equity
16   ownership in acquisitions we make.  When sold I
17   participate.
18   Q.    Do you have any equity ownership in
19   Go Global itself?
20   A.    No.
21   Q.    So I'm understanding correctly.
22   When Go Global purchases entities you
23   personally invest some of your own equity; is
24   that correct?
25   A.    No.

Page 16

1              Feuer
2    Q.    Is the equity you receive in the
3    entities owned by Go Global part of your
4    compensation from Go Global?
5    A.    I guess so.  I'm not clear what you
6    mean specifically.
7    Q.    I'm just trying to get a basic
8    understanding of your relationship and
9    compensation with Go Global.
10        Are you currently doing any work for
11   Go Global right now?
12   A.    Yes.
13   Q.    What are you currently doing for Go
14   Global?
15   A.    We are in the process of making
16   several acquisitions, and I'm part of the due
17   diligence team.
18   Q.    Am I correct that you worked on Go
19   Global's potential acquisition of BuyBuy Baby?
20   A.    Yes.
21   Q.    Do you know approximately when Go
22   Global first became interested in acquiring
23   BuyBuy Baby?
24   A.    The beginning of 2023, first half,
25   first quarter.



Page 17

1                      Feuer
2        Q.   What was your role in that process,
3    the process of the attempted acquisition?
4        A.   My role has been to understand the
5    existing business model and finding ways to
6    optimize this business model so that it's a
7    successful acquisition.
8        Q.   Were you responsible for attempting
9    to find investors or raise funds in connection
10   with the acquisition?
11       A.   I think you have to define the word
12   "responsible."
13       Q.   Involved?
14       A.   Yes.
15       Q.   What was your involvement in that
16   process?
17       A.   My involvement was to talk to other
18   investors.  That's it.  Whatever entails,
19   talking to investors for them to understand an
20   attractive investment.  The whole long process.
21       Q.   Am I correct that Go Global
22   retained the services of Ankura in connection
23   with the attempted acquisition?
24       A.   Yes.
25       Q.   Had you ever worked with Ankura

Page 18

1                      Feuer
2    before?
3        A.   Not in the capacity of raising
4    money, but I believe, some people who work at
5    Ankura I had worked with.  I'm not even sure
6    while they were at Ankura, but maybe before
7    they were at Ankura.  So I worked with people
8    who worked at Ankura while they working for a
9    different firm.
10       Q.   Were they partners during that
11   time?
12       A.   No.  They were at Berkeley Research
13   Group.  I can't remember whether -- I don't
14   know whether they were Ankura or whether they
15   were at Berkeley when I worked with them.
16       Q.   Do you know approximately when
17   Ankura started working on the project?
18       A.   I think May, but I don't really
19   know exactly.
20       Q.   Do you know what the scope of
21   Ankura's responsibilities were?
22       A.   Support our efforts to raise money
23   to acquire BuyBuy Baby.
24       MR. MURPHY:  Mr. Feuer, as we move
25   along I will mark certain documents as

Page 19

1                      Feuer
2    exhibit.  What I will do is share my
3    screen so you see those.  I'll start to
4    do that now (indicating).
5        For the record, I'm marking as
6    Exhibit 1 a document that is Bates
7    numbered ANK-0036256 as the first page.
8    It's a four page e-mail chain.
9        (Exhibit 1 was so marked for
10   identification.)
11   BY MR. MURPHY:
12       Q.   Mr. Feuer, what I will do is, I'll
13   let you review it and I'll scroll down slowly.
14   Let me know when you want me to scroll down so
15   you can see the document I put on the screen.
16       A.   Okay.  Can you go up again?  I'm
17   trying to understand the date --
18       Q.   Let me ask you this.  Would it be
19   easier to start at the bottom and scroll up?
20       A.   It started at the bottom, so it's
21   probably better; right?
22       Q.   Yes (indicating).
23       A.   Okay.
24       Q.   Mr. Feuer, the top e-mail appears
25   to be sent by you on May 21, 2023.  Do you

Page 20

1                      Feuer
2    recognize that e-mail?
3        A.   I don't remember the specific
4    e-mail.  That would be amazing.  It's probably
5    an e-mail I sent.  I believe that.  It makes
6    sense, let's put it this way.
7        Q.   Understood.  In the process, I
8    expect that e-mails are not ones that you will
9    necessarily specifically remember off the top
10   of your head.  If you believe there are any
11   that you did not write or receive, please let
12   me know that.
13       This top e-mail say█████████████████
14   ████████████████████████████████████h
15   ██████████████."
16       Am I correct that that would be based
17   on what appears to be the Version 8 of the
18   model, attached to the e-mail of May 21?
19       A.   Makes sense.
20       Q.   Who was responsible for developing
21   those assumptions?
22       A.   The word "responsible," I'm not
23   sure that responsible -- I would phrase it
24   differently.  The model was developed by myself
25   in conjunction with the input from others.  It



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
21–24

Page 21

Feuer
1
2  is a model from (unclear).
3      Q.   Understood.  The others who you
4  consulted with or communicated with in
5  connection with the model that you referenced,
6


Page 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16      (Brief discussion off the record.)
17  BY MR. MURPHY:
18      Q.   I'm going to move down to the
19  e-mail that appears to have been sent May 19 of
20  2023 from Abhishek Pathania, who appears to
21  work at Ankura Capital.
22      Are you familiar with Mr. Pathania?
23      A.   Yes.
24      Q.   It looks like, according to this
25  e-mail, as of May 19, Ankura had reached out to

Page 23

Feuer
1
2  347 potential investors, and that seven had
3  signed NDAs.
4      Does that sound correct based on your
5  recollection?
6      A.   That seems to be correct.  I don't
7  remember any of the specifics.
8      Q.   Were you involved in the process of
9  having any of the potential investors sign
10  NDAs?
11      A.   Some I have, most I have not.
12  Specifically, probably ones going through
13  Ankura -- I was not involved as far as I
14  remember.  Potentially I was, but I can't
15  remember any specifics there.
16      Q.   Were you involved in the process of
17  an NDA that was signed by Dream On Me?
18      A.   Yes.
19      (Brief discussion off the record.)
20  BY MR. MURPHY:
21      Q.   Mr. Feuer, I'd like to direct you
22  to the e-mail above that you sent on May 20.
23  And you asked of any outreach to equity
24  investors as well, which seems to imply the
25  investors below were not equity investors.

Page 24

Feuer
1
2  Can you explain to me what type of
3  investors the ones listed in the May 19 e-mail
4  were?
5      MR. BERLOWITZ:  Objection.
6      You can answer, if you know.
7      THE WITNESS:  Yes.  I know of some
8  of them, like Deutsche Bank, which is a
9  debt investor -- Light, Blue Torch, I
10  think SLR are debt investors that I can
11  identify.  I'm not sure about JGB Capital
12  and Dorset and DDT.  I don't know whether
13  they are debt or equity.  I just don't
14  know, I can't say.
15  BY MR. MURPHY:
16      Q.   As of May 20, 2023, do you know if
17  you had -- I mean Go Global -- had any
18  commitments from any equity investors for this
19  acquisition?
20      MR. BERLOWITZ:  Objection.  He's not
21  here to testify on behalf of Go Global.
22      MR. MURPHY:  He can testify whether
23  he knows that or not.
24      MR. BERLOWITZ:  Correct.  I want to
25  make sure he is testifying in his

CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
25–28

Page 25

1    Feuer
2    individual capacity.
3        MR. MURPHY:  I asked if he knew.
4        MR. BERLOWITZ:  Okay.
5    BY MR. MURPHY:
6        Q.    You can answer.
7        A.    As far as I know, we did not have
8    any firm equity commitment at that point in
9    time.
10        MR. MURPHY:  Mr. Feuer, I will mark
11    Exhibit 2.
12        (Exhibit 2 was so marked for
13    identification.)
14        It's an e-mail chain.  The top e-mail
15    appears to be sent by you on May 29, 2023 to
16    Kathleen Lauster at Ankura.  The e-mail chain
17    is five pages.  For the record, it was sent to
18    me this morning.  The system wiped off the
19    Bates numbers, so I will get the Bates numbers
20    for the record later.
21        I have a couple of questions about
22    your top e-mail.  Do you want to review the
23    entire e-mail chain before I ask those?
24        A.    Why don't you start asking the
25    questions, and then I might.

Page 26

1    Feuer
2        Q.    Fair enough.  Who is Sixth Street?
3        A.    Sixth Street is a lender, as far as
4    I remember, provided debt to, I don't know, I
5    think to Bed, Bath and Beyond, therefore BuyBuy
6    Baby, a subsidiary of it, BuyBuy Baby.  But I
7    don't know exactly whether it was only BuyBuy
8    Baby or Bed, Bath and Beyond.  I can't talk
9    about.  I don't know.  As far as I know, they
10    were the main lender to BuyBuy Baby.
11        Q.    At this point in response to
12    Kathleen's question, would you have expected
13    the seller's note to be senior to MidCap or any
14    other financing?  Do you know the answer to
15    that question?
16        MR. BERLOWITZ:  Objection.
17        You can answer.
18        THE WITNESS:  I don't know what I
19    responded to that e-mail, but I would
20    expect I said no, meaning that MidCap,
21    the new lender, will probably not allow
22    anybody else having priority over them.
23    So that's my expectation today, and I
24    can't imagine that I would have had a
25    different opinion back then.

Page 27

1    Feuer
2        MR. MURPHY:  I'm going to mark
3    Exhibit 3.
4        (Exhibit 3 was so marked for
5    identification.)
6        It is another e-mail chain.  The top
7    e-mail was sent from Matthew Lapish on
8    May 21 of 2023.  It is six pages.  The
9    first Bates number is ANK-0049356.
10    BY MR. MURPHY:
11        Q.    Mr. Feuer, my first question is
12    related to this e-mail that Mr. Streader sent
13    on May 31, which was directed to you and
14    Ms. Lauster.  The third topic in the e-mail are
15    any updates from Second Avenue.  It appears
16    that is directed to you, based on my reading of
17    the e-mail.
18        Am I correct about that?
19        A.    It clearly says -- to me.
20        Q.    What is Second Avenue?
21        A.    Second Avenue is a lender that also
22    potentially, one of other arms that can make
23    equity investments.
24        Q.    Do you know if Second Avenue ever
25    agreed to invest?

Page 28

1    Feuer
2        A.    Through us?
3        Q.    Yes?
4        A.    We never had any signed agreement
5    as far I remember; no, as far as -- I don't
6    think we ever had anything.
7        Q.    Are you aware of any signed
8    agreements that you had for equity investment,
9    you meaning Go Global?
10        A.    I don't think we had a signed
11    agreement with any equity investor.  I don't
12    know for certain, but I don't remember of any
13    signed agreement.
14        Q.    In your capacity at Go Global would
15    you expect to be aware of such an agreement if
16    one existed?
17        A.    Yes; most likely.
18        Q.    This e-mail mentions the Perot
19    Group.  Did you have any communications with
20    the Perot Group in connection with this
21    potential investment?
22        A.    I, personally?
23        Q.    Yes?
24        A.    If my memory serves me correctly,
25    the answer is no.  I talk to a lot of people.



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
29—32

Page 29

1                    Feuer
2    I'm pretty sure I did not.
3        Q.    This top e-mail that was written by
4    Mr. Lapish, addressed to Jeff but sent to you,
5    Jeff and Ms. Lauster.  Right above the charts
6    it says "Sixth Street is in a position to try
7    to extract onerous terms for us to partner with
8    them, but their partnership gives us the
9    greatest leverage in being selected as the
10   stalking horse and ultimately winning the bid."
11        As of May 31, 2023, is that a
12   statement you personally would have agreed
13   with?
14        A.    Yes.
15        Q.    Can you tell me what your
16   understanding of the term "stalking horse" is?
17        A.    In the auction process the seller
18   tries to have a stalking horse bid signed,
19   which outlines the deal that others are going
20   to bid on; so that basically it's not only the
21   financial amount that is part of the bid, but
22   basically the bidders agree to assume -- it's
23   an asset purchase agreement to assume that
24   asset purchase agreement that has been
25   negotiated with the stalking horse bidder, so

Page 30

1                    Feuer
2    that it is not only a financial but also legal
3    agreement that the winner of the bid would more
4    or less assume.
5        Q.    In connection with the BuyBuy Baby
6    going concern, to the best of your knowledge,
7    was there a qualified stalking horse bid that
8    was ever submitted?
9        A.    I don't know.  I don't think so.
10       Q.    Did Go Global submit a stalking
11   horse bid?
12       A.    No.
13       Q.    Did Go Global ever submit a bid of
14   any kind related to BuyBuy Baby?
15       A.    How do you define "bid," please?
16   Or what do you mean by this specific term?  I
17   want to be clear that I can respond to that as
18   correct as I can.
19       Q.    As you understand the term "bid,"
20   did Go Global ever submit one related to BuyBuy
21   Baby?
22       A.    I'm pretty sure that we never
23   submitted a legally binding bid.
24       Q.    Did Go Global ever submit a
25   contingent bid?

Page 31

1                    Feuer
2        A.    We discussed a lot of potential
3    bids.  But if we submit -- that's where it's
4    sort of in the gray area.  We discussed a lot,
5    we discuss it, but did we submit?  I'm pretty
6    sure we never submitted a legally binding bid.
7    Did we discuss bids?  Maybe in writing, I can't
8    remember.  There were so many discussions
9    trying to figure this out.
10        MR. MURPHY:  I'm going to mark as
11   Exhibit 4.
12        (Exhibit 4 was so marked for
13   identification.)
14        It is an e-mail chain that starts by
15   an e-mail sent on June 17 by Matthew Lapish.
16   It is two pages.  Same issue with the Bates
17   numbers, I'll clear it up later for the record.
18   BY MR. MURPHY:
19        Q.    Mr. Feuer, I will scroll down to
20   the bottom e-mail which is the earliest e-mail
21   in the chain, and then scroll up slowly so you
22   can review.  Then I'll ask a few questions
23   (indicating).
24        Mr. Feuer, after reviewing this e-mail
25   chain, does this refresh your recollection of

Page 32

1                    Feuer
2    whether Go Global ever submitted a bid for
3    BuyBuy Baby?
4        A.    It states that I submitted a
5    contingent bid, so.
6        Q.    Am I correct that you submitted a
7    contingent bid on behalf of Go Global?
8        A.    Yes.
9        Q.    Am I correct that Lazard appeared
10   to have issues with this bid?
11       A.    That's how it appears, yes.
12       Q.    Do you know what those issues were
13   that Lazard had?
14       A.    I would have to guess, but I can't
15   tell you right now.
16       Q.    I don't want you to guess.  You
17   don't know?
18       A.    I don't remember.
19       Q.    Besides this contingent bid that
20   you submitted on June 16, 2023, are you aware
21   of any other contingent bids that were
22   submitted by Go Global?
23       A.    I don't remember.
24       Q.    Do you remember what this bid would
25   be contingent on?



Page 33

Feuer

1
2    A.    No, not for sure.  No, I don't know
3  what it was.
4    Q.    As of June 16, 2023 did Go Global
5  have sufficient equity commitment in order to
6  acquire BuyBuy Baby?
7    A.    We did not have the equity sitting
8  in an account to be deployed.  But we had
9  investors who expressed interest in doing so.
10    Q.    So I'm correct at this point, that
11  you had investors who were interested, but as
12  far as you are aware there were no written
13  agreements to commit equity to the deal?
14    A.    As far as I remember, I don't
15  remember that we had written agreements in
16  place.  I just don't remember.  They might
17  exist, but I don't know of them.
18    Q.    Do you know if the equity
19  commitments were something that Lazard had an
20  issue with?
21    A.    No.  I don't know that.  And just
22  to be specific, the conversations with Perot as
23  far as asset capital did not go through me; so.
24    Q.    I know you mentioned you talked to
25  or spoke to several potential investors and you

Page 34

Feuer

1
2  may not be able to remember them all.
3      Are there any that you can remember
4  today, potential investors?
5    A.    I talked to Deutsche Bank.  I had
6  lunch with them.  Second Avenue.  I talked to
7  MidCap.  I talked to Sixth Street.  I talked to
8  many.  I have to say I can't remember any more
9  specific names, because a lot of the investors
10  we were talking to the same people for
11  different deals.  So I can't distinguish who I
12  talked, when about which deal.
13        MR. MURPHY:  I'm going to mark what
14  I believe is Exhibit 5.
15        (Exhibit 5 was so marked for
16  identification.)
17        It is a four page e-mail chain that
18  starts with an e-mail from Christian
19  Feuer.  It was sent on June 20, 2023.  It
20  is four pages.  It begins with Bates
21  number GG-0021594.
22  BY MR. MURPHY:
23    Q.    Are you familiar with a Steve
24  Hannan?
25    A.    Yes.

Page 35

Feuer

1
2    Q.    And if you want to see any more of
3  the e-mail chain, let me know.  My questions
4  are going to involve this e-mail that Steve
5  Hannan sent on June 20 on which you are copied.
6        First, Steve indicates he is a board
7  member.  Do you know what he is a board member
8  of?
9    A.    He and I are both board members of
10  Janie and Jack.
11    Q.    He indicates that he is very
12  concerned.  Do you know what he was very
13  concerned about at that time?
14    A.    It would be good to read the
15  e-mail.
16    Q.    Sure.
17    A.    If you start maybe at the bottom.
18    Q.    That makes sense (indicating).
19  It's really, this is the top of the last e-mail
20  (indicating).
21    A.    Please move further down
22  (indicating).  Your question, please?
23    Q.    I want to know if you knew what
24  Steve Hannan was very concerned about that he
25  references in his e-mail?

Page 36

Feuer

1
2    A.    Specifically, I can't say that I
3  remember.  I can guess, but I can't remember
4  what his specific concern was.  I can't.
5    Q.    Do you know if you ever spoke to
6  Mr. Hannan about any concerns that he had
7  around this time?
8    A.    Probably, but I can't remember.
9  Again, I'm a board member, he's a board member,
10  and so I'm pretty sure we talked.  But do I
11  remember a specific conversation with specific
12  content?  The answer is no.
13    Q.    At this time what was Janie and
14  Jack's involvement in the potential transaction
15  going to be?
16    A.    If I remember correctly, we moved
17  forward with the thought model that Janie and
18  Jack would be getting involved into the
19  acquisition, which the idea was an SPV, Special
20  Purpose Vehicle, a standalone investment.  And
21  we migrated from there to have Janie and Jack
22  involved.  And there were various thought
23  models but no --
24        MR. MURPHY:  I will mark Exhibit 6.
25        (Exhibit 6 was so marked for



CHRISTIAN FEUER                                          October 07, 2024
GO GLOBAL RETAIL vs DREAM ON ME                                    37–40

Page 37

1                     Feuer
2        identification.)
3            It's an e-mail sent by Kathleen
4        Lauster on June 21 of 2023 to Mr.
5        Streader, Mr. Chau and Mr. Feuer, with
6        some people from Ankura copied.  It is
7        Bates number ANK-0048569.
8    BY MR. MURPHY:
9        Q.    Specifically, my questions are
10       going to be related to the paragraph that
11       starts with BTW, which means By The Way.  In
12       the first sentence of that paragraph it
13       references Wells.  Is that Wells Fargo?
14       A.    Yes.
15       Q.    What is Wells Fargo's relationship
16       with Janie and Jack?
17       A.    Well Fargo was entertaining to
18       replace MidCap as lender for Janie and Jack, in
19       that capacity supporting the acquisition of
20       BuyBuy Baby.  That's what I remember.
21       Q.    Her question says, "Insofar as
22       they," I believe referring to Wells, "allowing
23       Janie and Jack to use cash for the purpose,
24       would they allow the addition of recourse
25       debt?"

Page 38

1                     Feuer
2            Do you know the answer to that
3        question?
4        A.    No.  I don't know whether they
5        ultimately -- no, I don't know whether they
6        ultimately allowed that or not.  I'll say that.
7        Q.    I'm sorry.  I spoke over you.  I
8        didn't hear the last part of what you said.
9        A.    I'm not able to say whether they
10       ultimately allowed it or not.
11       Q.    Is that something that was pursued
12       by Go Global?
13       A.    To be quite honest, I'm not even
14       really sure what recourse debt means.
15       Q.    I was actually going to ask you
16       that.
17       A.    So I'm a little bit at a loss here.
18       So I can speculate what the intention of this
19       is, but I do not know for sure.
20       Q.    Based on your last answer, do you
21       have an understanding of what recourse debt
22       means?
23       A.    No, not fully qualified.
24            (Recess taken.)
25    BY MR. MURPHY:

Page 39

1                     Feuer
2        Q.    Mr. Feuer, are you familiar with
3        the term "recourse debt"?
4        A.    No.  I'm familiar with it, but the
5        exact meaning, I'm not able to define it.
6        Q.    Over the break I did a quick
7        Internet search, and it says that "Recourse
8        debt, also known as a recourse loan, is a type
9        of debt that holds the borrower personally
10       liable for the full amount of the loan.  This
11       means that if the borrower defaults on the
12       loan, the lender can pursue legal action or
13       collect assets from the borrower even after
14       taking collateral."
15            Do you have any reason to believe that
16       definition is not correct?
17       A.    No.
18            MR. BERLOWITZ:  Objection.
19            You can answer.
20            THE WITNESS:  I have no reason to
21       believe it's incorrect.
22    BY MR. MURPHY:
23       Q.    Based on that definition, as of
24       June 21, 2023, do you know if that is something
25       Janie and Jack and/or Wells Fargo would have

Page 40

1                     Feuer
2        found acceptable?
3            MR. BERLOWITZ:  Objection.
4            You can answer.
5            THE WITNESS:  I can't answer it.  I
6        can't answer it whether we would have
7        thought it is acceptable.  I don't
8        remember having any discussion about that
9        where I was involved.  But maybe just as
10       a general policy, I don't think that we
11       would allow anything like that any debt
12       like that.
13    BY MR. MURPHY:
14       Q.    In the last sentence of that
15       paragraph she also asks "Also, have you
16       approached them about financing a transaction?"
17       I believe the "them" she is referring to is
18       Wells Fargo.
19            Do you know if Wells Fargo was ever
20       approached about the transaction?
21       A.    As I mentioned earlier, we were in
22       discussions to replace MidCap Capital through
23       Wells Fargo as lender.  In that context, the
24       most likely approach was Wells Fargo to
25       participate in the acquisition.  I don't think



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
41—44

1          Feuer
2   that Wells Fargo, we were ever able to come
3   together with Wells Fargo, since MidCap is
4   still our lender.
5          Q.    Above that, next to the bullet
6   points, there's an acronym ABL.  Do you know
7   what ABL stands for?
8          A.    Asset Backed Loan.
9          Q.    Below that it says term loan on IB.
10  Do you know what IB stands for?
11         A.    I assume it is meant to be IP, as
12  Intellectual Property.
13         Q.    That was going to be my follow-up
14  question, what I thought as well.  Okay; thank
15  you.
16         I'm going to switch gears now.
17         Are you aware of an entity called
18  Dream On Me?
19         A.    Yes.
20         Q.    When did you first become aware of
21  Dream On Me?
22         A.    Sometime in June.
23         Q.    How did you first become aware of
24  Dream On Me?
25         A.    If I remember correctly, Dream On

1          Feuer
2   Me was introduced to us either through Lazard
3   or Ankura.  I think through Lazard.
4          Q.    Prior to that introduction by
5   Lazard, did you have any familiarity with Dream
6   On Me?
7          A.    No.
8          Q.    You mentioned earlier that you were
9   involved in the process related to a
10  nondisclosure agreement for Dream On Me.  What
11  was your involvement in that process?
12         A.    I think that I was the first to
13  have direct contact with Dream On Me associates
14  or Dream On Me consultants.  And so that's how.
15         Q.    Do you remember who at Dream On Me
16  you had first contact with?
17         A.    Either it was Milan or Abhishek.  I
18  don't remember who was first.
19         Q.    That was Milan or Abhish, you said?
20         A.    Abhishek.
21         Q.    Do you remember if that first
22  contact with Dream On Me was a telephone call
23  or something else?
24         A.    No.  I don't know whether that was
25  maybe an e-mail first and then a phone call or

1          Feuer
2   text message.  Probably something in writing
3   before we talked.
4          Q.    Do you remember when that was?
5          A.    Beginning of June.
6          Q.    Did there come a time you met with
7   Dream On Me in person?
8          A.    Yes.
9          Q.    How many in-person meetings did you
10  have with Dream On Me?
11         A.    I believe there were only two.
12         Q.    You were present for both of them;
13  correct?
14         A.    Yes.  I was present for both
15  in-person meetings.
16         Q.    When you first had communications
17  with Dream On Me until the first in-person
18  meeting, do you know about how much time
19  passed?
20         A.    A few days.
21         Q.    Do you remember if your first
22  contact with Dream On Me was over the weekend?
23         A.    No.  I don't remember whether it
24  was over a weekend or not.
25         Q.    Have you ever seen a nondisclosure

1          Feuer
2   agreement that Dream On Me signed?
3          A.    Yes.
4          Q.    Do you know if you sent the
5   agreement to Dream On Me to sign?
6          A.    Yes, I believe I sent it.
7          MR. MURPHY:  I'm going to mark as
8   Exhibit 7.
9          (Exhibit 7 was so marked for
10  identification.)
11         It is a document entitled
12  Nondisclosure Agreement, has a Go Global logo
13  across the top of it.  It is a four page
14  document that begins Bates number DOM000031.
15  BY MR. MURPHY:
16         Q.    Mr. Feuer, do you recognize this
17  document?
18         A.    Yes.
19         Q.    Is this the nondisclosure agreement
20  signed by Dream On Me?
21         A.    Definitely looks like it, yes.
22         Q.    Do you know if this agreement is a
23  standard form that Go Global also sent to other
24  entities?
25         A.    We have a standard form.  I can't



Page 45

1                   Feuer
2    tell you whether this is exactly the standard
3    form, but probably yes.
4        Q.   When you're speaking to potential
5    investors, do you frequently send them
6    nondisclosure agreements to execute?
7           MR. BERLOWITZ:  Objection.
8           You can answer.
9           THE WITNESS:  Absolutely; yes.
10   BY MR. MURPHY:
11       Q.   Are there often negotiations over
12   the terms of those agreements?
13          MR. BERLOWITZ:  Objection.
14          You can answer.
15          THE WITNESS:  You need to define
16   "often."
17   BY MR. MURPHY:
18       Q.   The majority of the time, are there
19   negotiations over the terms of those
20   agreements?
21       A.   Depends on who we're talking to.
22   It really depends.  Some people accept it as it
23   is, others don't.
24       Q.   In this particular case, do you
25   know if Dream On Me accepted it as it is?

Page 46

1                   Feuer
2        A.   I believe they accepted it as it
3    is.
4        Q.   Did you personally send out other
5    nondisclosure agreements in connection with the
6    BuyBuy Baby potential transaction?
7        A.   Probably, but I can't give you an
8    affirmative answer to that.  There's so many.
9        Q.   If the recipient of the proposed
10   nondisclosure agreement did want to negotiate
11   the terms, is that something you would handle
12   or something someone else would handle at Go
13   Global?
14       A.   Depends.  Often if I reached out to
15   the entity it came back to me, and yes.
16       Q.   Do you know if you personally
17   modified any nondisclosure agreements related
18   to the BuyBuy Baby transaction?
19       A.   No, not affirmative.  I don't
20   remember whether I did or not.
21       Q.   Am I correct that you might have,
22   but you don't remember?
23       A.   Exactly, yeah.  I definitely in
24   other cases.  I don't remember which NDA I
25   negotiated in which terms.  Banks have very

Page 47

1                   Feuer
2    specific, lenders have very specific areas that
3    they cannot accept.  Equity investors are very,
4    very different from that perspective.  So if
5    the lender would not have accepted this NDA.
6        Q.   Do you know what specifically a
7    lender would not have accepted about this NDA?
8        A.   Yes.
9        Q.   What is that?
10       A.   No circumvention.
11       Q.   Do you know if Go Global entered
12   into any NDAs in connection with this potential
13   transaction that did not include a
14   non-circumvention clause?
15       A.   I would assume all the lender NDAs
16   did not include non-circumvention, do not
17   include non-circumvention; because a lender
18   has, a lender will never sign a
19   non-circumvention agreement because they might
20   want to work with somebody else on the same
21   deal in case, for example, we can come
22   together, they will never agree to therefore
23   not working with anybody else on the deal,
24   because we might not like their terms and
25   therefore they know we don't want to.

Page 48

1                   Feuer
2    Therefore the deal would be not possible for
3    them.  So therefore a lender, as far as I know,
4    never agrees to non-circumvention, at least not
5    that I know of.
6        Q.   Do you know if any of the
7    nondisclosure agreements entered into potential
8    equity investors related to BuyBuy Baby did not
9    include non-circumvention clauses?
10       A.   I don't know specifically here,
11   because I have not been part of all NDAs.  I
12   can't imagine that we would sign an NDA or
13   accept an NDA without non-circumvention for an
14   equity investor.  Hard to imagine.  Is it
15   possible?  Maybe, but hard to imagine.  I would
16   probably never agree to that.
17       Q.   Do you know if Go Global entered
18   into any NDAs with equity investors related to
19   the BuyBuy Baby potential transaction that
20   included non-circumvention clauses that were
21   not applicable if Go Global did not submit a
22   qualified bid for BuyBuy Baby?
23       A.   I do not remember other NDAs,
24   personally that involved equity investors.  So
25   I don't remember.  Do they exist?  Maybe, but I



CHRISTIAN FEUER                                          October 07, 2024
GO GLOBAL RETAIL vs DREAM ON ME                              49–52

Page 49

1           Feuer
2   do not remember.
3       Q.   Have you personally, for Go Global,
4   agreed to non-circumvention clauses for equity
5   investors that were not applicable if Go Global
6   did not submit a qualified bid?
7       A.   This specific case here or in other
8   situations?
9       Q.   My question was more general, in
10  other situations.  But I'd also like to know
11  about specific to this transaction.  So please
12  answer both.
13      A.   I don't know whether that's the
14  case in either.  It's highly unlikely.  Is
15  there a specific situation that justifies to
16  agree to that?  I can't -- I don't remember why
17  I personally would agree to it, because the
18  whole point of an equity investor is a
19  potential competitor.  And why I would agree to
20  that, I do not know why I would want to do
21  that.  Hard to imagine.  Therefore, I can't
22  remember a specific situation.
23      Q.   The first in-person meeting that
24  you attended with Dream On Me, do you remember
25  where that took place?

Page 50

1           Feuer
2       A.   Somewhere in Manhattan, at a
3   steakhouse.
4       Q.   Do you remember who was present?
5       A.   From our side, it was Deborah
6   Gargiulo and myself.  Then we had Mark -- then
7   I believe Abishek and Milan.  But I can't say
8   exactly who was exactly there, but I know Mark
9   -- probably Milan and Abhishek, but.
10      Q.   Was there anyone from Ankura at
11  that dinner?
12      A.   Maybe, could very well be, probably
13  Kathleen maybe.
14      Q.   There may have been someone from
15  Ankura but you're not sure; is that correct?
16      A.   That's correct.
17      Q.   What do you remember about that
18  dinner?
19      A.   What do I remember?  Nice steaks,
20  friendly conversations where we tried to
21  understand how serious the DOM team was in
22  participating working together with us.  And
23  our understanding was that they felt they
24  needed somebody who is a retailer.  They were,
25  from the product perspective, very competent.

Page 51

1           Feuer
2   But huge difference between developing product
3   and selling it through wholesale versus selling
4   to customers directly.  So it seemed to be as
5   when their and our competence would be a great
6   fit.
7       Q.   When you first met with Dream On Me
8   was the intention for them to be involved in
9   the day-to-day operation of BuyBuy Baby, or
10  were they only going to be a financial
11  investor?
12      A.   I would say our expectation was
13  that we would run the retail model, meaning
14  stores and online, and they would support the
15  sourcing of product.  The number one expense
16  for a retailer generally, often, is the product
17  and their sourcing capability would have been
18  beneficial to optimize expenses there.
19           We would not have expected them to be
20  involved in running stores and online
21  businesses, because we didn't expect them to
22  have any competence there.
23      Q.   So when you first met with them,
24  was it your expectation that they were going to
25  be potentially a general partner or a limited

Page 52

1           Feuer
2   partner?
3       A.   That was not defined.  Our
4   preference would have been limited, but general
5   partner would have been acceptable.  I don't
6   remember that we discussed that at dinner.
7       Q.   When you first met with Dream On
8   Me, was the plan for Go Global to contribute
9   equity to the potential transaction?
10      A.   Equity through limited partners,
11  that was definitely considered.
12      Q.   What about money actually from Go
13  Global itself?
14      A.   You mean the partners?
15      Q.   Meaning, at this time was it
16  presented that Go Global would be contributing
17  ████████ towards the acquisition of BuyBuy
18  Baby?
19      A.   That we would provide capital
20  through partners.  I don't remember whether
21  how we presented it or what we presented, but
22  that we would have through our network provided
23  equity.  I think that's how it was.
24      Q.   Back to the process of having the
25  NDA signed with Dream On Me.  Am I correct that



CHRISTIAN FEUER                                            October 07, 2024
GO GLOBAL RETAIL vs DREAM ON ME                            53–56

Page 53

1                        Feuer
2   you were dealing with Abhishek on that?
3       A.   Pretty sure, yes.
4       Q.   Do you remember if Abhishek signed
5   the NDA the same day you sent it to him?
6       A.   If I remember, you showed me the
7   NDA, it says 6/10.  Probably.  I think, we
8   moved very quickly, so definitely possible that
9   I sent it to him on 6/10 and he signed it the
10  same day.
11      Q.   I put the nondisclosure agreement
12  back up.  It is dated 6/10 in the first line.
13      A.   I don't know whether I sent it to
14  him on 6/10.  I wish I had a memory like that,
15  I would remember which e-mail was sent on which
16  date.  That would be great.
17      Q.   If I told you 6/10 was a Saturday,
18  does that sound right?
19      A.   Totally possible.  This was a deal
20  with a very short fuse, which got longer and
21  longer.
22      Q.   When you say it was "a deal with a
23  short fuse that got longer and longer," are you
24  referring to extensions in the auction date?
25      A.   Yes.

Page 54

1                        Feuer
2       Q.   I'll represent to you my
3   understanding is the in-person meeting at the
4   restaurant occurred on June 12, which was a
5   Monday evening.
6        Does that sound right to you?
7       A.   Yes.  Could very well be.
8       Q.   What was your impression of Dream
9   On Me when you left the in-person meeting on
10  the 12th?
11      A.   We believed, I believed that Dream
12  On Me would be a viable partner.  Our retail
13  experience on the one side, their sourcing
14  experience on the other side would be
15  strategically very good, where both sides can
16  contribute.  That was our view.
17      Q.   As of that time, on the evening of
18  the 12th after the meeting, did you have any
19  concerns about Dream On Me?
20      A.   Under the assumption that Dream On
21  Me is living up to their legal contract they
22  signed and lived up to that, we assumed we can
23  trust them.
24      Q.   Am I correct that Go Global had its
25  own data room related to this potential

Page 55

1                        Feuer
2   transaction?
3       A.   Specifically, Ankura together with
4   the data room and our name, that allowed others
5   to see the documents that we had put into that
6   data room, specifically Ankura has put to that
7   data room.
8       Q.   It would be accurate for me to say
9   that Ankura managed the data room related to
10  this transaction on Go Global's behalf?
11      A.   That would be correct.
12      Q.   Once Dream On Me signed the
13  nondisclosure agreement, were they then granted
14  access to the data room hosted by Ankura?
15      A.   Sooner or later, yes.  But I can't
16  tell you whether that happened on 6/10, 11 or
17  12.  I don't know.  But it was.  We would never
18  have let anybody into the data room without
19  signing an NDA.
20      Q.   Do you know if all entities that
21  signed NDAs with Go Global related to this
22  transaction received the same level of access
23  to the data room?
24      A.   Do I know that?  No.  I personally
25  don't know that.  What I know for a fact is,

Page 56

1                        Feuer
2   not for a fact, but most likely, over time the
3   contents of the data room changed depending on
4   the information we had available to us.  So not
5   everybody had the same access; most likely, but
6   it's a question of time.
7       Q.   And I'm correct that the data room
8   hosted by Ankura contained proprietary and
9   confidential information of Go Global; right?
10      A.   Yes.
11      Q.   Did Go Global hold information back
12  from the data room related to this transaction,
13  or was all of the confidential proprietary
14  information related to this transaction in the
15  data room?
16      A.   I wouldn't classify we held
17  anything back, not the right term, but would
18  express it differently.  Not every piece of
19  information we had was in the data room.
20  That's for sure, because it was not deemed
21  relevant for investors for different versions
22  of the model or whatever.  It was not having
23  all the information we had within the data
24  room.
25      Q.   Are you familiar with a Thoryn



Page 57

1          Feuer
2    Stevens?
3        A.   Yes.
4        Q.   What is your understanding of what
5    Thoryn Stevens does for Go Global or did for Go
6    Global?
7        A.   We as Go Global are a team of
8    different operators with specific backgrounds
9    that are relevant to run or turn a business
10   around.  And Thoryn Stevens has one very
11   specific knowledge, which is IT where, for
12   example, I'm not an IT guy.  If I have an IT
13   question I would have gone to Thoryn Stevens
14   and say "Hey, Thoryn, what do we do here?
15   Figure it out."
16       Q.   Do you know if Thoryn Stevens is
17   still affiliated with Go Global?
18       A.   I don't think he is affiliated
19   anymore.
20       Q.   Do you know approximately when he
21   ceased to be affiliated?
22       A.   I can't tell you that.
23       Q.   Have you had any contact with
24   Thoryn Stevens since he ceased being affiliated
25   with Go Global?

Page 58

1          Feuer
2        A.   I haven't talked to him for a long
3    time.  I don't know when his affiliation
4    ceased.  So therefore, I definitely cannot tell
5    you.  I don't even know when I talked to him
6    for the last time.
7        Q.   I'm sorry.  Did you say "I have not
8    talked to him for a long time"?
9        A.   I have not talked to him for quite
10   a while.  I don't think I talked to him this
11   year, to give you an idea.
12       Q.   Do you know if Thoryn developed an
13   IT model related to this potential transaction?
14       A.   A team model, I'm not sure whether
15   that would be the right term.  But an IT
16   migration plan, I would say yes.
17       Q.   Would that have been in the data
18   room?
19       A.   No, because IT is super important
20   but we would assume that the investors would
21   assume that we figure this out.  But it is not
22   a determinator to decide whether I want to
23   invest into a business.  It must have -- but it's
24   not a determinator.
25           MR. MURPHY:  I'm going to mark as

Page 59

1          Feuer
2    Exhibit 8 a three-page e-mail chain.  It starts
3    with an e-mail from Jeff Streader on June 13 of
4    2023, to Thoryn Stevens.  Mr. Feuer and Mr.
5    Chau are copied on the e-mail.  The subject of
6    the e-mail is Dream On Me.
7           (Exhibit 8 was so marked for
8           identification.)
9           I'll add the Bates numbers for the
10          record later.
11   BY MR. MURPHY:
12       Q.   Mr. Feuer, this third line of Mr.
13   Streader's e-mail says "Remember, they do not
14   have the secret sauce and we will not give it
15   to them."
16       Do you know who the "they" is that he
17   is referring to?
18       A.   Since the subject line is Dream On
19   Me, I assume it is them.
20       Q.   Do you know what the secret sauce
21   is that he's referring to?
22       A.   Again, I'm not an IT guy, so do I
23   know the specifics of the secret sauce of IT?
24   No.  The specifics, not.  But I think the plan
25   to migrate, as I said before, is important, but

Page 60

1          Feuer
2    it is not the determiner of the success of the
3    business.  If he messes it up -- but it is not
4    the determinator for the success of the
5    business.
6        Q.   Do you know if the secret sauce was
7    provided to other equity investors?
8        A.   I cannot tell you that.
9           MR. BERLOWITZ:  Objection.
10          THE WITNESS:  I can expand on that.
11   Simply, challenge of BuyBuy Baby to be
12   successful was not an IT question.  The
13   challenge, or the success was the ability
14   to sell, the ability to manage costs.
15   That was a challenge and that's where
16   basically all investors were interested
17   in.
18   BY MR. MURPHY:
19       Q.   I want to direct you to this e-mail
20   that you wrote to Thoryn on June 13 of 2023.
21   It's the middle of the page.  Can you review
22   that e-mail for me, please?
23       A.   Yes.
24       Q.   So I'm correct this was June 13,
25   early morning that you sent an e-mail which



CHRISTIAN FEUER                                          October 07, 2024
GO GLOBAL RETAIL vs DREAM ON ME                         61–64

Page 61

1              Feuer
2    would be the morning after your meeting with
3    Dream On Me; correct?
4        A.   Assuming dinner was on the 12th,
5    you are correct.
6        Q.   The first line of the e-mail
7    references a meeting yesterday evening?
8        A.   It must be, yes.
9        Q.   You say "Thoryn, it would very
10   helpful to give them confidence regarding our
11   technology plan.  We have two more days for
12   them to become our partner."
13            When you sent this e-mail do you know
14   what you were looking for Thoryn to do?
15       A.   From a specific level, absolutely
16   not because again I'm not an IT guy.  That's
17   not my world, I'm a front end guy.  But from
18   what he should have achieved was to give Dream
19   On Me the understanding that we have a plan and
20   can solve, carve out we have done it before.
21   That's the objective what I tried -- them.
22       Q.   Did you personally ever meet with
23   Amit from Dream On Me?
24       A.   Amit?
25       Q.   He sent this e-mail to you on June

Page 62

1              Feuer
2    12.
3        A.   I would assume.  But I don't know
4    Amit is a Dream On Me tech guy, that he asked a
5    question.
6        Q.   I represent to you that's correct.
7        A.   I don't think I ever met with him.
8    Maybe he was at the meeting we had later that
9    week.  But I don't know.  I really don't know.
10   Again, IT is not my focus.
11       Q.   Am I correct that you subsequently
12   attended an in-person meeting at Dream On Me's
13   office in New Jersey?
14       A.   That's correct.
15       Q.   Am I correct that the meeting was a
16   couple of days later?
17       A.   Yes.
18       Q.   If I told you that meeting was June
19   15, does that sound right?
20       A.   Sounds right.
21       Q.   Going into that meeting on June 15,
22   what were your feelings about Dream On Me?
23       A.   We expected that they could be a
24   partner, didn't really know them, but we still
25   went there because we believed that what we had

Page 63

1              Feuer
2    discussed before was true and correct and we
3    relied on their representation of intentions.
4    And so, as a skeptic/optimist I was trying to
5    figure out whether we'd come out with this
6    together to partner up to acquire BuyBuy Baby.
7        Q.   Prior to your June 15 meeting, did
8    you have any concerns that Dream On Me may try
9    to pursue BuyBuy Baby without Go Global?
10       A.   We were definitely concerned,
11   because there were concerns.
12       Q.   Why did you have those concerns at
13   that time?
14       A.   We had concerns because they were
15   interested in acquiring the business by
16   themselves.  Reference said they wouldn't do it
17   without a partner with retail knowledge,
18   because that's not what they know how to do.
19   Always, often in life you have to decide to
20   trust what people say and to protect yourself
21   in legal agreements, that people are bound to
22   do what they say.  Which I guess was not the
23   case here.
24       Q.   Did you have any discussions with
25   anyone from Dream On Me about any of the

Page 64

1              Feuer
2    specific terms of the nondisclosure agreement?
3        A.   Not that I recall.
4        Q.   Do you personally know whether
5    Dream On Me was aware of the non-circumvention
6    clause when they signed the nondisclosure
7    agreement?
8        A.   They presented themselves as a
9    pretty successful, meaningful business, which
10   on the 15th showed probably a huge warehouse
11   with, I don't know, tens of millions of dollars
12   of inventory.  I assume they read what they
13   sign, too.  They clearly made clear that they
14   are not a little street vender, but a
15   professional entity.
16       Q.   What do you remember about the
17   meeting on June 15?
18       A.   As I said before, very impressive
19   to see the building.  It was very new, spoke to
20   the fact they are successful in what they are
21   doing.  That's the appearance we got.  And we
22   had virtually some good discussions, but later
23   on it became clear that, not necessarily clear,
24   it became clear they they felt they should run
25   the business.  And I got the feeling is when



Feuer
1
2  they had very high -- how to put this?  Of
3  themselves, had extremely high esteem in what
4  they know without knowing, I believe, what they
5  didn't know.  So.
6      Q.    You mentioned that there were
7  initially good discussions.  What can you tell
8  me about those?
9      A.    To be quite honest, I can't tell
10 you exactly how the meeting, what was discussed
11 when.  There was some degree going through the
12 plans, much more direct specific level.  During
13 dinner we just met each other, had a general
14 idea what we do, what they do.  Here we went
15 through the presentation that we had prepared,
16 I believe.  Then later on we went through the
17 model.
18     Q.    Were all of the people who were at
19 the dinner on the 12th at the meeting on the
20 15th?
21     A.    I believe so.  Maybe somebody was
22 not, but generally the answer is yes.
23     Q.    Am I correct that Jeff Streader was
24 not at the dinner meeting?
25     A.    That's correct.

Feuer
1
2      Q.    Am I also correct that Jeff
3  Streader attended the June 15 meeting but that
4  he attended virtually?
5      A.    That's correct.
6      Q.    Did you have any communications
7  with Dream On Me after the June 15 meeting?
8      A.    I think there were some
9  communications afterwards.
10     Q.    By you, specifically?
11     A.    I think I had some communications
12 with Milan.
13     Q.    Did you think you communicated with
14 anyone else from Dream On Me besides Milan
15 after June 15?
16     A.    I can't remember.
17     Q.    Those communications with Milan,
18 would they have been telephone conversations or
19 over text or WhatsApp or some other form of
20 communication?
21     A.    I can't remember.  Probably both,
22 but I really can't remember whether one or the
23 other.
24     Q.    Do you know if Mr. Streader wanted
25 to have any further meetings with Dream On Me

Feuer
1
2  after the 15th?
3      A.    I can't tell you.  I don't know.
4          MR. MURPHY:  I'm going to mark as
5      Exhibit 9 a one page e-mail chain.  It is
6      Bates number GG-0008746.  It's an e-mail
7      from Jeffrey Streader, June 15, 2023 at
8      6:12 p.m.
9          To Kathleen Lauster and several
10     people are copied on the e-mail,
11     including Mr. Feuer.
12         (Exhibit 9 was so marked for
13     identification.)
14 BY MR. MURPHY:
15     Q.    Mr. Feuer, am I correct this e-mail
16 would have been sent the same day but after the
17 completion of the meeting with Dream On Me?
18     A.    Seems to be the same day, yes.
19     Q.    Do you remember Mr. Streader saying
20 "Nothing else, Milan, no more calls, no more
21 meetings, they know the timeline"?
22     A.    Reading it now, do I remember
23 specifically?  No.
24     Q.    I see the typo THY, assuming that
25 is "they."  Is your understanding the "they" he

Feuer
1
2  would be referring to is Dream On Me?
3      A.    Yes, I guess.
4      Q.    Above that he wrote "We spent way
5  too much time on how to reduce our carry and
6  why DOM should get more since they deliver ███
7  ████████ of the value of the future co."
8          Can you tell me anything about that?
9      A.    As I mentioned before, it became
10 clear that the DOM team believed that it's all
11 about what they contribute, their ability to
12 buy product and didn't indicate the meaningful
13 value we provide.  So therefore it -- majority
14 of the rewards instead of sharing it in some
15 shape or form.
16     Q.    Do you remember discussions about
17 how to reduce your carry?
18     A.    I think there was -- I don't
19 remember the specifics.  What I remember is
20 that Dream On Me team, specifically Mark,
21 believed that it's all about what they
22 contribute and discounted everything we
23 contributed, and basically say hey, it's my
24 show.  I can't deal.  So that's sort of was
25 expressed by him clearly.  We had definitely a



Page 69

1              Feuer
2    different perspective where we would partner
3    and contribute, because we think we contribute
4    more than they, but that's not a basis for
5    partnering.
6        Q.   After the meeting on the 15th did
7    you still believe a partnership with Dream On
8    Me was viable?
9        A.   It would have been viable if there
10   would have been terms that would be equitable
11   or which, as far as I know, was never expressed
12   by Dream On Me.
13           (Recess taken.)
14   BY MR. MURPHY:
15       Q.   Mr. Feuer, before I go to the model
16   I have a couple of additional questions.  When
17   Dream On Me returned the NDA to you, were you
18   surprised they did not request any changes?
19       A.   No.  The NDA is set up in a way
20   that takes into consideration both sides of
21   both parties, so that when we have it out, as I
22   said, we can agree all changes are minor.  So
23   therefore it's not a one sided NDA.  Usually
24   most entities can sign it more or less as is.
25       Q.   When you say it's not one sided,

Page 70

1              Feuer
2    was it a mutual NDA?
3        A.   One-sided, meaning that it requests
4    terms that are not easily accepted by others.
5        Q.   Am I correct that it was not a
6    mutual NDA?
7        A.   I don't think there is a mutual
8    NDA.
9        Q.   Was one of the purposes of the NDA
10   to restrict Dream On Me from bidding on BuyBuy
11   Baby?
12       A.   As I said, basically every equity
13   investor has a non-circumvention included.
14       Q.   At the time that you submitted the
15   contingent bid on June 16, did you submit a
16   deposit with that bid?
17       A.   Sorry?
18       Q.   Did you have to submit a deposit
19   with that bid?
20       A.   I know at some point we provided a
21   deposit, I believe.  There were so many
22   iterations in that process, it is not really
23   clear to me, memory, what was happening exactly
24   then.
25       Q.   I'm going to go back to what I had

Page 71

1              Feuer
2    marked Exhibit 5.  It's an e-mail chain.
3    Looking at where my cursor is here, it says,
4    "Although we submitted it LOI."
5        A.   Sorry.  I don't see your cursor.
6    Now I see it, okay (indicating).
7        Q.   "Although we submitted an LOI and
8    deposit on Friday, June 16, there are others
9    that are not ready and successfully received an
10   extension."
11           First off, do you know what LOI stands
12   for?
13       A.   I think it's Letter Of Intent.
14       Q.   Would that be the same as your
15   contingent offer or something different?
16       A.   I can't say that.  I don't know.
17   An LOI could be, an intention, not binding
18   agreement; right?  So I don't know whether that
19   word LOI and bid was used synonymously.  I
20   can't tell you.
21       Q.   It may or may not have been?
22       A.   It may not -- yeah.  Usually an LOI
23   is -- I'm literally guessing, I can't tell you.
24       Q.   We don't want you to guess.  This
25   e-mail is from Jeff Streader and it refers to a

Page 72

1              Feuer
2    deposit on June 16.  Does that indicate you
3    submitted a deposit on that day?
4        A.   Very much sounds like it.
5            MR. MURPHY:  I'm going to mark
6    Exhibit 10.  It's an eight page document.
7            (Exhibit 10 was so marked for
8    identification.)
9            It's from Christian Feuer at Go
10   Global to Lazard, attention Christian
11   Tempke.  It's eight pages.  It starts on
12   Bates number GG-0030208.
13   BY MR. MURPHY:
14       Q.   Mr. Feuer, do you recognize this
15   document?
16       A.   Yes.
17       Q.   Did you prepare this document?
18       A.   I haven't seen that document for
19   probably fifteen months or so, so I would have
20   to familiarize myself with this again.  I
21   assume it is from me.  The spelling of my last
22   name is not correct I assume -- definitely I
23   was involved in it for sure.  Looks very much,
24   I probably put this together.  Maybe if you
25   scroll down, my memory (indicating).  I can't



CHRISTIAN FEUER                                          October 07, 2024
GO GLOBAL RETAIL vs DREAM ON ME                         73–76

Page 73

1              Feuer
2    read it so quickly.  Keep on going please.
3         Q.   Tell me when to stop?
4         A.   Keep on going (indicating).  This
5    is a spreadsheet of -- keep going, please.
6    (Indicating.) I was wondering, I couldn't
7    remember that I wrote an eight page -- this is
8    just all the exhibits that add to the eight
9    pages.
10        Q.   Correct.  It appears to be the last
11   two pages reflect, one is blank, a screen shot
12   of a wire transfer, and the last page appears
13   to reflect the Bank of America --
14        A.   Do me a favor and enlarge it?  I
15   would love to see.
16        Q.   Yes (indicating).  How's that?
17        A.   So this was from Janie and Jack.
18        Q.   It's in the amount, appears to be
19   ██████████
20        Do you know anything about this?
21        A.   We made a deposit of ████████.
22        Q.   That was on June 16 when you
23   submitted that contingent we talked about
24   earlier; is that correct?
25        A.   Yes.  That's correct.

Page 74

1              Feuer
2         Q.   This document reflects under the
3    purchase price section that Go Global was
4    valuing the intellectual property at ████
5    ████  Does that sound correct?
6         A.   Yes.  That sounds correct.
7         Q.   At this time it looks like Go
8    Global intended on taking 20 stores; is that
9    correct?
10        A.   That's correct.
11        Q.   Am I correct that the number of
12   stores that Go Global intended on maintaining
13   if they acquired BuyBuy Baby changed over time?
14        A.   You're asking whether number of
15   stores changed over time that we intended to
16   acquire?
17        Q.   Yes, that you intended to keep
18   open?
19        A.   Yes.  That changed over time.
20        Q.   Am I correct that number decreased
21   over time?
22        A.   That is correct, it decreased.
23        Q.   From your perspective, why did that
24   number decrease?
25        A.   So, the area of the stores became

Page 75

1              Feuer
2    less and less attractive because the inventory
3    remaining in the stores was for actual reasons
4    became less and less attractive.  Inventory got
5    discounted, and the best -- the items with the
6    highest turn sold first, which made the start
7    up of the business more difficult because these
8    would be items we'd have to acquire the
9    inventory that we acquired -- not having no
10   value, it was a lot less valuable, and would
11   take time to restock the business by acquiring
12   these inventories.
13        So there would have been meaningful
14   amount before we were somehow cash flow
15   positive, simply that reason.  So in order to
16   limit the start-up cost for the investment,
17   reduce the number of stores that the inventory
18   required.
19   ████████████████████████████
20   ████████████████████████████
21   ████████████████████████████
22   ████████████████████████████
23   ████████████████████████████
24        What does COGS stand for?
25        A.   Cost Of Goods.

Page 76

1    ████████████████████████████
2    ████████████████████████████
3    ████████████████████████████
4    ████████████████████████████
5    ████████████████████████████
6    ████████████████████████████
7    ████████████████████████████
8    ████████████████████████████
9    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
1    ████████████████████████████
2    ████████████████████████████
2    ████████████████████████████
2    ████████████████████████████
2    ████████████████████████████
24        MR. MURPHY: I'm going to mark as
25   Exhibit 11 an Excel spreadsheet with multiple



Page 77

Feuer

1   tabs, Bates numbered DOM0000075.
2        (Exhibit 11 was so marked for
3        identification.)
4   BY MR. MURPHY:
5        Q.   Mr. Feuer, do you recognize this
6   document?
7        A.   Yes.
8        Q.   What do you recognize this document
9   to be?
10       A.   What we see in front of us is
11  something that I created personally, and is our
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which
13  we applied for every deal that we make.
14       Q.   I represent to you that my
15  understanding is this version is Version 9,
16  which you said you reviewed in preparation for
17  the deposition today.
18       Are you able tell by looking at this
19  document whether it is Version 9?
20       A.   No.  It sounds, it's definitely
21  within the vicinity --
22       Q.   Do you have any reason to believe
23  this is not Version 9?
24       A.   No.  I can pull it up and compare,

Page 78

Feuer

1   it's probably what it is.  I have no reason to
2   believe it is something different.
3        Q.   If any point during my questions
4   related to this document you see something that
5   makes you believe it is not Version 9, let us
6   know.
7        A.   I will.
8        Q.   It's my understanding that this
9   would be the version that was provided to Go
10  Global on or around June 11 of 2023.  Does that
11  sound correct to you?
12       A.   It was provided to Go Global, I
13  don't think so.
14       Q.   Sorry.  I meant Dream On Me?
15       A.   That's probably correct, yes.
16       Q.   I'll ask the question again.  It is
17  my understanding that the version of the model
18  that we are looking at was providded to Dream
19  On Me on or around June 11 of last year.  Does
20  that sound right to you?
21       A.   I have to say, I don't know whether
22  we provided it, the NDA was signed on the 10th.
23  We had the dinner on the 12th.  I don't know
24  whether we provided the model prior or

Page 79

Feuer

1   afterwards.  I can't tell you.  It would
2   definitely, since the NDA was signed, we have
3   made it available on the 11th.  Makes sense.
4        Q.   I want to look at the cap table.
5   The first line is family office, and it
6   indicates ▮▮▮▮▮▮.
7        Do you see that?
8        A.   Yes.
9        Q.   At this time would that be one
10  family office that contributed ▮▮▮▮▮▮▮
11       A.   Yes.
12       Q.   Do you know what family office that
13  would have been?
14       A.   I think that we had considered at
15  that time the Dream On Me as one option.
16       Q.   It should be ▮▮▮▮▮▮
17       A.   Yes.
18       Q.   How about family office 2 that was
19  supposed to contribute ▮▮▮▮▮▮n, according
20  to the model?
21       A.   Could have been Perot.  But none of
22  these numbers were specifically assigned to a
23  specific entity at that point in time.
24       Q.   And then, how about the third line

Page 80

Feuer

1   down.  It says "Go Global ▮▮▮▮▮▮▮▮▮
2   At this time was Go Global contributing ▮▮
3        A.   That could have been in this case,
4   assuming Janie and Jack, were existing partners
5   of Janie and Jack; so.
6        Q.   Since you are on the board of Janie
7   and Jack, I expect that is something you would
8   approve as a board member?
9        A.   Definitely we would approve it as a
10  board member.  If we would make a firm
11  commitment, 100 percent.
12       Q.   Did Janie and Jack ever make such a
13  commitment?
14       A.   As far as I know, no.
15       Q.   Was a specific request for ▮▮▮
16  ▮▮▮▮▮▮▮▮▮ ever presented to Janie and
17  Jack?
18       A.   Again, as I said, either through
19  Janie and Jack or through Janie and Jack
20  investor, we had discussions that we've seen
21  in some of the e-mails from Andrew Axelrod of
22  XR Capital who is a main investor into Janie
23  and Jack.



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
81–84



Page 81

1                              Feuer
2        Q.   So I'm clear.  When referring to
3   Jane and Jack versus Jane and Jack investors,
4   you are differentiating between the actual
5   entity Janie and Jack and Axelrod Capital?
6        A.   That's correct, where a multitude
7   of alternatives are considered and discussed.
8        Q.   Could you please explain to me how
9   the 20 percent carry of Go Global works?
10       A.   Sure.  Typical private equity model
11   works at the investor, the equity investor
12   provides the capital and that the investment
13   manager, in this case Go Global, would receive
14   or would participate in the upside of the deal.
15   Plus they would receive
16                    as management fee.
17
18
19
20
21
22
23
24
25

Page 82

1                              Feuer
2
3
4
5
6
7
8
9
10
11       Q.   During your discussions with Dream
12   On Me, did the              that was allocated
13   to Go Global through Janie and Jack go away?
14       A.   No.
15       Q.   So throughout your --
16       A.   Can you clarify the question?
17       Q.   When you met with Dream On Me on
18   June 15 was Go Global still going to be
19   contributing              to the deal
20   potentially through Janie and Jack?
21       A.   That was definitely considered at
22   that point as far as I remember.  Again, as I
23   said, we had various models, various, depending
24   on the partner with whom we would work there
25   were various solutions to acquire this

Page 83

1                              Feuer
2   business.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 84

1                              Feuer
2                 .
3        Q.   At that point you valued the IP at
4                  ; is that correct?
5        A.   Yes.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20       Q.   But I guess format, layout of the
21   chart would have come largely from Lazard; is
22   that correct?
23       A.   Part of it, yes.  Partially.
24   Pieces of that.  But if you go and take the
25   Lazard model and compare it, the numbers have



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
85–88



Page 85

Feuer

1
2  very few if any really comparable.  I mean
3  identical, they are all different; I mean
4  partially different.
5       Q.   During this time period was the
6  model changing daily?
7       A.   I wouldn't say daily, but often.
8  From a work in progress we had to establish one
9  model where we believe that it would
10  sufficiently reflect the opportunities what we
11  can achieve in the future; balance between on
12  the one side having the downside view, also
13  having a realistic upside.
14
15
16
17
18
19
20
21
22
23       It has nothing to do with the numbers
24  that the seller provided, which is not unusual.
25  I don't think we ever had a model where the

Page 86

Feuer

1
2  seller's projections were identical with ours,
3  not even closely, so.
4       Q.   Do you know when you received
5  access to the Lazard data room?
6       A.   I think wee start talking at Q1 or
7  beginning of Q2, March, April time frame.  I
8  assume at that time we would have received a
9  model, but I have no idea of any specific
10  dates.
11       Q.   Was the Lazard model also changing
12  frequently?
13       A.   Literally, probably, if they did a
14  good job.  Very different -- say in April
15  compared to June because they sold a little
16  inventory.  But I cannot tell you whether they
17  changed -- we were in permanent discussions
18  with them where we tried to get additional
19  information which allowed us to have a better
20  view of what can and will happen.
21       Assuming they had their own
22  information, they might have also revised
23  somewhat, but I can't tell you because it
24  wasn't relevant to us, because we are not
25  focusing on the Lazard model.  We were focusing

Page 87

Feuer

1
2  on what we were able to expect based on the due
3  diligence that we conducted.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 88

Feuer

1



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
89–92



Page 89
Feuer

Page 90
Feuer

15    Q.    In your opinion, in the middle of
16  June of 2023, did Go Global have enough
17  sufficient access to funds to acquire and run
18  the business successfully?
19    A.    We had funds in sight, would have
20  allowed us to make it work.
21    Q.    But I am correct, Go Global did not
22  have sufficient committed funds at that time to
23  make that work?
24    A.    Maybe signed and agreed, you are
25  correct.

Page 91
Feuer

Page 92



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
93–96

Page 93

```
1                    Feuer
2        Q.   Is that decrease in store sales in
3    part due to an overall macro of in-store sales,
4    or specific to BuyBuy Baby?
5        A.   So you have the issue that young
6    mothers are very busy with young babies.  So
7    the convenience of online purchase is there.
8    So as an example, Janie and Jack, the business
9    that we own, we have a very similar profile,
10   not as dramatic, more than 50 percent of sales
11   are online.
12        What we intended to do for BuyBuy Baby
13   is turn BuyBuy Baby into a marketplace where we
14   would have been able to offer basically a much
15   broader range of products than BuyBuy Baby was
16   offering originally, by allowing others to take
17   advantage of the massive, the customer traffic
18   which was going to the online business.
19        So a little bit like Amazon, which
20   allowed others to sell their products on
21   Amazon's website.  I as a retailer do that
22   because I know there's traffic and people go
23   there.  That is the same model, the underlying
24   assumption of what we believe we could do with
25   BuyBuy Baby.
```

Page 95



Page 94

Page 96

```
15        Q.   I think you mentioned earlier that
16   Deb was heavily involved in the stores; is that
17   correct?
18        A.   She did all the calculations, all
19   the detail on it.  And so, how she -- she and I
20   discussed the results how to get there, but she
21   is the owner of this tab.
22        Q.   This store recommendations tab was
23   largely created by Deborah; is that correct?
24        A.   Yes.  That's fair to say.
25        Q.
```



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
97–100





CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
101–104

Page 101

1              Feuer
2         MR. MURPHY:  I'm going to mark
3    Exhibit 12.  It is a presentation.  It's
4    got BuyBuy Baby logo on the center of it.
5    It's called Acquisition Turnaround
6    Strategy.  It's dated June of 2023.  It
7    has the Go Global logo down toward the
8    bottom in the center.  It starts on Bates
9    number DOM000052.
10        (Exhibit 12 was so marked for
11    identification.)
12 BY MR. MURPHY:
13    Q.    Mr. Feuer, is this a document or
14 presentation you're familiar with?
15    A.    Yes.  I assume so.  I haven't seen
16 all the slides.
17    Q.    I'll scroll through it kind of
18 quickly, if you need me to slow down let me
19 know (indicating).  It's 23 pages.
20    A.    Go ahead.
21    Q.    Were you involved in creating this
22 document?
23    A.    Yes.  A lot of the content is
24 coming from --
25    Q.    

Page 102

1              Feuer
2

Page 103

Page 104

1              Feuer
2    Q.    Would the model that we just looked
3 at -- I understand there are several versions
4 of the model generally.  Would the model that
5 we just looked at as well as this presentation
6 consist of the majority of the confidential
7 proprietary information that Go Global provides
8 to potential investors?
9         MR. BERLOWITZ:  Objection.
10        You can answer.
11        THE WITNESS:  I would say so.
12 BY MR. MURPHY:
13    Q.    Besides this presentation and the
14 model, what else would you consider to be
15 proprietary and confidential, provided to
16 investors?
17        MR. BERLOWITZ:  Objection.
18        You can answer.
19        THE WITNESS:  What in addition to
20 that?  What you have here is an outline
21 by a group of people who have spent a lot
22 of time in analyzing, distilling what was
23 analyzed into a plan of how to turn a
24 business around that was usually
25 underperforming.



Page 105

1                    Feuer
2          And I don't think that anybody else
3    had a plan as detailed as this, put
4    together by a group of people who have
5    done exactly that over and over in many
6    various businesses.
7          So basically, we created a blueprint
8    what to do and how to do it, what to
9    focus on and what to expect.  And that is
10   exactly what we provided and put together
11   there.  Is it more detailed?  Yes, of
12   course, more detail, but it is the plan.
13   BY MR. MURPHY:
14       Q.    Understood.  I understand that was
15   clearly other work that went into those
16   documents.  I'm trying to ascertain, looking at
17   what would be the main document at issue.
18       A.   Correct.
19          MR. MURPHY:  I'm going to mark
20   Exhibit 13.
21          (Exhibit 13 was so marked for
22   identification.)
23          It's Bates number DOM001082.  It is
24   61 pages.  It's got a BuyBuy Baby logo as
25   well as a Go Global logo.  There are

Page 106

1                    Feuer
2    multiple versions of this document.  The
3    one I'm looking at is dated May 2023, the
4    date on the cover.
5    BY MR. MURPHY:
6        Q.   Mr. Feuer, I can scroll through it
7    if you need me to.  Is this a document that
8    looks familiar to you?
9        A.   Yes.
10       Q.   What is this document?
11       A.   This is a presentation of -- was
12   created largely by the BuyBuy Baby team itself,
13   and that I believe we used in order to attract
14   or talk to potential investors before we had
15   the ability to create our own model, our own
16   presentation.
17          This is a very -- if you go back to
18   compare it to our presentation for this, this
19   is a very sloppy presentation, a lot of nice
20   images, a lot of stuff, but it is a quite
21   different approach compared to what our own --
22       Q.   Am I correct that there was an
23   auction for the IP of BuyBuy Baby?
24       A.   I think you are correct.
25       Q.   Did Go Global consider

Page 107

1                    Feuer
2    participating in that auction?
3        A.   Definitely considered it.
4        Q.   Did Go Global participate in that
5    auction?
6        A.   I don't think so.
7        Q.   In your opinion, why did Go Global
8    not participate in that auction?
9        A.   The intention was to buy the
10   business as a growing concern, and the IP
11   auction was not a going concern, if I
12   understand correctly.
13          MR. MURPHY:  I'm going to mark
14   Exhibit 14, a two page e-mail chain that
15   starts with Bates number ANK0035975.
16          (Exhibit 14 was so marked for
17   identification.)
18   BY MR. MURPHY:
19       Q.   Mr. Feuer, I'd like to direct your
20   attention to an e-mail that you were copied on,
21   June 26.  It seems to indicate Go Global would
22   no longer pursue acquisition of BuyBuy Baby.
23   Do you remember receiving this e-mail?
24       A.   No.  Doesn't mean that I didn't
25   receive it, but right now -- I would have to

Page 108

1                    Feuer
2    read it.  And if you want to go to the bottom
3    so that I see (indicating).
4          Let me read it, please.
5        Q.   Sure.
6        A.   Okay.
7        Q.   Do you remember at that point being
8    advised by Mr. Streader that the pursuit of
9    BuyBuy Baby was over?
10       A.   I'm sure we talked about it, but I
11   don't remember a specific conversation.
12       Q.   Was there a point where you were
13   told it was over and then it was subsequently
14   revived?
15       A.   No.  I don't remember.  From a
16   timeline perspective, I cannot point my finger
17   to different steps because it was fluid the
18   entire time of what opportunities I believe we
19   had of what we can do and not do.  So literally
20   there is no way for me to.  We have discussed
21   this I'm sure.  I can't remember specifically
22   when and how.
23       Q.   The subject of the e-mail refers to
24   Project Butterfly.  Was that a name Go Global
25   gave a name to or some other entity?



Page 109

Feuer

1    I think that was not coming from
2    A.   I think that was not coming from
3    us, but I don't remember.  I don't know, I
4    don't think any e-mails refer to Butterfly, so
5    I cannot tell you where Butterfly is coming
6    from.
7        MR. MURPHY:  I will mark Exhibit 15.
8        (Exhibit 15 was so marked for
9    identification.)
10       It's an e-mail from Jeff Streader on
11   June 27, 2023, a two-page document.  The
12   is first Bates number is GGH0013673.  The
13   e-mail is sent to Christian Temke and
14   Brennan Shea at Lazard, and several
15   people are copied, including Mr. Feuer,
16   and several more people are blind copied.
17   BY MR. MURPHY:
18       Q.   Mr. Feuer, look at this e-mail and
19   let me know if you remember receiving this
20   e-mail.
21       A.   This specific e-mail, I can't.  In
22   general, the discussion, yes.
23       Q.   Number 3 says "Brand damage has
24   occurred and a certain loss of market share."
25       A.   Yes, occurred.

Page 110

Feuer

2        Q.   Is that a statement you agreed with
3    at that time?
4        A.   Totally.  Every business, loss of
5    market share is easy if you don't sell any
6    more, people buy somewhere else, so market
7    share is substantially lower than what it was
8    at the beginning of the process.  And brand
9    damage you can always argue whether it's
10   permanent or temporary brand damage, but a
11   business that goes through an out of business
12   sale somehow creates a change in customers'
13   perception of the brand, because it's about to
14   go away.  We're in a turnaround business, so.
15       Q.   ███████████████████████████
16   ███████████████████████████████████
17   ███████████████████████████████████████
18   ████████████████████
19       Would those numbers have been
20   projected by you in your model?
21       A.   Yes.  At that point in time we
22   probably -- I would say yes.  Again, it's not
23   alone by myself but largely myself.  I believe
24   at that time you have one guy -- Mo Beig
25   involved, at that time he was CFO of Janie and

Page 111

Feuer

1    Jack.  So he participated in as well.  But I
2    still believe I'm the one who created the
3    model.  He somehow had discussion.  He was, I
4    can't tell exactly to which degree, but more
5    often before -- it was mostly Deborah and
6    myself.  Mo was involved to some degree.
7        Q.   Then, it says, next to my cursor
8    (indicating), "If the auction is tomorrow or
9    this week we are not going to participate,
10   regrettably."
11       Was that your understanding at that
12   time, that if there was an auction the last
13   week in June you were not going to participate?
14       A.   Yes.  At certain points in time we
15   assumed we would not participate, and other
16   points in time we assumed we will, so.
17       Q.   Ultimately, in your opinion why did
18   you not participate, you meaning Go Global?
19       A.   Why ultimately did we not
20   participate?  The longer the process took the
21   less value the business had, which of course to
22   some degree you can adjust the purchase price.
23   But the steeper the hill to turn the business
24   around.  So that's sort of somehow an equation.

Page 112

Feuer

1        On the other side, we're trying many
2    different opportunities to finance the
3    business.  I don't think we were able to have
4    funds available that would make us successful
5    in the auction.
6        MR. MURPHY:  I'm going to mark as
7    Exhibit 16.  It's a document with the Go
8    Global logo across top.  It doesn't have
9    a Bates number.  I'll get it later for
10   the record.  It is a three page document.
11       (Exhibit 16 was so marked for
12   identification.)
13       The first section says Case
14   Study-Investment Process.
15   BY MR. MURPHY:
16       Q.   Mr. Feuer, is this a document that
17   you have seen before?
18       A.   I think I have seen it.
19       Q.   Were you involved in creating this
20   document?
21       A.   I don't think so.
22       Q.   Do you know what this document is?
23       A.   It's a way to show how we work, a
24   case study.



Page 113

Feuer

1
2     Q.    The paragraph in bold that starts
3  with "The opaque status," can you review that
4  paragraph and let me know if you agree with it?
5     A.    I'm not sure I agree.
6     Q.    Can you tell me the parts you don't
7  agree with?
8     A.    This was created for other
9  investors to understand how we operate.  And so
10  it was basically -- a reflection of how we make
11  whatever decision we made, but the description
12  and rationale behind it.  I'm not the author of
13  that, and so, as I said, the object is, the
14  intention is directed towards potential
15  investors; not BuyBuy Baby investors, but other
16  investors.
17     Q.    I understand the document had a
18  certain purpose and it seems you did not write
19  the document.  What specifically would you
20  disagree with in that paragraph?
21     A.    I don't think that -- without a
22  higher level of certainty the seller needed to
23  provide the criteria mentioned below.  I don't
24  know -- there is more no come.  (Laughter.)
25     Q.    The criteria is below that --

Page 114

Feuer

1
2     A.    Let me read this so I see
3  (indicating).
4            (Brief recess.)
5  BY MR. MURPHY:
6     Q.    Mr. Feuer, have you had a chance to
7  review the -- increase in risk criteria.
8     A.    I had a chance.  Can you do me a
9  favor, go to the top of the document, please?
10     Q.    Sure (indicating).
11     A.    I want to read it first.
12     Q.    Take your time.  Read as much of
13  the document as you would like.
14     A.    I don't know who received this, but
15  if I read it correctly, this is a case study
16  and was also a reaction to what has been
17  reported on CNBC and other news agencies.  I
18  don't know what, I don't remember what was
19  reported or where there was -- I can't see.
20  And so this is some shape or form, I guess
21  partially a rebuttal to whatever was presented
22  there, as well made into a case study and
23  whoever has received it.
24            So I suspect that this document has
25  the objective of creating a certain message

Page 115

Feuer

1
2  which probably not the justification for why we
3  didn't move forward, because it has a direction
4  where I'm not clear what it is.  I can't really
5  tell you really anything.  I was not, I didn't
6  create it, I don't think I was part of it.  I
7  might have seen it, but I don't know the
8  intention of that document.
9     Q.    In your opinion, did Go Global pass
10  on the opportunity?
11     A.    In the end did not participate and
12  provide a bid.  As you've seen before we
13  provided a bid before.
14     Q.    Is it accurate to say that
15  ultimately Go Global passed on pursuing a
16  qualified bid?
17     A.    Can you say passed on what?
18     Q.    Is it correct to say that Go Global
19  ultimately passed on pursuing a qualified bid?
20     A.    Ultimately did not provide a
21  qualified bid, at least not for the IP auction.
22     Q.    Did you provide one for the growing
23  concern auction?
24     A.    I think we went to the documents
25  earlier where we provided a deposit o█████

Page 116

Feuer

1
2  ████████
3     Q.    Was that ultimately a qualified
4  bid?
5     A.    I don't know really whether it was
6  qualified, what is qualified versus
7  non-qualified.  I don't think it was a legally
8  binding bid, so the definition is of qualified
9  is legally binding, then it was not.  If legal
10  qualified is different.  I'm not able to make
11  this distinction.
12     Q.    But ultimately Go Global chose not
13  to submit a legally binding bid for either the
14  IP or growing concern; is that correct?
15        MR. BERLOWITZ:  Objection.
16        You can answer.
17        THE WITNESS:  As far as I
18     understand, this is correct.
19  BY MR. MURPHY:
20     Q.    Did you have any involvement in
21  attempting to obtain investment in Ziff Davis?
22     A.    I do think that I personally was
23  involved in that.
24     Q.    You were or were not?
25     A.    I was not involved personally --



Page 117

Feuer

1   there was a lot of Ziff Davis discussion, but I
2   don't think that, at least I can't remember
3   that I was involved in phone calls or anything
4   like that. I was probably involved in putting
5   something together, but I don't remember what
6   that was. I'm sure I was copied on many
7   e-mails but --
8       Q.   We were looking at Version 9 of the
9   model earlier. Do you know how many versions
10  it ended up being?
11      A.   Versions, 30, 40. I don't know.
12  Probably there many others which were not --
13  way too many.
14      Q.   Do you know when Dream On Me's
15  access to the data room would have been
16  rescinded?
17      A.   No. I assume it was probably
18  middle of June, second half of June. Anyway,
19  because -- I don't know.
20      Q.   Do you know how much Dream On Me
21  bid for the IP?
22      A.   I think something like $15 million.
23      Q.   If I told you it was 15 1/2, would
24  that sound right?
25

Page 118

Feuer

1       A.   It does, absolutely correct.
2       Q.   When the auction was held in late
3   June of last year did you believe that 15 1/2
4   million was a fair price for the IP?
5       A.   The IP by itself is very hard to
6   evaluate, seemingly was not far off from what
7   we had looked at, the document we put together.
8   So in general, yes. I'm not able to give you
9   my past thinking at that point in time.
10      Q.   Did you do any modelling or
11  calculations for the value of the IP unrelated
12  to a going concern purchase?
13      A.   I don't remember.
14      Q.   Would you agree that a significant
15  portion of your model would not be relevant to
16  an IP only purchase?
17          MR. BERLOWITZ:  Objection.
18      You can answer.
19          THE WITNESS:  I don't agree, unless
20      the IP purchase would have been for the
21      objective of licensing the brand out or
22      running a retail operation. It was 100
23      percent largely relevant.
24  BY MR. MURPHY:
25

Page 119

Feuer

1       Q.   Did you personally have any
2   dealings with Cart.com?
3       A.   Personally, I have talked to Cart
4   but dealings, I would not qualify this as
5   dealings. But I talked to them. I don't know
6   when talking ends, dealing starts.
7       Q.   Do you know if Cart.com ever
8   committed to invest?
9       A.   I don't know.
10      Q.   Did you ever have any conversations
11  with Patty Wu?
12      A.   Yes. Again, conversation I had,
13  meetings with her, if meeting counts as
14  conversation, yes.
15      Q.   At the time you had meetings with
16  her, what was Patty Wu's position?
17      A.   I think she was CEO. It was part
18  of the group, I don't know if she was actually
19  CEO or her official title was president,
20  whatever it was. But she was the one leading
21  the BuyBuy Baby.
22      Q.   Do you remember anything
23  specifically about your meetings with her?
24      A.   We liked her, seemed to be
25

Page 120

Feuer

1   competent. Not really a surprise, wants to
2   work with us, wants to be helpful. She thought
3   that we can work with her and we could see that
4   she with our help, support and direction would
5   be successful -- proven in reality, but that
6   was our expectation.
7       Q.   Do you remember ever reviewing
8   presentations or documents created by Deloitte?
9       A.   For some cases, but I don't
10  remember in the context of BuyBuy Baby.
11      Q.   I meant specifically, this case.
12      A.   I want to qualify it. Deloitte, I
13  don't know. I literally don't know. If you
14  show it to me I can tell whether I have seen
15  it. Other than that, right now I don't recall
16  it.
17      Q.
18          MR. MURPHY:  I will mark Exhibit 17,
19      an 18 page document. It starts with
20      Bates number DOM0001380. It's titled
21      "BuyBuy Baby Updated Financial
22      Allocations Projections, Strategy --
23      March 31, 2022. It says Bed Bath and
24      Beyond and Deloitte across the top.
25          (Exhibit 17 was so marked for



CHRISTIAN FEUER                                    October 07, 2024
GO GLOBAL RETAIL vs DREAM ON ME                   121–124

Page 121

1           Feuer
2      identification.)
3  BY MR. MURPHY:
4      Q.   Is this something you've seen
5  before?
6      A.   The cover doesn't -- keep going,
7  please.
8      Q.   Sure (indicating).
9      A.   Stay there for a moment.  Fiscal
10  year '21, that's a long time ago.  Keep going,
11  please (indicating).  This is about
12  allocations.  I'm not really -- balance sheet.
13  It doesn't really ring a bell.  It doesn't seem
14  to be relevant to what we try to understand.
15     Q.   Would all of the documents that you
16  reviewed in connection with creating your model
17  have been in the Lazard data room?
18     A.   Maybe.  We had a lot of
19  conversations with Lazard, Alex Partners, and I
20  think, not to be sure, we were probably of all
21  the entities that were interested in this
22  business, the most qualified and therefore the
23  ones who could have offered the highest bid.
24  So therefore everybody on the team of Lazard,
25  the company, Alex Partners in that context,

Page 122

1           Feuer
2  tried to help as much as they could.  So I can
3  imagine we received documents which never made
4  it into the data room, because we were working
5  so closely together.
6      So therefore, based on my assumption
7  there are probably documents we received that
8  were not in the data, in the Lazard data room.
9  Do I know it?  No.
10     Q.   I see.  But I'm correct that your
11  model was created by reviewing documents and
12  information provided by Lazard and Alex
13  Partners, and then you worked to augment and
14  create Go Global's own model; is that correct?
15     MR. BERLOWITZ:  Objection.
16     You can answer.
17     THE WITNESS:  Augment, as in we made
18  our own assumptions based on the
19  information provided.  It was not that
20  whatever ended up in our model was
21  information provided by Lazard, the
22  company or anybody.  We translated this
23  information of this data with our own
24  experience or knowledge we had from
25  wherever it was coming from, and

Page 123

1           Feuer
2  basically came up with a different set
3  of, a number that is our own.
4  BY MR. MURPHY:
5      Q.   When Go Global made requests to
6  Lazard, could other parties see those requests
7  in the Lazard data room?
8      A.   I have no idea.  I assume so, in
9  general, yes.  But I literally have no idea.
10  The most important for us was that we got the
11  information that we requested.  Whether it was
12  disseminated to others was not relevant to us.
13  And so I assume.
14     MR. MURPHY:  No further questions.
15  Thanks for your time today.
16     MR. BERLOWITZ:  No questions.
17     (Whereupon, at 3:19 p.m. the matter
18  was concluded.)
19
20
          _____
21          CHRISTIAN FEUER
22
23  Subscribed and sworn to before me
   this _____ day of _____, 20____.
24          _____
    NOTARY PUBLIC
25

Page 124

1                    I N D E X
2
WITNESS       EXAMINATION BY                PAGE
3
MR. FEUER     MURPHY / DIRECT                 4
4
5                    EXHIBITS
6
DEFENDANT'S    DESCRIPTION                   PAGE
7
Exhibit 1      Bates ANK-0036256             19
8
Exhibit 2      5/29/23 e-mail                25
9
Exhibit 3      Bates ANK-0049356             27
10
Exhibit 4      6/17 e-mail from Lapish       31
11
Exhibit 5      6/20/23 e-mail                34
12
Exhibit 6      6/21/23 e-mail                36
13
Exhibit 7      Bates DOM000031               44
14
Exhibit 8      6/13/23 e-mail                59
15
Exhibit 9      6/15/23 e-mail                67
16
Exhibit 10     8-page document               72
17
Exhibit 11     Excel spreadsheet             77
18
Exhibit 12     6/23 presentation            101
19
Exhibit 13     Bates DOM001082              105
20
Exhibit 14     Bates ANK0035975             107
21
Exhibit 15     6/27/23 e-mail               109
22
Exhibit 16     3-page document              112
23
Exhibit 17     18-page document             120
24
(Electronic copies of the exhibits were retained
25  by the reporter.)



## Page 125

```
 1
 2              C E R T I F I C A T I O N
 3
 4              I, Jeffrey Shapiro, a Stenographic
 5   Reporter and Notary Public, within and for the
 6   State of New York, do hereby certify:
 7              That CHRISTIAN FEUER, the witness
 8   whose examination is hereinbefore set forth, was
 9   first duly sworn by me, and that transcript of
10   said testimony is a true record of the testimony
11   given by said witness.
12              I further certify that I am not
13   related to any of the parties to this action by
14   blood or marriage, and that I am in no way
15   interested in the outcome of this matter.
16
17              IN WITNESS WHEREOF, I have hereunto
18   set my hand this 10th day of October, 2024.
19
20
21
22
23              JEFFREY SHAPIRO
24
25
```

## Page 126

```
 1        DEPOSITION ERRATA SHEET
 2
 3   Our Assignment No. J11846879
 4   Case Caption:  Go Global vs. Dream On Me
 5
 6   DECLARATION UNDER PENALTY OF PERJURY
 7              I declare under penalty of perjury
 8        that I have read the entire transcript of
 9        my Deposition taken in the captioned
10        matter or the same has been read to me,
11        and the same is true and accurate, save
12        and except for changes and/or
13        corrections, if any, as indicated by me
14        on the DEPOSITION ERRATA SHEET hereof,
15        with the understanding that I offer these
16        changes as if still under oath.
17
18
19        _____
20        Christian Feuer
21
22   Subscribed and sworn to on the _____ day of
     _____, 20____ before me,
23   _____
24   Notary Public,
     In and for the State of _____
25
```

## Page 127

```
 1        DEPOSITION ERRATA SHEET
 2
 3   Page No._____Line No._____Change to: _____
 4   _____
 5   Reason for change: _____
 6   Page No._____Line No._____Change to: _____
 7   _____
 8   Reason for change: _____
 9   Page No._____Line No._____Change to: _____
10   _____
11   Reason for change: _____
12   Page No._____Line No._____Change to: _____
13   _____
14   Reason for change: _____
15   Page No._____Line No._____Change to: _____
16   _____
17   Reason for change: _____
18   Page No._____Line No._____Change to: _____
19   _____
20   Reason for change: _____
21   Page No._____Line No._____Change to: _____
22   _____
23   Reason for change: _____
24   SIGNATURE:_____DATE:_____
25              Christian Feuer
```

## Page 128

```
 1        DEPOSITION ERRATA SHEET
 2
 3   Page No._____Line No._____Change to: _____
 4   _____
 5   Reason for change: _____
 6   Page No._____Line No._____Change to: _____
 7   _____
 8   Reason for change: _____
 9   Page No._____Line No._____Change to: _____
10   _____
11   Reason for change: _____
12   Page No._____Line No._____Change to: _____
13   _____
14   Reason for change: _____
15   Page No._____Line No._____Change to: _____
16   _____
17   Reason for change: _____
18   Page No._____Line No._____Change to: _____
19   _____
20   Reason for change: _____
21   Page No._____Line No._____Change to: _____
22   _____
23   Reason for change: _____
24   SIGNATURE:_____DATE:_____
25              Christian Feuer
```



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
Index: $1.2..12

---

**Exhibits**

11846879 Ch
ristian.
Feuer.
EXHIBIT1
    19:6,9
    124:7

11846879 Ch
ristian.
Feuer.
EXHIBIT2
    25:11,12
    124:8

11846879 Ch
ristian.
Feuer.
EXHIBIT3
    27:3,4
    103:7
    109:23
    124:9

11846879 Ch
ristian.
Feuer.
EXHIBIT4
    31:11,12
    124:10

11846879 Ch
ristian.
Feuer.
EXHIBIT5
    34:14,15
    71:2
    124:11

11846879 Ch
ristian.
Feuer.
EXHIBIT6
    36:24,25
    110:15
    124:12

11846879 Ch
ristian.
Feuer.
EXHIBIT7
    44:8,9
    124:13

11846879 Ch
ristian.
Feuer.
EXHIBIT8
    59:2,7
    124:14

11846879 Ch
ristian.
Feuer.
EXHIBIT9
    67:5,12
    124:15

11846879 Ch
ristian.
Feuer.
EXHIBIT10
    72:6,7
    124:16

11846879 Ch
ristian.
Feuer.
EXHIBIT11
    76:25
    77:3
    124:17

11846879 Ch
ristian.
Feuer.
EXHIBIT12
    101:3,10
    124:18

11846879 Ch
ristian.
Feuer.
EXHIBIT13
    105:20,21
    124:19

11846879 Ch
ristian.
Feuer.
EXHIBIT14
    107:14,16
    124:20

11846879 Ch
ristian.
Feuer.
EXHIBIT15
    109:7,8
    124:21

11846879 Ch
ristian.
Feuer.
EXHIBIT16
    112:8,12
    124:22

11846879 Ch
ristian.
Feuer.
EXHIBIT17
    120:18,25
    124:23

---

**$**

$1.2
    99:12
$1.4
    85:18
$1.5
    103:3
$100
    11:22
$15
    52:17
    79:20
    80:2,3,17
    82:12,19
    117:23
$153

$165
    83:13
$18
    91:22
    92:10
$18.7
    74:4
$2.2
    73:19,21
    115:25
$2.4
    85:22
$21.5
    76:15
$28
    76:19
$3
    11:6
$3.3
    75:20
$34
    110:15
$35
    99:14
$4.5
    110:18
$45
    79:7,11,
    17 84:4
$57
    20:14
$72
    84:2
$73
    20:14
$75
    83:4,9

98:7
$80
    92:12
$85
    76:12
$930
    85:18
$94
    85:21

---

**0**

06752
    4:11

---

**1**

1
    19:6,9
    75:21
1/2
    82:8
    117:24
    118:4
10
    72:6,7
100
    80:13
    118:23
10th
    78:23
11
    9:11
    12:9,10
    55:16
    76:25
    77:3
    78:11,20
11th
    79:4
12



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
Index: 12/31..7/1/23

54:4
55:17
62:2
101:3,10

**12/31**
95:15,17

**12th**
54:10,18
61:4
65:19
78:24

**13**
59:3
60:20,24
105:20,21

**14**
107:14,16

**15**
62:19,21
63:7
64:17
66:3,7,15
67:7
82:18
109:7,8
117:24
118:4

**152**
4:10

**15th**
64:10
65:20
67:2 69:6

**16**
32:20
33:4
70:15
71:8 72:2
73:22
112:8,12

**160**
83:13

**17**
13:20
31:15
120:18,25

**18**
120:19

**18.7**
76:18

**19**
22:19,25
24:3

**1984**
10:14

_____

_____ 2 _____

**2**
25:11,12
79:19
81:15
82:8

**20**
23:22
24:16
34:19
35:5 74:8
75:21
81:9 82:7
94:10

**2021**
100:11

**2022**
120:23

**2023**
16:24
19:25
22:20
24:16
25:15
27:8
29:11
32:20

33:4
34:19
37:4
39:24
59:4
60:20
67:7
78:11
90:16
95:22
101:6
106:3
109:11

**2024**
95:22

**21**
19:25
20:18
27:8 37:4
39:24
121:10

**23**
98:9
101:19

**25**
76:15
94:11
99:13

**26**
107:21

**27**
109:11

**29**
25:15

_____

_____ 3 _____

**3**
27:3,4
103:7
109:23

**30**

117:12

**300**
102:20
103:11

**31**
27:13
29:11
120:23

**32**
92:25

**347**
23:2

**35**
82:10

**363**
12:11

**38**
85:19

**3:19**
123:17

_____

_____ 4 _____

**4**
31:11,12
94:23

**40**
75:22
92:21,24
117:12

**48.2**
75:22

_____

_____ 5 _____

**5**
34:14,15
71:2
94:23

**50**

93:10

**52**
94:22

**53**
94:22

_____

_____ 6 _____

**6**
36:24,25
110:15

**6/10**
53:7,9,
12,14,17
55:16

**6/11**
9:11

**6/25/23**
99:11

**60**
92:20,23

**600**
110:16

**61**
105:24

**66.1**
76:19

**68**
92:23

**6:12**
67:8

_____

_____ 7 _____

**7**
44:8,9

**7/1/23**
99:11



---
**8**
---

**8**
20:17
21:9,10,
11 59:2,7
82:2
85:17
92:6

**80s**
10:20

**82**
10:17

**83**
10:18

**84**
10:16

**85**
68:6

**88**
99:12

---
**9**
---

**9**
9:3,5
21:9,11,
13 67:5,
12 77:16,
20,24
78:6 92:6
117:9

**90**
89:15

**95**
89:16

---
**A**
---

**Abhish**

**Abhish**
42:19

**Abhishek**
22:20
42:17,20
50:9
53:2,4

**ability**
60:13,14
68:11
106:15

**Abishek**
50:7

**ABL**
41:6,7

**absolutely**
45:9
61:15
118:2

**accept**
45:22
47:3
48:13

**acceptable**
40:2,7
52:5

**accepted**
45:25
46:2
47:5,7
70:4
76:13

**access**
55:14,22
56:5 86:5
87:6
90:17
117:16

**account**
33:8

**accurate**
55:8
115:14

**achieve**
76:22
85:11
110:17

**achieved**
61:18

**acquire**
12:9
18:23
33:6 63:6
74:16
75:8
82:25
89:4,7,11
90:17
92:4

**acquired**
11:16
13:14,15,
20 74:13
75:9
81:21
96:3

**acquiring**
16:22
63:15
75:11

**acquisition**
12:14
16:19
17:3,7,
10,23
24:19
36:19
37:19
40:25
52:17
101:5
107:22

**acquisition
s**
15:16
16:16

**acronym**
41:6

**action**
39:12

**actual**
75:3 81:4

**add**
59:9 73:8

**added**
84:14

**addition**
37:24
104:19

**additional**
69:16
86:18

**address**
4:9

**addressed**
29:4

**adjust**
111:23

**advance**
76:10,18
90:9

**advantage**
93:17
99:22

**advised**
108:8

**affiliated**
57:17,18,
21,24

**affiliation**
58:3

**affirmative**
46:8,19

**agencies**
114:17

**aggressive**
76:3

**agree**
29:22
47:22
48:16
49:16,17,
19 69:22
113:4,5,7
118:15,20

**agreed**
27:25
29:12
49:4
90:24
110:2

**agreement**
28:4,11,
13,15
29:23,24
30:3
42:10
44:2,5,
12,19,22
46:10
47:19
53:11
55:13
64:2,7
71:18

**agreements**
28:8
33:13,15
45:6,12,
20 46:5,
17 48:7
63:21

**agrees**
48:4

**agricultura
l**
10:4,7,23

**agriculture**
10:24



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
Index: ahead..attractive

ahead
    101:20
Alex
    121:19,25
    122:12
allocated
    82:12
allocations
    120:22
    121:12
allowed
    13:12
    38:6,10
    55:4
    86:19
    90:20
    93:20
allowing
    37:22
    93:16
alternatives
    81:7
amazing
    20:4
Amazon
    93:19
Amazon's
    93:21
America
    73:13
American
    10:5
Amit
    61:23,24
    62:4
amount
    29:21
    39:10
    73:18
    75:14

83:22
90:3
97:24
103:4
amounts
    103:2
analyzed
    104:23
analyzing
    104:22
and/or
    39:25
Andrew
    80:23
ANK-0036256
    19:7
ANK-0048569
    37:7
ANK-0049356
    27:9
ANK0035975
    107:15
Ankura
    17:22,25
    18:5,6,7,
    8,14,17
    22:21,25
    23:13
    25:16
    37:6 42:3
    50:10,15
    55:3,6,9,
    14 56:8
Ankura's
    18:21
annual
    91:15
answers
    5:15
anymore

57:19
appearance
    64:21
appeared
    32:9
appears
    19:24
    20:17
    22:19,20
    25:15
    27:15
    32:11
    73:10,12,
    18 100:22
    102:2
applicable
    48:21
    49:5
applied
    77:14
approach
    40:24
    106:21
approached
    40:16,20
approve
    80:10,11
approximate
    5:21
approximately
    9:4 16:21
    18:16
    57:20
approximating
    5:22
April
    86:7,14
area
    31:4

74:25
areas
    47:2
argue
    110:9
arms
    27:22
ascertain
    105:16
asks
    40:15
aspects
    102:23
asset
    29:23,24
    33:23
    41:8
    85:18
    100:8
assets
    39:13
assigned
    79:23
associates
    42:13
    110:17
assume
    5:18
    29:22,23
    30:4
    41:11
    47:15
    58:20,21
    59:19
    62:3
    64:12
    72:21,22
    86:8
    100:14
    101:15
    117:18
    123:8,13

assumed
    54:22
    111:16,17
assuming
    61:4
    67:24
    80:6
    81:19
    86:21
    92:16
    98:14
assumption
    21:10
    54:20
    93:24
    99:12
    103:3
    122:6
assumptions
    20:13,21
    92:5 98:9
    122:18
attached
    20:18
attempted
    17:3,23
attempting
    17:8
    116:21
attended
    49:24
    62:12
    66:3,4
attention
    72:10
    107:20
attorney
    7:18,23
attract
    106:13
attractive
    17:20



75:2,4

**auction**
12:11
29:17
53:24
106:23
107:2,5,
8,11
111:9,13
112:6
115:21,23
118:3

**augment**
122:13,17

**author**
113:12

**Avenue**
27:15,20,
21,24
34:6

**aware**
6:4 28:7,
15 32:20
33:12
41:17,20,
23 64:5

**Axelrod**
80:23
81:5

————————

**B**

————————

**babies**
93:6

**Baby**
16:19,23
18:23
26:6,8,10
30:5,14,
21 32:3
33:6
37:20
46:6,18

48:8,19,
22 51:9
52:18
60:11
63:6,9
70:11
74:13
76:3
93:4,12,
13,15,25
96:3 98:4
99:25
101:4
105:24
106:12,23
107:22
108:9
113:15
119:22
120:11,21

**Baby's**
99:23

**back**
26:25
46:15
52:24
53:12
56:11,17
70:25
94:2
97:22
98:3
100:6
102:11
106:17

**back-end**
14:11

**Backed**
41:8

**background**
10:2 14:7

**backgrounds**
57:8

**balance**
85:11
121:12

**Bank**
24:8 34:5
73:13

**Banks**
46:25

**based**
11:18
20:16
23:4
27:16
38:20
39:23
87:2
92:2,4
97:2 98:8
122:6,18

**basic**
16:7

**basically**
7:4 12:16
21:25
29:20,22
60:16
68:23
70:12
88:8
93:14
105:7
113:10
123:2

**basis**
69:4

**Bates**
19:6
25:19
27:9
31:16
34:20
37:7
44:14
59:9 67:6

72:12
77:2
101:8
105:23
107:15
109:12
112:10
120:20

**Bath**
26:5,8
76:4,8,23
120:23

**Bauer**
11:13

**Bed**
26:5,8
76:4,8,23
120:23

**begin**
5:3,14

**beginning**
16:24
43:5 86:7
89:9
92:19
110:8

**begins**
34:20
44:14

**behalf**
24:21
32:7
55:10

**Beig**
110:24

**believed**
54:11
62:25
68:10,21

**believes**
84:12

**bell**
121:13

**beneficial**
51:18

**beneficiary**
98:19

**benefit**
92:9

**Berkeley**
18:12,15

**Berlowitz**
7:12,13,
19 24:5,
20,24
25:4
26:16
39:18
40:3
45:7,13
60:9
104:9,17
116:15
118:18
122:15
123:16

**bid**
29:10,18,
20,21
30:3,7,
11,13,15,
19,23,25
31:6
32:2,5,7,
10,19,24
48:22
49:6
70:15,16,
19 71:19
76:14,22
115:12,
13,16,19,
21 116:4,
8,13
117:22



121:23

**bidder**
  29:25

**bidders**
  29:22

**bidding**
  70:10

**bids**
  31:3,7
  32:21

**big**
  102:22

**bigger**
  91:23
  94:11

**billion**
  11:6
  85:18
  103:3

**binding**
  30:23
  31:6
  71:17
  116:8,9,
  13

**bit**
  38:17
  93:19

**blank**
  73:11

**blind**
  109:16

**Blue**
  24:9

**blueprint**
  105:7

**board**
  15:5
  35:6,7,9
  36:9

80:8,10,
12

**bold**
  113:2

**bonds**
  76:14

**borrower**
  39:9,11,
  13

**bottom**
  19:19,20
  31:20
  35:17
  85:20
  101:8
  102:18
  108:2

**bound**
  63:21

**brand**
  109:23
  110:8,10,
  13 118:22

**brands**
  13:20

**break**
  5:23,24
  39:6

**Brennan**
  109:14

**Bridgewater**
  4:11

**bring**
  9:22

**broader**
  93:15

**Brook**
  4:10

**BTW**
  37:11

**building**
  64:19

**bullet**
  41:5
  75:20
  76:2

**business**
  11:7,20
  12:2,4,5,
  16,22
  13:11,18
  14:5 15:7
  17:5,6
  21:15,23
  57:9
  58:23
  60:3,5
  63:15
  64:9,25
  75:7,11
  81:20,22
  83:2,15
  87:12
  89:22,24
  90:6,10,
  18 93:8,
  18 97:24
  99:6,8
  103:4
  104:24
  107:10
  110:4,11,
  14
  111:22,24
  112:4
  121:22

**businesses**
  13:14
  14:3,14
  51:21
  105:6

**busy**
  93:6

**Butterfly**

108:24
109:4,5

**buy**
  68:12
  83:14
  88:12,13
  99:2
  102:25
  107:9
  110:6

**Buybuy**
  16:19,23
  18:23
  26:5,6,7,
  10 30:5,
  14,20
  32:3 33:6
  37:20
  46:6,18
  48:8,19,
  22 51:9
  52:17
  60:11
  63:6,9
  70:10
  74:13
  93:4,12,
  13,15,25
  96:3
  99:23,25
  101:4
  105:24
  106:12,23
  107:22
  108:9
  113:15
  119:22
  120:11,21

**buying**
  89:24
  90:6
  103:6

— C —

**calculated**
  81:25
  91:16
  96:4,13

**calculating**
  98:21

**calculation**
  77:13
  83:24
  89:2 92:2
  96:11
  97:18

**calculations**
  96:18
  118:12

**calendar**
  94:20
  95:7,9,18

**call**
  11:24
  42:22,25

**called**
  11:2 12:2
  15:7
  41:17
  91:2
  94:19
  101:5

**calls**
  67:20
  117:4

**cap**
  79:5

**capability**
  51:17

**capacity**
  18:3 25:2
  28:14



37:19

capital
    12:13,18,
    19 14:2
    20:15
    22:21
    24:11
    33:23
    40:22
    52:19
    80:24
    81:5,12
    83:4,10
    87:17
    89:21
    90:4

career
    10:20

carry
    68:5,17
    81:9

Cart
    119:4

Cart.com
    119:3,8

carve
    61:20

case
    4:19 6:5
    7:4 15:14
    21:22
    45:24
    47:21
    49:7,14
    63:23
    80:5
    81:13
    112:14,25
    114:15,22
    120:12

cases
    46:24
    120:10

cash
    20:14
    37:23
    75:14
    83:5
    87:18,19
    89:5,9,
    11,25
    90:14
    97:6,21
    98:4
    103:4

catalogue
    11:12

ceased
    57:21,24
    58:4

center
    101:4,8

CEO
    12:2
    119:18,20

certainty
    113:22

CF
    97:6

CF-BABY
    97:5

CFO
    110:25

chain
    19:8
    25:14,16,
    23 27:6
    31:14,21,
    25 34:17
    35:3 59:2
    67:5 71:2
    107:14

challenge
    60:11,13,
    15 89:24

chance
    114:6,8

change
    110:12

changed
    56:3
    74:13,15,
    19 86:17

changing
    8:18 85:6
    86:11

Chapter
    12:8,10

chart
    84:21
    94:2 99:7

charts
    29:5
    102:6

Chau
    8:4,7
    37:5 59:5

Chicago
    11:18

chimed
    22:13

chose
    116:12

Christian
    4:2,8
    34:18
    72:9,10
    109:13

circumventi
on
    47:10

clarify
    82:16

classify
    56:16

clause
    47:14
    64:6

clauses
    48:9,20
    49:4

clear
    16:5
    30:17
    31:17
    64:13,23,
    24 68:10
    70:23
    81:2
    95:21
    115:4

close
    96:8

closely
    86:3
    122:5

closing
    96:3

CNBC
    114:17

co-ceo
    15:7

Coast
    14:11

COGS
    75:23,24

coincidence
    83:7,12

collateral
    39:14

collect
    39:13

Column
    83:24
    85:15
    87:4 98:6

commit
    33:13

commitment
    25:8 33:5
    80:13,15

commitments
    24:18
    33:19

committed
    90:22
    119:9

communicate
d
    21:4
    66:13

communicati
on
    66:20

communicati
ons
    28:19
    43:16
    66:6,9,
    11,17

company
    11:2,3,13
    12:20
    15:9
    84:12
    90:8
    121:25
    122:22

comparable
    85:2

compare
    77:25
    84:11,25
    94:24
    95:9,12,
    21 106:18

compared
    76:4,8



86:15
106:21

compensated
15:11,13,
14,15

compensation
16:4,9

competence
51:5,22

competent
50:25
120:2

competitor
49:19

completion
67:17

conceivable
102:23

concern
30:6 36:4
107:10,11
115:23
116:14
118:13

concerned
35:12,13,
24 63:10

concerns
36:6
54:19
63:8,11,
12,14

concluded
123:18

conducted
87:3

confidence
61:10

confidential
56:9,13
104:6,15

conjunction
20:25

Connecticut
4:11

connection
4:19
17:9,22
21:5
28:20
30:5 46:5
47:12
83:18
121:16

consecutive
11:21

consideration
69:20

considered
52:11
79:15
81:7
82:21
107:3

consist
104:6

consisted
11:12

consultants
42:14

consulted
21:4

contact
42:13,16,
22 43:22
57:23

contained

56:8

content
36:12
101:23

contents
56:3

context
40:23
120:11
121:25

contingent
30:25
32:5,7,
19,21,25
70:15
71:15
73:23

continuing
96:2

contract
14:24
54:21

contribute
52:8
54:16
68:11,22
69:3
79:20

contributed
68:23
79:11

contributing
52:16
80:3
82:19

contributors
103:25

control
97:24

convenience
93:7

conversation
6:12,15,
20 7:5
8:5 36:11
108:11
119:13,15

conversations
7:11,22
8:8 33:22
50:20
66:18
119:11
121:19

copied
35:5 37:6
59:5
67:10
107:20
109:15,16
117:7

correct
8:19,24
10:8
14:20
15:24
16:18
17:21
20:16
23:4,6
24:24
27:18
30:18
32:6,9
33:10
39:16
43:13
46:21
50:15,16
52:25
54:24
55:11

56:7
60:24
61:3,5
62:6,11,
14,15
63:2
65:23,25
66:2,5
67:15
70:5
72:22
73:10,24,
25 74:5,
6,9,10,
11,20,22
78:12,16
81:6 83:3
84:4,22
87:16,19
88:3,4
89:19
90:21,25
96:17,23
97:3,4,7,
8,11
99:18
100:12,
15,22
102:4,5,
14 105:18
106:22,24
115:18
116:14,18
118:2
122:10,14

correctly
10:14
15:21
28:24
36:16
41:25
107:12
114:15

cost
75:16,25



costs
  60:14
  83:6
count
  94:17
counting
  94:14
counts
  119:14
couple
  25:21
  62:16
  69:16
court
  5:5,6
cover
  83:5
  106:4
  121:6
crazy
  94:19
create
  12:24
  84:7
  103:3
  106:15
  115:6
  122:14
created
  77:12
  89:17
  90:11
  91:12
  96:23
  103:18,23
  105:7
  106:12
  111:3
  113:8
  120:9
  122:11
creates

  110:12
creating
  97:12
  101:21
  112:20
  114:25
  121:16
crisper
  103:22
criteria
  113:23,25
  114:7
current
  9:5
cursor
  71:3,5
  111:8
customer
  93:17
customers
  51:4
  88:20
customers'
  110:12

───────────────
───────────────
        D
───────────────
D4
  85:15
daily
  85:6,7
damage
  109:23
  110:9,10
data
  54:25
  55:4,6,7,
  9,14,18,
  23 56:3,
  7,12,15,
  19,23

58:17
85:16
86:5 87:6
91:7
117:16
121:17
122:4,8,
23 123:7
date
  9:4,10
  19:17
  53:16,24
  106:4
dated
  53:12
  101:6
  106:3
dates
  86:10
Davis
  4:14
  116:21
  117:2
day
  53:5,10
  67:16,18
  72:3
day-to-day
  51:9
days
  43:20
  61:11
  62:16
DDT
  24:12
deal
  15:15
  29:19
  33:13
  34:12
  47:21,23
  48:2
  53:19,22

68:24
77:14
81:14,18
82:19
dealing
  53:2
  119:7
dealings
  119:3,5,6
deals
  34:11
Deb
  96:16
Deborah
  22:7,15
  50:5
  96:23
  111:6
debt
  20:14
  24:9,10,
  13 26:4
  37:25
  38:14,21
  39:3,8,9
  40:11
  83:19,22
decade
  22:3
decide
  58:22
  63:19
decided
  10:25
  12:12,18
decision
  113:11
decrease
  74:24
  93:2
decreased

74:20,22
deemed
  56:20
deep
  98:17
defaults
  39:11
define
  17:11
  30:15
  39:5
  45:15
defined
  52:3
definition
  39:16,23
  116:8
degree
  10:4,9,
  13,17,19,
  21,23
  65:11
  96:12
  98:18
  111:5,7,
  23
deliver
  68:6
Deloitte
  120:9,13,
  24
depending
  56:3
  82:23
  95:16
  96:8
  97:23
depends
  45:21,22
  46:14
deployed



33:8

**deposed**
6:5

**deposit**
70:16,18,
21 71:8
72:2,3
73:21
115:25

**deposition**
4:18,23
6:8,16,
22,25
7:10,25
8:12 9:2,
17,23
77:18

**describe**
91:17

**description**
113:11

**detail**
96:19
105:12

**detailed**
105:3,11

**details**
81:17

**determinator**
58:22,24
60:4

**determiner**
60:2

**Deutsche**
24:8 34:5

**developed**
13:24
20:24
58:12
87:22

**developing**
13:17
20:20
51:2

**difference**
14:9 22:5
51:2

**differentiating**
81:4

**differently**
20:24
56:18

**difficult**
75:7 89:2
90:12,13

**diligence**
13:22,23
16:17
87:3

**dinner**
50:11,18
52:6 61:4
65:13,19,
24 78:24

**direct**
4:5 23:21
42:13
60:19
65:12
107:19

**directed**
27:13,16
113:14

**direction**
11:7
115:3
120:5

**directly**
6:9 51:4
103:13

**director**
11:5
14:19

**disagree**
113:20

**discount**
98:17
100:5

**discounted**
68:22
75:5

**discuss**
7:14
31:5,7

**discussed**
7:14
31:2,4
52:6 63:2
65:10
81:7
96:20
102:8
108:20

**discussion**
7:6 22:16
23:19
40:8
109:22
111:4
117:2

**discussions**
31:8
40:22
63:24
64:22
65:7
68:16
80:22
82:11
86:17

**disseminated**
123:12

**distilling**
104:22

**distinction**
116:11

**distinguish**
34:11

**distribution**
81:22

**diverged**
21:24

**document**
19:6,15
44:11,14,
17 72:6,
15,17,18
74:2
77:7,9,20
78:5
101:13,22
102:14
103:13,
16,17
105:17
106:2,7,
10 109:11
112:8,11,
17,21,23
113:17,19
114:9,13,
24 115:8
118:8
120:19

**documents**
8:11 9:22
18:25
55:5
105:16
115:24
120:9
121:15
122:3,7,
11

**dollars**
64:11

**DOM**
50:21
68:6,10

**DOM0000075**
77:2

**DOM000031**
44:14

**DOM000052**
101:9

**DOM0001380**
120:20

**DOM001082**
105:23

**Dorset**
24:12

**downside**
85:12

**dramatic**
93:10

**Dream**
4:14,15
23:17
41:18,21,
24,25
42:5,10,
13,14,15,
22 43:7,
10,17,22
44:2,5,20
45:25
49:24
51:7
52:7,25
54:8,11,
19,20
55:12
59:6,18
61:3,18,
23 62:4,
12,22



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
Index: due..Europe

63:8,25
64:5
66:7,14,
25 67:17
68:2,20
69:7,12,
17 70:10
78:15,19
79:16
82:11,17
117:15,21

**due**
13:22
16:16
87:2 93:3

**duly**
4:3

**dwindled**
89:20

—————————

**E**

—————————

**e-mail**
9:15
19:8,24
20:2,4,5,
13,18
22:19,25
23:22
24:3
25:14,16,
22,23
26:19
27:6,7,
12,14,17
28:18
29:3
31:14,15,
20,24
34:17,18
35:3,4,
15,19,25
37:3
42:25

53:15
59:2,3,5,
6,13
60:19,22,
25 61:6,
13,25
67:5,6,
10,15
71:2,25
107:14,
20,23
108:23
109:10,
13,18,20,
21

**e-mails**
8:15
9:13,17,
18,20,21
20:8
80:23
109:4
117:8

**earlier**
40:21
42:8
73:24
76:17
88:17
96:15
97:23
115:25
117:10

**earliest**
31:20

**early**
10:20
60:25

**easier**
5:12
19:19
94:24

**easiest**
91:17

**easily**
70:4

**East**
14:11

**easy**
89:24
110:5

**EBITDA**
96:12

**economics**
10:5,6,7,
23

**Eddie**
11:13

**education**
10:3

**efforts**
18:22

**element**
22:12

**elements**
21:12
89:8

**employee**
14:21,24

**employment**
14:24
15:3

**end**
14:13
61:17
95:13,15
97:21
102:9
115:11

**ended**
99:12
117:11
122:20

**ends**

95:17
119:7

**enlarge**
73:14

**entails**
17:18

**entered**
47:11
48:7,17

**entertainin
g**
37:17

**entire**
25:23
89:14
96:9
108:18

**entities**
12:14
15:22
16:3
44:24
55:20
69:24
121:21

**entitled**
7:17
44:11

**entity**
11:8
13:14
15:6
41:17
46:15
64:15
79:24
81:5
97:15
108:25

**environment**
95:6

**equation**

90:3
111:25

**equitable**
69:10

**equity**
12:12
14:8
15:15,18,
23 16:2
23:23,25
24:13,18
25:8
27:23
28:8,11
33:5,7,
13,18
47:3
48:8,14,
18,24
49:4,18
52:9,10,
23 60:7
70:12
80:2,4
81:10,11,
15,24

**equivalent**
10:5 11:5

**establish**
85:8
88:9,10

**established**
76:12,16

**estate**
76:21
97:22

**esteem**
65:3

**estimated**
75:21

**Europe**
15:10



evaluate
  83:25
  118:7
evaluation
  76:3,9
evening
  54:5,17
  61:7
evolving
  8:18
exact
  14:23
  39:5
EXAMINATION
  4:5
examined
  4:3
Excel
  76:25
execute
  45:6
exhibit
  19:2,6,9
  25:11,12
  27:3,4
  31:11,12
  34:14,15
  36:24,25
  44:8,9
  59:2,7
  67:5,12
  71:2
  72:6,7
  76:25
  77:3
  101:3,10
  105:20,21
  107:14,16
  109:7,8
  112:8,12
  120:18,25
exhibits

73:8
exist
  33:17
  48:25
existed
  28:16
existing
  17:5 80:6
  89:20
expand
  60:10
expect
  20:8
  26:20
  28:15
  51:21
  80:9 87:2
  91:3,6
  105:9
expectation
  26:23
  51:12,24
  84:11
  92:19
  103:9
  120:7
expected
  21:24
  26:12
  51:19
  62:23
  83:25
  85:17,22
  91:21
  92:7,11,
  20,22
  98:13
expecting
  21:21
  88:13
expense
  51:15

expenses
  51:18
experience
  54:13,14
  122:24
expertise
  84:14
explain
  24:2 76:6
  81:8
  91:11
  95:3
explained
  88:17
explaining
  95:5
express
  56:18
  103:21,22
expressed
  33:9
  68:25
  69:11
  102:10
extension
  71:10
extensions
  53:24
extract
  29:7
extremely
  12:17
  65:3

─────────
        F
─────────

fact
  55:25
  56:2
  64:20

failure
  13:10
fair
  26:2
  96:24
  99:9
  118:5
fall
  94:18
falls
  95:2
familiar
  22:22
  34:23
  39:2,4
  56:25
  101:14
  106:8
familiarity
  42:5
familiarize
  72:20
family
  79:6,11,
  13,19
Fargo
  37:13,17
  39:25
  40:18,19,
  23,24
  41:2,3
Fargo's
  37:15
fashion
  12:21,24
fashion/
apparel
  12:20
fashions
  12:21
favor

73:14
  114:9
FCF
  87:16,19
February
  94:8
fee
  81:16
feeling
  64:25
feelings
  62:22
felt
  50:23
  64:24
  76:6
Feuer
  4:2,8,12
  5:1 6:1
  7:1,8,17
  8:1 9:1
  10:1 11:1
  12:1 13:1
  14:1 15:1
  16:1 17:1
  18:1,24
  19:1,12,
  24 20:1
  21:1 22:1
  23:1,21
  24:1
  25:1,10
  26:1
  27:1,11
  28:1 29:1
  30:1
  31:1,19,
  24 32:1
  33:1
  34:1,19
  35:1 36:1
  37:1,5
  38:1
  39:1,2



40:1 41:1
42:1 43:1
44:1,16
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1,4,12
60:1 61:1
62:1 63:1
64:1 65:1
66:1
67:1,11,
15 68:1
69:1,15
70:1 71:1
72:1,9,14
73:1 74:1
75:1 76:1
77:1,6
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1
101:1,13
102:1
103:1
104:1
105:1
106:1,6
107:1,19
108:1
109:1,15,
18 110:1
111:1
112:1,17

113:1
114:1,6
115:1
116:1
117:1
118:1
119:1
120:1
121:1
122:1
123:1

**field**
85:15

**fifteen**
72:19

**figure**
31:9
57:15
58:21
63:5
90:14

**figuring**
96:9

**files**
9:21

**fill**
103:11

**final**
100:23

**finance**
112:3

**financial**
29:21
30:2
51:10
120:21

**financing**
26:14
40:16

**find**
17:9
94:20

**finding**
17:5

**finger**
108:16

**finish**
5:14

**firm**
18:9 25:8
80:12

**Fiscal**
121:9

**fit**
51:6

**flow**
75:14
87:18,19
97:6 98:4

**fluid**
108:17

**focus**
62:10
105:9

**focusing**
86:25

**follow-up**
41:13

**forecast**
98:13
99:4

**form**
14:6
44:23,25
45:3
66:19
68:15
114:20

**format**
84:20

**forward**
36:17

98:25
115:3

**found**
40:2

**frame**
14:4 86:7

**FRB**
8:6

**Free**
87:18,19

**frequently**
45:5
86:12

**Friday**
71:8

**friendly**
50:20

**front**
14:13
61:17
77:11

**full**
39:10

**full-time**
14:21

**fully**
38:23

**function**
84:10

**funds**
17:9
90:17,19,
22 112:5

**fuse**
53:20,23

**future**
13:6
21:17,21,
24 22:4,
10 68:7

84:16
85:11
91:14
92:14

_____

**G**

**Gargiulo**
22:7 50:6

**Gate**
12:13,17,
19 13:21
14:2

**gave**
108:25

**gears**
41:16

**general**
40:10
49:9
51:25
52:4
65:13
109:22
118:9
123:9

**generally**
21:16
51:16
65:22
84:13
104:4

**generate**
14:13

**generated**
9:7

**generating**
97:21

**German**
11:3

**gestures**



5:11

GG-0008746
  67:6

GG-0021594
  34:21

GG-0030208
  72:12

GGH0013673
  109:12

give
  46:7
  58:11
  59:14
  61:10,18
  85:14
  88:20
  118:9

giving
  98:21

Global
  4:16 8:4
  14:17,18,
  22 15:2,
  6,12,14,
  19,22
  16:3,4,9,
  11,14,22
  17:21
  22:6
  24:17,21
  28:9,14
  30:10,13,
  20,24
  32:2,7,22
  33:4
  38:12
  44:12,23
  46:13
  47:11
  48:17,21
  49:3,5
  52:8,13,
  16 54:24
  55:21

56:9,11
57:5,6,7,
17,25
63:9
72:10
74:3,8,12
78:11,13
80:2,3
81:9,13
82:13,18
90:16,21
99:4
101:7
103:16
104:7
105:25
106:25
107:4,7,
21 108:24
111:19
112:9
115:9,15,
18 116:12
123:5

Global's
  16:19
  55:10
  122:14

goal
  102:21,22

Golden
  12:13,17,
  19 13:21,
  25

good
  4:12
  35:14
  54:15
  64:22
  65:7
  86:14

Goods
  75:25

granted

55:13

graphs
  87:20
  91:6

gray
  31:4

great
  51:5
  53:16

greatest
  29:9

green
  98:12

Greenbaum
  4:13

group
  6:17
  11:2,8,9,
  11 18:13
  28:19,20
  103:19
  104:21
  105:4
  119:19

growing
  107:10
  115:22
  116:14

grown
  92:23

growth
  92:13,15
  102:19
  103:8

guess
  5:20 16:5
  32:14,16
  36:3
  63:22
  68:3
  71:24
  84:20

114:20

guessing
  71:23

guy
  14:11,13
  57:12
  59:22
  61:16,17
  62:4
  110:24

guys
  7:21
  13:21

_____

_____

        H

half
  16:24
  99:20
  117:19

handle
  46:11,12

Hannan
  34:24
  35:5,24
  36:6

happen
  21:21
  84:12
  86:20
  98:23

happened
  55:16
  97:10
  100:20

happening
  70:23

hard
  48:14,15
  49:21
  94:13
  118:6

head
  20:10

hear
  4:21 38:8

heavily
  84:19
  96:16

held
  56:16
  118:3

helped
  11:20

helpful
  61:10
  120:3

helping
  11:14

helps
  95:9,21

hey
  57:14
  68:23
  103:20

hidden
  100:25

high
  12:21
  65:2,3
  103:2,9

higher
  113:22

highest
  10:3 75:6
  121:23

highly
  49:14

Hilco
  97:15
  98:4,16
  99:20



100:2

Hilco's
  99:4

hill
  111:24

hired
  10:25

historical
  97:9
  100:16

historically
  102:20

history
  10:21

hold
  56:11

holding
  90:7

holds
  39:9

hole
  90:11

holidays
  94:4,18

honest
  38:13
  65:9 87:9

horse
  29:10,16,
  18,25
  30:7,11
  76:22

host
  9:20

hosted
  55:14
  56:8

How's
  73:16

huge
  51:2
  64:10
  92:13

hundred
  91:5

———————————

            I

———————————

IB
  41:9,10

idea
  36:19
  58:11
  65:14
  85:14
  86:9
  87:10
  98:15,21
  123:8,9

ideas
  21:16

identical
  85:3 86:2

identification
  19:10
  25:13
  27:5
  31:13
  34:16
  37:2
  44:10
  59:8
  67:13
  72:8 77:4
  101:11
  105:22
  107:17
  109:9
  112:13
  121:2

identify

13:16
  24:11

images
  106:20

imagine
  26:24
  48:12,14,
  15 49:21
  122:3

immigrant
  12:6

implementing
  13:24

imply
  23:24

important
  5:9 58:19
  59:25
  94:17
  123:10

impression
  54:8

impressive
  64:18

in-person
  43:9,15,
  17 49:23
  54:3,9
  62:12

in-store
  93:3

include
  47:13,16,
  17 48:9

included
  48:20
  70:13

including
  67:11
  109:15

income
  85:21

incorrect
  39:21

increase
  91:15
  92:17
  114:7

increased
  102:20

increases
  92:15

indicating
  19:4,22
  31:23
  35:18,20,
  22 71:6
  72:25
  73:4,6,16
  87:24
  91:18
  98:5
  101:19
  108:3
  111:9
  114:3,10
  121:8,11

individual
  25:2

Industries
  4:15

information
  10:2
  21:19
  56:4,9,
  11,14,19,
  23 86:19,
  22 96:14
  97:9
  104:7
  122:12,
  19,21,23
  123:11

initial
  21:14

initially
  65:7

input
  20:25

instructions
  5:3 6:2
  7:12

intellectual
  41:12
  74:4
  76:10,11

intended
  74:8,12,
  15,17
  93:12
  102:10

Intent
  71:13

intention
  38:18
  51:8
  71:17
  83:20
  87:13
  89:13
  107:9
  113:14
  115:8

intentions
  63:3

interest
  33:9 82:2

interested
  16:22
  33:11
  60:16
  63:15
  90:6



121:21

**internally**
22:14

**Internet**
39:7

**introduced**
42:2

**introductio
n**
42:4

**inventories**
75:12

**inventory**
64:12
75:2,4,9,
17,20
86:16
88:4,11,
12,13,17,
18,19,23
89:4,6,7,
11,20
90:9
92:3,4
97:16,19,
25 98:2,
7,8,10,
14,17,20,
25 99:13,
14,16,21,
23 100:2,
4,7,9

**invest**
15:23
27:25
58:23
119:9

**invested**
12:20,22

**investment**
13:13
17:20
28:8,21

36:20
75:16
77:13
80:18
81:12,16,
24 82:5,9
83:3
102:24
116:21

**investments**
27:23

**investor**
24:9
28:11
48:14
49:18
51:11
70:13
80:22,24
81:11,21,
23 82:8

**investors**
17:9,18,
19 23:2,
9,24,25
24:3,10,
18 33:9,
11,25
34:4,9
45:5 47:3
48:8,18,
24 49:5
56:21
58:20
60:7,16
81:3
102:16
104:8,16
106:14
113:9,15,
16

**invoices**
88:2

**involve**

35:4

**involved**
17:13
23:8,13,
16 36:18,
22 40:9
42:9
48:24
51:8,20
72:23
96:16
101:21
110:25
111:7
112:20
116:23,25
117:4,5

**involvement**
17:15,17
36:14
42:11
116:20

**IP**
41:11
76:5,9,18
84:3
106:23
107:10
115:21
116:14
117:22
118:5,6,
12,17,21

**issue**
5:19
31:16
33:20
93:5
105:17

**issues**
32:10,12

**item**
13:5,7

**items**
75:5,8
88:24

**iterations**
70:22

—————————

—————————
J
—————————

**Jack**
15:6
35:10
36:18,21
37:16,18,
23 39:25
73:17
80:6,7,9,
14,19,21,
25 81:3,5
82:13,20
93:8
111:2

**Jack's**
36:14

**Jane**
81:3

**Janie**
15:5
35:10
36:13,17,
21 37:16,
18,23
39:25
73:17
80:6,7,8,
14,18,21,
24 81:5
82:13,20
93:8
110:25

**January**
94:7
95:22

**Jeff**

5:6 14:5
29:4,5
59:3
65:23
66:2
71:25
109:10

**Jeffrey**
6:4 67:7

**Jersey**
62:13

**JGB**
24:11

**job**
5:11
86:14

**July**
75:21
98:9

**jump**
90:12

**June**
9:11
31:15
32:20
33:4
34:19
35:5 37:4
39:24
41:22
43:5 54:4
59:3
60:20,24
61:25
62:18,21
63:7
64:17
66:3,7,15
67:7
70:15
71:8 72:2
73:22
78:11,20
82:18



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
Index: justification..longer

86:15
87:8
90:16
101:6
107:21
109:11
111:14
117:19
118:4

**justification**
115:2

**justifies**
49:15

**justify**
13:12

———————

**K**

**K-I-E-L**
10:11

**Kathleen**
25:16
37:3
50:13
67:9

**Kathleen's**
26:12

**Kiel**
10:11

**kind**
30:14
82:2
101:17

**kinds**
14:3

**knew**
25:3
35:23

**knowing**
65:4

**knowledge**
30:6
57:11
63:17
122:24

———————

**L**

———————

**labelled**
84:6
87:15

**Lapish**
27:7 29:4
31:15

**largely**
21:11
22:14
84:21
96:23
106:12
110:23
118:24

**larger**
94:11

**late**
118:3

**Laughter**
102:8
113:24

**Lauster**
25:16
27:14
29:5 37:4
67:9

**Law**
8:6

**lawsuit**
4:16

**lawyer**
4:13

**lawyers**

8:6,8

**layout**
84:20

**Lazard**
32:9,13
33:19
42:2,3,5
72:10
84:21,25
85:17
86:5,11,
25 87:5,7
89:15
109:14
121:17,
19,24
122:8,12,
21 123:6,
7

**leading**
119:21

**learned**
10:22

**left**
12:7,8
54:9
87:23
91:18

**legal**
30:2
39:12
54:21
63:21
116:9

**legally**
30:23
31:6
116:7,9,
13

**lender**
26:3,10,
21 27:21
37:18

39:12
40:23
41:4
47:5,7,
15,17,18
48:3
76:13

**lenders**
47:2

**Letter**
71:13

**level**
10:3
55:22
61:15
65:12
103:9
113:22

**leverage**
29:9

**liable**
39:10

**licensing**
118:22

**life**
63:19

**Light**
24:9

**likes**
91:10

**limit**
75:16

**limited**
51:25
52:4,10

**liquidate**
99:6

**liquidating**
97:16

**listed**

24:3

**literally**
71:23
83:12
86:13
90:2
108:19
120:14
123:9

**lived**
54:22

**lives**
14:10

**living**
4:10
54:21

**LLC**
4:16

**loan**
39:8,10,
12 41:8,9

**locations**
102:20
103:11

**logic**
96:6

**logo**
44:12
101:4,7
105:24,25
112:9

**LOI**
71:4,7,
11,17,19,
22

**long**
10:15
17:20
58:2,8
121:10

**longer**



53:20,21,
23 107:22
111:21

**looked**
83:11
104:2,5
118:8

**losing**
89:13

**loss**
38:17
109:24
110:4

**lost**
89:10

**lot**
5:12
13:14
28:25
31:2,4
34:9
75:10
89:10
90:14
96:6,13
101:23
103:23,24
104:21
106:19,20
117:2
121:18

**love**
73:15

**low**
89:6,10

**lower**
110:7

**lunch**
34:6

————————

**M**

————————

**macro**
93:3

**made**
64:13
73:21
75:6 79:4
90:11
97:18
113:11
114:22
122:3,17
123:5

**mail**
11:3

**main**
26:10
80:24
105:17

**maintain**
90:10
99:16

**maintaining**
74:12

**major**
21:22
92:9

**majority**
45:18
68:13
84:18
104:6

**make**
15:16
22:9
24:25
27:22
77:14
80:12,14
84:16
90:20,23

91:3
98:12,15
103:21
112:5
113:10
116:10

**makes**
5:11
20:5,19
35:18
78:6 79:4
94:24

**making**
16:15

**manage**
60:14

**managed**
55:9

**management**
81:16
82:5

**manager**
81:13
82:5

**Managing**
14:19

**Manhattan**
50:2

**manipulate**
21:21
84:15

**manipulated**
84:8,19

**March**
86:7 94:9
120:23

**mark**
18:25
25:10
27:2
31:10

34:13
36:24
44:7
50:6,8
58:25
67:4
68:20
72:5
76:24
101:2
105:19
107:13
109:7
112:7
120:18

**marked**
19:9
25:12
27:4
31:12
34:15
36:25
44:9 59:7
67:12
71:2 72:7
77:3
101:10
105:21
107:16
109:8
112:12
120:25

**market**
12:21
109:24
110:5,6

**marketing**
10:25
11:5,19

**marketplace**
93:13

**marking**
19:5

**mass**

12:21

**massive**
93:17

**massively**
21:24

**match**
95:8

**mathematical**
13:11

**matter**
123:17

**Matthew**
27:7
31:15

**maximize**
83:22

**MBA**
10:5

**Me's**
62:12
117:15

**meaning**
14:12
26:20
28:9 39:5
51:13
52:15
70:3
111:19

**meaningful**
64:9
68:12
75:13
96:12

**means**
37:11
38:14,22
39:11

**meant**
41:11



78:15
83:5
120:12

**meet**
61:22

**meeting**
43:18
49:23
54:3,9,18
61:2,7
62:8,12,
15,18,21
63:7
64:17
65:10,19,
24 66:3,7
67:17
69:6
119:14

**meetings**
43:9,15
66:25
67:21
119:14,
16,24

**member**
8:3 15:5
35:7 36:9
80:10,12

**members**
8:5 35:9

**memory**
28:24
53:14
70:23
72:25

**mentioned**
7:2,5
9:12,16
33:24
40:21
42:8 65:6
68:9
89:20

96:15
113:23

**mentions**
28:18

**message**
43:2
114:25

**messes**
60:3

**met**
14:5 43:6
51:7,23
52:7 62:7
65:13
82:17

**Midcap**
26:13,20
34:7
37:18
40:22
41:3

**middle**
60:21
90:15
117:19

**migrate**
59:25

**migrated**
36:21

**migration**
58:16

**Milan**
42:17,19
50:7,9
66:12,14,
17 67:20

**million**
11:22
20:14
52:17
73:19,21
74:5

75:20,22
76:12,15,
19 79:7,
11,17,20
80:2,4,18
82:12,19
83:4,9,
13,14
84:2,4
85:19,21,
22 91:22
92:11,12
98:7
99:12,14
110:16,18
116:2
117:23
118:5

**millions**
64:11

**minimize**
13:8

**minor**
69:22

**mistake**
90:7

**Mo**
110:24
111:7

**model**
8:16,18,
22 9:8,10
13:11
17:5,6
20:18,24
21:2,5,7,
12 36:17
51:13
56:22
58:13,14
65:17
69:15
78:18,25
79:21

80:4
81:10
83:5,18
84:6,10,
25 85:6,
9,25
86:9,11,
25 91:15
93:23
102:3,9
103:14
104:2,4,
14 106:15
110:15,20
111:4
117:10
118:16
121:16
122:11,
14,20

**modelling**
118:11

**models**
36:23
82:23
96:10
103:10

**modified**
46:17

**module**
22:7

**moment**
82:7
121:9

**Monday**
54:5

**money**
12:12
18:4,22
52:12
76:11
89:10,13

**month**

91:21
92:6,10
94:7,8,9,
10,17,25
95:2,12,
13

**monthly**
88:2
91:19
92:3 94:2
98:2

**months**
11:24
72:19
91:23,24,
25 94:4

**morning**
4:12,18
25:18
60:25
61:2

**mothers**
93:6

**move**
9:25
18:24
22:18
35:21
115:3

**moved**
11:17
36:16
53:8

**multiple**
76:25
106:2

**multitude**
81:6

**Murphy**
4:6,13
7:7,16
18:24
19:11



22:17
23:20
24:15,22
25:3,5,10
27:2,10
31:10,18
34:13,22
36:24
37:8
38:25
39:22
40:13
44:7,15
45:10,17
58:25
59:11
60:18
67:4,14
69:14
72:5,13
76:24
77:5
101:2,12
104:12
105:13,19
106:5
107:13,18
109:7,17
112:7,16
114:5
116:19
118:25
120:18
121:3
123:4,14

**mutual**
70:2,6,7

**Myron**
15:7,8

——————

**N**

**names**
34:9

**NDA**
23:17
46:24
47:5,7
48:12,13
52:25
53:5,7
55:19
69:17,19,
23 70:2,
6,8,9
78:23
79:3

**NDAS**
23:3,10
47:12,15
48:11,18,
23 55:21

**necessarily**
8:2 20:9
64:23
95:8,15

**needed**
50:24
81:21
88:22
89:7,9,11
113:22

**negotiate**
46:10

**negotiated**
29:25
46:25

**negotiations**
45:11,19

**net**
110:17

**network**
52:22

**Newport**
11:13,15,
16,18

12:8,10,
15

**news**
11:13,15,
16,18
12:8,10,
15 114:17

**nice**
50:19
106:19

**nods**
5:11

**non-circumventi
on**
47:14,16,
17,19
48:4,9,
13,20
49:4 64:5
70:13

**non-qualified**
116:7

**nondisclosu
re**
42:10
43:25
44:12,19
45:6
46:5,10,
17 48:7
53:11
55:13
64:2,6

**normal**
100:6

**normalize**
92:8

**note**
26:13

**number**

27:9
34:21
37:7
44:14
51:15
67:6
72:12
74:11,14,
20,24
75:17
83:15
88:14
96:10
101:9
102:24
103:7
105:23
107:15
109:12,23
110:15
112:10
120:20
123:3

**numbered**
19:7 77:2

**numbers**
25:19
31:17
59:9
79:23
84:15,17,
18,25
85:23
87:4,7
88:7
89:16
91:10,16
99:4
100:13,16
102:10
110:19

——————

**O**

**O-T-T-O**

11:2

**oath**
5:4

**object**
113:13

**Objection**
24:5,20
26:16
39:18
40:3
45:7,13
60:9
104:9,17
116:15
118:18
122:15

**objective**
61:21
114:25
118:22

**obtain**
116:21

**obtained**
87:5

**occurred**
54:4
109:24,25

**offer**
71:15
76:18,20
93:14
98:15,16

**offered**
121:23

**offering**
93:16

**office**
62:13
79:6,11,
13,19

**official**



119:20

**One-sided**
70:3

**onerous**
29:7

**online**
12:2
51:14,20
92:17,21
93:7,11,
18 94:20

**opaque**
113:3

**open**
74:18
96:7

**operate**
83:14
113:9

**operating**
11:3
15:10
85:20

**operation**
51:9
118:23

**operations**
14:12

**operator**
14:8

**operators**
57:8

**opinion**
26:25
90:15
107:7
111:18
115:9

**opportunities**
85:10

102:19
108:18
112:3

**opportunity**
11:25
12:6
115:10

**optimize**
17:6
51:18
89:3

**option**
79:16

**order**
4:18 11:3
22:3 33:5
75:15
89:11,12
91:9,11,
12 100:7,
19 106:13

**ordered**
97:2

**organized**
94:23

**original**
82:9
85:16
87:13

**originally**
93:16

**Otto**
11:2,9,11

**outcome**
22:4,14

**outline**
104:20

**outlined**
7:4

**outlines**
29:19

**outlining**
102:12

**outreach**
23:23

**owned**
11:11
15:6 16:3

**owner**
96:21
103:15,17

**ownership**
15:16,18

───────────
**P**
───────────

**P&l**
100:11

**p.m.**
67:8
123:17

**pages**
25:17
27:8
31:16
34:20
72:11
73:9,11
101:19
105:24

**paid**
82:2

**painting**
21:17
84:13

**paragraph**
37:10,12
40:15
113:2,4,
20

**part**
8:4 16:3,

16 29:21
38:8
48:11
83:9,17
84:9,23
93:3
99:3,5,15
115:6
119:18

**partially**
84:23
85:4
114:21

**participate**
15:17
40:25
81:14
82:6
107:4,8
111:10,
14,16,19,
21 115:11

**participated**
82:10
111:2

**participating**
50:22
107:2

**parties**
69:21
123:6

**partner**
29:7
51:25
52:2,5
54:12
61:12
62:24
63:6,17
69:2
82:24

**partnering**
69:5

**partners**
18:10
52:10,14,
20 80:6
121:19,25
122:13

**partnership**
29:8 69:7

**parts**
113:6

**pass**
115:9

**passed**
43:19
115:15,
17,19

**past**
21:19
22:9
84:11
100:20
118:10

**Pathania**
22:20,22

**Patty**
119:12,17

**Payroll**
110:15

**peaks**
94:3

**pending**
5:25

**people**
18:4,7
28:25
34:10
37:6
45:22
63:20,21



65:18
67:10
90:5
93:22
95:2,4
104:21
105:4
109:15,16
110:6

**percent**
68:7
75:22
76:16,19
80:13
81:9,15
82:2,7,10
89:16,17
91:5
92:20,21,
24 93:10
94:10,11
118:24

**perception**
110:13

**perfect**
12:6
98:22

**performance**
22:9,10
84:11
95:10

**period**
85:5

**permanent**
86:17
110:10

**Perot**
28:18,20
33:22
79:22

**person**
43:7

**personally**
15:23
28:22
29:12
39:9
46:4,16
48:24
49:3,17
55:24
61:22
64:4
77:12
116:22,25
119:2,4

**perspective**
6:25 7:3
12:25
22:6,15
47:4
50:25
69:2
74:23
83:21
89:4
108:16

**phone**
42:25
117:4

**phrase**
20:23

**picture**
21:17
84:13

**piece**
56:18

**Pieces**
84:24

**place**
33:16
49:25
99:9

**plan**
11:23

13:6,10,
17,24
14:13
52:8
58:16
59:24
61:11,19
94:21
104:23
105:3,12

**planned**
96:2

**plans**
65:12

**point**
25:8
26:11
33:10
49:18
70:20
75:20
76:2 78:4
79:24
82:22
84:3
87:11
97:19
100:8
108:7,12,
16 110:21
118:10

**points**
41:6
111:15,17

**policy**
40:10

**portion**
76:4
118:16

**portions**
103:12

**position**
29:6

119:17

**positive**
75:15

**possibility**
21:20

**post**
13:22

**potential**
16:19
23:2,9
28:21
31:2
33:25
34:4
36:14
45:4 46:6
47:12
48:7,19
49:19
52:9
54:25
58:13
102:15,19
104:8
106:14
113:14

**potentially**
23:14
27:22
51:25
82:20
103:10

**predict**
22:3

**predicting**
91:15

**prediction**
22:9

**preference**
52:4

**preparation**
7:24 8:3,

12 9:2
77:17

**prepare**
7:9 72:17

**prepared**
65:15
76:20

**present**
8:7
43:12,14
50:4

**presentatio
n**
65:15
101:3,14
104:5,13
106:11,
16,18,19

**presentatio
ns**
120:9

**presented**
52:16,21
64:8
80:18
114:21

**president**
119:20

**pretty**
13:9 29:2
30:22
31:5
36:10
53:3 64:9
95:14

**price**
74:3
75:19
83:5
111:23
118:5

**prior**



9:17 42:4
63:7
78:25

priority
26:22

private
14:8
81:10

privileged
7:15

proceeds
82:6,10

process
8:19
12:11
16:15
17:2,3,
16,20
20:7
23:8,16
29:17
42:9,11
52:24
70:22
90:8,13
103:20
110:8
111:21
112:15

product
15:9
50:25
51:2,15,
16 68:12

products
93:15,20

professiona
l
64:15

profile
93:9

profitabili
ty
96:4

profitable
11:23
22:11
103:3

progress
85:8

project
18:17
108:24

projected
110:20

projection
85:16,18

projections
86:2
97:10
120:22

promised
85:20

promotional
15:9

property
41:12
74:4
76:10,12

prophecy
88:21

proposed
46:9

proprietary
56:8,13
104:7,15

protect
63:20

prove
13:4

proven

120:6

providded
78:19

provide
5:9 52:19
68:13
113:23
115:12,
20,22

provided
8:16 26:4
52:22
60:7
70:20
76:11
78:10,13,
23,25
85:16,24
88:8
89:15
97:15
100:17
102:15
104:15
105:10
115:13,25
122:12,
19,21

public
76:15

pull
77:25

purchase
29:23,24
74:3
75:19
83:5 93:7
111:23
118:13,
17,21

purchased
13:7

purchases

15:22

purpose
36:20
37:23
113:18

purposes
70:9

pursue
39:12
63:9
107:22

pursued
38:11

pursuing
115:15,19

pursuit
108:8

put
19:15
20:6
53:11
55:5,6
65:2
72:24
96:6,13
105:3,10
118:8

puts
99:21

putting
117:5

_____

Q

Q1
86:6

Q2
86:7

qualified
30:7
38:23

48:22
49:6
115:16,
19,21
116:3,6,
8,10
121:22

qualify
119:5
120:13

quarter
16:25

question
5:14,16,
18,25
26:12,15
27:11
35:22
37:21
38:3
41:14
49:9 56:6
57:13
60:12
62:5
78:17
82:16
101:25

questions
7:3
25:21,25
31:22
35:3 37:9
69:16
78:4
123:14,16

quick
39:6

quickly
53:8 73:2
100:7
101:18



R

raise
17:9
18:22
83:16

raising
18:3

ran
12:16
13:15
14:4

range
93:15

ranking
96:5

rate
76:14,19

rationale
113:12

reached
22:25
46:14

reaction
114:16

read
35:14
64:12
73:2
108:2,4
114:2,11,
12,15

reading
27:16
67:22

ready
71:9

realistic
85:13

reality
120:6

reason
5:23
12:23
39:15,20
75:15
77:23
78:2
88:20
110:16

reasons
13:16
75:3 90:5

rebuttal
114:21

recall
64:3
120:16

receipts
88:2,4
98:2

receive
10:9,13
14:25
15:4 16:2
20:11
81:13,15,
24,25
82:3
107:25

received
7:12 9:21
10:21
55:22
71:9 82:8
86:4,8
114:14,23
122:3,7

receiving
107:23
109:19

recently
11:15

recess
38:24
69:13
114:4

recipient
46:9

recognize
20:2
44:16
72:14
77:6,9

recollectio
n
23:5
31:25

recommendat
ions
95:25
96:22

record
4:7 5:8
7:6 19:5
22:16
23:19
25:17,20
31:17
59:10
87:25
112:11

recourse
37:24
38:14,21
39:3,7,8

reduce
68:5,17
75:17

reducing
100:8

refer
109:4

reference
63:16
87:11
100:20

referenced
21:5

references
35:25
37:13
61:7

referring
37:22
40:17
53:24
59:17,21
68:2 81:2

refers
71:25
108:23

reflect
73:11,13
85:10
91:6

reflecting
102:9

reflection
113:10

reflects
74:2 99:8

reflexion
21:7

refresh
31:25

regrettably
111:11

related
27:12
30:14,20
37:10
42:9
46:17

48:8,18
54:25
55:9,21
56:12,14
58:13
78:5 94:4

relationshi
p
16:8
37:15
88:11

relevant
56:21
57:9
86:24
97:22
118:16,24
121:14
123:12

relied
63:3

remaining
75:3

remember
6:19
9:14,19
10:14,16
18:13
20:3,9
23:7,14,
15 26:4
28:5,12
31:8
32:18,23,
24 33:14,
15,16
34:2,3,8
36:3,8,
11,16
37:20
40:8
41:25
42:15,18,
21 43:4,



21,23
46:20,22,
24 48:23,
25 49:2,
16,22,24
50:4,17,
19 52:6,
20 53:4,
6,15
59:13
64:16
66:16,21,
22 67:19,
22 68:16,
19 73:7
82:22
107:23
108:7,11,
15,21
109:3,19
114:18
117:3,6
118:14
119:23
120:8,11

**rephrase**
5:17 6:11

**replace**
37:18
40:22

**replenish**
88:22
98:20
99:17
100:10

**replenished**
99:18,20,
24

**replenishing**
100:4

**reported**
114:17,19

**reporter**
5:6

**represent**
4:14 54:2
62:6
77:15

**representation**
63:3

**request**
69:18
80:17

**requested**
123:11

**requests**
70:3
123:5,6

**required**
75:18
89:21
90:4
103:4

**requirements**
89:5

**requires**
90:14

**rescinded**
117:17

**Research**
18:12

**respond**
30:17

**responded**
26:19

**response**
5:10
26:11

**responsibilities**

18:21

**responsible**
11:6
17:8,12
20:20,22,
23 97:12

**restaurant**
54:4

**restock**
75:11

**restrict**
70:10

**resulting**
13:9

**results**
96:20

**retail**
4:16
51:13
54:12
63:17
91:23
94:6,16,
19 95:6,
7,18
103:4
118:23

**retailer**
50:24
51:16
93:21

**retained**
17:22

**return**
77:13

**returned**
69:17

**revenue**
110:18

**review**
8:11,14,

25 19:13
25:22
31:22
60:21
113:3
114:7

**reviewed**
8:15,21,
23 9:12,
16 77:17
121:16

**reviewing**
9:14,19
22:13
31:24
120:8
122:11

**revised**
86:22
99:4

**revived**
108:14

**rewards**
68:14

**ring**
121:13

**risk**
114:7

**Road**
4:11

**ROI**
77:13

**role**
13:16
17:2,4

**room**
54:25
55:4,6,7,
9,14,18,
23 56:3,
7,12,15,
19,24

58:18
85:16
86:5 87:6
117:16
121:17
122:4,8
123:7

**rosy**
21:17
84:13

**row**
85:17,19
99:13

**Rowe**
4:13

**run**
51:13
57:9
64:24
90:17
96:2

**running**
51:20
97:17
99:5
118:23

**runs**
13:11

---

**S**

**S-P-I-E-G-E-L**
11:12

**safe**
76:14

**salary**
14:25
15:4

**sale**
87:13
110:12



sales
  14:13
  88:2,15,
  23 89:10,
  12 91:16,
  19,22
  92:3,5,8,
  16,17,20,
  24 93:2,
  3,10
  94:2,5,24
  95:3,6
  97:2
  98:2,24
  99:6,8

Saturday
  53:17

sauce
  59:14,20,
  23 60:6

science
  98:22

scope
  18:20

screen
  5:7 19:3,
  15 73:11

scroll
  19:13,14,
  19 31:19,
  21 72:25
  101:17
  106:6

search
  39:7

seasonal
  94:12

secret
  59:14,20,
  23 60:6

section
  74:3

112:14

seemingly
  118:7

selected
  29:9

self-
fulfilling
  88:21

sell
  12:5
  13:3,5
  60:14
  88:14,15
  93:20
  97:20
  100:7
  110:5

seller
  21:16,20,
  23 29:17
  85:24
  113:22

seller's
  26:13
  86:2

selling
  51:3
  88:24
  98:17
  99:22,25
  100:5

send
  45:5 46:4

senior
  26:13

sense
  6:12
  20:6,19
  22:8
  35:18
  79:4
  99:25

103:21

sentence
  37:12
  40:14

serves
  28:24

services
  17:22

set
  69:19
  123:2

shape
  14:6
  68:15
  114:20

share
  19:2
  109:24
  110:5,7

sharing
  68:14

Shea
  109:14

sheet
  121:12

shirt
  13:3

shirts
  13:3

short
  53:20,23

shot
  73:11

show
  68:24
  112:24
  120:15

showed
  53:6
  64:10

side
  21:19
  50:5
  54:13,14
  85:12
  103:6
  112:2

sided
  69:23,25

sides
  54:15
  69:20

sight
  90:19

sign
  23:9 44:5
  47:18
  48:12
  64:13
  69:24

signed
  23:3,17
  28:4,7,
  10,13
  29:18
  44:2,20
  52:25
  53:4,9
  54:22
  55:12,21
  64:6
  78:23
  79:3
  90:24

significant
  118:15

signing
  55:19

similar
  14:6 93:9

simple
  12:23

simply
  60:11
  75:15

sitting
  33:7

situation
  12:4
  49:15,22

situations
  49:8,10

Sixth
  26:2,3
  29:6 34:7

skeptic/
optimist
  63:4

slide
  91:18
  92:18
  102:18

slides
  91:2,12
  101:16
  102:3,11
  103:18

sloppy
  106:19

slow
  101:18

slowly
  19:13
  31:21

SLR
  24:10

small
  92:15

Smith
  4:14

sold
  12:4



15:16
75:6
81:20
86:15
88:18
90:9 98:8

**solution**
96:9

**solutions**
82:25

**solve**
61:20

**Sooner**
55:15

**sort**
14:15
31:4
68:24
88:9
99:14
111:25

**sound**
23:4
53:18
54:6
62:19
74:5
78:12,21
117:25

**sounds**
62:20
72:4 74:6
77:21

**source**
89:5

**sources**
21:8 22:5

**sourcing**
14:12
51:15,17
54:13

**speak**
7:21,24

**speaking**
7:8 45:4

**Special**
36:19

**specific**
8:22
9:15,18
20:3
30:16
33:22
34:9
36:4,11
47:2
49:7,11,
15,22
57:8,11
61:15
64:2
65:12
79:24
80:17
84:8 86:9
93:4
94:23
108:11
109:21

**specifically**
9:14 16:6
20:9 22:6
23:12
36:2 37:9
47:6
48:10
55:3,6
66:10
67:23
68:20
79:23
89:17
92:16
108:21
113:19

119:24
120:12

**specifics**
23:7,15
59:23,24
68:19

**speculate**
38:18

**spelling**
72:21

**spent**
68:4
104:21

**Spiegel**
11:11,13,
20 12:8,
9,15

**spike**
91:25

**spikes**
94:13
102:8

**spills**
95:16

**spoke**
7:18,20
33:25
36:5 38:7
64:19

**spoken**
6:7

**sponsor**
12:14

**spreadsheet**
73:5
76:25
89:14
91:8

**SPV**
36:19

**stalking**
29:10,16,
18,25
30:7,10
76:22

**stand**
75:24
81:22

**standalone**
36:20

**standard**
44:23,25
45:2 95:8

**stands**
41:7,10
71:11
87:16

**start**
19:3,19
25:24
35:17
75:6 86:6

**start-up**
75:16

**started**
10:16
11:4,14
18:17
19:20
89:6 90:8
98:6,19
99:17

**starts**
21:14
31:14
34:18
37:11
59:2
72:11
95:18
101:8
107:15
113:2

119:7
120:19

**State**
4:7

**statement**
29:12
110:2

**states**
11:10
15:10
32:4

**status**
14:23
113:3

**stay**
96:7
121:9

**staying**
13:23

**steakhouse**
50:3

**steaks**
50:19

**steeper**
111:24

**step**
81:23,24

**steps**
108:17

**Steve**
34:23
35:4,6,24

**Stevens**
57:2,5,
10,13,16,
24 59:4

**stop**
73:3
98:17

**store**



22:7
88:16,19,
21,25
92:16,24
93:2
95:24
96:22
103:10

stores
22:8,10
51:14,20
74:8,12,
15,25
75:3,17,
21 92:6,
22 96:2,
5,10,16
97:16
99:7,21

story
12:6
14:15
91:12

strategic
11:7

strategical
ly
54:15

strategy
101:6
103:8
120:22

Streader
6:4,7,15,
20 7:9,23
14:5
27:12
37:5 59:3
65:23
66:3,24
67:7,19
71:25
108:8
109:10

Streader's
59:13

street
26:2,3
29:6 34:7
64:14

structure
81:18

study
112:25
114:15,22

Study-
investment
112:15

stuff
98:20
106:20

subject
59:5,18
108:23

submit
30:10,13,
20,24
31:3,5
48:21
49:6
70:15,18
116:13

submitted
30:8,23
31:6
32:2,4,6,
20,22
70:14
71:4,7
72:3
73:23

subsequentl
y
62:11
108:13

subsidiary

26:6

substance
7:21

substantial
ly
76:21
81:20
110:7

substantiat
e
21:18

substantive
6:14,18

succeed
98:16

success
60:2,4,13

successful
11:17
17:7
60:12
64:9,20
81:19
112:5
120:6

successfull
y
71:9
90:18

sufficient
33:5
90:17,22

sufficientl
y
85:10

sum
97:2

Sunday
95:18

super
58:19

support
18:22
51:14
120:5

supporting
37:19
89:25

supposed
79:20

surprise
120:2

surprised
69:18

suspect
114:24

swings
94:13

switch
41:16

sworn
4:3

synonymousl
y
71:19

system
25:18
94:19

_____

          T
_____

tab
84:6,7,9
87:15,22,
25 91:2
95:24
96:21,22
97:5,13,
23 98:2
100:11,
15,23

table
79:5
97:14

tabs
77:2

takes
69:20

taking
5:7 39:14
74:8
84:14

talk
5:12
17:17
21:13
26:8
28:25
106:14

talked
6:12,24
8:2 33:24
34:5,6,7,
12 36:10
43:3
58:2,5,8,
9,10
73:23
108:10
119:4,6

talking
17:19
34:10
45:21
86:6
119:7

team
8:3,4,5
16:17
50:21
57:7
58:14
68:10,20
106:12
121:24



tech
    62:4

technology
    61:11

telephone
    42:22
    66:18

Temke
    109:13

Tempke
    72:11

temporary
    110:10

ten
    11:10

tend
    94:5

tens
    64:11

term
    29:16
    30:16,19
    39:3 41:9
    56:17
    58:15

terms
    29:7
    45:12,19
    46:11,25
    47:24
    64:2
    69:10
    70:4
    99:15

testified
    4:4

testify
    24:21,22

testifying
    5:5 24:25

text
    43:2
    66:19

Thew
    91:17

things
    84:10

thinking
    118:10

Thoryn
    56:25
    57:5,10,
    13,14,16,
    24 58:12
    59:4
    60:20
    61:9,14

thought
    36:17,22
    40:7
    41:14
    120:3

three-page
    59:2

tht
    8:22

THY
    67:24

time
    8:18 14:4
    18:11
    25:9
    35:13
    36:7,13
    43:6,18
    45:18
    52:15
    54:17
    56:2,6
    58:3,6,8
    63:13
    68:5
    70:14

74:7,13,
15,19,21
75:11
76:14
79:10,16,
24 80:3
85:5
86:7,8
87:8
90:22
96:9
97:19
102:21
104:22
108:18
110:3,21,
24,25
111:13,
15,17
114:12
118:10
119:16
121:10
123:15

timeline
    67:21
    108:16

times
    82:8

title
    14:18
    119:20

titled
    120:20

today
    5:4,8
    7:25 8:12
    9:23
    26:23
    34:4
    77:18
    123:15

today's
    7:10 9:2

told
    21:23
    53:17
    62:18
    108:13
    117:24

Tom
    4:13

tomorrow
    111:9

top
    19:24
    20:9,13
    25:14,22
    27:6 29:3
    35:19
    44:13
    88:7
    91:19
    97:14
    99:3
    102:7
    112:9
    114:9
    120:24

topic
    27:14

Torch
    24:9

total
    13:9
    83:13
    97:3

Totally
    53:19
    110:4

totals
    83:4

traffic
    93:17,22

tranche
    82:3,4

transaction
    36:14
    40:16,20
    46:6,18
    47:13
    48:19
    49:11
    52:9
    55:2,10,
    22 56:12,
    14 58:13
    83:6

transcribe
    5:10

transfer
    73:12

translated
    102:11
    122:22

trending
    87:12

trouble
    13:15,17

true
    10:15
    63:2
    99:20

trust
    54:23
    63:20

turn
    11:20
    13:17
    57:9 75:6
    93:13
    104:23
    111:24

turnaround
    11:15
    12:3
    101:5
    110:14



CHRISTIAN FEUER
GO GLOBAL RETAIL vs DREAM ON ME

October 07, 2024
Index: turned..wholesale

turned
  88:25

turning
  103:7

tweak
  94:14

two-page
  109:11

type
  24:2 39:8

Typical
  81:10

typo
  67:24

_____

        U
_____

U-V-I-D
  12:3

ultimately
  22:13
  29:10
  38:5,6,10
  102:12
  111:18,20
  115:15,
  19,20
  116:3,12

uncertainti
es
  96:8

unclear
  21:2

underlying
  93:23

underperfor
ming
  104:25

understand
  4:17 5:16

6:2 9:6
17:4,19
19:17
30:19
50:21
87:11
95:20,25
98:24
104:3
105:14
107:12
113:9,17
116:18
121:14

understandi
ng
  8:17
  15:21
  16:8
  21:15
  29:16
  38:21
  50:23
  54:3 57:4
  61:19
  67:25
  77:16
  78:9,18
  98:23
  111:12

understood
  5:18 20:7
  21:3
  105:14

United
  11:10
  15:10

University
  10:11

unrelated
  118:12

unusual
  85:24

Updated
  120:21

updates
  27:15

upside
  81:14
  85:13

Uvid.com
  12:3

_____

        V
_____

valuable
  75:10
  88:18

valuation
  83:25

valued
  75:22
  84:3

valuing
  74:4

vast
  84:18

Vehicle
  36:20

vender
  64:14

verbal
  5:10

version
  8:22,25
  9:3,5
  20:17
  21:9,10,
  11,13
  77:16,20,
  24 78:6,
  10,18
  117:9

versions
  56:21
  104:3
  106:2
  117:10,12

versus
  51:3 81:3
  87:12
  94:14
  95:9,11,
  12,13
  96:2
  116:6

viable
  54:12
  69:8,9

vicinity
  77:22

video
  13:2

view
  54:16
  85:12
  86:20
  89:15

virtually
  64:22
  66:4

VP
  11:19

_____

        W
_____

walk
  10:20

wanted
  66:24
  81:18

warehouse
  64:10

waterfall

81:23

ways
  17:5 96:5

WC
  87:15,16

wear
  13:2

website
  93:21

wee
  86:6

week
  6:5 62:9
  94:6,14
  95:2,4,
  12,17
  111:10,14

weekend
  43:22,24

weekly
  92:5 97:5
  98:4

weeks
  91:24,25
  94:7,8,9,
  21,22

Wells
  37:13,15,
  22 39:25
  40:18,19,
  23,24
  41:2,3

west
  14:10

Wewaka
  4:10

Whatsapp
  66:19

wholesale
  51:3



**winner**
30:3

**winning**
29:10

**wiped**
25:18

**wire**
73:12

**won**
12:11

**wondering**
73:6

**word**
17:11
20:22
71:19
102:22

**words**
102:11

**work**
12:17
13:21
16:10
18:4
21:18
22:21
47:20
82:24
84:16
85:8
90:20,23
91:13
102:13
105:15
112:24
120:3,4

**workdays**
95:4

**worked**
13:25
16:18
17:25

18:5,7,8,
15  22:7,
12  122:13

**working**
10:16
14:8,16
18:8,17
20:15
47:23
50:22
83:10
87:16
89:21
122:4

**works**
81:9,11

**world**
61:17

**worldwide**
11:4

**write**
20:11
113:18

**writing**
31:7  43:2

**written**
29:3
33:12,15

**wrong**
13:8

**wrote**
60:20
68:4  73:7

**Wu**
119:12

**Wu's**
119:17

─────────

**X**

─────────

**XR**

80:24

─────────

**Y**

─────────

**year**
10:12
11:21
12:4  13:4
58:11
78:20
85:21
92:8,9,
10,11,13,
14  95:9,
11,13,14,
15  110:17
118:4
121:10

**years**
11:5,10,
16,21
13:13
14:16
91:14
92:14,23

**yesterday**
61:7

**York**
11:14,19

**young**
93:5,6

**Yuen**
8:4

─────────

**Z**

─────────

**Ziff**
116:21
117:2

