# EXHIBIT AG

**Page 1**

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  -------------------------------------------
3  GO GLOBAL RETAIL LLC,
4                 Plaintiff,
5          -v-      Index No. 1:23-cv-07987-AS
6  DREAM ON ME INDUSTRIES, INC., and DREAM ON ME,
   INC.,
7
                Defendants.
8
   -------------------------------------------
9
10
11      REMOTE VIDEOCONFERENCE DEPOSITION OF YUEN
12  CHAU, a Witness herein, taken by the Defendant,
13  on Wednesday, October 16, 2024, at 2:30 p.m.,
14  before Jeffrey Shapiro, a Stenographic Reporter
15  and Notary Public, within and for the State of
16  New York.
17
18
19
20
21
22
23
24
25

**Page 2**

1  A P P E A R A N C E S :
2  GREENBAUM ROWE SMITH & DAVIS LLP
3    Attorneys for the Defendants
4    99 Wood Avenue South
5    Iselin, New Jersey 08830
6  BY:  THOMAS MURPHY, ESQ.
7
8
   FALCON RAPPAPORT & BERKMAN LLP
9
     Attorneys for the Plaintiff
10
     265 Sunrise Highway, Suite 50
11
     Rockville Centre, New York 11570
12
   BY:  STEVEN BERLOWITZ, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1
2
3
4
5
6       IT IS HEREBY STIPULATED AND AGREED by
7  and between the attorneys for the respective
8  parties hereto, that the filing, sealing and
9  certification be, and the same are hereby
10  waived;
11
12       IT IS FURTHER STIPULATED AND AGREED
13  that all objections, except as to the form of
14  the questions, shall be reserved to the time of
15  the trial;
16
17       IT IS FURTHER STIPULATED AND AGREED
18  that the within examination may be subscribed
19  and sworn to before any notary public with the
20  same force and effect as though subscribed and
21  sworn to before this Court.
22
23
24
25

**Page 4**

1  Whereupon,
2            YEUN CHAU,
3  after having been first duly sworn, was examined
4  and testified as follows:
5            DIRECT EXAMINATION
6  BY MR. MURPHY:
7      Q.   State your name for the record.
8      A.   Yuen Chau.
9      Q.   What is your address?
10     A.   12372 Chase Street, Garden Grove,
11  California 92845.
12     Q.   Good afternoon, Mr. Chau.  My name
13  is Tom Murphy, I'm a lawyer with Greenbaum Rowe
14  Smith & Davis.  We represent Dream On Me, Inc.,
15  and Dream On Me Industries, Inc. in a lawsuit
16  brought against it by Go Global Retail LLC.
17       Do you understand that you're here
18  virtually today to have your deposition taken
19  in connection with that case?
20     A.   Yes, I understand.  And you can
21  call me Yuen.
22     Q.   Okay.  Sounds good.  Thanks.  And
23  you can call me Tom.
24       Can you hear me okay?
25     A.   Yes.



Chau

Q. Great. Have you ever had your deposition taken before?
A. No.
Q. I'm going to go through some brief instructions before we begin. You're under oath here today the same way you would be if you're testifying in court.
The court reporter, Jeff, who you could see on your screen is going to be taking down and making a record of everything that is said this afternoon during the deposition. Therefore, it's important for you to provide verbal responses, he can't transcribe nods or other gestures. It also makes his job a lot easier if we don't talk over one another. So, you may know where I'm going with my question, just let me finish and I'll do the same with your answer?
If you don't understand a question, let me know and I'll rephrase it. If you answer, I will assume you understood the question. If you do not know the answer, let me know -- let us know that, that's perfectly fine. We just want to know what you know. We

Chau

don't want you to guess. You may approximate, just let us know that you're approximating. And if you need a break for any reason, just let us know, you just can't take one while a question is pending.
Do you understand these instructions?
A. Yes.
Q. Did you do anything to prepare for today's deposition?
A. I read e-mails, I spoke to our attorney.
Q. I don't want to know anything you spoke to your attorney about. But is there anything else you did besides review e-mails?
A. That's about it. The contents of the e-mails.
Q. And do you know approximately how many e-mails you've reviewed?
A. Twenty, give or take. And there's attachments and there's like old e-mails on e-mails.
Q. Understood. Did you speak to anyone else about Go Global about your deposition today?

Chau

A. Did I speak to anybody else in Go Global, you said?
Q. Yes.
A. Well, my colleague and I have the deposition today.
Q. Did you speak to Jeff Streader about his deposition?
A. I spoke to -- he told me that he had his deposition. He told me -- yes, I spoke to him.
Q. Did you have any substantive conversation about his deposition?
A. Not in detail. He's been traveling.
Q. How about -- same question for Christian Feuer?
A. No, I have not spoken to Christian Feuer in quite a few days. He knows I have a deposition, he told me he had -- he had his. So, minimal contact.
Q. Are you currently affiliated with Go Global?
A. Yes.
Q. What's your title?

Chau

A. I'm senior partner.
Q. And my understanding is that you are not a W-2 employee; is that correct?
A. Correct.
Q. And how long have you been affiliated with Go Global?
A. Approximately, close to seven years.
Q. Is your work for Go Global full-time?
A. No.
Q. Currently, approximately what percentage of your work is for Go Global?
A. Can you define "percentage"? I'm not trying to be a jerk about it, but what do you mean by that? Because I have -- I do a lot -- I work long hours, but I'm not a W-2, so I'm not sure of your question.
Q. Okay. Well, right now, besides Go Global, where else do you receive compensation from?
A. I'm a professor at a Community College.
Q. What do you teach?



Page 9

Chau

1
2    A.    Business.
3    Q.    And in your role as a senior
4  partner at Go Global, what are your
5  responsibilities?
6    A.    I evaluate potential deals coming
7  in. I speak to investors. I speak to my
8  colleagues in terms of evaluating the deals. I
9  do due diligence. I -- yeah, I manage
10  documentation.
11    Q.    Are you involved with any of the
12  companies that Go Global currently owns?
13    A.    I'm not directly involved, no. I
14  have been involved in the past. And there's a
15  certain period of involvement, and then I
16  disengage.
17    Q.    I see. So, the majority of your
18  involvement is generally on the front-end
19  before a transaction occurs; is that a fair
20  statement?
21    A.    During the transaction, and then
22  also during transition, and I won't be in the
23  company long-term, I'm not employed by the
24  company, but I do assist the company for a
25  period of time -- the companies.

Page 10

Chau

1
2    Q.    Did you work on the Janie and Jack
3  transaction?
4    A.    Yes.
5    Q.    And I am correct that you worked on
6  the attempted purchase of BuyBuy Baby; is that
7  correct?
8    A.    Yes.
9    Q.    Do you know when you --
10  approximately when you first started working on
11  the potential BuyBuy Baby deal?
12    A.    Probably March of 2023.
13    Q.    And how did that come to be in
14  March of '23?
15    A.    We were connected with Lazard, who
16  was the advisor of Bed Bath & Beyond, we were
17  interested in BuyBuy Baby.
18    Q.    And do you know who first connected
19  you with Lazard?
20    A.    I don't recall. Yeah, I don't
21  recall. I'm trying to remember. It could have
22  been us reaching out to Lazard because some of
23  our associates did have relationships with
24  them, so it could have been our connected
25  outreach.

Page 11

Chau

1
2    Q.    In March of 2023, do you know if
3  there was already a Lazard data room?
4    A.    No, I did not know. I did not --
5  let me rephrase. Lazard provided information,
6  but there was no -- we had a data room, but it
7  was not the same data room as -- it was a data
8  room that was created early on before their
9  foreclosure. So, there was a data room, but,
10  you know -- there's many different data rooms,
11  so I just want to make sure I'm clear, there
12  was a data room for us.
13    Q.    When you say "for us," you mean for
14  Go Global only?
15    A.    That we could access, there's data
16  that we could access.
17    Q.    But there were other -- well, your
18  understanding at that time is there were other
19  entities and people who are able to access that
20  data room other than Go Global?
21    A.    I do not know.
22    Q.    Related to BuyBuy Baby, do you know
23  how many different data rooms you accessed
24  through Lazard?
25    A.    Probably two, the one that we got

Page 12

Chau

1
2  in March, the data that we got in March, and
3  then the one for the Bed Bath & Beyond.
4    Q.    And am I correct that the
5  information and documents available in those
6  data rooms changed over time?
7    A.    When you say "changed," do you mean
8  additional information was provided --
9    Q.    Yeah, things were added.
10    A.    I'm sorry?
11    Q.    Were things added over time to the
12  data room?
13    A.    Sure. Yes, yes.
14    Q.    Would you make specific requests to
15  Lazard for additional information?
16    A.    Yes.
17    Q.    And then would the responses to
18  those requests end up in the Lazard data room?
19    A.    Yes.
20    Q.    Do you remember who your main
21  contacts at Lazard was?
22    A.    I believe there was a Mr. Tempke --
23        (Talking over each other.)
24    I believe so. There was also Brendan
25  or Brandon. And a couple of analysts, as well,



YUEN CHAU
GO GLOBAL RETAIL -v- DREAM ON ME INDUSTRIES

October 16, 2024
13–16

Page 13

Chau

1 but I don't recall the names.
2
3     Q.    I believe the name Brendan Shea, is
4 that who you're referring to?
5     A.    I believe so, that sounds correct.
6     Q.    So, when you first started this
7 process in March, what did you do?
8     A.    We expressed our interest in BuyBuy
9 Baby.  We asked for information.  We had
10 conversations with Lazard, they provided a
11 certain amount of information to us to start
12 our assessment and analysis.
13     Q.    And the e-mails that you mentioned
14 that you reviewed, did you bring them with you
15 today?
16     A.    No.
17     Q.    What is your highest level of
18 education?
19     A.    I have an MBA.
20     Q.    From where?
21     A.    Columbia.
22     Q.    Can you briefly walk me through
23 your career history since college?
24     A.    Sure.  Investment banking, capital
25 markets, trading desk, IT development on the

Page 14

Chau

1 trading desk, Morgan Stanley, Citi Group, CBS.
2 Venture Capital for a while.  And then a couple
3 of start-ups that I founded, and then before Go
4 Global, a multi-strategy hedge fund.
5     Q.    Am I correct that Go Global
6 retained Ankura in connection with this
7 potential transaction?
8     A.    Yes.
9     Q.    Were you involved in their
10 retention?
11     A.    I did not select them.  I was
12 involved in their discussions with them and
13 interaction with them.
14     Q.    Am I correct that Go Global had
15 potential investors sign non-disclosure
16 agreements?
17     A.    I'm sorry, repeat that again,
18 please.
19     Q.    Yes.  Am I correct that Go Global
20 had potential investors sign non-disclosure
21 agreements?
22     A.    Yes.
23     Q.    Were you involved in the process of
24 having those non-disclosure agreements
25

Page 15

Chau

1 executed?
2     A.    Some of them, yes.
3     Q.    Were you involved in the process of
4 -- well, do you know if Dream on Me signed a
5 non-disclosure agreement?
6     A.    I know that they did.
7     Q.    Were you involved in the process of
8 Dream on me executing a non-disclosure
9 agreement?
10     A.    Not in the execution.
11     Q.    Were you involved in any
12 discussions with Dream On Me over the terms of
13 the non-disclosure agreement?
14     A.    No.
15     Q.    Have you ever seen a non-disclosure
16 agreement that Dream On Me signed?
17     A.    Yes.
18     Q.    When did you first see that?
19     A.    I believe I provided some of that
20 to Christian Feuer, my colleague.
21     Q.    And do you know when that would
22 have been?
23     A.    In June, early June, maybe, around
24 there.
25

Page 16

Chau

1     Q.    Early June of '23 or '24?
2     A.    '23.  Before Dream On Me signed it,
3 I would have probably provided Christian a
4 template or a type of NDA.
5     Q.    I see.  So, you would have -- am I
6 correct that Go Global had a form or a template
7 non-disclosure agreement?
8     A.    There is a lot of non-disclosure
9 agreements out there, but yeah, we do have a
10 non-disclosure agreement, yes, we do.
11     Q.    And do you have multiple different
12 types of templates for that?
13     A.    We do have different non-disclosure
14 agreements depending on who we are in
15 discussions with.
16     Q.    And based on your testimony, it
17 seems like you did not discuss the
18 non-disclosure agreement with Dream On Me
19 before they executed it, but that you did
20 provide Christian Feuer with a form of
21 non-disclosure agreement --
22     A.    That's possible for him.  I don't
23 recall exactly.  He may have had it from the
24 past, I'm not sure.
25



Page 17

1                          Chau
2        Q.    But outside of that form or
3   template, do you know if you ever saw the
4   agreement that Dream On Me actually signed?
5        A.    Yes, I did.
6        Q.    And when would you have received
7   that?
8        A.    Possibly before they signed it and
9   definitely after they signed it.  I don't
10  recall.  I definitely saw it after they signed
11  it.
12       Q.    Do you remember in what context you
13  saw it after they signed it?
14       A.    Just to verify that they signed it
15  so that we could share the project information
16  with them.
17       Q.    Did you have a role in Go Global's
18  attempt to raise capital for this transaction?
19       A.    Yes.
20       Q.    And what was your role related to
21  that?
22       A.    I conversed with potential
23  investors, provided information and had phone
24  calls.
25       Q.    To the best of your recollection,

Page 18

1                          Chau
2   did Go Global ever receive firm commitments
3   from investors to contribute funds?
4        A.    We had varying degrees of
5   commitment, some very strong and some more
6   preliminary.  It varies because a deal is
7   fluid.
8        Q.    Understood.  Can you tell me either
9   what individuals or entities you would have
10  considered to be in the very strong category?
11       A.    There was a number of investors
12  that would have -- that were interested.
13       Q.    Any that you could specifically
14  remember?
15       A.    There was Axar Capital that was
16  interested, we were speaking to them.  We had
17  multiple conversations with Perot.
18       Q.    Did Axar Capital commit to invest?
19       A.    They had conditions for a
20  commitment, if I remember correctly.
21       Q.    Do you know if those conditions
22  were met?
23       A.    Sorry?
24       Q.    Do you know if those conditions
25  were met?

Page 19

1                          Chau
2        A.    I think some of them were and some
3   of them probably were not.  I don't recall.
4        Q.    How about Perot?  Did you have
5   input from Perot?
6        A.    We had a strong interest from them.
7        Q.    Do you know if Go Global ever
8   submitted a qualified bid for BuyBuy Baby?
9        A.    We submitted bids or indications of
10  an interest.  I'm not sure if that's what
11  you're talking about.
12       Q.    I'll get to that.
13             Did you submit more than one bid?
14       A.    No, I don't think we saw
15  indication.  We indicated our interest
16  throughout.
17       Q.    Throughout this deposition, I'm
18  going to, at certain times, share my screen and
19  mark certain documents as exhibits.  I'm going
20  to do that now (indicating).
21             MR. MURPHY:  I'm going to mark
22       Exhibit 1, it's a five-page e-mail chain.
23             (Exhibit 1 was so marked for
24       identification.)
25             The first one is Bates numbered

Page 20

1                          Chau
2   ANK-0039806.  And the top e-mail is an
3   e-mail from Yuen Chau on May 29th, 2023
4   to Christian Feuer, and then it CCs a
5   couple of people from Ankura and Jeff
6   Streader.
7   BY MR. MURPHY:
8        Q.    Take a look at this e-mail.
9             Does this appear to be an e-mail you
10  wrote?
11       A.    Sorry, say that again, sir.
12       Q.    Does it appear to be an e-mail that
13  you wrote?
14       A.    From the screen, it appears it is.
15       Q.    It mentions Sixth Street.  What can
16  you tell me about that?
17       A.    Sixth Street is a lender -- was a
18  lender to Bed Bath & Beyond.  I believe they
19  were a key lender and a focal point in terms of
20  a decisionmaker type of lender, like as far as
21  having certain rights as a lender.
22       Q.    Did you ever have any discussions
23  with Sixth Street about them being involved in
24  the transaction on your side?
25       A.    I did, yes.



Page 21

Chau

1
2      Q.    And how would they have been
3  potentially verified?
4      A.    They could have rolled their debt
5  or did some type of structure with their debt.
6  And they -- there's multiple things they could
7  have done as a debt holder.
8      Q.    Am I correct that Go Global was
9  ultimately unable to reach an agreement with
10  Sixth Street?
11     A.    We did not reach an agreement with
12  Sixth Street in this instance of getting
13  them -- and I'm trying to read the e-mail here.
14  I think we were trying to engage them, but we
15  did not.
16     Q.    And I understand that this e-mail
17  is from May 29th, and things changed over time
18  during June of last year; is that correct?
19     A.    So, yes.  So, May 29th, and then
20  June of the same year, Sixth Street could have
21  changed their perspective on the business.  I
22  can't speak to that.
23     Q.    Was the -- during that time period
24  of May and June of last year, was the value of
25  BuyBuy Baby decreasing?

Page 22

Chau

1
2      A.    I'm sorry, what --
3      Q.    Was the value of BuyBuy Baby
4  decreasing during that time period?
5      A.    Decreasing?  I think it depends on
6  who you speak to.  I mean, obviously, the --
7  there was a deterioration in Bed Bath & Beyond,
8  so I think as far as BuyBuy Baby goes, there
9  probably, you know -- it's a mother company, so
10  if the mother company is having issues, I would
11  think that the -- the, you know -- BuyBuy Baby
12  would, as well.  But as far as the value of the
13  company, that's a different question.  I mean,
14  I'm not sure.  Are you saying -- I'm not sure
15  what do you mean by the value of the company?
16     Q.    Well, I guess -- what -- during the
17  month of June of last year, did what Go Global
18  was willing to pay for the BuyBuy Baby going
19  concern change over time?
20     A.    Yes.
21     Q.    And am I correct that that number
22  was decreasing over time?
23     A.    I think that that's the valuation
24  of that, the value was decreasing in the
25  business, yeah.  If that's what you're asking.

Page 23

Chau

1
2  It's based on what one would pay.
3      Q.    And what were the reasons for that?
4      A.    There were a few reasons.  First of
5  all, the Bed Bath & Beyond parent was going
6  through a bankruptcy process, it did not go
7  through that process earlier in the year, it's
8  going through that process.  So, in that
9  process, they would be selling things to raise
10  money and pay back debt and do -- and that
11  certain amount of inventory would have been
12  sold, and that could have happened to BuyBuy
13  Baby, as well.
14        And during that transition, obviously
15  there is probably less customer engagement,
16  even though the brand -- the BuyBuy Baby
17  brand -- the BuyBuy Baby company, excuse me,
18  was still operating, so with Bed Bath & Beyond,
19  they were going through that foreclosure
20  process.
21     Q.    Would you say during that time
22  period that BuyBuy Baby suffered from brand
23  damage?
24     A.    I do think that they probably did
25  as any brand would in that situation.

Page 24

Chau

1
2        MR. MURPHY:  I shared my screen and
3  I'm going to mark as Exhibit 2, it's a
4  two-page e-mail chain.  It's not Bates
5  numbered, which I will clean up later for
6  the record.
7        (Exhibit 2 was so marked for
8  identification.)
9        MR. MURPHY:  It's an e-mail from
10  Kathleen Lauster to Jeff Streader, and it
11  CCs several people, including Yuen.
12  BY MR. MURPHY:
13     Q.    First off, do you know who Kathleen
14  Lauster is?
15     A.    Yes.
16     Q.    Who is she?
17     A.    She worked for Ankura.
18     Q.    And do you know what her role is at
19  Ankura?
20     A.    Yes, I'm reading it's senior
21  managing director.
22     Q.    And I recognized you said you were
23  reading that, you got that from her e-mail
24  signature block; is that right?
25     A.    Yeah, it's on there --



Page 25

Chau

1
2    Q.    Is that something you knew without
3    reading it just now?
4    A.    I didn't know her exact title.  I
5    mean, I think she was a managing director in
6    the advisory business.
7    Q.    Do you know if she's currently the
8    CEO of Ankura?
9    A.    I do not know that.
10    Q.    This e-mail indicates that you were
11    CC'd on it.  Do you remember receiving this
12    e-mail?
13    A.    I believe I did.  I don't remember
14    it -- this exact e-mail, but I remember e-mails
15    from her, yes.
16    Q.    Do you have any reason to believe
17    you didn't receive this e-mail?
18    A.    No.
19    Q.    In her e-mail above her signature,
20    it references "sources."  Am I correct that
21    that would be sources of capital for the
22    purchase?
23    A.    Potential, yes.
24    Q.    And it lists ███████ next to
25    Go Global.  Was Go Global going to be

Page 26

Chau

1
2    contributing ██████ in equity at that
3    time?
4    A.    I think there was a possibility
5    through our investors that that could be the
6    case.  I don't remember this amount
7    specifically, but that's within reason.
8    Q.    When you say through Go Global's
9    investors, what do you mean by that?
10    A.    Well, we work with investors that
11    invest in deals that -- where they provide us
12    money, like -- they give us LPs in the private
13    equity term.
14    Q.    At that time, do you know who the
15    potential investors would have been that would
16    have allocated the Go Global amount?
17    A.    Well, Kathleen was also helping us
18    raise money, that was part of her role.  So, I
19    believe some of it within her contacts or a
20    family office, interested family offices.
21    Q.    And I see that below the ███
22    ████ Go Global, there's family office 1 and
23    family office 2.  But that would be different
24    than the investors through Go Global?  I'm just
25    trying to understand the distinction.

Page 27

Chau

1
2    A.    Yeah, yeah.  So, some investors
3    would invest directly into the transaction, so
4    those would probably be a family office that
5    does that.  Others would put a -- fund the
6    transaction through Go Global as an LP.
7    They're both LPs in that sense that they're
8    investors coming in different ways.
9    Q.    Would I be correct that under this
10    scenario, that the potential family offices
11    would own a direct stake in BuyBuy Baby and an
12    investor that comes through Go Global would
13    not?
14    A.    Not necessarily.  They could still
15    go through Go Global, it's up to them.  But in
16    this case, I think we were also delineating, I
17    guess, different investors, maybe the ones that
18    Kathleen was bringing in.  So, I'm not sure
19    exactly why -- I'm not sure exactly who is who
20    in here, based on her naming convention or
21    whatnot.
22    Q.    You mentioned Axar and Perot
23    earlier.  Would they have been considered to be
24    family offices or they would have been under
25    the Go Global umbrella?

Page 28

Chau

1
2    A.    Perot could have been.  I don't
3    think -- I'm not sure if Axar would have been.
4    Q.    And just so -- I'm making sure I
5    understand your answer.  When you say "could
6    have been," you're saying it could have been
7    one of the family offices?
8    A.    That Kathleen was referring to.
9    Q.    So, you believe it could have been
10    Perot, but it would likely not have been Axar,
11    if I'm understanding you correctly?
12    A.    That's my speculation.  I didn't
13    write the e-mail, so I'm not sure --
14    Q.    Yeah, I don't want you to
15    speculate.  I just want -- just based on what
16    you either know or what your understanding was
17    of what was going on at the time on June 7th.
18    A.    Yeah, there was a lot going on.  We
19    were talking to a lot of investors.  She was
20    talking to different investors, as well, in her
21    network, or at least helping us.  So, it could
22    have been, it could have been.  Again, like I
23    said, I'm not sure because it's not specific
24    there.  It could have been.
25    Q.    Would Go Global be putting up any



Page 29

1           Chau
2   of its own money in a potential deal?
3       A.   In a potential deal, we could, yes.
4       Q.   You know -- and I know the model
5   exchanged over time.  We're going to take a
6   look at the model in a little bit.  But were
7   there ever times during the potential purchase
8   of BuyBuy Baby that Go Global was going to be
9   contributing any of its own funds to the
10  transaction?
11      A.   Not that I recall, no.  We were not
12  planning to put our own money.  There was some
13  thought about how we could raise -- put some of
14  our money in, there was talk about that.  But
15  that's not in what we presented to LPs.  They
16  knew that we were using -- we were the manager,
17  we would manage and operate and help with
18  developing the business and transitioning, but
19  not with -- they weren't expecting us to put
20  money in.
21      Q.   It's kind of I guess the second
22  paragraph, it's broken sort of into two, it
23  starts with, "Go Global's prior offer," and the
24  next sentence says, "The new structure."
25           Could you review that for me and let

Page 30

1           Chau
2   me know if you understand what she's describing
3   there.
4       A.   I believe she is saying that there
5   is two different ways to structure an offer.
6   One would be an amount in the first sentence,
7   where it says, "Go Global's prior offer valued
8   the business at ██████████████████████
9   ██████████████████████████████████████
10  ████████████████     That's one type of
11  structure.
12          The new structure, which maybe that's
13  what she is proposing or -- if I can remember
14  correctly, or offering up, ██████████████
15  ████████████████████████████████████████
16  ████████████████████████████████████████.
17  So, it's a different type of structure, lower
18  dollar amount, but more cash needed versus
19  using debt.  That's what I believe she's trying
20  to say there, if I was just to read it in that
21  way.
22          MR. MURPHY:  I'm going to mark as
23      Exhibit 3, it's a non-disclosure
24      agreement, it's got Go Global's logo on
25      the top.  It's Bates numbered DOM0000031.

Page 31

1           Chau
2          (Exhibit 3 was so marked for
3      identification.)
4          And it's executed on the last page
5      by Go Global Retail, and then Dream On
6      Me, Inc./non-family.
7   BY MR. MURPHY:
8       Q.   Is this the non-disclosure
9   agreement for Dream On Me that you were
10  referring to earlier?
11      A.   Yes.
12      Q.   I believe you said you would have
13  seen the agreement in connection with -- before
14  you would have provided Dream On Me with any
15  confidential proprietary information; is that
16  right?
17      A.   I would have seen this or at least
18  had my colleague confirm that it's signed.  So,
19  yes, there's no way we would provide, we would
20  not normally provide proprietary information on
21  work we've done unless we know that there's an
22  NDA signed.
23      Q.   And were you involved in providing
24  information to Dream On Me?
25      A.   No.

Page 32

1           Chau
2       Q.   So, if you were involved in
3   providing information to Dream On Me, what
4   would have been the reason you were checking on
5   the NDA?
6       A.   As a standard deal procedure, I
7   manage, you know, like I said earlier,
8   documents, checklist.
9       Q.   When did you personally first
10  become aware of Dream On Me?
11      A.   Probably early June, Kathleen had
12  mentioned them, as well as, I believe, Lazard
13  had mentioned them, as well.  So, I'm not sure
14  who I heard it from first, but I know it was
15  through these entities.
16      Q.   And when you first heard about
17  them, do you remember what you were told?
18      A.   That they are interested in the
19  BuyBuy Baby business.  They were not in the
20  process anymore.  They are looking for a
21  partner.  What else?  They were -- they are a
22  furnisher, manufacturer for baby cribs, and
23  they supplied those baby cribs to BuyBuy Baby.
24  That's --
25      Q.   Had you ever heard of them before



Page 33

1              Chau
2  that?
3      A.   No.
4      Q.   You said that you thought you were
5  told that they had been involved or were no
6  longer involved in the process; is that right?
7      A.   I remember seeing something -- or
8  somebody telling me that, I don't remember
9  seeing that. I don't recall exactly, but I --
10  my understanding is they were interested, but
11  they were not really in the process anymore, I
12  remember, yeah, something to that degree. But
13  that was just pure hearsay. I mean, that's my
14  impression from what I remember.
15      Q.   And am I correct that you don't
16  remember where you heard that from, but that's
17  your recollection of what you --
18      A.   Right. It was probably in an
19  e-mail, and that's probably the reason why
20  Lazard introduced us because they thought we
21  could be good partners together. They were
22  interested in the -- they're very interested in
23  the business, they had capital. Obviously, we
24  wouldn't be talking to them if they didn't
25  represent that they had money and capital to

Page 34

1              Chau
2  invest in it because we were talking to
3  investors.
4      Q.   Were there ever any discussions
5  about Dream On Me being a general partner with
6  Go Global?
7      A.   When you use the term "general
8  partner," what do you mean in terms of this
9  context? This is different --
10      Q.   Yeah. I guess involved in the
11  operation of the business going forward, as
12  opposed to a limited partner who's just
13  investing capital?
14      A.   So, no, not prior to a meeting that
15  happened on videoconferencing, I believe on
16  June 15th or something like that. In the
17  middle of the month or something. That was the
18  one interaction that I had with them. We
19  talked about our roles, but never as a GP.
20  Because a GP, under our definition, is a
21  private equity term, and not something that we
22  would --
23      Q.   What is your definition of a GP?
24      A.   It's basically a private equity
25  type of investor that manages a transaction,

Page 35

1              Chau
2  and manages the company, the asset. And that's
3  usually our -- that's our role, we're raising
4  money to make the acquisition. So, we weren't
5  looking -- we did not look to them for that.
6      Q.   You said you were involved with one
7  meeting with them; is that correct?
8      A.   Correct.
9      Q.   And you mentioned it was by
10  videoconference; is that right?
11      A.   Yes.
12      Q.   Were there -- in that meeting, were
13  there several people who were in one location?
14      A.   Yes.
15      Q.   So, I guess were there several
16  people who were in-person in New Jersey, and
17  then there were some other people on
18  videoconference; is that right?
19      A.   I was on the videoconference. I
20  believe my colleague, Jeff Streader, would have
21  been, too, because he is in California. And
22  there were people that I had ascertained from
23  the videoconference that were in-person
24  together.
25      Q.   Was Christian Feuer there

Page 36

1              Chau
2  in-person, do you know?
3      A.   Yes, I believe so.
4      Q.   Besides Christian, was there anyone
5  else from Go Global who was there in-person?
6      A.   I believe Deb Gargiulo was there.
7      Q.   And was there anyone from Ankura
8  who was there in-person?
9      A.   I believe Kathleen was there. I'm
10  not certain, but I believe she was there.
11      Q.   Besides those people, do you
12  remember who else may have been there
13  in-person?
14      A.   Dream On Me representatives and
15  leadership.
16      Q.   Do you remember their names?
17      A.   Mark, I think Milan was there,
18  Abish, I believe Mark's son was there, I don't
19  remember his name. So, there were people
20  there, yeah, that I could see. I mean, I don't
21  remember if there was a video. But I think
22  there's sometimes that we could see them and
23  times where there was screen share, but that's
24  what I can recall. There might have been more
25  people, I'm not sure.

Page 37

Chau

1
2    Q.    During that meeting, were you and
3  Jeff in the same place?
4    A.    No.
5    Q.    And then did you attend that entire
6  meeting?
7    A.    Pretty much, yes.  I may have --
8  yeah, I would say yes, because I think we
9  logged out at different times.  But the -- I
10  guess what I'm trying to make clear is that I
11  log off of the Zoom or the videoconferencing,
12  but they may have been still talking, walking
13  out the door or whatever --
14    Q.    Understood.  You don't know what
15  happened after you logged off?
16    A.    Correct.  I just want to be
17  accurate.
18    Q.    Understood.  Do you remember
19  approximately how long you were logged in for?
20    A.    At least an hour and a bit.  I
21  mean, I felt it was a long meeting.
22    Q.    What do you remember about the
23  meeting?
24    A.    We had introductions, we -- they
25  introduced who they are, we introduced who we

Page 38

Chau

1
2  are.  A little bit further, Jeff talked about
3  Go Global, and then we got right into it.  We
4  presented them our model, what we thought about
5  the business.  We went through our strategy
6  that we developed, in different aspects of how
7  we would stand up the business, the different
8  issues in the business.  So, it was really a
9  very frank open conversation about what we were
10  doing, and we shared a lot.
11    Q.    Am I correct that -- do you know if
12  Christian and Deborah had met a couple of days
13  prior with the Dream On Me people in-person?
14    A.    Yes, they had a dinner meeting to
15  get to know each other, which then transpired
16  into this conference call meeting, or larger
17  meeting.  Dream On Me had interest in working
18  with Go Global, hence this meeting, and, you
19  know, there was like time constraints of
20  bidding and all that stuff.  So, I think this
21  was -- yes, so I do remember that they met them
22  before.
23    Q.    When did you first have your own
24  direct contact with Dream On Me?
25    A.    Can you explain --

Page 39

Chau

1
2    Q.    You personally, did you speak to
3  them prior to the June 15th meeting?
4    A.    No, no.
5    Q.    Do you know if you personally
6  exchange any e-mails with Dream On Me prior to
7  that meeting?
8    A.    I might have been copied on some or
9  I might have sent some where I was CC'd, but I
10  was never the direct contact for Dream On Me.
11  So, I would not have like independently sent
12  something.
13    Q.    Who is the direct contact?
14    A.    Christian would have been.  Deb,
15  probably, because she was sharing the model,
16  the financial model.  Thoryn Stevenson would
17  have been, who was on the IT side.  I believe
18  he spoke with their IT head and technology
19  people about his work and his discoveries.
20  Jeff Streader would have spoken to them
21  directly.  I'm a little bit further away from
22  that engagement.
23    Q.    Is Thoryn Stevens still affiliated
24  with Go Global?
25    A.    No, I don't think he is.  I

Page 40

Chau

1
2  don't -- yeah, I'm not in charge of that, so.
3    Q.    Do you know the last time you spoke
4  to him?
5    A.    Four months ago, five months ago, I
6  mean, maybe -- I don't know.
7    Q.    And what was Thoryn's role?
8    A.    He was -- he is an operating
9  partner in the area of technology, data
10  science, software.
11    Q.    And I think I know the difference,
12  but can you just explain to me the difference
13  between an operating partner and yourself as a
14  senior partner?
15    A.    Yeah.  So, in certain cases,
16  it's -- I guess it's participation in the
17  deals; right?  He's also involved in deals kind
18  of like how I am.  But his role would be
19  specific to technology-related issues,
20  discovery assessment analysis and planning.
21        MR. MURPHY:  I'm going to mark as
22  Exhibit 4 a three-page e-mail chain.  The
23  first e-mail is an e-mail from Jeff
24  Streader that was sent on June 13th of
25  2023 to Thoryn Stevens, with a copy to



Page 41

Chau

1
2    Christian Feuer and to you.
3        (Exhibit 4 was so marked for
4    identification.)
5    BY MR. MURPHY:
6        Q.    Am I correct that June 13th would
7    have been between the initial meeting that some
8    people from Go Global had with Dream On Me and
9    the second meeting that you attended?
10       A.    I believe so.  So, they met early
11   in the week over dinner, so it would have been
12   either on the Monday or Tuesday.  If you can
13   tell me that, then I can confirm.
14       Q.    I'll represent to you that other
15   people in the case have testified that the
16   dinner was on Monday, the 12th?
17       A.    Okay.  Then this would have been
18   between the two, yes, you're correct.
19       Q.    Do you remember receiving this
20   e-mail?
21       A.    I don't remember it off the top of
22   my head, but I can see that I was CC'd and it's
23   very likely that I read it.
24       Q.    In -- the subject is "Dream On Me,"
25   and then on the third line down, Jeff says,

Page 42

Chau

1
2    "Remember they do not have the secret sauce and
3    we will not give it to them."
4        Do you know what he's referring to?
5        A.    I didn't write the e-mail, so I'm
6    not sure what he means by "secret sauce."  And
7    this was before we met them on the second
8    meeting.  And I believe -- yeah, I'm not sure
9    exactly because we did share a lot with them in
10   terms of things.  I'm just reading this e-mail
11   as I'm speak to you --
12       Q.    Take your time.
13       A.    Yeah.  They showed our blueprint.
14   I read the e-mail.  Thank you.
15       Q.    Since the e-mail was sent to
16   Thoryn, would that imply that it was about
17   technology-related issues?
18       A.    Yes, I would think so.
19       Q.    Do you know there were information
20   or documents that were specifically withheld
21   from Dream On Me?
22       A.    No, I don't know if they -- it's
23   how much documents -- I can't speak for what
24   documents were held and not held.  I do know
25   that we -- from my perspective, we provided the

Page 43

Chau

1
2    most what we knew in terms of our plans, we
3    were very open and sharing.  So, what we
4    withheld, I can't speak to that because I
5    didn't -- I wasn't part of that.  I can't
6    answer that in terms of -- because I shared
7    what we shared, I know a lot of us shared -- we
8    shared a lot, let's put it this way, in terms
9    of plans, documentation, things that we worked
10   on since March.  So, we shared a lot.
11       So, I can't say -- I wouldn't say we
12   withheld stuff.  In fact, I think we shared a
13   lot.
14       Q.    When he says, "We are not giving
15   the plans away," do you know what he is
16   referring to?
17       A.    Well, it could be related to
18   something in IT, but I know that Thoryn had
19   spoken to them about IT and the work that he
20   has done in it.  Whether these plans were given
21   and shared in that meeting, that could have
22   been possible, as well, because at this point,
23   we didn't have our second meeting.
24       So, this was more preliminary
25   information and as we got to know them better

Page 44

Chau

1
2    and we felt that we could work together in a
3    second meeting, I would be -- I wouldn't be
4    surprised of some of the stuff that was not
5    spoken about.  An initial call was spoken
6    about, you know, in our videoconference meeting
7    because we -- like I said, we shared a lot at
8    that point.  So, I don't think things were
9    withheld, no.
10       Q.    The meeting that you attended, how
11   do you think it went?
12       A.    I thought initially it went well.
13   We were talking about what we would do with the
14   business.  It sounded like they were interested
15   in working with us.  We provided insights based
16   on how they reacted, the things that we're
17   telling them.  I don't want to say they looked
18   surprised, but I think it was helpful to them.
19   They were interested and they asked about what
20   we were doing and so forth.
21       So, I think that worked out -- that
22   part of it worked out well, I think they were
23   trying to impress upon us the things that they
24   had done.  So, I think it was a good exchange.
25   I do think there was points where they may have



Page 45

Chau

1  been -- they may have wanted certain terms or
2  conditions that we may or may not agree with,
3  but I think that's in any discussion, right,
4  it's back and forth.
5      Q.   After that meeting, did you
6  personally have any contact with Dream On Me?
7      A.   No.
8      Q.   Do you know if anyone else in Go
9  Global had any contact with Dream On Me after
10  that meeting?
11      A.   I believe Christian did.
12          MR. MURPHY:  I'm going to mark
13      Exhibit 5, it's a one-page e-mail chain.
14      It's Bates numbered GG-0008746.
15          (Exhibit 5 was so marked for
16      identification.)
17          MR. MURPHY:  The top e-mail is an
18      e-mail from Jeff Streader, Thursday, June
19      15th, 6:12 p.m., Eastern.  It is sent to
20      Kathleen Lauster and copies several
21      people from Go Global, including Yuen.
22  BY MR. MURPHY:
23      Q.   Yuen, do you remember receiving
24  this e-mail?

Page 46

Chau

1      A.   Yes, I do.
2      Q.   So, this would have been the same
3  day as the meeting that we were just talking
4  about; correct?
5      A.   Yes.
6      Q.   Do you remember Jeff saying "no
7  more calls, no more meetings"?
8      A.   From the e-mail here, I can see
9  that, yeah.
10      Q.   Well, I guess does this e-mail
11  refresh your recollection of Go Global's
12  position at the meeting?
13      A.   It does reflect it because we want
14  them to come back to us and get their thoughts,
15  rather than giving up more.  We gave up a lot
16  of what we've done.  They have our Excel
17  sheets, they have our models, they have our
18  plans and information, so we don't want to give
19  out more unless they give us some indication of
20  where they stand as a potential partner.
21          I believe that your earlier question
22  of whether there was communications after that
23  meeting, I still think -- I believe, if I
24  remember correctly, they -- someone from Dream

Page 47

Chau

1  on Me did text or converse with Christian Feuer
2  after this meeting.  So, even though this --
3  Jeff had said this, it does not indicate that
4  no communications happened after that.  So,
5  this doesn't prove that what I said was wrong
6  because they still reached out to us, or to
7  Christian, at least from what I remember.
8      Q.   This e-mail says, "We spent way too
9  much time on how to reduce our carry, anyway
10  DOM should get more since they deliver 80 to 85
11  percent of the value of Future Co."
12          Do you agree with that statement?
13      A.   Do I -- yeah, I agree with that
14  statement in the sense that DOM I don't think
15  they had a realistic view of their value in the
16  business.  They were -- and again, this is --
17  this is -- this is how negotiations go, people
18  pop up who they are and they try to get a
19  better deal and whatnot, and we're not going
20  to -- we shouldn't acquiesce any further to the
21  deal because we were reducing our return on it.
22  Because we don't believe they were at 80 to 85
23  percent of future value, that was the
24  indication here.

Page 48

Chau

1      They thought they would, but it's
2  clear to me that they wouldn't from that
3  meeting.  And they obviously didn't in that
4  meeting either because they didn't offer
5  anything valuable to us in the sense of
6  insights, strategy or how to run the business.
7  The only thing they could offer, I believe, was
8  capital.
9      Q.   So, following the June 15th
10  meeting, do you remember what happened next
11  chronologically with regard to this
12  transaction?
13      A.   In terms of the transaction itself,
14  Lazard and I believe the law firm that was
15  conducting the process had delays, they sent
16  multiple different timelines.  Yeah.  And we
17  did not -- I don't think we -- we didn't have
18  another formal meeting with Dream On Me or
19  anything like that.  We were working on the
20  deal, we remained very interested in BuyBuy
21  Baby the whole time.  So, yeah, we were still
22  following the deal, for sure.
23      Q.   Do you know when Go Global
24  submitted their offer letter related to the



Page 49

1                    Chau
2    transaction?
3        A.   We submitted indications of
4    interest at different times.  Yeah, we even
5    indicated early before the bankruptcy happened
6    that we were interested in, you know -- there
7    was -- I'm not trying to avoid the question.
8    The deal -- there's a lot of changes, there's a
9    lot of flow in the deal.
10        So, at a lot of different points, we
11   were indicating to Lazard we'll be interested,
12   we were giving indications of interest.  So, it
13   was throughout the process that we were
14   communicating that to Lazard.
15       Q.   Did Go Global ever submit anything
16   that you would consider to be a bid?
17       A.   I believe we submitted indications
18   and we submitted statements that we would be
19   interested in buying it, and that we were
20   putting something together.  Personally, I
21   remember doing that, is that what you're
22   saying?
23        MR. MURPHY:  I'm going to mark
24   Exhibit 6, a two-page e-mail chain.  The
25   top e-mail is from Matthew Lapish on

Page 50

1                    Chau
2    Saturday, June 17th of 2023.
3        (Exhibit 6 was so marked for
4    identification.)
5    BY MR. MURPHY:
6        Q.   And I'm just going to scroll down
7    to the bottom, and then have you review it, and
8    then ask you a few questions about it.
9        A.   Okay.
10       Q.   The first e-mail is June 16th,
11   2023, at 11:27 p.m. from Christian Feuer.  I'm
12   going to let you review the whole thing, and
13   then I'm going to ask some questions.
14       A.   Okay.  You can stop there.
15       Q.   So, I guess a couple of questions.
16   Do you know who Matthew Lapish is?
17       A.   Yes, he works with Kathleen.
18       Q.   At Ankura?
19       A.   Yes.
20       Q.   Do you remember receiving this
21   e-mail?
22       A.   I remember, yes, receiving this
23   e-mail, or reading these e-mails.
24       Q.   So, would you agree with Matthew's
25   characterization that what was submitted was a

Page 51

1                    Chau
2    bid?
3        A.   What -- sorry, would I agree with
4    Matthew --
5        Q.   "Lazard's request for a meeting
6    ASAP in order to determine the seriousness of
7    this bid."
8        A.   Okay.
9        Q.   So, would you agree that Go Global
10   submitted a bid?
11       A.   Yes, in this process, yes.  Into
12   Lazard's hands, yes, we did in the sense of
13   this is what we were looking to do.  Is it a
14   binding bid?  I'm not sure, if that's what
15   you're asking for, but yeah --
16       Q.   Did Go Global ever submit a binding
17   bid?
18       A.   As far as this bid goes, yes.  I
19   mean, we submit a bid like this, let me put it
20   that way.  I mean, I'm not sure what you're
21   asking here.
22       Q.   Or why -- what -- why did Lazard
23   have -- did Lazard question the seriousness of
24   the bid?
25       A.   I don't know.  That's --

Page 52

1                    Chau
2        (Talking over each other.)
3        Well, they probably want to get to
4    know who the investors are, the ultimate
5    investors are, and to see whether they're able
6    to work with the timeline or work with us.  I
7    don't agree with Matthew, per se.  I think
8    that -- I don't know if Lazard said that.
9        I mean, they probably wanted a meeting
10   because the timing was really moving quickly
11   and also they had delays, so they probably
12   wanted to close the deal quickly, so that's why
13   it's ASAP.  I'm assuming that.  As far as the
14   seriousness, I think that's Matthew's
15   interpretation as an investment banker wanting
16   to close a deal or, you know, move things
17   along.  Yeah.
18        And it says the auction is Wednesday,
19   that's a Saturday, so there was maybe a few
20   days, so he was probably -- he was encouraging
21   us to have a discussion or a meeting or
22   something to that effect.  So, I can't say that
23   that was Lazard's opinion, this is Matthew's
24   interpretation of their opinion.
25       Q.   Do you disagree with that

Page 53

1          Chau
2  statement?
3      A.  No, I don't disagree with that.  I
4  think it's interpreted differently from him.  I
5  didn't speak to Lazard, so I can't say that
6  that's true or not true.  But, you know, we
7  were serious and -- yeah.  I mean, I don't
8  necessarily think he's wrong, but I don't agree
9  with it.  That could be his interpretation.  I
10 wasn't there, I didn't speak to Lazard, he
11 spoke to Lazard, and I don't know who he spoke
12 to in Lazard either.
13     Q.  As of June 17th, did Go Global have
14 the capital necessary to complete the
15 transaction?
16     A.  We had capital commitments and
17 capital -- indications of capital from
18 different investors, and we were trying to put
19 that all together.
20     Q.  Do you know what he meant when he
21 said there's no time to be trying to round up
22 capital on Tuesday?
23     A.  So, there, he's probably saying
24 that depending on the amount that Mike -- that
25 the transaction might take place.  Because if I

Page 54

1          Chau
2  remember it correctly, it was an auction
3  process, so the numbers might move; right?  So,
4  how much capital you have?  You might be able
5  to -- I'm thinking there's a bidding process,
6  so I think he's trying to say you have to know
7  how much you have so that you can bid in a
8  certain way or manner.
9      But we were, you know, the whole time
10 and he should know, too, because he's the one
11 helping us "round up capital," that's his job.
12 So, he is -- I think he was trying to say let's
13 get everything together, let's get all our
14 commitments together.
15     Q.  How much did Go Global have in
16 commitments as of this date?
17     A.  I don't recall.  I know that we
18 had -- based on the earlier part of your e-mail
19 chain here, that there was a discussion about
20 Janie and Jack, so -- and -- yeah.  So, there
21 may have been a couple of different plans here,
22 one was to buy it through -- acquire it -- if
23 you can go up a little, sir (indicating)?
24 Thanks.  It sounds like Janie and Jack would
25 acquire it.

Page 55

1          Chau
2      And so, there was some -- we had
3  thoughts about going that route and there was
4  other -- depending on which advisors would
5  ultimately commit, and there was also the route
6  of depending on how much some of these
7  investors would commit, we have Axar or Perot
8  that would support a different type of
9  structure.  So -- but these deals, it's pretty
10 fluid.
11     Q.  Do you agree with his statement
12 that "the chaotic scattershot approach to this
13 bid will not have engendered any goodwill with
14 either Sixth Street or Lazard"?
15     A.  No, I don't know what he meant by
16 that, to be honest.  He was part of -- he was
17 our advisor.  Yeah, I don't know why -- I can't
18 speak for him here.  I don't agree with it, per
19 se, but I don't -- I can't speak for him here.
20     MR. MURPHY:  I'm going to mark as
21 Exhibit 7, it's an eight-page document
22 with a Go Global logo on the top.  It's
23 numbered -- Bates number GG-0030208.
24     (Exhibit 7 was so marked for
25 identification.)

Page 56

1          Chau
2  BY MR. MURPHY:
3      Q.  Do you recognize this document?
4      A.  No, I don't think I wrote this one.
5      Q.  I didn't ask you who wrote it.  Do
6  you recognize it?
7      A.  Can you keep on going?
8      Q.  Sure (indicating).  And I can go as
9  fast or slow as you want, just --
10     A.  Yeah.  I just want to scan it to
11 make sure.  I don't want to say yes or no
12 without knowing something.
13     Stop there.
14     I don't recall this, per se.  Is that
15 the bottom?  If you can scroll back to the --
16     (Talking over each other.)
17     Q.  This is the last page.  I'll
18 represent to you the last page appears to be a
19 wire confirmation.  Do you know anything about
20 that?
21     A.  I don't remember this one.  I don't
22 do wires at Go Global.
23     Q.  Do you know if Go Global submitted
24 any kind of bid deposit at any time --
25     A.  Yeah, I don't think we wired -- I



Page 57

Chau

1  didn't wire -- I don't remember. I didn't wire
2  anything. I don't know if we wired anything,
3  per se. Who is this to? Restructuring,
4  administration -- I would have to go back and
5  look at this. Are these URLs?
6      Q.   Excuse me?
7      A.   Are these URLs, web addresses? If
8  you can go up, sir (indicating)?
9      Q.   Sure.
10      A.   Okay. Yeah, it looks like --
11      Q.   I believe this is an exhibit with
12  various domain names --
13      A.   Yeah. Okay. So, this will be the
14  assets that BuyBuy Baby holds, and we actually
15  researched it and looked into this. Okay. Got
16  it.
17      Q.   I believe what we're scrolling
18  through now are all exhibits (indicating) --
19          (Talking over each other.)
20      A.   These would have been the store
21  locations that we would have flagged after
22  having done some research in them. Our
23  group -- yeah, our group does that --
24      Q.   And am I correct that preliminary

Page 58

Chau

1  stores to be assumed would be the ones that
2  would remain open; is that right?
3      A.   These would be -- to the best of my
4  recollection, these would be the ones that we
5  think could work well. And after acquisition,
6  we keep these open. And that is something that
7  we worked on, that we did research on it. This
8  is not a random list. This is something that
9  we would have shared in our model.
10          So, that's a work to build together,
11  that's not an exhibit from Lazard. I just want
12  to make sure you understand that --
13          (Talking over each other.)
14      Q.   I believe it to be an exhibit --
15  well, let's back up a second. Do you recognize
16  this whole document now?
17      A.   I recognize pieces of it and that's
18  why I'm trying to like -- I'm running through
19  it. It looks like Christian, Christian Tempke.
20  I don't -- okay. I don't remember reading this
21  -- I recognize portions, let me put it that
22  bay. I recognize portions of this document.
23  Christian may have assembled it, as it says
24  here "drafted for BuyBuy Baby," and he sent it

Page 59

Chau

1  to Christian Tempke who I remember is from
2  Lazard.
3      Q.   Do you know -- we were just looking
4  at an e-mail chain that referenced a bid that
5  was submitted. Do you know if this is the bid
6  that was submitted?
7      A.   Probably. This is probably -- I
8  mean, I would think -- because your e-mail
9  earlier was June 17th and this is June 16th, so
10  I'm assuming Christian sent this on June 16th.
11  That's my assumption. I don't know that.
12      Q.   Okay. I don't want you to guess.
13  So, you personally did not have any involvement
14  with the submission of the bid; is that
15  correct?
16      A.   Right. Okay. So, I would probably
17  have talked to Christian about -- what should
18  be in a bid, what my thoughts are about the
19  company. But as far as writing this bid, it
20  would have been him.
21      Q.   Would you have reviewed the bid
22  before it was submitted?
23      A.   I may have. But as I mentioned, I
24  didn't submit this one, so it could be -- there

Page 60

Chau

1  could be different versions that went through.
2  That's why I'm saying I recognize parts of the
3  document, so I might have seen this at an
4  earlier iteration, and then this final
5  iteration, I can't say I reviewed it and okayed
6  it, I don't think I did that.
7      Q.   Seeing the wire confirmation, does
8  that refresh your recollection at all of
9  whether Go Global ever submitted any kind of
10  bid deposit?
11      A.   I don't remember, to be honest. I
12  don't remember. I mean, because the wire says
13  to Cro, and I'm not sure -- like I said, I
14  don't do the wires, so I'm not sure why it says
15  "Cro." Can you -- if you can enlighten me? If
16  you know something that I don't know?
17      Q.   I can represent to you that it was
18  attached as an exhibit to this document the way
19  it was produced to us.
20      A.   Okay.
21      Q.   And it says here under the third
22  bullet point, it says, "Janie and Jack will
23  initiate a wire tonight, please find the screen
24  shot of Exhibit 8."



Page 61

Chau

1
2    A.   Okay.  So, I'm assuming Janie and
3    Jack, this is probably the structure that we're
4    looking at where we would bring Janie and Jack
5    in as a potential partner into the transaction.
6    So, that's probably why it came from Janie and
7    Jack.
8        Q.   The first bullet point says the
9    total offer -- well, the ████████████
10   █████ comprised of the following, and then
11   ██████████████████████
12   ████████████████████ as outlined below.
13       Were you involved in valuing the
14   intellectual property of BuyBuy Baby?
15       A.   I was -- I contributed to the --
16   how do I say it -- the overall assessment of
17   the business, but I did not come up with the
18   intellectual property number.
19       Q.   Do you have an opinion about the
20   intellectual property number?
21       A.   In what way?  In this particular
22   document or eventually in the deal or --
23       Q.   At this point, did you have an
24   opinion about --
25       A.   Can you slow down?

Page 62

Chau

1
2        Q.   -- ████████████████ placed
3    on it?
4        A.   I believe that Christian would have
5    gone through his process and made a fair
6    determination based on what he knew at the
7    time.  It may have been -- if you scroll down a
8    little bit (indicating)?  Yeah.  I mean, I'm
9    not sure.  I mean, I guess -- it's been a
10   little while, but I would think that Christian
11   would have gone through his process properly
12   and kind of thought through what that should
13   be.
14       As far as the number or the opinion, I
15   mean, 21.5 for Bed Bath & Beyond, which is a
16   huge business, and -- at 21.5 and this █████
17   it seems like that, you know -- that there's a
18   high value on Baby at this point, yeah.  I
19   mean --
20       Q.   Does that mean you would agree with
21   the sentence above the chart that says, "We
22   believe the Baby IP valuation is very
23   aggressive when compared to the stalking horse
24   bid for the Bed Bath & Beyond IP"?
25       A.   Yes, I think so.  I would agree

Page 63

Chau

1
2    with that at that moment, yeah.  I'm just also
3    basing on Christian's assessment here, I trust
4    his judgment in that sense.  I can't speak for
5    him, per se, but I -- yeah.
6        Q.   So, am I correct that if you were
7    not directly involved in determining the amount
8    of --
9        (Talking over each other.)
10       -- submission to Lazard?
11       A.   I'm sure I provided my opinion at
12   time and probably in different areas where, you
13   know -- particularly with HR that I looked at
14   for this particular transaction.  I think,
15   hopefully, he would have taken some of my
16   thoughts and put it into his equation; right?
17   But no, I did not draft it or say, "Hey, this
18   is the number you got to go with, Christian."
19   I don't believe I did that.
20       Q.   We've been going about 90 minutes,
21   do you want to take a short break or are you
22   okay?
23       A.   I can do either.
24       (Recess taken.)
25       MR. MURPHY:  I'm going to mark as

Page 64

Chau

1
2    Exhibit 8, it's a two-page e-mail chain.
3    The first one is Bates number
4    ANK-0041290.  Top e-mail is from Jeff
5    Streader to Kathleen and it CCs some
6    people, including Yuen.
7        (Exhibit 8 was so marked for
8    identification.)
9    BY MR. MURPHY:
10       Q.   The e-mail I'd like to look at is
11   an e-mail from Kathleen Lauster on June 18th,
12   addressed to Christian.  Do you know if you
13   received this e-mail directly from Kathleen or
14   if you just received it on the copy from Jeff?
15       A.   I don't recall.  I'm sure that
16   could be found out, yeah.  But I did get the CC
17   or I got the one above this particular screen.
18       Q.   In the second paragraph, she says,
19   "We know the entire Go Global team has worked
20   hard to put together this alternative plan and
21   we recognize the effort it took to pivot in
22   such a short timeline, we applaud you on your
23   efforts."
24       Do you know what the "pivot" is that
25   she's referring to?



Page 65

1              Chau
2       A.    Probably in terms of trying to find
3    different ways to construct an offer.  As I
4    mentioned to you earlier, there is different
5    ways to come to an offer, kind of a package.
6    And I think maybe she -- I believe this is what
7    she's trying to say, or she could be talking
8    about, I guess, coming up with some type of,
9    you know, potential investor group or something
10   to that effect.
11       But it would be -- I would think that
12   there's, you know -- we're looking at different
13   structures and she's probably looking at --
14   she's probably talking about pivoting
15   structures or looking at different structures.
16       Q.    A little further down next to my
17   cursor, she says, "We would be remiss if we
18   didn't advise you that based on recent
19   conversations with Lazard, the debtors and
20   their advisors are frustrated and disappointed
21   with where we are three days before the
22   auction."
23       Do you know why they would have been
24   frustrated and disappointed?
25       A.    Yeah, I think this whole process

Page 66

1    was very frustrating for everybody.  If you
2    look at the deal history, they had multiple
3    delays, they didn't, you know -- they were
4    providing information that things were going
5    along.  So, things are changing.  And I think
6    what they were trying to do is basically put a
7    final kind of conclusion to the whole sale
8    process of BuyBuy Baby, and they probably
9    wanted people to put their -- put certain
10   offers together maybe in a format that they
11   wanted to within a few days, and I think
12   everybody was frustrated at the time.  So, I
13   think they were frustrated not just -- I don't
14   think it's directly only at us.
15       Q.    Above that, it says, "We want to
16   make sure Go Global is best positioned to
17   qualify and ultimately win the bid."
18       Do you know what it took to qualify?
19       A.    I think what she was referring to
20   maybe it's just to give them assurance that we
21   had investors, that we would have a good plan
22   to buy, and then keep running the company and
23   so forth.  So, I think it's just -- if I had to
24   think about where Lazard's position would be,

Page 67

1    it's that they want to make sure that people
2    are -- they have a good amount of buyers to
3    have a good auction; right?  I mean, yeah, I
4    think that's what they're saying.  So, she
5    wants us to be seen in a good light; right, so
6    that we could ultimately compete and win.
7       Q.    Are the terms "qualifying bid" and
8    "binding bid" the same in your mind?
9       A.    "Qualifying bid" and "binding bid,"
10   I -- no, I think in this sense, "qualifying
11   bid" means a bid that they would determine is a
12   viable bid.  "Binding," to me, would mean in
13   general, I don't know about here, would be
14   something you can't get out of; right?  I mean,
15   that's what I would understand is "binding."
16   But at this point, that process hasn't
17   happened.
18       Q.    So, am I correct that Go Global
19   never submitted a binding bid for BuyBuy Baby?
20       A.    I do not believe we had a binding
21   bid in that sense.  No, I don't think so, in
22   that definition.
23       Q.    Did Go Global ever submit a
24   qualifying bid for BuyBuy Baby?

Page 68

1              Chau
2       A.    I think our bids were qualified to
3    a degree.  I think they're, I want to say, like
4    reasonable or quality, of quality.  We had good
5    investors, we had investors who expressed
6    interest and they were quality investors.  So,
7    I think that qualification, in my point of
8    view, was met.  So, I would think we had
9    quality bids, I mean -- or a quality group
10   together.  Whether that was --
11       Q.    Did they qualify?
12       A.    Well, they would have to -- I think
13   you're saying did they qualify us, is that what
14   you're saying?
15       Q.    Yes.
16       A.    I don't recall because -- okay.
17   So, they could say -- because they were working
18   with us and kept on moving along with us, so
19   obviously they qualified us throughout the
20   process.  Otherwise, they would say step out of
21   the process; right?
22       So, I think if you're asking that,
23   yeah, I think we provided qualified bids along
24   the way -- qualified indications along the way.
25   But no, we didn't have a binding -- we



Page 69
1                  Chau
2    weren't -- didn't have a binding bid, if that's
3    what you're saying.  So, I think that's two
4    different --
5        Q.    Your e-mail, to me, says, "We want
6    to make sure Go Global is best positioned to
7    qualify and ultimately win the bid."  That
8    would imply to me that as of June 18th, Go
9    Global had not qualified; am I wrong?
10       A.    That is not -- I don't think that's
11   completely accurate because if I remember
12   correctly, there were different stages of this
13   process that got moved along.  So, I think we
14   were qualified at a certain stage, and then
15   they had moved, they delayed the auction or
16   delayed the process, and then I believe no one
17   actually showed up for the -- the auction got
18   pushed or something, and I think there's like
19   other bids.
20          And again, this is all from memory;
21   okay?  So, I believe we were a qualified
22   investor in the process; okay?  I mean, in the
23   sense that we should -- they saw us a viable
24   buyer; okay?  Based on the work we've done,
25   based on how we represented ourselves.

Page 70
1                  Chau
2          What they could -- I don't know what
3    they're referring to, but it could be part of
4    the process they're talking about because at
5    different stages, they were -- who was going to
6    be accepted as a bidder or -- that could have
7    been what they're implying here, but I can't
8    say exactly what Kathleen meant here.
9          But I do -- if you're asking me do I
10   think we were qualified?  Yes, I do think we
11   were qualified to make a bid, and they
12   qualified over us -- us over time.  But, you
13   know, I think if you're talking about the
14   actual bidding process, we didn't offer a
15   binding bid.
16       Q.    Did the going concern auction ever
17   occur?
18       A.    The going concern auction?  So, I
19   believe that the IP auction -- well, the IP
20   auction happened.  I think after that, there
21   would have been an opportunity to -- there was
22   an open -- I think there was an open
23   opportunity to go after the IP and the assets,
24   I would say, as a whole.  But at that time,
25   too, I think the IP -- yeah, I think there was

Page 71
1                  Chau
2    -- I don't remember if it was a separate
3    process.  I think you could bid for both at the
4    same time --
5          (Talking over each other.)
6        Q.    That was after the IP auction,
7    you're talking about?
8        A.    I believe -- I think you could have
9    done both at the same time, if I'm not
10   mistaken.
11       Q.    Was there ever an IP only auction?
12       A.    I think -- no, there was an IP only
13   auction in the auction; okay?  From what I
14   understand.  Okay.  So, you can walk in and say
15   I only want the IP or I want the whole thing.
16       Q.    Did Go Global bid on the IP only?
17       A.    No.  We would have -- any of our
18   indications would have been for both, our
19   indications.  I mean, again, we didn't have a
20   binding bid.
21       Q.    And why ultimately did Go Global
22   not have a binding bid?
23       A.    We tried to get investors to come
24   in with us, and I think the valuation of the
25   business changed over time, the state of the

Page 72
1                  Chau
2    business changed, as well.  And it's really
3    about what we believe is a fair value and what
4    the investors believe, as well.  They were
5    committed to us, they believed in what we were
6    doing, they saw the work, as well.  But
7    ultimately, it's a matter of whether your
8    investors see things eye to eye or see the same
9    type of value in order to allow you to execute
10   a bid.
11       Q.    So, ultimately, there was no bid
12   because there was not -- there were not
13   sufficient capital contributed --
14       A.    Right.
15       Q.    And do you believe Go Global would
16   have bid if it had raised sufficient capital?
17       A.    Say that again, sir.
18       Q.    Do you believe Go Global would have
19   bid if it had raised sufficient capital?
20       A.    I believe we would have bid at a
21   certain price.  And I think, you know, to say
22   that we didn't have sufficient capital to the
23   point that where the value was.  We had
24   commitments and we had investors interested,
25   but it's all about the valuation; right, how



Page 73

Chau

1
2  much you're willing to pay for it.  So, granted
3  where it was at in terms of the IP, ultimately
4  whether the IP auction ended up, I think that
5  value was outside of what we had indicated
6  before we think that -- because remember, the
7  deal starts to evolve over time; right?
8      So, what you saw, maybe what Christian
9  sent on the 17th, the next day, the day after,
10  things change, and we got, you know --
11  constantly getting more information and the
12  deal, you know -- certain things start to
13  diminish, values start kicking wrong values and
14  valuation ideas.
15      So, for instance, the IP would have
16  been probably lower than that particular
17  estimate.  So, are people, you know -- would
18  you be willing to pay that much; right?  And I
19  think that's where -- it's not so much that we
20  didn't have the capital, per se, but the
21  capital at certain valuations just, you know,
22  didn't make sense to the investor or didn't
23  make sense acquiring at a certain value -- at a
24  certain price, I should say.  Not value; at a
25  certain price.

Page 74

Chau

1
2      And that price was a little bit beyond
3  what we disclosed, we would kind of think of in
4  terms of ratios and how much we would pay for
5  the business, both IP, as well as the ongoing.
6  Does that make sense?
7      Q.  Yeah.  What was submitted on the
8  16th, did you have the capital for that?
9      A.  Sorry, what was submitted on the
10  16th?
11      Q.  The bid we were looking at, do you
12  know if you had the capital to support that
13  bid?
14      A.  Sorry, can you --
15      Q.  Yeah.
16      A.  I just want to make sure that I'm
17  speaking to the right document (indicating.)
18  The 22 million.  I believe we had some of that,
19  yeah.
20      Q.  Some, but not all.
21      A.  Maybe not all or not confirmed at
22  the time, which is probably why Kathleen had
23  mentioned, you know, get everything together or
24  whatnot.  So, I'm only -- I'm kind of -- yeah,
25  I would I believe that's -- I believe that's

Page 75

Chau

1
2  probably the case, and I'm putting this
3  together.  It's been a while, but I mean, if
4  I'm putting what you're showing me together,
5  that sounds right.  So, at -- but at this time,
6  this was on the 17th, so things have changed --
7  or 16th, so by the 17th, 18th or so, the
8  perception and the ratios may have changed in
9  terms of intellectual property versus what's in
10  the inventory, what we can rely on, and then
11  also how much we would want to pay for the
12  intellectual property at this point.
13      And so -- yeah.  So, that would
14  determine our thoughts behind it.
15      Q.  Do you know how much the winning
16  bid was for the intellectual property?
17      A.  I believe it was 15.5.
18      Q.  Do you know when that auction
19  occurred?
20      A.  I don't remember exactly.  It
21  must -- I would think it was after this date,
22  if that's correct.  I'm not sure, actually.
23  Again, because the timelines had moved a lot,
24  it's been a year, so I know that the
25  intellectual property bid happened, and then

Page 76

Chau

1
2  there was time after that to submit another bid
3  to kind of take the whole -- take that as well
4  as an ongoing concern.
5      My view is that -- what was seen in
6  that e-mail, that proposal, that indication was
7  higher than what I think was reasonable in the
8  sense of by the time it happened, at the time
9  that the bid was won and by the time one would
10  look to do a counter, that would have been a
11  high number because the value would have
12  changed or diminished by then.  Yeah.
13      Q.  You're saying that the value of the
14  IP would have diminished by then?
15      A.  May have, yeah, may have.  So, I'm
16  not saying that that's -- the number that
17  Christian had there in his proposal was the
18  right one.  It was the one that he felt was
19  aggressive at the time.  But at the same time,
20  you know, between then and the close of the
21  whole transaction; right, I mean, the whole
22  process, there was probably about another week
23  or so --
24      Q.  I'll represent to you that the IP
25  auction was on June 28th.



YUEN CHAU                                                    October 16, 2024
GO GLOBAL RETAIL -v- DREAM ON ME INDUSTRIES                  77–80

Page 77

Chau

1
2    A.    Okay.  There you go.  Thank you.
3    Q.    Does that sound right to you?
4    A.    Yeah.  I know that everything was
5  in June.  That's what I can say, yeah.  That
6  period of time.
7        MR. MURPHY:  What I've shared on my
8    screen now I'm going to mark as Exhibit
9    9, it is an Excel spreadsheet with
10    multiple tabs across the bottom.  The
11    whole document is Bates number DOM00075.
12        (Exhibit 9 was so marked for
13    identification.)
14  BY MR. MURPHY:
15    Q.    Yuen, just looking at this
16  spreadsheet, do you recognize it?
17    A.    I do.  Can you scroll up, sir?
18    Q.    Sure (indicating).
19    A.    I recognize it, although there were
20  many iterations, this evolved over time as we
21  put more work into it.  So, I'm not sure which
22  --
23    Q.    My understanding is this is version
24  9 --
25    A.    Okay.

Page 78

Chau

1
2    Q.    -- and was -- the current version
3  as of around June 10th of last year is what
4  I've been told, and I'll represent that to you.
5        Were you involved in the creation of
6  this document?
7    A.    No.
8    Q.    Did you use this document in any
9  way, or other versions of it --
10    A.    I've read this before.  I forwarded
11  versions of this, too.  But I didn't use it.  I
12  mean, I'm not sure what you meant by "use."
13  But I mean, I guess, yes, I forwarded it, you
14  know.  But I didn't create the document and --
15  yeah, but I referred to it, yes.
16    Q.    Is it your understanding that this
17  document was created by Christian Feuer?
18    A.    And I think Deb Gargiulo worked on
19  it, too.  So, I think there's -- and then we
20  all provided kind of our opinions and thoughts
21  and information based on our areas of due
22  diligence and specialty.  So, no, it wasn't
23  just one person, the team worked on it, but
24  Christian assembled it, put it together and
25  modeled it along with Deb, I believe.

Page 79

Chau

1
2    Q.    Am I correct that Deb's main focus
3  was the source?
4    A.    That was one of our focuses.  Deb
5  is a CFO level person, she's a CFO of different
6  companies, so she has a lot of understanding of
7  finance.  So, yeah, I think -- I believe that
8  was one of them, and there may have been
9  others, too.  And it's collaborative, so it
10  could be in different areas.
11    Q.    So, am I correct -- I'm just trying
12  to understand your involvement with this
13  particular document.  Am I correct that you
14  would have provided input, but you would not
15  have revised or changed the document yourself?
16    A.    No, I do not revise or change
17  documents.  That would have been Christian, Deb
18  and others, maybe.  I would have given my
19  opinion on certain things, and that might have
20  been the input, as we all do as a team, so.
21        MR. MURPHY:  I'm going to mark as
22    Exhibit 10, it's a 23-page document that
23    starts with DOM000052.  It's got a BuyBuy
24    Baby logo on the first page, and it's
25    entitled, "Acquisition and Turnaround

Page 80

Chau

1
2  Strategy," it has a June 2023 date across
3    the front.
4        (Exhibit 10 was so marked for
5    identification.)
6  BY MR. MURPHY:
7    Q.    Is this a document that you
8  recognize?
9    A.    Yes.
10    Q.    What is this document?
11    A.    I believe this document is an
12  information document of how we see the
13  opportunity, what we think is -- what's
14  available there, why we think it's attractive,
15  and it gives indication on what we would do, I
16  believe.  If you can scroll back up?
17    Q.    Sure.
18    A.    There's also Go Global, as well,
19  our background.
20    Q.    And who would this document be
21  provided to?
22    A.    It would be provided to probably
23  potential partners in this, be it investors,
24  passive investors or maybe the investment
25  partners here, in that sense.



Page 81

Chau

1
2      Q.    Here on page 8, there is a
3    reference to Go Global equity, and it says "15
4    million."
5        Do you see that?
6      A.    Mm-hmm.
7      Q.    You have to say "yes" or "no."
8      A.    Yes, I'm sorry.
9      Q.    So, would this indicate the
10   potential investors that Go Global is going to
11   contribute ████?
12      A.    That would indicate our investors
13   that would go through Go Global equity to
14   invest in the potential transaction.
15      Q.    I'm sorry, say that one more time.
16      A.    Yeah.  That would be -- yes.  That
17   would be Go Global equity contribution with the
18   investors that would put money through Go
19   Global to make the investment.
20        Can you scroll to the front two pages?
21   I just want to make sure I'm understanding
22   which document this -- because -- strategy.
23   Okay.  Can you go down one more, sir
24   (indicating).
25      Q.    Sure.

Page 82

Chau

1
2      A.    Okay.  Got it.  Understood.
3      Q.    Would you have been involved in the
4    creation of this document?
5      A.    I was involved in certain slides in
6    this, but not the creation of the complete
7    document.  Say, for instance, go down --
8      Q.    If I scroll down, can you tell me
9    what slides you were --
10      A.    Yeah, sure (indicating).  This one.
11      Q.    And what was your involvement?
12      A.    This is kind of a standard template
13   Go Global introduction.  So, I would introduce
14   Go Global to potential partners, investors, you
15   know, people that we work with.
16      Q.    Got it.  And I'm correct that this
17   slide is really about Go Global generally, and
18   less about BuyBuy Baby specifically?
19      A.    Correct.  And that's -- those would
20   have been my contributions.  This one here
21   (indicating).  This one here (indicating).
22      Q.    And just for the record, you've
23   indicated page 5, page 6.  And again, these
24   appear to be about Go Global in general; is
25   that right?

Page 83

Chau

1
2      A.    These are about Go Global.  This
3    would have been more Christian (indicating).
4    Yeah.  Whenever there's a spreadsheet involved
5    -- it would be him.  So, I just -- yeah.  So,
6    this would be his document --
7        (Talking over each other.)
8      Q.    Am I correct that this spreadsheet
9    and these chart -- the graphics came from some
10   version of the model that we looked at
11   previously?
12      A.    I'm assuming so just because the
13   page that you showed me and this page looks
14   similar.  As far as some of these other
15   statistics, yeah, I mean, some of it could be
16   our estimates, others could be derived from
17   information that we gathered in due diligence.
18   Sorry.  Yeah, like for instance, the software
19   one would have been things we ascertained, and
20   probably a plan that we would have in terms of
21   going about implementing certain software
22   (indicating), so.
23      Q.    And the software, for the record,
24   he's referring to page 9.
25      A.    No, I'm not.

Page 84

Chau

1
2      Q.    Okay.  Then tell me what you're
3    refer to, I'm sorry.
4      A.    Okay.  I didn't read the page, but
5    if you can scroll, that would be great
6    (indicating).  Continue, continue, continue,
7    continue.  Right there, I saw that when you
8    were scrolling down.
9      Q.    Okay.  So, just to clarify, you
10   were referring to page 14?
11      A.    Yes, yes.  So, these are things
12   that may or may not have been in the data that
13   we developed and thought through this and had
14   plans.  So, yeah, the technology carve-out
15   strategy, that would be our plan.
16      Q.    Were you involved in developing the
17   technology carve-out strategy?
18      A.    No.
19      Q.    Would that have been Thoryn?
20      A.    Probably, and Jeff.
21      Q.    And did you create any documents
22   that were in the Go Global data room?
23      A.    No, not that I can recall.  If --
24   yeah.  If you want to go through a list, I can
25   look at a list.  But I don't -- I don't think I

Page 85

Chau

1
2  put anything into the Go Global data room.
3       MR. MURPHY:  I'm going to mark
4  Exhibit 11, it's a 61-page document that
5  starts DOM0001082.  It's got a BuyBuy
6  Baby logo and a Go Global logo on the
7  front, it says "May 2023."
8       (Exhibit 11 was so marked for
9  identification.)
10 BY MR. MURPHY:
11      Q.    Yuen, is this a document you
12 recognize?
13      A.    I do.
14      Q.    What is this?
15      A.    This is earlier on in the
16 discussion.  This is back in May.  Yeah, this
17 is back in May.  I believe this is also a
18 discussion document we had with the management
19 at BuyBuy Baby at the time, where we were
20 really looking at how to work together.
21      When we approach things, we approach
22 it pretty holistically, thinking about how
23 management, we could work with management, who
24 in management we would work well with.  We were
25 gathering some of their information and I think

Page 86

Chau

1
2  we were trying to ascertain ways to go forward.
3  In this conversation, though, I think this was
4  also BuyBuy Baby showing us what they were
5  doing, the management was doing.  And then we
6  had ideas for them and we went back and forth
7  and so forth.
8       But I believe this is a meeting that
9  happened with -- this was shown to us at a
10 meeting that happened with the management of
11 the company.  The "company," meaning BuyBuy
12 Baby.
13      Q.    This is a BuyBuy Baby document?
14      A.    I believe so.  I believe so.  I
15 remember seeing this document in our
16 discussions with them because we had multiple
17 discussions.  And things are not in here on
18 paper, but I'm sure -- I remember us discussing
19 ideas, suggestions, things like that.  So,
20 there's a lot shared here, too, and interacted.
21      Q.    Do you know who Steve Hannan is?
22      A.    Steve Hannan?
23      A.    Hannan, yeah.
24      A.    Can you spell that, sir?
25      Q.    H-A-N-N-A-N.

Page 87

Chau

1
2       A.    Yes, I do.
3       Q.    And who is he?
4       A.    He is a board member of Janie and
5  Jack.
6       MR. MURPHY:  I'm going to mark as
7  Exhibit 12, it's a four-page e-mail
8  chain.  The top e-mail is from Christian
9  Feuer to Jeff Streader, copies Yuen and
10 Deborah Gargiulo.  The first Bates number
11 is GG-0021594.
12      (Exhibit 12 was so marked for
13 identification.)
14 BY MR. MURPHY:
15      Q.    Yuen, this e-mail you were copied
16 on is a forward from Christian Feuer, which
17 forwards an e-mail from Steve Hannan that was
18 sent on June 20th of 2023.  In that e-mail, he
19 says, "As a board member, I'm very concerned."
20      Do you know what he was concerned
21 about?
22      A.    If you scroll down, I could
23 probably tell you, ascertain (indicating).
24 Okay.  "I'm very concerned" -- can you also
25 make it bigger?

Page 88

Chau

1
2       Q.    Sure (indicating).  Is that better?
3       A.    Yeah, thank you.  (Reading.)
4       Okay.  All right.
5       Q.    Based on your review of this
6  e-mail, do you know what Steve Hannan was
7  concerned about?
8       A.    Not particularly.  I didn't -- no.
9       MR. MURPHY:  I'm going to mark as
10 Exhibit 13, it's a two-page e-mail chain
11 that starts with Bates number
12 ANK-0035975.  The top e-mail is from Jeff
13 Streader to Kathleen Lauster and Matthew
14 Lapish at Ankura.
15      (Exhibit 13 was so marked for
16 identification.)
17      THE WITNESS:  Tom, can I ask you to
18 make it bigger again?
19 BY MR. MURPHY:
20      Q.    I'm looking, actually, at the
21 second e-mail in the chain from June 26th of
22 2023 from Jeff Streader to Christian Tempke and
23 Brendan Shea, copying several people, including
24 Yuen (indicating).
25      Do you remember receiving this e-mail?



Page 89

1           Chau
2       A.   I remember receiving something like
3   this.
4       Q.   Where did things stand on June
5   26th?
6       A.   So, I don't remember exactly
7   because I know that there was this point, where
8   there was the actual auction, and they
9   needed -- I believe that they needed to know
10  whether we were going to be in the auction or
11  not.  That doesn't mean that we couldn't bid
12  again.  So, I'm not sure of the timeline
13  because we were also still looking at making an
14  offer countering what was the winning bid.  So,
15  I'm not sure here.
16      So, let me just qualify myself.  I
17  mean, it's been a while.  But I remember that
18  there was the -- there was one formal process
19  stream that ended, and I think we had to define
20  our position there.  But there was another
21  stream that we could try to go after things
22  afterwards or whatnot.  So, I'm not sure where
23  this lies in there, if that makes sense.
24      Q.   Understood.  Did there come a time
25  where you thought it was over from a Go Global

Page 90

1           Chau
2   perspective, and then it was revived again
3   before it was over?
4       A.   Yes, multiple times in the whole
5   because they would stop the process, and then
6   they would start it again and we didn't -- we
7   weren't sure what was going on.  That's -- I
8   don't want to say the fault of Lazard, but I
9   mean, it was Lazard and Kirkland Ellis that was
10  running the process, and sometimes we just --
11  things were pushed up, so we didn't -- but no,
12  we always wanted to -- we always wanted and
13  we're interested in the business, I mean,
14  that's something that I have to say that, you
15  know, we kept on pursuing.
16      Q.   Do you agree with Jeff's statement
17  that the prospect of brand and business revival
18  is not without significant risk?
19      A.   I agree with that, yes, that there
20  was significant risk to the business as
21  there -- that risk would then qualify how much
22  one would value the business and how much one
23  would pay for it.  But obviously, there would
24  have been risks all throughout the process.
25      Q.   Sir, am I correct that this e-mail

Page 91

1           Chau
2   was advising Lazard that Go Global was
3   withdrawing from the process?
4       A.   From that -- at that stage, that's
5   what it sounds like --
6       Q.   And do you know what happened after
7   that?
8       A.   I thought there was -- and I could
9   be wrong.  I thought there was an opportunity
10  allowed for maybe another process or something.
11  I mean, I'm not sure.
12      Q.   It's your understanding that
13  subsequent to the IP auction, there was still
14  an opportunity to purchase the whole thing?
15      A.   I believe so, yes.
16      Q.   Who is Patty Wu?
17      A.   She is the CEO of BuyBuy Baby.
18      Q.   And how about Sue Grove?
19      A.   I think she was very senior in Bed
20  Bath & Beyond, not BuyBuy Baby.  I'm not --
21  yeah, I think she was more senior, if I'm not
22  mistaken, probably on the Bed Bath & Beyond
23  side.
24      Q.   And that's for both of them or just
25  for Sue Grove?

Page 92

1           Chau
2       A.   No, I think Patty was -- Patty was
3   CEO of BuyBuy Baby.  Sue was very senior at Bed
4   Bath & Beyond, the parent, I believe.
5       Q.   And what was Alix Partner's role?
6       A.   I think Alix, they're a consulting
7   firm.  And they probably contributed thoughts
8   in terms of marketing or customer relationships
9   or customer profiling because that's their
10  background, I believe.  They are a consulting
11  group.
12      Q.   And they would have been retained
13  by BuyBuy Baby?
14      A.   We didn't pay them.  I don't think
15  we paid them.  So, I would assume so.  I
16  don't --
17      Q.   You're not sure?  Am I correct that
18  you're not sure?
19      A.   I don't know if they were retained
20  by them or they did a study or -- I mean, I
21  would think that they're on the other side of
22  the table.  They were providing information,
23  I'm assuming.  I mean, I don't know if they
24  were retained, I can't speak to that.
25      Q.   Go Global retained Ankura; correct?



Page 93

Chau

1
2    A.    Yes.
3    Q.    Besides Ankura, did Go Global
4  retain any other outside consultants related to
5  this --
6    A.    Let me think about that.  We may --
7  because we worked with different partners, we
8  may have -- we may have.  I didn't retain
9  anybody.  I didn't --
10    Q.    Besides Ankura, do you remember
11  working with anybody else outside of --
12    A.    There was another division in
13  Ankura that we worked with, the consulting
14  side.  The consulting side.  Because Kathleen
15  was the finance side and there was a consulting
16  side, I believe.  So, that's who I would think
17  we also worked with, retained.  But I didn't
18  create the retention.  I mean, I didn't write
19  up the contract or anything like that.
20    Q.    And am I correct that what you're
21  referring to is a consulting arm of Ankura?
22    A.    Yes.
23    Q.    And you think you guys may or may
24  not have worked with them, you're not sure?
25    A.    No, we worked with them.  I'm not

Page 94

Chau

1  sure about the retention -- how the retention
2  worked or how the contract worked.  So, I'm
3  not -- if that's what you're implying, if we
4  retained anybody else, that's what I'm trying
5  to answer.
6    Q.    Is Project Butterfly a name that Go
7  Global used or is that a name that Lazard used?
8    A.    I think that's a name that Lazard
9  used.
10    MR. MURPHY:  I'm going to mark as
11  Exhibit 14, it's a two-page e-mail chain,
12  it starts with GG-0013673.  It's an
13  e-mail.  The top e-mail is from Jeffrey
14  Streader on June 27th, 2023.  Sent to
15  Christian Tempke and Brendan Shea at
16  Lazard, it copies several people,
17  including Yuen, and it blind copies
18  several other people.
19    (Exhibit 14 was so marked for
20  identification.)
21    THE WITNESS:  Sorry, I'm blind
22  copied on this, you said?
23    MR. MURPHY:  You're regular copied.
24    THE WITNESS:  Okay.

Page 95

Chau

1    MR. MURPHY:  There are several other
2  people who are listed as blind copied.
3  BY MR. MURPHY:
4    Q.    Do you remember receiving this
5  e-mail from Jeff?
6    A.    I remember seeing this, yes, I do.
7    Q.    So, as of this date, the 27th, he
8  said, "The auction is tomorrow or this week,
9  you're not going to participate."
10    Was that your understanding at that
11  time?
12    A.    Was my understanding that the
13  auction was in the next couple of days?  Yes.
14    Q.    Or that you weren't going to
15  participate if it was?
16    A.    That's my understanding from Jeff's
17  e-mail here.
18    Q.    I guess is this e-mail consistent
19  with your recollection that you did start
20  attempting to participate again?
21    A.    Not at this stage.  At this stage,
22  this is just, I believe, Jeff, from what I can
23  read here, summarizing some of his discussions
24  with different members or different parties

Page 96

Chau

1  that he's mentioned here.  I was not part of
2  those conversations.  That's all I can
3  ascertain.
4    MR. MURPHY:  I'm going to mark
5  Exhibit 15, it's a two-page e-mail chain.
6  It doesn't have a Bates number, which I
7  will fix later.  But the first e-mail is
8  from Rick Maicki from Ankura to Kathleen
9  Lauster and Matthew Lapish.  But it's
10  forwarding an e-mail from Jeff Streader
11  on which you were CC'd.  The e-mail is to
12  a George Mrkonic.
13    (Exhibit 15 was so marked for
14  identification.)
15  BY MR. MURPHY:
16    Q.    Do you know top name Rick Maicki?
17    A.    Yeah, I know Rick.  Rick is part of
18  Ankura.
19    Q.    Do you know what his role at Ankura
20  is?
21    A.    Consulting.
22    Q.    Do you know who George Mrkonic is?
23    A.    Not really.  I have to jog my
24  memory.  I don't remember who George is.



Page 97

Chau

1
2      Q.    And I guess this e-mail said there
3  appears to be a problem with the IP auction
4  winner --
5      A.    Sorry, can I stop you for a little
6  bit.  I'm just trying to remember all this,
7  Tom.
8      Q.    Sure.
9      A.    George, I believe, is a high net
10  worth individual that Rick introduced us to
11  into this deal.  So, yeah, I've heard the name,
12  but there's a couple of Georges flying around.
13  So, yeah.  Okay.
14     Q.    So, I guess it says here the
15  lawyers have reached out, it appears there's a
16  problem with the IP auction winner.
17     Do you know what that problem was?
18     A.    I do not.
19     Q.    Do you know, from your perspective,
20  what was going on at this time?  We're now in
21  the first week of July.
22     A.    I believe at this time, we're
23  trying to do a counter bid or offer; right, at
24  this point.  I'm not sure what he means by
25  "problem."

Page 98

Chau

1
2      Q.    I guess you said you're trying to
3  do a counter bid, that's consistent with Jeff's
4  e-mail here that says, "We are sharpening our
5  pencils for a new lower bid"?
6      A.    Right, right, I would think so,
7  yeah.
8      Q.    And when he says "new lower bid,"
9  is he referring to lower than what Go Global
10  was planning on bidding earlier?
11     A.    I'm not sure on this one.  I can't
12  remember.  I mean, in the context of this, it
13  could be -- it could be what we would have bid
14  before, maybe.  But I'm not sure.  I mean,
15  there's not enough in this e-mail that I can
16  remember.
17     Q.    Do you remember what your
18  involvement was at this time?
19     A.    I was not part of the discussions
20  with Rick.
21     Q.    Let's just back up from that
22  specific discussion.  I guess at this point in
23  early July, do you remember what you were doing
24  related to this transaction?
25     A.    Yeah, I -- I'm trying to think of

Page 99

Chau

1
2  how we could still get into the deal, maybe.  I
3  mean, different options there.  We were just
4  evaluating what was happening.
5      Q.    Am I correct that at this point,
6  if -- the opportunity was there to obtain
7  BuyBuy Baby, still?
8      A.    It looks like it, yes.  I guess
9  what Lazard was saying or Kirkland Ellis was
10  that they indicated that there's an
11  opportunity.  They didn't talk to me directly.
12     MR. MURPHY:  I'm going to mark as
13     Exhibit 16, it's a three-page document
14     with a Go Global logo across the top.
15     The top section says, "Case
16     Study/Investment Process."  I'm just
17     going to go down slowly so you can see
18     the whole document I'm talking about.
19     (Exhibit 16 was so marked for
20     identification.)
21  BY MR. MURPHY:
22     Q.    Is this a document you're familiar
23  with?
24     A.    Yes.
25     Q.    What is this document?

Page 100

Chau

1
2      A.    This is a marketing document, I
3  believe, in a format that basically talks about
4  how we go about making investments, it offers
5  some insight to potential LPs of how we go
6  about doing due diligence, our processes and so
7  forth.  And it was a case study of BuyBuy
8  Baby's process for us post everything.  I think
9  this was probably later on in July or August or
10  something, after everything was over.
11     Q.    The top section says, "Go Global is
12  sharing this case study with our investment
13  partners to provide some insights into our
14  consideration to acquire BuyBuy Baby from the
15  bankruptcy auction process of its parent Bed
16  Bath & Beyond, and context as to why we passed
17  on the opportunity relative to what may have
18  been reported on CNBC and other news agencies."
19     Did Go Global pass on the opportunity
20  to purchase BuyBuy Baby?
21     A.    We -- so, based on -- so, on this
22  document, which is a marketing document, it's
23  not a deal document, when we say we passed on
24  it, we want to let the investors know that the
25  value that was being placed on the asset at the



Page 101

Chau

1 time, the money was not available for us to
2 make -- or it didn't make sense to make a
3 higher bid -- it was difficult to make a higher
4 bid, I should say.  And that we eventually did
5 not do the deal.  I mean, that's what we mean
6 by "passed," we did not do the deal.  Because
7 this is a marketing document, this is not an
8 investment document, so when I say "passed"
9 here, we didn't do the deal.
10     Q.    Were you involved in creating this
11 document?
12     A.    Yes.
13     Q.    So, when you say "I said passed,"
14 did you write this document?
15     A.    I wrote this document.
16     Q.    Why is "passed" in capital letters?
17     A.    Because there were some reports on
18 some news agency that we actually bought it, so
19 I didn't want any -- and that was -- I don't
20 know why that was the case, but there was
21 misinformation in the marketplace.
22     Q.    And that misinformation was that
23 you actually bought it?
24     A.    That we had obtained it or

Page 102

Chau

1 something to that effect, I can't remember
2 exact words.  But I wanted to clarify that.
3     Q.    So, does "passed" imply that Go
4 Global voluntarily chose not to participate?
5     A.    Not necessarily.  It could be for a
6 number of reasons.  I didn't want to get into
7 details there because, again, there would have
8 been some privacy issues or -- I just didn't
9 want to get into that -- the weeds of that, so
10 I just wanted to let them know that we
11 ultimately didn't do this deal and what was our
12 process in looking at it.  It's really a
13 document to show investors and potential
14 partners of the work that we do, kind of the
15 thought process.  And we just used this as a
16 case study.
17     Q.    So, I'm looking at the bold
18 section, where it says, "The opaque status of
19 inventory levels leads to human resources and
20 vendor contracts led us to increase the risk in
21 profile based on the cost to restock inventory,
22 uncertainty of retaining key customer data and
23 assurance of leases.  Without a higher level of
24 certainty we felt the seller needs to provide

Page 103

Chau

1 in the criteria mentioned below, we decided to
2 pass on acquiring Baby."
3     Is that accurate?
4     A.    That is accurate.
5     Q.    So, Go Global chose not to attempt
6 to acquire BuyBuy Baby; correct?
7     A.    Based on the amount of money that
8 was -- based on the winning bid, it -- and in
9 taking these risks and the assessment that I
10 put down there, it didn't -- we were not able
11 to go forward in terms of buying the asset.
12 The bid was higher than what our investors
13 probably would have paid for it and what we
14 thought was a good value for it, and it's
15 something that we didn't ultimately have a
16 binding bid for.
17     Q.    Obviously, you felt like it was
18 worth ███ on June 16th, but it wasn't worth
19 15.5 on June 28th?
20     A.    Christian felt that it was worth ███
21 at the time, and it was aggressive already.
22 And that document, I believe, would have said,
23 look, we're being aggressive here, if we were
24 being aggressive, we would bid this much; okay?

Page 104

Chau

1 By the time we got here, the inventory was
2 further diminished, certain stores are closing
3 down, people weren't sure about which stores
4 are open, could they use their gift cards and
5 things like that.  So, the brand of IP had some
6 more uncertainty; right?
7     And as I mentioned here in what I'm
8 writing, there was certainly uncertainty around
9 it.  So, certainly it would not have been worth
10 as much by this time.  Because we're talking
11 July now, and the way that things were moving
12 so quickly, that even from the 17th or 16th,
13 whatever Christian wrote that, to the 23rd,
14 things have already started changing.  And
15 definitely you'll, you know -- you probably
16 seen things where we're asking Lazard for more
17 information and to give us updates, because it
18 was that fluid.
19     So, if somebody knew our strategy in
20 terms of how much we think we value from a
21 ratio point of view, 15.5 is higher than what
22 our investors may have wanted to put in and
23 what we could have a binding offer for.  So,
24 that, you know -- passing both from a valuation



Page 105

Chau

1
2  point of view, but also from a, you know --
3  the -- not having the capital to buy it.
4      Q.   Do you know what the second highest
5  bid was?
6      A.   I think it's around 15.
7      Q.   So, if the winning bid was $15
8  million instead of $15 and a half million,
9  would that have changed anything, to your
10  knowledge?
11      MR. BERLOWITZ:  Objection.
12      THE WITNESS:  I still think it would
13  have been high.
14      MR. BERLOWITZ:  I just want to make
15  sure my objection was noted.
16  BY MR. MURPHY:
17      Q.   If the winning bid was $15 million
18  instead of $15 and a half million, is there
19  anything you would have written differently
20  here?
21      MR. BERLOWITZ:  Objection.
22      THE WITNESS:  I'm sorry, say that
23  again.
24  BY MR. MURPHY:
25      Q.   If the winning bid was $15 million

Page 106

Chau

1
2  for the IP instead of $15 and a half million,
3  would that have changed anything you wrote in
4  this document?
5      MR. BERLOWITZ:  Objection.
6      You can answer.
7      THE WITNESS:  If it was 15 instead
8  of 15 and a half, would it have changed
9  anything I would have written in this?  I
10  still think there was deterioration in
11  the value of the business.  I'm not sure
12  what you're trying to say.  I mean, I --
13  the -- you're trying to say that the half
14  a million difference --
15  BY MR. MURPHY:
16      Q.   I'm just asking if a half a million
17  difference would have made any difference?
18      A.   I would still have an opinion of
19  the opaque nature of the inventory, sure.
20      Q.   My question is, if it was 15
21  instead of 15 and a half, would your conclusion
22  have been any different?
23      A.   Probably not.  I mean, I think what
24  you're saying is that -- what I'm trying to say
25  to you here is that the nature of the business

Page 107

Chau

1
2  had changed, so we didn't think that that was a
3  fair value of it; right?  And that's what had
4  transpired.  I can't speculate that if things
5  had not changed differently with inventory and
6  human resources, would 15 be more worth it or
7  not worth it?  I can't speculate on that --
8      Q.   I'm not asking you to speculate --
9      A.   But I'm trying to say that -- that
10  if -- the -- my -- our assessment was that this
11  was deteriorating.  And so, therefore, you
12  know, that still stands; right?  I mean, I
13  still say yes, the risk profile was there.
14      Q.   Understood.  So, I am correct that
15  if the winning bid had been $15 million instead
16  of $15 and a half million, that would not have
17  changed your conclusion?
18      MR. BERLOWITZ:  Objection.
19      You can answer.
20      THE WITNESS:  If you want to
21  arbitrarily pick numbers, yeah, sure.  I
22  mean, I guess 15 is not that much
23  different than 15.5 or if it was 16 or
24  17.  I mean, what I'm trying to say is
25  that my assessment was the same.

Page 108

Chau

1
2  BY MR. MURPHY:
3      Q.   I'm correct it would not have
4  changed?
5      MR. BERLOWITZ:  Objection.  I think
6  he's answered the question.
7  BY MR. MURPHY:
8      Q.   You can answer.  Am I correct that
9  it would not have changed if it was $15
10  million?
11      MR. BERLOWITZ:  Objection.
12  BY MR. MURPHY:
13      Q.   You can answer.
14      A.   Okay.  So, just I just want to
15  make -- Tom, I'm not trying to be difficult
16  here.  I just want to understand.  So, I'm
17  looking at this from a perspective of this is
18  not a deal document, I'm not speculating on
19  pricing here.  What I'm doing here for
20  investors is to tell them we went through this
21  process and because of certain risk profiles,
22  based on what did actually happen, not
23  speculating whether it would have been lower or
24  higher, this is our assessment.
25      Q.   Looking at this, it says "The bid



Page 109

Chau

1  of 15 and a half million, just the IP set the
2  valuation in the higher end of our estimate for
3  the inventory levels and product stock could
4  not be accurately provided by the seller."
5  Okay?
6      All I want to know is, if that
7  sentence says a bid of 15 million instead of 15
8  and a half, would that have changed anything?
9      MR. BERLOWITZ:  Objection.
10     (Talking over each other.)
11 BY MR. MURPHY:
12     Q.   Is that half a million dollar
13 difference material?
14     A.   It could have been.  Based on -- I
15 mean -- so, I want to answer your question.  I
16 don't want to be -- I want to be
17 straightforward to you.  I'm looking at this as
18 a marketing document, this is not a deal
19 document.  So, when I reflect this, I reflect
20 what happened; right?  And why we came to
21 certain conclusions we did.  If you're asking
22 me to like speculate if it was oh, it was 5
23 million difference half a million difference,
24 then that's not what I'm trying to do here.

Page 110

Chau

1      If you're saying that this is an offer
2  document, then I could say oh, the range was
3  high, the range was low.  What I'm saying here
4  is that this was on the higher end of our
5  range, and that based on this risk here, we
6  would have -- we passed; right?  And for
7  different reasons.  One, because investors
8  didn't align with that thought, that was a high
9  bid.  And also secondly, there was this issue
10 that I mentioned here.
11     So, that's the perspective I'm coming
12 into, if I start saying oh, yeah, half a
13 million is more better or a quarter is easier,
14 then it becomes a deal situation, I can't
15 speculate that post deal.  I'm just working --
16 in this document, I'm only working with what I
17 have, does that make sense?
18     Q.   Yes.
19     Does the word "pass" mean something
20 different in a marketing document than it is in
21 a deal document?
22     A.   In a marketing document, as I
23 mentioned in the beginning, we did not do the
24 deal ultimately, and I didn't want to get

Page 111

Chau

1  into -- the marketing document to a potential
2  LP, why?  We couldn't raise the money or we
3  raised enough money, but the money -- I didn't
4  want to get into that; right?  It's suffice to
5  say in this document, we didn't do the deal.
6      Q.   Okay.  But the real reason was you
7  couldn't raise the money; correct?
8      A.   The real reason for what?
9      Q.   That you didn't do the deal was
10 that you couldn't raise enough money; correct?
11     A.   We didn't raise enough -- we didn't
12 raise the money based on the winning bid to
13 outbid, let's put it that way, yeah.  Because
14 investors were interested, different valuation,
15 different levels.
16     Q.   Am I correct, though, that if you
17 had submitted a binding bid for the going
18 concern before the IP auction, there never
19 would have been an IP only auction?
20     MR. BERLOWITZ:  Objection.
21     THE WITNESS:  That's speculation.  I
22 don't know.  Because you don't know if
23 the fulcrum lender would do it or not.  I
24 mean, I don't know.

Page 112

Chau

1      Why would you ask that, Tom?
2  BY MR. MURPHY:
3      Q.   Back to the case study for a
4  second.  At the end of the day, it's accurate
5  to say that Go Global passed on bidding on
6  BuyBuy Baby?
7      MR. BERLOWITZ:  Objection.
8      You can answer.
9      THE WITNESS:  We didn't -- I mean, I
10 think the -- it's in the records, we
11 didn't -- we didn't have -- at the end of
12 the day, we didn't have a bid there;
13 right?  I think that's a fact.  But not
14 material to this document, per se.
15 BY MR. MURPHY:
16     Q.   Why do you say it wasn't
17 material --
18     A.   Because like I said, this document
19 is a marketing document, I didn't want to go
20 into all the different rationales for passing;
21 right?  I mean, we sufficed that investors or
22 people we talked to know that we didn't do the
23 deal, that was the main point.  The main point
24 of the -- the main point of the document is to



Page 113

1              Chau
2    show our processes.  Okay.  Yeah.
3        Q.    Do you know when you wrote this
4    document, the case study?
5        A.    I think in August, if I'm not
6    wrong.
7        Q.    August of '23, just to clarify?
8        A.    Yes, that's right.  And I don't
9    think I finished it, then.  It was probably --
10   there's different iterations, probably, because
11   the grammar was kind of bad on some of them
12   that you read.
13       Q.    And do you know if this document
14   was ultimately shared with potential limited
15   partners?
16       A.    Not at the time of the transaction.
17   It has no relevance to the -- I mean, this is
18   way after.
19       Q.    No, no.  I meant subsequent, yeah.
20   I didn't mean  the BuyBuy Baby transaction, I
21   just meant in general.
22       A.    I've shared with a few people,
23   yeah.
24       MR. MURPHY:  I have no further
25   questions.  Thank you.

Page 114

1              Chau
2        MR. BERLOWITZ:  No questions from
3    me.
4        (Whereupon, at 5:27 p.m. the matter
5    was concluded.)
6
7
8
    _____
9           YUEN CHAU
10
11   Subscribed and sworn to before me
     this _____ day of _____, 20____.
12   _____
        NOTARY PUBLIC
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 115

1              I N D E X
2
3    WITNESS         EXAMINATION BY          PAGE
4    MR. CHAU        MURPHY / DIRECT          3
5
6              EXHIBITS
7    DEFENDANT'S     DESCRIPTION             PAGE
8    Exhibit 1       Bates ANK-0039806        19
9    Exhibit 2       Lauster e-mail           24
10   Exhibit 3       Bates DOM0000031         31
11   Exhibit 4       Streader e-mail          41
12   Exhibit 5       Bates GG-0008746         45
13   Exhibit 6       Lapish e-mail            50
14   Exhibit 7       Bates GG-0030208         55
15   Exhibit 8       Bates ANK-0041290        64
16   Exhibit 9       Bates DOM00075           77
17   Exhibit 10      Bates DOM000052          80
18   Exhibit 11      Bates DOM0001082         85
19   Exhibit 12      Bates GG-0021594         87
20   Exhibit 13      Bates ANK-0035975        88
21   Exhibit 14      Bates GG-0013673         94
22   Exhibit 15      Maicki e-mail            96
23   Exhibit 16      Case Study/Inv. Process  99

     (Electronic copies of the exhibits were retained
24   by the reporter.)
25

Page 116

1
2          C E R T I F I C A T I O N
3
4        I, Jeffrey Shapiro, a Stenographic
5    Reporter and Notary Public, within and for the
6    State of New York, do hereby certify:
7        That YUEN CHAU, the witness whose
8    examination is hereinbefore set forth, was first
9    duly sworn by me, and that transcript of said
10   testimony is a true record of the testimony
11   given by said witness.
12       I further certify that I am not
13   related to any of the parties to this action by
14   blood or marriage, and that I am in no way
15   interested in the outcome of this matter.
16
17       IN WITNESS WHEREOF, I have hereunto
18   set my hand this 31st day of October, 2024.
19
20
21
22
23               JEFFREY SHAPIRO
24
25



Page 117

```
1          DEPOSITION ERRATA SHEET

2

3    Our Assignment No. J11891487

4    Case Caption:  GO GLOBAL vs. DREAM ON ME

5

6    DECLARATION UNDER PENALTY OF PERJURY

7          I declare under penalty of perjury

8       that I have read the entire transcript of

9       my Deposition taken in the captioned

10      matter or the same has been read to me,

11      and the same is true and accurate, save

12      and except for changes and/or

13      corrections, if any, as indicated by me

14      on the DEPOSITION ERRATA SHEET hereof,

15      with the understanding that I offer these

16      changes as if still under oath.

17

18

19      _____

20      Yuen Chau

21

22   Subscribed and sworn to on the _____ day of

        _____, 20____ before me,

23      _____

24   Notary Public,
     In and for the State of _____

25
```

Page 118

```
1          DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to: _____

4    _____

5    Reason for change: _____

6    Page No._____Line No._____Change to: _____

7    _____

8    Reason for change: _____

9    Page No._____Line No._____Change to: _____

10   _____

11   Reason for change: _____

12   Page No._____Line No._____Change to: _____

13   _____

14   Reason for change: _____

15   Page No._____Line No._____Change to: _____

16   _____

17   Reason for change: _____

18   Page No._____Line No._____Change to: _____

19   _____

20   Reason for change: _____

21   Page No._____Line No._____Change to: _____

22   _____

23   Reason for change: _____

24   SIGNATURE:_____DATE:_____

25          Yuen Chau
```

Page 119

```
1          DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to: _____

4    _____

5    Reason for change: _____

6    Page No._____Line No._____Change to: _____

7    _____

8    Reason for change: _____

9    Page No._____Line No._____Change to: _____

10   _____

11   Reason for change: _____

12   Page No._____Line No._____Change to: _____

13   _____

14   Reason for change: _____

15   Page No._____Line No._____Change to: _____

16   _____

17   Reason for change: _____

18   Page No._____Line No._____Change to: _____

19   _____

20   Reason for change: _____

21   Page No._____Line No._____Change to: _____

22   _____

23   Reason for change: _____

24   SIGNATURE:_____DATE:_____

25          Yuen Chau
```



**Exhibits**

11891487 Yu
en.Chau.
EXHIBIT1
19:22,23
115:7

11891487 Yu
en.Chau.
EXHIBIT2
24:3,7
115:8

11891487 Yu
en.Chau.
EXHIBIT3
30:23
31:2
115:9

11891487 Yu
en.Chau.
EXHIBIT4
40:22
41:3
115:10

11891487 Yu
en.Chau.
EXHIBIT5
45:14,16
115:11

11891487 Yu
en.Chau.
EXHIBIT6
49:24
50:3
115:12

11891487 Yu
en.Chau.
EXHIBIT7
55:21,24
115:13

11891487 Yu
en.Chau.
EXHIBIT8
60:25
64:2,7
115:14

911891487 Y
uen.Chau.
EXHIBIT9
77:8,9,12
115:15

11891487 Yu
en.Chau.
EXHIBIT10
79:22
80:4
115:16

11891487 Yu
en.Chau.
EXHIBIT11
85:4,8
115:17

11891487 Yu
en.Chau.
EXHIBIT12
87:7,12
115:18

11891487 Yu
en.Chau.
EXHIBIT13
88:10,15
115:19

11891487 Yu
en.Chau.
EXHIBIT14
94:12,20
115:20

11891487 Yu
en.Chau.
EXHIBIT15
96:6,14
115:21

11891487 Yu
en.Chau.
EXHIBIT16
99:13,19
115:22

---

**$**

$15
25:24
26:2,21
81:11
105:7,8,
17,18,25
106:2
107:15,16
108:9

$18.7
61:11
62:2

$22
61:9

$60
30:8

$90
30:8

---

**1**

1
19:22,23
26:22

10
79:22
80:4

100
30:15

10th
78:3

11
85:4,8

11:27
50:11

12
87:7,12

12372
4:10

12th
41:16

13
88:10,15

13th
40:24
41:6

14
84:10
94:12,20

15
81:3
96:6,14
105:6
106:7,8,
20,21
107:6,22
109:2,8

15.5
75:17
103:20
104:22
107:23

15th
34:16
39:3
45:20
48:10

16
99:13,19
107:23

16th
50:10
59:10,11
74:8,10
75:7

103:19
104:13

17
107:24

17th
50:2
53:13
59:10
73:9
75:6,7
104:13

18
103:21

18.7
62:16
103:19

18th
64:11
69:8 75:7

---

**2**

2
24:3,7
26:23

20
114:11

2023
10:12
11:2 20:3
40:25
50:2,11
80:2 85:7
87:18
88:22
94:15

20th
87:18

21.5
62:15,16

22



74:18

**23**
10:14
16:2,3
113:7

**23-page**
79:22

**23rd**
104:14

**24**
16:2

**26th**
88:21
89:5

**27th**
94:15
95:8

**28th**
76:25
103:20

**29th**
20:3
21:17,19

─────────
**3**
─────────

**3**
30:23
31:2

─────────
**4**
─────────

**4**
40:22
41:3

─────────
**5**
─────────

**5**
45:14,16

82:23
109:23

**5:27**
114:4

─────────
**6**
─────────

**6**
49:24
50:3
82:23

**61-page**
85:4

**6:12**
45:20

─────────
**7**
─────────

**7**
55:21,24

**7th**
28:17

─────────
**8**
─────────

**8**
60:25
64:2,7
81:2

**80**
47:11,23

**85**
47:11,23

─────────
**9**
─────────

**9**
77:9,12,
24 83:24

**90**

63:20

**92845**
4:11

─────────
**A**
─────────

**Abish**
36:18

**accepted**
70:6

**access**
11:15,16,
19

**accessed**
11:23

**accurate**
37:17
69:11
103:4,5
112:5

**accurately**
109:5

**acquiesce**
47:21

**acquire**
54:22,25
100:14
103:7

**acquiring**
73:23
103:3

**acquisition**
35:4 58:6
79:25

**actual**
70:14
89:8

**added**
12:9,11

**additional**

12:8,15

**address**
4:9

**addressed**
64:12

**addresses**
57:8

**administrat
ion**
57:5

**advise**
65:18

**advising**
91:2

**advisor**
10:16
55:17

**advisors**
55:4
65:20

**advisory**
25:6

**affiliated**
7:22 8:7
39:23

**afternoon**
4:12 5:12

**agencies**
100:18

**agency**
101:19

**aggressive**
62:23
76:19
103:22,
24,25

**agree**
45:3
47:13,14
50:24

51:3,9
52:7 53:8
55:11,18
62:20,25
90:16,19

**agreement**
15:6,10,
14,17
16:8,11,
19,22
17:4
21:9,11
30:24
31:9,13

**agreements**
14:17,22,
25 16:10,
15

**align**
110:9

**Alix**
92:5,6

**allocated**
26:16

**allowed**
91:10

**alternative**
64:20

**amount**
13:11
23:11
26:6,16
30:6,18
53:24
63:7 67:3
103:8

**analysis**
13:12
40:20

**analysts**
12:25



**ANK-0035975**
  88:12

**ANK-0039806**
  20:2

**ANK-0041290**
  64:4

**Ankura**
  14:7 20:5
  24:17,19
  25:8 36:7
  50:18
  88:14
  92:25
  93:3,10,
  13,21
  96:9,19,
  20

**anymore**
  32:20
  33:11

**appears**
  20:14
  56:18
  97:3,15

**applaud**
  64:22

**approach**
  55:12
  85:21

**approximate**
  6:2

**approximately**
  6:18 8:8,
  13 10:10
  37:19

**approximating**
  6:3

**arbitrarily**
  107:21

**area**
  40:9

**areas**
  63:12
  78:21
  79:10

**arm**
  93:21

**ASAP**
  51:6
  52:13

**ascertain**
  86:2
  87:23
  96:4

**ascertained**
  35:22
  83:19

**aspects**
  38:6

**assembled**
  58:24
  78:24

**assessment**
  13:12
  40:20
  61:16
  63:3
  103:10
  107:10,25
  108:24

**asset**
  35:2
  100:25
  103:12

**assets**
  57:15
  70:23

**assist**
  9:24

**associates**

**10**:23

**assume**
  5:22
  92:15

**assumed**
  58:2

**assuming**
  52:13
  59:11
  61:2
  83:12
  92:23

**assumption**
  59:12

**assurance**
  66:21
  102:24

**attached**
  60:19

**attachments**
  6:21

**attempt**
  17:18
  103:6

**attempted**
  10:6

**attempting**
  95:21

**attend**
  37:5

**attended**
  41:9
  44:10

**attorney**
  6:12,14

**attractive**
  80:14

**auction**
  52:18
  54:2

**65**:22
  67:4
  69:15,17
  70:16,18,
  19,20
  71:6,11,
  13 73:4
  75:18
  76:25
  89:8,10
  91:13
  95:9,14
  97:3,16
  100:15
  111:19,20

**August**
  100:9
  113:5,7

**avoid**
  49:7

**aware**
  32:10

**Axar**
  18:15,18
  27:22
  28:3,10
  55:7

─────────

**B**

─────────

**baby**
  10:6,11,
  17 11:22
  13:9 19:8
  21:25
  22:3,8,
  11,18
  23:13,16,
  17,22
  27:11
  29:8
  32:19,22,
  23 48:22
  57:15

**58**:25
  61:14
  62:18,22
  66:9
  67:20,25
  79:24
  82:18
  85:6,19
  86:4,12,
  13 91:17,
  20 92:3,
  13 99:7
  100:14,20
  103:3,7
  112:7
  113:20

**Baby's**
  100:8

**back**
  23:10
  45:5
  46:15
  56:15
  57:5
  58:16
  80:16
  85:16,17
  86:6
  98:21
  112:4

**background**
  80:19
  92:10

**bad**
  113:11

**banker**
  52:15

**banking**
  13:24

**bankruptcy**
  23:6 49:5
  100:15

**based**



16:17
23:2
27:20
28:15
44:15
54:18
62:6
65:18
69:24,25
78:21
88:5
100:21
102:22
103:8,9
108:22
109:15
110:6
111:13

**basically**
34:24
66:7
100:3

**basing**
63:3

**Bates**
19:25
24:4
30:25
45:15
55:23
64:3
77:11
87:10
88:11
96:7

**Bath**
10:16
12:3
20:18
22:7
23:5,18
62:15,24
91:20,22
92:4
100:16

**bay**
58:23

**Bed**
10:16
12:3
20:18
22:7
23:5,18
62:15,24
91:19,22
92:3
100:15

**begin**
5:6

**beginning**
110:24

**believed**
72:5

**BERLOWITZ**
105:11,
14,21
106:5
107:18
108:5,11
109:10
111:21
112:8
114:2

**bid**
19:8,13
49:16
51:2,7,
10,14,17,
18,19,24
54:7
55:13
56:24
59:5,6,
15,19,20,
22 60:11
62:24
66:18
67:8,9,
10,12,13,

20,22,25
69:2,7
70:11,15
71:3,16,
20,22
72:10,11,
16,19,20
74:11,13
75:16,25
76:2,9
89:11,14
97:23
98:3,5,8,
13 101:4,
5 103:9,
13,17,25
105:5,7,
17,25
107:15
108:25
109:8
110:10
111:13,18
112:13

**bidder**
70:6

**bidding**
38:20
54:5
70:14
98:10
112:6

**bids**
19:9
68:2,9,23
69:19

**bigger**
87:25
88:18

**binding**
51:14,16
67:9,10,
13,16,20,
21 68:25

69:2
70:15
71:20,22
103:17
104:24
111:18

**bit**
29:6
37:20
38:2
39:21
62:8 74:2
97:6

**blind**
94:18,22
95:3

**block**
24:24

**blueprint**
42:13

**board**
87:4,19

**bold**
102:18

**bottom**
50:7
56:15
77:10

**bought**
101:19,24

**brand**
23:16,17,
22,25
90:17
104:6

**Brandon**
12:25

**break**
6:4 63:21

**Brendan**
12:24

13:3
88:23
94:16

**briefly**
13:22

**bring**
13:14
61:4

**bringing**
27:18

**broken**
29:22

**brought**
4:16

**build**
58:11

**bullet**
60:23
61:8

**business**
9:2 21:21
22:25
25:6
29:18
30:8,15
32:19
33:23
34:11
38:5,7,8
44:14
47:17
48:7
61:17
62:16
71:25
72:2 74:5
90:13,17,
20,22
106:11,25

**Butterfly**
94:7

**buy**



54:22
66:23
105:3

**Buybuy**
10:6,11,
17 11:22
13:8 19:8
21:25
22:3,8,
11,18
23:12,16,
17,22
27:11
29:8
32:19,23
48:21
57:15
58:25
61:14
66:9
67:20,25
79:23
82:18
85:5,19
86:4,11,
13 91:17,
20 92:3,
13 99:7
100:7,14,
20 103:7
112:7
113:20

**buyer**
69:24

**buyers**
67:3

**buying**
49:19
103:12

_____

**C**
_____

**California**
4:11

35:21

**call**
4:21,23
38:16
44:5

**calls**
17:24
30:14
46:8

**capital**
13:24
14:3
17:18
18:15,18
25:21
33:23,25
34:13
48:9
53:14,16,
17,22
54:4,11
72:13,16,
19,22
73:20,21
74:8,12
101:17
105:3

**cards**
104:5

**career**
13:23

**carry**
47:10

**carve-out**
84:14,17

**case**
4:19 26:6
27:16
41:15
75:2
99:15
100:7,12
101:21

102:17
112:4
113:4

**cases**
40:15

**cash**
30:16,18

**category**
18:10

**CBS**
14:2

**CC'D**
25:11
39:9
41:22
96:12

**CCS**
20:4
24:11
64:5

**CEO**
25:8
91:17
92:3

**certainty**
102:25

**CFO**
79:5

**chain**
19:22
24:4
40:22
45:14
49:24
54:19
59:5 64:2
87:8
88:10,21
94:12
96:6

**change**
22:19

73:10
79:16

**changed**
12:6,7
21:17,21
71:25
72:2
75:6,8
76:12
79:15
105:9
106:3,8
107:2,5,
17 108:4,
9 109:9

**changing**
66:6
104:15

**chaotic**
55:12

**characteriz
ation**
50:25

**charge**
40:2

**chart**
62:21
83:9

**Chase**
4:10

**Chau**
4:2,8,12
5:1 6:1
7:1 8:1
9:1 10:1
11:1 12:1
13:1 14:1
15:1 16:1
17:1 18:1
19:1
20:1,3
21:1 22:1
23:1 24:1

25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1 42:1
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1 84:1
85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1 98:1
99:1
100:1
101:1
102:1
103:1
104:1
105:1
106:1
107:1
108:1



109:1
110:1
111:1
112:1
113:1
114:1,9

checking
32:4

checklist
32:8

chose
102:5
103:6

Christian
7:17,18
15:21
16:4,21
20:4
35:25
36:4
38:12
39:14
41:2
45:12
47:2,8
50:11
58:20,24
59:2,11,
18 62:4,
10 63:18
64:12
73:8
76:17
78:17,24
79:17
83:3
87:8,16
88:22
94:16
103:21
104:14

Christian's
63:3

chronologic
ally
48:12

Citi
14:2

clarify
84:9
102:3
113:7

clean
24:5

clear
11:11
37:10
48:3

close
8:8
52:12,16
76:20

closing
30:16
104:3

CNBC
100:18

collaborati
ve
79:9

colleague
7:5 15:21
31:18
35:20

colleagues
9:8

college
8:24
13:23

Columbia
13:21

commit
18:18
55:5,7

commitment
18:5,20

commitments
18:2
53:16
54:14,16
72:24

committed
72:5

communicati
ng
49:14

communicati
ons
46:23
47:5

Community
8:23

companies
9:12,25
79:6

company
9:23,24
22:9,10,
13,15
23:17
35:2
59:20
66:23
86:11

compared
62:23

compensatio
n
8:21

compete
67:7

complete
53:14
82:6

completely

69:11

comprised
61:10

concern
22:19
70:16,18
76:4
111:19

concerned
87:19,20,
24 88:7

concluded
114:5

conclusion
66:8
106:21
107:17

conclusions
109:22

conditions
18:19,21,
24 45:3

conducting
48:16

conference
38:16

confidentia
l
31:15

confirm
31:18
41:13

confirmatio
n
56:19
60:8

confirmed
74:21

connected
10:15,18,

24

connection
4:19 14:7
31:13

considerati
on
100:14

considered
18:10
27:23

consistent
95:19
98:3

constantly
73:11

constraints
38:19

construct
65:3

consultants
93:4

consulting
92:6,10
93:13,14,
15,21
96:22

contact
7:21
38:24
39:10,13
45:7,10

contacts
12:21
26:19

contents
6:16

context
17:12
34:9
98:12
100:16



**continue**
84:6,7

**contract**
93:19
94:3

**contracts**
102:21

**contribute**
18:3
81:11

**contributed**
61:15
72:13
92:7

**contributing**
26:2 29:9

**contribution**
81:17

**contributions**
82:20

**convention**
27:20

**conversation**
7:13 38:9
86:3

**conversations**
13:10
18:17
65:19
96:3

**converse**
47:2

**conversed**
17:22

**copied**
39:8

**copies**
45:21
87:9
94:17,18

**copy**
40:25
64:14

**copying**
88:23

**correct**
8:4,5
10:5,7
12:4 13:5
14:6,15,
20 16:7
21:8,18
22:21
25:20
27:9
33:15
35:7,8
37:16
38:11
41:6,18
46:5
57:25
59:16
63:6
67:19
75:22
79:2,11,
13 82:16,
19 83:8
90:25
92:17,25
93:20
99:5
103:7
107:14
108:3,8
111:8,11,
17

**correctly**
18:20
28:11
30:14
46:25
54:2
69:12

**cost**
102:22

**counter**
76:10
97:23
98:3

**countering**
89:14

**couple**
12:25
14:3 20:5
38:12
50:15
54:21
95:14
97:12

**court**
5:8,9

**create**
78:14
84:21
93:18

**created**
11:8
78:17

**creating**
101:11

**creation**
78:5
82:4,6

**cribs**
32:22,23

**criteria**
103:2

**Cro**
60:14,16

**current**
78:2

**cursor**
65:17

**customer**
23:15
92:8,9
102:23

—————————

**D**

—————————

**damage**
23:23

**data**
11:3,6,7,
9,10,12,
15,20,23
12:2,6,
12,18
40:9
84:12,22
85:2
102:23

**date**
54:16
75:21
80:2 95:8

**Davis**
4:14

**day**
46:4 73:9
112:5,13
114:11

**days**
7:19
38:12
52:20
65:21
66:12
95:14

**deal**
10:11
18:6
29:2,3
32:6
47:20,22
48:21,23
49:8,9
52:12,16
61:22
66:3
73:7,12
97:11
99:2
100:23
101:6,7,
10 102:12
108:18
109:19
110:15,
16,22,25
111:6,10
112:24

**deals**
9:6,8
26:11
40:17
55:9

**Deb**
36:6
39:14
78:18,25
79:4,17

**Deb's**
79:2

**Deborah**
38:12
87:10

**debt**
21:4,5,7
23:10
30:10,19

**debtors**
65:19



decided
    103:2

decisionmak
er
    20:20

decreasing
    21:25
    22:4,5,
    22,24

deferred
    30:9

define
    8:15
    89:19

definition
    34:20,23
    67:23

degree
    33:12
    68:3

degrees
    18:4

delayed
    69:15,16

delays
    48:16
    52:11
    66:4

delineating
    27:16

deliver
    47:11

depending
    16:15
    53:24
    55:4,6

depends
    22:5

deposit
    56:24

60:11

deposition
    4:18 5:3,
    12 6:10,
    25 7:6,8,
    10,13,20
    19:17

derived
    83:16

describing
    30:2

desk
    13:25
    14:2

detail
    7:14

details
    102:8

deteriorati
ng
    107:11

deterioration
    22:7
    106:10

determination
    62:6

determine
    51:6
    67:12
    75:14

determining
    63:7

developed
    38:6
    84:13

developing
    29:18
    84:16

development
    13:25

difference
    40:11,12
    106:14,17
    109:14,24

differently
    53:4
    105:19
    107:5

difficult
    101:4
    108:15

diligence
    9:9 78:22
    83:17
    100:6

diminish
    73:13

diminished
    76:12,14
    104:3

dinner
    38:14
    41:11,16

direct
    4:5 27:11
    38:24
    39:10,13

directly
    9:13 27:3
    39:21
    63:7
    64:13
    66:15
    99:11

director
    24:21
    25:5

disagree
    52:25
    53:3

disappointe
d
    65:20,24

disclosed
    74:3

discoveries
    39:19

discovery
    40:20

discuss
    16:18

discussing
    86:18

discussion
    45:4
    52:21
    54:19
    85:16,18
    98:22

discussions
    14:13
    15:13
    16:16
    20:22
    34:4
    86:16,17
    95:24
    98:19

disengage
    9:16

distinction
    26:25

division
    93:12

document
    55:21
    56:3
    58:17,23
    60:4,19
    61:22
    74:17
    77:11

78:6,8,
    14,17
79:13,15,
    22 80:7,
    10,11,12,
    20 81:22
82:4,7
83:6
85:4,11,
    18 86:13,
    15 99:13,
    18,22,25
100:2,22,
    23 101:8,
    9,12,15,
    16 102:14
103:23
106:4
108:18
109:19,20
110:3,17,
    21,22,23
111:2,6
112:15,
    19,20,25
113:4,13

documentati
on
    9:10 43:9

documents
    12:5
    19:19
    32:8
    42:20,23,
    24 79:17
    84:21

dollar
    30:18
    109:13

DOM
    47:11,15

DOM0000031
    30:25

DOM000052



79:23

DOM0001082
85:5

DOM00075
77:11

domain
57:13

door
37:13

draft
63:17

drafted
58:25

Dream
4:14,15
15:5,9,
13,17
16:3,19
17:4
31:5,9,
14,24
32:3,10
34:5
36:14
38:13,17,
24 39:6,
10 41:8,
24 42:21
45:7,10
46:25
48:19

due
9:9 78:21
83:17
100:6

duly
4:3

_____
E
_____

e-mail
19:22

20:2,3,8,
9,12
21:13,16
24:4,9,23
25:10,12,
14,17,19
28:13
33:19
40:22,23
41:20
42:5,10,
14,15
45:14,18,
19,25
46:9,11
47:9
49:24,25
50:10,21,
23 54:18
59:5,9
64:2,4,
10,11,13
69:5 76:6
87:7,8,
15,17,18
88:6,10,
12,21,25
90:25
94:12,14
95:6,18,
19 96:6,
8,11,12
97:2
98:4,15

e-mails
6:11,15,
17,19,21,
22 13:13
25:14
39:6
50:23

earlier
23:7
27:23
31:10
32:7

46:22
54:18
59:10
60:5 65:4
85:15
98:10

early
11:8
15:24
16:2
32:11
41:10
49:5
98:23

easier
5:16
110:14

Eastern
45:20

education
13:18

effect
52:22
65:10
102:2

effort
64:21

efforts
64:23

eight-page
55:21

Ellis
90:9 99:9

employed
9:23

employee
8:4

encouraging
52:20

end
12:18

109:3
110:5
112:5,12

ended
73:4
89:19

engage
21:14

engagement
23:15
39:22

engendered
55:13

enlighten
60:16

entire
37:5
64:19

entities
11:19
18:9
32:15

entitled
79:25

equation
63:16

equity
26:2,13
30:9
34:21,24
81:3,13,
17

estimate
73:17
109:3

estimates
83:16

evaluate
9:6

evaluating

9:8 99:4

eventually
61:22
101:5

evolve
73:7

evolved
77:20

exact
25:4,14
102:3

EXAMINATION
4:5

examined
4:3

Excel
46:17
77:9

exchange
39:6
44:24

exchanged
29:5

excuse
23:17
57:7

execute
72:9

executed
15:2
16:20
31:4

executing
15:9

execution
15:11

exhibit
19:22,23
24:3,7
30:23



31:2
40:22
41:3
45:14,16
49:24
50:3
55:21,24
57:12
58:12,15
60:19,25
64:2,7
77:8,12
79:22
80:4
85:4,8
87:7,12
88:10,15
94:12,20
96:6,14
99:13,19

exhibits
19:19
57:12

expecting
29:19

explain
38:25
40:12

expressed
13:8 68:5

eye
72:8

—————————
        F
—————————

fact
43:12
112:14

fair
9:19 62:5
72:3
107:3

familiar
99:22

family
26:20,22,
23 27:4,
10,24
28:7

fast
56:9

fault
90:8

felt
37:21
44:2
76:18
102:25
103:18,21

Feuer
7:17,19
15:21
16:21
20:4
35:25
41:2 47:2
50:11
78:17
87:9,16

final
60:5 66:8

finance
79:7
93:15

financial
39:16

find
60:24
65:2

fine
5:25

finish
5:18

finished
113:9

firm
18:2
48:15
92:7

five-page
19:22

fix
96:8

flagged
57:22

flow
49:9

fluid
18:7
55:10
104:19

flying
97:12

focal
20:19

focus
79:2

focuses
79:4

foreclosure
11:9
23:19

form
16:7,21
17:2

formal
48:19
89:18

format
66:11
100:3

forward
34:11

86:2
87:16
103:12

forwarded
78:10,13

forwarding
96:11

forwards
87:17

found
64:16

founded
14:4

four-page
87:7

frank
38:9

front
80:3
81:20
85:7

front-end
9:18

frustrated
65:20,24
66:13,14

frustrating
66:2

fulcrum
111:24

full-time
8:11

fund
14:5 27:5

funds
18:3 29:9

furnisher
32:22

future

47:12,24

—————————
        G
—————————

Garden
4:10

Gargiulo
36:6
78:18
87:10

gathered
83:17

gathering
85:25

gave
46:16

general
34:5,7
67:14
82:24
113:21

generally
9:18
82:17

George
96:13,23,
25 97:9

Georges
97:12

gestures
5:15

get all
54:13

GG-0008746
45:15

GG-0013673
94:13

GG-0021594
87:11



GG-0030208
  55:23

gift
  104:5

give
  6:20
  26:12
  42:3
  46:19,20
  66:21
  104:18

giving
  43:14
  46:16
  49:12

Global
  4:16 6:24
  7:3,23
  8:7,10,
  14,21
  9:4,12
  11:14,20
  14:5,6,
  15,20
  16:7 18:2
  19:7 21:8
  22:17
  25:25
  26:16,22,
  24 27:6,
  12,15,25
  28:25
  29:8
  30:14
  31:5 34:6
  36:5
  38:3,18
  39:24
  41:8
  45:10,22
  48:24
  49:15
  51:9,16
  53:13
  54:15

55:22
56:22,23
60:10
64:19
66:17
67:19,24
69:6,9
71:16,21
72:15,18
80:18
81:3,10,
13,17,19
82:13,14,
17,24
83:2
84:22
85:2,6
89:25
91:2
92:25
93:3 94:8
98:9
99:14
100:11,19
102:5
103:6
112:6

Global's
  17:17
  26:8
  29:23
  30:7,24
  46:12

good
  4:12,22
  33:21
  44:24
  66:22
  67:3,4,6
  68:4
  103:15

goodwill
  55:13

GP
  34:19,20,

23

grammar
  113:11

granted
  73:2

graphics
  83:9

great
  5:2 84:5

Greenbaum
  4:13

group
  14:2
  57:24
  65:9 68:9
  92:11

Grove
  4:10
  91:18,25

guess
  6:2 22:16
  27:17
  29:21
  34:10
  35:15
  37:10
  40:16
  46:11
  50:15
  59:13
  62:9 65:8
  78:13
  95:19
  97:2,14
  98:2,22
  99:8
  107:22

guys
  93:23

———————

H

———————

H-A-N-N-A-N
  86:25

half
  105:8,18
  106:2,8,
  13,16,21
  107:16
  109:2,9,
  13,24
  110:13

hands
  51:12

Hannan
  86:21,22,
  23 87:17
  88:6

happen
  108:22

happened
  23:12
  34:15
  37:15
  47:5
  48:11
  49:5
  67:18
  70:20
  75:25
  76:8
  86:9,10
  91:6
  109:21

happening
  99:4

hard
  64:20

head
  39:18
  41:22

hear
  4:24

heard
  32:14,16,
  25 33:16
  97:11

hearsay
  33:13

hedge
  14:5

held
  42:24

helpful
  44:18

helping
  26:17
  28:21
  54:11

Hey
  63:17

high
  62:18
  76:11
  97:9
  105:13
  110:4,9

higher
  76:7
  101:4
  102:24
  103:13
  104:22
  108:24
  109:3
  110:5

highest
  13:17
  105:4

history
  13:23
  66:3



holder
  21:7

holds
  57:15

holisticall
y
  85:22

honest
  55:16
  60:12

horse
  62:23

hour
  37:20

hours
  8:18

HR
  63:13

huge
  62:16

human
  102:20
  107:6

─────────

I

─────────

ideas
  73:14
  86:6,19

identificat
ion
  19:24
  24:8 31:3
  41:4
  45:17
  50:4
  55:25
  64:8
  77:13
  80:5 85:9
  87:13

88:16
94:21
96:15
99:20

implementin
g
  83:21

imply
  42:16
  69:8
  102:4

implying
  70:7 94:4

important
  5:13

impress
  44:23

impression
  33:14

in-person
  35:16,23
  36:2,5,8,
  13 38:13

Inc./non-
family.
  31:6

included
  30:8

including
  24:11
  45:22
  64:6
  88:23
  94:18

increase
  102:21

independent
ly
  39:11

indicating
  19:20

49:11
54:23
56:8
57:9,19
62:8
74:17
77:18
81:24
82:10,21
83:3,22
84:6
87:23
88:2,24

indication
  19:15
  46:20
  47:25
  76:6
  80:15

indications
  19:9
  49:3,12,
  17 53:17
  68:24
  71:18,19

individual
  97:10

individuals
  18:9

Industries
  4:15

information
  11:5
  12:5,8,15
  13:9,11
  17:15,23
  31:15,20,
  24 32:3
  42:19
  43:25
  46:19
  66:5
  73:11
  78:21

80:12
83:17
85:25
92:22
104:18

initial
  41:7 44:5

initially
  44:12

initiate
  60:24

input
  19:5
  79:14,20

insight
  100:5

insights
  44:15
  48:7
  100:13

instance
  21:12
  73:15
  82:7
  83:18

instruction
s
  5:6 6:7

intellectua
l
  61:12,14,
  18,20
  75:9,12,
  16,25

interacted
  86:20

interaction
  14:14
  34:18

interest
  13:8

19:6,10,
15 38:17
49:4,12
68:6

interested
  10:17
  18:12,16
  26:20
  32:18
  33:10,22
  44:14,19
  48:21
  49:6,11,
  19 72:24
  90:13
  111:15

interpretat
ion
  52:15,24
  53:9

interpreted
  53:4

introduce
  82:13

introduced
  33:20
  37:25
  97:10

introductio
n
  82:13

introductio
ns
  37:24

inventory
  23:11
  75:10
  102:20,22
  104:2
  106:19
  107:5
  109:4



**invest**
18:18
26:11
27:3  34:2
81:14

**investing**
34:13

**investment**
13:24
52:15
80:24
81:19
100:12
101:9

**investments**
100:4

**investor**
27:12
34:25
65:9
69:22
73:22

**investors**
9:7
14:16,21
17:23
18:3,11
26:5,9,
10,15,24
27:2,8,17
28:19,20
34:3
52:4,5
53:18
55:7
66:22
68:5,6
71:23
72:4,8,24
80:23,24
81:10,12,
18 82:14
100:24
102:14

103:13
104:23
108:20
110:8
111:15
112:22

**involved**
9:11,13,
14 14:10,
13,24
15:4,8,12
20:23
31:23
32:2
33:5,6
34:10
35:6
40:17
61:13
63:7 78:5
82:3,5
83:4
84:16
101:11

**involvement**
9:15,18
59:14
79:12
82:11
98:18

**IP**
62:22,24
70:19,23,
25 71:6,
11,12,15,
16 73:3,
4,15 74:5
76:14,24
91:13
97:3,16
104:6
106:2
109:2
111:19,20

**issue**
110:10

**issues**
22:10
38:8
40:19
42:17
102:9

**iteration**
60:5,6

**iterations**
77:20
113:10

————————

**J**

————————

**Jack**
10:2
54:20,24
60:23
61:3,4,7
87:5

**Janie**
10:2
54:20,24
60:23
61:2,4,6
87:4

**Jeff**
5:9 7:7
20:5
24:10
35:20
37:3 38:2
39:20
40:23
41:25
45:19
46:7 47:4
64:4,14
84:20
87:9
88:12,22
95:6,23

96:11

**Jeff's**
90:16
95:17
98:3

**Jeffrey**
94:14

**jerk**
8:16

**Jersey**
35:16

**job**
5:15
54:11

**jog**
96:24

**judgment**
63:4

**July**
97:21
98:23
100:9
104:12

**June**
15:24
16:2
21:18,20,
24 22:17
28:17
32:11
34:16
39:3
40:24
41:6
45:19
48:10
50:2,10
53:13
59:10,11
64:11
69:8
76:25
77:5 78:3

80:2
87:18
88:21
89:4
94:15
103:19,20

**junior**
30:10

————————

**K**

————————

**Kathleen**
24:10,13
26:17
27:18
28:8
32:11
36:9
45:21
50:17
64:5,11,
13 70:8
74:22
88:13
93:14
96:9

**key**
20:19
102:23

**kicking**
73:13

**kind**
29:21
40:17
56:24
60:10
62:12
65:5 66:8
74:3,24
76:3
78:20
82:12
102:15
113:11



Kirkland
  90:9 99:9

knew
  25:2
  29:16
  43:2 62:6
  104:20

knowing
  56:12

knowledge
  105:10

―――――――

        L
―――――――

Lapish
  49:25
  50:16
  88:14
  96:10

larger
  38:16

Lauster
  24:10,14
  45:21
  64:11
  88:13
  96:10

law
  48:15

lawsuit
  4:15

lawyer
  4:13

lawyers
  97:15

Lazard
  10:15,19,
  22 11:3,
  5,24
  12:15,18,
  21 13:10

32:12
33:20
48:15
49:11,14
51:22,23
52:8
53:5,10,
11,12
55:14
58:12
59:3
63:10
65:19
90:8,9
91:2
94:8,9,17
99:9
104:17

Lazard's
  51:5,12
  52:23
  66:25

leadership
  36:15

leads
  102:20

leases
  102:24

led
  102:21

lender
  20:17,18,
  19,20,21
  111:24

letter
  48:25

letters
  101:17

level
  13:17
  79:5
  102:24

levels
  102:20
  109:4
  111:16

lies
  89:23

light
  67:6

limited
  34:12
  113:14

list
  58:9
  84:24,25

listed
  95:3

lists
  25:24

LLC
  4:16

location
  35:13

locations
  57:22

log
  37:11

logged
  37:9,15,
  19

logo
  30:24
  55:22
  79:24
  85:6
  99:14

long
  8:6,18
  37:19,21

long-term
  9:23

longer
  33:6

looked
  44:17
  57:16
  63:13
  83:10

lot
  5:15 8:18
  16:9
  28:18,19
  38:10
  42:9
  43:7,8,
  10,13
  44:7
  46:16
  49:8,9,10
  75:23
  79:6
  86:20

low
  110:4

lower
  30:15,17
  73:16
  98:5,8,9
  108:23

LP
  27:6
  111:3

LPS
  26:12
  27:7
  29:15
  100:5

―――――――

        M
―――――――

made
  62:5
  106:17

Maicki
  96:9,17

main
  12:20
  79:2
  112:24,25

majority
  9:17

make
  11:11
  12:14
  35:4
  37:10
  56:11
  58:13
  66:17
  67:2 69:6
  70:11
  73:22,23
  74:6,16
  81:19,21
  87:25
  88:18
  101:3,4
  105:14
  108:15
  110:18

makes
  5:15
  89:23

making
  5:11 28:4
  89:13
  100:4

manage
  9:9 29:17
  32:7

management
  85:18,23,
  24 86:5,
  10

manager
  29:16



manages
  34:25
  35:2

managing
  24:21
  25:5

manner
  54:8

manufacture
r
  32:22

March
  10:12,14
  11:2 12:2
  13:7
  43:10

mark
  19:19,21
  24:3
  30:22
  36:17
  40:21
  45:13
  49:23
  55:20
  63:25
  77:8
  79:21
  85:3 87:6
  88:9
  94:11
  96:5
  99:12

Mark's
  36:18

marked
  19:23
  24:7 31:2
  41:3
  45:16
  50:3
  55:24
  64:7
  77:12

80:4 85:8
87:12
88:15
94:20
96:14
99:19

marketing
  92:8
  100:2,22
  101:8
  109:19
  110:21,23
  111:2
  112:20

marketplace
  101:22

markets
  13:25

material
  109:14
  112:15,18

matter
  72:7
  114:4

Matthew
  49:25
  50:16
  51:4 52:7
  88:13
  96:10

Matthew's
  50:24
  52:14,23

MBA
  13:19

meaning
  86:11

means
  42:6
  67:12
  97:24

meant
  53:20
  55:15
  70:8
  78:12
  113:19,21

meeting
  34:14
  35:7,12
  37:2,6,
  21,23
  38:14,16,
  17,18
  39:3,7
  41:7,9
  42:8
  43:21,23
  44:3,6,10
  45:6,11
  46:4,13,
  24 47:3
  48:4,5,
  11,19
  51:5
  52:9,21
  86:8,10

meetings
  46:8

member
  87:4,19

members
  95:25

memory
  69:20
  96:25

mentioned
  13:13
  27:22
  32:12,13
  35:9
  59:24
  65:4
  74:23
  96:2

103:2
104:8
110:11,24

mentions
  20:15

met
  18:22,25
  38:12,21
  41:10
  42:7 68:8

middle
  34:17

Mike
  53:24

Milan
  36:17

million
  25:24
  26:2,22
  30:8,9
  61:10,11
  62:2
  74:18
  81:4,11
  105:8,17,
  18,25
  106:2,14,
  16
  107:15,16
  108:10
  109:2,8,
  13,24
  110:14

mind
  67:9

minimal
  7:21

minutes
  63:20

misinformat
ion
  101:22,23

mistaken
  71:10
  91:22

Mm-hmm
  81:6

model
  29:4,6
  38:4
  39:15,16
  58:10
  83:10

modeled
  78:25

models
  46:18

moment
  63:2

Monday
  41:12,16

money
  23:10
  26:12,18
  29:2,12,
  14,20
  33:25
  35:4
  81:18
  101:2
  103:8
  111:3,4,
  8,11,13

month
  22:17
  34:17

months
  40:5

Morgan
  14:2

mother
  22:9,10

move



52:16
54:3

moved
69:13,15
75:23

moving
52:10
68:18
104:12

Mrkonic
96:13,23

multi-
strategy
14:5

multiple
16:12
18:17
21:6
48:17
66:3
77:10
86:16
90:4

Murphy
4:6,13
19:21
20:7
24:2,9,12
30:22
31:7
40:21
41:5
45:13,18,
23 49:23
50:5
55:20
56:2
63:25
64:9
77:7,14
79:21
80:6
85:3,10
87:6,14

88:9,19
94:11,24
95:2,4
96:5,16
99:12,21
105:16,24
106:15
108:2,7,
12 109:12
112:3,16
113:24

——————

N
——————

names
13:2
36:16
57:13

naming
27:20

nature
106:19,25

NDA
16:5
31:22
32:5

necessarily
27:14
53:8
102:6

needed
30:16,18
89:9

negotiation
s
47:18

net
97:9

network
28:21

news
100:18

101:19

nods
5:14

non-
disclosure
14:16,21,
25 15:6,
9,14,16
16:8,9,
11,14,19,
22 30:23
31:8

NOTARY
114:12

noted
105:15

number
18:11
22:21
55:23
61:18,20
62:14
63:18
64:3
76:11,16
77:11
87:10
88:11
96:7
102:7

numbered
19:25
24:5
30:25
45:15
55:23

numbers
54:3
107:21

——————

O
——————

oath

5:7

objection
105:11,
15,21
106:5
107:18
108:5,11
109:10
111:21
112:8

obtain
99:6

obtained
101:25

occur
70:17

occurred
75:19

occurs
9:19

offer
29:23
30:5,7
48:5,8,25
61:9
65:3,5
70:14
89:14
97:23
104:24
110:2

offering
30:14

offers
66:11
100:4

office
26:20,22,
23 27:4

offices
26:20
27:10,24

28:7

okayed
60:6

one-page
45:14

ongoing
74:5 76:4

opaque
102:19
106:19

open
38:9 43:3
58:3,7
70:22
104:5

operate
29:17

operating
23:18
40:8,13

operation
34:11

opinion
52:23,24
61:19,24
62:14
63:11
79:19
106:18

opinions
78:20

opportunity
70:21,23
80:13
91:9,14
99:6,11
100:17,19

opposed
34:12

options
99:3



order
  51:6 72:9

outbid
  111:14

outlined
  61:12

outreach
  10:25

ownership
  30:9

owning
  30:15

owns
  9:12

_____

              P
_____

p.m.
  45:20
  50:11
  114:4

package
  65:5

pages
  81:20

paid
  92:15
  103:14

paper
  86:18

paragraph
  29:22
  64:18

parent
  23:5 92:4
  100:15

part
  26:18
  43:5
  44:22

54:18
55:16
70:3
96:2,18
98:19

participate
  95:10,16,
  21 102:5

participati
on
  40:16

parties
  95:25

partner
  8:2 9:4
  32:21
  34:5,8,12
  40:9,13,
  14 46:21
  61:5

Partner's
  92:5

partners
  33:21
  80:23,25
  82:14
  93:7
  100:13
  102:15
  113:15

parts
  60:3

pass
  100:19
  103:3
  110:20

passed
  100:16,23
  101:7,9,
  14,17
  102:4
  110:7
  112:6

passing
  104:25
  112:21

passive
  80:24

past
  9:14
  16:25

Patty
  91:16
  92:2

pay
  22:18
  23:2,10
  73:2,18
  74:4
  75:11
  90:23
  92:14

payout
  30:9

pencils
  98:5

pending
  6:6

people
  11:19
  20:5
  24:11
  35:13,16,
  17,22
  36:11,19,
  25 38:13
  39:19
  41:8,15
  45:22
  47:18
  64:6
  66:10
  67:2
  73:17
  82:15
  88:23

94:17,19
95:3
104:4
112:23
113:22

percent
  30:15
  47:12,24

percentage
  8:14,15

perception
  75:8

perfectly
  5:24

period
  9:15,25
  21:23
  22:4
  23:22
  77:6

Perot
  18:17
  19:4,5
  27:22
  28:2,10
  55:7

person
  78:23
  79:5

personally
  32:9
  39:2,5
  45:7
  49:20
  59:14

perspective
  21:21
  42:25
  90:2
  97:19
  108:17
  110:12

phone
  17:23

pick
  107:21

pieces
  58:18

pivot
  64:21,24

pivoting
  65:14

place
  37:3
  53:25

plan
  64:20
  66:22
  83:20
  84:15

planning
  29:12
  40:20
  98:10

plans
  43:2,9,
  15,20
  46:19
  54:21
  84:14

point
  20:19
  43:22
  44:8
  60:23
  61:8,23
  62:18
  67:17
  68:7
  72:23
  75:12
  89:7
  97:24
  98:22
  99:5



104:22
105:2
112:24,25

**points**
44:25
49:10

**pop**
47:19

**portions**
58:22,23

**position**
46:13
66:25
89:20

**positioned**
66:17
69:6

**possibility**
26:4

**Possibly**
17:8

**post**
100:8
110:16

**potential**
9:6 10:11
14:8,16,
21 17:22
25:23
26:15
27:10
29:2,3,7
46:21
61:5 65:9
80:23
81:10,14
82:14
100:5
102:14
111:2
113:14

**potentially**

21:3

**preliminary**
18:6
43:24
57:25

**prepare**
6:9

**presented**
29:15
38:4

**pretty**
37:7 55:9
85:22

**previously**
83:11

**price**
72:21
73:24,25
74:2

**pricing**
108:19

**prior**
29:23
30:7
34:14
38:13
39:3,6

**privacy**
102:9

**private**
26:12
34:21,24

**problem**
97:3,16,
17,25

**procedure**
32:6

**process**
13:7
14:24
15:4,8

23:6,7,8,
9,20
32:20
33:6,11
48:16
49:13
51:11
54:3,5
62:5,11
65:25
66:9
67:17
68:20,21
69:13,16,
22 70:4,
14 71:3
76:22
89:18
90:5,10,
24 91:3,
10 99:16
100:8,15
102:13,16
108:21

**processes**
100:6
113:2

**produced**
60:20

**product**
109:4

**professor**
8:23

**profile**
102:22
107:13

**profiles**
108:21

**profiling**
92:9

**project**
17:15
94:7

**properly**
62:11

**property**
61:12,14,
18,20
75:9,12,
16,25

**proposal**
76:6,17

**proposing**
30:13

**proprietary**
31:15,20

**prospect**
90:17

**prove**
47:6

**provide**
5:13
16:21
26:11
31:19,20
100:13
102:25

**provided**
11:5 12:8
13:10
15:20
16:4
17:23
31:14
42:25
44:15
63:11
68:23
78:20
79:14
80:21,22
109:5

**providing**
31:23
32:3 66:5
92:22

**PUBLIC**
114:12

**purchase**
10:6
25:22
29:7
91:14
100:20

**pure**
33:13

**pursuing**
90:15

**pushed**
69:18
90:11

**put**
27:5
29:12,13,
19 43:8
51:19
53:18
58:22
63:16
64:20
66:7,10
77:21
78:24
81:18
85:2
103:11
104:23
111:14

**putting**
28:25
49:20
75:2,4

_____

Q

**qualificati
on**
68:7



**qualified**
19:8
68:2,19,
23,24
69:9,14,
21 70:10,
11,12

**qualify**
66:18,19
68:11,13
69:7
89:16
90:21

**qualifying**
67:8,10,
11,25

**quality**
68:4,6,9

**quarter**
110:14

**question**
5:17,20,
23 6:6
7:16 8:19
22:13
46:22
49:7
51:23
106:20
108:6
109:16

**questions**
50:8,13,
15 113:25
114:2

**quickly**
52:10,12
104:13

_____

**R**

_____

**raise**
17:18

23:9
26:18
29:13
111:3,8,
11,12,13

**raised**
72:16,19
111:4

**raising**
35:3

**random**
58:9

**range**
110:3,4,6

**ratio**
104:22

**rationales**
112:21

**ratios**
74:4 75:8

**reach**
21:9,11

**reached**
47:7
97:15

**reaching**
10:22

**reacted**
44:16

**read**
6:11
21:13
30:20
41:23
42:14
78:10
84:4
95:24
113:12

**reading**
24:20,23

25:3
42:10
50:23
58:21
88:3

**real**
111:7,9

**realistic**
47:16

**reason**
6:4 25:16
26:7 32:4
33:19
111:7,9

**reasonable**
68:4 76:7

**reasons**
23:3,4
102:7
110:8

**recall**
10:20,21
13:2
16:24
17:10
19:3
29:11
33:9
36:24
54:17
56:14
64:15
68:16
84:23

**receive**
8:21 18:2
25:17

**received**
17:6
64:13,14

**receiving**
25:11
41:19

45:24
50:20,22
88:25
89:2 95:5

**recent**
65:18

**recess**
63:24

**recognize**
56:3,6
58:16,18,
22,23
60:3
64:21
77:16,19
80:8
85:12

**recognized**
24:22

**recollectio
n**
17:25
33:17
46:12
58:5 60:9
95:20

**record**
4:7 5:11
24:6
82:22
83:23

**records**
112:11

**reduce**
47:10

**reducing**
47:22

**refer**
84:3

**reference**
81:3

**referenced**
59:5

**references**
25:20

**referred**
78:15

**referring**
13:4 28:8
31:10
42:4
43:16
64:25
66:20
70:3
83:24
84:10
93:21
98:9

**reflect**
46:14
109:20

**refresh**
46:12
60:9

**regard**
48:12

**regular**
94:24

**related**
11:22
17:20
43:17
48:25
93:4
98:24

**relationshi
ps**
10:23
92:8

**relative**
100:17



**relevance**
    113:17

**rely**
    75:10

**remain**
    58:3

**remained**
    48:21

**remember**
    10:21
    12:20
    17:12
    18:14,20
    25:11,13,
    14 26:6
    30:13
    32:17
    33:7,8,
    12,14,16
    36:12,16,
    19,21
    37:18,22
    38:21
    41:19,21
    42:2
    45:24
    46:7,25
    47:8
    48:11
    49:21
    50:20,22
    54:2
    56:21
    57:2
    58:21
    59:2
    60:12,13
    69:11
    71:2 73:6
    75:20
    86:15,18
    88:25
    89:2,6,17
    93:10
    95:5,7

    96:25
    97:6
    98:12,16,
    17,23
    102:2

**remiss**
    65:17

**repeat**
    14:18

**rephrase**
    5:21 11:5

**reported**
    100:18

**reporter**
    5:9

**reports**
    101:18

**represent**
    4:14
    33:25
    41:14
    56:18
    60:18
    76:24
    78:4

**representat
ives**
    36:14

**represented**
    69:25

**request**
    51:5

**requests**
    12:14,18

**research**
    57:23
    58:8

**researched**
    57:16

**resources**

    102:20
    107:6

**responses**
    5:14
    12:17

**responsibil
ities**
    9:5

**restock**
    102:22

**Restructuri
ng**
    57:4

**Retail**
    4:16 31:5

**retain**
    93:4,8

**retained**
    14:7
    92:12,19,
    24,25
    93:17
    94:5

**retaining**
    102:23

**retention**
    14:11
    93:18
    94:2

**return**
    47:22

**review**
    6:15
    29:25
    50:7,12
    88:5

**reviewed**
    6:19
    13:14
    59:22
    60:6

**revise**
    79:16

**revised**
    79:15

**revival**
    90:17

**revived**
    90:2

**Rick**
    96:9,17,
    18 97:10
    98:20

**rights**
    20:21

**risk**
    90:18,20,
    21 102:21
    107:13
    108:21
    110:6

**risks**
    90:24
    103:10

**role**
    9:3
    17:17,20
    24:18
    26:18
    35:3
    40:7,18
    92:5
    96:20

**roles**
    34:19

**rolled**
    21:4

**room**
    11:3,6,7,
    8,9,12,20
    12:12,18
    84:22
    85:2

**rooms**
    11:10,23
    12:6

**round**
    53:21
    54:11

**route**
    55:3,5

**Rowe**
    4:13

**run**
    48:7

**running**
    58:19
    66:23
    90:10

—————

S

**sale**
    66:8

**Saturday**
    50:2
    52:19

**sauce**
    42:2,6

**scan**
    56:10

**scattershot**
    55:12

**scenario**
    27:10

**science**
    40:10

**screen**
    5:10
    19:18
    20:14
    24:2
    36:23



60:24
64:17
77:8

**scroll**
50:6
56:15
62:7
77:17
80:16
81:20
82:8 84:5
87:22

**scrolling**
57:18
84:8

**secret**
42:2,6

**section**
99:15
100:11
102:19

**select**
14:12

**seller**
102:25
109:5

**selling**
23:9

**senior**
8:2 9:3
24:20
40:14
91:19,21
92:3

**sense**
27:7
47:15
48:6
51:12
63:4
67:11,22
69:23
73:22,23

74:6 76:8
80:25
89:23
101:3
110:18

**sentence**
29:24
30:6
62:21
109:8

**separate**
71:2

**seriousness**
51:6,23
52:14

**set**
109:2

**share**
17:15
19:18
36:23
42:9

**shared**
24:2
38:10
43:6,7,8,
10,12,21
44:7
58:10
77:7
86:20
113:14,22

**sharing**
39:15
43:3
100:12

**sharpening**
98:4

**Shea**
13:3
88:23
94:16

**sheets**
46:18

**short**
63:21
64:22

**shot**
60:25

**show**
102:14
113:2

**showed**
42:13
69:17
83:13

**showing**
75:4 86:4

**shown**
86:9

**side**
20:24
39:17
91:23
92:21
93:14,15,
16

**sign**
14:16,21

**signature**
24:24
25:19

**signed**
15:5,17
16:3
17:4,8,9,
10,13,14
31:18,22

**significant**
90:18,20

**similar**
83:14

**sir**

20:11
54:23
57:9
72:17
77:17
81:23
86:24
90:25

**situation**
23:25
110:15

**Sixth**
20:15,17,
23 21:10,
12,20
55:14

**slide**
82:17

**slides**
82:5,9

**slow**
56:9
61:25

**slowly**
99:17

**Smith**
4:14

**software**
40:10
83:18,21,
23

**sold**
23:12

**son**
36:18

**sort**
29:22

**sound**
77:3

**sounded**
44:14

**sounds**
4:22 13:5
54:24
75:5 91:5

**source**
79:3

**sources**
25:20,21

**speak**
6:23 7:2,
7 9:7
21:22
22:6 39:2
42:11,23
43:4
53:5,10
55:18,19
63:4
92:24

**speaking**
18:16
74:17

**specialty**
78:22

**specific**
12:14
28:23
40:19
98:22

**specificall
y**
18:13
26:7
42:20
82:18

**speculate**
28:15
107:4,7,8
109:23
110:16

**speculating**
108:18,23



speculation
  28:12
  111:22

spell
  86:24

spent
  47:9

spoke
  6:11,14
  7:9,10
  39:18
  40:3
  53:11

spoken
  7:18
  39:20
  43:19
  44:5

spreadsheet
  77:9,16
  83:4,8

stage
  69:14
  91:4
  95:22

stages
  69:12
  70:5

stake
  27:11

stalking
  62:23

stand
  38:7
  46:21
  89:4

standard
  32:6
  82:12

stands
  107:12

Stanley
  14:2

start
  13:11
  73:12,13
  90:6
  95:20
  110:13

start-ups
  14:4

started
  10:10
  13:6
  104:15

starts
  29:23
  73:7
  79:23
  85:5
  88:11
  94:13

state
  4:7  71:25

statement
  9:20
  47:13,15
  53:2
  55:11
  90:16

statements
  49:18

statistics
  83:15

status
  102:19

step
  68:20

Steve
  86:21,22
  87:17
  88:6

Stevens
  39:23
  40:25

Stevenson
  39:16

stock
  109:4

stop
  50:14
  56:13
  90:5  97:5

store
  57:21

stores
  58:2
  104:3,4

straightfor
ward
  109:18

strategy
  38:5  48:7
  80:2
  81:22
  84:15,17
  104:20

Streader
  7:7  20:6
  24:10
  35:20
  39:20
  40:24
  45:19
  64:5  87:9
  88:13,22
  94:15
  96:11

stream
  89:19,21

Street
  4:10
  20:15,17,
  23  21:10,

12,20
  55:14

strong
  18:5,10
  19:6

structure
  21:5
  29:24
  30:5,11,
  12,17
  55:9  61:3

structures
  65:13,15

study
  92:20
  100:7,12
  102:17
  112:4
  113:4

Study/
investment
  99:16

stuff
  38:20
  43:12
  44:4

subject
  41:24

submission
  59:15
  63:10

submit
  19:13
  49:15
  51:16,19
  59:25
  67:24
  76:2

submitted
  19:8,9
  48:25
  49:3,17,

18  50:25
  51:10
  56:23
  59:6,7,23
  60:10
  67:20
  74:7,9
  111:18

Subscribed
  114:11

subsequent
  91:13
  113:19

substantive
  7:12

Sue
  91:18,25
  92:3

suffered
  23:22

suffice
  111:5

sufficed
  112:22

sufficient
  72:13,16,
  19,22

suggestions
  86:19

summarizing
  95:24

supplied
  32:23

support
  55:8
  74:12

surprised
  44:4,18

sworn
  4:3



114:11

_____

T
_____

table
  92:22

tabs
  77:10

taking
  5:10
  103:10

talk
  5:16
  29:14
  99:11

talked
  34:19
  38:2
  59:18
  112:23

talking
  12:23
  19:11
  28:19,20
  33:24
  34:2
  37:12
  44:13
  46:4 52:2
  56:16
  57:20
  58:14
  63:9
  65:7,14
  70:4,13
  71:5,7
  83:7
  99:18
  104:11
  109:11

talks
  100:3

teach
  8:25

team
  64:19
  78:23
  79:20

technology
  39:18
  40:9
  84:14,17

technology-
related
  40:19
  42:17

telling
  33:8
  44:17

Tempke
  12:22
  58:20
  59:2
  88:22
  94:16

template
  16:5,7
  17:3
  82:12

templates
  16:13

term
  26:13
  34:7,21

terms
  9:8 15:13
  20:19
  34:8
  42:10
  43:2,6,8
  45:2
  48:14
  65:2 67:8
  73:3 74:4
  75:9

83:20
92:8
103:12
104:21

testified
  4:4 41:15

testifying
  5:8

testimony
  16:17

text
  47:2

thing
  48:8
  50:12
  71:15
  91:14

things
  12:9,11
  21:6,17
  23:9
  42:10
  43:9
  44:8,16,
  23 52:16
  66:5,6
  72:8
  73:10,12
  75:6
  79:19
  83:19
  84:11
  85:21
  86:17,19
  89:4,21
  90:11
  104:6,12,
  15,17
  107:4

thinking
  54:5
  85:22

Thoryn

39:16,23
40:25
42:16
43:18
84:19

Thoryn's
  40:7

thought
  29:13
  33:4,20
  38:4
  44:12
  48:2
  62:12
  84:13
  89:25
  91:8,9
  102:16
  103:15
  110:9

thoughts
  46:15
  55:3
  59:19
  63:16
  75:14
  78:20
  92:7

three-page
  40:22
  99:13

Thursday
  45:19

time
  9:25
  11:18
  12:6,11
  21:17,23
  22:4,19,
  22 23:21
  26:3,14
  28:17
  29:5
  38:19

40:3
42:12
47:10
48:22
53:21
54:9
56:24
62:7
63:12
66:13
70:12,24
71:4,9,25
73:7
74:22
75:5
76:2,8,9,
19 77:6,
20 81:15
85:19
89:24
95:12
97:20,22
98:18
101:2
103:22
104:2,11
113:16

timeline
  52:6
  64:22
  89:12

timelines
  48:17
  75:23

times
  19:18
  29:7
  36:23
  37:9 49:4
  90:4

timing
  52:10

title
  7:25 25:4



**today**
  4:18 5:7
  6:25 7:6
  13:15

**today's**
  6:10

**told**
  7:9,10,20
  32:17
  33:5 78:4

**Tom**
  4:13,23
  88:17
  97:7
  108:15
  112:2

**tomorrow**
  95:9

**tonight**
  60:24

**top**
  20:2
  30:25
  41:21
  45:18
  49:25
  55:22
  64:4 87:8
  88:12
  94:14
  96:17
  99:14,15
  100:11

**total**
  61:9

**trading**
  13:25
  14:2

**transaction**
  9:19,21
  10:3 14:8
  17:18
  20:24

  27:3,6
  29:10
  34:25
  48:13,14
  49:2
  53:15,25
  61:5
  63:14
  76:21
  81:14
  98:24
  113:16,20

**transcribe**
  5:14

**transition**
  9:22
  23:14

**transitioning**
  29:18

**transpired**
  38:15
  107:4

**traveling**
  7:15

**true**
  53:6

**trust**
  63:3

**Tuesday**
  41:12
  53:22

**Turnaround**
  79:25

**Twenty**
  6:20

**two-page**
  24:4
  49:24
  64:2
  88:10
  94:12

  96:6

**type**
  16:5
  20:20
  21:5
  30:10,17
  34:25
  55:8 65:8
  72:9

**types**
  16:13

———————

  **U**

**ultimate**
  52:4

**ultimately**
  21:9 55:5
  66:18
  67:7 69:7
  71:21
  72:7,11
  73:3
  102:12
  103:16
  110:25
  113:14

**umbrella**
  27:25

**unable**
  21:9

**uncertainty**
  102:23
  104:7,9

**understand**
  4:17,20
  5:20 6:7
  21:16
  26:25
  28:5 30:2
  58:13
  67:16
  71:14

  79:12
  108:16

**understanding**
  8:3 11:18
  28:11,16
  33:10
  77:23
  78:16
  79:6
  81:21
  91:12
  95:11,13,
  17

**understood**
  5:22 6:23
  18:8
  37:14,18
  82:2
  89:24
  107:14

**updates**
  104:18

**URLS**
  57:6,8

———————

  **V**

**valuable**
  48:6

**valuation**
  22:23
  30:16
  62:22
  71:24
  72:25
  73:14
  104:25
  109:3
  111:15

**valuations**
  73:21

**valued**
  30:7

**values**
  73:13

**valuing**
  61:13

**varies**
  18:6

**varying**
  18:4

**vendor**
  102:21

**Venture**
  14:3

**verbal**
  5:14

**verified**
  21:3

**verify**
  17:14

**version**
  77:23
  78:2
  83:10

**versions**
  60:2
  78:9,11

**versus**
  30:18
  75:9

**viable**
  67:13
  69:23

**video**
  36:21

**videoconference**
  35:10,18,
  19,23
  44:6



**videoconfer**
**encing**
  34:15
  37:11

**view**
  47:16
  68:8 76:5
  104:22
  105:2

**virtually**
  4:18

**voluntarily**
  102:5

————————

**W**

————————

**W-2**
  8:4,18

**walk**
  13:22
  71:14

**walking**
  37:12

**wanted**
  45:2
  52:9,12
  66:10,12
  90:12
  102:3,11
  104:23

**wanting**
  52:15

**ways**
  27:8 30:5
  65:3,5
  86:2

**web**
  57:8

**Wednesday**
  52:18

**weeds**
  102:10

**week**
  41:11
  76:22
  95:9
  97:21

**whatnot**
  27:21
  47:20
  74:24
  89:22

**win**
  66:18
  67:7 69:7

**winner**
  97:4,16

**winning**
  75:15
  89:14
  103:9
  105:7,17,
  25 107:15
  111:13

**wire**
  56:19
  57:2
  60:8,13,
  24

**wired**
  56:25
  57:3

**wires**
  56:22
  60:15

**withdrawing**
  91:3

**withheld**
  42:20
  43:4,12
  44:9

**won**
  76:9

**word**
  110:20

**words**
  102:3

**work**
  8:10,14,
  18 10:2
  26:10
  31:21
  39:19
  43:19
  44:2 52:6
  58:6,11
  69:24
  72:6
  77:21
  82:15
  85:20,23,
  24 102:15

**worked**
  10:5
  24:17
  43:9
  44:21,22
  58:8
  64:19
  78:18,23
  93:7,13,
  17,24,25
  94:3

**working**
  10:10
  38:17
  44:15
  48:20
  68:17
  93:11
  110:16,17

**works**
  50:17

**worth**
  97:10

**103:19,21**
  104:10
  107:6,7

**write**
  28:13
  42:5
  93:18
  101:15

**writing**
  59:20
  104:9

**written**
  105:17
  106:9

**wrong**
  47:6 53:8
  69:9
  73:13
  91:9
  113:6

**wrote**
  20:10,13
  56:4,5
  101:16
  104:14
  106:3
  113:3

**Wu**
  91:16

————————

**Y**

————————

**year**
  21:18,20,
  24 22:17
  23:7
  75:24
  78:3

**years**
  8:9

**YEUN**
  4:2

**Yuen**
  4:8,21
  20:3
  24:11
  45:22,24
  64:6
  77:15
  85:11
  87:9,15
  88:24
  94:18
  114:9

————————

**Z**

————————

**Zoom**
  37:11

