UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GO GLOBAL RETAIL LLC,

Plaintiff,

v.

DREAM ON ME INDUSTRIES, INC., and DREAM ON ME, INC.,

Defendants.

Case No. 1:23-cv-07987-AS

**CIVIL ACTION**

**ORAL ARGUMENT REQUESTED**

**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS DREAM ON ME INDUSTRIES, INC., AND DREAM ON ME, INC.**

GREENBAUM, ROWE, SMITH & DAVIS LLP
260 Madison Avenue
20th Floor
New York, New York 10016
(973) 535-1600
Attorneys for Defendants, Dream On Me Industries, Inc. and Dream On Me, Inc.

Of Counsel and on the Brief:
Thomas K. Murphy III, Esq.
Darren C. Barreiro, Esq. (admitted pro hac vice)
Judah Skoff, Esq. (admitted pro hac vice)

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

LEGAL ARGUMENT ..... 1

POINT I ..... 1

GO GLOBAL HAS FAILED TO ESTABLISH THAT DOM'S ALLEGED BREACH OF THE NDA DIRECTLY OR PROXIMATELY CAUSED GO GLOBAL DAMAGES ..... 1

A. DOM DID NOT PREVENT GO GLOBAL FROM BIDDING ..... 1

B. GO GLOBAL HAS NOT ESTABLISHED RELIANCE OR ANY VALUE PROVIDED TO DOM FROM THE GO GLOBAL MODEL ..... 4

POINT II ..... 6

GO GLOBAL DID NOT PROVIDE THE TECHNOLOGY PLAN OR OTHER "TRADE SECRETS" ..... 6

POINT III ..... 8

GO GLOBAL'S COMPARISON OF ITS MODEL TO THE BBBY MODEL IS MISLEADING ..... 8

POINT IV ..... 9

GO GLOBAL'S EXPERT OPINIONS REGARDING LOST PROFITS ARE INADMISSIBLE NET OPINIONS ..... 9

CONCLUSION ..... 10

# TABLE OF AUTHORITIES

**Cases**

*Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F.Supp.2d 334 (S.D.N.Y. 2005) ..... 9

*Daubert v. Dow Pharmaceuticals*, 509 U.S. 579 (1993) ..... 10

*LinkCo v. Fujitsu Ltd.*, 230 F.Supp.2d 492 (S.D.N.Y.2002) ..... 8

*Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, No. 1:15-CV-4428 (ALC), 2018 WL 4278286 (S.D.N.Y. Mar. 26, 2018) ..... 10

*In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143 (Bankr. S.D.N.Y. 2019) ..... 3

**Rules**

*Federal Rule of Evidence 702* ..... 3

## INTRODUCTION

Plaintiff, Go Global Retail, LLC ("Go Global") opposes the summary judgment motion of defendants Dream On Me Industries, Inc. and Dream On Me, Inc. (collectively "DOM") on the basis that DOM breached the terms of a non-disclosure agreement ("NDA") and that as a result Go Global sustained damages as a result of DOM's misappropriation of "trade secret" information in connection with DOM's purchase of the intellectual property of buybuy Baby ("BBBY") at a bankruptcy auctions (the "IP Auction").

Despite Go Global's assertions in its opposition, it cannot establish causation, reliance or damages based on the undisputed facts in this case. Therefore, DOM's motion for summary judgment should be granted, and the Complaint should be dismissed with prejudice.

## LEGAL ARGUMENT

### POINT I

### GO GLOBAL HAS FAILED TO ESTABLISH THAT DOM'S ALLEGED BREACH OF THE NDA DIRECTLY OR PROXIMATELY CAUSED GO GLOBAL DAMAGES

Go Global alleges that DOM breached the terms of the NDA by bidding at the IP Auction and sharing it allegedly proprietary information with DOM's advisors and/or investment partners and that these actions caused damage to Go Global. However, the undisputed facts establish that Go Global sustained no damages as a direct or proximate cause of any action taken by DOM.

#### A. DOM DID NOT PREVENT GO GLOBAL FROM BIDDING

Go Global argues that DOM somehow kept Go Global from participating in the IP Auction or even subsequently bidding on BBBY as a going concern. *See* ECF 68, Plaintiff's Opposition

at 6; Ex. AM, Amended Complaint at ¶108.[1] However, this claim has no merit as DOM's participation in the IP auction had no bearing on whether Go Global participated in the auction since Go Global never raised the required funds and was unwilling to unable to invest its own capital. *See* Statement of Facts Material Facts Not In Dispute at ¶¶31-39 Kathleen Lauster admitted that Go Global was "close" but could not raise sufficient funds to make a bid. *See* ECF 66-11, Go Global, Ex. 9, Lauster Dep. Trans. at 64:12-22. Christian Feuer similarly acknowledged they "had funds in sight" but they did not have the funds "signed and agreed" to acquire and run the business. *See* Ex. AS, Feuer Dep Trans. at 90:15-25. This is not a case where Go Global submitted a qualifying bid that was then deemed too low after DOM's participation in the IP Auction. Rather, Go Global has failed to submit any evidence it could have made a qualifying bid and in fact Go Global never intended on participating in the IP Auction regardless of whether DOM bid or not. *See* Ex. H, Streader Dep. Trans. at 28:16-22; 35:9:11. Indeed, Go Global's bare assertion that it had the investors and capital to submit a bid is wholly contracted by the e-mail communications and testimony in this case.

For instance, Mr. Streader claimed that Axar gave a firm commitment of funds. *See* Ex. H, Streader Dep. Trans. at 38:17-21. However, Kathleen Lauster stated that Axar was "dancing around" and "looked promising, but nobody knew for sure." ECF 66-11, Go Global, Ex. 9, Lauster Dep. Trans. at 65:14-66:7. Similarly, Yuen Chau stated they had "strong" commitments rather than firm commitments. *See* Ex. AT, Chau Dep. Trans. at 17:25-19:6. George Mrkonic committed to [redacted] and Cart.com committed to [redacted], but the Cart.com commitment had significant contingencies regarding future business. *See* Ex. AU, Go Global E-Mails; Ex. AV,

[1] Exhibits A through AQ are attached to the Declaration of Counsel filed with DOM's motion for summary judgment on December 20, 2024. *See ECF 61*. Exhibits AR through AZ are filed with the Declaration of Counsel filed with this Reply Brief on January 16, 2025.

Cart.com Letter. Regardless, the documentary evidence does not support that Go Global had secured commitments or term sheets from investors to contribute sufficient funds to support a qualifying bid. *See* Ex. AS, Feuer at 111:18-112:6.

Additionally, it is undisputed that the investment firm Ziff Davis, Inc. ("Ziff") bid $15 million for the BBBY intellectual property during the IP Auction and that DOM subsequently submitted the winning bid $15.5 million. *See* Ex. H, Streader Dep. Trans. at 28:16-22. Therefore, Go Global's argument that DOM artificially inflated the value of the intellectual property is not supported by the evidence as at most DOM increased the value by $500,000 which is immaterial on a bid for a company that Go Global claims would make billion of dollars. *See* Exhibit N, Go Global's 95-store model.

It also cannot be credibly disputed that Ziff would have won the IP auction with a $15 million bid if DOM had not bid $15.5 million and that Go Global would be in literally the exact same position that it is today if DOM had not won the IP auction. As a result, Go Global has not established that any damages that are directly traceable to any breach of the NDA by DOM. *See In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143, 154 (Bankr. S.D.N.Y. 2019) (finding that the suggestion that the Debtors were damaged defies common sense even under the assumption that the defendant breached the NDA).

Furthermore, Go Global asserts that without DOM's intervention Go Global would have worked together with Ziff to operate BBBY as a going concern. This is undue speculation that is not supported by their communications. Indeed, the email communications produced in discovery show that Ziff and Go Global did not discuss a joint bid until *after* Ziff lost the IP auction to DOM, and, in fact, no communications between Go Global and Ziff that predate the IP Auction were produced in discovery. Ex. AW, Go Global E-Mails re. Ziff. Indeed, Go Global did not even

send Ziff an NDA until July 5, 2023. Ex. AX, Go Global E-Mails re. NDA. Moreover, the potential partnership appeared to fall apart, much like the potential partnership with DOM, because Ziff did not want Go Global to "lead" and Go Global did not want Ziff as "lead." Ex. X, Emails between Axar and Go Global. Additionally, Ziff did not want to invest in brick and mortar retail which Ziff viewed as a "fundamental issue." Ex. AY, Go Global and Ziff E-Mails.

### B. GO GLOBAL HAS NOT ESTABLISHED RELIANCE OR ANY VALUE PROVIDED TO DOM FROM THE GO GLOBAL MODEL

Go Global also attempts to argue two conflicting points, on one hand that DOM had some advantage because it knew how Go Global would bid, and, on the other hand, that DOM bid irrationally and without preparation. The assertion that DOM knew how Go Global would bid in the IP Auction is patently false in the context of an IP Auction, and in fact, Go Global admits that the valuation it provided to DOM was wildly inaccurate and outdated by the time of the IP Auction, especially in light of the Overstock purchase of the intellectual property of Bed Bath & Beyond that occurred in the interim. *See* Ex. AS, Feuer Dep Tran. at 77:9-14; 84:6-19; 85:5-7. Ex. F, Gargiulo Dep. Trans. at 49:2-50:14. Further, the only model provided to DOM was a 95 store model and not a plan to purchase to intellectual property making it inapplicable. *See* Exhibit N, Go Global 95 store model

Regardless, Go Global argues that DOM's disclosure of the 95-store model damaged Go Global. However, Go Global has not established that the 95-store model had any value to DOM or anyone else in the bidding process. On June 14, 2023, DOM's CEO, Mark Srour, shared Go Global's 95-store model with Michael Tennyson, Gary Mason, Joseph "Yussy" Friedland, Scott Englander, and Jacob Sod. Mr. Tennyson did not invest with DOM because he did not have funds at the time. *See* Ex. D, Srour Dep. Trans. at 55:23-25. Mr. Mason works with Mr. Tennyson and DOM did not have any conversations with Mr. Mason about investing in BBBY. *Id.* at 56:22-

57:9. Mr. Friedland invested $8 million because of his relationship with Mark Srour and his trust in Mr. Srour's business expertise. *Id.* at 66:15-25. Mr. Englander invested $2 million, and Mr. Sod invested $20 million. *Id.* at 206:2-9. These investments bear no resemblance to the "bidding strategy" set forth in Go Global's 95 store model. The fact that the Go Global Model was irrelevant to the actions taken by DOM and its advisors/investors during the IP auction process is not surprising since it is undisputed that the information provided by Go Global was at best stale and inaccurate by the time the IP Auction was conducted. *See* Ex. AS, Feuer Dep. Trans. at 6:17-20; 77:9-14; 82:21-83:2; 84:6-19; 85:5-13. Ex. F, Gargiulo Dep. Trans. at 49:2-50:14. In fact, Go Global even acknowledges this point in its opposition by admitting that its model was useless to its own expert who was "forced to develop a new model." *See* ECF 68, Plaintiff's Opposition at 24.

On the other hand, Go Global's assertions that DOM failed to conduct sufficient due diligence, bid rationally and was otherwise unprepared and unqualified to bid on and run BBBY are simply irrelevant even assuming they are true for purposes of this motion. The bottom line is that DOM's preparation and qualifications do not provide a basis for any claims by Go Global, and, in fact, they have nothing to do with GO Global. The facts establish that DOM bid on BBBY based on a gut instinct of the company's value. *See* Ex. D, Srour Dep. Trans. at 202:11-21.

As a result, Go Global's breach of contract claim fails as a matter of law because there is no causation or damages resulting from the alleged breach, both of which are essential elements of a cause of action for breach of contract. Additionally, since DOM received nothing of value from Go Global, its unjust enrichment claim likewise fails as a matter of law.

## POINT II

## GO GLOBAL DID NOT PROVIDE THE TECHNOLOGY PLAN OR OTHER "TRADE SECRETS"

Go Global asserts that it provided its technology plan to DOM. DOM bases this claim on 1) Go Global's June 12, 2023 email communications with Amit Malhotra; 2) a June 13, 2023 phone conference between Amit Malhotra and Go Global's Thoryn Stephens; and 3) a PowerPoint created by DOM.

However, by Go Global's own admission, Go Global did not reveal its allegedly proprietary technology plan to DOM in those June 12 and June 13 communications. Those were the only communications Go Global had with DOM regarding technology plans. Ex. AR, Malhotra Dep. Trans. at 141:19-24. On June 13, 2023, prior to Thoryn Stephens and Amit Malhotra's call regarding the technology plan, Jeffrey Streader wrote to Thoryn Stephens:

> Nice work on the answers Thoryn
> In your 1x1 call today
> Remember - they do not have the secret sauce and we will not give it to them.
> This is a high level overview of our blueprint - we have done this before - the cut and stand up - the extraction -
> We are not giving the plans away
> Do not have their commitment yet - We do not want to embolden them to move forward with out us. Slim chance.
> Keep it high level but informative.

Ex. AP, Go Global E-mails. Jeffrey Streader testified at his deposition that the "secret sauce" discussed in this email is the technology plan. Ex. H, Streader Dep. Trans. at 53:19-55:18. Mr. Streader further explained that he had multiple conversations with Mr. Stephens emphasizing that he should not give away the technology plan to DOM. *Id.* at 55:2-18. Therefore, in those June 12 and June 13 communications, according to Go Global, Go Global merely discussed a "high level overview" and were "not giving the plans away." Ex. AP, Go Global E-mails. These statements

by Jeffrey Streader directly contradict Go Global's assertion that "DOM Reviewed Go Global's Technology Plan." *See* ECF 68, Plaintiff's Opposition at 16.

Mr. Malhotra's recollection is consistent with Mr. Streader's instructions. Mr. Malhotra categorized the conversation with Mr. Stephens as a "very high level general conversation of us getting to know each other." Ex. AR, Malhotra Dep. Trans. at 71:14-19. Mr. Malhotra elaborated that Mr. Stephens did not share a "clear picture" with them. *Id.* at 69:5-14. For instance, DOM and Go Global did discuss the transition services agreement ("TSA") created by BBBY that was in the Lazard data room. *Id.* at 68:4-16. However, Mr. Malhotra and Mr. Stephens did not discuss a TSA or stack migration agreement created by Go Global. *Id.* at 68:4-16; 72:16-73.

Furthermore, Mr. Malhotra did not find the conversation particularly helpful or enlightening. He stated that he moved on from the conversation because "that one conversation was like there's nothing here, like there's nothing here, even from my tech perspective. [Go Global] were just doing whatever the buybuy BABY team was telling them and I had lost faith in the buybuy BABY's team to execute." *Id.* at 131:10-15. In addition, the discussion was in the context of the going concern bid which was not relevant for the IP bid. *Id.* at 52:4-14. Mr. Malhotra stated that from what he "could gather" Go Global was planning to follow BBBY's TSA of using Oracle and a Google Cloud Platform. *Id.* at 52:4-53:10. However, DOM did not use any of those products in its technology plan. *Id.* at 52:4-53:10. Moreover, DOM did not follow BBBY's technology advice and did not hire BBBY's technology team including the CTO that Mr. Stephen's praised in his conversation with Mr. Malhotra. *Id.* at 131:8-20.

Lastly, Go Global cannot rely on DOM's Technology Roadmap to claim Go Global divulged the technology plan when Go Global consistently represented that they did not reveal their technology plan to DOM. Regardless, the Roadmap stated that DOM "Review[ed]

goglobals' tech and product plan and understand how they think they can pull this off by reviewing their tech stack, partners and risk on DOM if this approach is followed." ECF 66-30 at DOM0018452. Mr. Malhotra wrote DOM's technology roadmap and clarified his intention in writing that sentence. Ex. AR, Malhotra Dep. Trans. at 145:18- 147:24. He stated that he did not review Go Global's technology plan but rather had a "sense of their approach" which was very similar to BBBY's recommended technology plans. *Id.* at 145:18- 148:22. A "high level" "sense of an approach" clearly does not constitute trade secret information. *LinkCo v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 500 (S.D.N.Y.2002) ("Marketing concepts and new product ideas are not considered trade secrets. Similarly, information consisting simply of business possibilities or goals is not a trade secret."). Moreover, DOM understood that the "approach" mirrored BBBY's technology plans and was available to all bidders in the Lazard Data Room. Ex. AR, Malhotra Dep. Trans. at 52:4-53:10. Therefore, the facts are clear that Go Global did not provide DOM with its technology plan and that it never intended to do so.

## POINT III

### GO GLOBAL'S COMPARISON OF ITS MODEL TO THE BBBY MODEL IS MISLEADING

In its Section II, B, i. of its opposition Go Global attempts to distinguish its model from the model available to all bidders, but it does so by comparing its model to an old and outdated version of the model than the model available in the Lazard Data Room in June 2023 (the "BBBY Model"). Notably, Go Global references a column in its 95 store model referred to as BBBY's "original data room projections" which were not the contemporaneous projections contained in the BBBY model. *See* Exhibit AK, BBBY Model. This argument is frankly disingenuous and should be disregarded.

Go Global's argument is also misleading because it cherry picks projections for specific months that happen to be different rather than comparing the projections year over year which are what actually what matter and which are extremely similar. A comparison reveals the BBBY model is shockingly similar to the Go Global model:



*See* Exhibit N, Go Global's 95-store model (on the left above). and Exhibit AK, the BBBY Model (also for 95 stores – on the right above).

Therefore, Go Global's assertion that their model is so different is just not true. In fact, the total net sales of both their model and the BBBY model that DOM had are virtually identical in years 2-4 and only slightly different in year 5.

**POINT IV**

**GO GLOBAL'S EXPERT OPINIONS REGARDING LOST PROFITS ARE INADMISSIBLE NET OPINIONS**

Go Global argues that DOM's motion to preclude Alan Schachter's opinions regarding lost profits should be denied because it is premature. However, Your Honor's rules require such a motion to have been made by the dispositive motion deadline. Additionally, the case law is clear that excluding expert opinions in conjunction with summary judgment motion is wholly appropriate. *See Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F.Supp.2d 334, 351 (S.D.N.Y. 2005)

("[I]t is proper for district courts so screen out inadmissible expert testimony on summary judgment… even if the exclusion of expert testimony would be outcome-determinative."); *see also Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, No. 1:15-CV-4428 (ALC), 2018 WL 4278286, at *31 (S.D.N.Y. Mar. 26, 2018).

Here, Mr. Schachter's opinion regarding lost profits ignores the Go Global's model which is allegedly the important trade secret at issue, BBBY's actual performance and otherwise lacks a factual basis rending them inadmissible net opinions under *Federal Rule of Evidence* 702; *Daubert v. Dow Pharmaceuticals*, 509 U.S. 579 (1993). Notably, Mr. Schachter does admit that the fact that BBBY has [redacted] since DOM purchased the IP precludes Go Global's claim for unjust enrichment, so Go Global's own expert admits that claim must be dismissed. *See* Ex. AJ, Schacter Report at 18.

Go Global also argues that the Mr. Schachter was "forced to develop a new model" since "direct application of Go Global's Financial Model was not possible." *See* ECF 68, Plaintiff's Opposition at 6. DOM agrees with this point as it proves how irrelevant and worthless the Go Global 95 store model was to DOM at both the time of the IP Auction and in running the business going forward.

In the end, the Schacter Model for lost profits is supported by baseless speculation rather than actual facts and data. Indeed, Schachter's damage analysis is completely independent of any alleged trade secret and the Go Global Model. Thus, it does not establish a factual basis for lost profits, and his opinions related to lost profits must be excluded.

**<u>CONCLUSION</u>**

Based on the foregoing, Defendants, Dream On Me Industries, Inc. and Dream On Me, Inc., respectfully request that this Court grant its motion for summary judgment and enter an Order dismissing plaintiff's Complaint in its entirety with prejudice.

Respectfully submitted,

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
Attorneys for Defendants,
Dream On Me Industries, Inc. and Dream On Me, Inc.

By: *s/ Thomas K. Murphy III*
Thomas K. Murphy III, Esq.

January 16, 2025