# EXHIBIT AZ



**GO GLOBAL RETAIL LLC,**

**PLAINTIFF**

**v.**

**DREAM ON ME INDUSTRIES, INC. AND DREAM ON ME, INC.,**

**DEFENDANTS**

**EXPERT REBUTTAL REPORT OF**

**ADAM J. HANOVER, CPA, JD, CIRA, CFF**
**MANAGING DIRECTOR, COHNREZNICK LLP**

**December 9, 2024**

## TABLE OF CONTENTS

I.   Qualifications ........................................................................................................... 1

II.  Nature of Engagement ............................................................................................ 1

III. Summary of Conclusion .......................................................................................... 1

IV. Information Considered ............................................................................................ 2

V.  Background ............................................................................................................... 2

VI. Discussion .............................................................................................................. 19

VII. Conclusion ............................................................................................................ 35

## EXHIBITS

**Exhibit A:** Curriculum Vitae of Adam J. Hanover, CPA, JD, CIRA, CFF

**Exhibit B:** Listing of Documents Relied Upon

## I.   QUALIFICATIONS

I, Adam J. Hanover, am a managing director at CohnReznick LLP ("**CR**"), an accounting, tax and financial consulting firm that maintains offices at 1301 Avenue of the Americas, New York, New York 10019, with other offices at various locations throughout the United States.  I have been employed by CR and its predecessor, J.H. Cohn LLP, for over twenty-six years.  I am a Certified Public Accountant, licensed by the state of New York, and a Certified Insolvency and Restructuring Advisor.  I am also Certified in Financial Forensics by the American Institute of Certified Public Accountants.  My hourly rate for services rendered in this case is $825 per hour, and my compensation is not based upon my opinions.  My curriculum vitae, along with a list of my prior expert testimony, affidavits, and expert reports, and a list of my authored presentations and articles are attached hereto as **Exhibit A**.

I have extensive experience (a) preparing damages analyses, (b) in forensic accounting matters, and (c) working with financially troubled companies, having advised debtors, trustees and creditors in many Chapter 11 matters.

## II.   NATURE OF ENGAGEMENT

Greenbaum, Rowe, Smith & Davis LLP, counsel to Dream On Me Industries, Inc. and Dream On Me, Inc. (together, "**Dream On Me**") retained CR to provide expert rebuttal testimony regarding the expert report of Alan Schachter, dated November 15, 2024 ("**Schachter**" and the "**Schachter Report**").  The Schachter Report concluded that, during the period from July 11, 2023, through July 10, 2028, Dream On Me caused Go Global Retail LLC ("**Go Global**") to incur damages ranging from $1,545,813 to $37,292,525.

## III.   SUMMARY OF CONCLUSION

The Schachter Report is structured on a litany of assumptions that are entirely unsupported and/or unsupportable and, as a result, it is deeply flawed and unreliable. And, with regard to the alleged trade secrets, Schachter does nothing to demonstrate that he incorporated any such secrets into his damage calculation.  Moreover, Schachter's damage calculation bears little, if any, resemblance to Go Global's own projection models. Further, among other things, Schachter fails to explain (a) how his calculated

1

"reasonable" royalty is reasonable at all, (b) what, if any, efforts Go Global undertook to mitigate its damages, or (c) why his calculation of development costs is almost twice the amount calculated by Go Global.

## IV.    <u>INFORMATION CONSIDERED</u>

This report is based upon analyses of the list of documents set forth in **Exhibit B**, which includes all relevant documents that I, and persons working under my supervision, have reviewed or considered.  The accuracy of this report and the findings therein are dependent upon the reliability and completeness of this information.

The nature and scope of this engagement did not require an audit of this information in accordance with Generally Accepted Auditing Standards ("**GAAP**"), or a review or compilation in accordance with Statements on Standards for Accounting and Review Services established by the American Institute of Certified Public Accountants ("**AICPA**"). Moreover, I did not (and was not required to) issue any compilation or examination reports in accordance with the AICPA's Guide for Prospective Financial Statements.

I, or persons working under my supervision, have performed various procedures as considered appropriate to assist me in forming my opinions.  Based on my independent judgment, experience, and expertise, I determined which documents to use and the analyses to perform.  My findings are based solely on these procedures.

The opinions and conclusions presented in this report are based on the information reviewed to date.  Should additional relevant information or documents be produced at a later date, my opinions and conclusions could be influenced by this information.

## V.    <u>BACKGROUND</u>

### A.    <u>Baby</u>

Buy Buy Baby (stylized as "buybuy BABY" and referred to herein as "**Baby**") is a North American specialty baby retailer selling a wide assortment of baby essentials and nursery furnishings.[1]

---

[1] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶19.

Baby was founded in 1996 by Richard and Jeffrey Feinstein, the sons of Bed Bath & Beyond Inc ("**Bed Bath & Beyond**") co-founder, Leonard Feinstein.[2]  And, in 2007, Baby was acquired by Bed Bath & Beyond for approximately $67 million (net of cash acquired) and repayment of debt of approximately $19 million.[3]  At the time of acquisition, Baby operated eight stores in New York, New Jersey, Maryland, and Virginia.[4]  As of April 2023, Bed Bath & Beyond had grown Baby to approximately 120 stores across the United States and an online e-commerce business.[5]

**B.    Bed Bath & Beyond**

Bed Bath & Beyond has historically operated as an omni-channel retailer selling a wide assortment of merchandise in the home, baby, beauty and wellness markets both at physical retail stores and online.[6]  And, prior to the events described below, Bed Bath & Beyond operated under the names Bed Bath & Beyond, Baby, Harmon, among other brands and/or subsidiaries.[7]

**1.    Deteriorating Financial Condition**

At its peak, Bed Bath & Beyond was the largest home furnishing retailer in the United States, operating over 970 stores across the country, with additional locations in Canda, Mexico, and Puerto Rico.[8]  However, in the years preceding 2023, Bed Bath & Beyond encountered significant financial difficulty, including annual operating and net losses.  The following table summarizes the results of Bed Bath & Beyond's consolidated operations for the twelve-month periods ended February 2020, 2021, and 2022.[9]

---

[2] Bed Bath & Beyond Inc., SEC Form 8-K filed Mar. 28, 2007.

[3] Bed Bath & Beyond Inc., SEC Form 8-K filed Mar. 28, 2007.

[4] Bed Bath & Beyond Inc., SEC Form 8-K filed Mar. 28, 2007.

[5] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶40.

[6] Bed Bath & Beyond Inc., SEC Form 10-K filed Apr. 21, 2022, at 4.

[7] Bed Bath & Beyond Inc., SEC Form 10-K filed Apr. 21, 2022, at 4.

[8] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶4.

[9] Bed Bath & Beyond Inc., SEC Form 10-K filed Apr. 21, 2022, at 43.

| ($ in millions) | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | Feb. 29, 2020 | | Feb. 27, 2021 | | Feb. 26, 2022 | |
| Net Sales | $ | 11,158.6 | $ | 9,233.0 | $ | 7,867.8 |
| Gross Profit | $ | 3,541.7 | $ | 3,118.1 | $ | 2,483.5 |
| Operating Loss | $ | (700.1) | $ | (336.9) | $ | (407.6) |
| Net Loss | $ | (613.8) | $ | (150.8) | $ | (559.6) |

Bed Bath & Beyond reported a net loss of approximately $560 million for the twelve months ended February 26, 2022, and the subsequent months were "undoubtedly … the most difficult and turbulent in Bed Bath & Beyond's storied history."[10]  During that period, in-store sales continued to decline, vendor relationships worsened and led to a lack of inventory, and the company defaulted under its credit agreement.[11]  Concurrently, Bed Bath & Beyond experienced changes in executive leadership and was the target of an activist investment campaign led by RC Ventures LLC and its founder, Ryan Cohen.[12] The following figure depicts the continued decline in Bed Bath & Beyond's share price preceding the bankruptcy filing.[13]

---

[10] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶5.

[11] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶¶5-7.

[12] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶30.

[13] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶57.



As discussed in further detail below, company management and multiple outside advisors tried to implement a turnaround plan and restructure Bed Bath & Beyond out of court.[14]  However, these attempts were unsuccessful, and, ultimately, Bed Bath & Beyond and its subsidiaries filed for Chapter 11 bankruptcy on April 23, 2023.  Collectively, I refer to Bed Bath & Beyond, Baby, and Harmon as the "**Debtors**".

### 2.    Restructuring Attempts

Prior to the bankruptcy filing, Bed Bath & Beyond management engaged third party advisors to explore various strategic alternatives, including the sale of Bed Bath & Beyond and its subsidiaries as a going concern.  And, beginning in December 2022, financial advisory firm, Lazard, Inc ("**Lazard**"), began soliciting interest in a going concern sale transaction.[15]  Lazard reached out to an initial group of approximately twenty potential financial and strategic investors and, by mid-January 2023, nine investors had executed

---

[14] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶¶6-7.

[15] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶73.

nondisclosure agreements ("**NDAs**").[16]  The investors contacted by Lazard "could have potentially been acquirors of *some or all of the Company's businesses*, as well as providers of post-petition financing to fund a going-concern reorganization."[17]

Lazard continued to engage with investors throughout January, expanding the universe of potential investors and continuing diligence with those investors already identified.  During this process, Lazard had discussions with approximately 60 potential investors, 30 of which executed NDAs, regarding, among other things, acquiring some or all of Bed Bath & Beyond's assets or businesses.[18]  However, by the end of January 2023, "it became apparent that the process was unlikely to yield a plan … that would facilitate a going-concern reorganization."[19]

Bed Bath & Beyond continued to explore sale options following the bankruptcy filing, and retained AlixPartners, LLP ("**Alix Partners**") as its financial advisor and Lazard as its investment banker.

### C.    Sale of Baby as a Standalone Business

#### 1.    Lazard Data Room and Key Documents

In connection with marketing the Bed Bath & Beyond assets, Lazard established a data room (the "**Lazard Data Room**") that was populated with a vast amount of Baby and other Debtor documents, including those containing historical and projected financial data, corporate strategy, and other information.

---

[16] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶73. Emphasis added.

[17] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶73. Emphasis added.

[18] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶74.

[19] Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (Apr. 23, 2023), at ¶74.

Among the documents located in the Lazard Data Room was a May 2023 presentation setting forth the "buybuy BABY Growth Strategy" (the "**Baby Management Growth Strategy**").[20]  The Baby Management Growth Strategy contained projections for Baby as a standalone business consisting of e-commerce operations and 115 brick and mortar stores.

The Lazard Data Room also contained a model prepared by Alix Partners that projected the results from operating e-commerce and 95 of the then existing Baby stores (the "**Debtors' 95 Store Model**").[21]  The following figure is a summary of the projected operating results reflected in the Debtors' 95 Store Model.



The Debtors' 95 Store Model projects ███████████████████████████ ████ at the end of year one, and includes "IT Transformation" costs of approximately ████████████████ during that period.[22]  Historically, the IT systems of Baby were intertwined with those of Bed Bath & Beyond and, to the extent that Baby was sold separately from Bed Bath & Beyond, a standalone Baby business would require significant upfront investment in new IT systems.

---

[20] *See* Buy Buy Baby Presentation dated May 2023 [DOM0001319].

[21] *See* GG-0037062, at tabs "Model" and "WC & FCF".  The Debtors' 95 Store Model was created and last modified by Isabel Arana de Uriarte, an employee of AlixPartners.

[22] *See* GG-0037062, at tab "WC & FCF".

Notwithstanding the efforts to sell Baby as a going concern, the Debtor continued to close various Baby stores throughout the United States. Accordingly, Baby's plans and projections had to change as stores were shed.

### 2.    Sale Timeline

On April 25, 2023, the Bankruptcy Court entered an order approving the bidding procedures in connection with the sale of the Debtors' assets.[23]  The auction of Baby assets was scheduled for June 28, 2023, with a final hearing approving the sale scheduled for July 11, 2023.[24]  At that time, the Debtors anticipated that the Baby auction would be a going concern sale.

### D.    <u>Go Global</u>

Go Global is a self-described "brand investment platform", whose strategy is based on implementing its "Technology, Customer Engagement and Operational Expertise."[25] Go Global does not deploy any of its own funds. Instead, Go Global partners with other parties with capital to invest in distressed retail brands, which Go Global then operates. Go Global is compensated for managing investments on behalf of the parties that provide funding.[26]  Go Global, like many traditional hedge funds, follows a "two and twenty" fee structure. In this fee structure, managers (*e.g.*, Go Global) charge investors a 2% annual management fee and a 20% performance fee on profits.[27]

### 1.    Go Global Becomes Interested in Baby

In or around March 2023, Go Global became interested in acquiring and operating Baby as a going concern and began seeking investors to fund the acquisition. Given its

---

[23] *See* Order Approving the Auction and Bidding Procedures, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 92 (Apr. 25, 2023); Notice of Cancellation of BuyBuy Baby Going-Concern Auction, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 1208 (Jul. 6, 2023).

[24] *See* Order Approving the Auction and Bidding Procedures, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 92 (Apr. 25, 2023); Notice of Cancellation of BuyBuy Baby Going-Concern Auction, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 1208 (Jul. 6, 2023).

[25] *See* https://www.goglobalretail.com/strategy, last accessed Dec. 5, 2024.

[26] Deposition Transcript of Jeffrey Streader, at 22:10-23:7.

[27] Deposition Transcript of Jeffrey Streader, at 23:2-15.

business model, Go Global needed to identify outside investors to fund the acquisition of Baby. To that end, on May 12, 2023, Go Global retained Ankura Capital Advisors LLC ("**Ankura**") to assist in securing funding.[28]

Ankura established a data room (the "**Ankura Data Room**") that was populated with certain documents, most of which were also contained in the Lazard Data Room, and started engaging with potential investors. As of May 19, 2023, Ankura had reached out to 347 potential investors. Some of those investors showed interest in working with Go Global, and seven signed NDAs and were granted access to the Ankura Data Room. And, as of May 31, 2023, Ankura was in discussions with over a dozen potential investors (both debt and equity) to partner with Go Global.[29] Ultimately Go Global signed NDAs with approximately two dozen potential investors (at least).

### 2.    Go Global Model

The Ankura Data Room contained a version of the Debtors' 95 Store Model which, as noted above, was created and last modified by Alix Partners, that Ankura and Go Global modified ("**Go Global 95 Store Model**").[30] The Go Global 95 Store Model reflected Go Global's projected operating results from 95 Baby stores and e-commerce over a six-year period. The following figure is a summary of the projected operating results for the first five years reflected in the Go Global 95 Store Model.



---

[28] Letter Agreement dated May 12, 2023 [GG-0013368].

[29] Email from M. Lapish dated May 31, 2023 [ANK-0049356].

[30] *See* DOM0000075.

The Go Global 95 Store Model contemplated a ███████████████████ ████████████████████████████████ ████████████ ████████████████████████████ The following figure reflects Go Global's sources and uses of funds in connection with its proposed acquisition of Baby.[32]



The Go Global 95 Store Model reflected that equity investors would realize a ████ ████████████████████████[33] Notably, the model also reflected that ████ ████████████████████████████████ however, Go Global represented that it did not intend to directly invest any funds.[34]

### E.    Dream On Me

Dream On Me is a designer, manufacturer, and supplier of baby products.[35]  And, prior to the bankruptcy filing, Dream On Me was one of Baby's largest furniture suppliers.

#### 1.    Discussions Go Global

On June 9, 2023, Lazard introduced Dream On Me to Go Global in connection with Go Global's attempt to secure funding to acquire Baby.[36]  And, on June 10, 2023, Go Global provided Dream On Me with an NDA, which Avish Dahiya executed that same day

---

[31] *See* DOM0000075, at tab "ROI".

[32] *See* DOM0000075, at tab "ROI".

[33] *See* DOM0000075, at tab "ROI".

[34]  Deposition Transcript of Jeffrey Streader at 80:24-81:11.

[35] *See* https://www.dreamonme.com/aboutus/, last accessed Dec. 5, 2024.

[36] Email from C. Tempke dated Jun. 9, 2023 [ANK-0047997.

on behalf of Dream On Me.[37]  Ankura then granted Dream On Me access to the Ankura Data Room.  Prior to being connected with Go Global, Dream On Me had been granted access to the Lazard Data Room and was familiar with the contents of that data room.[38]

On June 12, 2023, and June 15, 2023, Dream On Me personnel and Go Global personnel met in person to discuss jointly investing in Baby.  Following these in-person meetings, Dream On Me and Go Global discussions did not meaningfully develop further. Dream On Me and Go Global did not agree upon an investment strategy, in part, because (a) Go Global was only interested in operating Baby, but not investing in Baby,  (b) Dream On Me was only interested in potential partners that would invest their own capital, and (c)  Dream On Me was only interested in investing in Baby if it was a general partner involved in the day-to-day operation.  Further, Go Global was only interested in purchasing a going concern.

Prior to these in-person meetings, Dream On Me reviewed some of the contents of the Ankura Data Room, and downloaded certain documents, including the Go Global 95 Store Model.  As noted above, the IT systems of Baby were intertwined with those of Bed Bath & Beyond.  Independent of the Go Global 95 Store Model, Go Global prepared a technology plan, which is referred to as its "secret sauce."[39]  While Dream On Me had access to the Go Global 95 Store Model, Go Global did not provide Dream On Me with its technology plan.  In an email dated June 13, 2023, discussing Go Global's technology plans for the potential acquisition, Ankura noted, "Remember - [Dream On Me] do[es] not have the secret sauce [the Go Global technology plan] and we will not give it to them … [W]e are not giving the plans away".[40]

### F.    Go Global's Failed Bid to Acquire Baby

Go Global prepared many iterations of projection models for acquiring and operating Baby as a going concern, reflecting various scenarios and some decreasing the number of stores.  The last known Go Global projection model reflected operating the Baby e-

---

[37] Nondisclosure Agreement dated Jun. 10, 2023 [DOM0000031].

[38] *See* Email from B. Shea dated May 6, 2023 [DOM0010362, at DOM0010369].

[39]  Deposition Transcript of Jeffrey Streader at 53:19-55:14 and 82:8-83:14.

[40] Email from J. Streader dated Jun. 13, 2023 [GG-0008911].

commerce business and only 22 brick and mortar stores (the "**Go Global 22 Store Model**").[41] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

On June 16, 2023, the day after Go Global last met with Dream On Me, Go Global made a $22 million "bid" (*i.e.*, an offer) to acquire (a) the leases and inventory of 20 Baby stores, and the (b) the Baby intellectual property.[45] ███████████████████████

███████████████████████████████████████████     Dream On Me was not invited to participate in that bid.  However, Go Global's bid was not a qualifying offer, as Go Global had not firmly established that it secured the necessary funding to complete the transaction.[47]  Indeed, Go Global never submitted a qualifying offer for any of Baby's assets during the entire bankruptcy auction process.

### 1.    Go Global Withdraws Its Interest In Baby

After failing to submit a qualifying bid, Go Global withdrew from the bidding process. On June 26, 2023, Go Global sent an email asserting:

> [W]e have concluded that the brand has suffered material deterioration in the last year and during the going out of business process.  The prospect of <u>brand and business revival</u> is not without significant risk.  Inventory recovery (from market) and normalized vendor relations also have risks.

---

[41] *See* GG-0000625.

[42] GG-0000625, at tab "ROI".

[43]  GG-0000625, at tab "ROI"; Email from J. Streader dated May 26, 2023 [GG-0035979]; Email from J, Streader dated Jun. 27, 2023 [GG-0013673].

[44] GG-0000625, at tab "ROI".

[45] Email from C. Feuer dated Jun. 16, 2023 [ANK-0036486]; Email from J. Streader dated Jun. 20, 2023 [GG-0021594]; Draft Bid for the Assets of BuyBuy Baby dated Jun. 16, 2023 [GG-0030208].

[46] Draft Bid for the Assets of BuyBuy Baby dated Jun. 16, 2023 [GG-0030208].

[47] *See* email from J. Streader dated Jun. 18, 2023 [ANK-0047854].

Notwithstanding that email, Go Global continued to have discussions with investors regarding a potential investment, including with Axar and with Sixth Street Partners ("**Sixth Street**"), a then current lender to Bed Bath & Beyond.  However, in an email dated June 27, 2023, Axar declined to invest with Go Global for the acquisition of Baby, in part, because Go Global was not contributing any funding.  Said Axar, "[t]his is a great bet for Go Global … It's not for [Axar] investors".[49]

As of June 27, 2023, Go Global was aware that it did not have the financing in place to make an offer, and wrote in an email that "[i]f the auction is tomorrow or this week – we are not going to participate."[50]

### G.    Dream On Me's Lack of Due Diligence

Though Dream On Me declined to partner with Go Global, it continued to contemplate an investment in Baby.  However, it had not conducted meaningful due diligence.  In response to an email from Lazard, on June 23, 2023, Avish Dahia, a Dream On Me employee, wrote to the broader Dream On Me team:

> [Lazard is] telling us to do our own work. This also shows our inability to do certain due diligence internally. Every other bidder has done more extensive work.

> We have to develop this ourselves... based on what has been already shared, Milan, can you help? Can we even do this? If we cannot even give them what they need, we look highly unprofessional not knowing what we are doing. Today they challenged our due diligence and understanding of running this business by asking us if we really know what it will take to run the business cash flow positively and if our numbers were matching the ask. They were asking us to be cash positive to run the company better, and raise more equity, and if we knew what were immediate expenses in closing the deal.

> Lack of proper internal teams/professionals to work on this project, we are all shooting in the dark with no internal capabilities to help. While we were

---

[48] Email from J. Streader dated Jun. 26, 2023 [ANK 0035975].  Emphasis in original.

[49] Email from A. Axelrod dated Jun. 27, 2023 [GG-0038097].

[50] Email from J, Streader dated Jun. 27, 2023 [GG-0013673].

trying to do deals, *there should have been a team of ours with Legal, Financial, and Technology Capabilities* working in the background on Due diligence and working with their operating teams.

A lot of Data we see now in the Data room slowly emerged as companies did due diligence and asked questions and more data got added to the Data room.[51]

In short, Dream On Me acknowledged that its *legal, financial, and technology* due diligence was woefully inadequate.  And, as discussed below, the auction where Dream On Me bid on the Baby intellectual property, occurred on June 28, 2023, just three business days following the above email.  In any event, Dream On Me stated that it did not rely upon the Go Global 95 Store Model.[52]

### H.    The Intellectual Property Auction

On June 28, 2023, the Debtors conducted an auction of the Baby intellectual property, independent of any going concern assets (the "**IP Auction**").  Go Global did not attend nor participate in the IP Auction.

During the IP Auction, investment firm Ziff Davis, Inc. ("**Ziff Davis**") bid $15 million for the Baby intellectual property, and Dream On Me subsequently bid $15.5 million.[53]  Dream On Me's $15.5 million bid "won" the IP Auction.

### 1.    Go Global's Failed Post-IP Auction Efforts

The IP Auction did not preclude Go Global from continuing to pursue Baby. Notwithstanding that (a) Go Global did not attend the IP Auction, (b) Dream On Me won that auction, and (c) Go Global's prior statement of withdrawing from the process, Go Global continued to seek funding to acquire the Baby intellectual property and certain store leases.  This post-IP Auction plan sought to have Ziff Davis (the second highest bidder at the IP Auction), Axar, and Sixth Street partner with Go Global to bid on a going

---

[51] Email from A. Dahiya dated Jun. 23, 2023 [DOM0011714].  Emphasis added.

[52] Deposition Transcript of Amit Malholtra at 93:3-13.

[53] Per the bidding procedures, the "minimum overbid" was 2%.  Accordingly, Dream On Me was required to bid at least $300,000 more than Ziff Davis' $15 million bid.  *See* Order Approving the Auction and Bidding Procedures, *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 92 (Apr. 25, 2023).

concern Baby.[54]  However, despite Go Global's continued efforts, it did not submit a bid for any Baby assets.

Ultimately, Go Global's efforts to cobble together investors failed again, and, on July 7, 2023, Go Global wrote, "[o]ur pencils are down."[55]  Dream On Me's bid was approved by the Bankruptcy Court, and it acquired the Baby intellectual property for $15.5 million.

### I.        The Lease Auction

On July 19, 2023, the Debtors conducted an auction for certain Baby store leases (the "**Lease Auction**").  Again, Go Global did not participate in that auction.  At the Lease Auction, Dream On Me successfully bid on the leases for 11 Baby stores.[56]

### J.        Go Global Explains Why It Did Not Acquire Baby

In late July, following the IP Auction and the Lease Auction, Go Global prepared a case study to explain to its investors why it passed on the opportunity to acquire the Baby assets.  Go Global first explained its investment thesis:



Then, Go Global explained why it ultimately passed on the Baby opportunity:



---

[54] *See* Email from M. Lapish dated Jun. 28, 2023 [ANK-0040997]; Email from J. Streader dated Jun. 29, 2023 [ANK-0035720]; Email from J. Streader dated Jul. 3, 2023 [GG-0020497]; Revised Acquisition Strategy & Structure dated Jul. 2023 [GG-0038361].

[55] Email from J. Streader dated Jul. 6, 2023 [GG-0027497].

[56] After operating those stores for several months, in October 2024, Dream On Me announced its plans to close all physical Baby stores by the end of 2024 and continue to operate Baby solely as an online retailer. *See* https://www.retaildive.com/news/buybuy-baby-closing-all-stores-online-only/730280/, last accessed Dec. 5, 2024.

[57] Go Global Case Study (undated), at 1 [GG-0024442, at GG-0024442].



**K.**    **Post-Acquisition Baby Operations**

Based on Schachter's review of Baby's financial performance following the IP Auction, Baby generated a ███████████████ for the period of July 2023 through December 2023 and ████████████████████ for the period of January 2024 through July 2024."[59] Accordingly, during the approximate one-year period following the acquisition, Baby generated ████████████████████████████ while operated by Dream On Me.

**L.**    **Go Global and Dream On Me Dispute**

On July 18, 2023, Falcon, Rappaport and Berkman, counsel to Go Global ("**Go Global Counsel**"), sent a demand letter to Dream On Me seeking $834,250 for Go Global's "out of pocket expenses and unlawful use of GGR's valuable proprietary information".[60]

Subsequently, on December 22, 2023, Go Global filed an amended complaint against Dream On Me for damages arising from Dream On Me's alleged breach of the NDA that

---

[58] Go Global Case Study (undated), at 2 [GG-0024442, at GG-0024443].  Emphasis in original.

[59] Schachter Report, at 18-19.

[60] Demand Letter dated Jul. 18, 2023 [GG-0012966].

it executed with Go Global (the "**Amended Complaint**").  Specifically, Go Global alleges in the Amended Complaint that Dream On Me breached the NDA by using Go Global's "proprietary information" without first seeking approval.[61]  The Amended Complaint alleges causes of action for breach of contract and violation of the Defend Trade Secrets Act (the "**DTSA**").

## M.    The Schachter Report

Go Global Counsel retained Guidepost Solutions LLC ("**Guidepost**") to "calculate economic damages."[62]  And, Schachter, on behalf of Guidepost, submitted the Schachter Report dated November 15, 2024, wherein he opined that Go Global's damages ranged from approximately $1.5 million to $37.3 million for the period July 11, 2023, through July 10, 2028.[63]

With regard to the "trade secrets" that lie at the core of this matter, Schachter assumes that "Go Global's annotated versions of [Baby's] financial data, Go Global's proprietary forecasts, financial models, and strategic operating plans shared with [Dream On Me] under the NDA meets the definition of trade secrets under federal and New York State law (the 'Model')."[64]

Schachter's damage calculation consists of three components: avoided development costs, lost profits, and, what Schachter refers to as "reasonable" royalty.[65]  A summary of Schachter's estimated damages is presented below.

---

[61] *See* Amended Complaint.

[62] Schachter Report, at 3.

[63] Schachter Report, at 10.

[64] Schachter Report, at 8.

[65] Schachter Report, at 11.

| Schachter Estimated Damages ($) | | |
|---|---|---|
| **I.** **Avoided Development Costs** | $ | 1,545,813 |
| **II.** **Lost Profits:** | | |
|    Including E-Commerce | $ | 26,257,965 |
|    Excluding E-Commerce | $ | 4,628,110 |
| **III.** **Reasonable Royalty:** | | |
|    Including E-Commerce | $ | 37,292,525 |
|    Excluding E-Commerce | $ | 11,775,383 |

### 1.    Avoided Development Costs

To calculate avoided development costs, Schachter totaled all costs that Go Global allegedly incurred to develop what Schachter defines as the "Model" ***and*** the costs that Go Global incurred in connection with its attempt to acquire Baby.  These costs include amounts for legal fees, Ankura, and Go Global's own employees.  Schachter calculated the costs for Go Global employees by using a rate per hour "estimated based on the consulting rates of Ankura for individuals in the similar position" and multiplied that rate by the "estimated hours worked on the project."[66]

### 2.    Lost Profits

To calculate lost profits (both including and excluding e-commerce), Schachter created his own independent projection model for Baby (the "**Schachter Model**").[67]  The Schachter Model is premised on Go Global, Dream On Me, and other parties jointly acquiring (a) the Baby intellectual property, and (b) the 11 store leases acquired by Dream On Me in the Lease Auction.  The Schachter Model projects the operating results of the 11 Baby brick and mortar stores and the e-commerce business for a five-year period.  As discussed further below, the Schachter Model, which seemingly calculates the damages arising from the Defendants' use of Go Global's alleged "trade secrets", does not incorporate any known Go Global projection model, including either the Go Global 95 Store Model or the Go Global 22 Store Model.

---

[66] Schachter Report, at Exhibit 2.

[67] As discussed below, the Schachter Model incorporates some inputs provided by Go Global.

### 3.    Reasonable Royalty

Schachter states that the damages in this matter may include "a reasonable royalty for the Defendant's use of the trade secrets" and that this "is typically based on what a willing buyer and a willing seller would have agreed to for the use of the information."[68] To calculate a reasonable royalty, Schachter assumed that Dream On Me would have agreed to pay a royalty to Go Global amounting to 4% of annual net sales as reflected in the Schachter Model.

## VI.    <u>DISCUSSION</u>

The Schachter Report is structured on a litany of assumptions that are entirely unsupported and/or unsupportable and, as a result, is deeply flawed and unreliable. Further, the Schachter Model is based on additional unsupported assumptions. And, with regard to the alleged trade secrets, there is nothing to demonstrate that the Schachter Model relied on and/or incorporated any such secrets. Moreover, the Schachter Model bears little, if any, resemblance to the Go Global 95 Store Model.

The Schachter Report is structured on the following unsupported assumptions (the "**Report Assumptions**"):

1. That Go Global provided trade secrets to Dream On Me;
2. That the alleged trade secrets are separate and distinct from Go Global's "secret sauce";[69]
3. That Go Global embedded those alleged trade secrets in the Go Global 95 Store Model;
4. That Dream On Me used and relied on the alleged trade secrets;
5. That Go Global's business plans would have successfully attracted investors;
6. That the Go Global 95 Store Model was still relevant and meaningful to Dream On Me at the time of the IP Auction;

---

[68] Schachter Report, at 17.

[69] As discussed above, Go Global considered its technology plan to be its "secret sauce". Deposition Transcript of Jeffrey Streader at 53:19-55:14 and 82:8-83:14.

7. That, but for Dream On Me's actions, Go Global and Dream On Me would have submitted a "joint bid" to acquire and operate Baby; and

8. That Go Global would have agreed to a joint bid with Dream On Me for the Baby IP without any guarantee that they, collectively, would have been able to secure the store leases in the subsequent Lease Auction.

Each of the above assumptions are unsupported, and several are simply unsupportable. In the absence of those assumptions, the conclusions contained in the Schachter Report are simply meaningless and irrelevant.

The Schachter Model incorporates the above Report Assumptions and contains additional unsupported and/or unsupportable assumptions (the "**Schachter Model Assumptions**"). The Schachter Model Assumptions include:

1. That Go Global could and would have raised $36 million of equity financing;

2. That the projected e-commerce sales provided to Schachter by Go Global are reasonable and achievable;

3. That Go Global could have operated Baby in a manner that was almost *twice* as profitable as Go Global's own projections; and

4. That Go Global would have attracted investors with a 20% annualized return, notwithstanding that Go Global tried and failed to secure investors with an annualized return in excess of 50%.

Given that "trade secrets" are at the core of this dispute, the Schachter Model ought to have incorporated those alleged secrets, and there is no evidence that Schachter did so. The Schachter Model was not based on any Go Global model prepared during the relevant period, and certainly, not the Go Global 95 Store Model.

Further, among other things, Schachter fails to explain (a) how his calculated "reasonable" royalty is reasonable at all, (b) what, if any, efforts Go Global undertook to mitigate its damages, or (c) why his calculation of development costs is almost twice the amount calculated by Dream On Me.

A.     <u>The Schachter Report Assumptions</u>

     1.     **Schachter Assumes That There Were Trade Secrets**

This case is about Dream On Me's alleged unauthorized use of Go Global trade secrets, which Schachter claims are embedded in the "Model." Schachter claims (without any support) that Dream On Me "us[ed Go Global's] trade secrets".[70] Schachter then opines that (a) those trade secrets (on a pre-tax, undiscounted basis) are worth over $100 million on the open market, and (b) due to Dream On Me's conduct, Go Global suffered a "total loss" of those secrets.[71] But, without any pun intended, what is really secret, is any detailed description of what actually are the alleged trade secrets.

Schachter only states *in one part of one sentence* covering the entirety of his report, that the alleged trade secrets include "Go Global's annotated versions of the [Baby] data, Go Global's proprietary forecasts, financial models, and strategic operating plans."[72] Schachter collectively refers to that information as the "Model," but Schachter provides *no details* about (a) the alleged annotations, nor provides any examples, (b) the alleged financial models, nor what is special or unique about them, and (c) the alleged strategy, or even a sample of any such strategy. Schachter does state (again, without any support) that the alleged trade secrets were "destroyed," but again, he does not describe in his report what precisely was destroyed. In short, Schachter simply assumes that there were trade secrets, which were destroyed. Without any trade secrets, there are no damages.

     2.     **Schachter Assumes That the Alleged Trade Secrets Are Separate and Distinct From Go Global's "Secret Sauce"**

The Go Global business models (and the Schachter Model) project that the majority of future Baby sales would arise from e-commerce. The Debtors' 95 Store Model, the Go Global 95 Store Model, and the Schachter Model all project that e-commerce would account for over 64% of total net sales. Accordingly, functioning IT systems are critical to achieving those sales. As noted above, it was known that Baby's IT systems were intertwined with those of Bed Bath & Beyond. And, to the extent that Baby was sold

---

[70] Schachter Report, at 12.

[71] Schachter Report, at Exhibit 5A.

[72] Schachter Report, at 8.

separately from Bed Bath & Beyond, a standalone Baby business would require significant upfront investment in new IT systems.

Go Global prepared a technology plan, which was referred to as its "secret sauce."[73] But, as noted above, Go Global did not provide Dream On Me with that secret sauce. Further, I am unaware of any evidence that suggests Dream On Me ever received any such technology plan. Accordingly, whatever the alleged trade secrets were, they did not include Go Global's technology plan.

### 3. Schachter Assumes the Go Global 95 Store Model Incorporates the Alleged Trade Secrets

Schachter asserts that Dream On Me "us[ed Go Global's] trade secrets."[74]   As explained above, Go Global prepared multiple iterations of Baby business models.  The **only** Go Global model that Dream On Me received was the Go Global 95 Store Model, which was based, in large part, on the Debtors' 95 Store Model.  Putting aside the relevance of the Go Global 95 Store Model, to the extent that that model contained any trade secrets, those secrets would have to be the ***modifications*** that Go Global made to the Debtors' model (which Dream On Me also had access to).

Accordingly, to discern those modifications, and by definition, any alleged trade secrets, I compared the Go Global 95 Store to the Debtors' 95 Store Model.  The following figure is a comparison of those two models.[75]

---

[73]  Deposition Transcript of Jeffrey Streader at 53:19-55:14 and 82:8-83:14.

[74] Schachter Report, at 12. Also see at 13.

[75] *See* GG-0037062 and DOM0000075.



As shown in the comparison, Go Global's modifications to the Debtors' 95 Store Model were not significant. Again, whatever the alleged trade secrets were is simply not apparent. Further, the comparison hardly explains why anyone would pay anything, let alone over $100 million (on pre-tax, undiscounted basis), to purchase them.[76]

Lastly, Schachter does nothing at all to explain how the alleged trade secrets are different from any of the information contained in the Lazard Data Room. The Lazard Data Room contained thousands of documents, including projections for Baby as a standalone business. Inherently, any alleged Go Global trade secrets would have been excluded from the Lazard Data Room. But, the Schachter Report does nothing to help answer what secret, meaningful information Go Global provided to Dream On Me that was not contained in the Lazard Data Room.

### 4.    Schachter Assumes That Dream On Me Relied on the Go Global Model

The Schachter Report states that Dream On Me "utilized" the "Model", and that Dream On Me "us[ed Go Global's] trade secrets."[77] Just like Schachter Report is silent regarding any detail as to the alleged trade secrets, also absent is ***any*** evidence establishing that Dream On Me used and/or relied on any Go Global model. Rather, the evidence points to the contrary.

---

[76] *See* Schachter Report, at Exhibit 5A.

[77] Schachter Report, at p.12-13.

First, just *three* business days before Dream On Me bid on the Baby intellectual property – and only the Baby intellectual property – a member of the Dream On Me team complained that Dream On Me had not performed *any* meaningful financial due diligence, stating "[e]very other bidder has done more extensive work".[78]

Second, the Schachter Report claims that (a) Dream On Me received valuable trade secrets, and (b) Dream On Me had "little to no expertise in operating a durable baby goods store",[79] which is why Schachter concludes that the Dream On Me operated Baby brick and mortar stores failed.  Seemingly, Schachter is opining that the trade secrets were only valuable in the hands of seasoned retail experts, which did not include Dream On Me.  As a result, Schachter seems to say that, even if Dream On Me had Go Global's alleged trade secrets, Dream On Me did not have the ability to deploy or use those alleged trade secrets.

### 5.    Schachter Assumes That Go Global Could Have Secured Investors to Fund its Business Plan

Bed Bath & Beyond's financial condition was rapidly deteriorating leading up to its bankruptcy filing.  And, prior to the filing, Bed Bath & Beyond retained Lazard to market Bed Bath & Beyond, Baby, and its other subsidiaries.  Despite Lazard's robust marketing efforts, it was unable to identify a buyer for Baby.  Further, after the bankruptcy filing, Lazard, along with Alix Partners, continued its efforts to market Bed Bath & Beyond and Baby, both individually and collectively.  Despite those continued efforts, the Debtors and its advisors were unable to identify a buyer and never even scheduled or held an auction for Baby as a going concern.  For clarity, Dream On Me first purchased only the Baby intellectual property, and then, at a later date, purchased the 11 store leases.

In May 2023, Go Global retained Ankura to identify potential investors with which to acquire Baby.  Ankura reached out to over 347 investors, at least seven parties signed NDAs and were given access to the Ankura Data Room, which contained the Go Global

---

[78]  Email from A. Dahiya dated Jun. 23, 2023 [DOM0011714].

[79]  Schachter Report, at 7.

95 Store Model.  As noted above, approximately two dozen parties ultimately signed NDAs with Go Global, if not more.

Schachter asserts that the Go Global 95 Store Model was prepared specifically for a "joint bid" between Go Global and Dream On Me.[80]  But, at best, that assertion is highly misleading.  Rather, Go Global and Ankura supplied its interested investors with that model.  That model was hardly prepared "just" for Dream On Me.  The Go Global 95 Store Model assumed that Go Global would raise ███████████████████ financing to purchase the Baby intellectual property, inventory, and the going concern operations of 95 Baby stores.  That ███████████ assumed that Go Global could raise ███████████ ████████ At no time did Go Global receive a firm commitment from any investor, or group of investors, ███████████████████  Go Global projected that equity investors would realize an annualized return of over 50% on their investment.  Under any standard, that is a hefty return on investment.  Nonetheless, Go Global did not secure the necessary financing.

As a general rule, investors are compensated for the risk that they are willing to bear.  The higher the risk, the higher the return investors seek from their investment.  Accordingly, investors likely saw what Go Global and Ankura were marketing as a highly risky investment, and the market was simply not interested in what Go Global was selling.  Go Global's failure to attract investors was a continuation of Bed Bath & Beyond's own months long failed attempts to attract equity investors for a "going concern" Baby sale.  Indeed, there never was an auction for such a sale.

Further, as noted above, Go Global prepared other iterations of projection models that Dream On Me did not see, including the Go Global 22 Store Model.  As discussed below, that model **only** required Go Global to secure approximately ██████████████ financing and reflected that equity investors would receive an approximate ██████████ ███████████████  Notwithstanding the marketing efforts, Go Global still was unable to secure investors to execute that plan.  Once again, the market had spoken and rejected Go Global's business plan.

---

[80] Schachter Report, at 13.

6.   **Schachter Assumes That the Go Global Model was Still Relevant as of the IP Auction**

Dream On Me was only provided with the Go Global 95 Store Model, which was a modification of the Debtors' 95 Store Model.  Dream On Me was not provided with any subsequently prepared Go Global models that contemplated a lesser number of stores.  As noted above, Dream On Me acquired the leases for 11 Baby stores, which occurred after the IP Auction.  Schachter implicitly suggests that Dream On Me could have converted the Go Global 95 Store Model to an 11 store model.  Neither Go Global nor Schachter provide any insight as to what trade secrets were embedded in the Go Global 95 Store Model, nor how Dream On Me could have deployed those "trade secrets" and converted that model into much smaller one for only 11 stores.

For example, the following is a comparison of the Go Global 95 Store Model and the Go Global 22 Store Model.[81]



---

[81] *See* DOM0000075 and GG-0000625.

Accordingly, even if Go Global's projection contained trade secrets, Schachter provided no evidence that Dream On Me (or anyone, for that matter) would know how to reduce the 95 store model to an 11 store model, while **preserving** the alleged "trade secrets". There was nothing in any Go Global model that gave any guidance as to what a "user" (such as the alleged user, Dream On Me) should change if fewer stores were purchased.

In short, Schachter assumes, without support, that the Go Global 95 Store Model was somehow meaningful to Dream On Me and its purchase and operation of only 11 stores.

### 7. Schachter Assumes That a Joint Bid Would Happen

Schachter assumes that (a) Go Global and Dream On Me would have made a joint bid to acquire Baby, and (b) that bid would have proceeded "as planned." Perhaps Schachter is simply unfamiliar with the underlying facts of this matter, but the record is clear that Dream On Me was only interested in potential partners that would invest their own capital, and that Dream On Me had no interest in ceding operating control to another party. In turn, Go Global was only interested in a role as the operating partner and had no interest in investing any of its own funds. Further, Go Global was only interested in purchasing a going concern, but Dream On Me was, as the facts establish, willing to buy only the Baby intellectual property without any guarantee of procuring a going concern operation.[82]

The Schachter Report fails to address how he, Go Global, or anyone else would have bridged these two diametrically opposed positions. Without any support, Schachter assumes that Dream On Me would (a) partner with Go Global without Go Global making any equity investment, (b) allow Go Global to be the operating partner, and (c) agree to compensate Go Global following a "two and twenty" fee structure.

Aside from assuming that Go Global and Dream On Me would have partnered to bid on Baby, Schachter further assumes that the two parties would have "carried out the Joint

---

[82] At the time of the IP purchase, there was no guarantee that Dream On Me would have been able to procure the 11 store leases.

Bid as planned."[83]  Needless to say, Schachter does not share **anything** about any such "plans".  Indeed, days after Dream On Me had access to the Go Global 95 Store Model and exactly one day after the second meeting between Dream On Me and Go Global, Go Global made an offer to purchase Baby without Dream On Me's participation.  That begs the question as to what joint "plans" Schachter refers to in his report.

In sum, Schachter does not say what the Go Global and Dream On Me plans were, but his damage findings are based on the assumption that those undefined and unsupported "plans" would somehow "proceed".

        **8.**    **Schachter Assumes That Go Global and Dream On Me Would Bid on the Intellectual Property Without the Guarantee of Leases**

Schachter assumes that Go Global would have agreed to a joint bid with Dream On Me for only the Baby IP without any guarantee that they, collectively, would have been able to subsequently secure the store leases.  As discussed above, the Debtors held two independent auctions for the Baby assets: first, the IP Auction and then, approximately three weeks later, the Lease Auction.  There was no guarantee that the winner of the IP Auction would also be the winner of the Lease Auction.  And, Go Global was only interested in acquiring a going concern, which would require winning both the IP Auction and the Lease Auction.

    **B.**    **The Schachter Model Assumptions**

        **1.**    **Schachter Model Assumes That Go Global Would Raise $36 Million of Equity Financing**



The Schachter Model assumes that Go Global would raise ███████ to acquire and operate Baby, consisting of ████████████████████████████ Nowhere in his report does Schachter explain how Go Global was going to raise ████████████ when it could not raise either ████████ to execute the Go Global 95 Store Model or the much lower ████████ to execute the Go Global 22 Store Model.  And, as discussed above, Go Global was unable to secure financing to support its independent bid to acquire the Baby intellectual property and the leases and inventory of 20 Baby stores for ███

---

[83] Schachter Report, at 20.

██████    Nonetheless, Schachter assumes that Go Global would raise ████████ to acquire and operate the Baby e-commerce business and 11 brick and mortar stores.

Before and after the Bed Bath & Beyond bankruptcy filing, Lazard, a well-respected and highly competent investment banker, was unable to generate interest in a going concern sale of Baby.  Subsequently, Go Global and/or Ankura canvased over 300 investors, and was unable to secure an investment to acquire Baby as a going concern. Nonetheless, the Schachter Model is premised on Go Global successfully raising ████ ██████.

### 2.    Schachter Model Assumes the Projected E-commerce Sales Provided by Go Global Are Reasonable and Achievable

The Schachter Model projects that e-commerce sales would amount to approximately $1.7 billion during 5-year period following the Baby acquisition, which Schachter concedes was provided by Go Global.[84]  However, other than relying on Go Global, he does not explain the rationale for those projected e-commerce sales.  Schachter does nothing to ascertain the reasonableness of the Go Global projected e-commerce sales, even though those sales account for the overwhelming majority of his calculated damages.  Further, the projected e-commerce sales that Go Global provided to Schachter are materially different from the amounts reflected in Go Global's contemporaneous projections.

### 3.    Schachter Model Assumes That Go Global Would Operate Baby Almost Twice More Profitable Than Projected

The Schachter Model assumes that Go Global would operate Baby in a manner that was almost ████ as profitable as projected in the Go Global 95 Store Model, which, as discussed above, allegedly incorporates Go Global's trade secrets.  ████████████



████    In sharp contrast, the Schachter Model projects that the Baby e-commerce

---

[84] Schachter Report, at Exhibit 3D.  *See* footnote 4 ("E-Commerce sales per information provided by Gargiulo.").

business and the operations of 11 stores would generate operating income equal to 12.0% of total net sales.

To the extent that there are any damages in this case, the damages would have to arise from Go Global and Dream On Me's "plans". At best, those "plans" would be embedded in the Go Global 95 Store Model. Schachter's analysis is based on Schachter's own independent plans, and not on any plans or financial model that Go Global provided to Dream On Me.

Again, Schachter does nothing to explain how Go Global was going to operate only 11 stores and the Baby e-commerce business twice as profitably as projected in the Go Global 95 Store Model. Given that Schachter touts Go Global as a successful retail operator, it is unclear why the Schachter Model reflects higher profitability than Go Global's own model.

### 4. Schachter Model Assumes That Go Global Would Attract Investors with a Mere Fraction of the Return That Go Global Projected

The Schachter Model performs a series of analyses to calculate the investment returns that an equity investor would realize if it invested in Schachter's hypothetical version of the Baby business. Ultimately, Schachter opines that equity investors would receive a 20.38% return on their $36 million investment.[85] As noted above, Go Global tried and failed to secure investors when it projected that equity investors would receive an annualized return greater than 50%. Schachter fails to explain why equity investors would somehow "buy in" to the Schachter Model when they factually did not "buy in" to the Go Global model.

In addition, after the IP Auction, Go Global painted a dim view of Baby. Indeed, Go Global stated:



---

[85] Schachter Report, at Exhibits 3B and 6B.



In sharp contrast, according to Schachter, a mere 5 years post-acquisition, the Baby intellectual property and the 11 brick and mortar stores would have been worth over ***$413 million***.[87]  If Schachter's theory is correct, then Go Global should not have met much resistance in its efforts to raise equity.  But, in fact, it did.  Schachter failed to reconcile his optimistic view of Baby's future valuation with Go Global's contrary opinion at the time.

### C.    The Schachter Model Does Not Incorporate Any Alleged Trade Secrets

Lastly, given that trade secrets are at the core of this dispute, the Schachter Model should have incorporated those alleged secrets, and there is no evidence that the Schachter Model did so.  As explained further below, the Schachter Model was based on Schachter's independent thought process, incorporating certain unsupported amounts that Go Global fed to Schachter, rather than any Go Global model prepared during the relevant period, and certainly was not based on the Go Global 95 Store Model.

Schachter asserts that the "Model shared with [Dream On Me] under the NDA contained Go Global's trade secrets".[88]  Notwithstanding that the "model" contained the alleged "trade secrets," the Schachter Model is wholly different from the Go Global 95 Store Model.  The Schachter Model was not based on any "trade secret" or any "secret sauce" provided by Go Global, rather, it is merely a model that Schachter prepared – post hoc – for this litigation.

---

[86] Go Global Case Study (undated), at 2 [GG-0024442, at GG-0024443].  Emphasis in original.

[87] Schachter Report, at Exhibit 3B.

[88] Schachter Report, at 14.

The Schachter Model projects that e-commerce sales over a five-year period would amount to approximately $1.7 billion, which accounts for 67% of total net sales. Schachter's projected e-commerce sales are not sourced from any Go Global model, as the Go Global 95 Store Model projected total e-commerce sales of approximately ███ ███ and the Go Global 22 Store Model projected total e-commerce sales of approximately ███████ Rather, Schachter notes that the critical e-commerce sales projected in his model were provided by Go Global.[89]

Go Global and Schachter may believe that $1.7 billion of projected e-commerce sales are reasonable, but Schachter provides nothing to link – in any way, whatsoever – those projected e-commerce sales to any Go Global model or, more importantly, to any Go Global trade secrets. In short, Schachter fails to explain (a) why $1.7 billion of projected e-commerce sales is reasonable, and, more importantly (b) how those sales bear any relation to any alleged "trade secret," or (c) why Dream On Me should be responsible for damages arising from those sales.

Similarly, Schachter bases the projected net sales for 11 brick and mortar stores on his own independent analysis of the historical operating results for those 11 stores.[90] Whatever it is that Go Global did to project net sales for the 95 stores contemplated in the Go Global 95 Store Model, which is frankly somewhat convoluted and confusing, it is not how Schachter projected net sales for the 11 stores in the Schachter Model. In short, Schachter fails to explain (a) how those sales bear any relation to any alleged "trade secret," (b) why he did not use Go Global's prior methodology, or (c) why Dream On Me should be responsible for damages arising from those sales.

The Schachter Model projects that the selling, general, and administrative expenses ("**SG&A**") would amount to 17% of total net sales, based on his own independent analysis.[91] However, the Go Global 95 Store Model projects that SG&A would amount to ███ of total net sales. Once again, Schachter fails to explain (a) how the projected SG&A

---

[89] Schachter Report, at Exhibit 3D.  *See* footnote 4 ("E-Commerce sales per information provided by Gargiulo.").

[90] Schachter Report, at Exhibit 3D.

[91] Schachter Report, at Exhibit 3D.

bears any relation to any alleged "trade secret," and (b) why the Go Global 95 Store Model was not materially flawed by using a significantly higher expense ratio.

The Schachter Model projects that the total operating income generated from e-commerce and 11 brick and mortar stores would amount to approximately $302 million over a five-year period. However, the Go Global 95 Store Model, which projects the results from operating e-commerce and 95 stores, reflects that Go Global would generate operating income of approximately ███████ over a five-year period. Schachter fails to reconcile how a drastic reduction in brick and mortar stores does not result in a similar reduction in profitability while incorporating the same "trade secrets".

In sum, the Schachter Report assumes that Dream On Me is responsible for the damages reflected in the Schachter Model, but there is no evidence that any alleged trade secrets are reflected or incorporated in that model. Indeed, Schachter has prepared an analysis completely independent of any alleged trade secret.

**D.    <u>Schachter's "Reasonable" Royalty Is Unreasonable</u>**

The Schachter Report asserts that "[i]f avoided development costs, lost profits and unjust enrichment cannot be readily calculated, the court may award a reasonable royalty for the Defendant's use of the trade secrets."[92] Schachter's "reasonable" royalty is based on a number of assumptions, including that (a) there was trade secret, (b) Dream On Me used the trade secret, (c) a willing buyer (*i.e.*, Dream On Me) would have paid a willing seller (*i.e.*, Go Global) over $100 million (on a pre-tax, undiscounted basis) for use of that alleged trade secret,[93] and (d) Schachter's projected total net sales incorporated that alleged trade secret.

First, as explained above, Schachter does ***nothing*** to identify any specific trade secret, and he provides no support for the notion that Dream On Me used any such trade secret.

Second, Schachter's core argument is that Dream On Me "reasonably" would have paid $15.5 million for the Baby intellectual property and an additional $100.6 million for

---

[92] Schachter Report, at 17.

[93] *See* Schachter Report, at Exhibit 5A.

use of the alleged trade secret (on a pre-tax, undiscounted basis),[94] which implies a total value of approximately $116.1 million (pre-tax, undiscounted). To the extent that that is logical (which, it is not), Schachter has not explained why Go Global, or any experienced retail operator, would not have outbid Dream On Me for that intellectual property. Given that the minimum overbid was only 2%, any experienced retail operator could have overbid Dream On Me by $310,000, and, according to Schachter, immediately reap approximately $37 million of value (on a post-tax, discounted basis).[95] None did. In fact, Go Global did not even attend the IP Auction. And, subsequent to the IP Auction, Go Global's own statements implied that the Baby intellectual property was worth no more than $15.5 million.[96]

Third, the Schachter Report is premised on Dream On Me's alleged use of Go Global's trade secrets. Schachter calculates the "reasonable" royalty as a percentage of his projected total net sales. But, as noted above, Schachter independently projected net sales, and those net sales are not seemingly derived from any unique trade secret. Indeed, Schachter created that projection on his own, along with some unsupported numbers provided by Go Global. Schachter fails to explain why Dream On Me should pay a royalty on sales that do not incorporate the alleged trade secret.

### E.    Go Global's Failure to Mitigate of Damages

As a general rule, injured parties are required to mitigate their damages. According to Schachter, the damages in this case range from approximately $1.5 million to $37.3 million. As discussed above, Go Global could have tried to mitigate their damages by making an incremental bid for the Baby intellectual property of $310,000. They failed to do so, not even attending the IP Auction. Given that Schachter failed to identify any Go Global attempts to mitigate damages, Schachter has likewise failed to explain why Go Global should be entitled to any damages in excess of $310,000.

---

[94] *See* Schachter Report, at Exhibit 5A.

[95] *See* Schachter Report, at Exhibit 5A.

[96] Go Global Case Study (undated), at 2 [GG-0024442, at GG-0024443]. "The bid of $15.5 million from another party for just the IP set the valuations on the higher end our estimate while the inventory levels and product stock could not be accurately provided by the seller."

### F.    Schachter's Inflated Development Costs

In addition to calculating lost profits and a "reasonable" royalty amount, Schachter also calculates the alleged costs that Dream On Me incurred to develop the trade secret. Schachter calculates "avoided development costs" of approximately $1.5 million. However, Schachter's analysis is flawed.

First, Go Global has previously calculated its development costs and other items, which amounted to ███████ Schachter failed to reconcile Go Global's calculated amount to his calculated amount, which is nearly double.

Second, Schachter's calculation includes *all* of Go Global's efforts in connection with evaluating and potentially acquiring Baby's going concern operations.  All of those costs were not incurred solely to generate the alleged trade secrets.  Rather, at best, only a portion of those costs relate to the development of the alleged trade secret.  If and when Schachter updates his calculation to identify only those costs specifically incurred to develop of the alleged trade secret, then I will further opine on the reasonableness of those costs.

Third, to calculate the development costs arising from Go Global employees, Schachter uses an hourly rate "estimated based on the consulting rates of Ankura for individuals in the similar position", multiplied by the "estimated hours worked on the project."[97]   Schachter provides no basis as to why the  Ankura rate – that was largely incurred to market an investment in Baby – should be the guiding metric for Go Global's staff to develop the alleged trade secret.

## VII.    CONCLUSION

Based upon the above, I conclude that the Schachter Report is structured on a litany of assumptions that are entirely unsupported and/or unsupportable and, as a result, is deeply flawed and unreliable.  And, with regard to the alleged trade secrets, Schachter does nothing to demonstrate that he relied on and/or incorporated any such secrets to calculate damages.  Moreover, Schachter's damage calculation bears little, if any, resemblance to Go Global's own projection models.  Further, Schachter fails to explain

---

[97] Schachter Report, at Exhibit 2.

(a) how his calculated "reasonable" royalty is reasonable at all, (b) what, if any, efforts Go Global undertook to mitigate its damages, or (c) why his calculation of development costs is almost twice the amount calculated by Go Global.

I reserve the right to amend this report if and when additional information is provided to me.

December 9, 2024

_____    _____
Adam J. Hanover                      Date

**Exhibit A**





# Adam J. Hanover, CPA, J.D., CIRA, CFF
## Managing Director
## Restructuring & Dispute Resolution Services

14 Sylvan Way
Parsippany, New Jersey 07054
732-635-3110
Adam.Hanover@CohnReznick.com
www.cohnreznick.com

Adam J. Hanover, CPA, JD, CIRA, CFF, is a managing director with CohnReznick's Restructuring and Dispute Resolution Services Practice, where he provides financial advisory and litigation support services in the areas of investigative and forensic accounting, accounting malpractice, damage analyses, business valuations, bankruptcy related matters, and mergers and acquisitions. Adam also provides clients with assistance in resolving contractual disputes relating to working capital adjustments.

Adam has been involved in numerous complex forensic accounting and financial investigatory matters and has represented various official committees, secured and unsecured creditors, and asbestos property damage creditors in bankruptcy proceedings and turnaround situations.

Adam has represented court-appointed Trustees and Examiners and has been involved in a number of high profile cases, including WorldCom, Federal Mogul, and TOUSA. He has prepared expert reports in numerous cases involving lost profits and other measurements of damages and is experienced in reconstructing accounting records.

Adam has also worked for several years as a management consultant and as an internal auditor in various companies throughout the United States, Europe, Asia, Africa, and South America.

### Functional Expertise
- Damages Analyses
- Forensic Accounting and Dispute Resolution Services
- Restructuring and Insolvency

### Education
- The George Washington University: Bachelor of Science, Accounting
- Brooklyn Law School, Juris Doctor

### Professional Affiliations
- American Institute of Certified Public Accountants
- New Jersey Society of Certified Public Accountants
- Association of Insolvency and Restructuring Advisors



Adam J. Hanover, CPA, JD, CIRA, CFF

## List of Testimony, Affidavits and Expert Reports

*Credibility Capital Inc. v. Nu Direction Lending, LLC, et al.*
Report regarding forensic accounting and arbitration testimony (2023)

*In re: Helen Cecchia (Deceased)*
Report regarding forensic accounting and trial testimony (2022)

*United States Small Business Administration as Receiver of Elk Associates Funding Corp. v. Michael Feinsod, et al.*
Report regarding solvency and deposition testimony (2022)

*North Shore, et al. v. Ciampa 24 LLC et al.*
Damage Expert Report (2019) Arbitration testimony (2023)

*Mafcote Inc. v. Navigators Insurance Co., et al.*
Rebuttal damage report and deposition testimony (2019)

*Direct Access Partners, LLC v. Rothstein, Kass & Company, PC*
Rebuttal damage report and deposition testimony (2018)

*In Re: Fansteel, Inc.*
Trial testimony regarding company viability (2018)

*Frank Investments, et al. v. Ranson Gateway, LLC, et al.*
Rebuttal damage report (2017)

*BC Liquidating, LLC v. Lloyd J. Weinstein, et al.*
Report regarding solvency and trial testimony (2016); Damage report (2016)

*RAD Electronics, Inc. v. OSI Cable Acquisition Corp. et al.*
Rebuttal damage report and deposition testimony (2015)

*Cannonball Fund, Ltd. et al. v. Dutchess Capital Management, LLC*
Deposition testimony (2015)

*Andejo Corporation, et al. v. South Street Seaport Limited Partnership, et. al.*
Rebuttal damage report, deposition testimony, and trial testimony (2014)

*Zvi Guttman v. Steven G. Hutchinson, et al.*
Report regarding solvency (2010)

*In re: aaiPharma, Inc.*
Testimony regarding claims objections (2007)

*United States Mineral Products Company v. Anderson Kill & Olick*
Rebuttal damage report and deposition testimony (2006)

## Presentations and Articles

*Selected Bankruptcy Issues Arising in Bank Holding Company Cases*
AIRA Journal, Volume 27, Number 3 - 2013 with Matthew W. Levin

*Complacency NOT an OPTION*
Financial Executive, April 2013 with Kevin Clancy and Andrew Masini

**Confidential**

**Exhibit B**

This report is based upon analyses of the list of documents set forth below, which includes all relevant documents that I, and persons working under my supervision, have reviewed:

- Report of Alan Schachter dated November 15, 2024;
- DOM000001 - DOM0022678;
- BBBY001 - BBBY435;
- GG-0000001 - GG-0050345;
- ANK-0000001 - ANK-0049569;
- Lazard_GoGlobal_0000001 - Lazard_GoGlobal_0042922;
- The depositions, and exhibits referenced therein, of:
    - September 30, 2024, Deposition Transcript of Jeffrey Streader;
    - October 1, 2024, Deposition Transcript of Mark Srour;
    - October 2, 2024, Deposition Transcript of Avish Dahiya;
    - October 7, 2024, Deposition Transcript of Christian Feuer;
    - October 10, 2024, Deposition Transcript of Kathleen Lauster;
    - October 16, 2024, Deposition Transcript of Yeun Chau;
    - October 18, 2024, Deposition Transcript of Deborah Gargiulo;
    - October 17, 2024, Deposition Transcript of Milan Gandhi;
    - October 24, 2024, Deposition Transcript of Amit Malhotra;
- Demand letter dated July 18, 2023;
- The pleadings in this matter, including, but not limited to:
    - Amended Complaint filed December 22, 2023;
- The pleadings in the Bed Bath & Beyond bankruptcy matter, including, but not limited to:
    - *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 10 (April 23, 2023);
    - *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 92 (April 25, 2023);
    - *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 422 (May 22, 2023);
    - *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 1208 (July 6, 2023);
    - *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 1428 (July 20, 2023);
    - *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 1707 (August 1, 2023);
    - *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 1708 (August 1, 2023);
    - *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 1804 (August 4, 2023);

**Confidential**

- o *In re: Bed Bath & Beyond Inc, et al.*, Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered), ECF No. 1835 (August 4, 2023);
- Certain publicly available information, including:
  - o Bed Bath & Beyond Inc., SEC Form 8-K filed March 28, 2007;
  - o Bed Bath & Beyond Inc., SEC Form 10-K filed April 21, 2022;
  - o https://www.goglobalretail.com/strategy;
  - o https://www.dreamonme.com/aboutus; and
  - o https://www.retaildive.com/news/buybuy-baby-closing-all-stores-online-only/730280.