UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GO GLOBAL RETAIL LLC,<br><br>       Plaintiff,<br><br>   -against-<br><br>DREAM ON ME, INC. and DREAM ON ME INDUSTRIES, INC.,<br><br>       Defendants. | 23-cv-7987 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

 Go Global Retail has sued defendants Dream On Me Industries and Dream On Me, Inc. (collectively DOM) for misappropriation of trade secrets, breach of contract, and unjust enrichment. Dkt. 29 ¶¶ 119–79. Both sides have moved for summary judgment. For the following reasons, Go Global's motion is GRANTED in part and DENIED in part, and DOM's motion is GRANTED in part and DENIED in part.

## BACKGROUND

 Go Global is a "private equity and brand investment firm" that often buys up "distressed retail assets." Dkt. 77-1 ¶ 1. It uses its in-house research and industry know-how to try to spot profitable opportunities. When it learned that Bed Bath & Beyond planned to auction off assets of its subsidiary, buybuy BABY (BBBY), Go Global started to structure a bid. *Id.* ¶¶ 22–23. During that process, Go Global—together with DOM and at least thirty potential investors—were granted access to a data room that contained hundreds of documents with BBBY's financial information, so that they could conduct due diligence. *Id.* ¶¶ 25–29; Dkt. 68-1 ¶ 9. Using that data, Go Global developed three alleged trade secrets: its Financial Model, its Bidding Strategy, and its Technology Plan. Dkt. 65 at 7–8; Dkt. 77-1 ¶¶ 32, 47, 49. The Financial Model—developed by Managing Director Christian Feuer—included sales projections, plus Go Global's comments on BBBY's data. Dkt. 77-1 ¶¶ 33, 36. The Bidding Strategy, which was contained in the Financial Model, included the amount of money Go Global planned to bid, as well as the amount of capital it believed necessary to operate the resulting business.[1] *Id.* ¶ 47. And the Technology Plan concerned how to implement Go Global's proprietary technology playbook and cost-cutting measures into BBBY's technology platform. *Id.* ¶ 49.

 But the alleged trade secrets alone weren't enough to win a bid: Go Global needed financing. *Id.* ¶ 63; Dkt. 68-1 ¶¶ 34–35. It eventually turned to DOM. Dkt. 77-1 ¶¶ 61–62. After the parties

---

[1] Because the Bidding Strategy was embedded within the Financial Model, the Court will refer to both as the Financial Model.

talked about bidding on BBBY's assets jointly, Go Global sent DOM a nondisclosure agreement (NDA), and DOM's Chief Marketing Officer, Avish Dahiya, signed it. *Id.* ¶¶ 13, 72; Dkt. 68-1 ¶¶ 17–21. The NDA precluded DOM from disclosing Go Global's proprietary information— including any trade secrets—"by any means, or for any purpose." Dkt. 61-16 ¶ 3; *accord* Dkt. 61-16 ¶ 9; Dkt. 77-1 ¶¶ 73–74. It also prohibited DOM from bidding on BBBY's assets without the participation of Go Global. Dkt. 61-16 ¶ 12 (Non-Circumvention Obligation); Dkt. 77-1 ¶ 76.

Like Go Global, DOM already had access to BBBY's historical financial data. Dkt. 77-1 ¶ 93. But it didn't have access to Go Global's Financial Model. *Id.* ¶ 95. So after DOM signed the NDA, it downloaded the contents of Go Global's data room, which included the Financial Model. *Id.* ¶ 98. Then, over a few days, representatives from Go Global and DOM met to discuss investing in BBBY. *Id.* ¶¶ 101–02. In one meeting, DOM's technology specialist Amit Malhotra spoke with Thoryn Stephens, his counterpart at Go Global. *Id.* ¶ 134. And in between those discussions, DOM's Chief Executive Officer, Mark Srour—without Go Global's knowledge—sent the Financial Model to various potential investors, three of whom invested with DOM. *Id.* ¶¶ 119–29. Ultimately, Go Global and DOM failed to reach an agreement. *Id.* ¶ 118. But at the bankruptcy auction, DOM bid on and won BBBY's intellectual property independently, and it later purchased the leases for 11 BBBY stores. *Id.* ¶¶ 158–61; Dkt. 68-1 ¶ 47. Go Global then sued.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

**I. Go Global's trade secret claims will proceed to trial.**

Because there are genuine and material factual disputes about whether Go Global provided trade secrets to DOM and whether DOM improperly used them, Go Global's trade secret claims will proceed to trial.[2]

---

[2] Go Global seeks exemplary damages and attorney's fees on its trade secret claims. *See* 8 U.S.C. § 1836(b)(3)(C)–(D). On its summary-judgment motion, DOM doesn't make any argument specific as to these forms of relief, so they will proceed to trial as well.

2

### A. Go Global's claims based on the Financial Model survive summary judgment.

Go Global claims that DOM acknowledged and exploited the Financial Model's value to accelerate its due diligence and raise investment capital. DOM responds that the Financial Model fails to qualify as a trade secret because it wasn't valuable, and because others could have independently developed it by using proper means. There are genuine and material disputes on both fronts.

Go Global has brought both federal and state trade secret claims. "The elements for stating a claim for misappropriation of trade secrets under New York law 'are fundamentally the same'" as a federal Defense of Trade Secrets Act claim. *W. Energy Opportunities II, LLC v. Finalis Secs., LLC*, 2025 WL 935201, at *8 (S.D.N.Y. Mar. 26, 2025) (quoting *Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020)). Under New York law, "[a] plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (internal quotation marks omitted). For information to constitute a "trade secret" under the DTSA, it must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *FXRobott LLC v. Noetiq Rsch. Inc.*, 2025 WL 1874888, at *11 (S.D.N.Y. July 8, 2025) (quoting 18 U.S.C. § 1839(3)(A)–(B)). "The existence of a trade secret is generally a question of fact." *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020). The alleged trade secrets in this case are no exception to that general rule.

Go Global points to various forms of evidence to show that DOM was motivated to misappropriate its Financial Model, recognized its value, and used it. As to motive, Go Global highlights two of Dahiya's messages. In one, Dahiya admits DOM's "inability to do certain due diligence internally" and notes that "[e]very other bidder has done more extensive work." Dkt. 66-33 at 1; *see* Dkt. 78-1 ¶ 92. In another, he acknowledges, "Without go global our chances reduce as we are 4 weeks behind." Dkt. 65-24 at 5; *see* Dkt. 77-1 ¶ 144.

Next, to establish the Financial Model's value and the difficulty of replicating it, Go Global underscores testimony given by its employee, Feuer, who said that he used his knowledge and experience, coupled with due diligence of BBBY's data, to create the model. Dkt. 66-4 (Feuer Dep.) at 122:10–123:3; *see id.* at 104:19–25 ("What you have here is an outline by a group of people who have spent a lot of time in analyzing, distilling what was analyzed into a plan of how to turn a business around that was usually underperforming."); *see also* Dkt. 68 at 16–17.

Finally, Go Global focuses on Srour's statements that show DOM both valued and used the Financial Model. It points to how Srour told a prospective investor that the potential BBBY acquisition "was a good deal" and, to substantiate that statement, showed the investor the Financial Model, which the investor "liked" (and then invested $2 million towards DOM's successful solo bid). Dkt. 65-7 (Srour Dep.) at 71:14–25, 206:6–9; *see* Dkt. 77-1 ¶¶ 122, 124–29. Go Global also

3

highlights a statement that Srour made to Go Global during negotiations: "If it cost you a million dollars to do the legwork that you did right now, I'd be happy to pay for half of that, of course [I'll] pay it." Dkt. 66-23 (June 15, 2023 Tr.) at 133:13–16. And it identifies an internal DOM email titled "BBB Go Forward Plan we can use," which details how DOM's plan was "about 90% of the plan Go Global was going forward with." Dkt. 66-28.

DOM disagrees. To start, it says the Financial Model is just the BBBY model that DOM and other potential bidders already possessed, but with a few annotations and slight modifications that they could have readily developed on their own. *See* Dkt. 61-2 at 21; Dkt 71 at 21–22; Dkt. 71-1 ¶ 36; Dkt. 71-3 (Dahiya Dep.) at 86:24–87:3; Dkt. 78 at 12 (comparing BBBY projections with Go Global's projections). DOM also asserts that it never used the Financial Model, which was based on a 95-store deal, because it purchased the leases of 11 stores only and used different financial analyses to develop a unique smaller store model. Dkt. 61-2 at 24; Dkt. 61-34, -38. And DOM points out that Go Global unsuccessfully shopped the Financial Model to hundreds of investors, but none of them took the bait, which might suggest that it didn't have much, if any, value.

Putting all that together, a jury could go either way. On the one hand, a jury could find that the Financial Model lacked value. *See Sarkissian Mason, Inc. v. Enter. Holdings, Inc.*, 955 F. Supp. 2d 247, 257 (S.D.N.Y. 2013) ("[Plaintiffs] expended considerable effort in pitching and creating their proposal, which suggests it had value. However, no manufacturer agreed to [use it], despite efforts to get [a company] to do so. No matter the hypothetical revenue a . . . program might generate, an idea has commercial value only if there is a market for it and a willingness of its target audience to implement it.") *aff'd*, 572 F. App'x 19 (2d Cir. 2014); *see also FXRobott LLC*, 2025 WL 1874888, at *12 (rejecting claim because plaintiffs did "not demonstrate that the [alleged trade secret] had any value"); Dkt. 71 at 20 ("[T]he market weighed the value of Go Global's 95-store model and rejected it."). Relatedly, a jury could determine that DOM's investors committed funds without relying on the Financial Model. And it could find that the Financial Model was easily replicable because Go Global included only minor changes to the BBBY model. *See Sarkissian*, 955 F. Supp. 2d at 257–58 (rejecting trade secret claim because "the components of the system are widely known, and the concept as a whole . . . is readily ascertainable").

On the other hand, a jury could conclude the opposite: that based on DOM's internal emails and Srour's comments, DOM used the Financial Model to catch up on due diligence and persuade investors who then provided financial backing to DOM's successful solo bid. *See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 806 (2d Cir. 2023) (determining that because "[plaintiff] did not authorize [defendant] to use [plaintiff's] trade secrets to compete with [plaintiff] . . . [defendant] misappropriated [plaintiff's] intellectual property in violation of the DTSA and New York law").[3] And it could conclude, based on Feuer's testimony,

---

[3] The Court adopts a definition of "use" under which "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use,'" including "relying on

4

that Go Global developed an edge—through substantial time and effort—that other competitors couldn't readily match. *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 219 (S.D.N.Y. 2013) (denying summary judgment where "the information, while in some ways publicly available . . . , is not necessarily easily duplicable or attainable in the form that [the plaintiff] maintains it").

For these reasons, neither side is entitled to summary judgment, and a jury will decide whether Go Global has met its burden on this aspect of its trade secret claims.

### B. The claims based on the Technology Plan also survive.

As to the Technology Plan, DOM says it only ever received a high-level summary that wasn't specific enough to qualify as a trade secret. To support that, it cites Malhotra's account of his meeting with Stephens, Dkt. 66-10 at 61:21–69:23, and an internal Go Global email in which the company's CEO instructs Stephens, "Remember – [DOM] do[es] not have the secret sauce and we will not give it to them. This is a high level overview of our blueprint . . . We are not giving the plans away . . . Keep it high level but informative." Dkt. 61-46 at 2. Go Global counters by pointing to internal DOM emails indicating that DOM reviewed Go Global's Technology Plan. Dkt. 66-30 at 8 (DOM's Technology Roadmap plan, stating: "Review goglobal['s] tech and product plan and understand how they think they can pull this off by reviewing their tech stack, partners and risk on DOM if this approach is followed.").

What transpired in the conversation between Malhotra and Stephens is a quintessential question of disputed fact. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotations omitted).

For these reasons, summary judgment is unwarranted on the trade secret claims.

### II. The Court grants summary judgment to Go Global on the liability portion of its contract claim, and denies DOM's motion to exclude the testimony of Go Global's damages expert.

DOM doesn't dispute that it violated the NDA's terms. But it argues that there was no consideration for the contract, and that Go Global has failed to tie DOM's violation to any damages. "To prevail on a breach of contract claim under New York law, a plaintiff must show (1) the existence of an agreement, (2) due performance on the agreement by the plaintiff, (3) breach of the agreement by the defendant, and (4) damages suffered by the plaintiff as a result of the breach." *Tradex Eur. SPRL v. Conair Corp.*, 2008 WL 1990464, at *2 (S.D.N.Y. 2008).

---

the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret." Restatement (Third) of Unfair Competition § 40 cmt. c (Am. L. Inst. 1995); *see Next Commc'ns, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *4 (S.D.N.Y. 2016) (adopting Restatement definition of "use"); *see also* Restatement (First) of Torts § 757, cmt. c (Am. L. Inst. 1939) ("One who has a trade secret may be harmed . . . by the use of his secret in competition with him . . . .").

DOM first argues that there is no enforceable agreement because there was no valid consideration. Dkt. 61-2 at 22; *see Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 500 (S.D.N.Y. 2022). But the parties agree that Go Global's Financial Model was *not* in the Lazard Data Room that DOM already had access to. Dkt. 77-1 ¶ 95. Plus, DOM admits that Go Global's Financial Model was different from BBBY's model. *Id.* ¶ 36; *see also* Dkt. 66-4 (Feuer Dep.) at 84:25–85:2. Given that Go Global provided DOM with a different analysis of BBBY's financial data in exchange for non-disclosure and non-circumvention commitments, the contract was supported by consideration. *See Alessi Equip., Inc.*, 578 F. Supp. 3d at 500 ("Consideration exists if something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him." (internal quotation omitted)); *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 709 (2d Cir. 2004) ("So long as a contract provides some consideration, it may be minimal—even a peppercorn. Courts do not inquire into the value or adequacy of the consideration." (internal citation omitted)). And although DOM relies on "submission of idea" cases to argue that the contract lacked consideration because the "idea" disclosed wasn't novel to DOM, *see* Dkt. 61-2 at 20–22, those cases don't apply here, because Go Global provided DOM with concrete financial projections, not just an idea. *Cf. Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 378 (2d Cir. 2000).

Because DOM doesn't otherwise dispute whether Go Global has satisfied the first three elements of its contract claim, there is no genuine dispute as to liability.[4] Accordingly, summary judgment is granted to Go Global on the liability portion of its contract claim.

There is, however, a genuine dispute of fact on the amount of damages. DOM argues that its alleged breach did not cause Go Global damages. Dkt. 71 at 24–30. It claims that Go Global failed to participate in any auction of BBBY's assets because Go Global couldn't secure the necessary financing. Dkt. 61-2 at 19. And DOM further asserts that even if it (DOM) hadn't bid during the auction of BBBY's intellectual property, the second highest bidder (Ziff Davis) would have won the auction with its $15 million bid instead. *Id.*; *see also Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("[A] plaintiff must prove that a defendant's breach *directly and proximately* caused his or her damages." (emphasis in original)). Simply put, the argument is that "Go Global would be in literally the exact same position that it is today if DOM had not won the IP auction." Dkt. 61-2 at 19.

That argument misconstrues Go Global's two damages theories. The first of those is an avoided development cost (ADC) damages theory, which isn't about the price of the winning auction, but is instead about the value of the analysis that Go Global provided DOM. *See* Dkt. 42 at 4; *see also* Dkt. 68 at 14. Under that theory, a reasonable jury could determine that Go Global provided DOM with trade secrets, and it could conclude that DOM enjoyed a substantial benefit—without

---

[4] Although DOM asserts in its statement of facts that Dahiya, DOM's Chief Marketing Officer, didn't have the authority to sign the NDA on DOM's behalf, *see* Dkt. 61-1 ¶ 23, it doesn't argue that the NDA is unenforceable for this reason.

6

compensating Go Global—by using those trade secrets to accelerate its due diligence and to persuade investors. *See Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*, 980 F.3d 1117, 1131–32 (7th Cir. 2020) (upholding award of damages for avoided development costs because "a jury could determine that a reasonable valuation of this benefit," i.e., "using [plaintiff's] confidential information to thoroughly evaluate what it would take to compete in a new market," is "the cost [defendant] avoided by not having to develop this information by itself").

Go Global's other damages theory is a lost profits theory, which assumes that the parties would have bid *jointly*, and that the purchase of BBBY would have been profitable. That is, Go Global argues that DOM would have had to cut Go Global into the deal if it didn't have the option of simply stealing its work instead.

DOM says there's no factual basis for Go Global to assume a joint bid. Dkt. 71 at 29. That objection dovetails with its challenge to Alan Schacter's expert opinions: DOM asserts that because Schacter's damages model relies on terms of a planned joint bid that are "entirely speculative," it flunks the *Daubert* test. *See* Dkt. 61-2 at 15; *Daubert v. Dow Pharm.*, 509 U.S. 579 (1993); *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 (2d Cir. 2021) (applying *Daubert* and holding that expert testimony must be "grounded on sufficient facts and data"). But the factual basis is the NDA itself: If DOM had complied with the Non-Circumvention Obligation, then DOM would have had to bid for BBBY with Go Global. Given that DOM won the bid on its own, it isn't "entirely speculative" that Go Global would have won a bid as DOM's partner. And any argument that DOM would have chosen not to bid at all rather than bid with Go Global is foreclosed by DOM's admission that it was "always going to submit a bid for the [BBBY] assets, with or without Go Global." Dkt. 78-1 at ¶ 75.

Next, DOM challenges Go Global's lost profits theory on the grounds that Schacter's calculation "ignores the actual financial performance of BBBY since it was acquired by DOM which shows net losses of approximately $17.4 million." Dkt. 61-2 at 28. But to the extent DOM argues that Schachter relies on "unrealistic assurances provided by Go Global" in preparing his model, that boils down to whether Go Global is correct that it would have turned BBBY profitable had it bought the company with DOM—a question that is firmly within the province of the jury. *See Proctor*, 846 F.3d at 608; *see also* Dkt. 77-1 ¶ 45.

* * *

Accordingly, Go Global is granted summary judgment as to the liability portion of its contract claim. That claim will proceed to trial so that a jury can determine the amount of damages. And Schacter is permitted to testify at trial about the opinions in his report.

### III. The Court grants summary judgment to DOM on Go Global's unjust enrichment claim and request for a constructive trust.

Finally, DOM argues that any unjust enrichment claim is precluded because, "to the extent that Go Global's breach of contract claims succeed, the unjust enrichment claim is duplicative." Dkt. 61-2 at 26. Go Global responds that it could still recover on an unjust enrichment theory if the

Court or jury determines that no valid contract was formed. Dkt. 68 at 27. But since the Court has determined that Go Global is entitled to summary judgment on the liability portion of its contract claim, the unjust enrichment claim is duplicative. *See Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012). And because Go Global's request for a constructive trust relies on its unjust enrichment claim, the former fails too. *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 213–14 (2d Cir. 2004) ("[W]e conclude that this principle—that the existence of a written agreement precludes a finding of unjust enrichment—also applies to constructive trust claims.").

## CONCLUSION

For the reasons above, Go Global's motion is GRANTED in part and DENIED in part, and DOM's motion is GRANTED in part and DENIED in part.

The Clerk of Court is directed to terminate Dkts. 61, 65, and 66.

SO ORDERED.

Dated: September 26, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge